UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 17-60926-CIV-WPD

ROGER ANDREU,                    .
                                 .
            Plaintiff,           . Fort Lauderdale, Florida
                                 . April 16, 2018
            v.                   . 2:46 p.m.
                                 .
WASTE PRO OF FLORIDA, ET AL.,.
                                 .
            Defendants.          .
. . . . . . . . . . . . . . . .

        -   -   -   -   -

    Transcript of Excerpt of Trial Proceedings had

    before the Honorable William K. Dimitrouleas,

      United States District Judge, and a Jury.

            -   -   -   -   -

                VOLUME 1

            -   -   -   -   -

Proceedings recorded by mechanical stenography, transcript
produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

```
APPEARANCES:

For the Plaintiff:      Paul D. Edwards, Esq.
                        Marc E. Rosenthal, Esq.
                        Rosenberg, Cummings & Edwards, PLLC
                        801 NE 20th Avenue
                        Fort Lauderdale, Florida  33304


For the Defendant:      Amy S. Tingley, Esq.
                        Joseph S. Hudson, Esq.
                        Stovash, Case & Tingley, P.A.
                        220 North Rosalind Avenue
                        The VUE at Lake Eola
                        Orlando, Florida  32801


Court Reporter:         Francine C. Salopek, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        299 E. Broward Blvd., Room 205F
                        Fort Lauderdale, Florida 33301
                        (954)769-5657/mjsfcs@aol.com

                        -  -  -  -  -
```

1    <u>**MONDAY, APRIL 16, 2018, 2:46 P.M.**</u>

2    *******

3         **THE COURT:**  All right.  Members of the jury, now that

4    you've been sworn, I need to explain some basic principles

5    about a civil trial and your duty as jurors.  These are

6    preliminary instructions.  I'll give you more detailed

7    instructions at the end of the trial.

8         It's your duty to listen to the evidence, decide what

9    happened, and apply the law to the facts.

10        It's my job to provide you with the law that you must

11   apply, and you must follow the law even if you disagree with

12   it.

13        You must decide the case only on the evidence

14   presented in the courtroom.  Evidence comes in many forms.  It

15   can be testimony about what someone saw, heard, or smelled.  It

16   can be an exhibit or a photograph.  It can be someone's

17   opinion.

18        Some evidence may prove a fact indirectly.  Let's say

19   a witness saw wet grass outside and people walking into the

20   courthouse carrying wet umbrellas.  This may be indirect

21   evidence that it rained, even though the witness didn't

22   personally see it rain.

23        Indirect evidence like this is also called

24   circumstantial evidence.  Simply a chain of circumstances that

25   likely proves a fact.

1          As far as the law is concerned, it makes no difference

2    whether evidence is direct or indirect.  You may choose to

3    believe or disbelieve either kind.  Your job is to give each

4    piece of evidence whatever weight you think it deserves.

5          During the trial, you'll hear certain things that are

6    not evidence, and you must not consider them.

7          First, the lawyers' statements and arguments aren't

8    evidence.  In their opening statements and closing arguments,

9    the lawyers will discuss the case.  Their remarks may help you

10   follow each side's arguments and presentation of evidence, but

11   the remarks themselves aren't evidence and shouldn't play a

12   role in your deliberations.

13         Second, the lawyers' questions and objections aren't

14   evidence.  Only the witnesses's answers are evidence.  Don't

15   decide that something is true just because a lawyer's question

16   suggests that it is.

17         For example, a lawyer may ask a witness:  You saw

18   Mr. Jones hit his sister, didn't you?  That question is not

19   evidence of what the witness saw or what Mr. Jones did, unless

20   the witness agrees with it.

21         There are rules of evidence that control what the

22   Court can receive into evidence.  When a lawyer asks a question

23   or presents an exhibit, the opposing lawyer may object if he or

24   she thinks the rules of evidence don't permit it.  If I

25   overrule the objection, then the witness may answer the

1    question or the Court may receive the exhibit.  If I sustain

2    the objection, then the witness cannot answer the question, and

3    the Court cannot receive the exhibit.

4         When I sustain an objection to a question, you must

5    ignore the question and not guess what the answer might have

6    been.

7         Sometimes I may disallow evidence -- this is also

8    called "striking evidence" -- and order you to disregard or

9    ignore it.  That means that you must not consider that evidence

10   when you are deciding the case.

11        I may allow some evidence for only a limited purpose.

12   When I instruct you that I've admitted an item of evidence for

13   a limited purpose, you must consider it only for that purpose

14   and no other.

15        To reach a verdict, you may have to decide which

16   testimony to believe and which testimony not to believe.  You

17   may believe everything a witness says, part of it, or none of

18   it.

19        When considering a witness's testimony, you may take

20   into account the witness's opportunity and ability to see,

21   hear, or know the things the witness is testifying about; the

22   witness's memory; the witness's manner while testifying; any

23   interest the witness has in the outcome of the case; any bias

24   or prejudice the witness may have; any other evidence that

25   contradicts the witness's testimony; and the reasonableness of

1  the witness's testimony in light of all the evidence; and any

2  other factor affecting believability.

3          At the end of the trial, I'll give you additional

4  guidelines for determining a witness's credibility.

5          This is a civil case.  To help you follow the

6  evidence, I'll summarize the parties' positions.

7          The plaintiff, Roger Andreu, claims the defendants,

8  Defendant Waste Pro of Florida, Inc., and Russell Mackie,

9  failed to pay him overtime pay required by the federal Fair

10  Labor Standards Act, also known as the FLSA.

11          The defendants, Waste Pro of Florida, Inc., and

12  Russell Mackie, dispute the plaintiff's claims and contend that

13  plaintiff was properly paid all the overtime owed to him under

14  the FLSA.

15          Plaintiff has the burden of proving his case by what

16  the law calls a preponderance of the evidence.  That means the

17  plaintiff must prove that in light of all the evidence, what he

18  claims is more likely true than not.

19          So, if you could put the evidence favoring plaintiff

20  and the evidence favoring defendants on opposite sides of

21  balancing scales, the plaintiff needs to tip the scales to his

22  side.  If plaintiff fails to meet this burden, you must find in

23  favor of defendants.

24          To decide whether any fact has been proved by a

25  preponderance of the evidence, you may, unless I instruct you

1    otherwise, consider the testimony of all the witnesses,

2    regardless of who called them, and all exhibits the Court

3    allowed, regardless of who produced them.

4           After considering all the evidence, if you decide a

5    claim or fact is more likely true than not, then the claim or

6    fact has been proved by a preponderance of the evidence.

7           While serving on the jury, you may not talk with

8    anyone about anything related to the case.  You may tell people

9    that you're a juror and give them information about when you

10   must be in court, but you must not discuss anything about the

11   case itself with anyone.

12          You shouldn't even talk about the case with each other

13   until you begin your deliberations.  You want to make sure

14   you've heard everything -- all the evidence, the lawyers'

15   closing arguments, and my instructions on the law -- before you

16   begin deliberating.

17          You should keep an open mind until the end of the

18   trial.  Premature discussions may lead to a premature decision.

19          In this age of technology, I want to emphasize that in

20   addition to not talking face-to-face with anyone about the

21   case, you must not communicate with anyone about the case by

22   any other means.  This includes emails, text messages, the

23   Internet, including social networking websites, such as

24   Facebook, MySpace, and Twitter.

25          You also shouldn't Google or search online or offline

1     for any information about the case, the parties, or the law.

2            Don't read or listen to the news about this case.

3     Don't visit any places related to the case or research any

4     fact, issue, or law related to the case.

5            The law forbids the jurors to talk with anyone else

6     about the case, and forbids anyone else to talk to the jurors

7     about it.  It's very important that you understand why these

8     rules exist and why they're so important.

9            You must base your decision only on the testimony and

10    other evidence presented in the courtroom.  It is not fair to

11    the parties if you base your decision in any way on information

12    you acquire outside the courtroom.

13           For example, the law often uses words and phrases in

14    special ways.  So, it's important that any definitions you hear

15    come only from me and not from any other source.

16           Only you jurors can decide a verdict in this case.

17    The law sees only you as fair, and only you have promised to be

18    fair; no one else is so qualified.

19           If you wish, you may take notes to help you remember

20    what the witnesses said.  If you do takes notes, please don't

21    share them with anyone until you go to the jury room to decide

22    the case.  Don't leave your notes out here on the chairs, don't

23    take them home with you.  They'll be safe in the jury

24    deliberation room.

25           And don't let notetaking distract you from carefully

1    listening to and observing the witnesses.

2            And, again, when you leave the courtroom, you should

3    leave your notes hidden from view in the jury deliberation

4    room.

5            And whether or not you take notes, you should rely

6    upon your own memory of the testimony.  Your notes are there

7    only to help your memory.  They're not entitled to greater

8    weight than your memory or impression about the testimony.

9            Let's walk through the trial.

10            First, each side may make an opening statement, but

11    they don't have to.  Remember, an opening statement isn't

12    evidence, and it's not supposed to be argumentative.  It's just

13    an outline of what the party intends to prove.

14            Next, plaintiff will present its witnesses and ask

15    them questions.  After plaintiff questions the witnesses,

16    defendants may ask the witness questions.  That is called

17    cross-examining the witness.  Then defendants will present

18    their witnesses, and plaintiff may cross-examine them.

19            You should base your decision on all the evidence,

20    regardless of which party presented it.

21            After all the evidence is in, the parties' lawyers'

22    will present their closing arguments to summarize and interpret

23    the evidence for you, and then I'll give you the instructions

24    on the law.

25            All right.  At this time, Karen's going to take you

```
 1   into the jury deliberation room and show you where the jury
 2   deliberation room is.  From now on, you won't be entering the
 3   courtroom through those two front doors.  You'll be coming in
 4   through that side door over there that Karen's going to be
 5   standing next to in a moment.  And Karen will show you how to
 6   get from the lobby into the jury deliberation room.
 7            While there's a break in the trial, you're welcome to
 8   stay in the jury deliberation room for the whole time, that
 9   includes lunch breaks.  If you do go outside the jury
10   deliberation room, though, be careful that you don't put
11   yourself in a position where you're overhearing conversations,
12   because there may be witnesses waiting to testify.
13            I allow jurors to keep their cell phones except during
14   deliberations.  When you begin your deliberations in the case,
15   we're going to collect your cell phones, and then if there's a
16   break in the deliberations or once you reach a verdict, we'll
17   give you the cell phones back.  But I don't allow the cell
18   phones during the deliberations.
19            Again, if you want to take notes, Karen will give you
20   notebooks and pens and pencils at this time.  And we're gonna
21   take about a ten-minute recess.  And Karen will show you where
22   the jury deliberation room is at this point.
23            We'll see you back in the jury deliberation room in
24   about ten minutes.
25            ROOM CLERK:  Right this way, please.
```

```
 1              (The jury exited the courtroom)

 2         THE COURT:  And if there's nothing else to come before

 3    the Court, we'll be in recess for about ten minutes.

 4         MR. EDWARDS:  Thank you, your Honor.

 5         MS. TINGLEY:  Thank you.

 6         MR. EDWARDS:  Your Honor, are we free to -- I'm not

 7    familiar with the Court's presentation equipment.  May I

 8    examine it briefly?

 9         THE COURT:  Let Fran help you with it.  She'll make

10    sure you get it right.

11         MR. EDWARDS:  Wonderful.  Thank you, your Honor.

12              (The Judge exited the courtroom)

13              (Recess taken at 2:58 p.m. until 3:09 p.m.)

14              (The Judge entered the courtroom)

15         THE COURT:  Please be seated.

16         All right.  We're back on the record.

17         Counsel are present.

18         Anything to come before the Court before we bring the

19    jury in?

20         MS. TINGLEY:  We were just stipulating to some of the

21    these exhibits, pulling back our objections.  So, I'm just

22    running through them real quick.  May I take 60 more seconds?

23         THE COURT:  Sure.

24         MS. TINGLEY:  It will save time ultimately.

25              (Discussion had off the record between counsel)
```

OPENING STATEMENT - EDWARDS

1          **MS. TINGLEY:**  Okay.  Yeah, we're ready.  We stipulated

2   to a few more exhibits.  There's only a few that we're gonna

3   have objections to.

4          **THE COURT:**  Okay.

5          Let's bring in the jury.

6          **COURTROOM SECURITY OFFICER:**  All rise.

7          **THE COURT:**  You can have a seat when you come in.

8          *(The jury entered the courtroom)*

9          **THE COURT:**  You can have a seat.

10          All right.  We have all the jury back.

11          Did everyone follow my admonition not to discuss the

12   case or allow it to be discussed in your presence?

13          All right.  I think we're ready for the opening

14   statements of the attorneys.

15          The plaintiff may proceed.

16          **MR. EDWARDS:**  Thank you, your Honor.

17          Thank you, your Honor.

18          Ladies and gentlemen of the jury.

19          Sometimes in life, it can feel like the house always

20   wins.  Sometimes it can feel like, try as we might, something's

21   working against us, like we're running in place.  Fortunately

22   for most of us, that's just a feeling.  It's a feeling that we

23   get after a long week of work or maybe a personal setback.

24          Throughout this case, the evidence that we will

25   present to you is going to show you that in some cases, the

OPENING STATEMENT - EDWARDS

1    system can actually be designed in a way that prevents people

2    from getting ahead.

3           This is a case about the waste removal business.  And

4    it's a case about one of the men and women that work in that

5    business.  And while we may not see it, we may not be aware of

6    it, these folks work a lot of hours at a very hard job and

7    don't always get the respect that they deserve.

8           This is also a case about one of those companies

9    that's involved in the waste removal business, Waste Pro of

10   Florida, and one of its representatives, Mr. Russell Mackie.

11          Again, my name is Paul Edwards.  And I, along with my

12   co-counsel, Mr. Rosenthal, represent one of those waste truck

13   drivers, the plaintiff, Mr. Roger Andreu.  That's Roger seated

14   right over there.

15          I want to thank you for giving us your time and giving

16   us your attention to both myself, my client,

17   Judge Dimitrouleas, and the defendants in this case.  Most of

18   all, I want to thank you for giving your time and your

19   attention to this process.

20          **THE COURT REPORTER:**  Excuse me.

21          **MR. EDWARDS:**  I want to thank you for giving your time

22   and your attention to the process that we're about to go

23   through over the next few days.

24          This is my chance to explain a little bit to you about

25   what I intend to show you and some of the things you may see

OPENING STATEMENT - EDWARDS

1    and some of the things you may hear over the next few days.

2            You're going to hear from Roger.  He's going to talk

3    to you about the waste business, about who employed him, how he

4    worked there, the kinds of jobs he did, the long hours,

5    weekends and holidays that he worked.  And, most importantly,

6    he's going to tell you about how Waste Pro compensated him for

7    that time that he spent.

8            You're also going to hear from some of the folks that

9    worked with Roger.  You're gonna hear about the waste business,

10   about how they designed their routes, about how it is that they

11   do their job.

12           Roger is here today, and Waste Pro and Mr. Mackie are

13   here today, because Roger intends to show you over the course

14   of this trial, through the evidence he'll present, that he was

15   not paid appropriately for the hours and hours of overtime that

16   he worked when he worked for Waste Pro.

17           At the end of the case, after you've heard from both

18   sides, and after Judge Dimitrouleas has instructed you on the

19   law that applies to this case, that's what we're going to ask

20   you to determine, whether or not Waste Pro or Mr. Mackie did

21   underpay the overtime that's due to Roger, and if they did, how

22   much.

23           You may also be asked to determine whether this

24   underpayment, if you find one, was willful on the part of

25   Waste Pro.

OPENING STATEMENT - EDWARDS

1        As you heard a few moments ago, when

2   Judge Dimitrouleas was explaining some of the law, Roger is the

3   plaintiff in this case, and he carries with him what's called a

4   burden of proof.  You heard preponderance of the evidence,

5   greater weight of the evidence, things of that nature.  And the

6   illustration really is that it's like a scale.  Roger is going

7   to tip that scale in his favor.  That's what he has to do for

8   him to prevail.

9        I'm gonna tell you how he plans to do it.  Roger's

10  gonna take that stand, and he's gonna tell you about his time

11  working for Waste Pro.  He was hired by Waste Pro in October of

12  2013, and he worked there for about three years.  He's gonna

13  tell you that this line of work is not necessarily his first

14  choice.  But because of Roger's life and some decisions and

15  choices that he made many decades ago, sometimes his employment

16  options can be limited.  But Roger will tell you that he does

17  not allow his past to dictate his future.

18        Fortunately, you'll hear Waste Pro knows this.  They

19  knew about Roger's past, and they hired him anyway.  They hired

20  men and women like that, that may have made some bad decisions

21  but are still ready to go.

22        You'll also hear that no matter what happened in

23  Roger's past, when he was hired by Waste Pro, he went to work.

24  He worked hard.  He was responsible and reliable and

25  trustworthy.  He did his job every single day, and on many

OPENING STATEMENT - EDWARDS

1    days, he did the jobs of others.  And for that, you'll find out

2    that he was rewarded.  He was promoted.  In some cases, he was

3    given pay bumps.  He was given better assignments.  He was

4    placed in a supervisory position, and even towards the end of

5    his time at Waste Pro, he was considered for a management

6    position.

7            So, why did he leave?  Why are we here?  Why would he

8    leave a job that he was, by all accounts, excelling at?  He's

9    going to tell you that the entire time that he worked at

10   Waste Pro, something was eating at him.  He had some unanswered

11   questions about how it was that he was compensated, about how

12   his pay was calculated, and particularly about how his overtime

13   pay was calculated.

14           He will tell you that no one ever really explained it

15   to him, and that when he asked, people might try to explain it

16   to him, but no one was ever really able to do it.  He'll tell

17   you he still doesn't understand it as he sits here today.

18           This bothered him from beginning to end, but like a

19   lot of folks, he wasn't really in a position to complain about

20   it.

21           Roger eventually resigned his position with Waste Pro

22   in May of 2017.  He was one day off of a neck surgery, came

23   back to work and was assigned a very long route.  And you'll

24   hear that routes are what are assigned to these drivers where

25   they go and pick up the waste at the various spots and deliver

OPENING STATEMENT - EDWARDS

1    it where it needs to go.

2          And when he raised an issue with coming off the

3    surgery and his concerns about being able to complete the route

4    in a sufficient time, he was dismissed and just told to get it

5    done.  He'll tell you that this was a little bit different for

6    him, and he thought it was best to resign his position, because

7    that interaction made him, a great employee of Waste Pro, feel

8    like he was nothing, like he was totally replaceable.

9          Even after this, Roger's gonna tell you that he

10   doesn't have any ill will against Waste Pro or Mr. Mackie.  He

11   just wants what the evidence in this case is going to show you

12   he's due in terms of overtime.

13         I told you a moment ago that we're going to learn

14   about Waste Pro, about how it does its business, and about some

15   of the many policies that it has in place.

16         Roger first encountered Waste Pro and these policies

17   when he was hired in October of 2013.  He applied, he was

18   interviewed, and he was hired.

19         During that interview, he was asked about some of

20   those past choices that he made that I mentioned to you.  And

21   he answered those questions honestly and candidly.

22         Waste Pro knew exactly who he was, and they hired him.

23         Waste Pro is a garbage and recycling collection

24   company.  And in their south Florida branch, they have several

25   divisions.  Roger worked in two of those divisions -- the

OPENING STATEMENT - EDWARDS

1   Pembroke Pines and the Pompano divisions.  He worked for them

2   as a laborer or a helper, the people that ride on the back of

3   the trucks.  He drove a number of those trucks for them.  And

4   he'll tell you a little bit about his experience with the

5   different equipment that he had to use.

6           He was a supervisor at a transfer station for them.

7           You're going to learn that of all of these positions

8   he occupied, though, he was paid in a way that is subject to

9   regulation by the Fair Labor Standards Act, or the FLSA.

10  You're gonna hear plenty about the FLSA over the next few days.

11  The FLSA is a federal law that prevents unfair wage practices,

12  essentially.

13          Generally speaking, the FLSA requires that an employer

14  who employs employees for more than 40 hours in a week must pay

15  them overtime.  And, generally speaking, it requires that that

16  overtime be calculated at time and a half.

17          This can incentivize employees who want to work extra

18  hours.  It can serve, in some cases, to deincentivize employers

19  from pushing their people too hard.

20          I should point out to you now that you're going to

21  hear many phrases over the course of this trial.  And some of

22  these phrases may have common sounding or common sense meanings

23  to you.  Terms like "regular rate" might sound like a rate a

24  person is regularly paid, but words like "regular rate," as

25  you'll find, have legal meaning as well.  They have legal

OPENING STATEMENT - EDWARDS

1   requirements, and they have legal consequences.

2          To give you that as an example, a regular rate is an

3   hourly rate that's used to calculate overtime.  It doesn't

4   necessarily mean that employees have to be paid by the hour.

5   And, indeed, Roger wasn't paid by the hour.  But there's an

6   equation that you'll do, and that we'll explain to you, that

7   can show you what a regular rate is.  That's just an example.

8          Since not all employees, as you'll find, are required

9   to be paid on an hourly basis, you may also hear about some

10  exceptions or some alternative payment schemes that employers

11  can use sometimes to avoid paying overtime at time and a half.

12  These are also going to have common-sounding names, terms like

13  "piece rate" or "day rate" or "job rate."

14         You may hear from the defendants that they've taken a

15  position that some of these may have been the way that Roger

16  was compensated.  I'll let them explain that to you when they

17  have a chance to speak to you.

18         Roger will tell you about the understanding that he

19  had and the conditions he was hired under.  When he interviewed

20  and was hired for the job, he was told that he would be paid a

21  so-called daily rate, and that this daily rate would be paid to

22  him to complete an assigned job.  And that job was his route

23  for the day, whatever was assigned to him.  And when he asked,

24  "How long can I expect that route to be," he was told it would

25  be about eight hours.

OPENING STATEMENT - EDWARDS

1        So, as far as he understood, he'll tell you, he got a

2   flat rate to do this job, and he could expect to do it for

3   about eight hours.  And he understood that he'd still be

4   entitled to overtime if he worked extra and wouldn't be

5   entitled to overtime if he didn't work extra.

6        In theory, some of the alternative schemes that you

7   may hear about may sound like they could work out in the favor

8   of the employee.  But I would ask you to pay very close

9   attention to whatever explanation you receive about those

10  alternatives.  Because those alternatives also have legal

11  requirements and legal rules.  And the evidence in this case is

12  going to show you that those rules were not followed.  In many

13  cases, they were broken, broken in different ways.

14       There's a rub.  Some of these alternative payment

15  plans are a basis for calculation of overtime.  And rather than

16  calculating overtime at time and a half, they allow for

17  calculation of overtime at half time.  So, that's the

18  equivalent of multiplying somebody's regular rate, which we

19  explained a moment ago, by .5, instead of 1.5.

20       Essentially, this can mean that every additional hour

21  worked in a day is not just an additional hour worked in the

22  day.  It serves to slowly whittle away, water down, and dilute

23  that regular rate.  So that when overtime is calculated, it

24  allows for overtime payments at staggeringly low numbers.

25       I will show you evidence in this case that shows that

OPENING STATEMENT - EDWARDS

1   Roger Andreu was compensated in some cases for his overtime at

2   less than minimum wage.

3          Beyond being complicated, you're going to hear that a

4   lot of the rules that I mentioned weren't followed.  A lot of

5   this case is going to center around some of the records, the

6   time records and the pay records of Mr. Andreu.  And it's in

7   those records that we'll be able to show you that these rules

8   weren't followed.

9          For starters, Roger will show you that when he did, in

10  theory, what he was supposed to do, he finished his route fast,

11  he got the job done very quickly and efficiently, and he would,

12  in theory, receive a benefit under some of these alternative

13  plans, that that benefit was taken away from him.  That if he

14  finished his job in less than a certain amount of time -- and

15  you'll hear that that time is about four hours -- that he

16  wasn't paid his day rate anymore; he was only paid a half day

17  rate.  And that half day rate was then used to calculate his

18  regular rate and pay him overtime.  That was a policy of

19  Waste Pro's, that if an employee worked less than four hours

20  and one minute, they wouldn't receive their full day rate.

21          You're also going to hear about routes and how they're

22  assigned.  Routes for Waste Pro would typically be assigned by

23  a supervisor.  And that supervisor might be new to the area, or

24  maybe the area is a new area that Waste Pro just started doing

25  business in.  So, when the supervisors would assign these

OPENING STATEMENT - EDWARDS

1    routes, they could make miscalculations, need to make

2    adjustments.  And before they had made those miscalculations,

3    drivers like Roger would complete those routes, and they

4    wouldn't necessarily be done in the most efficient fashion,

5    because they weren't designed right.  And every additional hour

6    that they were delayed because of inefficiencies all weighed

7    against them all at the employees' expense.

8            You're also going to hear that Roger on many occasions

9    worked more than 15 hours in a day.  I'll show you records that

10   verify the amount of time that Roger spent working on a

11   day-to-day basis.  And while we may dispute some things in this

12   case, the time that he worked is not in dispute.  Neither party

13   disputes that.  Roger will dispute for you some of the payments

14   that were not made to him when they were promised to be, but we

15   do not dispute the time.

16           The reason he would work 15 hours in a day on

17   sometimes is because Waste Pro had another policy called their

18   "1098 policy."  What the 1098 policy means is that when a

19   driver like Roger is done, they're not really done.  They can't

20   drop their load off, clock out, and be done for the day.  If

21   they did that, they face punishment up to and including

22   termination.

23           When they finished their assigned route for the day,

24   they had to call in to a supervisor.  They had to check in.

25   And they would often be asked to go and do extra work, to pick

OPENING STATEMENT - EDWARDS

1   up somebody else's route, to help somebody whose truck had

2   broken down, to run an errand for the company.

3          Occasionally, they'd be given a little extra

4   compensation to do that.  You may hear that called a bonus, you

5   may hear that called additional compensation, but on occasion,

6   they would be offered that.  That's another rule that was

7   broken, as you'll see through the evidence.

8          Roger will tell you that he took this work on.  He

9   didn't mind working the extra hours so long as he was getting

10  something extra.  He'll also tell you that on occasion, this

11  pay was promised to him, and it wasn't received.  That's

12  another rule that was broken, the evidence will show you.

13         So, when those additional payments for those

14  additional services were not paid to him, not only was the

15  money not received, but those additional hours that he spent

16  doing those jobs were working against him.  Every hour that he

17  spent doing those jobs was, again, whittling away and watering

18  down his regular rate.  So that when his overtime was

19  calculated, it wasn't what he should have been paid.

20         You'll also see that this policy applied to all kinds

21  of time that he spent.  When he took a lunch, that hour of

22  lunch was calculated in his time and weighed against him.  When

23  he ran an errand for the company, it was computed against him.

24  And the evidence will show you that all of this additional time

25  that he was forced to work on behalf of Waste Pro, all worked

1   against him.  All because of their policies and all without his

2   understanding.

3           I understand that a lot of this may seem strange and

4   complicated at first glance.  But some of the issues that we'll

5   ask you to determine are actually fairly narrow -- whether

6   Roger received the amount of overtime that we'll show you,

7   through the evidence, he was entitled to, and if not, how much

8   is he owed.

9           Mr. Andreu has spent a lot of time and a lot of work

10  preparing his case to present to you.  I want to thank you

11  again for your time and your attention today and over the next

12  few days.  And I look forward to presenting the facts of

13  Mr. Andreu's case to you.

14          **THE COURT:**  Ms. Tingley.

15          **MS. TINGLEY:**  Thank you, your Honor.

16          Good afternoon.

17          As you know, we represent Waste Pro Florida as well as

18  its regional manager, Russell Mackie, in this case.  And this

19  is about the solid waste industry and about this solid waste

20  company.  And no one is going to dispute this week that the

21  plaintiff worked very, very hard, and he worked long hours.

22          And what's interesting about the solid waste industry

23  and why it is necessary for workers to work long hours is

24  because it's one of the great magic acts in our society, right?

25  You take your cart out on Friday morning, you put it out in

OPENING STATEMENT - TINGLEY

```
 1    your driveway, you go to work, and when you come home, it's

 2    empty, right?  And it better be empty.  Because that's what

 3    you've been thinking about.  When you come home, if there's

 4    trash in it, you have to haul it back up.  That's a problem.

 5    So, it is an industry that requires consistency for the

 6    citizens.

 7              And, yes, there would be times that -- there are times

 8    where trucks break down, accidents happen, things of that

 9    nature, but the routes need to be covered.

10              And so, this is not a case where there is any dispute

11    that the plaintiff worked very hard.

12              But the plaintiff was also paid for his hard work.  He

13    was paid in the form of bonuses.  When he would help people,

14    and he would finish his route and go help where a truck broke

15    down, sometimes he would get $300 in the day, sometimes a

16    hundred dollars, sometimes $50.  Just to help someone else.

17    And he would stay clocked in.  So, he would still be generating

18    the time on the clock.

19              In addition, he was paid bonuses for being a safe

20    driver and making sure that he abided by the company's safety

21    policies.

22              You're going to have an opportunity to see in this

23    case various pay stubs like this.  And this is the last pay

24    stub for the plaintiff for 2016.  And you'll see he made in

25    excess of $74,000 that year.  And that year he made his
```

OPENING STATEMENT - TINGLEY

1  regular, he made overtime, bonuses.  He made bonuses of over

2  $7500, as well as safety bonuses of over a thousand dollars.

3       You're going to see time records like this.  You're

4  also gonna hear about he was paid a daily rate.  And the daily

5  rate in this industry is -- it is regulated, but it also

6  permits -- a company that doesn't know how many hours are gonna

7  be worked on any given day, it allows them to set the time and

8  to say, What you work today, this is the amount you're gonna

9  get paid.

10      So, on this same time period, you're going to have an

11 opportunity to see that whether Mr. Andreu worked seven hours

12 one day or ten hours or six hours, in this same period, he

13 would get that daily rate.

14      And you'll hear from Mr. Mackie that this rate

15 encourages efficiency on the part of the drivers.  So they can

16 get their routes done.  They can get all the trash pulled, and

17 they can get it to the dump.  And they can get those big trucks

18 off the street before people get home from work.

19      You're gonna have an opportunity to hear as well from

20 Regina Lombardo, from the human resources department at

21 Waste Pro Florida.  And she's going to talk to you about the

22 approval system and how employees approve their time every pay

23 period.  They clock in and out of the system, and then they

24 approve it before those records go in.  And you're gonna hear

25 from Mr. Andreu that if there was ever a problem, he would

OPENING STATEMENT - TINGLEY

1    bring it to the attention of Ms. Lombardo, and she would

2    correct it.

3         You're going to have the opportunity to weigh the

4    credibility of the evidence.  So, you're gonna have an

5    opportunity to weigh the credibility of Mr. Andreu.  And for,

6    as counsel told you, someone who it was just getting to him

7    that he wasn't paid overtime, that Mr. Mackie and Waste Pro

8    weren't paying him, that they were screwing him out of money.

9         You're gonna have an opportunity to see this text

10   message that he sent to Mr. Mackie the day he resigned, when he

11   thanked him for all he did for him over the years and told him

12   it was great working for him.  And you're gonna have an

13   opportunity to decide whether this text that was done at the

14   moment -- you're gonna have an opportunity to weigh it against

15   his testimony about he resigned because he thought he was owed

16   all this money that he hadn't been paid.

17        At the end of the case, the judge is going to instruct

18   you on the law, and then you're going to deliberate.  And

19   you're gonna have an opportunity to recall and to discuss all

20   the testimony that you hear and all the documents that you

21   receive.  And you get to weigh all of that evidence to decide

22   whether or not Mr. Andreu was paid under the Fair Labor

23   Standards Act.  And I submit to you that he was, in fact, paid

24   correctly under the law.

25        You are gonna hear from the attorney for Waste Pro,

OPENING STATEMENT - TINGLEY

1  who came and did an audit and actually audited how Waste Pro

2  was paying their employees, their drivers, just like

3  Mr. Andreu.  And he's gonna tell you the advice that he gave

4  Waste Pro and the formula that he gave Waste Pro.

5          One of the important things about the day rate that

6  you're going to learn is that folks like Mr. Andreu did many

7  different jobs.  And so, regardless of whether he was going to

8  pick up a truck, run a route, be at the transfer station in

9  Coral Springs, he knew that he was going to be given that a

10  certain rate *(sic)*.  And that if he was asked to do extra work,

11  that he would negotiate for that amount.  And that if someone

12  said, Listen, I have a truck that's broke *(sic)* down, I need

13  you to go help finish that route, and he would say, I would

14  negotiate with them and say, Well, I'll do it for a hundred

15  dollars.  And there would be this whole negotiation.

16          You're going to hear that this was a man that

17  interacted with Regina Lombardo and Russell Mackie virtually on

18  a daily basis.  And when he gets up and talks about, Oh, there

19  was money he wasn't paid, you're going to hear from them that

20  they never ever heard that complaint.  Instead, Russell Mackie

21  received that text message the day he resigns.

22          And it's gonna to be up to you to weigh the evidence

23  and decide what weight you're going to give the testimony and

24  the documents.  And at the end of this trial, we're going to

25  ask on behalf of Waste Pro and Russell Mackie that you find

ANDREU - DIRECT/EDWARDS

1  they have not been liable in this case, and that they did pay

2  Roger Andreu everything he was due and owing under the law.

3         Thank you.

4         **THE COURT:**  Plaintiff may call its first witness.

5         **MR. EDWARDS:**  Thank you, your Honor.

6         The plaintiff called Roger Andreu.

7         **THE COURT:**  Right up here if you would, sir.

8         **THE COURT REPORTER:**  Please raise your right hand.

9         *(ROGER ANDREU, PLAINTIFF HEREIN, WAS SWORN)*

10        **THE COURT REPORTER:**  Please sit down.

11        Please get right behind the microphone and state your

12  full name for the record, spelling your last name.

13        **THE WITNESS:**  Roger Andreu, A-N-D-R-E-U.

14                       **DIRECT EXAMINATION**

15  BY MR. EDWARDS:

16  Q.  Good afternoon, Roger.

17  A.  Good afternoon.

18  Q.  Where you from originally?

19  A.  New York.

20  Q.  How long have you lived in Florida?

21  A.  My family moved here in 1972.

22  Q.  How old are you?

23  A.  Fifty-one.

24  Q.  How far did you go in school?

25  A.  Graduated college.

ANDREU - DIRECT/EDWARDS

1    Q.   What do you do for work now?

2    A.   HVAC.

3    Q.   How long have you been working in that field?

4    A.   I just got started now.

5    Q.   Okay.  Did you ever work for Waste Pro?

6    A.   Yes.

7    Q.   Do you know how long you worked there?

8    A.   Almost four years.

9    Q.   When were you hired?

10   A.   October of 2013.

11   Q.   Prior to October of 2013, had you ever worked in the waste

12   industry before?

13   A.   No, sir.

14   Q.   Did you have any experience dealing with machinery or any

15   of the type of stuff that you'd worked with there?

16   A.   Yes, sir.

17   Q.   What made you decide to work for Waste Pro?

18   A.   It -- when I was looking for work at Workforce One, they

19   told me about the local garbage company, and that I should go

20   and apply over there.  I talked to some of the guys that I saw,

21   and they told me I could get an application online.  And I

22   filled it out and hoped for the best.

23   Q.   Okay.  Did you interview?

24   A.   Yes, sir, I did.

25   Q.   What was the interview process for Waste Pro like?

ANDREU - DIRECT/EDWARDS

1  A.  It was somewhat lengthy.  I met with Ms. Lombardo.  I met

2  Carlos, which at the time I believe was the operations manager.

3  Q.  During the interview process did anybody explain to you how

4  you would be paid for your time at Waste Pro?

5  A.  The one person that I spoke with that we talked about the

6  compensation was Carlos.

7  Q.  Okay.  How was your pay explained to you?

8  A.  It's a day rate.

9  Q.  Okay.  Was that term explained to you?

10 A.  The -- the question that I raised, What is it exactly, and

11 he says, Well, you know, your day, you do your route, and

12 you're compensated for the -- at the X amount of hours that

13 cover that day, which I believe is eight, and if you finish the

14 route before eight hours, obviously it will benefit you,

15 because the hourly rate obviously increases.

16 Q.  Okay.  Did he tell you how long the routes could typically

17 take you to complete?

18 A.  Eight to ten hours.

19 Q.  Did he explain to you what your pay would cover?

20 A.  Yes.

21 Q.  What was that?

22 A.  What the pay covers is the initial route that's given to

23 you in the morning by the supervisor.  You have to complete

24 that route.

25 Q.  Okay.  Can you tell me about the routes?  Do you know how

ANDREU - DIRECT/EDWARDS

1   they're determined?

2   A.   I believe they're determined by the supervisors.  They'll

3   take a house count -- and hopefully Russell could explain it

4   later -- I believe that they take the amount of trucks that

5   they have, they'll divide that, and try and make it as even as

6   possible and as fair as possible for all the drivers.

7   Q.   Okay.  Not speaking about anything additional, but in the

8   beginning of a day, were you ever assigned more than one route

9   to do?

10  A.   At the beginning of the day, there could be times when a

11  route was left from the previous day or something may have been

12  called in that's an emergency that needs to be resolved, and

13  there -- yes, there were times when they would come to me and

14  say, This has to be done in addition to....

15  Q.   During this interview process, did anyone ever tell you how

16  your overtime would be paid?

17  A.   I simply asked, Is there overtime?

18  Q.   What did they say?

19  A.   Yes.

20  Q.   Who were you talking to?

21  A.   Carlos.

22  Q.   Did anybody ever explain to you how the so-called day rate

23  might affect your overtime?

24  A.   Over my tenure with Waste Pro, I asked several people,

25  because, as I believe everybody will see, it -- it's something

ANDREU - DIRECT/EDWARDS

1   until this day I don't understand this formula that they have

2   for paying overtime and in a way that penalizes me.  The more

3   hours I work, the more money they make.

4        I -- I questioned it on numerous occasions.  You know,

5   how is it possible to work so many hours, and if I put in, I

6   don't know, 80 hours of overtime, I earn six bucks and change

7   an hour.

8   Q.  Okay.  Do you know how shortly after your initial interview

9   you were hired?

10  A.  Weeks.

11  Q.  Okay.  Did you have to attend any new hire training, any

12  programs on behalf of Waste Pro?

13  A.  What I recall, once they did offer me the position, I went

14  to the Pembroke Pines division, and they had established there

15  a few days of -- I guess it's the training process.  I took a

16  driving test.  I was told about safety issues, more or less

17  about the industry.

18       Again, I met with Ms. Lombardo, who gave me a series

19  of papers informing me of company policies and things of that

20  nature that I signed.

21  Q.  Okay.  At any of the training that you were going through,

22  was the rate of pay ever discussed or the rate of overtime ever

23  discussed?

24  A.  Absolutely not.

25  Q.  Can you give me an example of some of the other policies

ANDREU - DIRECT/EDWARDS

1    you were informed of?

2    A.   Safety policies.  A lot of it revolves around safety.  It's

3    obvious that in the industry, there -- with all this equipment

4    and the areas that we operate within, there has to be a large

5    attention to -- paid to the safety of the people that are

6    operating on the trucks with us, as well as, most importantly,

7    the peoples there -- the people that live in the communities

8    that we operate within.

9          Also, going to transfer stations, there's a lot of

10   dangers present there that we need to be made aware of.

11         There were a series of -- there were a series of -- I

12   believe it was a couple of videos that were shown to us about

13   the proper operation of trucks, the equipment.  A lot of it

14   revolved around the safety.

15   Q.   Okay.  When you were hired, did you ever sign any formal

16   employment agreement with Waste Pro?

17   A.   I signed a lot of papers with Ms. Lombardo.  Exactly what

18   each and every one of those papers were, I don't recall today.

19   Q.   Do you recall if there was ever an employment agreement

20   there?

21   A.   I do not.

22   Q.   Do you know if there was anything that you signed

23   indicating that you understood how you would be paid?

24   A.   No.

25   Q.   Do you know if there was anything that you ever signed

ANDREU - DIRECT/EDWARDS

 1  indicating that your rate of pay was at least explained to you

 2  and you acknowledging that?

 3  A.  No.

 4  Q.  Did you have to sign any other kinds of paperwork?

 5  A.  Over my tenure there, I signed several documents that were

 6  requested.  I signed -- again, a lot of it revolved around

 7  safety, a lot of it revolved around one of the matters that you

 8  had mentioned with the 1098, making sure you call in before you

 9  go back, fuel cards, all sorts of forms that were requested we

10  sign, video recording, voice recording.

11  Q.  Okay.

12        **MR. EDWARDS:**  Your Honor, I'm gonna show the witness

13  what's been marked pretrial for identification as Plaintiff's

14  Exhibit 4.

15        *(Plaintiff's Exhibit 4 marked for identification)*

16        **MS. TINGLEY:**  No objection.

17        **MR. EDWARDS:**  Your Honor, may I approach the witness?

18        **THE COURT:**  Okay.

19  BY MR. EDWARDS:

20  Q.  Roger, would you please take a look at that document and

21  let me know if you recognize it.

22  A.  I do.

23  Q.  How do you recognize it, sir?

24  A.  My signature's on it.

25  Q.  Can you tell me who it's from?

ANDREU - DIRECT/EDWARDS

1   A.   Waste Pro.

2   Q.   How do you know that?

3   A.   The entitlement *(sic)* up on top, "Waste Pro."

4   Q.   Do you recall signing that document?

5   A.   Yes, sir.

6   Q.   Can you tell me if that document, as you're looking at it,

7   appears to be in the same or substantially the same condition

8   as it was at the time you saw it last?

9   A.   I believe it to be, yes, sir.

10       **MR. EDWARDS:**   Your Honor, at this time plaintiff

11   offers what was premarked as Plaintiff's Exhibit 4 into

12   evidence.

13       **MS. TINGLEY:**   No objection.

14       **THE COURT:**   Four will be received.

15       *(Plaintiff's Exhibit 4 admitted into evidence)*

16       **MR. EDWARDS:**   Thank you, your Honor.

17       Your Honor, may I publish to the jury?

18       **THE COURT:**   All right.

19   BY MR. EDWARDS:

20   Q.   Roger, can you tell us what we're looking at it?

21   A.   The Waste Pro fuel card policy.

22   Q.   Okay.  Was that what was explained to you about their fuel

23   card policy?

24   A.   Yes, sir.

25   Q.   Were you familiar with that policy when you were hired?

ANDREU - DIRECT/EDWARDS

1   A.   Yes, sir.

2   Q.   Do you know if it was explained to you more than once?

3   A.   We've talked about the fuel cards, but as of this date,

4   from this date moving forward, that would be when it was

5   explained to me.

6   Q.   It looks like offense 4 lists "termination."  Did you ever

7   see anyone be terminated for violating the fuel card policy?

8   A.   No, I did not.

9   Q.   I'll talk to you about some of the other policies in a

10  moment, Roger.

11        Can you give me a rundown of the types of jobs that

12  you did for Waste Pro?

13  A.   Yeah.  When I originally came on with Waste Pro, I started

14  as a helper on the back of a truck on bulk routes in the area

15  of Hollywood.

16        My responsibilities would be to pick up the bulk that

17  was set out in the alleys by homeowners and load it by hand

18  into the back of rear-load trucks, ride with the drivers to the

19  dumps, trucks would be dumped, go back on route until the route

20  is completed.

21  Q.   Okay.  For any of the positions that you worked for

22  Waste Pro -- and we'll talk a little bit about those more in a

23  moment -- how did you start your day for Waste Pro?

24  A.   Typically, coming in and seeing the supervisor, seeing what

25  routes we have, and clocking in.

ANDREU - DIRECT/EDWARDS

1    Q.   What do you mean "clocking in"?

2    A.   We have a time card that we have that we're responsible for

3    that we need to swipe every morning when we came in.

4    Q.   Did you do that every morning?

5    A.   I believe so, yes.

6    Q.   Do you know if there was any policy regarding clocking in?

7    A.   I believe there to be a couple of policies.

8    Q.   Okay.  Do you know if there was ever a punishment for not

9    clocking in?

10   A.   If you forget to clock in, they can take the -- they title

11   it as "safety bonus," but it falls into all sorts of

12   categories.

13   Q.   Okay.  Could you lose your safety bonus?

14   A.   Sure.

15        **MR. EDWARDS:**  Your Honor, at this time, I'm showing

16   the witness what was marked pretrial for identification as

17   Plaintiff's Exhibit 14.

18        *(Plaintiff's Exhibit 14 marked for identification)*

19        **MS. TINGLEY:**  Thank you.

20        **MR. EDWARDS:**  May I approach the witness, your Honor?

21        **THE COURT:**  All right.

22   BY MR. EDWARDS:

23   Q.   Roger, would you please take a look at that document and

24   let me know if you recognize it?

25   A.   I do.

ANDREU - DIRECT/EDWARDS

1   Q.  How do you recognize it?

2   A.  My signature's on it.

3   Q.  Do you remember signing that document, Roger?

4   A.  Yes, sir.

5   Q.  Can you tell me who it's from?

6   A.  Waste Pro, the Pompano division.

7   Q.  And does that document appear to be in the same or

8   substantially the same condition as it was the last time you

9   saw it?

10  A.  I do *(sic)*.

11          **MR. EDWARDS:**  Your Honor, at this time, plaintiff

12  offers what was marked pretrial for identification as

13  Exhibit 14 into evidence.

14          **MS. TINGLEY:**  One moment, your Honor.

15          *(Discussion had off the record between counsel)*

16          **MS. TINGLEY:**  No objection.

17          **THE COURT:**  Fourteen will be received.

18          *(Plaintiff's Exhibit 14 admitted into evidence)*

19  BY MR. EDWARDS:

20  Q.  Roger, can you tell me what we're looking at here?

21  A.  This is another one of the directives that were put out by

22  the Pompano division for the drivers and the workers in that

23  division.

24  Q.  And do you know when you were informed about this policy?

25  A.  This is one of the areas that over my tenure there was

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

ANDREU - DIRECT/EDWARDS

 1   talked about on numerous occasions, whether it be at an initial

 2   orientation or when they completed these forms here, passing

 3   them out and asking us to sign them.

 4   Q.   There's a line here referencing "deduct bonuses

 5   accordingly."  Do you know what that's referring to?

 6   A.   What it references to, again, when we receive bonuses,

 7   whether they title it a safety bonus or however it is that they

 8   want to title it, again, if you fall within violation of any of

 9   these regulations that are given to us, they can take those

10   bonuses away.

11   Q.   Okay.  After you clock in, what's the next thing that you

12   have to do?

13   A.   Depending on the position that I had, if I was driving, I

14   would have to go and do the pretrip of the truck after clocking

15   in and receiving the route and seeing who was assigned to work

16   on the truck with me, if I was driving a reloader and doing

17   bulk, or it's dependent, again, on whatever truck.

18   Q.   Okay.

19   A.   So, typically, do a pretrip of the truck.

20   Q.   Can you tell me what a "pretrip" is?

21   A.   Sure.

22        Prior to starting the day, as the driver, you want to

23   assure the safety of the vehicle.  You want to make sure that

24   it's in good operational condition.  You will want to check

25   everything, from all the fluids, make sure that it has fuel,

ANDREU - DIRECT/EDWARDS

1    obviously that it starts, all electrical is in order.  It gets

2    pretty detailed as far as you want to make sure that the brakes

3    are in working order; you want to do brake tests.  Just the

4    overall safety of the operation -- that that vehicle is gonna

5    operate properly throughout the day.

6    Q.  Any other tasks that you were required to do before you

7    started your daily route?

8    A.  I don't believe so.  It's clocking in, getting the route

9    sheet, learning what needs to be done from the supervisor,

10   checking out the vehicle, finding out who's assigned to work

11   with me, if I'm on a rear loader or a truck that requires help,

12   and go do the route.

13   Q.  Did you ever have to refuel the truck in the morning?

14   A.  There are times when the trucks do have to be refueled when

15   someone may have forgotten to fuel it the night before.

16   Q.  Typically, how long would the pretrip that you describe

17   take you?

18   A.  Thirty minutes.

19   Q.  And if you had to refuel a truck, do you know how often you

20   had to do that in the morning?

21   A.  In the Pompano division?  More times than I wanted to.  In

22   Pines, they have fuel at the Pines yard, so even if I had to

23   fuel it, although I had to go and sometimes get in line there

24   and take a little of bit time doing it, I would do it there.

25   Uhm, in a month, I would say I would have to do that maybe a

ANDREU - DIRECT/EDWARDS

1  half a dozen times.

2  Q.  How long could refueling the truck in the morning take you?

3  A.  In Pompano, because we have to go off site, it could take

4  up to an hour, depending on if Coca-Cola's there or whomever,

5  you know, they're fueling their trucks and stuff.  It could

6  take a while.  It could take some time.

7  Q.  Okay.  Is there more -- is it harder to refuel at a station

8  any of those trucks than the average vehicle?

9  A.  It -- I wouldn't say it's harder.  I would say it's a

10  lengthier process, a longer -- more time-consuming process.

11  Q.  Okay.  Why, in your experience, is that the case?

12  A.  The amount of diesel that these vehicles take.

13  Q.  Okay.

14  A.  And, also, if you're in line, and you're waiting behind a

15  few trucks, you're looking at possibly well over a thousand

16  gallons of diesel being put in before you can even get up

17  there.

18  Q.  Could you have started your day without doing those tasks?

19  A.  No.  Obviously, I would need diesel in the truck and make

20  sure that it's an operational vehicle.

21  Q.  Okay.  Were you ever told that the daily rate to do your

22  route was designed to cover those tasks as well?

23  A.  Again, it's -- I believe it to be an additional task.  I --

24  when hired, it's talk about the route and what you do on the

25  route and stuff, and I learned these things as, of course, I

ANDREU - DIRECT/EDWARDS

1   went through the hiring process.  And in fairness, of course,

2   to Waste Pro and Russell, I would say that it's self-evident,

3   that, yeah, I would myself want to check the truck out.  I want

4   to make sure that it's operational.  So, yeah.

5   Q.  Would you be permitted to not do those jobs and start your

6   route under Waste Pro, though?

7   A.  No, you're not supposed to do that.

8   Q.  Okay.  Were there any tasks that you had to complete during

9   the day, during your primary route, not related to picking up

10  garbage and taking it where it needs to go?

11  A.  During the course of the route, if the route is really

12  heavy, we would have to go to the dumps.  We would have to dump

13  the trucks, come back on route.

14       Uhm, if there were any issues with the truck during

15  the route, it would be my responsibility to make sure that I

16  contact the supervisor and wait for mechanics, get things done,

17  get another truck, if I had to.

18  Q.  How often would delays like that happen?

19  A.  Dumping is every day.  You know, sometimes multiple times a

20  day, depending on the route.

21  Q.  Okay.

22  A.  Breakdowns of the vehicles, unfortunately, uhm, some of the

23  vehicles aren't really great in the Pompano division when I was

24  there, so that happened a -- quite often.

25  Q.  How about lunch?  Did you take lunch?

ANDREU - DIRECT/EDWARDS

1  A.  If I -- if I wanted to, and I wanted to make the day a

2  little longer, than I could pull over, yes, and I can take

3  lunch.  Would I take lunch?  I didn't like to, no.  I want to

4  work, and I want to try to get the job done.

5  Q.  Was your time spent at lunch ever explained to you from a

6  payment standpoint?

7  A.  That was never talked about, no.

8  Q.  Okay.  Have you been able to review any of your time to see

9  if your lunch hour is backed out of your time for the day?

10 A.  I've looked at it, and I see that it's not.

11 Q.  Would you ever clock out during the middle of the day and

12 clock back in?

13 A.  No.  In order to clock in or clock out, you have to be back

14 at the main terminal.

15 Q.  How about tasks after the route is completed, what type of

16 work would you have to do?

17 A.  As stated earlier in the openings, that there could be

18 occasions where a route is left on the ground.  Someone may not

19 be completing their route that day.

20       Some guys have a tendency, after they figure out how

21 this sort of works, to use not completing the route to their

22 advantage, because they are almost absolutely 100 percent

23 certain that the route supervisor's gonna get the first guy

24 that finishes and say, Oh, well, go help so and so, because

25 he's got like eight alleys left in Hollywood.

ANDREU - DIRECT/EDWARDS

1   Q.  Okay.  Let me -- I'll ask you about some of the additional

2   task work in a minute.  But in terms of finishing your route --

3   let's say you were done for the day.

4   A.  Um-hum.

5   Q.  What type of work is necessary before you were allowed to

6   clock out?

7   A.  Make sure that the truck is dumped, make sure the truck is

8   fueled, do the post-trip inspection, and clock out.

9   Q.  Okay.  Do you know how long that procedure would typically

10  take you?

11  A.  Towards the end of the day, the dumps are -- tend to have

12  more traffic in them, so going to the dump could take an hour,

13  two hours.  I've sat there for several hours sometimes fueling

14  the truck, depending on the division.  If you're in Pompano, it

15  could take a half hour, it could take an hour, depending on how

16  many trucks are at that common fuel station.

17          The post-trip, I could do it probably within 15 to

18  30 minutes.

19  Q.  Okay.  Was it easier to do the morning tasks or the

20  end-of-shift tasks?

21  A.  About equal.

22  Q.  Okay.  Would you be permitted to complete your day for

23  Waste Pro without doing any of those end-of-day tasks?

24  A.  We're not supposed to.

25  Q.  Okay.  Do you know if you'd be punished?

ANDREU - DIRECT/EDWARDS

1    A.   One could be.

2    Q.   Okay.  If you didn't do the DOT inspection, was there a

3    punishment for that?

4    A.   They could take the bonus or write you up for not doing it,

5    if they wanted to do that.

6    Q.   Okay.  Did you ever get written up for that?

7    A.   No.

8    Q.   Did you always do the inspection?

9    A.   Honestly?  No.

10   Q.   Okay.  Did you ever understand the time that you were being

11   paid for to include this time doing these post-trip tasks?

12   A.   Again, going back to the original date of hire, when

13   talking with Carlos and asking about, you know, How am I paid,

14   and he came up with the day rate.  You're given a day rate for

15   doing the route.  And most of the talk was about day rate and

16   doing the route.  As I got indoctrinated into it, I learned,

17   you know, you have to do pretrips, you have to do post-trips.

18   Q.   Okay.  Did you ever experience delays in either pretrip or

19   post-trip that were beyond your control?

20   A.   Sure.

21   Q.   Give me an example of that.

22   A.   You show up in the morning, and the truck has a flat.  You

23   show up in the morning, and the truck isn't fueled from the day

24   before where someone else used it.  Show up in the morning, and

25   the truck just doesn't start at all.  There are several reasons

ANDREU - DIRECT/EDWARDS

```
1    why I could incur delays.  Show up in the morning, none of the
2    routes are scheduled for specific drivers.
3    Q.  Roger, I want to take you back to your interview with
4    Waste Pro, okay?
5    A.  Um-hum.
6    Q.  What were you hired for originally?
7    A.  Helper.
8    Q.  Who was it -- your interviewer again?
9    A.  Carlos.
10   Q.  During your interview, were you asked if you had a criminal
11   record?
12   A.  Absolutely.
13   Q.  What did you respond?
14   A.  Yes.
15   Q.  Roger, in the last ten years, have you been convicted of a
16   felony?
17   A.  No, sir.
18   Q.  In the last ten years, have you been released from
19   confinement --
20   A.  Yes, sir.
21   Q.  -- for a felony?
22   A.  Yes, sir.
23   Q.  When were you released from confinement?
24   A.  2010.
25   Q.  What crime does that pertain to, sir?
```

ANDREU - DIRECT/EDWARDS

1   A.  Second-degree murder.

2   Q.  When was that adjudication?

3   A.  1989.

4   Q.  How old were you at that time?

5   A.  Twenty-two.

6   Q.  Did you kill anybody?

7   A.  No, sir.

8   Q.  How long did you serve for that?

9   A.  Twenty-two years.

10  Q.  Did Waste Pro ask you about that in your interview?

11  A.  Carlos asked me what was different about me now during the

12  interview process from before I went to prison.

13  Q.  Okay.  Did you tell him the truth?

14  A.  Absolutely.

15  Q.  Let me ask you this.  Can you tell us what's different

16  about you now than then?

17  A.  Yeah.  I went -- as I stated, I went to prison as a young

18  man at the age of 22.  I served a long time, several decades in

19  prison.

20          When I got out, I didn't think of going back to doing

21  anything illegal.  I said that, you know, if afforded an

22  opportunity to salvage some semblance of normalcy in my life

23  again -- because, as I'll tell you, it wasn't certain that I

24  was ever gonna get out of prison.  But I knew that if I did, I

25  would never repeat my actions of when I was a young man at the

ANDREU - DIRECT/EDWARDS

1    age of 22.

2            I surround myself with some pretty good people.  I

3    know it may sound silly coming from a guy with a felony that

4    did so much time, but I'm very loyal to people that I call my

5    friend.  I value my family and the time that....

6    Q.  Let me ask you this.

7    A.  The time that I have with my family that remains -- my

8    mother, who suffers from brain cancer now, my father, that I

9    just buried a couple months ago....

10           **MS. TINGLEY:**  Your Honor, at this point, we're gonna

11   interpose an objection to the narrative.

12           **THE COURT:**  Next question.

13   BY MR. EDWARDS:

14   Q.  Roger --

15   A.  Yes.

16   Q.  -- in your interview, after you gave that explanation, did

17   Waste Pro hire you anyway?

18   A.  Yes, sir.

19   Q.  Do you know of anybody else that might have a criminal

20   record that you worked with?

21   A.  Yes, sir, I do.

22   Q.  Was that abnormal in that industry?

23           **MS. TINGLEY:**  I'm gonna object, your Honor.  Hearsay.

24   A.  No, sir, it's not.

25           **THE COURT:**  Overruled.

ANDREU - DIRECT/EDWARDS

1    A.   It's --

2    Q.   Roger, can you tell me about some of the work.  Can you

3    describe what a helper's job is?

4    A.   Yes, sir.

5         As a helper, I would ride on the back of the rear load

6    truck.  When I first started, I started in Hollywood.  Anybody

7    that's familiar with the area knows that the bulk waste is put

8    out in the alleys in Hollywood in the back of people's homes.

9    So, it would be my job to ride on or walk behind the truck

10   through those alleys and pick up whatever bulk waste there is,

11   put it into the truck.  And as I said before, when the truck is

12   full, ride with the driver to the dump and dump that bulk

13   waste, go back on route and complete the route.

14   Q.   Okay.  What was your start time typically like?

15   A.   In Pines, when I started as a helper, we would start around

16   6:30 a.m., 6:15.

17   Q.   Okay.  Do you know how long it would typically take you to

18   complete your daily route?

19   A.   When I first started, it could be up to ten hours.

20   Q.   Okay.  What did you do after helper?

21   A.   I was given the position of bulk route driver.

22   Q.   What's a bulk route driver do?

23   A.   A bulk route driver, now I'm actually driving the truck

24   that's going through the alleys, and it's sort of an oxymoron,

25   but I help the helper.  I get out of the truck, and I still do

ANDREU - DIRECT/EDWARDS

1    the same thing, only now I have the added responsibility of

2    driving the truck through the alleys.

3    Q.   Is that a promotion from helper to residential bulk?

4    A.   Absolutely.

5    Q.   What did you do after residential bulk?

6    A.   Staying on residential bulk, but operating a different

7    truck.

8    Q.   What kind of a truck?

9    A.   A grapple truck.

10   Q.   What's that?

11   A.   A grapple truck could be viewed as somewhat of a truck with

12   a dump body and a grappling device that is operated by myself,

13   the driver, that extends from the vehicle out to where bulk

14   waste may be, to be collected, put into the truck, and then

15   taken to the dump.

16   Q.   Okay.  Did you drive any other equipment other than a

17   grapple truck?

18   A.   Yes, sir, a roll-off truck.

19   Q.   What's that?

20   A.   Roll-off truck, again, could be viewed as a type of a dump

21   truck, only the containers are left on site, whether it be a

22   compactor at an apartment complex, a Walmart, Target, whatever

23   commercial area.

24        The containers, you see a lot of those at construction

25   sites with construction debris in them, you go there with the

ANDREU - DIRECT/EDWARDS

1    truck, pick those containers up, dump them, and return them on

2    site.

3    Q.  What was your start time like?

4    A.  That job, I believe I started sometimes five a.m.

5    Q.  Okay.

6    A.  Maybe earlier.

7    Q.  Was -- any of these changes in equipment, was that a

8    promotion in your mind?

9    A.  Absolutely.

10   Q.  Did you ever receive any increase in your pay --

11   A.  Yes, sir, I did.

12   Q.  -- for any of those different assignments?

13   A.  I did.

14   Q.  What's a "rabbit truck"?

15   A.  A "rabbit truck," or the container delivery truck, if you

16   look, like, on the side of a 7-Eleven, you see these dumpsters.

17   That container truck can deliver those, delivering to your

18   homes the carts that you normally put your waste into.  That

19   truck, I'll deliver that with that, and also do repairs to some

20   of those containers.

21   Q.  Okay.  Did you ever work as a lead driver?

22   A.  Yes, sir.

23   Q.  What's that?

24   A.  Lead driver, again, the way that it was explained to me

25   when given the job, the responsibility obviously, they would

ANDREU - DIRECT/EDWARDS

1  call on me occasionally to teach some of the guys how to use

2  some of the equipment.

3  Q.  Okay.

4  A.  Or, uhm, teach them proficiencies in the route, things like

5  that.

6  Q.  Okay.  What were your hours like at this point?

7  A.  There -- there were -- there were some really long days.

8  Some days were 15-hour days, uhm.  As I was getting better and

9  more efficient, I could literally do my routes in well under

10  eight hours.

11  Q.  Can you tell me what a "transfer station" is?

12  A.  The transfer station that I'm familiar with in Coral

13  Springs allows for local residents of Coral Springs to present

14  their ID, come to the transfer station and be able to throw

15  away any bulk waste that they might have on the weekends, on

16  Saturdays and Sundays.  And then from there, that transfer

17  station is emptied out, the containers are taken to the

18  incinerator or the dump, or recycling plants, depending upon

19  what's in the container.

20  Q.  Okay.  How big size-wise is a transfer station?

21  A.  Maybe two football fields, maybe.

22  Q.  Okay.  As a part of your position -- what was your position

23  at the transfer station?

24  A.  When I first started there, I was just operating within the

25  transfer station, emptying cans and stuff.  And then it was

ANDREU - DIRECT/EDWARDS

1    requested of me that I oversee all of the operations of the

2    transfer station.  And if any of the other guys were sent out

3    there working, to supervise them and make sure that everything

4    functioned as it should.

5    Q.  Okay.  So, did you have any supervisory role over other

6    employees' activities?

7    A.  Out at the transfer station, yes.

8    Q.  Okay.  In your mind, was that a promotion?

9    A.  Sure.

10   Q.  Did you have any other positions with Waste Pro after the

11   transfer station supervisor?

12   A.  No.

13   Q.  I want to talk about something that we discussed a moment

14   ago about clocking out.

15         When you finished your daily route for the day, were

16   you allowed to just finish and clock out?

17   A.  No.  It's required that we do the 1098, that we let one of

18   the supervisors know we've completed our route before we go to

19   do our final dump or do the final check of the truck and drop

20   the truck off and clock out.

21   Q.  What's the 1098 policy, Roger?

22   A.  As I stated, we're required to call in to the supervisor,

23   let him know that we have completed our route, and that we're

24   gonna go dump the truck for the final time, and clock out for

25   the end of the day.

ANDREU - DIRECT/EDWARDS

1          **MR. EDWARDS:**  Your Honor, at this time, I'm showing

2     the witness an exhibit that was premarked for identification as

3     Plaintiff's Exhibit 13.

4          *(Plaintiff's Exhibit 13 marked for identification)*

5          **MR. EDWARDS:**  Your Honor, may I approach the witness?

6          **THE COURT:**  Okay.

7     BY MR. EDWARDS:

8     Q.  Roger, would you please look at that document and let me

9     know if you recognize it, please?

10    A.  I do.

11    Q.  How do you recognize it?

12    A.  My signature's on it.

13    Q.  Okay.  Can you tell me who it's from?

14    A.  Waste Pro.

15    Q.  How do you know that?

16    A.  Their title's up on top, "Waste Pro."

17    Q.  Do you recall receiving that document?

18    A.  I do.

19    Q.  Does that document appear to be in the same or

20    substantially the same condition as the last time you saw it?

21    A.  Yes, sir.

22          **MR. EDWARDS:**  Your Honor, at this time, plaintiff

23    offers what was premarked as Exhibit 13 into evidence.

24          **MS. TINGLEY:**  No objection.

25          **THE COURT:**  Thirteen will be received.

ANDREU - DIRECT/EDWARDS

```
 1            (Plaintiff's Exhibit 13 admitted into evidence)
 2         MR. EDWARDS:  Your Honor, may I publish to the jury?
 3         THE COURT:  Okay.
 4    BY MR. EDWARDS:
 5    Q.  Roger, does this document reflect the 1098 policy as you
 6    understand it?
 7    A.  Yes, sir.
 8    Q.  Did you ever have any issues complying with the 1098
 9    policy?
10    A.  Issues in what way?
11    Q.  It says you must call in on completion of your route for
12    further instructions.  Did you ever not call in?
13    A.  Yes.
14    Q.  Okay.  Do you know if finishing your route earlier affected
15    whether or not you might be assigned work -- additional work?
16    A.  Definitely in Hollywood.
17    Q.  When was this policy first explained to you?
18    A.  The date on there is 2013, November 28th.
19    Q.  That would have been shortly after your hire?
20    A.  Yes, sir.
21    Q.  Do you know where it was explained to you?
22    A.  In Hollywood, at the Pembroke Pines division.
23    Q.  Okay.  I don't mean geographically.  I mean a training
24    session, anything along those lines?
25    A.  I don't remember exactly.
```

ANDREU - DIRECT/EDWARDS

1    Q.  Okay.

2            MR. EDWARDS:  Your Honor, at this time, I'd show the

3    witness what was premarked for identification as Plaintiff's

4    Exhibit 5.

5            (Plaintiff's Exhibit 5 marked for identification)

6            MS. TINGLEY:  Thank you.

7            MR. EDWARDS:  May I approach the witness?

8            THE COURT:  All right.

9    BY MR. EDWARDS:

10   Q.  Roger, please take a look at that document and let me know

11   if you recognize it?

12   A.  I do.

13   Q.  Okay.  Can you tell me what that is?

14   A.  Similar, it's the 1098 policy in the Pompano division.

15   Q.  Okay.  Can you tell me who it's from?

16   A.  Waste Pro.

17   Q.  How do you know that?

18   A.  It's on top here, "Waste Pro."

19   Q.  Okay.  Is that document in the same or substantially the

20   same condition it was as the last time you saw it?

21   A.  Yes, sir.

22           MR. EDWARDS:  Your Honor, at this time, plaintiff

23   offers what was premarked for identification as Exhibit 5 into

24   evidence.

25           MS. TINGLEY:  No objection, your Honor.

ANDREU - DIRECT/EDWARDS

| | |
|---|---|
| 1 | **THE COURT:**  Five will be received. |
| 2 | *(Plaintiff's Exhibit 5 admitted into evidence)* |
| 3 | **MR. EDWARDS:**  Your Honor, may I publish to the jury? |
| 4 | **THE COURT:**  All right. |
| 5 | BY MR. EDWARDS: |
| 6 | Q.  Roger, do you know how many times you were advised of the |
| 7 | 1098 policy? |
| 8 | A.  Numerous, over the years. |
| 9 | Q.  This one looks to be a little less than two years after the |
| 10 | first one.  Uhm, did you ever see anybody receive a punishment |
| 11 | for not complying with the 1098 policy? |
| 12 | A.  Sure. |
| 13 | Q.  You ever see anyone get terminated? |
| 14 | A.  I can't say I saw someone get terminated, no. |
| 15 | Q.  This lists that that's a possibility, though, right? |
| 16 | A.  Yes, it is. |
| 17 | Q.  Was that something you were concerned with? |
| 18 | A.  Everyone's concerned with it.  It's there in writing. |
| 19 | Q.  So, how would it -- how would you properly comply with the |
| 20 | 1098 policy?  How would that come about? |
| 21 | A.  Finishing my task for the day and, prior to bringing the |
| 22 | truck back to the division, calling one of the route |
| 23 | supervisors and letting him know that I completed my route. |
| 24 | Q.  Okay.  Who -- give me an example of some of your route |
| 25 | supervisors. |

ANDREU - DIRECT/EDWARDS

1   A.   In Hollywood, it was Elliot.   In Pompano, Troy or Shawn,

2   Art.   There's just -- there were numerous supervisors over the

3   years.

4   Q.   Okay.   Did it fluctuate -- or you tell me.   Did it

5   fluctuate?

6   A.   *(No response)*

7   Q.   Did your supervisor change?

8   A.   Quite often, yes.

9   Q.   Okay.   Do you know how often?

10  A.   Again, often.   It wasn't -- it's an industry that has a

11  large turnover rate.

12  Q.   Okay.   Did you know who you needed to call in to?

13  A.   In the mornings, we would be told, yes, sir.

14  Q.   Did you know who was permitted within Waste Pro to assign

15  you additional tasks?

16  A.   Whomever your route supervisor was for the day.

17  Q.   Okay.

18  A.   Or anybody above him, an operations manager, a division

19  manager, whoever.

20  Q.   Can you give us some examples of the additional tasks you

21  would ask -- be asked to do upon completion of your daily

22  route?

23  A.   Depending on what type of equipment I was operating, if I

24  was doing a roll-off, it could be anything from going to

25  service a Walmart or any other commercial account that they may

ANDREU - DIRECT/EDWARDS

1    have had.  If I'm on a rear loader, it could be going to

2    collect from homes that weren't serviced or missed.

3          The worst one, of course, is, as I stated before, some

4    of the guys that believe they're getting over, where they work

5    really slow, because they know somebody's gonna come and help

6    them.

7    Q.  Okay.  Did you ever understand this additional work to be

8    compensated by your daily rate?

9    A.  My belief always was that what I was told during the hiring

10   process, I held with me throughout my tenure there.  Come in,

11   in the morning, clock in, receive your route from your

12   supervisor, complete that route, and you should be able to go

13   home.  One of the incentives to doing that obviously is, if I'm

14   granted X amount of dollars for eight hours, as was explained

15   to me, if I do that same amount of work within four or five

16   hours, naturally my hourly rate is higher.

17   Q.  Were you ever asked -- or were you ever offered additional

18   compensation for these services?

19   A.  Yes, sir.

20   Q.  Can you give me an example of how that process would come

21   about?

22   A.  Completing my route, call a route supervisor, or even on my

23   route, prior to finishing, something needs to be done, I can

24   get a phone call, and it will be something to the effect of, We

25   have X, Y, Z that needs to be completed.

ANDREU - DIRECT/EDWARDS

1          A lot of times, as was talked about earlier, obviously
2     I'm gonna try to negotiate some money for that.  A lot of times
3     money was offered to me for it, whether it be, Hey, I'll give
4     you 50 bucks, go and help so and so complete his route, or I'll
5     give you $200 to go and help pick up a route that wasn't done
6     the day before.  Other than that, that's pretty much it, how
7     that process took place.
8     Q.  Okay.  How long, if you can approximate for me, would these
9     additional tasks take you to complete?
10    A.  It depends.  If -- say we're in Pembroke Pines, and
11    somebody didn't do a recycling route or a solid waste or a bulk
12    route, an entire route, that could take five, six hours.  It
13    could take a long time.
14         If it's something as simple as, I need you to go and
15    take care of a compactor, it could take two hours.
16    Q.  Okay.  Would that be -- that time, whether it was two
17    hours, whether it was six hours, would that be, if you're
18    aware, added into your total hours for the day?
19    A.  It's added into the total hours of the day, yes, sir.
20    Q.  Were you ever asked to do the work without compensation?
21    A.  I wouldn't say asked.  It was asked of me to help.  And
22    then it could be told to me that I have to do it.
23    Q.  Did you ever decline?  Did you ever say, I'm not gonna do
24    it?
25    A.  Absolutely.

ANDREU - DIRECT/EDWARDS

1   Q.  What kind of reaction were you met with?

2   A.  It depends on who I'm talking to.

3   Q.  Okay.  Did you ever have any confrontation with any of your

4   supervisors over that?

5   A.  One of the confrontations I had, at the beginning of my

6   time with Waste Pro, was with Elliot.

7   Q.  Who was Elliot?

8   A.  He was my Hollywood bulk route supervisor.

9   Q.  Okay.

10  A.  I had completed my route.  Shawn was the driver.  We were

11  anxious to go home.  We did what we had to do.  He was on the

12  phone with Shawn, and I remember him saying to meet him at one

13  of the shopping centers.  And we went over there to meet him at

14  the shopping center, and he says, I need you guys to go, you

15  know, do these alleys.  And I was like, We did everything that

16  was assigned to us.  I want to go home, and I have to go home.

17  And Shawn was feeling the same way.  He wanted to leave.  And

18  he made a comment that day.  He's like, Well, we own you for 12

19  to 15 hours a day.  And --

20  Q.  Did that comment make sense with your understanding of how

21  you were being paid by Waste Pro?  We own you for 12 to

22  15 hours?

23  A.  No, it didn't.  Because I -- again, my belief always was,

24  you get your route assignment in the morning, what is your

25  responsibility, and you do it as best you can.  If it takes you

ANDREU - DIRECT/EDWARDS

```
1    five hours, you took five hours to do your route.  The other
2    guys, if they're slacking, and they fall behind, and they want
3    to take their time, they take longer, okay, well, they took
4    longer.  But it can be done.
5    Q.  Okay.  How many times a week, approximately, would you say
6    you were asked to do extra work after your daily route was
7    completed?
8    A.  My goodness, in Hollywood, two, three times a week easily.
9    Q.  Okay.  Did it change when you moved divisions or anything
10   like that?
11   A.  If I averaged it out, it would be two, three times a week,
12   no matter where you are.
13   Q.  Okay.  Were there ever occasions where you were asked to do
14   work, and you agreed to do the extra work for some additional
15   compensation, and that compensation wasn't paid to you?
16   A.  Absolutely.
17   Q.  Do you know how often that would happen?
18   A.  Probably two out of three times.
19   Q.  Okay.  Can you give me a specific instance where that
20   happened?
21   A.  The most recent was actually on Easter Sunday of 2017.
22   Q.  What happened on Easter Sunday of '17?
23   A.  I was told by Shawn that he received a call from Russell
24   that there was a compactor in an apartment complex that wasn't
25   operating, could I please go and check it out.  And if the
```

ANDREU - DIRECT/EDWARDS

1   compactor isn't working, if there's nothing I could do to get

2   it working, go to the Pompano division, get a truck, go to the

3   Coral Springs transfer station, get a can, bring it back to

4   Fort Lauderdale, and then turn the truck back in, in Pompano,

5   and then I'll go back to Easter brunch with my family.

6   Q.  Did you agree to do that work that day?

7   A.  Yes, sir, I did.

8   Q.  On that day, on Easter Sunday, were you paid your day rate?

9   A.  No.  They didn't give me the day rate either.

10  Q.  Okay.  Did they give you the bonus?

11  A.  No, I didn't get the bonus from them.

12  Q.  Okay.

13       **MR. EDWARDS:**  Your Honor, at this time, the plaintiff

14  would offer into evidence, through stipulation, what has been

15  previously marked as Plaintiff's Exhibits 1, 2, 3, 7, 8, and 9.

16       *(Plaintiff's Exhibits 1, 2, 3, 7, 8, and 9 marked for*

17  *identification)*

18       **THE COURT:**  All right.  If there's no objection, 1, 2,

19  3, 7, 8, and 9 will be received.

20       **MS. TINGLEY:**  No objection.

21       **MR. EDWARDS:**  Thank you, your Honor.

22       *(Plaintiff's Exhibits 1, 2, 3, 7, 8, and 9 admitted*

23  *into evidence)*

24  BY MR. EDWARDS:

25  Q.  Roger, can you tell us how your time was kept?

ANDREU - DIRECT/EDWARDS

1  A.  I would clock in, in the morning, and I would clock out in

2  the evenings after completing my routes.

3  Q.  Okay.  Do you know if that was ever recorded through any

4  system with Waste Pro?

5  A.  I'm sorry, could you ask me that again?

6  Q.  Yes.  I'm sorry.  One moment.

7       Do you know if that was ever recorded through a system

8  with Waste Pro?

9  A.  The ADP system.

10 Q.  Okay.  I'm gonna show you what's been entered into

11 evidence, and I promise not to go through each and every one of

12 these with you.

13 A.  All right.

14 Q.  Can you tell us what we're looking at here?

15 A.  That would be a copy of my time card for the time period of

16 4-27-2014 to 5-10-2014, a two-week period.

17 Q.  Okay.  Would you see these types of requests -- or these

18 types of records?

19 A.  Not on paper like this, but on the time clock, prior to

20 approving my time for the two-week period, I could scroll

21 through, and I would see the information of clock-in and

22 clock-out time.

23 Q.  Okay.  It says "time card approval by employee."  Did you

24 approve the time cards?

25 A.  Absolutely.  I always approved all of my time cards.

ANDREU - DIRECT/EDWARDS

1  Q.  Okay.  Do you take any issue with any of the recorded time?

2  Do you think your time was ever recorded incorrectly?

3  A.  As was stated earlier, if there's something that's

4  incorrect on there, I was always able to reach out to Regina,

5  and she would make corrections, if she was able to do it.

6  Q.  Okay.  So, as it pertains to the time from 4-27-14 through

7  5-9-15, do you have any issue with that?

8  A.  No.

9  Q.  How about May of '15 to May of '16, any issue with that

10  time?

11  A.  No.

12  Q.  How about May of '16 through May of '17, any issue with

13  that time?

14  A.  No.

15  Q.  Okay.  I'm gonna show you another set of documents, Roger.

16  And, again, I promise not to make you go through each and every

17  one of them.

18       Can you tell me what we're looking at here?

19  A.  That would be one of my earnings statements.

20  Q.  Okay.  I want to talk about these earnings statements with

21  you.

22       Can you tell me what's listed here?

23  A.  The pay period when it began, the pay period when it ended,

24  and the date that I received the actual pay for that time

25  period.

ANDREU - DIRECT/EDWARDS

1   Q.   Okay.  How about what's listed here *(indicating)*?  What

2   does that mean to you?

3   A.   My daily rate, the number of days that I worked in week 1,

4   the number of days I worked in week 2, and the total number of

5   days for the two-week period.

6   Q.   Okay.  You worked two seven-day weeks in a row?

7   A.   Yes, sir, quite often.

8   Q.   How about over here *(indicating)*, as you understand it,

9   what does "regular" mean?

10  A.   Regular, as I understood it, is that we work the six days,

11  and every day for the eight hours, you're given the regular

12  rate, which would be the $155 for that day.

13  Q.   Roger, do you understand how it was that you were paid

14  $2,170 for your first 80 hours and then 529 for the next 70.36?

15  A.   No.  I questioned it all the way to almost my last day with

16  Waste Pro, how it was possible for me to work 70 hours of

17  overtime, and the more hours of overtime I work, the more money

18  they make, the less money I make.  My rate literally declines

19  as I work more hours.

20  Q.   Okay.  How about bonus?  Do you know what "bonus" means?

21  A.   Bonus could be the safety bonus.  Sometimes under "bonus,"

22  they may put times that I have helped and calculate it as

23  bonus.

24  Q.   Okay.  If we look at the second page of plaintiff's -- what

25  was premarked as Plaintiff's Exhibit 2, can you tell me now,

ANDREU - DIRECT/EDWARDS

1    based on looking at this, what that bonus may have been for,

2    the hundred dollars in bonus that's reflected there?

3    A.  No, I can't.

4    Q.  Okay.  I'm gonna show you the next page.  It looks like

5    there's a $250 bonus there.  Do you know what that's for?

6    A.  I would guess that it could include the safety bonus as

7    well as an additional helper bonus.

8    Q.  Okay.  How do you -- why do you suspect that there is a

9    helping bonus on that --

10   A.  Because it's above the hundred dollars, and the safety

11   bonus is only $50 a week, if I earn it.

12   Q.  Okay.  I want to show you another page of this.

13        If you will -- can you see that okay?

14   A.  Yeah, I can see it fine.

15   Q.  Take a look with me at the June 2 date.  Do you see that?

16   A.  Yes, sir.

17   Q.  Can you tell me, does it look like you received a bonus on

18   that day?

19   A.  There's a bonus above it and a bonus below it.  It could be

20   for that day.

21   Q.  Okay.  Can you tell me, by looking at this --

22   A.  Right.

23   Q.  -- how many hours was spent doing your daily assigned route

24   versus a bonus route?

25   A.  Typically, I could tell, because I would know more or less

ANDREU - DIRECT/EDWARDS

1    about how much time it takes me to normally complete the

2    average route that was issued to me.  So, if I'm working for,

3    say, a day of 15 hours, I know that I must have helped somebody

4    on that day, I must have done additional tasks on that day,

5    because they don't design the routes -- that's one thing that

6    they do not do is design a route where it's gonna force someone

7    to work 15 hours.

8    Q.  Okay.  In any of the four years that you worked for

9    Waste Pro, do you recall your daily route taking you 15 hours

10   to complete?

11   A.  No.  No, it wouldn't take 15 hours to complete a route.

12   Q.  Okay.  So, if you look at the June 2nd date, are you able

13   to distinguish for us here today how much time of that

14   13.88 hours was spent doing your regular route versus any bonus

15   route -- or bonus work?

16   A.  Again, if I -- I were to look at it and see over -- over

17   13 hours, as I do here, I would assume that at least five of

18   those hours were doing additional tasks.

19   Q.  I want to show you just a couple more records here, Roger.

20        If you will, I'm gonna skip right ahead to January 8th

21   of 2016.  Do you know what position you were working in January

22   of 2016?

23   A.  In January of 2016, I would have been in the Pompano

24   division.

25   Q.  Okay.  Do you know what kind of job you were doing?

ANDREU - DIRECT/EDWARDS

1   A.   I could have been doing the -- I could have been operating

2   the grapple truck at that time.

3   Q.   Okay.  This lists a holiday.  Do you know what "holiday"

4   means?

5   A.   Yes, I do.

6   Q.   Do you have any explanation as to why it's listed as eight

7   hours?

8   A.   Holidays, sick days, any other vacation and stuff, it's

9   eight hours means one day.

10  Q.   Okay.  Looking at the next time record, you mentioned sick

11  days.  Do you have any explanation as to why sick day is listed

12  as an eight-hour day?

13  A.   Again, a day is eight hours.

14  Q.   Okay.  Take a look within this pay range for me, if you

15  will, at your work on January 14th.

16  A.   Um-hum.

17  Q.   How many hours did you work on January 14th?

18  A.   17.45 hours.

19  Q.   Did it ever take you 17.45 hours to complete your daily

20  route?

21  A.   Absolutely not.

22  Q.   Do you have any explanation as to why that time is recorded

23  at that extent without a bonus?

24  A.   I was doing additional tasks.

25  Q.   How do you know that?

ANDREU - DIRECT/EDWARDS

1    A.  Because, again, it would never take me 17.45 hours, or

2    anybody else, that long to complete a route.

3    Q.  Okay.  I'm gonna show you just a couple more of these.

4         Take a look with me here at your pay period of

5    February 5th of 2016.  How many hours did you work in that pay

6    period?

7    A.  166 hours.

8    Q.  Okay.  If you were asked how to figure out how many dollars

9    per hour your overtime was paid to you at, do you know how to

10   do that equation?

11   A.  I -- I believe I do.  I would take the $587.94, divide it

12   by 86.06.

13   Q.  Do you know if that's above or below minimum wage?

14   A.  It comes out to about six dollars and change an hour.

15   Q.  Okay.  Just a couple more of these to go through with you,

16   Mr. Andreu.

17        I'm gonna skip ahead to September 30th of 2016.  Give

18   me one moment to arrange this.

19   A.  All right.

20   Q.  I'm showing you your earnings statement for September 30th

21   of 2018 *(sic)*.  Can you tell me how many days you worked in

22   week one?

23   A.  It says 5.50, indicating five-and-a-half days.

24   Q.  Can you explain that?

25   A.  No.

ANDREU - DIRECT/EDWARDS

1   Q.  Why not?

2   A.  Because I shouldn't have a half a day.  If I clocked in,

3   and I clocked out, I should have received my day rate, if I

4   went to work that day.

5   Q.  If we look at this, it looks like at least on one of these

6   days, on September 14th, your route only took you 3.3 hours --

7   3.33 -- excuse me.  Do you know why that is?

8   A.  The Wednesday route that I got in Coral Springs was over

9   off the Sawgrass Expressway and is an incredibly simple, easy

10  route to do.  Actually, when they said that they didn't have

11  the rear load driver for that day, and they asked me to do it,

12  I had no objections, and I went, and I did that.  Because I

13  know I was able to knock that route out in four hours tops.

14  Q.  Okay.  If you finished a route --

15  A.  Um-hum.

16  Q.  -- in 3.33 hours, did you still expect your day rate?

17  A.  Sure.

18  Q.  Do you have any explanation for us as to why you did not

19  receive that day rate?

20  A.  Well, by now, I was -- I learned that if you now, all of a

21  sudden, clock out before 11:30, you don't get the day rate.

22  Q.  Were you ever told at any point during the four years that

23  you worked for Waste Pro that if you finished your route too

24  fast, you wouldn't be paid your day rate?

25  A.  No.  No, that's why when this started to happen, and I

ANDREU - DIRECT/EDWARDS

1  would get the half, you know, the few times that I did, it was

2  new to me and new to a lot of guys that weren't aware of it.

3  Q.  I've got one more record to show you --

4  A.  Um-hum.

5  Q.  -- from your pay records, Mr. Andreu.  Give me one moment.

6       I'm gonna show you your pay record for April 28th of

7  2017.  How many days did you work in week 2?

8  A.  6.50, six-and-a-half days.

9  Q.  Same question.  Any explanation as to why there's a half

10  day paid there?

11  A.  Again, it's less than 4.1 hours worked.

12  Q.  I want to show you your time for this pay cycle.

13       Can you see with me Sunday, 4-16, it looks like you

14  only worked 2.28 hours.  Do you remember when that was?

15  A.  Easter Sunday.

16  Q.  Is that the description that you gave us previously about

17  Easter Sunday?

18  A.  Yes, it is.

19  Q.  So, you were not paid even your full day rate on that day?

20  A.  No, I was not.

21  Q.  Do you have any explanation as to why you didn't receive

22  your full day rate on that day?

23  A.  The only reason I see is that it's less than 4.1 hours.

24  Q.  Did you ever ask anybody, when you would get these pay

25  sheets, about, "Why am I getting paid this way?  This isn't

ANDREU - DIRECT/EDWARDS

1   making sense with my understanding."  Anything along those

2   lines?  Did you ever ask that question?

3   A.  Yeah, absolutely.  From almost the onset of my employment

4   with Waste Pro, I would wonder about how it is that overtime is

5   calculated in this manner.

6   Q.  Okay.

7   A.  You know, what it is.  I've asked it from Regina Lombardo,

8   I've asked it from Elliot, Carlos, Kenny, Troy.  Explanations

9   were given along the way.

10  Q.  Okay.

11  A.  But, in reality, they didn't even know how this is

12  calculated.  Nobody could say to me how it is that they come to

13  the conclusion that if you work X amount of hours of overtime,

14  you actually get less money, and at some points, you receive

15  literally less than minimum wage for overtime, which I assume

16  should be at time and a half.

17  Q.  At any time in the four years that you worked for

18  Waste Pro, did you ever understand how it was that you were

19  paid or how you were paid overtime?

20  A.  I understand how I'm paid in the sense of the day rate that

21  was discussed.  And I understand the benefits that came with

22  it.  What I never comprehended was exactly what I just said,

23  which was how is it possible for someone to work, in that

24  instance there, 166 hours and literally make less money than if

25  I worked 40 hours?

ANDREU - DIRECT/EDWARDS

1   Q.   Roger, when did you leave Waste Pro?

2   A.   2017 I left.

3   Q.   Why did you leave Waste Pro?

4   A.   I know it sounds easy when explained by someone else that

5   wasn't present when it happened, but I showed up for work, just

6   came off of surgery the day before.

7   Q.   What kind of surgery?

8   A.   My back, my neck.

9        I went to work.  I was gonna do my job.  I was gonna

10  get my route done.  And when I approached the person that was

11  in charge of my task assignment for that day, I explained to

12  him, right as I walked in, I said, Hey, I'm here for you today.

13  I got it.  I could do mine.

14       He says, Well, I got some other things I need to get

15  done.

16       I said, Man, I really -- you know, I'll get this done,

17  but I want to go home.

18       Well, I don't -- I don't care how you do it, get it

19  done.

20  Q.   How did that make you feel, Roger?

21  A.   Well, he turned his back on me, he walked away.  And I'll

22  be honest with you, I mean, I look back on it, and I say to

23  myself, maybe -- maybe -- maybe he could have talked to me a

24  little differently, or maybe I could have not acted as quickly

25  as I did, but right then and there, just something was like,

ANDREU - DIRECT/EDWARDS

1   you really don't give a -- I don't want to curse.

2           **THE COURT:**  So don't.

3   A.  You really don't give a damn about me.  You know, that's

4   what's going through my head.  I'm not saying that to the

5   supervisor, because I didn't actually say "I quit" yet.  You

6   know, this is all running through my head.  And I just -- I'm

7   like, I'm treated like a less than, you know, and just so much

8   was running through my head, where I walked up to him and told

9   him -- I said, You know what, I'd rather just resign.  I'm not

10  gonna -- I'm not doing this.  I'm not killing myself anymore

11  for you.  I'm not going out here.  I'm not gonna work all these

12  hours today, and all I asked was, Listen, I just came off of

13  this surgery.  I just want to do what I have to do and go home.

14          And he just ignored all of that.  He chose to ignore

15  it.  He chose to just treat me like -- no pun intended -- like

16  trash.  Just get out of here, you know.

17  Q.  Let me ask you this, Roger.  Did you bring this case

18  because you're upset at that supervisor?

19  A.  Absolutely not.  I'm not upset at him.  I'm not upset with

20  Russell that I had a quasi, you know, relationship with outside

21  of the work, with our fantasy football and stuff, or especially

22  Regina Lombardo, or anybody else that's here.

23          My entire grievance over this whole process is how is

24  it possible that there exists a system that could take and work

25  a man for 166 hours, and the more that he works, his rate of

ANDREU - DIRECT/EDWARDS

1  hourly -- his hourly rate literally declines, to the point

2  where I'm working for less than minimum wage, overtime hours

3  much the less -- are less than minimum wage.  That never made

4  sense to me, ever.  And it still doesn't today.  And until this

5  day, nobody's ever been able to explain to me this magical

6  formula that they have that allows them to do that.

7         And all due respect to everybody involved in this,

8  from the beginning, I always said --

9         **MS. TINGLEY:**  Your Honor, I'm gonna object to the

10 narrative at this point.

11        **THE COURT:**  Next question.

12 BY MR. EDWARDS:

13 Q.  Let me ask you this.  Any bad blood between you and

14 Waste Pro or you and Mr. Mackie?

15 A.  Absolutely not.  It's not about Russell Mackie.  It's not

16 about Waste Pro.  It's about the pay policy, and how it is that

17 they're able to pay me $6.80 an hour, when if you look at my

18 hourly rate on there, it should be 20-some-odd dollars an hour.

19 But because I worked more hours, I made less -- I literally

20 declined my hourly rate?  It made no sense to me.  And that's

21 what has driven me all along.  You know, to say, after I was

22 out there looking for work and hustling and guys telling me,

23 they're like --

24        **MS. TINGLEY:**  Your Honor, I'm gonna object.  He's

25 about to -- hearsay.

1    **MR. EDWARDS:**  We have no further questions for this

2    witness, your Honor.  Thank you.

3    **THE COURT:**  All right, members of the jury, we're

4    going to go ahead and recess for the evening.  Remember my

5    admonition not to discuss the case or allow it to be discussed

6    in your presence.  I've got a hearing at nine o'clock tomorrow,

7    so I'm gonna ask you to come in at 9:30.

8    So have a nice evening.  We'll see you back tomorrow

9    at 9:30.

10   **COURTROOM SECURITY OFFICER:**  All rise.

11   *(The jury exited the courtroom)*

12   **THE COURT:**  And if there's nothing else to come before

13   the Court, we'll be in recess in this case until 9:30 tomorrow

14   morning.

15   **MS. TINGLEY:**  Thank you, your Honor.

16   **MR. HUDSON:**  Thank you, your Honor.

17   **MR. EDWARDS:**  Nothing from the plaintiff, your Honor.

18   Thank you.

19   *(The Judge exited the courtroom)*

20   *(Proceedings concluded at 4:57 p.m.)*

21                    -  -  -  -  -

22

23

24

25

```
1                              INDEX

2    OPENING STATEMENT                      PAGE

3    By Mr. Edwards                          12

4    By Ms. Tingley                          14

5                        -  -  -  -  -

6                     INDEX OF WITNESSES

7    PLAINTIFF'S WITNESS                    PAGE

8    Roger Andreu
     Direct by Mr. Edwards                   29
9

10                       -  -  -  -  -

11                    INDEX OF EXHIBITS

12   PLAINTIFF'S EXHIBITS:          MARKED      RECEIVED

13    4                               36           36
      14                              38           39
14    13                              55           56
      5                               57           58
15    1, 2, 3, 7, 8, and 9            64           64

16                       -  -  -  -  -

17

18

19                  C E R T I F I C A T E

20    I certify that the foregoing is a correct transcript from

21    the record of proceedings in the above-entitled matter.

22

23
        /S/Francine C. Salopek                5-12-18
24    Francine C. Salopek, RMR-CRR       Date
      Official Court Reporter
25
```

**COURTROOM SECURITY OFFICER: [2]** 12/5 78/9
**MR. EDWARDS: [25]**
**MR. HUDSON: [1]** 78/15
**MS. TINGLEY: [19]**
**ROOM CLERK: [1]** 10/24
**THE COURT REPORTER: [3]** 13/19 29/7 29/9
**THE COURT: [29]**
**THE WITNESS: [1]** 29/12

**$**
**$155 [1]** 67/12
**$2,170 [1]** 67/14
**$200 [1]** 61/5
**$250 [1]** 68/5
**$300 [1]** 25/15
**$50 [2]** 25/16 68/11
**$587.94 [1]** 71/11
**$6.80 [1]** 77/17
**$74,000 [1]** 25/25
**$7500 [1]** 26/2

**'**
**'15 [1]** 66/9
**'16 [2]** 66/9 66/12
**'17 [2]** 63/22 66/12

**.**
**.5 [1]** 20/19

**/**
**/S/Francine [1]** 79/23

**1**
**1.5 [1]** 20/19
**100 percent [1]** 44/22
**1098 [9]** 35/8 54/17 54/21 56/5 56/8 57/14 58/7 58/11 58/20
**1098 policy [2]** 22/18 22/18
**11:30 [1]** 72/21
**12 [3]** 62/18 62/21 79/3
**13 [5]** 55/3 55/4 55/23 56/1 79/14
**13 hours [1]** 69/17
**13.88 hours [1]** 77/18
**14 [7]** 38/17 38/18 39/13 39/18 66/6 79/4 79/13
**14th [3]** 70/15 70/17 72/6
**15 [2]** 45/17 66/7
**15 hours [8]** 22/9 22/16 62/19 62/22 69/3 69/7 69/9 69/11
**15-hour [1]** 53/8
**16 [3]** 1/7 3/1 73/13
**166 [1]** 71/7
**166 hours [2]** 74/24 76/25
**17-60926-CIV-WPD [1]** 1/4
**17.45 [1]** 70/18
**17.45 hours [2]** 70/19 71/1
**18 [1]** 79/23
**1972 [1]** 29/21
**1989 [1]** 48/3

**2**
**2.28 hours [1]** 73/14
**20-some-odd [1]** 77/18
**2010 [1]** 47/24
**2013 [5]** 15/12 17/17 30/10 30/11 56/18
**2014 [2]** 65/16 65/16
**2016 [6]** 25/24 69/21 69/22 69/23 71/5 71/17
**2017 [4]** 16/22 63/21 73/7 75/2
**2018 [3]** 1/7 3/1 71/21
**205F [1]** 2/10
**20th [1]** 2/3
**22 [2]** 48/18 49/1

**220 [1]** 2/6
**28th [2]** 56/18 73/6
**29 [1]** 79/8
**299 [1]** 2/10
**2:46 [2]** 1/7 3/1
**2:58 [1]** 11/13
**2nd [1]** 69/12

**3**
**3.3 hours [1]** 72/6
**3.33 [1]** 72/7
**3.33 hours [1]** 72/16
**30 minutes [1]** 45/18
**30th [2]** 71/17 71/20
**32801 [1]** 2/7
**33301 [1]** 2/10
**33304 [1]** 2/4
**36 [2]** 79/13 79/13
**38 [1]** 79/13
**39 [1]** 79/13
**3:09 [1]** 11/13

**4**
**4-16 [1]** 73/13
**4-27-14 [1]** 66/6
**4-27-2014 [1]** 65/16
**4.1 hours [2]** 73/11 73/23
**40 hours [2]** 18/14 74/25
**4:57 [1]** 78/20

**5**
**5-10-2014 [1]** 65/16
**5-12-18 [1]** 79/23
**5-9-15 [1]** 66/7
**5.50 [1]** 71/23
**50 bucks [1]** 61/4
**529 [1]** 67/14
**55 [1]** 79/14
**56 [1]** 79/14
**57 [1]** 79/14
**58 [1]** 79/14
**5th [1]** 71/5

**6**
**6.50 [1]** 73/8
**60 [1]** 11/22
**64 [2]** 79/15 79/15
**6:15 [1]** 50/16
**6:30 a.m [1]** 50/16

**7**
**7-Eleven [1]** 52/16
**70 hours [1]** 67/16
**70.36 [1]** 67/14
**769-5657/mjsfcs [1]** 2/11

**8**
**80 hours [2]** 33/6 67/14
**801 [1]** 2/3
**86.06 [1]** 71/12
**8th [1]** 69/20

**9**
**954 [1]** 2/11
**9:30 [3]** 78/7 78/9 78/13

**A**
**A-N-D-R-E-U [1]** 29/13
**a.m [2]** 50/16 52/4
**abided [1]** 29/4
**ability [1]** 5/20
**abnormal [1]** 49/22
**above [5]** 59/18 68/10 68/19 71/13 79/21
**above-entitled [1]** 79/21
**absolutely [13]** 33/24 44/22 47/12 48/14 51/4 52/9 61/25 63/16 65/25 70/21 74/3

**76/19 77/15**
**accidents [1]** 25/8
**accordingly [1]** 40/5
**account [2]** 5/20 59/25
**accounts [1]** 16/8
**acknowledging [1]** 35/2
**acquire [1]** 8/12
**Act [3]** 6/10 18/9 27/23
**acted [1]** 75/24
**actions [1]** 48/25
**activities [1]** 54/6
**acts [1]** 24/24
**added [3]** 51/1 61/18 61/19
**addition [3]** 7/20 25/19 32/14
**adjudication [1]** 48/2
**adjustments [1]** 22/2
**admitted [6]** 5/12 36/15 39/18 56/1 58/2 64/22
**admonition [2]** 12/11 78/5
**ADP [1]** 65/9
**advantage [1]** 44/22
**advice [1]** 28/3
**advised [1]** 58/6
**affect [1]** 32/23
**affected [1]** 56/14
**affecting [1]** 6/2
**afforded [1]** 48/21
**afternoon [3]** 24/16 29/16 29/17
**age [3]** 7/19 48/18 49/1
**agree [1]** 64/6
**agreement [2]** 34/16 34/19
**agrees [1]** 4/20
**AL [1]** 1/8
**alleys [7]** 37/17 44/25 50/8 50/10 50/24 51/2 62/15
**allow [7]** 5/11 10/13 10/17 12/12 15/17 20/16 78/5
**allowed [3]** 7/3 45/5 54/16
**allows [4]** 20/24 26/7 53/13 77/6
**almost [4]** 30/8 44/22 67/15 74/3
**alternative [4]** 19/10 20/6 20/14 21/12
**alternatives [2]** 20/10 20/10
**although [1]** 41/23
**amount [11]** 21/14 22/10 24/6 26/8 28/11 31/12 32/4 42/12 60/14 60/15 74/13
**Amy [1]** 2/5
**ANDREU [19]**
**Andreu's [1]** 24/13
**answer [3]** 4/25 5/2 5/5
**answers [1]** 4/14
**anxious [1]** 62/11
**anymore [2]** 21/16 76/10
**aol.com [1]** 2/11
**apartment [2]** 51/22 63/24
**APPEARANCES [1]** 2/1
**application [1]** 30/21
**applied [2]** 17/17 23/20
**applies [1]** 14/19
**apply [3]** 3/9 3/11 30/20
**approach [4]** 35/17 38/20 55/5 57/7
**approached [1]** 75/10
**appropriately [1]** 14/15
**approval [2]** 26/22 65/23
**approve [3]** 26/22 26/24 65/24
**approved [1]** 65/25
**approving [1]** 65/20
**approximate [1]** 61/8
**approximately [1]** 63/5
**April [3]** 1/7 3/1 73/6
**April 28th [1]** 73/6
**area [6]** 21/23 21/24 21/24 37/14 50/7 51/23
**areas [2]** 34/4 39/25
**aren't [4]** 4/7 4/11 4/13 43/23
**argumentative [1]** 9/12
**arguments [5]** 4/7 4/8 4/10 7/15 9/22
**arrange [1]** 71/18

**A**

**Art [1]** 59/2
**assign [2]** 21/25 59/14
**assigned [13]** 16/23 16/24 19/22 19/23 21/22 21/22 22/23 32/8 40/15 41/10 56/15 62/16 68/23
**assignment [2]** 62/24 75/11
**assignments [2]** 16/3 52/12
**assume [2]** 69/17 74/15
**assure [1]** 40/23
**attend [1]** 33/11
**attorney [1]** 27/25
**attorneys [1]** 12/14
**audit [1]** 28/1
**audited [1]** 28/1
**Avenue [2]** 2/3 2/6
**average [2]** 42/8 69/2
**averaged [1]** 63/11
**avoid [1]** 19/11
**aware [4]** 13/5 34/10 61/18 73/2

**B**

**balancing [1]** 6/21
**base [3]** 8/9 8/11 9/19
**basic [1]** 3/4
**basis [4]** 19/9 20/15 22/11 28/18
**began [1]** 66/23
**begin [3]** 7/13 7/16 10/14
**beginning [5]** 16/18 32/8 32/10 62/5 77/8
**behind [4]** 29/11 42/14 50/9 63/2
**belief [2]** 60/9 62/23
**believability [1]** 6/2
**believe [18]**
**below [2]** 68/19 71/13
**benefit [3]** 21/12 21/13 31/14
**benefits [1]** 74/21
**beyond [2]** 21/3 46/19
**bias [1]** 5/23
**blood [1]** 77/13
**Blvd [1]** 2/10
**body [1]** 51/12
**bonus [27]**
**bonuses [8]** 25/13 25/19 26/1 26/1 26/2 40/4 40/6 40/10
**bothered [1]** 16/18
**brain [1]** 49/8
**brake [1]** 41/3
**brakes [1]** 41/2
**branch [1]** 17/24
**break [3]** 10/7 10/16 25/8
**breaks [1]** 10/9
**broke [2]** 25/14 28/12
**broken [5]** 20/13 20/13 23/2 23/7 23/12
**Broward [1]** 2/10
**brunch [1]** 64/5
**bucks [2]** 33/6 61/4
**bulk [16]**
**bumps [1]** 16/3
**burden [3]** 6/15 6/22 15/4
**buried [1]** 49/9
**business [7]** 13/3 13/5 13/9 14/3 14/9 17/14 21/25

**C**

**calculate [3]** 19/3 21/17 67/22
**calculated [8]** 16/12 16/13 18/16 20/23 23/19 23/22 74/5 74/12
**calculating [1]** 20/16
**calculation [2]** 10/15 20/17
**call [12]** 22/24 29/4 35/8 49/4 53/1 54/22 56/11 56/12 59/12 60/22 60/24 63/23
**called [12]** 3/23 5/8 7/2 9/16 15/3 19/21 22/17 23/4 23/5 29/6 32/12 32/22
**calling [1]** 58/22
**calls [1]** 6/16

**cancer [1]** 49/8
**candidly [1]** 17/21
**card [6]** 36/21 36/23 37/7 38/2 65/15 65/23
**cards [4]** 35/9 37/3 65/24 65/25
**careful [1]** 10/10
**carefully [1]** 8/25
**Carlos [7]** 31/2 31/6 32/21 46/13 47/9 48/11 74/8
**carries [1]** 15/3
**carrying [1]** 3/20
**cart [1]** 24/25
**carts [1]** 52/18
**categories [1]** 38/12
**cell [4]** 10/13 10/15 10/17 10/17
**center [2]** 21/5 62/14
**centers [1]** 62/13
**certify [1]** 79/20
**chain [1]** 3/24
**chairs [1]** 8/22
**chance [2]** 13/24 19/17
**charge [1]** 75/11
**check [5]** 22/24 40/24 43/3 54/19 63/25
**checking [1]** 41/10
**choice [1]** 15/14
**choices [2]** 15/15 17/20
**choose [1]** 4/2
**chose [2]** 76/14 76/15
**circumstances [1]** 3/24
**circumstantial [1]** 3/24
**citizens [1]** 25/6
**CIV [1]** 1/4
**civil [2]** 3/5 6/5
**claim [2]** 7/5 7/5
**claims [3]** 6/7 6/12 6/18
**client [1]** 13/16
**clock [21]**
**clock-in [1]** 65/21
**clock-out [1]** 65/22
**clocked [3]** 25/17 72/2 72/3
**clocking [7]** 37/25 38/1 38/6 38/9 40/14 41/8 54/14
**close [1]** 20/8
**closing [3]** 4/8 7/15 9/22
**co [1]** 13/12
**co-counsel [1]** 13/12
**Coca [1]** 42/4
**Coca-Cola's [1]** 42/4
**Cola's [1]** 42/4
**collect [2]** 10/15 60/2
**collected [1]** 51/14
**collection [1]** 17/23
**college [1]** 29/25
**comment [2]** 62/18 62/20
**commercial [2]** 51/23 59/25
**common [4]** 18/22 18/22 19/12 45/16
**common-sounding [1]** 19/12
**communicate [1]** 7/21
**communities [1]** 34/7
**compactor [4]** 51/22 61/15 63/24 64/1
**companies [1]** 13/8
**company [7]** 17/24 23/2 23/23 24/20 26/6 30/19 33/19
**company's [1]** 25/20
**compensated [6]** 14/6 16/11 19/16 21/1 31/12 60/8
**compensation [7]** 23/4 23/5 31/6 60/18 61/20 63/15 63/15
**complain [1]** 16/19
**complaint [1]** 38/20
**complete [17]**
**completed [9]** 37/20 40/2 44/15 54/18 54/23 58/23 60/25 62/10 63/7
**completing [4]** 44/19 44/21 60/22 65/2
**completion [2]** 56/11 59/21
**complex [2]** 51/22 63/24
**complicated [2]** 21/3 24/4

**comply [1]** 58/19
**complying [2]** 56/8 58/11
**comprehended [1]** 74/22
**computed [1]** 23/23
**computer [1]** 1/25
**concerned [3]** 4/1 58/17 58/18
**concerns [1]** 17/3
**concluded [1]** 78/20
**conclusion [1]** 74/13
**condition [5]** 36/7 39/8 40/24 55/20 57/20
**conditions [1]** 19/19
**confinement [1]** 47/19 47/23
**confrontation [1]** 62/3
**confrontations [1]** 62/5
**consequences [1]** 19/1
**consistency [1]** 25/5
**construction [2]** 51/24 51/25
**consuming [1]** 42/10
**contact [1]** 43/16
**container [3]** 52/15 52/17 53/19
**containers [5]** 51/21 51/24 52/1 52/20 53/17
**contend [1]** 6/12
**contradicts [1]** 5/25
**control [2]** 4/21 46/19
**conversations [1]** 10/11
**convicted [1]** 47/15
**copy [1]** 65/15
**Coral [5]** 28/9 53/12 53/13 64/3 72/8
**corrections [1]** 66/5
**counsel [5]** 11/17 11/25 13/12 27/6 39/15
**count [1]** 32/3
**court [13]** 1/1 2/8 2/9 2/9 4/22 5/1 5/3 7/2 7/10 11/3 11/18 78/13 79/24
**Court's [1]** 11/7
**courthouse [1]** 3/20
**courtroom [11]** 3/14 8/10 8/12 9/2 10/3 11/1 11/12 11/14 12/8 78/11 78/19
**cover [3]** 31/13 31/19 42/22
**covered [1]** 25/9
**covers [1]** 31/22
**credibility [3]** 6/4 27/4 27/5
**crime [1]** 47/25
**criminal [2]** 47/10 49/19
**cross [2]** 9/17 9/18
**cross-examine [1]** 9/18
**cross-examining [1]** 9/17
**CRR [2]** 2/8 79/24
**Cummings [1]** 2/3
**curse [1]** 76/1
**cycle [1]** 73/12

**D**

**daily [17]**
**damn [1]** 76/3
**dangers [1]** 34/10
**date [8]** 37/3 37/4 46/12 56/18 66/24 68/15 69/12 79/24
**day-to-day [1]** 22/11
**debris [1]** 51/25
**decades [2]** 15/15 48/18
**decide [12]** 3/8 3/13 4/15 5/15 6/24 7/4 8/16 8/21 27/13 27/21 28/23 30/17
**decision [4]** 7/18 8/9 8/11 9/19
**decisions [2]** 15/14 15/20
**decline [1]** 61/23
**declined [1]** 77/20
**declines [2]** 67/18 77/1
**deduct [1]** 40/4
**Defendant [2]** 2/5 6/8
**defendants [9]** 1/9 6/7 6/11 6/20 6/23 9/16 9/17 13/17 19/14
**definitions [1]** 8/14
**degree [1]** 48/1
**deincentivize [1]** 18/18
**delayed [1]** 22/6
**delays [3]** 43/18 46/18 47/1

**D**

**deliberate [1]** 27/18
**deliberating [1]** 7/16
**deliberation [9]** 8/24 9/3 10/1 10/2 10/6 10/8 10/10 10/22 10/23
**deliberations [6]** 4/12 7/13 10/14 10/14 10/16 10/18
**deliver [3]** 16/25 52/17 52/19
**delivery [1]** 52/15
**department [1]** 26/20
**dependent [1]** 40/17
**depending [7]** 40/13 42/4 43/20 45/14 45/15 53/18 59/23
**depends [2]** 61/10 62/2
**describe [2]** 41/16 50/3
**description [1]** 73/16
**deserve [1]** 13/7
**deserves [1]** 4/4
**design [2]** 69/5 69/6
**designed [4]** 13/1 14/10 22/5 42/22
**detailed [2]** 3/6 41/2
**determine [1]** 14/20 14/23 24/5
**determined [2]** 32/1 32/2
**determining [1]** 6/4
**device [1]** 51/12
**dictate [1]** 15/17
**diesel [3]** 42/12 42/16 42/19
**difference [1]** 4/1
**dilute [1]** 20/22
**Dimitrouleas [4]** 1/14 13/17 14/18 15/2
**direct [3]** 4/2 29/14 79/8
**directives [1]** 39/21
**disagree [1]** 3/11
**disallow [1]** 5/7
**disbelieve [1]** 4/3
**discuss [5]** 4/9 7/10 12/11 27/19 78/5
**discussed [6]** 12/12 33/22 33/23 54/13 74/21 78/5
**Discussion [2]** 11/25 39/15
**discussions [1]** 7/18
**dismissed [1]** 17/4
**dispute [7]** 6/12 22/11 22/12 22/13 22/15 24/20 25/10
**disputes [1]** 22/13
**disregard [1]** 5/8
**distinguish [1]** 69/13
**distract [1]** 8/25
**DISTRICT [4]** 1/1 1/2 1/15 2/9
**divide [2]** 32/5 71/11
**division [14]** 1/3 33/14 39/6 39/22 39/23 41/21 43/23 45/14 56/22 57/14 58/22 59/18 64/2 69/24
**divisions [4]** 17/25 17/25 18/1 63/9
**document [12]** 35/20 36/4 36/6 38/23 39/3 39/7 55/8 55/17 55/19 56/5 57/10 57/19
**documents [4]** 27/20 28/24 35/5 66/15
**dollars [9]** 25/16 26/2 28/15 60/14 68/2 68/10 71/8 71/14 77/18
**door [1]** 10/4
**doors [1]** 10/3
**DOT [1]** 46/2
**dozen [1]** 42/1
**drive [1]** 51/16
**driven [1]** 77/21
**driver [12]** 22/19 25/20 40/22 50/12 50/21 50/22 50/23 51/13 52/21 52/24 62/10 72/11
**drivers [9]** 13/13 16/24 22/3 26/15 28/2 32/6 37/18 39/22 47/2
**driveway [1]** 25/1
**driving [5]** 33/16 40/13 40/16 50/23 51/2
**drop [2]** 22/20 54/19
**drove [1]** 18/3
**dump [12]** 26/17 43/12 45/12 50/12 50/12 51/12 51/15 51/20 52/1 53/18 54/19 54/24
**dumped [1]** 37/19 45/7
**Dumping [1]** 43/19

**dumps [3]** 37/19 43/12 45/11
**dumpsters [1]** 52/16
**duty [2]** 3/5 3/8

**E**

**earn [2]** 33/6 68/11
**earnings [3]** 66/19 66/20 71/20
**easier [1]** 45/19
**easily [1]** 63/8
**Easter [6]** 63/21 63/22 64/5 64/8 73/15 73/17
**easy [2]** 72/9 75/4
**eating [1]** 16/10
**Edwards [5]** 2/2 2/3 13/11 79/3 79/8
**effect [1]** 60/24
**efficiency [1]** 26/15
**efficient [2]** 22/4 53/9
**efficiently [1]** 21/11
**eight [13]** 19/25 20/3 31/13 31/14 31/18 44/25 53/10 60/14 67/11 70/6 70/9 70/12 70/13
**eight-hour [1]** 70/12
**electrical [1]** 41/1
**Eleven [1]** 52/16
**Elliot [4]** 59/1 62/6 62/7 74/8
**else's [1]** 23/1
**emails [1]** 7/22
**emergency [1]** 32/12
**emphasize [1]** 7/19
**employed [1]** 14/3
**employee [4]** 17/7 20/8 21/19 65/23
**employees [6]** 18/14 18/17 19/4 19/8 26/22 28/2
**employees' [2]** 22/7 54/6
**employer [1]** 18/13
**employers [2]** 18/18 19/10
**employment [4]** 15/15 34/16 34/19 74/3
**employs [1]** 18/14
**emptied [1]** 53/17
**empty [2]** 25/2 25/2
**emptying [1]** 53/25
**encountered [1]** 17/16
**encourages [1]** 26/15
**end-of-day [1]** 45/23
**end-of-shift [1]** 45/20
**entitled [5]** 9/7 20/4 20/5 24/7 79/21
**entitlement [1]** 36/3
**Eola [1]** 2/7
**equal [1]** 45/21
**equation [2]** 19/6 71/10
**equipment [8]** 11/7 18/5 34/3 34/13 51/16 52/7 53/2 59/23
**equivalent [1]** 20/18
**errand [2]** 23/2 23/23
**especially [1]** 76/21
**Esq [4]** 2/2 2/2 2/5 2/5
**essentially [2]** 18/12 20/20
**established [1]** 33/14
**ET [1]** 1/8
**evening [1]** 78/4 78/8
**evenings [1]** 65/2
**everybody [2]** 32/25 77/7
**everyone [1]** 12/11
**Everyone's [1]** 58/18
**evidence [65]**
**evident [1]** 43/2
**EXAMINATION [1]** 29/14
**examine [2]** 9/18 11/8
**examining [1]** 9/17
**examples [1]** 59/20
**excelling [1]** 16/8
**exceptions [1]** 19/10
**Excerpt [1]** 1/13
**excess [1]** 25/25
**excuse [2]** 13/20 72/7

**exhibit [22]**

**Exhibit 13 [2]** 55/3 55/23
**Exhibit 14 [2]** 38/17 39/13
**Exhibit 2 [1]** 67/25
**Exhibit 4 [2]** 35/14 36/11
**Exhibit 5 [2]** 57/4 57/23
**exhibits [8]** 7/2 11/21 12/2 64/15 64/16 64/22 79/11 79/12
**Exhibits 1 [1]** 64/15
**exist [1]** 8/8
**exists [1]** 76/24
**exited [4]** 11/1 11/12 78/11 78/19
**expect [3]** 19/24 20/2 72/16
**expense [1]** 22/7
**experience [4]** 18/4 30/14 42/11 46/18
**explain [11]** 3/4 13/24 16/15 19/6 19/16 31/3 31/19 32/3 32/22 71/24 77/5
**explained [15]** 16/14 20/19 31/7 31/9 35/1 36/22 37/2 37/5 44/5 52/24 56/17 56/21 60/14 75/4 75/11
**explaining [1]** 15/2
**explanation [8]** 20/9 49/16 70/6 70/11 70/22 72/18 73/9 73/21
**Explanations [1]** 74/8
**Expressway [1]** 72/9
**extends [1]** 51/13
**extent [1]** 70/23
**extra [10]** 18/17 20/4 20/5 22/25 23/3 23/9 23/10 28/10 63/6 63/14

**F**

**face [3]** 7/20 7/20 22/21
**face-to-face [1]** 7/20
**Facebook [1]** 7/24
**fact [7]** 3/18 3/25 6/24 7/5 7/6 8/4 27/23
**factor [1]** 6/2
**facts [2]** 3/9 24/12
**failed [1]** 6/9
**fails [1]** 6/22
**fairness [1]** 43/1
**fall [2]** 40/8 63/2
**falls [1]** 38/11
**family [4]** 29/21 49/5 49/7 64/5
**fantasy [1]** 76/21
**fashion [1]** 22/4
**fast [2]** 21/10 72/24
**father [1]** 49/8
**favor [3]** 6/23 15/7 20/7
**favoring [2]** 6/19 6/20
**February [1]** 71/5
**February 5th [1]** 71/5
**federal [2]** 6/9 18/11
**felony [3]** 47/16 47/21 49/3
**field [1]** 30/3
**fields [1]** 53/21
**Fifty [1]** 29/23
**Fifty-one [1]** 29/23
**figure [2]** 44/20 71/8
**filled [1]** 30/22
**final [3]** 54/19 54/19 54/24
**fine [1]** 68/14
**finish [4]** 25/14 28/13 31/13 54/16
**finished [6]** 21/10 21/14 22/23 54/15 72/14 72/23
**finishes [1]** 44/24
**finishing [4]** 45/2 56/14 58/21 60/23
**five a.m [1]** 52/4
**five-and-a-half [1]** 71/23
**flat [2]** 20/2 46/22
**FLORIDA [11]** 1/2 1/6 1/8 2/4 2/7 2/10 13/10 17/24 24/17 26/21 29/20
**Florida, [2]** 6/8 6/11
**Florida, Inc [2]** 6/8 6/11
**FLSA [5]** 6/10 6/14 18/9 18/10 18/11 18/13
**fluctuate [2]** 59/4 59/5
**fluids [1]** 40/25
**folks [4]** 13/6 14/8 16/19 28/6

**F**

**football [2]** 53/21 76/21
**forbids [2]** 8/5 8/6
**force [1]** 69/6
**forced [1]** 23/25
**foregoing [1]** 79/20
**forget [1]** 38/10
**forgotten [1]** 41/15
**form [1]** 5/20
**formal [1]** 34/15
**forms [3]** 3/14 35/9 40/2
**FORT [5]** 1/3 1/6 2/4 2/10 64/4
**Fort Lauderdale [1]** 64/4
**Fortunately [2]** 12/21 15/18
**Fourteen [1]** 39/17
**Fran [1]** 11/9
**Francine [3]** 2/8 79/23 79/24
**free [1]** 11/6
**Friday [1]** 24/25
**friend [1]** 49/5
**front [1]** 10/3
**fuel [10]** 35/9 36/21 36/22 37/3 37/7 40/25
 41/15 41/22 41/23 45/16
**fueled [2]** 45/8 46/23
**fueling [2]** 42/5 45/13
**functioned [1]** 54/4

**G**

**gallons [1]** 42/16
**garbage [3]** 17/23 30/19 43/10
**generating [1]** 25/17
**gentlemen [1]** 12/18
**geographically [1]** 56/23
**gets [2]** 28/18 41/1
**glance [1]** 24/4
**gonna [47]**
**goodness [1]** 63/8
**Google [1]** 7/25
**Graduated [1]** 29/25
**granted [1]** 60/14
**grapple [4]** 51/9 51/11 51/17 70/2
**grappling [1]** 51/12
**grass [1]** 3/19
**great [4]** 17/7 24/24 27/12 43/23
**greater [2]** 9/7 15/5
**grievance [1]** 76/23
**ground [1]** 44/18
**guidelines [1]** 6/4

**H**

**half [14]** 18/16 19/11 20/16 20/17 21/16
 21/17 42/1 45/15 71/23 72/2 73/1 73/8 73/9
 74/16
**hand [2]** 29/8 37/17
**harder [2]** 42/7 42/9
**haul [1]** 25/4
**he'd [1]** 20/3
**he'll [6]** 14/14 16/16 17/5 18/4 20/1 23/10
**head [3]** 76/4 76/6 76/8
**hear [29]**
**heard [6]** 3/15 7/14 14/17 15/1 15/4 28/20
**hearing [1]** 78/6
**hearsay [2]** 49/23 77/25
**heavy [1]** 43/12
**help [17]**
**helped [2]** 67/22 69/3
**helper [9]** 18/2 37/14 47/7 50/5 50/15 50/20
 50/25 51/3 68/7
**helper's [1]** 50/3
**helping [1]** 68/9
**Hey [2]** 61/3 75/12
**hidden [1]** 9/3
**higher [1]** 60/16
**hire [4]** 33/11 46/12 49/17 56/19
**hired [15]** 15/11 15/19 15/19 15/23 17/17

17/18 17/22 19/19 19/20 30/9 33/9 34/15
 36/25 42/24 47/6
**hiring [2]** 43/1 60/9
**hit [1]** 4/18
**holiday [2]** 70/3 70/3
**holidays [2]** 14/5 70/8
**Hollywood [9]** 37/15 44/25 50/6 50/8 56/16
 56/22 59/1 62/8 63/8
**home [10]** 8/23 25/1 25/3 26/18 60/13 62/11
 62/16 62/16 75/17 76/13
**homeowners [1]** 37/17
**homes [3]** 50/8 52/18 60/2
**honest [1]** 75/22
**honestly [2]** 17/21 46/9
**Honor [34]**
**Honorable [1]** 1/14
**hoped [1]** 30/22
**hopefully [1]** 32/3
**hour [19]**
**hourly [8]** 19/3 19/9 31/15 60/16 77/1 77/1
 77/18 77/20
**hours [78]**
**house [2]** 12/19 32/3
**Hudson [1]** 2/5
**hum [5]** 45/4 47/5 70/16 72/15 73/4
**human [1]** 26/20
**hundred [2]** 25/16 28/14 68/2 68/10
**hustling [1]** 77/22
**HVAC [1]** 30/2

**I**

**I'd [2]** 57/2 76/9
**I'll [16]**
**I'm [43]**
**I've [7]** 5/12 44/10 45/13 73/3 74/7 74/8 78/6
**ID [1]** 53/14
**identification [11]** 35/13 35/15 38/16 38/18
 39/12 55/2 55/4 57/3 57/5 57/23 64/17
**ignore [3]** 5/5 5/9 76/14
**ignored [1]** 76/14
**ill [1]** 17/10
**illegal [1]** 48/21
**illustration [1]** 15/6
**impression [1]** 9/8
**Inc [2]** 6/8 6/11
**incentives [1]** 60/13
**incentivize [1]** 18/17
**incinerator [1]** 53/18
**include [2]** 46/11 68/6
**includes [2]** 7/22 10/9
**including [2]** 7/23 22/21
**incorrect [1]** 66/4
**incorrectly [1]** 66/2
**increase [1]** 52/10
**increases [1]** 31/15
**incredibly [1]** 72/9
**incur [1]** 47/1
**indeed [1]** 19/5
**INDEX [3]** 79/1 79/6 79/11
**indicating [5]** 34/23 35/1 67/1 67/8 71/23
**indirect [3]** 3/20 3/23 4/2
**indirectly [1]** 3/18
**indoctrinated [1]** 46/16
**industry [9]** 24/19 24/22 25/5 26/5 30/12
 33/17 34/3 49/22 59/10
**inefficiencies [1]** 22/6
**information [4]** 7/9 8/1 8/11 65/21
**informed [2]** 34/1 39/24
**informing [1]** 33/19
**initial [3]** 31/22 33/8 40/1
**inspection [5]** 45/8 46/2 46/8
**instance [2]** 63/19 74/24
**instead [2]** 20/19 28/20
**instruct [3]** 5/12 6/25 27/17
**instructed [1]** 14/18
**instructions [5]** 3/6 3/7 7/15 9/23 56/12

**intend [1]** 13/25
**intended [1]** 76/15
**intends [2]** 9/13 14/13
**interacted [1]** 28/17
**interaction [1]** 17/7
**interest [1]** 5/23
**interpose [1]** 49/11
**interview [11]** 17/19 30/23 30/25 31/3 32/15
 33/8 47/3 47/10 48/10 48/12 49/16
**interviewed [2]** 17/18 19/19
**interviewer [1]** 47/8
**issue [6]** 8/4 17/2 66/1 66/7 66/9 66/12
**issued [1]** 69/2
**issues [5]** 24/4 33/16 43/14 56/8 56/10
**item [1]** 5/12

**J**

**January [5]** 69/20 69/21 69/23 70/15 70/17
**January 14th [2]** 70/15 70/17
**January 8th [1]** 69/20
**job [20]**
**jobs [7]** 14/4 16/1 23/16 23/17 28/7 37/11
 43/5
**Jones [2]** 4/18 4/19
**Joseph [1]** 2/5
**judge [8]** 1/15 11/12 11/14 13/17 14/18 15/2
 27/17 78/19
**Judge Dimitrouleas [3]** 13/17 14/18 15/2
**June [2]** 68/15 69/12
**June 2 [1]** 68/15
**June 2nd [1]** 69/12
**juror [1]** 7/9
**jurors [5]** 3/5 8/5 8/6 8/16 10/13
**jury [24]**

**K**

**Karen [3]** 10/5 10/19 10/21
**Karen's [2]** 9/25 10/4
**keep [2]** 7/17 10/13
**Kenny [1]** 74/8
**kill [1]** 48/6
**killing [1]** 76/10
**kinds [3]** 14/4 23/20 35/4
**knock [1]** 72/13
**knows [2]** 15/18 50/7

**L**

**Labor [1]** 6/10 18/9 27/22
**laborer [1]** 18/2
**Ladies [1]** 12/18
**Lake [1]** 2/7
**large [2]** 34/4 59/11
**LAUDERDALE [5]** 1/3 1/6 2/4 2/10 64/4
**law [18]**
**lawyer [3]** 4/17 4/22 4/23
**lawyer's [1]** 4/15
**lawyers [1]** 4/9
**lawyers' [4]** 4/7 4/13 7/14 9/21
**lead [3]** 7/18 52/21 52/24
**learn [3]** 17/13 18/7 28/6
**learned [3]** 42/25 46/16 72/20
**learning [1]** 41/9
**leave [8]** 8/22 9/2 9/3 16/7 16/8 62/17 75/1
 75/3
**legal [5]** 18/25 18/25 19/1 20/10 20/11
**lengthier [1]** 42/10
**lengthy [1]** 31/1
**letting [1]** 58/23
**liable [1]** 29/1
**life [3]** 12/19 15/14 48/22
**light [2]** 6/1 6/17
**limited [3]** 5/11 5/13 15/16
**lines [2]** 56/24 74/2
**listen [4]** 3/8 8/2 28/12 76/12
**listening [1]** 9/1

**L**

lists [3]  37/6 58/15 70/3
literally [6]  53/9 67/18 74/15 74/24 77/1 77/19
load [5]  22/20 37/17 37/18 50/5 72/11
loader [2]  41/11 60/1
lobby [1]  10/6
local [2]  30/19 53/13
Lombardo [8]  26/20 27/1 28/17 31/1 33/18 34/17 74/7 76/22
lose [1]  38/13
loyal [1]  49/4
lunch [9]  10/9 23/21 23/22 43/25 43/25 44/3 44/3 44/5 44/9

**M**

machinery [1]  30/14
Mackie [15]  6/8 6/12 13/10 14/12 14/20 17/10 24/18 26/14 27/7 27/10 28/17 28/20 28/25 77/14 77/15
magic [1]  24/24
magical [1]  77/5
main [1]  44/14
man [5]  28/16 48/18 48/25 75/16 76/25
management [1]  16/5
manager [4]  24/18 31/2 59/18 59/19
manner [5]  5/22 74/5
Marc [1]  2/2
marked [10]  35/13 35/15 38/16 38/18 39/12 55/4 57/5 64/15 64/16 79/12
matter [3]  15/22 63/12 79/21
matters [1]  35/7
mean [8]  19/4 40/20 38/1 56/23 56/23 67/2 67/9 75/22
meaning [1]  18/25
meanings [1]  18/22
means [7]  5/9 6/16 7/22 22/18 67/20 70/4 70/9
mechanical [1]  1/24
mechanics [1]  43/16
meet [3]  6/22 62/12 62/13
members [2]  3/3 78/3
memory [4]  5/22 9/6 9/7 9/8
men [2]  13/4 15/20
message [2]  27/10 28/21
messages [1]  7/22
microphone [1]  29/11
middle [1]  44/11
mine [1]  75/13
minimum [5]  21/2 71/13 74/15 77/2 77/3
minute [3]  10/21 21/20 45/2
minutes [4]  10/24 11/3 41/18 45/18
miscalculations [2]  22/1 22/2
missed [1]  60/2
mjsfcs [1]  2/11
moment [11]  10/5 17/13 20/19 27/14 37/10 37/23 39/14 54/13 65/6 71/18 73/5
moments [1]  15/1
MONDAY [1]  3/1
money [11]  23/15 27/8 27/16 28/19 33/3 61/2 61/3 67/17 67/18 74/14 74/24
month [1]  41/25
months [1]  49/9
morning [16]
mornings [1]  59/13
mother [1]  49/8
moved [2]  29/21 63/9
moving [1]  37/4
Mr [2]  79/3 79/8
Mr. [23]
Mr. Andreu [10]  21/6 24/9 26/11 26/25 27/5 27/22 28/3 28/6 71/6 73/5
Mr. Andreu's [1]  24/13
Mr. Jones [2]  4/18 4/19
Mr. Mackie [7]  14/12 14/20 17/10 26/14 27/7 27/10 77/14

Mr. Roger [1]  13/13
Mr. Rosenthal [1]  13/12
Mr. Russell [1]  13/10
Ms [1]  79/4
Ms. [5]  24/14 27/1 31/1 33/18 34/17
Ms. Lombardo [4]  27/1 31/1 33/18 34/17
Ms. Tingley [1]  24/14
multiple [1]  43/19
multiplying [1]  20/18
murder [1]  48/1
MySpace [1]  7/24

**N**

name [3]  13/11 29/12 29/12
names [1]  19/12
narrative [2]  49/11 77/10
narrow [1]  24/5
nature [3]  15/5 25/9 33/20
NE [1]  2/3
necessary [2]  24/23 45/5
neck [2]  16/22 75/8
negotiate [2]  28/11 28/14 61/2
negotiation [1]  28/15
Neither [1]  22/12
networking [1]  7/23
New York [1]  29/19
news [1]  8/2
nice [1]  78/8
nine [1]  78/6
nine o'clock [1]  78/6
Nobody [1]  74/12
nobody's [1]  77/5
none [2]  5/17 47/1
normalcy [1]  48/22
normally [2]  52/18 69/1
North [1]  2/6
notebooks [1]  10/20
notes [7]  8/19 8/20 8/22 9/3 9/5 9/6 10/19
notetaking [1]  8/25
November [1]  56/18
November 28th [1]  56/18
number [4]  18/3 67/3 67/4 67/4
numbers [1]  10/24
numerous [4]  33/4 40/1 58/8 59/2

**O**

o'clock [1]  78/6
object [4]  4/23 49/23 77/9 77/24
objection [11]  4/25 5/2 5/4 35/16 36/13 39/16 49/11 55/24 57/25 64/18 64/20
objections [4]  4/13 11/21 12/3 72/12
observing [1]  9/1
obvious [1]  34/3
occasion [2]  23/5 23/10
occasions [5]  22/8 33/4 40/1 44/18 63/13
occupied [1]  18/8
October [4]  15/11 17/17 30/10 30/11
odd [1]  77/18
offense [1]  37/6
offense 4 [1]  37/6
offer [2]  33/13 64/14
offers [4]  36/11 39/12 55/23 57/23
Official [2]  2/9 79/24
offline [1]  7/25
Oh [2]  28/18 44/24
online [2]  7/25 30/21
onset [1]  74/3
open [1]  7/17
opening [5]  4/8 9/10 9/11 12/13 79/2
openings [1]  44/17
operate [3]  34/4 34/8 41/5
operated [1]  51/12
operating [6]  34/6 51/6 53/24 59/23 63/25 70/1
operation [2]  34/13 41/4
operational [3]  40/24 42/20 43/4

operations [3]  31/2 54/1 59/18
opinion [1]  3/17
opportunity [11]  5/20 25/22 26/11 26/19 27/3 27/5 27/9 27/13 27/14 27/19 48/22
opposing [1]  4/23
opposite [1]  6/20
options [1]  15/16
order [4]  5/8 41/1 41/3 44/13
orientation [1]  40/2
original [1]  46/12
originally [3]  29/18 37/13 47/6
Orlando [1]  2/7
outcome [1]  5/23
outline [1]  9/13
overall [1]  41/4
overhearing [1]  10/11
overrule [1]  4/25
Overruled [1]  49/25
oversee [1]  54/1
overtime [37]
owed [2]  6/13 24/8 27/15
owing [1]  29/2
oxymoron [1]  50/24

**P**

P.A [1]  2/6
p.m [5]  1/7 3/1 11/13 11/13 78/20
page [5]  67/24 68/4 68/12 79/2 79/7
paper [1]  65/19
papers [3]  33/19 34/17 34/18
paperwork [1]  35/4
part [4]  5/17 14/24 26/15 53/22
parties [2]  8/1 8/11
parties' [2]  6/6 9/21
party [3]  9/13 9/20 22/12
passing [1]  40/2
Paul [2]  2/2 13/11
pay [32]
payment [2]  19/10 20/14 44/6
payments [3]  20/24 22/13 23/13
Pembroke [4]  18/1 33/14 56/22 61/10
penalizes [1]  33/2
pencils [1]  10/20
pens [1]  10/20
people [13]  3/19 7/8 13/1 16/15 18/2 18/19 25/13 26/18 32/24 34/5 34/7 49/2 49/4
people's [1]  50/8
peoples [1]  34/7
percent [1]  44/22
period [12]  26/10 26/12 26/23 65/15 65/16 65/20 66/23 66/23 66/25 67/5 71/4 71/6
permit [1]  4/24
permits [1]  26/6
permitted [3]  43/5 45/22 59/14
person [3]  18/24 31/5 75/10
personal [1]  12/23
personally [1]  3/22
pertain [1]  47/25
pertains [1]  66/6
phone [2]  60/24 62/12
phones [4]  10/13 10/15 10/17 10/18
photograph [1]  3/16
phrases [3]  8/13 18/21 18/22
pick [7]  16/25 22/25 28/8 37/16 50/10 52/1 61/5
picking [1]  43/9
piece [2]  4/4 19/13
Pines [7]  18/1 33/14 41/22 41/22 50/15 56/22 61/10
place [3]  12/21 17/15 61/7
plaintiff [28]
plaintiff's [21]
plans [3]  15/9 20/15 21/13
plants [1]  53/18
play [1]  4/11
plenty [1]  18/10

**P**

**PLLC [1]** 2/3
**point [1]** 10/22 18/20 49/10 53/6 72/22 77/1 77/10
**points [1]** 74/14
**policies [9]** 17/15 17/16 24/1 25/21 33/19 33/25 34/2 37/9 38/7
**policy [20]**
**Pompano [12]** 18/1 39/6 39/22 41/21 42/3 43/23 45/14 57/14 59/1 64/2 64/4 69/23
**position [13]** 10/11 16/4 16/6 16/19 16/21 17/6 19/15 33/13 40/13 50/21 53/22 53/22 69/21
**positions [4]** 6/6 18/7 37/21 54/10
**possibility [1]** 58/15
**post [5]** 45/8 45/17 46/11 46/17 46/19
**post-trip [4]** 45/8 45/17 46/11 46/19
**post-trips [1]** 46/17
**practices [1]** 18/11
**prejudice [1]** 5/24
**preliminary [1]** 3/6
**premarked [6]** 36/11 55/2 55/23 57/3 57/23 67/25
**premature [2]** 7/18 7/18
**preparing [1]** 24/10
**preponderance [4]** 6/16 6/25 7/6 15/4
**presence [2]** 12/12 78/6
**present [10]** 9/14 9/17 9/22 11/17 12/25 14/14 24/10 34/10 53/13 75/5
**presentation [2]** 4/10 11/7
**presented [3]** 3/14 8/10 9/20
**presenting [1]** 24/12
**presents [1]** 4/23
**pretrial [3]** 35/13 38/16 39/12
**pretrip [5]** 40/14 40/19 40/20 41/16 46/18
**pretrips [1]** 46/17
**prevail [1]** 15/8
**prevents [2]** 13/1 18/11
**primary [1]** 43/9
**principles [1]** 3/4
**prison [4]** 48/12 48/17 48/19 48/24
**PRO [74]**
**Pro's [1]** 21/19
**problem [2]** 25/4 26/25
**procedure [1]** 45/9
**proceed [1]** 12/15
**proceedings [4]** 1/13 1/24 78/20 79/21
**process [14]** 13/19 13/22 30/25 31/3 32/15 33/15 42/10 42/10 43/1 48/12 60/10 60/20 61/7 76/23
**produced [2]** 1/25 7/3
**proficiencies [1]** 53/4
**programs [1]** 33/12
**promise [2]** 65/11 66/16
**promised [3]** 8/17 22/14 23/11
**promoted [1]** 16/2
**promotion [3]** 51/3 52/8 54/8
**proof [1]** 15/4
**proper [1]** 34/13
**properly [3]** 6/13 41/5 58/19
**prove [3]** 3/18 6/17 9/13
**proved [2]** 6/24 7/6
**proves [1]** 3/25
**provide [1]** 3/10
**proving [1]** 6/15
**publish [3]** 36/17 56/2 58/3
**pull [1]** 44/2
**pulled [1]** 26/16
**pulling [1]** 11/21
**pun [1]** 76/15
**punished [1]** 45/25
**punishment [4]** 22/21 38/8 46/3 58/10
**pushing [1]** 18/19

**Q**

**qualified [1]** 8/18

**quasi [1]** 76/20
**question [12]** 4/15 4/18 4/22 5/1 5/2 5/4 5/5 31/10 49/12 73/9 74/2 77/11
**questioned [2]** 33/4 67/15
**questions [7]** 4/13 9/15 9/15 9/16 16/11 17/21 78/1
**quick [1]** 11/22
**quickly [2]** 21/11 75/24
**quit [1]** 76/5

**R**

**rabbit [2]** 52/14 52/15
**rain [1]** 3/22
**rained [1]** 3/21
**raise [1]** 29/8
**raised [2]** 17/2 31/10
**ran [1]** 23/23
**range [1]** 70/14
**rate [56]**
**reach [3]** 5/15 10/16 66/4
**reaction [1]** 62/1
**read [1]** 8/2
**ready [3]** 12/1 12/13 15/21
**reality [1]** 74/11
**rear [5]** 37/18 41/11 50/5 60/1 72/11
**rear-load [1]** 37/18
**reasonableness [1]** 5/25
**reasons [1]** 46/25
**recall [7]** 27/19 33/13 34/18 34/19 36/4 55/17 69/9
**receive [14]** 4/22 5/1 5/3 20/9 21/12 21/20 27/21 40/6 52/10 58/10 60/11 72/19 73/21 74/14
**received [14]** 23/11 23/15 24/6 28/21 36/14 39/17 55/25 58/1 63/23 64/19 66/24 68/17 72/3 79/12
**receiving [2]** 40/15 55/17
**recent [1]** 63/21
**recess [5]** 10/21 11/3 11/13 78/4 78/13
**recognize [7]** 35/21 35/23 38/24 39/1 55/9 55/11 57/11
**record [10]** 11/16 11/25 29/12 39/15 47/11 49/20 70/10 73/3 73/6 79/21
**recorded [6]** 1/24 65/3 65/7 66/1 66/2 70/22
**recording [2]** 35/10 35/10
**records [10]** 21/5 21/6 21/6 21/7 22/9 26/3 26/24 65/18 69/19 73/5
**recycling [3]** 17/23 53/18 61/11
**references [1]** 40/6
**referencing [1]** 40/4
**referring [1]** 40/5
**reflect [1]** 56/5
**reflected [1]** 68/2
**refuel [3]** 41/13 41/19 42/7
**refueled [1]** 41/14
**refueling [1]** 42/2
**Regina [5]** 26/20 28/17 66/4 74/7 76/22
**regional [1]** 24/18
**regular [5]** 18/23 18/24 19/2 19/7 20/18 20/23 21/18 23/18 26/1 67/9 67/10 67/11 69/14
**regularly [1]** 18/24
**regulated [1]** 26/5
**regulation [1]** 18/9
**regulations [1]** 40/9
**relationship [1]** 76/20
**released [2]** 47/18 47/23
**reliable [1]** 15/24
**reloader [1]** 40/16
**rely [1]** 9/5
**remains [1]** 49/7
**remarks [2]** 4/9 4/11
**remember [7]** 8/19 9/11 39/3 56/25 62/12 73/14 78/4
**removal [2]** 13/3 13/9
**repairs [1]** 52/19

**replaceable [1]** 17/8
**Reporter [3]** 2/8 2/9 79/24
**represent [2]** 13/12 24/17
**representatives [1]** 13/10
**requested [3]** 35/6 35/9 54/1
**requests [1]** 65/17
**required [5]** 6/9 19/8 41/6 54/17 54/22
**requirements [2]** 19/1 20/11
**research [1]** 8/3
**residential [3]** 51/3 51/5 51/6
**residents [1]** 53/13
**resign [2]** 17/6 76/9
**resigned [3]** 16/21 27/10 27/15
**resigns [1]** 28/21
**resolved [1]** 32/12
**resources [1]** 26/20
**respond [1]** 47/13
**response [1]** 59/6
**responsibilities [1]** 37/16
**responsibility [4]** 43/15 51/1 52/25 62/25
**return [1]** 52/1
**review [1]** 44/8
**revolved [3]** 34/14 35/6 35/7
**revolves [1]** 34/2
**rewarded [1]** 16/2
**ride [5]** 18/2 37/18 50/5 50/9 50/12
**rise [2]** 12/6 78/10
**RMR [2]** 2/8 79/24
**RMR-CRR [1]** 79/24
**ROGER [55]**
**Roger's [5]** 15/9 15/14 15/19 15/23 17/9
**role [2]** 4/12 54/5
**roll [3]** 51/18 51/20 59/24
**roll-off [3]** 51/18 51/20 59/24
**room [11]** 2/10 8/21 8/24 9/4 10/1 10/2 10/6 10/8 10/10 10/22 10/23
**Rosalind [1]** 2/6
**Rosenberg [1]** 2/3
**Rosenthal [2]** 2/2 13/12
**route [89]**
**routes [16]**
**row [1]** 67/6
**rub [1]** 20/14
**rule [2]** 23/6 23/12
**rules [7]** 4/21 4/24 8/8 20/11 20/12 21/4 21/7
**rundown [1]** 37/11
**Russell [12]** 6/8 6/12 13/10 24/18 28/17 28/20 28/25 32/3 43/2 63/23 76/20 77/15

**S**

**safe [2]** 8/23 25/19
**safety [16]**
**Salopek [3]** 2/8 79/23 79/24
**salvage [1]** 48/22
**sat [1]** 45/13
**Saturdays [1]** 53/16
**save [1]** 11/24
**saw [10]** 3/15 3/19 4/17 4/19 30/20 36/8 39/9 55/20 57/20 58/14
**Sawgrass [1]** 72/9
**scale [2]** 15/6 15/7
**scales [2]** 6/21 6/21
**scheduled [1]** 47/2
**schemes [2]** 19/10 20/6
**school [1]** 29/24
**screwing [1]** 27/8
**scroll [1]** 65/20
**search [1]** 7/25
**seat [2]** 12/7 12/9
**second [3]** 4/13 48/1 67/24
**Second-degree [1]** 48/1
**seconds [1]** 11/22
**sees [1]** 8/17
**self [1]** 43/2
**self-evident [1]** 43/2
**semblance [1]** 48/22

**S**

**sense [6]** 18/22 62/20 74/1 74/20 77/4 77/20
**September [3]** 71/17 71/20 72/6
**September 14th [1]** 72/6
**September 30th [2]** 71/17 71/20
**series [3]** 33/18 34/11 34/11
**serve [2]** 18/18 48/8
**served [1]** 48/18
**serves [1]** 20/22
**service [1]** 59/25
**serviced [1]** 60/2
**services [2]** 23/14 60/18
**serving [1]** 7/7
**session [1]** 56/24
**setback [1]** 12/23
**seven [2]** 26/11 67/6
**seven-day [1]** 67/6
**share [1]** 8/21
**Shawn [5]** 59/1 62/10 62/12 62/17 63/23
**She'll [1]** 11/9
**sheet [1]** 41/9
**sheets [1]** 73/25
**shift [1]** 45/20
**shopping [2]** 62/13 62/14
**shown [1]** 34/12
**sic [5]** 28/10 28/12 36/3 39/10 71/21
**sick [3]** 70/8 70/10 70/11
**side [4]** 6/22 9/10 10/4 52/16
**side's [1]** 4/10
**sides [2]** 6/20 14/18
**sign [4]** 34/15 35/4 35/10 40/3
**signature's [3]** 35/24 39/2 55/12
**signed [6]** 33/20 34/17 34/22 34/25 35/5 35/6
**silly [1]** 49/3
**simple [2]** 61/14 72/9
**single [1]** 15/25
**sister [1]** 4/18
**site [3]** 42/3 51/21 52/2
**sites [1]** 51/25
**six-and-a-half [1]** 73/8
**size [1]** 53/20
**size-wise [1]** 53/20
**skip [2]** 69/20 71/17
**slacking [1]** 63/2
**slow [1]** 60/5
**slowly [1]** 20/22
**smelled [1]** 3/15
**so-called [2]** 19/21 32/22
**social [1]** 7/23
**society [1]** 24/24
**solid [4]** 24/19 24/19 24/22 61/11
**somebody's [2]** 20/18 60/5
**someone's [1]** 3/16
**something's [1]** 12/20
**sorts [2]** 35/9 38/11
**sound [3]** 18/23 20/7 49/3
**sounding [2]** 18/22 19/12
**sounds [1]** 75/4
**source [1]** 8/15
**south [1]** 17/24
**SOUTHERN [1]** 1/2
**special [1]** 8/14
**specific [2]** 47/2 63/19
**spelling [1]** 29/12
**spent [9]** 14/7 22/10 23/15 23/17 23/21 24/9 44/5 68/23 69/14
**spoke [1]** 31/5
**spots [1]** 16/25
**Springs [5]** 28/9 53/13 53/13 64/3 72/8
**staggeringly [1]** 20/24
**stand [1]** 15/10
**Standards [3]** 6/10 18/9 27/23
**standing [1]** 10/5
**standpoint [1]** 44/6
**starters [1]** 21/9

**starting [1]** 40/22
**starts [1]** 41/1
**state [1]** 29/11
**stated [5]** 44/17 48/17 54/22 60/3 66/3
**statement [2]** 9/10 9/11 71/20 79/2
**statements [5]** 4/7 4/8 12/14 66/19 66/20
**STATES [1]** 1/1 1/15 2/9
**station [15]** 18/6 28/8 42/7 45/16 53/11 53/12 53/14 53/17 53/20 53/23 53/25 54/2 54/7 54/11 64/3
**stations [1]** 34/9
**stay [2]** 10/8 25/17
**Staying [1]** 51/6
**stenography [1]** 1/24
**stipulated [1]** 12/1
**stipulating [1]** 11/20
**stipulation [1]** 64/14
**Stovash [1]** 2/6
**strange [1]** 24/3
**street [1]** 26/18
**stub [1]** 25/24
**stubs [1]** 25/23
**stuff [6]** 30/15 42/5 42/25 53/25 70/8 76/21
**subject [1]** 18/8
**submit [1]** 27/23
**substantially [4]** 36/7 39/8 55/20 57/19
**sudden [1]** 72/21
**suffers [1]** 49/8
**sufficient [1]** 17/4
**suggests [1]** 4/16
**summarize [2]** 6/6 9/22
**Sunday [5]** 63/21 63/22 64/8 73/13 73/15 73/17
**Sundays [1]** 53/16
**supervise [1]** 54/3
**supervisor [17]**
**supervisor's [1]** 44/23
**supervisors [7]** 21/25 32/2 54/18 58/23 58/25 59/2 62/4
**supervisory [2]** 16/4 54/5
**surgery [5]** 16/22 17/3 75/6 75/7 76/13
**surround [1]** 49/2
**suspect [1]** 68/8
**sustain [2]** 5/1 5/4
**swipe [1]** 38/3
**sworn [2]** 3/4 29/9
**system [7]** 13/1 26/22 26/23 65/4 65/7 65/9 76/24

**T**

**take [51]**
**taken [5]** 11/13 19/14 21/13 51/15 53/17
**takes [3]** 8/20 62/25 69/1
**talk [12]** 7/7 7/12 8/5 8/6 14/2 26/21 37/9 37/22 42/24 46/15 54/13 66/20
**talked [7]** 30/20 31/5 37/3 40/1 44/7 61/1 75/23
**talking [4]** 7/20 32/20 46/13 62/2
**talks [1]** 28/18
**Target [1]** 51/22
**task [4]** 42/23 45/2 58/21 75/11
**tasks [15]** 41/6 42/18 42/22 43/8 44/15 45/19 45/20 45/23 46/11 59/15 59/20 61/9 69/4 69/18 70/24
**teach [2]** 53/1 53/4
**technology [1]** 7/19
**tell [44]**
**telling [1]** 77/22
**ten-minute [1]** 10/21
**tend [1]** 45/11
**tendency [1]** 44/20
**tenure [4]** 32/24 35/5 39/25 60/10
**term [1]** 31/9
**terminal [1]** 44/14
**terminated [3]** 37/7 58/13 58/14
**termination [2]** 22/22 37/6

**terms [4]** 17/12 18/23 19/12 45/2
**test [1]** 33/16
**testify [1]** 10/12
**testifying [2]** 5/21 5/22
**testimony [13]** 3/15 5/16 5/16 5/19 5/25 6/1 7/1 8/9 9/6 9/8 27/15 27/20 28/23
**tests [1]** 41/3
**text [4]** 7/22 27/9 27/13 28/21
**thank [20]**
**thanked [2]** 27/11
**theory [3]** 20/6 21/10 21/12
**they'd [1]** 23/3
**think [4]** 4/4 12/13 48/20 66/2
**thinking [1]** 25/3
**thinks [1]** 4/24
**Thirteen [1]** 55/25
**Thirty [1]** 41/18
**thought [2]** 17/6 27/15
**thousand [2]** 26/2 42/15
**throw [1]** 53/14
**time [90]**
**time-consuming [1]** 42/10
**times [7]**
**Tingley [4]** 2/5 2/6 24/14 79/4
**tip [2]** 6/21 15/7
**title [3]** 38/10 40/7 40/8
**title's [1]** 55/16
**top [3]** 36/3 55/16 57/18
**tops [1]** 72/13
**total [3]** 61/18 61/19 67/4
**totally [1]** 17/8
**towards [2]** 16/4 45/11
**traffic [1]** 45/12
**training [4]** 33/11 33/15 33/21 56/23
**transcript [3]** 1/13 1/24 79/20
**transfer [14]** 18/6 28/8 34/9 53/11 53/12 53/14 53/16 53/20 53/23 53/25 54/2 54/7 54/11 64/3
**trash [3]** 25/4 26/16 76/16
**treat [1]** 76/15
**treated [1]** 76/7
**trial [11]** 1/13 3/5 3/7 4/5 6/3 7/18 9/9 10/7 14/14 18/21 28/24
**trip [4]** 45/8 45/17 46/11 46/19
**trips [1]** 46/17
**Troy [2]** 59/1 74/8
**truck [54]**
**trucks [15]** 18/3 18/3 25/8 26/17 32/4 34/6 34/13 37/18 37/19 41/14 42/5 42/8 42/15 43/13 45/16
**true [3]** 4/15 6/18 7/5
**trustworthy [1]** 15/25
**truth [1]** 48/13
**turnover [1]** 59/11
**Twenty [2]** 48/5 48/9
**Twenty-two [1]** 48/5 48/9
**Twitter [1]** 7/24
**two-week [3]** 65/16 65/20 67/5
**typically [9]** 21/22 31/16 37/24 40/19 41/16 45/9 50/14 50/17 68/25

**U**

**uhm [6]** 41/25 43/14 43/22 53/4 53/8 58/10
**ultimately [1]** 11/24
**Um [5]** 45/4 47/5 70/16 72/15 73/4
**Um-hum [5]** 45/4 47/5 70/16 72/15 73/4
**umbrellas [1]** 3/20
**unanswered [1]** 16/10
**underpay [1]** 14/21
**underpayment [1]** 14/24
**understand [12]** 8/7 16/17 24/3 33/1 46/10 56/6 60/7 67/8 67/13 74/18 74/20 74/21
**understanding [4]** 19/18 24/2 62/20 74/1
**understood [4]** 20/1 20/3 34/23 67/10
**unfair [1]** 18/11
**unfortunately [1]** 43/22

**U**

**UNITED [3]**  1/1 1/15 2/9
**unless [2]**  4/19 6/25
**upset [3]**  76/18 76/19 76/19
**us [17]**

**V**

**vacation [1]**  70/8
**value [1]**  49/5
**vehicle [6]**  40/23 41/4 41/10 42/8 42/20
51/13
**vehicles [3]**  42/12 43/22 43/23
**verdict [3]**  5/15 8/16 10/16
**verify [1]**  22/10
**versus [2]**  68/24 69/14
**video [1]**  35/10
**videos [1]**  34/12
**view [1]**  9/3
**viewed [2]**  51/11 51/20
**violating [1]**  37/7
**violation [1]**  40/8
**virtually [1]**  28/17
**visit [1]**  8/3
**voice [1]**  35/10
**VOLUME [1]**  1/17
**VUE [1]**  2/7

**W**

**wage [6]**  18/11 21/2 71/13 74/15 77/2 77/3
**wait [1]**  43/16
**waiting [2]**  10/12 42/14
**walk [2]**  9/9 50/9
**walked [3]**  75/12 75/21 76/8
**walking [1]**  3/19
**Walmart [2]**  51/22 59/25
**waste [92]**
**Waste Pro [73]**
**Waste Pro's [1]**  21/19
**water [1]**  20/22
**watering [1]**  23/17
**websites [1]**  7/23
**Wednesday [1]**  72/8
**week [14]**  12/23 18/14 24/20 63/5 63/8
63/11 65/16 65/20 67/3 67/4 67/5 68/11
71/22 73/7
**week 1 [1]**  67/3
**week 2 [2]**  67/4 73/7
**weekends [2]**  14/5 53/15
**weeks [2]**  33/10 67/6
**weigh [5]**  27/3 27/5 27/14 27/21 28/22
**weighed [2]**  22/6 23/22
**weight [4]**  4/4 9/8 15/5 28/23
**welcome [1]**  10/7
**wet [2]**  3/19 3/20
**whittle [1]**  20/22
**whittling [1]**  23/17
**who's [1]**  41/10
**willful [1]**  14/24
**William [1]**  1/14
**wins [1]**  12/20
**wise [1]**  53/20
**wish [1]**  8/19
**witness [24]**
**witness's [7]**  5/19 5/20 5/22 5/22 5/25 6/1
6/4
**witnesses [8]**  7/1 8/20 9/1 9/14 9/15 9/18
10/12 79/6
**witnesses's [1]**  4/14
**women [2]**  13/4 15/20
**wonder [1]**  74/4
**Wonderful [1]**  11/11
**words [2]**  8/13 18/24
**work [63]**
**worked [38]**
**workers [2]**  24/23 39/22
**Workforce [1]**  30/18

**working [14]**  12/21 15/11 22/10 23/9 23/16
27/12 30/3 41/3 54/3 64/1 64/2 69/2 69/21
77/2
**works [2]**  44/21 76/25
**worst [1]**  60/3
**WPD [1]**  1/4
**write [1]**  46/4
**writing [1]**  58/18
**written [1]**  46/6

**X**

**X amount [2]**  60/14 74/13

**Y**

**yard [1]**  41/22
**York [1]**  29/19
**you'd [2]**  30/15 45/25
**young [2]**  48/17 48/25