UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 17-60926-CIV-WPD

ROGER ANDREU,                    .
                                 .
            Plaintiff,           . Fort Lauderdale, Florida
                                 . April 17, 2018
            v.                   . 9:41 a.m.
                                 .
WASTE PRO OF FLORIDA, ET AL.,.
                                 .
            Defendants.          .
. . . . . . . . . . . . . . . .

                    - - - - -

         Transcript of Trial Proceedings had

    before the Honorable William K. Dimitrouleas,

      United States District Judge, and a Jury.

                    - - - - -

                    VOLUME 2

                    - - - - -

Proceedings recorded by mechanical stenography, transcript
produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

```
APPEARANCES:

For the Plaintiff:     Paul D. Edwards, Esq.
                       Marc E. Rosenthal, Esq.
                       Rosenberg, Cummings & Edwards, PLLC
                       801 NE 20th Avenue
                       Fort Lauderdale, Florida  33304


For the Defendant:     Amy S. Tingley, Esq.
                       Joseph S. Hudson, Esq.
                       Stovash, Case & Tingley, P.A.
                       220 North Rosalind Avenue
                       The VUE at Lake Eola
                       Orlando, Florida  32801


Court Reporter:        Francine C. Salopek, RMR, CRR
                       Official Court Reporter
                       United States District Court
                       299 E. Broward Blvd., Room 205F
                       Fort Lauderdale, Florida 33301
                       (954)769-5657/mjsfcs@aol.com


                       -  -  -  -  -
```

| | |
|---|---|
| 1 | **TUESDAY, APRIL 17, 2018, 9:41 A.M.** |
| 2 | *(The Judge is presently on the bench)* |
| 3 | **THE COURT:** Counsel want to come up on |
| 4 | Andreu vs. Waste Pro. We'll get going on that case now. |
| 5 | **MS. TINGLEY:** Your Honor, may we have a moment to |
| 6 | empty out our box? |
| 7 | **THE COURT:** Sure. |
| 8 | **MS. TINGLEY:** Thanks. |
| 9 | **THE COURT:** Mr. Andreu, do you want to go ahead and |
| 10 | resume the stand? |
| 11 | **THE WITNESS:** Yes, sir. Thank you, your Honor. |
| 12 | *(Pause)* |
| 13 | **THE COURT:** You ready? |
| 14 | **MS. TINGLEY:** Yes, your Honor. |
| 15 | **THE COURT:** All right. Let's bring in the jury. |
| 16 | **COURTROOM SECURITY OFFICER:** All rise. |
| 17 | *(The jury entered the courtroom)* |
| 18 | **THE COURT:** You can be seated when you come in. |
| 19 | All right. We have all the jury back. |
| 20 | Did everyone follow my admonition not to discuss the |
| 21 | case or allow it to be discussed in your presence? |
| 22 | All right. I think we're ready for cross-examination. |
| 23 | Ms. Tingley. |
| 24 | **MS. TINGLEY:** Thank you, your Honor. |
| 25 | |

ANDREU - CROSS/TINGLEY

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | BY MS. TINGLEY: |
| 3 | Q.  Good morning, Mr. Andreu. |
| 4 | A.  Good morning. |
| 5 | Q.  Now, I understand that yesterday we went through about five |
| 6 | of the payroll records with you during your direct testimony. |
| 7 | Do you recall that? |
| 8 | A.  Yes, ma'am. |
| 9 | Q.  Okay.  And today we're going to go through far more of |
| 10 | those pay records than just those five. |
| 11 |         How long were you employed by Waste Pro? |
| 12 | A.  October 2013 through the earlier part of 2017. |
| 13 | Q.  Okay.  And the payroll records that you reviewed yesterday |
| 14 | during your testimony, that was for a three-year period? |
| 15 | A.  The records that I reviewed, I believe them to be for a |
| 16 | three-year period. |
| 17 | Q.  Okay.  Did you have a chance to look at all of those |
| 18 | records prior to your testimony yesterday or just those five? |
| 19 | A.  The ones that I viewed while I was on the stand, but prior |
| 20 | to that, obviously, being my ADP records, yes, I have looked at |
| 21 | them before. |
| 22 | Q.  You looked at every single one. |
| 23 | A.  Yeah, my ADP statements?  Yes, ma'am. |
| 24 | Q.  Okay.  And the time cards that were behind it. |
| 25 | A.  The time cards, again, is something that I would have |

ANDREU - CROSS/TINGLEY

1  viewed on a biweekly basis and weekly basis, clocking in and

2  clocking out, not in the paper form that's there.

3  Q.  Okay.  So, let's go back to when you first started at

4  Waste Pro.  And, again, who did you say you interviewed with?

5  A.  Carlos?

6  Q.  And Carlos -- does Carlos have a last name?

7  A.  I don't recall his last name.  I believe it started with an

8  M.

9  Q.  And did you say yesterday you interviewed with someone else

10  too?

11  A.  I don't believe I said that.  I think that I was

12  referencing two times that I signed papers and other

13  information that was given me by Regina.

14  Q.  Okay.  So, yesterday you did not testify that Regina

15  Lombardo was part of your interview process.  You didn't say

16  that?

17  A.  That's what I just said, that she did give me papers and

18  stuff.  I met with her in her office on the second floor.

19  Q.  Was that during the interview process?

20  A.  Yes, during the interview process.

21  Q.  Okay.  So, you're saying that she interviewed you with this

22  Carlos.

23  A.  No, no.  Carlos interviewed me, the operations manager.  He

24  referred me to Regina, she was on the second floor, who had all

25  sorts of papers and everything to sign prior to being hired.

ANDREU - CROSS/TINGLEY

1    Q.   And were you hired the day that you interviewed?

2    A.   Carlos called me, I believe, a week or two afterwards to

3    inform me that I was hired.

4    Q.   Right.  Because you said yesterday that there was a lengthy

5    interview process, I believe was your testimony.

6    A.   Yes, ma'am, I did.

7    Q.   Okay.  Was it the first time that you were there was when

8    you met with Ms. Lombardo?

9    A.   I can't recall exactly if it was the first or second or

10   third time.

11   Q.   Okay.  Because you were in the office multiple times during

12   your interview process?

13   A.   Yes, ma'am, I was.

14   Q.   And you were told by this Carlos, who you don't know his

15   last name, who interviewed you, that you would be paid a day

16   rate.

17   A.   If I recall correctly, actually, on one of the documents

18   that was given to me yesterday, his name is on there, and he's

19   the operations manager.  If we could review that, I'll give you

20   his last name.

21   Q.   No, we'll get to whatever documents we need to.

22        The question was --

23   A.   Okay.  All right.

24   Q.   -- was that the only person that explained your pay as the

25   day rate?

ANDREU - CROSS/TINGLEY

1    A.   Yes, ma'am, at the time of hiring, absolutely.

2              **THE COURT REPORTER:**  Ms. Tingley, could you move --

3              **MS. TINGLEY:**  Move it down?

4              **THE COURT REPORTER:**  Point it towards you.

5    BY MS. TINGLEY:

6    Q.   Now, do you recall last August having your deposition

7    taken?

8    A.   Yes, ma'am.

9    Q.   In this particular case.

10   A.   Yes, ma'am.

11   Q.   And I was there, and your attorneys were there, correct?

12   A.   Correct.

13   Q.   And there was a court reporter there?

14   A.   Correct.

15   Q.   And the court reporter put you under oath?

16   A.   Yes.

17   Q.   And in putting you under oath, you swore to tell the truth,

18   correct?

19   A.   Yes.

20   Q.   And you swore to tell the truth, just like you swore to

21   tell the truth when you gave your oath yesterday, is that

22   right?

23   A.   Yes, that's correct.

24   Q.   Okay.  And do you recall being asked in your deposition

25   about what the day rate encompassed?

ANDREU - CROSS/TINGLEY

1  A.  The exact question, I don't recall, but I know that it was

2  asked.

3  Q.  Okay.  And do you recall what your response was?

4  A.  No, I do not.

5  Q.  Okay.  So, you don't have any recollection of saying that

6  the day rate was whatever job you were assigned to that day.

7           **MR. EDWARDS:**  Objection.  Improper impeachment.

8           **THE COURT:**  Overruled.

9  A.  Please repeat that?

10 Q.  You don't recall saying in your deposition --

11 A.  Um-hum.

12 Q.  -- that the day rate was intended to encompass whatever job

13 you were assigned to that day for a day's work?

14 A.  Actually, yes, ma'am, I do recall that.

15 Q.  Okay.

16 A.  Absolutely.

17 Q.  Okay.  And during the course of your employment at

18 Waste Pro, what type of assignments or tasks or jobs would you

19 get?

20 A.  As I stated yesterday, I would clock in, and I would be

21 given my route sheet, and I was to complete that route for the

22 day.  That's my job assignment for the day.

23 Q.  In addition to routes.

24 A.  No, ma'am, not at all.  The route is the job assignment.

25 You're handed a route sheet with the houses or containers that

ANDREU - CROSS/TINGLEY

1    you need to service that morning.  They give it to you in the

2    morning, say, This is your job.

3    Q.  All right.  I apologize.  I thought yesterday you said you

4    also worked at the transfer station on weekends.

5    A.  Yes, ma'am.

6    Q.  Is that a route?

7    A.  The transfer station on Saturdays and Sundays, no, it is

8    not a route.

9    Q.  Okay.  So, now let's go back to the different types of

10   assignments that you would get in addition to routes.

11   A.  Okay.  Um-hum.

12   Q.  Would the transfer station be one of them?

13   A.  No, ma'am.

14   Q.  Oh, so that would not be a daily assignment for you?

15   A.  The transfer station, when they asked me to supervise it

16   and work it, was something in addition that -- because it

17   required me to work seven days, something that we're not even

18   supposed to do, I found out later.  But they said to me, We'll

19   give you X amount of dollars, watch the transfer station, make

20   sure that it's clean and it's operating properly.  And I was

21   doing such a good job that they wanted to keep me there.  So

22   that was in addition.

23            The regular job that I had, what I was hired for,

24   obviously was as a driver.  I started as a helper.  I moved up

25   as a driver.  And every day you're given your route.  And even

ANDREU - CROSS/TINGLEY

1   on Saturdays, there would be times that I would do a route, and

2   it's part of that six-day week.  Sunday, I would go, and I

3   would supervise the transfer station.  At the beginning of

4   doing that, it would encompass driving as well, because I would

5   bring a roll-off truck out there, a grapple truck, and I would

6   service the cans as they were being filled, and drive to the

7   dump and dump them and come back while somebody watched the

8   gate.

9   Q.  Right.  But on those Sundays --

10  A.  Um-hum.

11  Q.  -- your task or your job that you were assigned was to be

12  on duty at the Coral Springs transfer station, correct?

13  A.  There were days when that was the sole assignment, yes,

14  ma'am.  But there are times when I would come in, and they

15  would say, Well, today you're gonna go do a route.

16  Q.  On Sundays.

17  A.  On a Sunday, on a Saturday, I need you to go and help with

18  a special event, whatever it may be.

19          But I -- I don't really get the gist of the question,

20  and I believe I'm -- the only answer I would have is, again,

21  that when I show up in the morning, I'm given that daily task.

22  Q.  Okay.  So, you're given a daily task.

23  A.  Um-hum.

24  Q.  You're not specifically on every day assigned a route,

25  correct?

ANDREU - CROSS/TINGLEY

1   A.   Yes, we are.  Yes, ma'am.

2   Q.   Okay.  So, you said that sometimes you would work special

3   events.

4   A.   Yes, ma'am.

5   Q.   Was that a route?

6   A.   Actually, it is.  Because it's -- like, for instance, in

7   North Lauderdale, the special event is they're cleaning up the

8   neighborhood.  So, we'll send three trucks over there, and

9   they'll say, Okay, this is the neighborhood.  We broke it up

10  into three sections.  This is your section.  Make sure that

11  this section is picked up.  And the other two trucks will do

12  the other two sections.

13  Q.   Now, what about days where you had to go and -- I think you

14  said that sometimes you would be sent to repair containers or

15  compactors or things of that nature?

16  A.   Yes, ma'am.

17  Q.   Okay.  Was that a route?

18  A.   Yes, ma'am, it is.  Again, you go in the morning, they'll

19  go on the computer, and they'll look, and they'll say, Okay, we

20  have this list of commercial accounts that either need a

21  container replaced, they need some wheels replaced on the

22  container, or they need a container removed, because they

23  didn't pay for their service.  These are the ten or 12,

24  whatever's on the route for that day, that you need to

25  complete.

ANDREU - CROSS/TINGLEY

```
1            So, you're given that route sheet, which has all the
2    addresses and locations on it, and it's my responsibility to
3    complete that route.  Yes, ma'am.
4    Q.  Okay.  Now, that is a route --
5    A.  Yes, ma'am.
6    Q.  -- in your mind.
7    A.  Not in my mind, ma'am.  It's what they made it.
8    Q.  Okay.  And going to a special event is a route in your
9    mind.
10   A.  Again, if you title it as -- you know, it's a play on
11   verbiage here -- special event.  No, it's actually a community
12   cleanup.  It's a specific community.  It's broken up into
13   sections.  They send multiple trucks.  Each truck is handed a
14   section.  That is your route.  And you go out and you do the
15   route.
16   Q.  Okay.  And so, for purposes of the jury that may be
17   unfamiliar with this industry --
18   A.  Yes, ma'am.
19   Q.  -- in your mind, the route could encompass anything from
20   picking up resident's trash, correct?
21   A.  Correct.
22   Q.  Going and working at the transfer station.
23   A.  That's correct.
24   Q.  Going to a special event.
25   A.  Correct.
```

100

ANDREU - CROSS/TINGLEY

1   Q.  What about picking up a truck that's being repaired or

2   picking up a truck from another facility?  Would that be a

3   route?

4   A.  Not a route, a daily assignment.

5   Q.  Okay.  So, now we're getting somewhere.

6   A.  Yes.

7   Q.  So, they were daily assignments that you were given.

8   A.  No, going to pick up the truck was the daily assignment

9   that I was given.

10  Q.  Okay.  And would you be paid the daily rate for that daily

11  assignment?

12  A.  Yes, ma'am.

13  Q.  Okay.  And would you be paid the daily rate for the special

14  events?

15  A.  Yes, ma'am.

16  Q.  Would you be paid the daily rate for working at the

17  transfer station?

18  A.  Yes, ma'am.

19  Q.  Would you be paid the daily rate for picking up trash at

20  residents *(sic)* throughout Broward County?

21  A.  Yes, ma'am.

22  Q.  Would you be paid the daily rate when you were picking up

23  bulk items throughout Broward County?

24  A.  Yes, ma'am.

25  Q.  When you first started at Waste Pro, what office were you

ANDREU - CROSS/TINGLEY

1    assigned to?

2    A.   Pembroke Pines division.

3    Q.   Okay.  When did you first meet Russell Mackie?

4    A.   2000 -- shortly after being hired.

5    Q.   Was it before your first day on the job?

6    A.   I don't believe so.  I don't remember the exact day.

7    Q.   How would you characterize your relationship with Russell

8    Mackie?

9    A.   Like I said in my deposition, he -- he treated me well.

10   He's a decent human being.  I have had opportunities on several

11   occasions where outside of work, we've met.  We've discussed

12   everything from fantasy football to all the football games and

13   betting on games and stuff.  And he's just to me -- like I said

14   before, I -- I think of him as a outstanding human being.  He's

15   a great guy.

16   Q.   Did you consider him a hands-on manager?

17   A.   Absolutely.

18   Q.   And what do you base that on?

19   A.   Well, seeing him, seeing his interactions with people,

20   being good enough to actually talk with guys that are just

21   laborers, a driver.  You know, he's -- he's the vice president.

22   And he doesn't believe himself as, you know, greater than.

23   He's not afraid to talk with the guys and communicate with the

24   guys and hear what's going on and take care of issues.

25   Q.   Did you ever have occasion to observe Mr. Mackie actually

ANDREU - CROSS/TINGLEY

1   helping with routes while you were employed at Waste Pro?

2   A.  Absolutely.

3   Q.  And can you just describe that to the jury.

4   A.  There was an issue in the Pompano division, where I believe

5   it was the front-end route, and they had either too many stops

6   on one route or whatever, and he was interjecting his opinion

7   about that.  Mr. Mackie, one of the good things about him is

8   that he's a person that actually worked the job.  He was a

9   driver, he was a helper.  He came from the bottom.  He worked

10  his way up.  So, he understands it.  Unlike a lot of the people

11  that are in management positions that have no comprehension of

12  what this job encompasses.

13  Q.  Didn't Mr. Mackie actually assist with the routes by

14  getting on a truck with you?

15  A.  He's -- he's gotten on trucks, yes, ma'am.

16  Q.  Okay.  How many times with you?

17  A.  I -- with me personally?

18  Q.  Yeah.

19  A.  He wasn't on the truck.  We were in Pembroke Pines.  It was

20  2016.  It was probably, like, ten o'clock at night, and he was

21  driving the streets, and he would tell me if there was

22  something out there or could you go clear this area or that

23  area.  It was ten, almost 11 o'clock at night the last time I

24  spoke with him, and he asked me to go dump the truck.  We had a

25  100-yard container at the Pines division.  And that's as close

ANDREU - CROSS/TINGLEY

1   as like actually getting on a truck with me.

2          But he's been on routes where I've been where he

3   needed help, because he was in -- he had a serious issue.  The

4   City of Pembroke Pines was pretty pissed off that this stuff

5   was out there.  And I came from Pompano down to Pines to help

6   him.

7   Q.  And didn't that happen because one of the drivers had

8   gotten hit by a car, and the truck, and so both the truck and

9   the driver were out of commission for some time?

10  A.  No.  This was an ongoing issue for several months.  They

11  just weren't able to complete the routes in Pembroke Pines.

12  And they were having a lot of complaints from the residents,

13  and the city was complaining.  And they needed somebody who's a

14  hustler and a hard worker to go down there, and he requested

15  that I go down and help.  And I would drive down from Pompano

16  on a daily basis, and I would help out down there.

17  Q.  And Russell Mackie, to your knowledge, he was actually

18  helping as well, correct?  He didn't mind assisting and picking

19  up the trash.

20  A.  I -- I know for a fact that he has helped.  Was he helping

21  that day physically picking up the garbage?  I can't say that

22  he was.  But he was there.  And it was his request that I come

23  down and help, yes, ma'am.

24  Q.  How often would you see Mr. Mackie when you were in the

25  Pembroke Pines division?

ANDREU - CROSS/TINGLEY

1   A.  Periodically.  It would be random.

2   Q.  And what was the primary way that you would communicate

3   with Mr. Mackie?

4   A.  Hello.  How are you?  What's going on?  What's happening?

5   Talk sports, whatever.  Call him the emperor of the universe.

6   Q.  Okay.  So, you would see him on a routine basis.

7   A.  I wouldn't call it routine.  Occasionally, yes, ma'am.

8   Q.  When you say "occasionally," how often?  Every week?

9   A.  No.  Once every month or two.

10  Q.  Really?

11  A.  Yeah.  I'm -- again, I'm guessing.  I don't recall each and

12  every time that I saw him or came into contact with him.

13  Q.  Okay.  And what about texting?

14  A.  What about it?

15  Q.  Texting.  Did you ever text Mr. Mackie?

16  A.  Absolutely.  Yes, ma'am, I did.

17  Q.  How often were you texting Mr. Mackie?

18  A.  If it's Sunday and football is on, quite often.

19  Q.  Okay.  So, you were routinely communicating with him by

20  text?

21  A.  Again, if it's Sunday and football is on, and we're doing

22  fantasy sports, yes.

23  Q.  That's the only time that you would communicate with him by

24  text, was --

25  A.  No.

ANDREU - CROSS/TINGLEY

1    Q.   -- fantasy football.

2    A.   No.  There's been other times I've communicated with him.

3    Q.   Okay.  How often were you communicating with him by text?

4    A.   Again, I don't know exactly how many times.

5    Q.   More than once a week?

6    A.   No, absolutely not.

7    Q.   What about Ms. Lombardo?  Where was she when you were in

8    Pembroke Pines?  Did she have an office there?

9    A.   She had -- when I first met her, she was upstairs.  Then

10   she moved downstairs.  She had several offices, yes, ma'am.

11   Q.   Okay.  And so would you see her -- how often would you see

12   her?

13   A.   There were times I could see her every day.

14   Q.   And did you have occasion to speak with her on a routine

15   basis?

16   A.   Yes, ma'am.

17   Q.   Okay.  And when you had questions, concerns, anything,

18   would you be able to talk to her about them?

19   A.   Absolutely.

20   Q.   And would she address those concerns with you?

21   A.   Absolutely.

22   Q.   Okay.  So, you considered her someone that you could go to

23   when something wasn't right or you had a question.

24   A.   Yeah, she -- she afforded me that privilege.  She would

25   always have that open-door policy.  She was polite.  She was

ANDREU - CROSS/TINGLEY

1    receptive.  And she would most definitely take care of matters.

2    Q.  Now, you said you started in the Pembroke Pines as a

3    helper.  Do you know when you ceased being a helper?

4    Approximately.

5    A.  The exact date, I don't know, but it was in '14, the early

6    part of '14.

7    Q.  And then what was your next position?

8    A.  From helper, I transitioned into bulk route driver in

9    Hollywood.

10   Q.  And how long did you have that?

11   A.  Probably the better part of a year.

12   Q.  So into 2015?

13   A.  I may have transitioned to the bulk route grapple truck

14   before then.  I may have.  I don't know the exact dates.

15   Q.  So, you went from the bulk driver to the bulk grapple,

16   correct, driver?

17   A.  Yes, ma'am.

18   Q.  Okay.  And how long did you drive the grapple truck in '15,

19   approximately?

20   A.  Six, seven months, maybe longer.

21   Q.  When you were working as the bulk route driver -- let me

22   ask it this way, sir.  When you started at Waste Pro, was it

23   your understanding you would be working six days a week?

24   A.  Yes, ma'am.

25   Q.  And for you, didn't you think that was a good thing, that

ANDREU - CROSS/TINGLEY

1  you could work and earn money?

2  A.  Absolutely.  I wanted to work seven days a week.

3  Q.  Okay.  So, on these weeks where you did work seven days a

4  week, that was fine with you.

5  A.  Yes, ma'am, it was.

6  Q.  And you were always asking Waste Pro to give you more

7  hours, weren't you?

8  A.  Absolutely.

9  Q.  Okay.  So, you wanted more work, because you wanted to make

10  more money.

11  A.  Yes, ma'am, I did.

12  Q.  And was that the case when you were a helper?

13  A.  The case when I was a helper to want more?

14  Q.  Yes.

15  A.  Sure.

16  Q.  And that was also the case when you were the bulk route

17  driver?

18  A.  Absolutely.  Yes, ma'am.

19  Q.  And the bulk grapple driver.

20  A.  Yes, ma'am.

21  Q.  Okay.  After you were the bulk grapple driver, what

22  position did you have?

23  A.  I believe I transitioned over into the roll-off division,

24  the commercial part of the industry.

25  Q.  And how long were you the roll-off driver?

ANDREU - CROSS/TINGLEY

1   A.   Into 2006 -- the later -- probably the later part of 2016,

2   if I recall correctly.

3   Q.   And if you could just explain to the jury, when you were a

4   roll-off driver -- that's in the commercial side of Waste Pro's

5   business, isn't it?

6   A.   Yes, ma'am, it is.

7   Q.   Okay.  Can you just explain to the jury what a roll-off

8   driver does?

9   A.   Sure.

10          The roll-off driver will service cans at commercial

11  sites.  I mentioned yesterday, they could be construction

12  sites, a lot of the commercial stores that you go to --

13  Walmarts, Publix, Targets, areas like that, apartment

14  complexes, city -- anywhere where you see the large compactors

15  or open top roll-off cans.

16  Q.   And what specifically would you do in that role?

17  A.   I would go to the site that I have the address for, which

18  needs to be serviced.  I would retain the container, bring it

19  to the dump.  I would dump it, I would return it back, and go

20  on to the next container.

21  Q.   And during the course of any given day as a roll-off

22  driver, could you have extra businesses added, because somebody

23  called in, in the morning at, say, Publix, and needed to have

24  their container emptied?

25  A.   Absolutely.  Similar to the residential routes, where a

ANDREU - CROSS/TINGLEY

1   supervisor, if I finish, I call in, I'm done with my route, if

2   they had like Publix call up and say, Our container was missed,

3   or whatever, they would say to me, I need you to help, I need

4   you to go and service Publix or Walmart or an apartment

5   complex.

6   Q.  Well, we'll get to the 1098 calls in a little bit.  But

7   let's talk specifically when you were a roll-off driver, not

8   when you're calling in, but during the course of your day --

9   A.  Um-hum.

10  Q.  -- were businesses added as part of your route?

11  A.  Again, they would call me, and they would ask -- if they

12  were to do it in that manner, they would ask, How far along are

13  you on your route?  Do you think you could help us and fit this

14  in?  Yes, they can call me, and, yes, they can request me to

15  add more onto the route, yes, ma'am.

16  Q.  Okay.  But that would still part of your main route, isn't

17  that correct?

18  A.  No, ma'am, it wouldn't.  What would happen is, again, in

19  the roll-off division, when you go in, you're handed a route

20  sheet.  It will have, on average, seven stops, because these

21  commercial roll-off routes take a lot longer to service than

22  most of the other projects in Waste Pro.

23  Q.  Mr. Andreu, weren't there days where your route sheet would

24  show that you were only given two or three stops with the

25  expectation that other stops would be added as part of your

110

ANDREU - CROSS/TINGLEY

```
 1  day?
 2  A.   Absolutely not.  If you go in, and you are very lucky, and
 3  you get a day where there's three stops, you're gonna try to
 4  hustle those three stops and go home.  But, again, in fairness
 5  to Waste Pro, and as the question insinuates, yes, they'll
 6  probably call me and ask me, Hey, you got the short route
 7  today, take care of these.
 8  Q.   But those -- whatever roll-offs that you were picking up
 9  that day --
10  A.   Yes, ma'am.
11  Q.   -- those were all part of what you were paid for in your
12  daily rate, isn't that true?
13  A.   No, actually not.  What happens, again, if I have my route,
14  and I go, whether it's three containers, seven containers --
15  there's days it's sometimes crazy, and there will be 11
16  containers, it's a long day -- they'll call, and it will be,
17  I'll give you 50 bucks to go take care of this, I need this
18  done, we need help here or there.  And it's added.  And they'll
19  give you an additional, quote/unquote, help pay.
20  Q.   Right.  And we'll talk about the help pay.  But I'm still
21  trying to understand, when you were in the roll-off division --
22  A.   Yes, ma'am.
23  Q.   -- and you get a call -- what time would you typically
24  start those days?
25  A.   I've started those days as early as one a.m.
```

111

ANDREU - CROSS/TINGLEY

1    Q.   Okay.  So, for instance, if you had started one of those

2    days at one a.m. --

3    A.   Um-hum.

4    Q.   -- and you've picked up your various roll-offs that you

5    were supposed to, and you were assigned to --

6    A.   Yes, ma'am.

7    Q.   -- and you get a call at nine in the morning from

8    Waste Pro, and they said, Oh, we have to add Target to your

9    route --

10   A.   Yes, ma'am.  Yes, ma'am.

11   Q.   -- you would have to go to Target at that time and do that

12   as part of your day, wouldn't you?

13   A.   No.  Quite honestly, if I started at one, and they called

14   me at nine, I'm probably gonna tell them, I really want to go

15   home, I'm not doing that, get somebody else who came in later.

16   Q.   At nine in the morning?

17   A.   If I started at one.  I've already been there eight or nine

18   hours.  Yes, ma'am, I definitely want to go home.

19   Q.   Okay.  And so, when you told them no, they would let you,

20   wouldn't they?

21   A.   No, not all the time.  There were times when they would

22   literally say to me, No, you gotta go and do this, don't come

23   back here, get that can, pick it up.

24        It's not... the waste industry, this job -- you know,

25   I'm up here with a tie and a shirt and everything.  It's --

ANDREU - CROSS/TINGLEY

1   this is out of respect for the Court and what's *(sic)* the venue

2   demands.  The waste industry is full of a bunch of knock-around

3   guys, and the way that people talk to one another isn't as

4   polite as we're being here today.

5   Q.  Okay.

6   A.  I'm not trying to be disrespectful to you nor disrespect

7   the Court by saying the things that are really said, but use

8   your imagination.  It's a bunch of guys that --

9   Q.  Mr. Andreu --

10  A.  -- just speak like guys.

11  Q.  Understood, Mr. Andreu.

12          Let's get back to my questions, okay?

13  A.  Sure.

14  Q.  Now, when you are -- it is your position that when you were

15  a roll-off driver --

16  A.  Yes, ma'am.

17  Q.  -- that any time --

18  A.  Um-hum.

19  Q.  -- that they added an additional roll-off location, an

20  additional business --

21  A.  Yes, ma'am.

22  Q.  -- if you had not finished your route, you expected to be

23  paid help pay?  Is that your position?

24  A.  That is my position, yes, ma'am, help pay, correct.

25  Q.  Okay.  So, when you -- for three years --

ANDREU - CROSS/TINGLEY

1  A.  Um-hum.

2  Q.  -- when you would get those assignments, would you

3  negotiate the help pay at that time?

4  A.  I would do my best to try, yes, ma'am.

5  Q.  Okay.  And it was somewhat of a negotiation, correct?

6  A.  Yes.

7  Q.  Okay.  And if Waste Pro agreed to pay you that help pay,

8  then you would go and do it, wouldn't you?

9  A.  Yes.

10  Q.  Okay.  And did you say no to Waste Pro?  I think yesterday

11  you said you did.

12  A.  Yes.

13  Q.  Okay.  How often?

14  A.  Often.

15  Q.  So, on the days where you didn't say no --

16  A.  Um-hum.

17  Q.  -- and you got your help pay --

18  A.  Yes, ma'am.

19  Q.  You also said yesterday that there were occasions that the

20  help pay wasn't on your paycheck.

21  A.  That's correct.

22  Q.  Okay.  And how often did you say that was happening?

23  A.  Probably two out of the three times.

24  Q.  Okay.  And what did you do about it?

25  A.  Same thing that all the other guys do, complain about it

114

ANDREU - CROSS/TINGLEY

 1    the next day to the supervisor that didn't give it to you.

 2    Q.   Okay.  So, let's not talk about anybody else at Waste Pro.

 3    A.   Right.

 4    Q.   Okay?  Let's talk about you.

 5    A.   Yes, ma'am.

 6    Q.   What did you do two out of three times when you didn't get

 7    your help pay?

 8    A.   Complain to the supervisor when I got my check, why wasn't

 9    my help pay on there?

10    Q.   And then what would happen?

11    A.   Absolutely nothing.  We would probably get in a verbal

12    match back and forth, and you just keep on going.  There's -- I

13    can't force them to pay me.  I would ask.

14         There were occasions when I've gone to Ms. Lombardo,

15    and I would ask, Hey, you know, I didn't get the bonus that I

16    was promised.  And it got corrected, absolutely.

17    Q.   If two out of three times you didn't get it --

18    A.   Um-hum.

19    Q.   -- why didn't you go to Ms. Lombardo two out of three

20    times?

21    A.   Again, like I said, when the occasions arose, and I could

22    get in touch with Ms. Lombardo, I'd go into the office, and I'd

23    say, Hey, I didn't get it.

24    Q.   And she'd correct it, wouldn't she?

25    A.   Absolutely, 100 percent.  Like I said earlier, she always

ANDREU - CROSS/TINGLEY

1   had her open-door policy, and she was always more than willing

2   to help.  And that's the good thing that we had people like her

3   there, because at the level that I was at, and with the

4   supervisors that I had, they really don't care.

5   Q.  Okay.  But you've told the jury that you would talk to

6   Ms. Lombardo, and she would correct any problem you had with

7   your paycheck, correct?

8   A.  Absolutely.

9   Q.  And yet you're telling this jury that two out of three

10  times --

11  A.  Um-hum.

12  Q.  -- you were promised help pay, you didn't get it.

13  A.  Absolutely.  That's exactly what I'm saying.

14  Q.  And nothing happened.

15  A.  Absolutely nothing.  Yes, ma'am.

16  Q.  And you want this jury to believe that two out of three

17  times, you didn't say a word to Ms. Lombardo, even though you

18  knew that she would fix it.  Is that what you want this jury to

19  believe?

20  A.  Yes.

21  Q.  Okay.

22      **MS. TINGLEY:**  Might I approach, your Honor?

23      **THE COURT:**  Okay.

24  BY MS. TINGLEY:

25  Q.  Mr. Andreu, I'm showing you one of the exhibits that came

ANDREU - CROSS/TINGLEY

1    in yesterday.

2    A.   Yes, ma'am.

3    Q.   Try to unzoom it.

4         And these are the time cards that you spoke about

5    yesterday with your attorney.  Do you recall that testimony?

6    A.   Yes, ma'am.

7    Q.   And you said that you would never see these in a paper

8    form, correct?

9    A.   Correct.  I see it on the actual time clock itself.

10   Q.   Right.

11        But what you saw on the time clock, with the exception

12   of the approvals on the bottom --

13   A.   Um-hum.

14   Q.   -- that was all the information that you would see.

15   A.   Yes, ma'am.

16   Q.   Okay.  So, you would see all the various times where you

17   worked, what hours you worked, and then any bonuses that you

18   were paid.

19   A.   That's correct.  Yes, ma'am.

20   Q.   And then at the bottom, when it says "time card approval,"

21   Roger Andreu.

22   A.   Um-hum.

23   Q.   And that would mean that you would actually approve the

24   time card.

25   A.   Absolutely I would.

ANDREU - CROSS/TINGLEY

1  Q.  And then this information would go from the time card to

2  what, a payroll processing company, to your knowledge?

3  A.  I believe it -- ADP?

4  Q.  Okay.  Are you asking this jury to believe that you were

5  promised help pay bonuses that showed up on your time card, and

6  you approved it without those bonuses being on there?

7  A.  Yes.

8  Q.  Okay.  Now, looking at your paycheck for the same time

9  period, when you would get your paycheck from Waste Pro --

10  A.  Correct.

11  Q.  -- would this information be on it?

12       And here's the pay stub on the bottom, and then it

13  would have this information.

14  A.  Yes, I would.

15  Q.  Okay.  And this information would show whatever bonuses you

16  were getting, correct?

17  A.  Yes, ma'am.

18  Q.  And you would know, because you would have already approved

19  your bonuses ahead of time, correct?

20  A.  I would approve my time card, yes, ma'am.

21  Q.  That included all your bonuses for that pay period,

22  correct?

23  A.  If I recall correctly, the bonuses should show up on the

24  time -- I believe they should show up on it or -- I -- I'm not

25  certain if sometimes it's put in after you approve it, and

ANDREU - CROSS/TINGLEY

1    Ms. Lombardo puts it into ADP, the bonuses.

2    Q.   Well, you just told the jury that when you approved your

3    time card, the bonuses were on there.

4    A.   Right, the 50 and the 50.  And, again, if a supervisor

5    comes into the office, and he could say to her, Give Roger

6    75 bucks or 150 bucks, depending on the day, like if it was

7    Friday afternoon, I came in, I clocked out, I already approved

8    the time card, it may not be on there, but she will put it on

9    for the paycheck, yes, ma'am.

10   Q.   So -- but say, for instance, by the end of the time

11   period --

12   A.   Um-hum.

13   Q.   -- if you say that on Saturday -- on this particular day --

14   this was the 4th of July --

15   A.   Correct.

16   Q.   -- and that's when you approved your time card.

17   A.   Yes.

18   Q.   So, for certain, you know that you would have approved that

19   bonus, the $150.

20   A.   Yes, ma'am.

21   Q.   And that bonus -- you also would have had the opportunity

22   to approve these bonuses from 6-27.

23   A.   Absolutely, yes, ma'am.

24   Q.   And then you would also have had the opportunity to approve

25   these bonuses, correct?

ANDREU - CROSS/TINGLEY

1    A.   That's correct, yes.

2    Q.   Okay.  So, you're saying there might be a bonus that isn't

3    in there, because you approved it ahead of time.

4    A.   Not ahead of time.  If I approved it on the day it was

5    supposed to be approved, and let's say the supervisor says, Put

6    75 bucks or 50 bucks, whatever, he can go to Ms. Lombardo, and

7    she'll get it on there, yes, ma'am.

8    Q.   Okay.  But then you have the opportunity, when you get your

9    paycheck --

10   A.   Um-hum.

11   Q.   -- to confirm that all those bonuses were paid to you.

12   A.   That's correct, yes, ma'am.

13   Q.   Okay.  So, you have not one, but two opportunities to take

14   a look at all these times, two out of three times, you're not

15   paid your bonus work, two out of three times, and it's still

16   your testimony that you approved your time card, and you

17   accepted your paychecks and didn't bring it to Ms. Lombardo's

18   attention.

19   A.   Like I said before, I have brought it to her attention.

20   And when I say two out of three, I'm going over an expanse of

21   the almost four years that I was there.  So, it's not that you

22   get bonuses all the time.  But a lot of bonuses that were

23   promised to me, specifically in the earlier part, when I was

24   working in Hollywood in the alleys, there would be day after

25   day when they would say, We'll give you 35 bucks helper pay,

ANDREU - CROSS/TINGLEY

1   $35 helper pay.  And in a two-week period, that's like nine

2   days.  When you look, you got 50 bucks.  It's like, you know,

3   what happened to all the helper pay?  It's like, Well, we can't

4   get so much approved, or I put you in for 50.  And it is what

5   it is.  And you just keep going.

6   Q.  So -- but you've already told the jury that if you talked

7   to Ms. Lombardo, she would fix it.

8   A.  Um-hum, correct.

9   Q.  And -- but it is your testimony that in a six-day week, so

10  you got two days a week --

11  A.  Um-hum.

12  Q.  -- that you're not getting help pay, and you're not talking

13  to Ms. Lombardo, and you want the jury to believe that, yes or

14  no?

15  A.  Yes, that's what I want you to believe.

16  Q.  And this not getting paid help pay -- did you sue Waste Pro

17  for not getting your help pay?

18  A.  *(No response)*

19  Q.  Yes or no?

20  A.  The lawsuit isn't about not getting the help pay.

21  Q.  Okay.  That was -- so, you have not sued Waste Pro for that

22  money, correct?

23  A.  No, I did not sue Waste Pro for not getting the help pay.

24  That's correct.

25  Q.  Okay.  So, you approve it on your time card.

ANDREU - CROSS/TINGLEY

1    A.   Um-hum.

2    Q.   And if there was a day that there was no help pay, would

3    you have gone to a supervisor, gone to Ms. Lombardo?  That's an

4    opportunity for you, correct?

5    A.   Absolutely.  The same supervisor that promised me the help

6    pay.

7    Q.   Perfect.

8    A.   Yes, ma'am.

9    Q.   But, instead, you approved your time card.

10   A.   Of course.  I want to get my paycheck.

11   Q.   And then you get your paycheck --

12   A.   Yes.

13   Q.   -- and you still don't say anything, correct?

14   A.   On several -- several -- lots of occasions, yes, I did not

15   get that help pay.  That is correct.

16   Q.   And you didn't say anything.

17   A.   Sure I said it.  I said it before.  I would talk to the

18   supervisor that was putting in the help pay.

19   Q.   But you didn't talk to Ms. Lombardo.

20   A.   Or on occasions when it was really large amounts, I could

21   go to Ms. Lombardo, and she would resolve it, but she has to

22   get it verified from the same supervisor that said that he

23   would give it to me.

24         So, at times, it's like, you know what, it's not even

25   worth, you know, fighting over 50 bucks, 35 bucks with them and

ANDREU - CROSS/TINGLEY

1   just keep going.  And they'll make it up.  You know, I would

2   get it made up.  There are times when I get really big bonuses.

3   Q.  Okay.  And then you went to court and filed this lawsuit,

4   correct?

5   A.  That's correct.

6   Q.  And you haven't made any claim against Waste Pro for that

7   money, correct?

8        **MR. EDWARDS:**  Objection.  Calls for a legal

9   conclusion.

10  A.  For which money?

11       **THE COURT:**  Overruled.

12  BY MS. TINGLEY:

13  Q.  You haven't -- you have not sued Waste Pro for all of these

14  bonuses, two out of three times, yes or no, sir?

15  A.  No.

16  Q.  And yet you want the jury to believe --

17  A.  Um-hum.

18  Q.  -- that you're -- you were not paid that money two out of

19  three times.

20       **MR. EDWARDS:**  Objection.  Asked and answered.

21       **THE COURT:**  Sustain.

22  BY MS. TINGLEY:

23  Q.  Mr. Andreu, yesterday we talked about -- or you talked

24  about the fuel card policy.

25  A.  Yes, ma'am.

ANDREU - CROSS/TINGLEY

1  Q.  Can you just assist the jury in understanding what the fuel

2  card is at Waste Pro?

3  A.  A fuel card, the credit card that allows us to fuel up at

4  the local gas station to get diesel for the trucks.

5  Q.  So, it's basically a gas card at a gas station.

6  A.  Basically, yes.

7  Q.  Okay.  And so you could go to that gas station and put gas

8  in your own personal tank, couldn't you?

9  A.  No.  There's a code on there that it distinguishes what

10 type of car you have and what you're allowed to purchase with

11 that card.

12 Q.  Okay.  But you could use it, you could try, couldn't you?

13 A.  I don't know why you would.  It's a diesel island.  It

14 doesn't have regular fuel for a car.

15 Q.  Okay.  But if somebody owned a diesel truck or if somebody

16 wanted to get diesel gas, they could use the fuel card for it.

17 A.  Yes, ma'am.

18 Q.  Okay.  And it was important to Waste Pro that these fuel

19 cards or these gas credit cards weren't lost, stolen,

20 misplaced, or otherwise --

21 A.  It was important to them that they were lost?

22 Q.  That they would not be lost.

23 A.  Yes.

24 Q.  Would not be stolen.

25 A.  Correct.

ANDREU - CROSS/TINGLEY

1   Q.  Would not be misplaced.

2   A.  Correct.

3   Q.  Okay.  And that's why they had this policy.

4   A.  *(No response)*

5   Q.  Is that your understanding?

6   A.  It's my understanding, yes.

7   Q.  And this policy had nothing to do with whether or not you

8   were paid overtime, correct?

9   A.  Correct.

10  Q.  It simply was Waste Pro's way of trying to ensure that

11  folks that had this gas card didn't lose it or use it

12  improperly.

13  A.  I believe that to be correct.

14  Q.  We also talked yesterday about this 1098, correct?

15  A.  Yes, ma'am.

16  Q.  And you started at the Pembroke Pines division.  When did

17  you move to the Pompano division?

18  A.  I believe 2000 -- the end of '15 or '16.

19  Q.  So, when you were doing the commercial roll-off work, you

20  were doing it through the Pompano division?

21  A.  Actually, I was driving from Pembroke Pines when I first

22  started and doing Coral Springs and other areas.

23  Q.  Now, when you -- this first policy -- actually, this one

24  that we're looking at right now, this is about you filling out

25  your route sheet, correct?

ANDREU - CROSS/TINGLEY

1   A.   That's correct, yes, ma'am.

2   Q.   And this is your signature on this.

3   A.   I can't see it.

4   Q.   Oh, let me put it up for you, sir.

5   A.   I believe it to be, yes, ma'am.

6   Q.   Okay.  And what is this information that Waste Pro is

7   wanting?  Tell us -- just tell the jury, what is this

8   information, "times in and out"?  What does that refer to?

9   A.   When we clock in, in the morning and when we clock out at

10  the end of the shift.

11  Q.   And what else?

12  A.   Everything on there -- lack of information on the route

13  sheet can lead to misconception.  Your productive efforts.

14  When information is given and entered correctly, management

15  can....

16          **THE COURT REPORTER:**  I'm sorry?

17          **THE WITNESS:**  Oh, I'm sorry.  I was just reading to

18  myself.

19          *(Pause)*

20  A.   It deals also with driver vehicle inspection reports.

21  Q.   Okay.  And --

22  A.   And this -- the other information there that they request,

23  if you have issues on the route, to go ahead and note that on

24  the route for them to also review.

25  Q.   And what type of issues would that be?  A truck breaking

ANDREU - CROSS/TINGLEY

1  down?

2  A.  No, no.  What they're referencing to here is if we're doing

3  a route -- and it could be a route that's either out of

4  boundaries, too large, too small, anything that you could

5  volunteer to management that assists them in putting together

6  routes.

7  Q.  Okay.  Would you note on your route sheet if a truck broke

8  down?

9  A.  No, ma'am.

10  Q.  You would not put it on the route sheet.

11  A.  I would put it on the driver vehicle inspection report.

12  Q.  Okay.  Were there occasions where your truck broke down?

13  A.  Yes, ma'am.

14  Q.  Can you please describe to the jury what would happen when

15  your truck broke down?

16  A.  If the truck broke down, depending on the area that I was

17  at, if I was operating for, say, the transfer station on a

18  Sunday, and a truck broke down, I'd call a supervisor.  Either

19  a mechanic will come out -- if there's no mechanic available,

20  we'll find a way to get back to the main -- back to the main

21  office, pick up another truck, bring it out.  A tow truck can

22  come.  Multiple things can happen when a truck breaks down.

23  Q.  Okay.  And when the tow truck comes --

24  A.  Um-hum.

25  Q.  -- do you have to wait with the -- for the tow truck,

ANDREU - CROSS/TINGLEY

1  correct?

2  A.   It -- it depends.   Again, there are times when -- route

3  supervisors sometimes can come out and bring you another truck.

4  He'll wait for the tow truck with that truck, and I'll go with

5  the other truck and complete the route.   There are times when,

6  yes, you could just sit there and wait for a tow truck,

7  absolutely.

8  Q.   Okay.   And would that be -- because you would need the tow

9  truck on those occasions to give you a ride back to the

10 facility, wouldn't you?

11 A.   If I were stuck, and there were no other -- if nobody was

12 bringing me another truck to complete the route or complete

13 what it was that I was doing, then the tow truck would bring me

14 and the broken down vehicle back to the facility, yes, ma'am.

15 Q.   And sometimes that could be a long process, correct?

16 A.   On the couple of occasions it happened to me, I had one

17 where I spent probably about three hours, yeah.

18 Q.   So, when you told the jury yesterday about that 15-hour day

19 and that it must have been because you were helping --

20 A.   Um-hum.

21 Q.   -- are you certain that that day that your truck didn't

22 break down, and you had to wait for a tow truck to get a ride

23 back to the Waste Pro facility?

24 A.   Again, I would have to look at the driver vehicle

25 inspection report to see if that was the day when the truck

ANDREU - CROSS/TINGLEY

1  broke down.

2  Q.  Okay.  Now, yesterday you were pretty certain that you were

3  helping on another route that day.  Are you certain today that

4  you were helping on another route, or could you have been

5  waiting on a tow truck to get back to the facility?

6  A.  Again, I believe -- and you can go back on the record and

7  check -- that my statement was that if I see 15, 17 hours, more

8  than likely I was helping.  There could be one occasion out of

9  four years where I was waiting for a tow truck.  But out of the

10  hundreds and hundreds of times that are in those time sheets

11  where it says 15, 16 hours, 13 hours, you could be more than

12  certain that that is helping.

13  Q.  Well, sir, let's start taking a look at some of those

14  records.

15  A.  Okay.

16  Q.  First off, do you remember your testimony yesterday when

17  you said it was your understanding that you would get paid for

18  half of your daily rate if you clocked out before 11:30?  Do

19  you recall that testimony?

20  A.  Yes, ma'am, I do.

21  Q.  Okay.  And were you telling the truth?

22  A.  Absolutely.  Ms. Lombardo's here.  That's who I asked, and

23  she said 11:30.

24  Q.  Okay.  And so, if you clocked out before 11:30, you

25  wouldn't get a daily rate, correct?

ANDREU - CROSS/TINGLEY

1    A.   That's correct.   I learned about that in 2000 and...

2    probably the end of '16.

3    Q.   Okay.   So, let's take a look at your time record from

4    June 5th, 2016 --

5    A.   Um-hum.

6    Q.   -- to June 18th, 2016.

7    A.   Okay.

8    Q.   On Monday, June 6th, what time did you clock out?

9    A.   9:52 a.m.

10   Q.   Is it your testimony that you were only paid -- that you

11   were not paid a daily rate on that day?

12   A.   I'd have to see the front of the check --

13   Q.   Okay.

14   A.   -- the earnings statement.

15   Q.   But if your testimony yesterday was accurate, your earning

16   statement would show you were only paid for a half day,

17   correct?

18   A.   If I clocked out before 4.1 hours?

19   Q.   No.   No, no, no, sir.   You said 11:30 yesterday.

20   A.   Correct.   That's what I said.

21   Q.   And you said 11:30 back in your deposition last August,

22   didn't you?

23   A.   Yes, ma'am, I did.

24   Q.   Okay.   Now, here is your paycheck for that same period.

25   A.   Yes, ma'am.

ANDREU - CROSS/TINGLEY

1   Q.  Were you paid any half days or half of the daily rate?

2   A.  No, I was not, because I didn't work 4.0 hours.  They were

3   all more than 4.1.  Unfortunately -- again, I said 11:30.  Yes,

4   I did, but that's the regular day.  I'm sure that I could find

5   other areas where I clocked in earlier than I should and

6   clocked out, and it's more than -- it's less than 4.1, and it

7   will show a half a day, yes, ma'am.

8   Q.  Well, I understand now you're talking about 4.1.  But you

9   told the jury yesterday --

10  A.  Right.

11  Q.  -- specifically --

12  A.  Yes, ma'am.

13  Q.  -- 11:30.

14  A.  Absolutely.  Yes, I did.

15  Q.  And you told your attorneys and myself --

16  A.  That's right.

17  Q.  -- at your deposition, 11:30, last August, did you not?

18  A.  Absolutely.  I do not deny that.  That is correct.

19  Q.  And at your deposition, you didn't say anything about

20  4.1 hours, did you?

21  A.  Absolutely not.

22  Q.  Okay.  So, now --

23  A.  Right.

24  Q.  -- this is the first instance, and we're talking about an

25  11:30 clock-out --

ANDREU - CROSS/TINGLEY

1   A.   Um-hum.

2   Q.   -- which I just asked you in front of the jury, is your

3   paycheck gonna show that you didn't get the full daily rate,

4   and you said yes.

5   A.   If I clocked in at the regular clock-in time, which doesn't

6   permit for me to get 4.1 hours.  But there are days, and I --

7   as I stated, I clock in earlier, and obviously I would have to

8   shift the 11:30 time closer, yes.  But with 100 percent

9   certainty, if I don't get the 4.1, I wasn't entitled to that

10  day rate.  And I found out about that later.  When I posed the

11  question to Ms. Lombardo, the answer was 11:30, because she's

12  assuming I'm clocking in by seven.

13  Q.   Well, didn't you say that -- yesterday in your testimony

14  that when you started at Waste Pro, your shift would start at

15  six o'clock?

16  A.   When I first started, I would clock in 6:15, six o'clock.

17  There were some days I would clock in a little bit earlier.

18  Q.   Now, did any drivers, helpers, route supervisors clock in

19  at seven o'clock?

20         MR. EDWARDS:  Objection.  Relevance.

21         THE COURT:  Overruled.

22  BY MS. TINGLEY:

23  Q.   To your knowledge.

24  A.   To my knowledge, I've seen people clock in at

25  seven o'clock.  I've seen people clock in at one in the

ANDREU - CROSS/TINGLEY

1    morning.  It depends on what they're doing.  Again, I don't

2    have control over when somebody clocks in or out.

3    Q.  For you --

4    A.  Right.

5    Q.  -- didn't your shift always start before seven a.m. or

6    7:30 a.m.?

7    A.  I would try to start my shift as early as possible, yes,

8    ma'am.  And it more than always would be before seven a.m.,

9    that's correct.

10   Q.  Was it ever after seven a.m.?

11   A.  I would have to go back over.  I mean I'm sure there's a

12   time or two when I clocked in after seven.

13   Q.  Now, here is your time summary from November 6, 2016, to

14   November 19th, 2016.

15   A.  Okay.

16   Q.  And do you see on Friday, the 18th, that you clocked out at

17   11:13?

18   A.  Yes, I did.

19   Q.  Okay.  And so, in line with your previous testimony, would

20   you anticipate that you were paid a half day for that day?

21   A.  No, because I worked 6.1 hours.

22   Q.  Okay.  And so -- but you've already told the jury under

23   oath --

24   A.  Um-hum.

25   Q.  -- that if you clocked out before 11:30, you did not get

ANDREU - CROSS/TINGLEY

1   your full daily rate.  Did you not say that?

2   A.  Yes, ma'am, I said that.

3   Q.  Okay.  And so would you expect on that day, because you

4   clocked out at 11:13, would you have expected to have gotten

5   half of your daily rate, yes or no?

6   A.  Again, no.

7   Q.  No?

8   A.  No.  It's 6.1 hours.

9   Q.  Okay.  But you told the jury under oath --

10  A.  Yes, ma'am.

11  Q.  -- that if you clocked out before 11:30, you would not get

12  your full daily rate.

13  A.  That is correct.  I did say that.

14  Q.  Okay.  So, were you being dishonest?

15  A.  Absolutely not.  I was going on the premise of a 4.1 --

16  Q.  Okay.  So, if you were telling them --

17         **THE COURT REPORTER:**  I'm sorry.  You're talking on top

18  of each other.

19  BY MS. TINGLEY:

20  Q.  So, if you were telling --

21         **THE COURT REPORTER:**  I'm sorry.  Can you repeat your

22  answer?

23         **THE WITNESS:**  Yes.

24  A.  Again, I said 11:30, yes, I did.  I'm looking at it as for

25  the four hours and change.  I said 11:30.  I don't even know

ANDREU - CROSS/TINGLEY

1    what more to say.  And I don't really understand this.  What is

2    established now is that it's, of course, the 4.1 hours.  I just

3    said 11:30 because that's what -- on that day, when I spoke

4    with Ms. Lombardo, she said 11:30.  So, we know it to be

5    4.1 hours or you don't get it.  And I didn't even find out

6    about this until way later on in my employment.  Because it

7    really never happened but maybe two or three times.

8    Q.   Two or three times?

9    A.   Yes, ma'am.

10   Q.   Now, in 2017 --

11   A.   Yes --

12   Q.   -- January 15th to January 28th.

13   A.   -- um-hum.

14   Q.   You see on Saturday, that you clocked out at 10:11 a.m.

15   A.   Correct.

16   Q.   So, based on your previous testimony -- which I understand

17   you've changed -- but based on your previous testimony, you

18   would have had -- expected to get paid less than your daily

19   rate that day, would you not?  Yes or no?

20   A.   Which day?

21   Q.   On the day that you clocked out at 10:11 a.m.

22   A.   No, I would not.

23   Q.   Okay.  Is that because 10:11 is after 11:30?

24   A.   No, that's because I started at three in the morning, and I

25   worked 7.1 hours.

ANDREU - CROSS/TINGLEY

1   Q.   Okay.  March 26th to April 8th, 2017.

2   A.   Okay.

3   Q.   Do you see where you clocked out at 9:56 a.m.?

4   A.   Yes, I do.

5   Q.   And is it fair to say that 9:56 a.m. is before 11:30?

6   A.   Absolutely it is.

7   Q.   Okay.  And so, based on what you told the jury before --

8   A.   Correct.

9   Q.   -- would you have expected to get paid your full daily rate

10  that day?

11  A.   Absolutely.  I started at three in the morning.

12  Q.   But you clocked out before 11:30.

13  A.   Yes, I did.

14  Q.   Going back to July 19th, 2015, to August 1st, 2015, do you

15  see where you clocked out at 9:22 a.m.?

16  A.   Yes, I do.

17  Q.   Okay.  And that was before 11:30?

18  A.   Yes, it is.

19  Q.   Okay.  And based on your testimony under oath yesterday and

20  this morning, would you have expected to get paid your full

21  daily rate that day, yes or no?

22  A.   Yes, ma'am.

23  Q.   Okay.  Even though it was 9:22 in the morning.

24  A.   Yes, ma'am.

25  Q.   Directing your attention now, November 22nd to

ANDREU - CROSS/TINGLEY

1   December 5th, 2015.  Do you see where you clocked out at

2   11:19 a.m.?

3   A.  Yes, ma'am, I do.

4   Q.  Okay.  And based on your prior testimony, would you have

5   expected when being -- when clocking out at 11:19 to have

6   gotten your full daily rate that day?

7   A.  Yes, ma'am.

8   Q.  Even though it was before 11:30, correct?

9   A.  That is correct, yes, ma'am.

10  Q.  Yesterday, on direct examination, you talked about this

11  memo about the completion of routes?

12  A.  Yes.

13  Q.  And in the memo, it says that you have to call when you're

14  completing your route, correct?

15  A.  Yes, ma'am.  I did.

16  Q.  And do you know why you had to call in?

17  A.  Yes.

18  Q.  Why?

19  A.  To let them know we completed our route, and we're headed

20  back to the yard.

21  Q.  And as part of that, was one of the reasons why you had to

22  do that was in case there was missed stops along the route,

23  they could say, Whoa, you forgot this street, you have to go

24  back and get it?

25  A.  Sure.  If something like that happened, that is one of the

ANDREU - CROSS/TINGLEY

1   things that could occur.

2   Q.  And could it also occur that they say, Oh, by the way,

3   Mrs. Jones just put something else out there, do you mind going

4   back and getting that for her, it's on your route?

5   A.  Yes, they can do that as well.  They could request that.

6   Q.  Okay.  And it says in this memo that you might get

7   instructions to help with other routes that have gone down

8   throughout the day, correct?

9   A.  Yep.

10  Q.  But they don't say that that's a must, that's a given.  The

11  only thing you must do on this memo is call in, correct?

12  A.  Correct.

13  Q.  And isn't that also for Waste Pro to know that you're fine,

14  the truck's fine, it didn't break down, nothing happened, your

15  route is complete, everything's done, correct?

16  A.  That's fair, yes.

17  Q.  And this warning, when they talk about you're gonna get a

18  written warning if you don't adhere to this, that you could be

19  suspended or terminated, that's just for calling in, correct,

20  not for helping?

21  A.  Oh, no, absolutely not.  People get written up all the time

22  for refusing to help.

23  Q.  Okay.  But that's not what I'm asking you about, sir.  I'm

24  asking you about this memo.

25  A.  Okay.

ANDREU - CROSS/TINGLEY

1    Q.   This memo says you simply have to call.

2    A.   Correct.

3    Q.   Okay.  And let's ask about you.  Were you ever written up

4    for not helping?

5    A.   I don't believe I was.

6    Q.   But you said no, didn't you?

7    A.   Absolutely I said no.

8    Q.   And you said earlier, you said it what, frequently, didn't

9    you?

10   A.   Yes, I did.

11   Q.   Now, you talked about the various things that you have to

12   do when you get to Waste Pro in the morning.  Okay.  So, you

13   come into the facility, be it Pompano or Pembroke Pines, and

14   you clock in, correct?

15   A.   Correct.

16   Q.   And then you do the precheck of the vehicle, correct?

17   A.   You get your route sheet first.

18   Q.   Oh, first you get your route sheet.

19   A.   Yes, ma'am.

20   Q.   Okay.  And what do you do after you get your route sheet?

21   A.   With the route sheet and the DVR *(sic)*, we go out to the

22   truck to inspect the truck and do the pretrip inspection on our

23   trucks.

24   Q.   And that could include fueling the vehicle, correct?

25   A.   If somebody failed to fuel the vehicle the day before, I

ANDREU - CROSS/TINGLEY

1    would have to go and fuel the vehicle, because, obviously, I

2    can't do a route without fuel, yes, ma'am.

3    Q.   Okay.  Now, from the time that you clock in --

4    A.   Um-hum.

5    Q.   -- until the time that you get behind the wheel of your

6    truck, how long did that take, generally?

7    A.   Generally, 30 minutes.

8    Q.   Okay.  So, once you get in your truck, don't you have to

9    drive to the start of the route?

10   A.   Yes, ma'am.

11   Q.   Okay.  So, I think yesterday you talked about this one day

12   about the Sawgrass Expressway route in Coral Springs?

13   A.   The route that's right off the Sawgrass Expressway, yes,

14   ma'am, behind the Publix.

15   Q.   So, how far is that route from the Waste Pro facility?

16   A.   Fifteen minutes.

17   Q.   Okay.  So, you spent 30 minutes doing your pretrip.

18   A.   Um-hum.

19   Q.   And then 15 minutes -- what's the furthest place --

20   A.   That's if I did the pretrip.

21   Q.   Oh, maybe you --

22   A.   A lot of times, you know you left the truck the day before,

23   it's in good condition, you just jump in it and go.

24   Q.   Wasn't it part of your job --

25   A.   It's fueled up.

ANDREU - CROSS/TINGLEY

1  Q.  -- to do the pretrip?

2  A.  Absolutely.  But I did the post-trip the night before on

3  the truck, and I know it's in good condition, it's fueled up,

4  it's ready to go, and I'm -- I can go right out on the road.

5  Q.  Right.  But doesn't Waste Pro say that you have to do the

6  pretrip regardless?

7  A.  Absolutely.

8  Q.  And so, you would just disregard that rule.

9  A.  A couple of times, absolutely I did, yes, ma'am.

10 Q.  Okay.  And when you come back post-trip -- so you would --

11 but you would go along your route, and then you would have to

12 take everything to the dump?

13 A.  That's what's required, go to the dump, dump the truck.

14 Again, there are times when you might be in a hurry, you'll

15 bring the truck back, and then you'll hear it the next day, You

16 know, these aren't holding facilities, you gotta dump the

17 truck.  But that happens a lot.

18 Q.  Where you wouldn't dump the truck.

19 A.  Absolutely, yeah.

20 Q.  Okay.  So, even though you were supposed to do that, you

21 wouldn't do it, correct?

22 A.  There were a couple of occasions when, yeah, I did not go

23 to the dump.  I went directly back.  There --

24 Q.  And when you get back, you would have to do the post-trip

25 inspection, correct?

ANDREU - CROSS/TINGLEY

1    A.   That's what they would like to have happen, yes, ma'am.

2    Q.   Okay.   And yesterday I think you called it the DOT

3    inspection?   Do you know what that --

4    A.   A DOT inspection is completely different.   Those are

5    level 1, 2, and 3 inspections that are done by the Department

6    of Transportation.

7    Q.   Okay.   But you -- aren't you supposed to do -- because you

8    have a commercial license, correct?

9    A.   That's correct.   I do.

10   Q.   So, you're familiar with the Department of Transportation

11   rules, are you not?

12   A.   Yes, I am.

13   Q.   And aren't you required to do the post-trip inspection as

14   part of the Department of Transportation rules?

15   A.   No.   Actually, in the Federal Motor Carrier Safety act, and

16   nowhere is it cited that you have to complete a post-trip

17   inspection on the truck that you're driving.   Absolutely not.

18   Q.   Okay.   So, you don't believe -- do you think the Department

19   of Transportation requires you to do a pretrip check?

20   A.   They -- they would like for you to do a minimum of a

21   15-minute pretrip inspection.   That's what they would like to

22   have happen.   But there's nothing in there that says that it's

23   mandated by them.

24   Q.   Okay.   It was certainly mandated by Waste Pro, wasn't it?

25   A.   Again, Waste Pro would like for you to do your pretrip or

ANDREU - CROSS/TINGLEY

1   your post-trip every day, but I'd say 90 percent of the trucks

2   go in and out of there without that happening.  The guys are

3   not trying to waste hours of their day.  So, if you go and you

4   sit there and you watch them, that's one of the ongoing issues.

5   Nobody does it.

6   Q.  Let's not talk about other folks.  Let's talk about you.

7   A.  Okay.  I didn't do it a lot.

8   Q.  You didn't do what a lot?

9   A.  The post-trip.

10  Q.  What about the pretrip?

11  A.  Lots of times I would miss it.

12  Q.  I think you also said yesterday that you didn't call in

13  when you were supposed to on the 1098s, that you missed doing

14  that, too.

15  A.  There were occasions, yeah, that I wouldn't call in.

16  Q.  And so... let's just go through this.

17  A.  Um-hum.

18  Q.  There were times where you didn't do the pretrip.

19  A.  Yes.

20  Q.  And would you go to safety meetings at Waste Pro?

21  A.  You're supposed to go to all the safety meetings at

22  Waste Pro, but if you show up earlier, where I did on numerous

23  occasions, you could miss it, yes.

24  Q.  Okay.  So, you -- what do you mean you could miss it?  You

25  just --

ANDREU - CROSS/TINGLEY

1   A.  You could miss it.  The safety meeting would be, let's say,

2   at 6:30 a.m.  If I clocked in at three, I wouldn't be there.

3   Q.  And you didn't make it -- you did not make sure you were

4   there at six a.m. for the safety meetings.

5   A.  I wouldn't have to be.  I'm on a route.

6   Q.  Okay.  So, you -- it's your testimony that you weren't

7   required to go to safety meetings.

8   A.  No.  My testimony is that if you're there, you're required

9   to go.  But if you've clocked in, and you're on your route, no,

10  you're not required to go.  Like, for instance, the front-end

11  guys, they start at one, two in the morning.  They don't get

12  the safety meeting.  They'll go to work.

13  Q.  Well, let's talk about you, sir.

14  A.  Okay.  As --

15  Q.  Not talk about all --

16  A.  Right.

17          So, again, on occasion --

18          **THE COURT REPORTER:**  I'm sorry.  Again, you're talking

19  on top of each other.

20  A.  As -- like when I was doing roll-off, I start so early in

21  the morning, there's no safety meeting.  So, for almost a year

22  doing roll-off, I'm not gonna see a safety meeting, because

23  those aren't until like 6:30 in the morning, and roll-off

24  starts way before that.

25  Q.  Was it one of the conditions of getting the safety bonus

ANDREU - CROSS/TINGLEY

1   that you go to the safety meetings?

2   A.  I don't recall if that was one of them.  But there's

3   several things that that safety bonus falls under.  I mean, if

4   I don't -- if I miss clocking in, they'll take my safety bonus.

5   Q.  Right.  But let's talk about the safety meetings.

6   A.  Right.

7   Q.  You don't recall whether or not attendance at the safety

8   meetings was a prerequisite to getting your safety bonus.

9   A.  Again, I would assume that it is, if you're there.

10          THE COURT:  Ms. Tingley, is this a good spot to take a

11  break?

12          MS. TINGLEY:  Yes, your Honor.

13          THE COURT:  All right, members of the jury, we're

14  going to take a ten-minute recess.  Remember my admonition not

15  to discuss the case or allow it to be discussed in your

16  presence.  We'll see you back in the jury deliberation room in

17  about ten minutes.

18          COURTROOM SECURITY OFFICER:  All rise.

19          (The jury exited the courtroom)

20          THE COURT:  And if there's nothing else to come before

21  the Court, we'll be in recess for ten minutes.

22          MR. EDWARDS:  Thank you, your Honor.

23          (The Judge exited the courtroom)

24          (Recess taken at 10:58 a.m. until 11:11 a.m.)

25          (The Judge entered the courtroom)

ANDREU - CROSS/TINGLEY

1          **THE COURT:**  Please be seated.

2          All right.  We're back on the record.

3          Counsel are present.

4          Anything to come before the Court before we bring the

5     jury in?

6          **MS. TINGLEY:**  No, your Honor.

7          **MR. EDWARDS:**  No, your Honor.

8          **THE COURT:**  Okay.  Let's bring in the jury.

9          I've got three sentencings this afternoon, so we're

10    going to resume after lunch at two o'clock.

11         **MS. TINGLEY:**  Okay, your Honor.  Thank you.

12         **COURTROOM SECURITY OFFICER:**  All rise.

13         *(The jury entered the courtroom)*

14         **THE COURT:**  Again, you can be seated as soon as you

15    come in.

16         And we have all the jury back.

17         Did everyone follow my admonition not to discuss the

18    case or allow it to be discussed in your presence?

19         All right.  Ms. Tingley, you may continue.

20    BY MS. TINGLEY:

21    Q.  Mr. Andreu, going back to the pretrip and post-trip

22    inspections, do you know what a DVIR form is?

23    A.  Driver vehicle inspection report.

24    Q.  Okay.  And what information is contained on the driver

25    vehicle inspection report?

ANDREU - CROSS/TINGLEY

1    A.   The information that I could input there would be issues

2    with the vehicle itself, comments that I might want to make

3    about the vehicle, things of that nature.

4    Q.   Now, it refers to -- the third word in that is "inspection"

5    report, correct?

6    A.   That's correct.

7    Q.   Isn't that information that you would get when you did your

8    pretrip and post-trip inspections?

9    A.   Information that I would put in, yes.

10   Q.   Okay.  And so, in order to fill out this form, you had to

11   do a pretrip and a post-trip inspection, correct?

12   A.   Not necessarily.

13   Q.   Okay.  So, you could fill out the form without doing your

14   pretrip inspection?

15   A.   Sure.  If I come in, and I have the same truck from the

16   night before that I did the post-trip on, I know it's fine.

17   So, I could put in it's fine.  You don't have to put in any

18   defects.  It requires for you to put in a defect, so I already

19   know it's established there's no defect.

20   Q.   Okay.  But you put in -- you do a new form every day?

21   A.   I'm sorry?

22   Q.   Do you do a new form every day?

23   A.   You should do a new form every day, yes, ma'am.

24   Q.   Now, if you got pulled over in a Waste Pro truck by the

25   Department of Transportation --

ANDREU - CROSS/TINGLEY

1   A.   Um-hum.

2   Q.   -- wouldn't they ask you for your DVIR form?

3   A.   No, ma'am.

4   Q.   Oh, they don't.

5   A.   I've never been asked.  I've never been pulled over,

6   either.

7   Q.   Okay.  But don't you know, because you have a commercial

8   driver's license, that that DVIR form is specifically for the

9   benefit of the Department of Transportation?

10  A.   I don't know if it's specifically for their benefit.

11  Q.   Okay.  Are you supposed to keep the form in your truck?

12  A.   The form from the day before, you should keep the yellow

13  copy if there was a defect.  So, what could happen is, if you

14  were pulled over, they can't cite you as the driver.  If

15  there's no defect, there's no reason to have a form, because

16  he's not gonna find a defect on the vehicle.

17  Q.   As part of your job were you required to keep the DVIR form

18  in your truck in case you were pulled over by the Department of

19  Transportation?

20  A.   Never told that at all, ever.

21  Q.   What were you told to do with the form?

22  A.   If there's a defect, you'll turn it into the mechanics at

23  the end of the day.

24  Q.   What if there's not a defect, what do you do with the form?

25  A.   Throw it away.

ANDREU - CROSS/TINGLEY

1   Q.  Like, so when you get to work in the morning, you get

2   handed a form.

3   A.  Correct.

4   Q.  And if you checked your truck the night before --

5   A.  Right.

6   Q.  -- and you knew it didn't have a defect --

7   A.  Right.

8   Q.  -- you would crumple it up and throw it away.

9   A.  No, I didn't say that.

10  Q.  Oh.

11  A.  I wouldn't have to put any defects in it.  It would stay

12  with me and my route sheet while I'm on the route.  When I get

13  back, there's no defects or anything, we could throw it out.

14  Q.  Would you fill anything out on that document?

15  A.  I could put my name in there.

16  Q.  When you get there in the morning, and you've checked your

17  truck the night before --

18  A.  Um-hum.

19  Q.  -- and so, you decide, you know what, I'm not gonna do my

20  pretrip inspection today.

21  A.  Correct.

22  Q.  What would you fill out on that form?

23  A.  Name, date.

24  Q.  And that's it.

25  A.  As far as I recall, yeah.  I don't have any defects to

ANDREU - CROSS/TINGLEY

1   report.

2   Q.  Okay.  Was it your testimony earlier this morning that you

3   worked 15 or more hours on hundreds of occasions?

4   A.  If I said hundreds of occasions, then that would be my

5   testimony.

6   Q.  Okay.  Well, is that accurate?

7   A.  Again, I would have to review the records to count the

8   exact number, yes, ma'am.

9   Q.  But if you were just -- you think it was hundreds of times.

10  A.  I would think that it's a lot of times, and I've used the

11  number 100 or hundreds, yes, ma'am.

12  Q.  Okay.  I'm handing you your approved time cards for the

13  three-year period.

14          **MS. TINGLEY:**  Your Honor, may I approach?

15          **THE COURT:**  Okay.

16  BY MS. TINGLEY:

17  Q.  And I would ask you to just flip through those time cards.

18  Those are your approved time cards.

19  A.  Yes, ma'am.

20  Q.  And then I'd like you to tell the jury how many times over

21  those three years that you were working at Waste Pro that you

22  worked 15 or more hours.

23  A.  Okay.

24          *(Pause)*

25  A.  In the first one, from 4-27-14 to 4-26-15, I only count two

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

ANDREU - CROSS/TINGLEY

1    times in there.

2    Q.   In that year?

3    A.   In that entire year, yes, ma'am.

4    Q.   Okay.  Let's go to 2015 then.

5    A.   Okay.

6    Q.   Because maybe there's a hundred there.

7    A.   Okay.

8         *(Pause)*

9    A.   From 5-10-2015 to 4-24-2016, just one 16, a bunch of 13s,

10   14s.

11   Q.   So, one.

12   A.   No 15s at all, just the 16.

13   Q.   Sixteen or over, correct?

14   A.   Yes.

15   Q.   Okay.

16   A.   Yep.

17   Q.   So, that's a total of three times in two years.

18   A.   Yes, ma'am.

19   Q.   Okay.  Let's look at your final year.

20        *(Pause)*

21   A.   Absolutely none.

22   Q.   Okay.  So, three occasions that you could count in the

23   three years that you worked 15 or more hours.

24   A.   Fifteen or more hours, yes, ma'am, not 14-and-a-half or

25   nothing like that, because those are in there.

ANDREU - CROSS/TINGLEY

1   Q.   Right.  But your testimony --

2   A.   Yes.

3   Q.   -- was 15 or more.  That's what you told the jury under

4   oath.

5   A.   Yes.  Yes, ma'am, I said that.  I said 15.

6   Q.   And you said hundreds, or a hundred, or --

7   A.   Yeah, if -- I'd probably find a lot more if I get the

8   first -- I don't see the first... October, November, December

9   of '13, I don't see any of that in there.  A lot of that was

10  pretty chaotic those days in Hollywood.  Those are probably

11  like 17, 15 a lot of them, I would think.

12  Q.   Perhaps that's it.  Perhaps that's the answer.  These are

13  the exhibits that you put into evidence, sir.

14  A.   Yes, ma'am.

15  Q.   Based on your lawsuit.

16  A.   Yes, ma'am.

17  Q.   Okay.  And there's three occasions.

18  A.   From what I see, yes, ma'am.

19  Q.   Okay.  And on each one of those, you approved the time.

20  A.   Absolutely.  I always approved my time.

21  Q.   Okay.  Now, directing your attention to your time detail

22  from June -- July 20th to August 2nd of 2014.

23  A.   Okay.

24  Q.   Do you see that?

25  A.   Uhm, yes.

ANDREU - CROSS/TINGLEY

1   Q.   Yes.

2          Okay.  And do you see on Saturday, on August 2nd, you

3   worked less than eight hours, correct?

4   A.   Yes, 6.57.

5   Q.   Less than ten hours.  Correct?

6   A.   Yes.

7   Q.   Less than 15 hours, correct?

8   A.   Yes, I did.

9   Q.   And were you paid your full day daily rate for that day?

10  A.   Yes, I did.

11  Q.   And in addition, were you paid a bonus that day?

12  A.   Actually, the -- that's just the day that the bonus is put

13  in.  It's not for that specific day, from what I understand.

14  That's -- if it's 50 and 50, I believe those to be safety

15  bonuses.  They're just put in at the end there.

16  Q.   Okay.  Are you certain that you got your safety bonus?

17  A.   Again, they're your records, and I -- I would need -- maybe

18  Ms. Lombardo could tell us.

19  Q.   Didn't you check that you were paid the bonuses in your pay

20  every time you got paid?

21  A.   Right.  If I'm looking at this, I would automatically

22  assume 50 one week, 50 the next week, those have to be a safety

23  bonus.

24  Q.   Okay.  But on this particular day, you didn't even work a

25  seven-hour day, did you?

ANDREU - CROSS/TINGLEY

1   A.   No, 6.57.

2   Q.   Okay.  And you were paid your full daily rate.

3   A.   Absolutely.

4   Q.   Okay.  And going now to August 17th to August 30th, do you

5   see again on Saturday, August 30th, you worked less than eight

6   hours, less than ten hours?

7   A.   7.48 hours, that's correct.

8   Q.   Okay.  And so -- and on that day, were you paid your full

9   daily rate?

10  A.   Absolutely.

11  Q.   Okay.  How often do you think that you worked less than

12  eight hours and was paid -- and were paid your daily rate?

13  A.   As often as I could.

14  Q.   Okay.  So, you didn't want to have more hours and get more

15  money, like you said earlier?

16  A.   There are times -- there are times when I want to get home

17  early.  There are times when I have things that I have to do.

18  And the deal is, if you complete your route, no matter what

19  time it takes, that's the incentive, that's the draw to get you

20  in.  You know, do your route as quickly as possible.

21  Mr. Mackie, he'll -- I'm sure he's gonna testify to that.

22  That's how they get you, you know, do the route, get it done,

23  get it done fast, we'll pay you the day rate.

24        So, I mean when you're saying to me, Oh, you got your

25  day rate for working seven hours, you owe me my day rate for

ANDREU - CROSS/TINGLEY

1    working seven hours.  I didn't do nothing wrong.  I'm doing

2    what benefits me, not you.

3    Q.  But you did get your daily rate.

4    A.  Right.

5    Q.  And you did work less than eight hours.

6    A.  Absolutely.  And the ones that I didn't make the 4.1 hours,

7    you ripped me off.

8    Q.  I understand that's your testimony.

9    A.  Absolutely.

10   Q.  When you said as much as you could, you would work less

11   than eight hours and try and get out and get your daily rate,

12   how often do you think that that happened?  Because earlier you

13   talked about any time you'd finish, they want you to stay and

14   help and work these 15-hour days hundreds of times.

15   A.  Correct.

16   Q.  How many times do you think that you left before eight

17   hours?

18   A.  I would say quite a bit of times I was leaving before eight

19   hours, whether it was they weren't gonna give me money for

20   helping or I had something to do, but there are many, many,

21   many occasions where I worked well in excess of the eight

22   hours.  Whether it's exactly 15, above 15, but I know there's

23   14-hour days, 13-hour days.  It's something that I hope maybe

24   later everybody could look at the records and see that -- I

25   mean, I was working, I was doing a lot, you know, 150-hour

ANDREU - CROSS/TINGLEY

1  weeks, 30-hour weeks.  You know, it wasn't -- or biweekly

2  186 hours on an occasion.  I worked a lot, ma'am.  I really

3  did.  And there were times when maybe I didn't want to help.

4  Q.  You believe that there were times where you worked

5  180 hours in a pay period?

6  A.  About 168, about 168, around there.

7  Q.  Okay.  Was that -- did that happen frequently?

8  A.  No, not frequently, but there -- if we look back at

9  especially the beginning of my tenure with the company, there

10  were weeks when they were -- they were really up there.

11  Biweekly, the pay period is what I'm referencing to.  So, if I

12  put the two weeks together, there were weeks when it was

13  80 hours, 70 hours.  That was -- that was a pretty regular

14  basis.  But I don't see those records here.  That's the

15  problem.

16  Q.  Right.  But these are the records that you put into

17  evidence.

18  A.  Right.

19  Q.  Okay.  Okay.

20  A.  Right.

21  Q.  So, that's what's before the jury.

22  A.  Right.

23        And, again, in these records, you'll see that I have

24  the earning statements for two-week periods that are really a

25  lot of hours, you know, well over -- there's plenty of them in

ANDREU - CROSS/TINGLEY

1   here that I'm sure are gonna be over a hundred hours.

2   Q.  Nobody is disputing that you worked over a hundred hours

3   during a time period.  But the question was:  When you start

4   saying that you're working 168 hours in a pay period, how often

5   do you believe that that happened in the pay records that you

6   put into evidence?

7   A.  Well, I wouldn't say -- you know, you're saying like it

8   happened.  It's something that I worked.  It's something that

9   I -- you know, I earned my money for working those hours.  I

10  can recall one specific earning pay statement where it shows

11  160, 168 hours.  The other ones, again, I got to look at it,

12  but I know that I have multiple earning statements that are

13  well over a hundred hours in the period.

14  Q.  Okay.  But you would agree that there's a substantial

15  difference between telling the jury you worked in excess of a

16  hundred hours and telling the jury you worked in excess of

17  160 hours, would you not?

18  A.  Right.  I don't want you to believe at any time that I did

19  that week in and week out, but I did it a lot of times.  And my

20  average weeks were well in excess of 40 hours, yes, they were.

21  Q.  Okay.  But 160 hours would be 80 hours a week.  Do you

22  know -- was that a frequent occurrence or was it just the one

23  time that you spoke of today?

24  A.  Again, if I could look through it all, it could be the one,

25  it could be a couple.  I would have to look at it.

ANDREU - CROSS/TINGLEY

1    Q.   Okay.  But you don't believe it's the hundred times that

2    you worked 15 hours.  You think it's less than that?

3    A.   Oh, yes, ma'am, I do.

4    Q.   Can you tell the jury how many days vacation you would get

5    a year from Waste Pro?

6    A.   When I first started, I think they give you a week after

7    the first year.  And then two weeks -- it increases as you go

8    along.

9    Q.   Were you also given sick days, paid sick leave?

10   A.   Paid sick days, I don't want to -- you get them.  I don't

11   know the exact number.  I think it's every quarter, you get a

12   couple or one.

13   Q.   Were you paid for holidays?

14   A.   We're supposed to be paid for the holiday as well as the

15   day rate.

16   Q.   What do you mean you're "supposed to be paid"?

17   A.   The way that I understand it, because we work every holiday

18   except for Christmas morning, it's basically you clock in,

19   clock out, so you got your day rate, and then they just add

20   another eight hours on top of it.

21   Q.   Do you know how many holidays that you were given that you

22   were paid for when you worked at Waste Pro?

23   A.   As -- I would assume as many holidays that passed by

24   throughout the years that I was there.

25   Q.   What holidays were you paid for, sir?

ANDREU - CROSS/TINGLEY

1   A.   Thanksgiving, Easter, Christmas.  I guess federal holidays?

2   Q.   Did you keep track of your holiday pay?

3   A.   I don't -- by "keeping track," you mean like if I looked

4   and saw that it was on there?

5   Q.   Yes.

6   A.   Sure.  If I look on there, it will be on there.

7   Q.   So, by way of example, when you look at August 30th, 2015,

8   to September 12th, 2015, you were paid for a holiday on Labor

9   Day, were you not?

10  A.   I believe so, yes, it says that.

11  Q.   Okay.  Were you paid for a holiday on Memorial Day?

12  A.   If you put it up there, I'll tell you.

13  Q.   Okay.  So you know -- were you paid for -- as I find that

14  one -- you know you were paid holidays on Thanksgiving?

15  A.   Yeah.  Thanksgiving's a paid holiday.

16  Q.   And Christmas?

17  A.   Christmas, we -- well, we're supposed to get a bonus, but

18  there was a few years that they took the bonus away.  Rather

19  than be something gratuitous, they turned into a

20  incentive-based bonus, and they would just take it back from

21  you.

22  Q.   Let's talk about the holidays.  That's what my question

23  was.  Were you paid the holiday on Christmas?

24  A.   I was just talking about Christmas, ma'am.

25  Q.   Right.  You said bonus.  I'm asking was it a paid holiday

ANDREU - CROSS/TINGLEY

1   for you?

2   A.  Right.  That's what I'm assuming is part of it, is the

3   bonus that they give you, paying you that bonus.

4   Q.  Okay.  And what about Independence Day, July 4th, was that

5   a paid holiday?

6   A.  It says so here, yes.  Right?  Holiday?  I think -- could

7   you put that back up, please?

8   Q.  Certainly.

9   A.  Because I wanted to look at the bottom part.

10          Uhm, yes, there's eight hours here for the holiday.

11  Yes, ma'am.

12  Q.  And it's your testimony that Easter was a paid holiday, on

13  a Sunday?

14  A.  I believe that if I was working, I'm supposed to get paid

15  for the holiday, yes.

16  Q.  And if you didn't get paid for a holiday, what would you

17  do?

18  A.  If you're saying if it's on Sunday, the holiday falls on a

19  day that we're not working, I wouldn't do anything.  There's

20  nothing to do.  But I know Easter Sunday I did work.  I clocked

21  in and I clocked out.  And I didn't get my full rate of pay nor

22  what was promised me.

23  Q.  Mr. Andreu, do you recall talking about Easter Sunday

24  during your deposition in August?

25  A.  Yes, ma'am, I do.

ANDREU - CROSS/TINGLEY

1    Q.   And do you recall being under oath at that time?

2    A.   Yes, ma'am, I do.

3    Q.   And by being under oath, you swore to tell the truth?

4    A.   Absolutely.

5    Q.   And at the time of your deposition last August 11th, isn't

6    it true --

7         **MR. EDWARDS:**  Objection.   Improper impeachment.

8         **THE COURT:**  Overruled.

9    BY MS. TINGLEY:

10   Q.   Isn't it true that you gave sworn testimony that

11   Ms. Lombardo actually fixed the pay records for Easter Sunday

12   to make sure you got paid?

13   A.   If I said that, yes.

14   Q.   What do you mean if you said it, yes?

15   A.   If I said that I clocked in and clocked out, and that she

16   made sure that I got paid for Easter Sunday, then that's what I

17   said.

18   Q.   Was that true?

19   A.   I didn't get paid for Easter Sunday.  I got a half a day,

20   and I didn't get the bonus that was promised me.

21   Q.   Who promised you a bonus on Easter Sunday, sir?

22   A.   As I stated before, I believe it was Russell who called

23   Shawn.  Shawn called me.  I was at brunch with my family on

24   Easter Sunday.  They said they had an issue at an apartment

25   complex, the compactor was down, please go see if you could

ANDREU - CROSS/TINGLEY

1   get -- do something with the compactor, if we can get it

2   running.  If not, go to Pompano division, pick up a truck, get

3   a can from the Coral Springs transfer station, bring it back

4   out to the apartment complex, and then I clocked out.

5   Q.  Are you certain that that's what happened on Easter Sunday

6   of 2017?

7   A.  Yes, I'm certain.

8   Q.  What happened the day before Easter Sunday in 2017 at the

9   transfer station?

10  A.  I don't know.  I -- opened the transfer station, maybe?

11  What are you referencing to?

12  Q.  Do you recall an altercation you had with a resident of

13  Coral Springs at the transfer station on April 16th, 2017, the

14  day before Easter?

15          **MR. EDWARDS:**  Objection.  Relevance.

16          **THE COURT:**  Overruled.

17  A.  No, but I've had many altercations with lots of upset

18  residents and nonresidents.

19  Q.  You don't recall that the City of Coral Springs, the city

20  manager said on Easter Sunday that the city did not want you

21  checking IDs at the transfer station because of the altercation

22  that occurred the day before?

23  A.  Absolutely not.

24  Q.  You don't recall having to write --

25          **MR. EDWARDS:**  Objection.  Hearsay.

ANDREU - CROSS/TINGLEY

1          **THE COURT:**  What the lawyers say in their question

2     isn't evidence; it's the answers that are evidence.

3          Overruled.

4     BY MS. TINGLEY:

5     Q.  You have no recollection as you sit here today --

6     A.  Um-hum.

7     Q.  -- as to what happened on that Saturday at the transfer

8     station --

9     A.  Right.

10    Q.  -- involving a resident.

11    A.  Again, I've -- there is many, many times, not one or two,

12    that issues arise.

13          There was probably four times I had to call the police

14    to come out to remove people from the transfer station.  There

15    were times that I got into it verbally with people at the

16    transfer station.  That does happen.  People get there, they

17    demand that I'm entitled to do this or entitled to do that, and

18    they really aren't.  And we get into -- that's what happens

19    there.  It's not -- it's not easy running it.

20    Q.  And you don't recall having to write up an incident report

21    about your conduct that day.

22    A.  There were times that I did have to write an incident

23    report about something that may have occurred at the transfer

24    station.  If you would be more specific and tell me, this is

25    what happened, I'll tell you if that occurred or it did not

ANDREU - CROSS/TINGLEY

1   occur, yes, ma'am.

2   Q.  Do you recall the day before Easter at the --

3   A.  I don't know if it's the day before Easter what you're

4   referencing to me, because you're not telling me exactly what

5   happened, ma'am.

6   Q.  That you had an altercation with a resident that caused the

7   City of Coral Springs to say that they would not allow you to

8   be checking IDs at the transfer station on Easter Sunday, which

9   is why you had to leave early.

10  A.  No, I don't recall having to leave the transfer station

11  early because of an altercation with a resident.

12  Q.  No, because of what the City of Coral Springs required of

13  Waste Pro, that you not be allowed to have interaction with the

14  residents on Easter Sunday.

15  A.  Absolutely not.  Never would the City of Coral Springs say

16  that I wasn't allowed there.  They actually sent several emails

17  praising my work at that transfer station.  They literally

18  say -- and the residents thanked me on numerous occasions.  You

19  have those emails.  They're in their records.  They thanked me

20  plenty of times.  I turned that transfer station around for

21  you.

22  Q.  We're talking about that one particular day.

23  A.  And, again, I've had issues where residents have come in,

24  and residents have been upset, because I did my job.  And I

25  tell them, Look, you're not allowed to come in here and dump

ANDREU - CROSS/TINGLEY

1    that.

2           Residents would come in with loads, trucks filled with

3    stuff, where you know it's a commercial job, and you have to

4    say, You can't come in here.

5           And they're like, Well, I don't give an F, because I'm

6    a resident, and I'm entitled to do this, I'm entitled to do

7    that.

8           And you have to do your job.  Your job is, I can't let

9    you in here.  And like I said, there were numerous occasions.

10          And if I had to write an incident report, that's an

11   internal thing.  But the city has never said, We don't want him

12   there.  Quite the contrary, the city always said, We want

13   Mr. Andreu there.

14   Q.   On that particular day didn't the city say, We don't want

15   him checking IDs at the --

16   A.   I do not know that, ma'am.  You're asking me something that

17   I do not know.  I was never told, We don't want you checking

18   ID's.  No, ma'am, I was never told that by any city official.

19   Q.   Right.  Because on that particular Easter Sunday, you were

20   at brunch and told to go fix a compactor, right?  Isn't that

21   what you told the jury yesterday?

22   A.   You said Saturday, ma'am.

23   Q.   Saturday was the altercation, was it not?

24   A.   Okay.  And you're saying the transfer station was open on

25   Sunday?

ANDREU - CROSS/TINGLEY

1    Q.  Yes, it was.  You don't recall?

2    A.  No, I don't.  I was at brunch on Sunday.  If somebody else

3    worked the transfer station, then I was simply probably just

4    supervising as a position of, if something happens, call Roger.

5    Q.  Okay.  So, that's what you were doing, is supervising the

6    transfer station that Easter Sunday.

7    A.  No, no, what I'm saying, on Easter Sunday, if something

8    happened, no matter what day it was, if I didn't happen to be

9    there, they could call me.  I'm not on the clock or anything

10   like that.  But if they call me, and I have to do something, I

11   would clock in, yes, ma'am.

12   Q.  But on that Sunday were you supervising the transfer

13   station, yes or no?

14   A.  On that Sunday, Easter Sunday, I was off.

15   Q.  So --

16   A.  But, again, because I was the one that knew how to operate

17   that transfer station the best, if there was ever an issue,

18   whether it be a Saturday that I was off or a Sunday that I was

19   off, they could always call me.  If they called me, absolutely

20   I could clock in, resolve the matter, and then clock out.

21          But that Sunday, Easter Sunday, I was off.  I was with

22   my family.  I was having brunch.  I got a call from Shawn

23   Glenn, We have an issue with the apartment complex, as I stated

24   before, go and take care of the matter.  I did.  I resolved the

25   matter.

ANDREU - CROSS/TINGLEY

1   Q.   Okay.  Sir, didn't you say in your sworn deposition that

2   you went to Regina about your pay on Easter Sunday, and she

3   corrected it for you?

4   A.   I just said that, yes.  Made sure that I get paid for

5   Easter Sunday.

6   Q.   And she did that.  Isn't that what you said in your depo?

7   A.   I did, but, unfortunately, it turned out to be a half a

8   day, whatever a half a day rate is.  And I didn't get the money

9   that was promised by Shawn Glenn, the helper pay, which was a

10  couple hundred bucks.

11  Q.   Did you go back to Ms. Lombardo and say, I didn't get the

12  right pay?

13  A.   No.  After I got the check, I -- how long did I stay after

14  that?  A few weeks or whatever.  And I didn't even bother with

15  it.

16  Q.   Okay.  At this point in your tenure at Waste Pro, you were

17  actually a supervisor, correct?

18  A.   Again, they -- they titled me as the lead driver, and I

19  would supervise the transfer station on the weekends.

20  Q.   And as the lead driver, that was more of a supervisory

21  position, was it not?

22  A.   No.  The way that it was explained to me, some of the

23  responsibilities that I would take on, if needed, I would help

24  some of the guys learn some of the different equipment, I would

25  help some of the guys learn some of the other matters that

ANDREU - CROSS/TINGLEY

1    sometimes occur with routes.  But my -- my job every day was

2    doing the route.  That was my everyday regular job.  And when

3    they moved it up in title to lead driver, it was a way also to

4    justify the pay increase.

5    Q.  When you got paid for the Easter Sunday on 4-28 --

6    A.  It doesn't show Easter Sunday on there.

7    Q.  This is the pay stub that you said when it was on there, it

8    was a half a day?

9    A.  I needed the time card.

10   Q.  Here's the time card.

11           (Pause)

12   A.  What am I looking at?

13   Q.  At Easter Sunday, that Sunday?

14   A.  Oh, sorry.  4-16?

15   Q.  Right.

16   A.  2.28?

17   Q.  So, you approved the time card with that time.

18   A.  Yes, ma'am.

19   Q.  At what point did you talk to Ms. Lombardo?  Was it when

20   you're scrolling through?

21   A.  No, ma'am.

22   Q.  Okay.  When did you talk to her when you said, in your

23   deposition and today, that she fixed it for Easter Sunday?

24   A.  It could have been a few days after the actual -- I

25   actually received the pay or whatever, where I brought it up

ANDREU - CROSS/TINGLEY

1   that I didn't get what was promised me, the bonus or the full

2   day's pay.

3   Q.   Okay.  And you testified to this jury on multiple occasions

4   that every time you brought it to her attention, she corrected

5   it.

6   A.   That's correct.  It didn't get corrected that time.

7   Q.   And you also said in your deposition that Regina fixed it

8   for you.

9   A.   Right, that's what I said.  And, clearly, it's not fixed on

10  there.  I don't know if they -- I got another bonus the week

11  after that to make up for it.  If we could look at the sheet

12  after that, maybe.  But, obviously, she can't fix that.  That's

13  already issued.  But I did raise the matter, especially with

14  Shawn.  When I called Shawn back, I said, I didn't get my money

15  for Easter Sunday.

16  Q.   And so, you testified she always fixed it --

17  A.   Yes, ma'am.

18  Q.   -- but not this time.  That's your testimony.

19  A.   It's evident that that didn't get corrected there, because

20  maybe I brought it up afterwards.  Once I got the check, and

21  I'd look at it -- we don't get this until after we're actually

22  issued our paycheck.  Then we gotta go online to ADP to look at

23  this.  Then if I look at it, obviously I'm gonna notice right

24  away, I didn't get my bonus for Easter, and I'll complain to

25  Shawn, I could bring it back to Ms. Lombardo and talk to her

ANDREU - CROSS/TINGLEY

1    about it.  And hopefully it gets corrected.

2         A lot of times -- like I said earlier in my testimony,

3    a lot of times I don't get the bonuses, I don't get the money.

4    It is what it is.

5    Q.  Right.  But you did say that every time you told

6    Ms. Lombardo --

7    A.  Right.

8    Q.  -- she fixed it.

9    A.  Absolutely.  That's what I said.

10   Q.  And is the reason why you only got half your daily rate

11   that day is because you got sent home because of the

12   altercation that you had gotten into the day before?  Isn't

13   that true?

14   A.  On Sunday?

15   Q.  Yes.

16   A.  No, that's not true.  Absolutely not.

17   Q.  Okay.

18   A.  On Sunday, I clocked in, and then on Sunday, I clocked out,

19   because I was repairing the issue in Fort Lauderdale with the

20   apartment complex.  That's on Sunday.

21   Q.  Okay.  You said yesterday that the day -- one more question

22   about that Easter Sunday.

23   A.  Um-hum.

24   Q.  Easter Sunday was on April 17th, right?  Or do you want me

25   to put it back up so you can look?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

ANDREU - CROSS/TINGLEY

1   A.  If it says April 17th, I agree it was April 17th.

2          Okay.

3   Q.  And that day you worked 2.28 hours.

4   A.  Yes, ma'am.

5          **THE COURT:**  Doesn't that say April 16th?

6          **MS. TINGLEY:**  Oh, you're correct, your Honor.

7   BY MS. TINGLEY:

8   Q.  April 16th.

9   A.  16th.  Sunday.  I'm sorry.

10  Q.  You worked 2.28 hours.

11  A.  Yes, ma'am.

12  Q.  And you were paid half of your daily rate.

13  A.  Correct.

14  Q.  And what was your daily rate at that time?

15  A.  207.79.

16  Q.  And you were paid half of that.

17  A.  Yes, ma'am.

18  Q.  So, you were paid over a hundred dollars for those two

19  hours worked that day.

20  A.  That's correct.  That's what you paid me.

21  Q.  You talked quite a bit yesterday about minimum wage and not

22  making minimum wage.  Were you paid more than the minimum wage

23  that day?

24  A.  Absolutely, I was.

25  Q.  But you have a problem being paid more than a hundred

ANDREU - CROSS/TINGLEY

1    dollars for two hours' work.

2    A.   Yes, I do.

3    Q.   Okay.

4    A.   Because I'm supposed to get the day rate.  I mean I didn't

5    make the rules, you did.

6    Q.   You also talked yesterday about the half day that you

7    worked --

8    A.   I can't see this side.

9         Okay.  I see it.

10   Q.   During the pay period from 9-11 to 9-24.  Do you recall

11   that testimony?

12   A.   Yes, ma'am.

13   Q.   And you recalled with some detail that -- what you were

14   doing that day for those, what was it, three-and-a-half hours?

15   A.   Right.  If I recall correctly, I said that if it's on a

16   Wednesday, and it was the Coral Springs route, I was able to --

17   I was able to complete it very fast.

18   Q.   Do you recall being asked at your deposition if you could

19   recall any of the details about that day?

20   A.   You probably asked me that, yes.

21   Q.   And do you recall at your deposition last August saying

22   that you could not remember any of the details of that day?

23   A.   If I said that in my deposition, that's what I said, yes,

24   ma'am.

25   Q.   Okay.  But somehow your memory is better now --

ANDREU - CROSS/TINGLEY

1   A.   No.

2   Q.   -- than it was last August?

3   A.   No, it's not better.  You were asking me questions off the

4   cuff, and I don't have any information in front of me.  So, if

5   I sit there and I look at all of this, and I review the

6   deposition, and I see what it is that you're talking about as

7   far as dates, times, areas, I could put two and two together

8   and try to say, Okay, well, this is that Wednesday, I may have

9   been doing that.  I didn't have time to do any of that in the

10  deposition.  I don't even know what you're gonna ask me.

11  Q.   Okay.  So, now, you've just said that that may have

12  happened on that day, the three hours.

13  A.   If it's that Wednesday, and I'm in Coral Springs, that was

14  the route that I did, yes, ma'am.  That is my belief.  I did

15  that route on that day, because of the hours and that --

16  usually on that Wednesday, that's the route that's taken care

17  of on the rear loader.  And I'm able to get it done quickly.

18  Q.   I thought during that time frame, you were doing commercial

19  roll-off work.

20  A.   Absolutely.  Commercial roll-off, grapple, as well.  I also

21  did the grapple truck.  I ran the transfer station.  I was

22  their go-to guy.  If they needed something done, if I showed up

23  in the morning, he'll say to me, Oh, I got this route, I need

24  you to do this.

25       On Wednesdays, everybody knows that section behind

ANDREU - CROSS/TINGLEY

1    Publix off the Sawgrass Expressway is the easiest route they

2    have.  If you're good, and you do your job, you're gonna get

3    out of there before four hours is up.  You're not gonna be

4    there all day.  The guys that go in there and stay there all

5    day, it's because they want to.

6    Q.  Now, on that day when you -- what did it take you,

7    3.3 hours?

8    A.  If that's what it says, yeah, 3.3 hours.

9    Q.  Okay.  And on that day, did you clock in?

10   A.  If it shows that I clocked in, yes, I did.

11   Q.  Okay.  Let's pull that up.

12           **MS. TINGLEY:**  Can I approach to get the time card?

13           **THE COURT:**  Okay.

14   BY MS. TINGLEY:

15   Q.  On that Wednesday, what time did you clock in?

16   A.  6:11 a.m.

17   Q.  And what time did you clock out?

18   A.  9:31 a.m.

19   Q.  Okay.  So, at 6:11, you clock in.

20   A.  Yes.

21   Q.  And you get your route sheet.

22   A.  At 6:11 -- I would probably be there a lot earlier than

23   that.  I swipe my time card at 6:11.  I usually show up about

24   five a.m.

25   Q.  I thought you testified under oath that when you got to

ANDREU - CROSS/TINGLEY

1    work, you would clock in?

2    A.  Yes.

3    Q.  Okay.

4    A.  Absolutely.

5    Q.  Okay.  Now, at 6:11, you clock in.  Is that when you get

6    your route sheet?

7    A.  Yes.

8    Q.  And you have to fill out your route sheet.

9    A.  No.  The route sheet is complete.  That's what I'm trying

10   to get you to understand.  The route sheet is what's given to

11   you.  That's what you're gonna do that day.  So, it could be

12   the day before, Bill, Shawn, one of them say, Tomorrow so and

13   so is not gonna be here, do you want to go do that easy route?

14   And you'd know what the route is.  I can go in there.  I have

15   keys to the building.  I can grab the route sheet, the map, if

16   I needed it -- which for that area, I don't even need the map,

17   because I know the route; it's quite simple.  It's Heron Bay.

18   Q.  Okay.  We've gone through this policy with you --

19   A.  Right.

20   Q.  -- Exhibit 14.  And this is about the route sheet.

21   A.  Yes.

22   Q.  And the things that you're supposed to fill out.

23   A.  Absolutely.

24   Q.  Okay.  So, this was part of your job.

25   A.  Absolutely.

175

ANDREU - CROSS/TINGLEY

1    Q.   Okay.  So, you had to fill out the route sheet every day,

2    didn't you, sir?

3    A.   You're -- you're confusing what it is.  The route sheet --

4    you're thinking of the DVIRs or putting your name on the route

5    that you're doing.  You're not making a route or completing

6    anything.  That is all done the day before by the supervisors.

7         What you need to do with the route sheet is literally

8    put your name on it.  That's all.  You don't do anything else

9    to the route sheet.  And when you know the route, you could

10   literally come in -- I had keys to the office.  I could clock

11   in, jump in a truck, go knock out a route, come back, and clock

12   out.

13   Q.   And not fill out your route sheet.

14   A.   There's nothing on there, other than your name.  There's --

15   the only thing that I have to do, especially with these routes,

16   when you're doing a residential bulk route -- what are you

17   turning back in?  There's nothing there.  It's not like a

18   roll-off route, where you got to turn in all the specific stops

19   that you made.  The route sheet is nothing more than a map of

20   the residences where you're going to go.  It just shows you

21   where to drive.  That's all that does.

22   Q.   Okay.  But we went through this policy that you put into

23   evidence --

24   A.   Right, yes.

25   Q.   -- that your lawyer asked you about.

ANDREU - CROSS/TINGLEY

1   A.  Yes, ma'am.

2   Q.  And it talks about --

3   A.  Right.

4   Q.  -- route sheets and DVIRs are part of your daily

5   description as a driver.

6   A.  Yes, ma'am.

7   Q.  Okay.  And so, you're saying on any given day, you would

8   choose not to do them, correct?

9   A.  Absolutely.

10  Q.  Even though it was part of your job.

11  A.  Absolutely.

12  Q.  And it talks about the information.  What -- when you come

13  in, you have to put your name on it.  Do you have to put what

14  time you clocked in?

15  A.  Not when you come in.  Again, it's -- you're -- it's not an

16  exact science.  It's literally -- I mean I'm there for several

17  years.  I know these routes.  I know what needs to be done.  I

18  know what's easy; I know what's hard.  I know what's gonna take

19  a long time, what's gonna take a short time.  So, if Art,

20  Shawn, one of them say, Tomorrow I'm missing this guy, you want

21  to let somebody else do the grapple and you go do this route?

22  You'll be out of here in three, four hours.

23          Yeah, okay.  I'll do it tomorrow.  Don't worry about

24  it.

25          I know tomorrow, then, if I'm going over there,

ANDREU - CROSS/TINGLEY

1   especially on a Wednesday, like I said, if it was that route, I

2   already knew I don't need the map, I don't need any of those

3   things.  I can get in the truck, I can go do the route, and I

4   can finish.

5   Q.  Okay.  And so, you -- on that day, is it your position you

6   just chose not to fill out a route sheet?

7   A.  It's my belief that on that day, I may not have filled it

8   out.  Which, again, it's put your name on it.

9   Q.  Okay.

10  A.  It's not something that's complex.  Literally, put your

11  name on it that you did the route.

12  Q.  But you did testify yesterday --

13  A.  Yes.

14  Q.  -- that right when you clocked in, you were handed the

15  route sheet.

16  A.  Yes.  You could be handed a route sheet.

17  Q.  You could be or you were?

18  A.  If it was on that specific day, if I was handed the route

19  sheet on that specific day -- I don't know if I was -- if it

20  was like that, where I got a route sheet, or if it's a day

21  where I went in, I used my own keys, I clock in, I go take a

22  truck, and I go and do a route.  It varies.

23  Q.  Well, this particular day, what time did you say you got to

24  work?  Let's see.

25  A.  I believe it showed 6:11 a.m.

ANDREU - CROSS/TINGLEY

1   Q.  6:11 a.m.

2   A.  Yes, ma'am.

3   Q.  Okay.  So, it wasn't one of these three in the morning.

4   This was 6:11, is when you clocked in, correct?

5   A.  If it says 6:11, yes, ma'am.

6   Q.  Okay.  And do you recall whether you did the pretrip

7   inspection that day?

8   A.  I don't recall.

9   Q.  Okay.  But if you did, the pretrip inspection you said took

10  how long?

11  A.  Fifteen to 30 minutes.

12  Q.  Fifteen to 30 minutes.

13       And then you would have to drive to the route,

14  correct?

15  A.  About 15 minutes, yeah.

16  Q.  Fifteen minutes.

17       And then how many houses are on that route?

18  A.  I don't know an exact house count.  It's in Heron Bay, and

19  it's literally the easiest route.  You could drive literally an

20  entire section, and there won't be a single item out there.

21  They're very high-priced homes.  Unless a landscaper went

22  through -- and that's another one of the tricks.  You want to

23  get out there as early as possible, because if the landscapers

24  come through, and they know it's bulk day, they're gonna put

25  all the bulk out in front of the house and not take it away.

ANDREU - CROSS/TINGLEY

1   And then your day becomes even longer.

2          I mean I wish that I could explain every single way to

3   get around or through these routes.  You don't understand it,

4   clearly, how the business really operates.  But I'm telling you

5   that on that day, if I went to that Coral Springs area, that

6   route is the easiest route.  I can literally drive through

7   multiple sections, there will not be a single item out.  I can

8   drive through it.

9          One of the things you can do -- those trucks have

10  cameras -- you can get the film from the camera, and then you

11  can definitely be positive of happened on that day.

12  Q.  Mr. Andreu, after you would finish that route, would you

13  have to take the solid waste to the dump?

14  A.  If it were solid waste that I did, but if it would be bulk,

15  I would take it right down the street to the incinerator or up

16  on the Hill.

17  Q.  Okay.

18  A.  Or I could take it also to where the vegetation is, which

19  is two minutes from the shop.

20  Q.  Okay.  So, how long would that take under each of those

21  scenarios?

22  A.  Depending on where I'm going.  If it's the vegetation,

23  which is usually what I was doing, I could dump that truck

24  there in probably -- that early there won't be that many

25  trucks -- 20 minutes.

ANDREU - CROSS/TINGLEY

1  Q.  Okay.  And what if it was one of the other places?

2  A.  Depending if it's the incinerator, uhm, the incinerator

3  could take 30 minutes.  The ones that take the longest is if

4  you have to go up on Monarch Hill or if you're going to one of

5  the old SWS transfer receiving areas, those could take -- if

6  you go first thing in the morning, you can get in and out of

7  there quick.  If you go towards 11 and beyond, it could take

8  hours sometimes, an hour, two hours, depending on who's

9  dumping, who's not dumping.  It varies every single day.

10  Nothing is constant there at any of those facilities.

11  Q.  Now, if you decided -- because I think you told the jury

12  earlier this morning, there would be times where you just

13  wouldn't take it, right?

14  A.  Absolutely, yes, ma'am.

15  Q.  Okay.  And so, this could have been a day where you just

16  didn't take it?

17  A.  There might have not -- the truck may not have been full,

18  and I said, Why go to the dump?

19  Q.  Okay.  And so, you could have gone back to Waste Pro, and

20  then how long would your post-trip take?

21  A.  Going back -- again, the post-trip, if I had to do it, if

22  there was somebody standing there, watching, and they wait for

23  you to drive in, which there's not going to be at that time in

24  the morning, only in the afternoons, they'll sometimes have

25  somebody at the post-trip line -- if there was somebody there,

ANDREU - CROSS/TINGLEY

1    I could pull the post-trip off, if I was really in a hurry, 15,

2    20 minutes.

3    Q.  And how long does it take to get from -- back to the

4    facility after you have done -- after you've dumped, assuming

5    you chose to that day?

6    A.  If I dumped, and I was doing the bulk, the vegetation?

7    Like I said, it's literally two minutes down the road on

8    Powerline.

9    Q.  So, it's two minutes from the residents, and then two

10   minutes to Waste Pro?

11   A.  No, no, no.  From the residents, it will take you about

12   maybe ten minutes.  Because it's literally a straight shoot on

13   the Sawgrass, maybe ten minutes.  That would be a lot.

14   Q.  On the Sawgrass Expressway at that time of morning, you

15   wouldn't have traffic?

16   A.  There'd be traffic.  You'd make it.

17   Q.  Okay.  And then -- so, on that particular day, when you

18   worked 3.3 hours --

19   A.  Right.

20   Q.  -- theoretically, you could have chosen not to do the

21   pretrip inspection, correct?

22   A.  I could have chosen that, yes, ma'am.

23   Q.  You could have chosen not to do the DVIR form, correct?

24   A.  I could have chosen that, yes.

25   Q.  Okay.  You could have chosen to make sure you get through

ANDREU - CROSS/TINGLEY

1   the route before the vegetation is put out by the landscapers

2   so you didn't have to pick it up, correct?

3   A.  If they were doing that that day, yes, ma'am.

4   Q.  Okay.  And then you could choose not to do your post-trip

5   inspection.

6   A.  All of those are choices, yes, ma'am.

7   Q.  And you could choose to not even dump the waste.

8   A.  That's correct.  I could choose that as well.

9   Q.  Okay.  And on that particular day, you would also -- you

10   could have chosen not to do a route sheet.

11   A.  That's right.  But if I chose to do it all, and if I did do

12   it all, let's say it took an hour to do those things, I still

13   have two hours and change on a route that I could drive through

14   in like 45 minutes.  I could run through this place.  It's

15   ridiculous that route.  It really is.

16   Q.  Okay.  And as you sit here today, unlike last August,

17   you're certain that's what you were doing that day.

18   A.  Again, as I stated earlier, when I look at it, and I see

19   the Wednesday, and I see where I was working and the short

20   amount of hours, it's my assumption, it's my belief, my honest

21   belief that that was one of the days, on a Wednesday, when I

22   would have taken that route if it was available.  Yes, ma'am.

23   Q.  Is there anything else that you could have been doing for

24   Waste Pro that day --

25   A.  Sure there is.

ANDREU - CROSS/TINGLEY

1   Q.   -- that would have just taken a few hours?

2   A.   Sure there is.

3   Q.   Like what?

4   A.   Could have showed up to work, and they asked me to maybe go

5   deliver a few containers.

6   Q.   Anything else?

7   A.   Could have showed up for work, and they could have said, We

8   want you to take a roll-off truck and go do a few roll-off

9   cans.

10       Could have showed up for work, they could have said,

11  Take the grapple truck, we just need you to go service the new

12  city hall that they're doing, just empty those cans out.

13       There's -- in my position, it wasn't a definite.  It

14  was a position where I worked, and I was basically the go-to.

15  If they needed something done, I got it done.  There were tons

16  of things that I would do.

17       And when something good came up where if I could get

18  the whole day, and I needed some time off or whatever, and

19  there was a shorter route, if it was offered to me, I would

20  take that.  Most definitely I would.

21       So, there's a lot of things that can occur that will

22  cause somebody not to have to work the full eight hours, ma'am.

23  Q.   Could you have gone to just pick up a truck for Waste Pro?

24  A.   Where?

25  Q.   Maybe in Palm Beach.

184

ANDREU - CROSS/TINGLEY

1   A.  That's possible.

2   Q.  Okay.  Were there jobs or tasks that were assigned to you

3   over the course of your tenure that you anticipated would only

4   take a couple hours?

5   A.  Yes.

6   Q.  Okay.  Did you ever have any conversations with supervisors

7   when you would choose not to take waste to the dump?

8   A.  Like when I would call and say, I'm just gonna go back,

9   I'll dump the truck tomorrow, absolutely.  Yes, ma'am.

10  Q.  And did you ever -- did you find that that was acceptable?

11  A.  They'll say, Okay, dump it tomorrow morning.

12  Q.  And so, when you talked yesterday about sometimes you had

13  to finish the route from the day before --

14  A.  Um-hum.

15  Q.  -- isn't that actually because you didn't finish your route

16  the day before, sir?

17  A.  No, ma'am, not at all.

18  Q.  Oh, okay.

19  A.  You just asked about dumping a truck, not finishing a

20  route.

21  Q.  Isn't taking the waste to the landfill part of the route,

22  sir?

23  A.  No, again, the route is the route.  Dumping a truck is

24  totally different and separate from the route.  There are

25  trucks that will sit there all weekend with stuff in them, and

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

1   guys will come in on Monday and dump them and then go on route.

2   Q.   You talked quite a bit yesterday about minimum wage.

3   A.   Yes, ma'am.

4   Q.   Is it your sworn testimony to this jury that you don't

5   believe you were paid the minimum wage by Waste Pro?

6   A.   No, ma'am.  If I recall correctly, what I said was, when I

7   did the math, and I'd look at the overtime, if I take the

8   overtime, and I'm doing, you know, the division by the amount

9   of money that I earned, you could take almost any one of those

10  statements, and it comes out sometimes five bucks an hour, six

11  bucks an hour.

12        We're going back to how this all originates, which is

13  the true lack of understanding how all of this compensation

14  takes place.  It's just -- you said something very interesting

15  at the beginning.  You said that people wake up in the morning,

16  and there's this incredible magic trick that happens.  By the

17  end of day, you come home and your garbage is gone.  That's not

18  true at all, ma'am.

19        By the end of the day, when you come home and that

20  garbage is done, it's because guys like me, women like me,

21  they've worked all day long to get that garbage.  There's no

22  magic behind it.  The only magic that I see here is how you

23  managed to pay me the small wage that I would get for working

24  all those hours of overtime.  Those are the only magical

25  formulas that I see.

ANDREU - CROSS/TINGLEY

1              Because I said from the beginning, ma'am, and with all

2    due respect to everybody involved, I always said, Just show me,

3    just explain it to me.  That's all I ever wanted to know.  I

4    don't understand it.

5    Q.  And in 2016, sir, you made in excess of $74,000, did you

6    not?

7    A.  *(No response)*

8    Q.  Yes or no?

9    A.  Ma'am, I made money, yes.

10   Q.  Yes or no?

11   A.  I didn't make it.  I earned that money.  And more that I

12   believe that I am owed.  Don't punish me because I'm a hard

13   worker, and I work 168 hours sometimes or 140 or 120.  You're

14   literally sitting there trying to get people to believe, Oh, he

15   earned this, so he's not entitled to any more.  You couldn't be

16   more wrong.  You couldn't be a greater down fighter.  I mean,

17   it's so absurd to sit here and try to say to me, Oh, you made

18   74 grand, so that's okay, we could punish you and not pay you

19   for anything else.

20              You're wrong, ma'am.  Very, very wrong.

21   Q.  Well, during that year, when you made $74,000 --

22   A.  Right.  Yes, ma'am.

23   Q.  -- you were paid almost $11,000 in overtime, were you not?

24   Yes or no?

25   A.  I earned that.

ANDREU - CROSS/TINGLEY

1  Q.  Okay.  And you were paid that?  Yes or no?

2  A.  That's what it says, yes, ma'am.

3  Q.  And you also earned almost another $8,000 in bonus money.

4  Yes or no?

5  A.  Earned that, yes, ma'am, I earned it.

6  Q.  And another thousand dollars in safety bonuses.

7  A.  Correct.

8  Q.  As well as sick time, vacation time, holiday pay that we've

9  been talking about.  Is that correct?

10  A.  Ma'am, this is my hard work.  It's my earnings.  You

11  probably made $2 million.  Is that wrong?  I work very hard for

12  what I earn.  Look at my statements.  Don't just look at a

13  number.  Look at the hours that I put in.  You could go work at

14  McDonald's 168 hours and make that money.  I put in a lot of

15  hours for this.

16        And my contention has been all along, the overtime is

17  not paid properly.  That's my contention.  If you could show me

18  otherwise, I'll walk out of here today.  No hard feelings, love

19  you guys, it's over.  But I really believe you messed up.

20  That's it.  That's all.

21  Q.  Your daily rate in 2016 was $207.79, was it not?

22  A.  Yes, ma'am, it is.

23  Q.  Okay.  So, do you know what the minimum wage was?

24  A.  What year?

25  Q.  This was at the end of 2016.

ANDREU - CROSS/TINGLEY

1  A.  8.05.

2  Q.  Okay.  So, even if you worked a 20-hour day --

3  A.  Yes, ma'am.

4  Q.  -- your daily rate paid you more than the minimum wage, did

5  it not?

6  A.  Absolutely.

7  Q.  And then on your hours over 40, you got additional money,

8  did you not?

9  A.  Like five bucks an hour.  That's what I'm not

10  understanding, ma'am.  That's where the confusion comes in.

11  Q.  Five dollars an hour --

12  A.  Oh, my God.

13  Q.  -- is what you're saying, and I think that the records are

14  gonna show different --

15  A.  Um-hum.

16  Q.  -- but the five dollars an hour was in addition to that

17  daily rate, was it not?

18  A.  *(No response)*

19  Q.  Yes or no?

20  A.  When you show me the formula, then we could talk about it.

21  I just don't know.  I'm doing the math the way that I

22  understand it, ma'am.  That that's what I'm saying to you.

23  That's what I've been saying all along.  I mean, all I

24  understand is that there were certain things that shouldn't

25  have been done, that you violated; there were certain things

```
 1   that should have been done, that you didn't do.  And I just

 2   wanted clarity on it.  And if I'm owed something, please.  If

 3   I'm not owed something, then fine.  But I really believe that

 4   I'm owed something.

 5          THE COURT:  Ms. Tingley, about how much longer is your

 6   cross gonna be?

 7          MS. TINGLEY:  It's gonna be a little while, your

 8   Honor.

 9          THE COURT:  All right, members of the jury, we're

10   going to go ahead and recess for lunch.  Remember my admonition

11   not to discuss the case or allow it to be discussed in your

12   presence.  I've got a couple of hearings this afternoon.  I'm

13   gonna ask you to come back at two o'clock.

14          So have a nice lunch.  We'll see you back at

15   two o'clock.

16          COURTROOM SECURITY OFFICER:  All rise.

17          (The jury exited the courtroom)

18          THE COURT:  And if there's nothing else to come before

19   the Court, we'll be in recess till two o'clock on this case,

20   1:15 on other matters.

21          MR. EDWARDS:  Thank you, your Honor.

22          MS. TINGLEY:  Thank you, your Honor.

23          (The Judge exited the courtroom)

24          (Luncheon recess taken at 12:18 p.m.)

25                        -  -  -  -  -
```

1          **TUESDAY, APRIL 17, 2018, 2:18 P.M.**

2          *(The Judge is presently on the bench)*

3          **MS. TINGLEY:**  Your Honor, may we set up?

4          **THE COURT:**  Yes.

5          **MS. TINGLEY:**  Thank you.

6          **THE COURT:**  Mr. Andreu, you can go ahead and resume

7     the stand.

8          **THE WITNESS:**  Thank you, your Honor.

9          *(Pause)*

10         **THE COURT:**  We ready?

11         **MS. TINGLEY:**  Yes, your Honor.  Thank you.

12         **THE COURT:**  All right.  Let's bring in the jury.

13         **COURTROOM SECURITY OFFICER:**  All rise.

14         *(The jury entered the courtroom)*

15         **THE COURT:**  All right.  We're back on the record.

16         Did everyone follow my admonition not to discuss the

17    case or allow it to be discussed in your presence?

18         I want to apologize to you for our tardy start.  The

19    hearings I had at 1:15 took a lot longer than I thought they

20    were going to take.  Hold that against me, not against the

21    lawyers.  They were here ready, willing, and able to go.

22         Ms. Tingley, you may continue.

23         **MS. TINGLEY:**  Thank you, your Honor.

24

25

ANDREU - CROSS/TINGLEY

1          **CROSS-EXAMINATION** (CONTINUED)

2     BY MS. TINGLEY:

3     Q.   Mr. Andreu, when you were started at Waste Pro were you

4     told the approximate length of your shifts that you'd be

5     working?

6     A.   Yes, ma'am.

7     Q.   And what were you told?

8     A.   Eight to ten hours.

9     Q.   And how many days were you expected to work?

10    A.   Six days.

11    Q.   And did you have the option, if you wanted more hours, to

12    work the seventh day?

13    A.   They don't want you to, but if they offer it, and I was

14    able to get help pay, I would take it.

15    Q.   If you did work on the seventh day, say, for instance, at

16    the transfer station -- because I think we've already talked

17    about it was open on Sundays, right?

18    A.   Yes, ma'am, it was.

19    Q.   Would you get your daily rate for those days?

20    A.   Yes, ma'am.

21    Q.   Okay.  And if you're starting at Waste Pro, and you're

22    going into this relationship, your employment relationship,

23    thinking you're working six days a week --

24    A.   Um-hum.

25    Q.   -- eight to ten hours a day --

ANDREU - CROSS/TINGLEY

```
 1   A.   Correct.

 2   Q.   -- is it fair to assume that you knew you'd be getting

 3   overtime?

 4   A.   Yeah.

 5   Q.   Okay.  And if you worked the six days a week, even at the

 6   ten hours, you were gonna be working about 120 hours a pay

 7   period, correct?

 8   A.   Yes.

 9   Q.   Okay.  So, you knew going into this job that that's what

10   was required of you.

11   A.   Again, going into it, and the way that it's being discussed

12   now, one would assume every day is ten hours.  Going into it,

13   it was explained to me -- and this is where I don't think we're

14   really understanding one another -- that the routes usually can

15   take up to eight hours.  We're going to give you X amount of

16   dollars for these eight hours.

17        The benefit to me is, when I'm proficient at my job,

18   I'm able to do it in much less than eight hours and get the

19   same benefit as if I had worked the entire eight hours that

20   they say encompasses the day rate.

21   Q.   Well, I thought you said when you started there, it was

22   eight to ten hours, was what they --

23   A.   Yes, ma'am.

24   Q.   Okay.  So, not eight hours, eight to ten.

25   A.   Again, eight to ten hours.
```

ANDREU - CROSS/TINGLEY

1  Q.  Okay.

2  A.  But like I said, when Carlos was speaking to me, he says,

3  It'll take about eight hours.  If you're good, you'll get it

4  done faster.  Your incentive is to work faster, work harder,

5  get it done sooner, you make more money.

6  Q.  Now, was it a common occurrence for you to work less than

7  eight hours?

8  A.  There were a lot of occasions when I worked less than eight

9  hours, yes, ma'am.

10  Q.  Okay.  In the three years that are at issue in this case,

11  at 52 weeks a year, you know, 156 weeks, how many times do you

12  think that you worked less than eight hours?

13  A.  I would love to look over the records and tell you an exact

14  number.  If I guesstimate, I'm afraid you're gonna come back

15  and say that I'm not exact.  I would say 20 percent.  I -- it's

16  a guess.

17  Q.  Okay.

18  A.  I don't have the records.

19  Q.  Okay.  So, 20 percent, that in your mind would be once a

20  week?

21  A.  Okay.

22  Q.  Is that what you're thinking.  I'm just asking.

23  A.  No.

24  Q.  Okay.  So, you're unsure about that.

25  A.  I'm just guessing.  I mean I don't --

ANDREU - CROSS/TINGLEY

1   Q.  Okay.

2   A.  Again, it's like the 15-hour day.  It's 14.7, but I said

3   15.  I'm sorry.  All I can do is guess.  And it's your records,

4   ma'am.  I only have your records to go off of.  I didn't keep

5   records.  I'm sorry.

6   Q.  Mr. Andreu, you told this jury over a hundred times you

7   worked 15 or more hours.

8   A.  Yes, I did.

9   Q.  That wasn't me.  That was your testimony.

10  A.  Absolutely.  You are 100 percent correct.

11  Q.  And the records that --

12  A.  Right.

13  Q.  -- you put into evidence --

14  A.  Yes.

15  Q.  -- showed that that was actually three times.

16  A.  Yes, ma'am.

17  Q.  Okay.  You said this morning that you wanted more hours,

18  you wanted to work more hours.

19  A.  Yes.

20  Q.  Okay.  Wasn't that a constant theme with you, is that you

21  wanted to work the seventh day, you wanted to work longer

22  hours, you wanted to make more money?

23  A.  Absolutely.

24  Q.  Okay.  And Waste Pro accommodated that request by you.

25  A.  Absolutely they did.

ANDREU - CROSS/TINGLEY

1          It's not working.

2          **MS. TINGLEY:**  I'm sorry.  How do I turn it on?

3          **THE COURT REPORTER:**  Sorry.

4          **MS. TINGLEY:**  Thank you.

5    BY MS. TINGLEY:

6    Q.  Directing your attention to this pay period, and this was

7    July 19th to August 1st of 2015, do you see on that Monday, the

8    20th?

9    A.  Yes.

10   Q.  And on that day, you were paid for an eight -- almost a

11   nine-hour day, correct?

12   A.  Yes.

13   Q.  And you were paid $150 of bonus money.

14   A.  Yes.

15   Q.  Okay.  And so, there were times where you weren't working

16   these long days, but you were still getting paid bonus money by

17   Waste Pro, is that correct?

18   A.  Absolutely, of course.

19   Q.  And then there were times, like on the Tuesday, where you

20   worked just over four hours.  Were you paid your full day rate

21   that day?

22   A.  I'm gonna say yeah, because it's 4.02.

23   Q.  Oh, right.  And this morning you said, now all of a sudden

24   it's 4.01, not 11:30, correct?

25   A.  You're referencing to this 4.02, or you're referencing to

ANDREU - CROSS/TINGLEY

1   what we talked about --

2   Q.   Your testimony.

3   A.   Yes.

4   Q.   When you said --

5   A.   The 11:30?

6   Q.   Yeah.

7   A.   Yes, ma'am.

8        **THE COURT REPORTER:**  Excuse me.  You can't talk at the

9   same time.

10       **THE WITNESS:**  Okay.

11  BY MS. TINGLEY:

12  Q.   I'm referencing when you told the jury that you wouldn't

13  get paid a full day if you clocked out before 11:30.  Do you

14  recall telling the jury that?

15  A.   Absolutely I said that to you.

16  Q.   Okay.  Now, this is the last pay period that you had in

17  2015.  Do you see this, sir?

18  A.   Yes, ma'am, I do.

19  Q.   Okay.  And your year-to-date wages were over $67,000?

20  A.   That's correct.

21  Q.   And at the time, you were getting a daily rate of $155?

22  A.   That's correct.

23  Q.   And on top of that, on top of your 48 -- your regular rate,

24  your regular pay was 48,780, correct?

25  A.   That's correct.

ANDREU - CROSS/TINGLEY

1   Q.  And is it your understanding that that's all the daily

2   rates that you earned throughout the year?

3   A.  Yes, the way I understand this.

4   Q.  Okay.  And then your overtime was another $10,000.

5   A.  Yes, ma'am.

6   Q.  And then your bonuses were another $5,000.  Do you see

7   that?

8   A.  Yes, I do.

9   Q.  And then you got vacation pay and holiday pay and sick pay

10  and year-end bonus.

11  A.  That's correct.

12  Q.  Okay.  Do you believe in 2015, you were making less than

13  the minimum wage?

14  A.  No.  I never said I was making less than minimum wage.  The

15  argument that I had was when I calculate the overtime, that it

16  comes out to less than minimum wage.  That's what I'm saying,

17  is if I took, for instance, 54 hours and divided it into

18  451.85, what do I get?  You know, it's like yesterday with the

19  66 hours, it comes out to like six bucks or something.  That's

20  the part that I really have a lot of difficulty with.

21  Q.  Right.  But you do understand that you're getting that

22  overtime premium on top of your daily rate, aren't you?

23  A.  From what I understand, any hours after the 40, you're

24  supposed to be the overtime.  And I understand it to be time

25  and a half.  That's what I'm saying.  And I've been more than

ANDREU - CROSS/TINGLEY

1   open to receive what it is that you have to say to me in

2   regards to this and show me how to calculate it or whatever

3   that you do.

4   Q.  You have said that you have seen the -- all of your pay

5   records, correct?  Or did you just look at a handful of them?

6   A.  Everything that is there, I believe I've had an opportunity

7   to go over.  But if you talk about time cards, of course I

8   approved them, and I've seen every one that I've approved.

9   Q.  You talked earlier about Waste Pro giving you a formula --

10  or talking about a formula.  Do you recall that testimony?

11  A.  Yes, I do.

12  Q.  Okay.  And --

13        **MS. TINGLEY:**  Let me show you.

14  BY MS. TINGLEY:

15  Q.  I'm gonna show you this document.

16        **MR. EDWARDS:**  Your Honor, objection.  Lack of

17  predicate.

18        **THE COURT:**  Is it in evidence?

19        **MR. EDWARDS:**  It's not in evidence, your Honor.

20        **MS. TINGLEY:**  It's not in evidence, your Honor.

21        **MR. EDWARDS:**  It's being shown to the jury.

22        **THE COURT:**  Sustain.

23        **MS. TINGLEY:**  Okay.

24        May I approach the witness?

25        **THE COURT:**  Yes.

ANDREU - CROSS/TINGLEY

1    BY MS. TINGLEY:

2    Q.   Mr. Andreu.

3    A.   Yes.

4    Q.   I'm gonna show you this document and ask you if you

5    recognize this formula?

6    A.   No.

7    Q.   Okay.  Do you know what the formula that you were talking

8    about yesterday and today -- do you know what it encompasses?

9    Can you describe this formula to the jury?

10   A.   No.  That's what I've been asking, is exactly what is it

11   and how it is that they do it.  I've asked the question even in

12   my early tenure with the company.  I directly asked Regina.

13   I've asked Elliot.  I've asked a lot of -- how is it that they

14   calculate this?  They've come up with -- you know, I've heard

15   names, I've heard ways, but nobody knew a definitive way to

16   actually explain that, how that's calculated.  Did I assume it

17   was correct?  Absolutely I assumed it was correct.  It looked

18   like a lot of money to me, but when you get into it, and you

19   start doing it, it just didn't make any sense to me.

20   Q.   Did you ever ask Mr. Mackie about it?

21   A.   No, Mr. Mackie and I, every time I saw him, almost every

22   time I saw him, I used to ask, and I'd be like, I need to get

23   some more money.  I mean I just -- I'm not making enough with

24   all the stuff that you're asking me to do, whether it's the

25   transfer stations, going to Pembroke Pines, doing things like

ANDREU - CROSS/TINGLEY

1    that.  And he accommodated me.  He assured that I got raises.

2    Q.  In fact, in 2016, didn't you get a substantial raise?

3    A.  Absolutely.

4    Q.  Do you recall what your day rates went from and to in 2016

5    when you got that raise?  Or would you like me to show you?

6    A.  Yeah, please.

7    Q.  Okay.

8    A.  It was like one something to 207?

9    Q.  Right.

10        So, your day rate was 157.79?

11   A.  Yes.

12   Q.  And then do you recall your day rate going from -- going to

13   207.79?

14   A.  Absolutely.

15   Q.  Okay.  And during that time, you said you would ask

16   Mr. Mackie -- you would just ask him for more money.  You

17   needed to make more money.  And he would accommodate you, is

18   that accurate?

19   A.  Absolutely.  When I talked to him about it, he said that

20   they can't do like anything with the hourly thing, that it's

21   all corporate, they would have to change my job title, but I

22   deserve it, and he'll get it for me.  And he did that.

23   Q.  Okay.  So, when you asked him for more money, he was able

24   to accommodate you, correct?

25   A.  Yes, ma'am.

ANDREU - CROSS/TINGLEY

1   Q.   Now, you've sued Russell Mackie individually in this case,

2   haven't you?

3   A.   The attorneys.  I didn't prepare the lawsuit.

4   Q.   Mr. Andreu, you brought this lawsuit, did you not?

5   A.   Absolutely.

6   Q.   And you brought this lawsuit against Waste Pro of Florida

7   and Russell Mackie individually, did you not?

8   A.   The way I understand it is he's here to answer questions.

9   I'm not asking no money from him.  I'll tell you that upfront,

10  and I'll tell it to the jury.  He doesn't owe me a dime.

11  Waste Pro does.

12  Q.   Do you recall when you left Waste Pro the circumstances of

13  your resignation?

14  A.   Yes, ma'am, I do.

15  Q.   Okay.  And so can you tell the jury what happened?

16  A.   As I stated to you yesterday, came into work.  I just got

17  off of surgery.  I came in.  One of the supervisors told -- I

18  explained to him, I said, Look, you know, I can get this done,

19  but don't ask me to do anything extra today.

20       And he said, Well, I got stuff that has to get done.

21  I don't care how you get it done, get it done.

22       I felt -- just doesn't care.  And with all that

23  running through my mind, which was pretty chaotic, I made the

24  decision of, you know what, they just don't give a darn.  I'm

25  done, I'm done.  And I resigned.

ANDREU - CROSS/TINGLEY

1   Q.   Now, had you -- was it your testimony that you had just had

2   neck surgery?

3   A.   That's my testimony.

4   Q.   And when had you had the neck surgery?

5   A.   That procedure that I'm talking about, I literally had the

6   day before, in Hollywood.

7   Q.   Now, when you were going to resign that day --

8   A.   I wasn't going to resign.

9   Q.   Well, when you chose to resign, were you told that you had

10  to write up a resignation letter and bring it back?

11  A.   Yes, yes.

12  Q.   Okay.

13  A.   I wrote it right there.

14  Q.   You wrote it at the moment.

15  A.   Yes.

16  Q.   And when did you find out that your resignation was

17  accepted?

18  A.   The following morning.

19  Q.   Okay.  So, you go in two different days.

20  A.   Correct.

21  Q.   And it was the day before the first -- your resignation was

22  accepted on -- let me put up your last date.

23        So, the Wednesday, 5-3, is when your resignation was

24  accepted?

25  A.   If the date on the resignation is correct, it would be the

ANDREU - CROSS/TINGLEY

1   day after I wrote it.

2   Q.  Okay.  And so, on 5-2, that Tuesday, was when you wrote the

3   resignation.

4   A.  If I could see it, I'll tell you.

5   Q.  You don't recall when you resigned?

6   A.  The exact date, no, ma'am, I do not.

7   Q.  Okay.

8           *(Discussion had off the record between counsel)*

9           **MS. TINGLEY:**  Your Honor, may I approach the witness?

10          **THE COURT:**  Okay.

11  BY MS. TINGLEY:

12  Q.  Sir, I'm handing you this document, and I'd ask if you

13  could identify it?

14  A.  It appears to be a text.

15  Q.  Is it a text message from you to Russell Mackie?

16  A.  I believe it to be, yes.

17  Q.  And what was the date of that text?

18  A.  Here it says Wednesday, May 3rd.

19  Q.  And do you recall sending a text message to Russell Mackie

20  on May 3rd, the day your resignation was accepted?

21  A.  Yes.

22  Q.  And does this document that I've handed to you -- does this

23  represent a true, accurate, and genuine copy of the text

24  message that you sent to Mr. Mackie?

25  A.  I believe it to be, yes, ma'am.

ANDREU - CROSS/TINGLEY

1   Q.  Okay.

2          **MS. TINGLEY:**  Your Honor, I believe -- we would enter

3   this into evidence.

4          **MR. EDWARDS:**  No objection, your Honor.

5          **THE COURT:**  Is there an exhibit number?

6          **MS. TINGLEY:**  I think it is... 16.

7          **THE COURT:**  Is it 16?

8          **MS. TINGLEY:**  Sixteen, your Honor.

9          *(Defendants' Exhibit 16 marked for identification)*

10         **THE COURT:**  All right.  Defense 16 will be received.

11         *(Defendants' Exhibit 16 admitted into evidence)*

12         **MS. TINGLEY:**  May I publish to the jury?

13         **THE COURT:**  All right.

14  BY MS. TINGLEY:

15  Q.  Before we show this exhibit, I just want to go back to

16  this, sir.

17         So, on Wednesday, 5-3, the date of your text --

18  A.  Yes.

19  Q.  -- was that the day that your resignation was accepted?

20  A.  Yes.  I came in, in the morning, and he told me -- he said,

21  Your resignation was accepted at 5:25.  I clocked out.

22  Q.  Okay.  And so, the day before was when you had this

23  incident at Waste Pro where you wrote your resignation.

24  A.  I believe that to be correct, yes.  If you have the

25  resignation, it should say 5-2 on it.

ANDREU - CROSS/TINGLEY

1  Q.  Okay.  And you told the jury that your surgery was the day

2  before that.

3  A.  I believe so.  The procedure that I had should have been

4  the day before that, yes.

5  Q.  Okay.  So, that would have been Monday, 5-1?

6  A.  I -- I would think, yes, looking at this, the pay stub.

7  Again, it doesn't indicate anything other than hours that I

8  worked.

9  Q.  Right.  But just based on what you've told the jury about

10  when you had this surgery --

11  A.  I would say yes.

12  Q.  Okay.  And you worked on May 1st.

13  A.  Yep.

14  Q.  From 5:45 to 3:24.

15  A.  Yes.

16  Q.  And then you went and had surgery.

17  A.  No.  Actually, when I went in that morning, I told Bill, I

18  says, I have to go, they're doing something on my back, it's an

19  invasive procedure, it will only take like maybe 45 minutes or

20  so.  Back was really, really in bad condition.  They had to do

21  it.  He allowed me to drive from Pompano down to Hollywood.  I

22  actually walked inside of there, I had my procedure, I left, I

23  went back to work.

24  Q.  And didn't you say it was your neck, not your back?

25  A.  It's my back and my neck that are affected.  What they did

ANDREU - CROSS/TINGLEY

1  was they used those -- I believe they're cortisone shots and

2  some other stuff to try to alleviate the pain.

3  Q.  Okay.  So, it remains your testimony that on that Monday,

4  you had surgery.

5  A.  Yes, on Monday I did.  I went to Hollywood, and I had a

6  procedure, yes.

7  Q.  And after surgery, you came back and finished a route?

8  A.  Absolutely.  I was driving a grapple truck.

9  Q.  But then the next day --

10  A.  A lot of soreness.  I went in, I said, Listen, I'm not

11  feeling it today.  I don't want to sit out here all day.  I'll

12  do my route.  I didn't say I didn't want to work at all.  I

13  said, I will do my route, I just don't want to do added stuff.

14  And that's when he got offended, and he was like, No, I got

15  stuff, you gotta do it, get it done, I don't care how you get

16  it done.  And that's how that happened.

17  Q.  Why didn't you take a sick day?

18  A.  I didn't want to.  I wanted to get the route done that I

19  knew that I could do, but I just couldn't sit out there all day

20  long.  And that was the only objection, was don't give me all

21  the extra stuff.  I'll get this done for you.  Don't give me

22  all the extra stuff today.

23  Q.  But isn't that why you have sick days?

24  A.  Absolutely we have sick days for stuff like that.  But,

25  again, if my arm was falling off, yeah, I'll take the sick day.

ANDREU - CROSS/TINGLEY

1  But I was feeling very sore.  I didn't feel good.  I can make

2  it.  I can do it.  But I just can't sit here all day for you.

3  And it's similar to what's going on between you and I now.  You

4  want to me to justify to you my level of pain and why I needed

5  a day off.  I just needed that time.  I can sit here and do it

6  for a few hours, but don't ask me to do it for ten or 12.

7  That's all.

8  Q.  On your last pay period, were you paid all the vacation

9  time that you had in the bank, you know, all your unpaid

10  vacation time?

11  A.  I -- I believe, actually, that they did give me that.  I

12  think.

13  Q.  And didn't they also give you two weeks of pay?

14  A.  Absolutely, because I resigned with a two-week notice.

15  They said, It won't be necessary for you to come the two weeks.

16  I requested, Can I have the two weeks pay at least, because I

17  was willing to come in and work it.  And they agreed, and they

18  gave me my two weeks.

19  Q.  Now, you said the day that you had this surgery that your

20  supervisor accommodated your request to go have surgery while

21  you were on the clock.

22  A.  Yes, ma'am.  Yes, he did.

23  Q.  And were there other accommodations that Waste Pro gave

24  you?

25  A.  Absolutely, yes, ma'am.

ANDREU - CROSS/TINGLEY

1    Q.   Can you give the jury some examples of these
2    accommodations?
3    A.   Let's say -- as I had mentioned yesterday, my mother, she's
4    been battling with brain cancer.  She had a tumor removed.  She
5    had some pretty extensive surgery.  My father I just buried a
6    few months ago.
7            There were times when I had to leave early to take
8    care of my mother.  I could call up and say, Look, you know, I
9    gotta go, I gotta take my mother to an appointment or whatever.
10   Things like that they would accommodate, yes, ma'am.
11   Q.   And yet you have sued Waste Pro now for willfully
12   disregarding the amount of money that you're supposed to be
13   paid under the overtime rules.
14   A.   I believe that to be correct, yes, ma'am.
15   Q.   Okay.  So, they would accommodate you with all these
16   requests, and you still believe they're violating these
17   overtime rules.
18   A.   I don't believe it.  I know it.
19   Q.   And Regina would fix your time, and Regina would fix the
20   records any time you complained, on behalf of Waste Pro, but
21   you still believe that they willfully were violating overtime
22   records.
23   A.   Regina would do what she could do.  And sometimes, like I
24   said, it gets fixed.  Sometimes it did not.
25   Q.   Actually, sir, your testimony was, every time you went to

209

ANDREU - CROSS/TINGLEY

1    Regina, she fixed it.

2    A.   Every time I went to Regina, she would fix it, but as we

3    showed before, there are times when it didn't get fixed.  It's

4    not all the time.  And as I stated earlier in my testimony,

5    there are times when I'm promised these bonuses, and I just

6    wouldn't get them.

7    Q.   And you didn't go to Regina and tell her, did you?

8    A.   A lot of times, no, I did not, not every single time.  But

9    the times that I went, she did correct it or try to correct it.

10   Q.   Okay.  But you told the jury right before lunch about how

11   you earned this money.

12   A.   Absolutely.

13   Q.   But you want them to believe that time after time after

14   time, you're not getting your $50 bonus or your $75 bonus or

15   your $300 bonus, and time after time, you just didn't say

16   anything.  You just left the money on the table.

17   A.   No, I don't want them to believe that.  I didn't ask them

18   to believe any of that.  I said to them that usually two out of

19   three times, you end up getting screwed on it.  That's exactly

20   what I said to them.

21   Q.   And that on those two to three times, you never went to

22   Regina to get it corrected.

23   A.   On numerous occasions, I did go to her.  On numerous

24   occasions, she did correct it.  On numerous occasions, it

25   didn't get corrected or it just went mute.

ANDREU - CROSS/TINGLEY

1   Q.  Are you changing your testimony now because --

2   A.  No, I'm not changing my testimony.  It's the same thing.

3   Again, it's -- it is -- as I say, you know, sometimes I got

4   them, sometimes I didn't.  Was I entitled to them?  I believe I

5   was.

6        There's a lot of times when the supervisor will

7   literally come back and tell you, I can't do that, you know, I

8   can't give you so many bonuses in a week.

9        What are you talking about?  You told me you were

10  gonna do it yesterday.

11       Again, it's the interaction -- I think the greatest

12  flaw that the system has is that it's a negotiation, literally,

13  between a laborer and a supervisor and a truck in an alley, and

14  there's nobody there to hold anybody accountable to any of

15  this.  And then I'm left to -- he promised me, and he could

16  say, Oh, you know, we gave him one, and that's it.  I mean

17  that's just the nature of it.  I know you want it -- to believe

18  to be a perfect system, but it's not, ma'am.  It's not.

19  Q.  Sir, this is not about whether or not it's a perfect

20  system.

21  A.  I believe it is, ma'am, because there's rules that you have

22  to follow, and you're trying to defend not following them.  I

23  had to follow them.  Why don't you have to?

24  Q.  You followed the rules?

25  A.  I followed those rules, yes.

211

ANDREU - CROSS/TINGLEY

1    Q.  Did you follow the rules when you filled out your --

2    A.  Not all the time.  Just like you didn't do it all the time.

3    Q.  Okay.  Did you follow the rules when you were supposed to

4    fill out a route sheet?

5    A.  A lot -- 90 percent of the time, yes.  But I'm not gonna

6    sit here and deny that I didn't cut corners on occasion.

7    Q.  Did you follow --

8    A.  And I won't justify it by saying other people do it, but

9    it's the reality of the business, ma'am.

10   Q.  Did you follow the rules when you didn't do your pretrip

11   inspection?

12   A.  When I didn't do it?  Absolutely not.

13   Q.  Did you follow the rules when you left trash in the truck

14   instead of taking it to the landfill?

15   A.  Absolutely not.

16   Q.  Did you follow the rules when you didn't do your post-trip

17   inspection?

18   A.  Their rules?  Absolutely not.

19   Q.  And you knew since the time you were hired that if you

20   had -- because you told the jury -- if you had a complaint or a

21   problem, you could go to Ms. Lombardo, isn't that accurate?

22   A.  Sure.

23   Q.  And you testified yesterday and today and at your

24   deposition that when you went to her, she fixed it.

25   A.  Absolutely.

212

ANDREU - CROSS/TINGLEY

1  Q.  Didn't you say that?

2  A.  Absolutely I said that.

3  Q.  But you want this jury to believe that two out of three

4  times --

5  A.  Yes.

6  Q.  -- you didn't go to Ms. Lombardo.

7  A.  I didn't say I didn't go to her.  I said two out of three

8  times, I didn't get the bonus that I was promised by a

9  supervisor.  I didn't say two out of three times I went to her.

10 I said on the occasions that I did, she would get it right.

11 There, of course, exists times that it didn't get corrected.

12 But, again, I'm -- it's --

13 Q.  Why?

14 A.  -- all I can explain.  You know, these are your records,

15 and I'm doing the best that I can with that.

16 Q.  Why didn't you go to her every single time?  You're here

17 asking --

18 A.  Again, and I'm saying to you as well as the jury, every

19 single time -- you can go to Regina, every week I could go to

20 her and say, Shawn promised me 50 bucks, Art promised me

21 35 bucks.  Again, it's between them and I.  And a lot of times,

22 they'll be like, Well, we gave him 50, and it covered the three

23 days or four days or whatever he did two or three times at the

24 apartment complex.  It turns into a whole bunch of excuses why.

25         So, when you get it, you get it.  When you don't -- it

ANDREU - CROSS/TINGLEY

1  got to the point where I was like, All right, well, got screwed

2  again.

3        Bring 50 guys up here that worked there.  They're

4  gonna tell you the exact same thing.  They're promised bonuses

5  every day, and they don't get them.

6  Q.  Mr. Andreu, this is about you.

7  A.  I think it's about your company, ma'am.

8  Q.  This is about whether or not you were truthful to the jury.

9  A.  Absolutely I was.

10  Q.  And you're --

11  A.  Everything that I'm saying to the jury is to the best of my

12  knowledge.  All my recollections are the best that I can make

13  them, based upon records that are actually your records, not

14  mine.  I'm doing the best that I can.

15        I mean, if I were to ask you, Where were you July 3rd

16  on 2015 *(sic)*, what are you gonna tell me?  You don't know.

17  It's just -- if there's not -- if there's not a great moment in

18  your life at that time, how are you gonna remember exactly each

19  and every single detail?  But I do the best that I can with my

20  recollection of routes by looking at that and seeing that if I

21  was working a lot of days 12 hours, 13 hours, and I could look

22  at the year, and I could say, Okay, at this time, this is what

23  I was doing more or less.  I know that if I'm doing routes in

24  that area at that specific time frame, if I was working 13,

25  14 hours, 90 percent of the time I was helping somebody,

ANDREU - CROSS/TINGLEY

1    because I got that stuff done very quick.  All of the trucks

2    that I operated, operated in the black, every single one of

3    them.  Every one.

4    Q.  We're talking about you and Ms. Lombardo.

5    A.  Yes, ma'am.

6    Q.  And your testimony that when you went to her, she fixed it.

7    A.  That's right.  And today you showed me there was an

8    occasion, and there's probably more, that it didn't get fixed.

9    I'm not disputing that with you.  But I did go to her.

10   Q.  When you were in your deposition, Mr. Andreu --

11   A.  Yes, ma'am.

12   Q.  -- weren't you the one who brought up Easter Sunday as an

13   example of when Ms. Lombardo fixed it?

14   A.  Yes.

15   Q.  Okay.  So that wasn't me and my records.

16   A.  Absolutely not.  That's me --

17   Q.  That was you --

18   A.  -- saying it to you.

19          **THE COURT REPORTER:**  Excuse me.

20          **THE WITNESS:**  Oh, again.  I'm sorry.

21   BY MR. TINGLEY:

22   Q.  That was you volunteering --

23   A.  Right.

24   Q.  -- and explaining --

25   A.  Yes.

ANDREU - CROSS/TINGLEY

1    Q.   -- the most recent example of when Ms. Lombardo fixed it

2    for you.

3    A.   Yes, ma'am.

4    Q.   And you said under oath --

5    A.   Yes.

6    Q.   -- Easter Sunday, I went to her, she got it fixed.

7    A.   If I remember, what that was all about was, if I remembered

8    a time when I was promised a bonus and didn't receive it.  I

9    said the most recent that I remember was Easter Sunday.  Could

10   I go to Regina?  I may have asked her, Would you fix it?  Shawn

11   owes me some overtime, and I didn't get it.

12           So, did she fix it?  No.  Did I get the 200 bucks that

13   Shawn promised me?  I didn't get that either.  If you could fix

14   it, I'd appreciate it.

15   Q.   On Easter Sunday, you worked just over two hours, and you

16   got -- what did we say -- over a hundred dollars?

17   A.   That's -- that's the crux of my argument here.  I make 207.

18   Anytime -- that's the deal.  And I don't get how you get to

19   renege on it.  The deal is, if I'm able to work very good, very

20   hard, very fast, as I did, and as quite evident by the raises

21   that I got, by the promotions that I got -- and I'm sure that

22   they'll have to testify to the same.  If anybody needed

23   something done, they knew they could turn to me.  I was very

24   good at what I did, ma'am.

25           You chose, somewhere along the game, probably in '16,

ANDREU - CROSS/TINGLEY

1   to say 4.1 or however it works out -- I didn't even know about

2   this stuff -- that all of a sudden, you get to steal half of

3   that money back.  So, to stand there and say to me, We gave you

4   a hundred bucks.  Well, I'm promised 207.  So, why do you get

5   to change the rules in the middle of the game?  I don't

6   understand that, ma'am.  That's all that I'm here to

7   understand.  If you can rationalize, justify that, I'll walk

8   away.

9   Q.  Those two occasions.  Those two occasions.

10  A.  On Easter Sunday, that's right, you owe me 207.  You didn't

11  give it to me.  You gave me a hundred bucks.  Why did you do

12  that?

13  Q.  On two occasions.

14  A.  Easter Sunday, why did you do that?

15  Q.  Sir, I'll be asking the questions.

16  A.  I'm sure, because you can't answer it.  That's the problem.

17  Q.  Sir, if you could not stay at the transfer station because

18  Coral Springs said you had an altercation the day before, and

19  you weren't allowed to check IDs, and you were sent home, is it

20  your --

21  A.  No, ma'am.  I worked -- Saturday I worked 14 hours at the

22  transfer station.

23  Q.  Is it --

24  A.  I was there 14 hours.  I worked the whole day.  Look,

25  Saturday.  Put it up, please.

ANDREU - CROSS/TINGLEY

1   Q.  Correct.

2        And if you had --

3   A.  Okay.  So, if I'm correct, on Sunday, I have Easter Sunday

4   off, and they call me while I'm at brunch with my family, and

5   they request, Hey, we need you to take care of this apartment

6   complex in Fort Lauderdale, clock in, clock out, plus I'll give

7   you 200 bucks.  You don't give me the 200 bucks.  I don't get

8   my 207.

9        **THE COURT:**  All right.  We've been all over this.

10  Let's move on.

11       **MS. TINGLEY:**  If I could have a moment, your Honor.

12  BY MS. TINGLEY:

13  Q.  Sir, getting back to Defense 14.

14  A.  Yes.

15  Q.  When you resigned --

16  A.  Yes, ma'am.

17  Q.  -- did you make any reference to the fact that you hadn't

18  been paid overtime correctly through your tenure at Waste Pro?

19  A.  No, I did not.

20  Q.  You never said to Ms. Lombardo, you never said to Russell,

21  Hey, I gotta get out of here, because you guys have been

22  stiffing me of overtime for years?

23  A.  No, I didn't say that.

24  Q.  In fact, you thanked Russell for all he had done for you.

25  A.  Absolutely.  And I would thank him again today.

ANDREU - CROSS/TINGLEY

1  Q.  You thanked him by suing him, didn't you?

2  A.  No.  Again, like I said, I don't want anything from him.  I

3  guess he's just here to support you guys with whatever

4  testimony he has to give.  It's the company and it's the

5  policies of the company, ma'am.  That's all.

6       I do not hate this man.  I still talk to him now.  I

7  shake his hand when I see him.  I respect him tremendously.  I

8  do not hold any grievances against Russell Mackie, Regina

9  Lombardo -- that's an amazing lady -- or anyone else, ma'am.

10 It's not about that.  It's just the time, and when I looked at

11 it, and I calculate it, it just doesn't work.  And I feel that

12 you're wrong in that sense.  Not you personally, but,

13 obviously, the company is wrong in the way that I was

14 compensated.

15      You're mad at me because I made money?  I worked very

16 hard for that money.  I hope they look at those hours that I

17 put in, because I put in a lot of hours during that.  I didn't

18 make, like you say, 50 bucks an hour every day.  I busted my

19 ass for that.  I worked very hard, ma'am, very, very hard.  And

20 I was -- like I said, they -- anything they needed, I got it

21 done for them.  I got it done for them.

22 Q.  When you brought this lawsuit, you only brought it for

23 overtime, correct?

24      **MR. EDWARDS:**  Objection.  Asked and answered.

25      **THE COURT:**  Sustain.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

219

ANDREU - CROSS/TINGLEY

1  BY MS. TINGLEY:

2  Q.  You didn't bring any claim for these two unpaid half of

3  your daily rates, did you?

4       **MR. EDWARDS:**  Objection.  Calls for a legal

5  conclusion.

6       **THE COURT:**  It's been asked and answered.

7  BY MS. TINGLEY:

8  Q.  And it is your testimony to the jury today that you have

9  not sued Russell Mackie.

10  A.  Ladies and gentlemen of the jury, do not make Russell

11  Mackie give me a dime.  I don't want anything from him.  It's

12  with the company and their policies.  That is my testimony.

13  That's what I beg you not to do.  My beef isn't with Russell,

14  I'm telling you that.  It's the policy and the way that you're

15  paying.  That's it.  It's the company.  It's not you, not

16  him -- this company.  That is all, ma'am.

17  Q.  And that's the same company that Ms. Lombardo worked for,

18  the lady who fixed your pay every time you went to her,

19  correct?

20  A.  Every time that I was going to Ms. Lombardo, she would put

21  forth a concerted effort to try to make corrections to my pay,

22  yes, ma'am.  I would say that she was 99 percent correct.  She

23  always helped.  Again, I had nothing but the utmost respect for

24  this woman.

25  Q.  Okay.  Thank you.

ANDREU - REDIRECT/EDWARDS

1        **MS. TINGLEY:**  Nothing further.

2        **THE COURT:**  Redirect?

3        **MR. EDWARDS:**  Yes, your Honor.  May I have a brief

4    moment to organize the exhibits?

5        **THE COURT:**  Okay.

6        **MR. EDWARDS:**  Thank you.

7        May I approach?

8        **THE COURT:**  All right.

9                    **REDIRECT EXAMINATION**

10   BY MR. EDWARDS:

11   Q.  Good afternoon, Roger.

12   A.  Good afternoon.

13   Q.  I have a couple points I would like to clarify with you

14   from your cross-examination with Ms. Tingley.

15       First, I want to show you the text message exhibit

16   that you were sent -- or you sent around the time of your last

17   day of work.  Can you tell us why you sent a text message

18   that's using those words to Mr. Mackie?

19   A.  Like I've said repeatedly, Russell, he treated me like a

20   human being.  He, uhm -- we had a different relationship.  It

21   wasn't that regular boss/employee thing.  He, uhm -- he -- he

22   would always be willing to talk with me.  He would always be

23   receptive to the things that I had to say.

24       Mr. Mackie, as I stated before, if I went to him, and

25   I said, Hey, Russ, man, you know, I'm really putting it in for

ANDREU - REDIRECT/EDWARDS

1  you here, and I'm only making 150 bucks, his reply, you know,

2  would be, It's corporate, it's not me, you know, there's really

3  nothing that I could do.  And I'll do what I can.  And he would

4  come through like he did the last time.  And he got my rate for

5  the day bumped up.

6       I said to you before, you know, fantasy football, the

7  Super Bowls, whatever it is, he was -- he's just a decent human

8  being, and he was a good guy.  And I'm not resigning because of

9  anything that he did to me personally.  I resigned because of

10  another issue.  And I felt it appropriate, of course, to thank

11  the people that I actually interacted with the most and say,

12  Hey, look, man, I'm going, I really appreciate the time with

13  you.  It doesn't warrant for me to say, Hey, go screw yourself,

14  I hate you, or whatever, because I do not.  It's not about that

15  at all.  It's not about Russell Mackie at all.

16       I am not an attorney, quite evident.  I did not write

17  this lawsuit.  I simply presented what I believe was happening

18  to me.  I requested assistance from attorneys.  I found a group

19  of attorneys that said, You know what, we think you were

20  wronged here.  And they do the legal stuff.  All I could do is

21  state the facts.

22  Q.  Roger, let me ask you a question about another area that

23  you discussed with Ms. Tingley.

24       Your half day rate, do you remember discussing that

25  issue with her?

ANDREU - REDIRECT/EDWARDS

1    A.  I do.

2    Q.  When you were originally employed by Waste Pro, back in

3    October of 2013, were you ever, ever advised of a half day rate

4    policy?

5    A.  Never.  Never advised that there's a half day rate policy.

6    We are told at the time of hire -- Carlos told me, It's eight

7    hours.  You know, we make these routes so they could be done

8    within eight hours.  If you work good, if you work hard, you

9    get done before then, and we give you this total amount.

10           Never at any point in time did they say to me, If you

11   get it done in three hours, we're gonna screw you and give you

12   just 50 bucks.

13   Q.  Let me ask you this then.  You had some conversation with

14   Ms. Tingley about 11:30.  Do you recall that testimony?

15   A.  Yes, I do.

16   Q.  What is that testimony, 11:30?  What's that based on?

17   A.  Around the latter part of '16, it was George --

18           **MS. TINGLEY:**  Your Honor, I'm gonna object to the

19   extent he's going into hearsay.

20           **THE COURT:**  Overruled.

21           I'll allow it for the fact it was said, not the truth

22   of the matter asserted.

23   BY MR. EDWARDS:

24   Q.  Let me ask you something more direct.

25           Who told you about the 11:30 policy?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

ANDREU - REDIRECT/EDWARDS

1   A.   Ms. Regina Lombardo said 11:30 was the earliest we can

2   clock out.

3   Q.   Okay.  Prior to that conversation -- can you tell me when

4   that conversation with her might have occurred?

5   A.   Like the latter part of '16, around there.

6   Q.   Had anybody told you about 11:30 prior to 2016?

7   A.   It was never in question.  I never had that issue, really,

8   that I looked or noticed it.

9   Q.   Okay.  I want to show you just a couple of the time records

10  that you discussed with Ms. Tingley as well.

11       Particularly, I'm gonna show you your time record for

12  January 22nd of 2016.  And I'm gonna ask you specifically about

13  the 17.45 hours that you worked.

14       You were asked some questions by Ms. Tingley about

15  vehicle breakdowns.  Do you remember those questions?

16  A.   Yes, sir, I do.

17  Q.   Uhm, is any of the time that you spent in any of these

18  records, not just that one, that would show the hours spent

19  doing the extra tasks?  Is that recorded anywhere in those?

20  A.   No, it's not.

21  Q.   Okay.  If that was recorded in there, would you be able to

22  tell whether that 17.5 -- or 17.45 -- I'm sorry -- was related

23  to a vehicle breakdown or bonus work?

24  A.   Yeah.  But their records don't differentiate anything.

25  They just bunch all of the hours into one.

ANDREU - REDIRECT/EDWARDS

1   Q.  Did you -- even assuming that that was due to a vehicle

2   delay, did you ever understand that the time and the hours

3   spent for delays that were outside of your control would be

4   weighed against you?

5   A.  No, I did not.

6         **MS. TINGLEY:**  Your Honor, object.  I'm gonna object to

7   the form of the question.

8         **THE COURT:**  Overruled.

9   BY MR. EDWARDS:

10  Q.  Roger, if we look through all of your records, like the

11  jury will have an opportunity to do, were there times that you

12  were paid in a two-week pay cycle all of your bonuses as far as

13  you can tell?

14  A.  Yes.

15  Q.  Are there pay cycles in those records that will show that

16  maybe all the hours were under ten, maybe they were eight,

17  maybe you weren't asked to do extra work?

18  A.  I believe so, yes.

19  Q.  So, how is it that you arrive at the numbers that you've

20  given us that you weren't paid certain amounts of these bonus

21  days?

22  A.  Looking, again, back on the records that are -- they're

23  their records, but I'm doing the best I can with what they gave

24  us.

25  Q.  Okay.  Do you know how, if at all, your bonus time, or the

ANDREU - REDIRECT/EDWARDS

1  lack thereof, is factored into your pay determination or your

2  overtime determination?

3  A.  I do now.  I didn't know....

4  Q.  Okay.  I want to talk to you about the safety meetings you

5  spoke about.  Do you remember that testimony?

6  A.  Yes.

7  Q.  Uhm, were you told that those safety meetings were

8  mandatory?

9  A.  Yes.

10  Q.  Was the safety meeting ever assigned on a route sheet?

11  A.  No.

12  Q.  Was the pretrip inspection ever assigned on a route sheet?

13  A.  No.

14  Q.  Was the post-trip inspection ever assigned on a route

15  sheet?

16  A.  No.

17  Q.  Did you ever understand that you were to be compensated

18  through the so-called daily rate for the time spent doing these

19  additional tasks?

20  A.  I -- I didn't understand how that worked, and I later

21  understood that it all worked against me.

22  Q.  Okay.  All of that time was on the clock, right?

23  A.  Yes.

24  Q.  You were asked earlier by Ms. Tingley about some of the

25  time records that you have, and if you can look through those

ANDREU - REDIRECT/EDWARDS

1  and find instances where you worked over 15 hours.  Do you

2  remember that testimony?

3  A.  Yes, I do.

4  Q.  Did anyone ever tell you that that was something you could

5  expect, to work more than 15 hours in a single day?

6  A.  No.

7  Q.  Have you gone through any of your pay records to see on

8  particular instances how often you worked over ten hours, for

9  example?

10  A.  Yes, I did.

11  Q.  Okay.  I would like to show you some of these records.  I

12  won't go through them all again.  And I don't want to be

13  accused of picking and choosing, so I'll just show you in

14  order, starting with your first pay record that's been entered

15  into evidence.

16        It looks to me like every day was over ten hours,

17  wasn't it?

18  A.  Yes.

19  Q.  This is your second pay sheet.  How many days are over ten

20  hours there?

21  A.  All of them.

22  Q.  Okay.  This is your third pay sheet.  How many hours -- how

23  many days are over ten hours there?

24  A.  All of them.

25  Q.  Okay.  Do you know how often that happened, that you worked

ANDREU - REDIRECT/EDWARDS

1   over ten hours?

2   A.  A lot.

3   Q.  I want to discuss specifically another time period with

4   you -- the Easter issue.

5       How do you know that you were called away from your

6   family on Easter Sunday to go work?

7   A.  Because I got the phone call?

8   Q.  Okay.  You recall that instance?

9   A.  Yes.  Shawn Glenn called me.

10  Q.  How are you able to recall that?

11  A.  Because I remember I was having brunch with my family,

12  Shawn Glenn called me, and he asked me to go take care of a

13  matter that he stated that Russell said there's an issue with

14  an apartment complex in Fort Lauderdale, the compactor, can I

15  see if I could go take care of it.

16  Q.  Were you asked to leave the transfer station the day prior

17  to that, Saturday?

18  A.  No, I was not asked to leave.

19  Q.  How do you know that?

20  A.  Because I worked.  I think that's the day I worked 14 hours

21  or whatever on a Saturday, so I know that I was out there.

22  Q.  Is that what your time records reflect, that the Saturday

23  before Easter Sunday --

24  A.  Yes.

25  Q.  -- you worked 14 hours?

ANDREU - REDIRECT/EDWARDS

1   A.   Yes.

2   Q.   How many days on that list do you work over ten hours?

3   A.   Five *(sic)*.

4   Q.   Okay.  You also testified previously about some of the

5   issues that Ms. Lombardo would help you with.  Do you recall

6   that testimony?

7   A.   Absolutely.

8   Q.   Okay.  And when you testified that she fixed the Easter

9   Sunday time, were you correct?

10  A.   I wasn't correct.

11  Q.   Okay.  Why?

12  A.   Because it didn't get fixed.

13  Q.   Okay.  Did you know that?

14  A.   I know now, yeah.

15  Q.   You were asked some questions about wanting to work more.

16  Do you recall that testimony?

17  A.   Yes.

18  Q.   When you started, did you ever work seven days a week?

19  A.   When I started, the beginning was six days a week, mostly.

20  Q.   Why did you pick up a seventh day a week?

21  A.   Because I thought I was actually gonna be making more

22  money.  I didn't know how it's actually calculated.

23  Q.   Okay.  More work would mean more hours, more hours might

24  mean more money?

25  A.   It's supposed to.

229

ANDREU - REDIRECT/EDWARDS

1   Q.   Okay.  Was that the case?  Is that how it worked out?

2   A.   It doesn't work out that way when you look at it and you do

3   the math.  More hours, my rate, hourly rate, literally

4   decreases.  And this is the part that I -- I hope you could

5   understand it and figure it out.  I -- it's....

6        **MR. EDWARDS:**  A moment to confer, your Honor?

7        **THE COURT:**  Okay.

8        *(Discussion had off the record between counsel)*

9   BY MR. EDWARDS:

10  Q.   Did you ever expect the daily rate, as it's been called in

11  this trial, to cover everything that you did in a day?

12  A.   No, absolutely not.

13  Q.   Is that consistent with your understanding of the

14  additional pay bonuses?

15  A.   In what sense?

16  Q.   If you were paid all the hours -- paid one rate for all the

17  hours in a day, do you know why you were paid additional money

18  for additional work?

19  A.   Because I was doing additional work, and they have to pay

20  me for the eight hours.  And then anything outside of it, they

21  would pay me.

22       **MR. EDWARDS:**  No further questions for this witness,

23  your Honor.

24       **THE COURT:**  Thank you, sir.  You may step down.

25       **THE WITNESS:**  Thank you.

LOMBARDO - DIRECT/EDWARDS

1          *(Witness excused)*

2          **THE COURT:**  Plaintiff may call its next witness.

3          **MR. EDWARDS:**  Your Honor, the plaintiff would call

4   Waste Pro's human resources representative, Regina Lombardo.

5          **THE COURT REPORTER:**  Please raise your right hand.

6          *(REGINA LOMBARDO, PLAINTIFF'S WITNESS, WAS SWORN)*

7          **THE COURT REPORTER:**  Please sit down.

8          Please stay close to the microphone, state your full

9   name for the record, spelling your last name.

10         **THE WITNESS:**  Regina Lombardo, L-O-M-B-A-R-D-O.

11                         **DIRECT EXAMINATION**

12   BY MR. EDWARDS:

13   Q.  Good afternoon, Ms. Lombardo.

14   A.  Good afternoon.

15   Q.  You are still employed by Waste Pro, are you not?

16   A.  Yes, I am.

17   Q.  Can you tell us what your job title is, please?

18   A.  Human resource generalist.

19   Q.  Can you explain to us what that means?

20   A.  I process payroll.  I recruit.  I do the on boarding.  I

21   also handle employee relations with employees along with their

22   supervisors.

23   Q.  Okay.  Can you explain what "on boarding" means, please?

24   A.  "On boarding" is -- I do the technical on boarding through

25   the computer once the employee is imported -- hired.

LOMBARDO - DIRECT/EDWARDS

1   Q.   Okay.  I'm sorry, I still don't know what you mean by "on

2   boarding."

3   A.   "On boarding" -- so, once they file their paperwork, I

4   process everything into the computer.

5   Q.   Okay.  Thank you.

6   A.   Into their system.

7   Q.   And do you work in any particular division?

8   A.   I work in Pembroke Pines and Pompano Beach.

9   Q.   Those are the same divisions that Mr. Andreu worked in,

10  correct?

11  A.   Yes.

12  Q.   You were not always a human resources generalist, though --

13  A.   No.

14  Q.   -- am I right?

15       What did you do before that?

16  A.   I was customer service, accounts receivable, and then I

17  went into human resources.

18  Q.   What is your training in human resources?

19  A.   My training is through Waste Pro and previous jobs.

20  Q.   Okay.  You've worked in human resources prior to joining

21  Waste Pro?

22  A.   I did management.

23  Q.   Okay.  Was there a human resources element to that?

24  A.   Yes.

25  Q.   Okay.  I believe you mentioned on boarding and hiring to

LOMBARDO - DIRECT/EDWARDS

1   some degree.  That's something that you handle as well, am I

2   right?

3   A.   Correct.

4   Q.   Uhm, do you know what the hiring process is like at

5   Waste Pro?

6   A.   Yes, I do.

7   Q.   Do you know if Waste Pro does a background check for their

8   employees?

9   A.   Yes, we do.

10  Q.   Is that background check to look for things like criminal

11  background?

12  A.   Yes, it is.

13  Q.   Is a criminal background a deal breaker, so to speak, in

14  your industry?

15  A.   No, it's not.

16  Q.   Okay.  Do you have folks that work for Waste Pro that may

17  have criminal records?

18  A.   Yes, we do.

19  Q.   Do you know if that explains why Roger was able to be hired

20  with one?

21  A.   I don't know Roger's circumstances when he was hired.

22  Q.   You weren't doing that aspect of the work when Roger was

23  hired?

24  A.   Not in October of 2013.

25  Q.   Okay.  When did you start as a human resources generalist?

LOMBARDO - DIRECT/EDWARDS

1   A.  Mid-November 2013.

2   Q.  Okay.  Does Waste Pro keep records on their employees?

3   A.  Yes, we do.

4   Q.  What kind of records?

5   A.  We keep their personnel records.  We keep all their

6   policies that they sign, their request off, any disciplinary

7   records, payroll.

8   Q.  What do you mean by "personal (*sic*) records"?

9   A.  Personnel records, like their emergency contacts, W-4s,

10  direct deposit.

11  Q.  Okay.  You mentioned disciplinary records.  Have you had an

12  opportunity to look at Mr. Andreu's file?

13  A.  I've looked at it.

14  Q.  Did you see any disciplinary records in there?

15  A.  Not that I recall.

16  Q.  Okay.  Any bonus loss forms in his file?

17  A.  Not that I recall.  I would have to look again.

18  Q.  Okay.  Did you look before you came today?

19  A.  No.

20  Q.  Okay.  Talk to me about some of those policies, if you

21  will, please.  What type of policies are contained in an

22  employee's file at Waste Pro?

23  A.  We have attendance policies.  We have all different sort of

24  safety policies.  Daily policies of what they're suppose to do

25  on a daily basis.

LOMBARDO - DIRECT/EDWARDS

1  Q.  Do they sign any of those policies?

2  A.  They sign all their policies.

3  Q.  Okay.  Why do they sign those policies, if you know?

4  A.  For acknowledgment.

5  Q.  So that Waste Pro doesn't ever have an issue if they say

6  they didn't know, is that right?

7  A.  Correct.

8  Q.  Okay.  So, we've looked at some of the policies that

9  Waste Pro has.  And I'll just go back through a few of these

10  with you.  I promise not to spend much time.

11        But a policy like your fuel card policy, is that a

12  policy that Roger was required to sign?

13  A.  Yes.

14  Q.  Okay.  How about the clock in, clock out, is that a policy

15  that Roger was required to sign?

16  A.  Yes.

17  Q.  Okay.  And on at least two instances, one in November 28th

18  of 2013, a 1098 policy, or a policy describing that, and a

19  second in 2015, are those the kind of policies that are

20  contained in the personnel files at Waste Pro?

21  A.  Yes.

22  Q.  Okay.  And, again, Ms. Lombardo, those are contained in the

23  policies -- or in the files of the employees at Waste Pro so

24  that there's never a question whether they knew about it,

25  right?

LOMBARDO - DIRECT/EDWARDS

1    A.  Correct.

2    Q.  So, if an employee were to violate one of your policies,

3    they couldn't claim that they didn't know about it, is that

4    fair?

5    A.  Fair.

6    Q.  And there is no policy that's contained in the records for

7    Waste Pro of Mr. Andreu acknowledging how it was he's being

8    paid, is there?

9    A.  He signed his offer letter.

10   Q.  Does his offer letter describe his rate of pay?

11   A.  It describes his day rate.

12   Q.  Does it describe how his pay is calculated or his overtime

13   rate?

14   A.  No.  It just describes what his day rate offer is.

15   Q.  It just says the number.  Do I have that right?

16   A.  Correct.

17   Q.  Okay.  That's open to misunderstanding at the least, isn't

18   it?

19   A.  I don't know.  I can't answer that.

20   Q.  Okay.  They don't do employee agreements, contracts,

21   anything like that?

22   A.  No, we don't.

23   Q.  They don't do any policy that shows that -- other than the

24   offer letter, of course -- that an employee understands or at

25   least had the policy explained to them?

236

LOMBARDO - DIRECT/EDWARDS

1    A.  They're provided their offer letter.  It's explained in

2    their interview.

3    Q.  Is there anything, other than the offer letter that we've

4    discussed, in Mr. Andreu's file that discusses his rate of

5    payment or his understanding of his rate of payment?

6    A.  No.  He signed his offer letter.

7    Q.  Okay.  So, just the offer letter.

8    A.  Correct.

9    Q.  Do you have the offer letter?

10   A.  I don't have the offer letter in front of me.  No, I do

11   not.

12   Q.  Okay.  Now, all the employees that work for Waste Pro,

13   they're not necessarily all paid this so-called day rate, are

14   they?

15   A.  No.  There's different ways of paying.

16   Q.  Okay.  You're not paid a day rate, are you?

17   A.  No, I'm not.

18   Q.  Do you know what kind of employees are paid a day rate?

19   A.  Our drivers and our helpers.

20   Q.  Okay.  So, just the guys on the trucks, driving the trucks,

21   those guys, right, and women?

22   A.  The employees.

23   Q.  Okay.  Well, you have other employees --

24   A.  Males and females that drive or are helpers are paid day

25   rates.

LOMBARDO - DIRECT/EDWARDS

1   Q.   Okay.  Any of the office staff paid a day rate?

2   A.   No.

3   Q.   Any of the executive folks paid a day rate?

4   A.   No, sir.

5   Q.   Is there any reason for that?

6   A.   They're either paid hourly or they're paid salary,

7   depending on their positions.

8   Q.   Okay.  Have you ever been asked to explain the day rate

9   payment scheme to any of the employees?

10  A.   I'm sorry, the scheme?

11  Q.   The alternative payment scheme, the method, whatever you'd

12  like to call it.  Have you ever been asked to explain that to

13  employees?

14  A.   I've gone over the method with employees, yes, sir.

15  Q.   Okay.  Were you given any training in how to explain that

16  to employees?

17  A.   I have gone over the calculation, yes.

18  Q.   Okay.  How do you explain the day rate?

19  A.   How do I explain it?

20  Q.   Yes, ma'am.

21  A.   You take their day rate times how many days they work, plus

22  their bonus, which gives them their weekly earnings.  You take

23  their weekly earnings, and you divide it by how many hours they

24  work, which will then give them a rate.  They take that rate,

25  and they -- they take that rate, and then they divide it by

LOMBARDO - DIRECT/EDWARDS

1  two, which gives us the overtime rate.  The overtime rate times

2  how many overtime hours they work gives them their overtime

3  earnings.  After that, then you take your overtime earnings,

4  and you add it with your weekly salary, weekly earnings, which

5  will give you, then, your gross earnings for one week.

6  Q.  Okay.  Let me ask you.  You mentioned something -- I know

7  that that was a lot -- and I thank you for that explanation --

8  but you mentioned divided by total hours worked.

9  A.  Right.

10  Q.  What does that mean?

11  A.  It's part of the formula to figure out how to pay the

12  overtime.

13  Q.  If -- I don't mean to get too mathematical with you, but if

14  there's a bigger number that's being used to divide into the

15  total amount they've been paid, that's reducing their rate,

16  isn't it?

17  A.  Not necessarily.  I would have -- you would have to show me

18  the numbers.

19  Q.  Sure.

20      Hypothetically, if a person were to be paid a hundred

21  dollars an hour -- or a hundred dollars for a day, and they

22  worked five hours, they'd be paid about 20 bucks an hour,

23  right?

24  A.  No.  They're paid a hundred dollars for that day.

25  Q.  Okay.  But when we go to figure their regular rate, using

LOMBARDO - DIRECT/EDWARDS

1  at least part of the method you described, it would be

2  five *(sic)* dollars an hour.

3  A.  But that's not part of their rate.  That's going -- we're

4  trying to figure out their overtime.

5  Q.  Okay.  So, I won't go back and forth with you in your area

6  of expertise, but the more hours an employee works, the lower

7  their regular rate is, is that correct?

8  A.  Not their regular rate, no.  Their regular rate is staying

9  the same.  We're paying them a day rate.  Their overtime is in

10  addition to that day rate.

11  Q.  So, if an employee works more hours, they're not penalized,

12  is that what you're telling us?

13  A.  I don't understand your question.

14  Q.  Okay.  Have you ever been asked that question by any of

15  your employees that you've worked with?

16  A.  No, sir.

17  Q.  Have you ever had to explain overtime calculation to the

18  employees that you work with?

19  A.  I would go over the formula with their -- with their

20  information with them so they understood how they got paid.

21  Q.  Okay.  Do you utilize that formula when you calculate pay

22  for these employees?

23  A.  No.  It's done automatically in the system.

24  Q.  Okay.  So, you plug the numbers into a system, and it

25  generates, right?

LOMBARDO - DIRECT/EDWARDS

1    A.   The employee clocks in and out, and that's already in the

2    system from the employee.

3    Q.   Okay.  After you input the numbers, do you have any other

4    determinations of what happens?

5    A.   No.  It goes through the system.

6    Q.   Uhm, I want to ask you, speaking about policies again, does

7    Waste Pro have any policies that require its supervisors to

8    report when bonus work is offered to employees?

9    A.   They'll submit it to me weekly on a spreadsheet.

10   Q.   Okay.  Is there any policy in place that requires them to

11   do that, though?

12   A.   No.

13   Q.   Okay.

14   A.   Not that I'm aware of.

15   Q.   But there's a policy in place that requires employees to

16   report all of their hours, isn't there?

17   A.   Correct.  Employees clock in and out, and when there's help

18   pay owed, the supervisors submit it to myself, and then I will

19   input it for them.

20   Q.   Wouldn't it be fair to have supervisors have at least the

21   same level of accountability as the drivers and workers that

22   have to record their time?

23   A.   They do.  They report it to me.

24   Q.   Okay.  Do they -- the supervisors don't have to sign

25   anything, though, that says that they could be punished if they

LOMBARDO - DIRECT/EDWARDS

1   don't report that time, right?

2   A.  The supervisors are hold *(sic)* accountable if they don't.

3   Q.  How so?

4   A.  Because then we'll have a discussion with that.

5   Q.  Okay.  How do you know?  How do you know they didn't report

6   the time?

7   A.  If it's -- if an employee comes to me and states that they

8   didn't receive their help pay, we'll investigate it.  I'll get

9   with the supervisor, and then we will make sure that they get

10  compensated.

11  Q.  Okay.  Have you done that in any instances?  Have you gone

12  to a supervisor and said, Employee A has indicated that you

13  promised a bonus that wasn't paid?

14  A.  Of course I would do that for that employee.

15  Q.  Have you done it?

16  A.  Yes.

17  Q.  So it happens.

18  A.  Occasionally.  Rarely.  It's not an everyday occurrence,

19  no.

20  Q.  Okay.  It's not an everyday occurrence that it's happening

21  or that it's reported?

22  A.  Both.  Because it doesn't happen every day.

23  Q.  How do you know that, if it's not reported?

24  A.  Well, then that's on the employee.  The employee needs to

25  come to me.  I have an open-door policy.

LOMBARDO - DIRECT/EDWARDS

1    Q.   Okay.  We heard about that today.

2         I have a couple questions for you about some of the

3    terms that are used on the employee pay sheets.  I'll make you

4    the same promise.  I won't go through all of these, okay?

5    A.   Sure.

6    Q.   This is the first pay record of Mr. Andreu for his second

7    year back.  It's the pay record indicating May 29 of 2015.

8         The term "bonus" there, what does that mean?

9    A.   It could be safety bonus or it could be a help pay bonus.

10   Q.   How would an employee looking at that -- or if you were

11   employee looking at that, how would you know if that's a safety

12   bonus or if that is an extra work bonus?

13   A.   They would know that they received their -- a bonus.

14   Q.   Okay.

15   A.   And they can also review it on their time card.

16   Q.   There's some more details on the next page, isn't there?

17   A.   Correct.

18   Q.   Does that -- can you see that okay?

19   A.   Yes, I'm fine.  Thank you.

20   Q.   Does that give you any more detail about what those bonuses

21   might be for?

22   A.   They were put in on Saturday, so that would be their safety

23   bonus.

24   Q.   Okay.  So, Saturday is the day for safety bonus?

25   A.   Yes.

LOMBARDO - DIRECT/EDWARDS

1  Q.  Okay.  It's not possible that that's extra work bonus on

2  Saturday?  Because I can see Mr. Andreu worked about

3  12.67 hours on that day.  How do you know that that's not an

4  extra work bonus?

5  A.  Because if it was an extra work bonus, there would be

6  another bonus line.

7  Q.  Okay.  So, there's a extra bonus line for that?

8  A.  Yes.

9  Q.  Okay.  Great.

10        I'm gonna show you the second record in Mr. Andreu's

11  from 2015.  This is one dated June 12th of 2015.

12        Can you see that okay?

13  A.  Yes.

14  Q.  Let me back that out a little for you.

15        It looks like there's more than a hundred dollars

16  bonus paid there, am I reading that correctly?

17  A.  Yes.

18  Q.  What's that for?

19  A.  He received help pay.

20  Q.  How do you know?

21  A.  Because it's more than a hundred dollars.

22  Q.  Okay.  So, more than a hundred dollars is help pay?

23  A.  I would assume, without looking at the time card.

24  Q.  Okay.  Does this help at all?

25  A.  Yes.

LOMBARDO - DIRECT/EDWARDS

1   Q.  How so?

2   A.  Because on 6-2 and on 6-3, he received extra bonus.

3   Q.  Okay.  I'm seeing that with you.

4        Let's look at 6-2.  Are you with me?

5   A.  Yes.

6   Q.  How many hours did Mr. Andreu work to receive that hundred

7   dollars?

8   A.  Uh, he worked 13.88.

9   Q.  Okay.  Did he work 13.88 to receive the hundred dollars or

10  to receive his day rate?

11  A.  He worked the 13.88 and received his day rate.  I don't

12  know why he received his bonus that day.

13  Q.  Okay.  Do you know if he did any extra work?

14  A.  I would not know that.  I'm not part of the assignments.

15  Q.  Okay.  The record doesn't tell us that, does it?

16  A.  No.

17  Q.  There's no notation for how many hours he spent doing his

18  daily assigned route or task versus how many hours he spent

19  doing bonus work on that day, right?

20  A.  No.

21  Q.  Is there any record that indicates how many hours

22  Mr. Andreu was spending doing that extra work?

23  A.  I wouldn't know.  I'm not part of that department.

24  Q.  Do you know if that is something that is kept?  If that's a

25  record that Waste Pro keeps?  Additional hours spent doing the

LOMBARDO - DIRECT/EDWARDS

1  additional task work?

2  A.  It would be on his route sheet.

3  Q.  Be on his route sheet?

4  A.  I would assume it's on his route sheet.

5  Q.  Is there a clock in and clock out when a normal route ends

6  and the bonus work begins?

7  A.  No.

8  Q.  So, it's just one clock in and clock out.  There's no

9  differentiation, is there?

10  A.  No.

11  Q.  And there's no differentiation in the records, is there?

12  A.  No.

13  Q.  And Mr. Andreu has testified in this trial that he believes

14  that some of his additional task work bonuses were unpaid to

15  him.  Have you been with us and heard that testimony?

16  A.  I heard him say that, yes.

17  Q.  And I think we can all assume that Waste Pro is disputing

18  that.

19        Wouldn't be easy if these records indicated hours

20  spent doing additional task work to say, Well, yes, he did it

21  here, and no, he didn't do it here?  We would know, wouldn't

22  we?

23  A.  This is his punch in and punch out time.  This does not

24  have to do with his assignments given that morning, his route

25  sheet.

246

LOMBARDO - DIRECT/EDWARDS

1    Q.   Okay.  But the punch in and punch out time doesn't show how

2    much time is spent working on his normal daily assigned task

3    versus any additional work, does it?

4    A.   I wouldn't know.  I'm just processing the payroll.  I do

5    not have anything to do with his assignments.

6    Q.   Okay.  Great.

7          Where it says at the bottom of this page, "full day,"

8    "overtime," "regular" -- are you with me?

9    A.   Yes.

10   Q.   It says "money in hours," and there's no money -- or

11   there's no hours next to the $250 for bonus.  Do you know why

12   that it is?

13   A.   I'm sorry, can you repeat that?

14   Q.   Absolutely.

15         It appears that there is a line for money and for

16   hours.  How come there's no hours listed next to the bonus

17   money?

18   A.   Because the hours isn't part of the bonus.  That's just

19   telling him how many -- how much dollar amount was offered to

20   him for bonus.

21   Q.   Strictly speaking, though, it's not a bonus, is it?  You

22   don't just get it.  You have to do work to get it, right?

23   A.   Correct.  He was given a bonus for whatever assignment he

24   was given extra.

25   Q.   Do you know why on the payroll records Waste Pro uses the

LOMBARDO - DIRECT/EDWARDS

1  term "bonus"?

2  A.  That was prior to me, so I don't know why they use that --

3  Q.  Okay.

4  A.  -- that verbiage.

5  Q.  Because, again, strictly speaking, it's not a bonus.  It's

6  more pay for more work, right?

7  A.  It's a bonus.

8  Q.  Okay.  How so?

9  A.  He gets a weekly safety bonus, and then he got any bonuses

10  on top of that --

11  Q.  Okay.

12  A.  -- for any --

13  Q.  Any what?

14  A.  -- additional work or assignments that he negotiated.

15  Q.  Can you at least agree with me, if we don't agree on the

16  term "bonus," that he had to do something else, he had to work

17  more to get those bonuses, other than the safety bonus?

18  A.  I'm not gonna agree.

19  Q.  Okay.  Do you think they just gave it to him?

20  A.  I don't know.  I'm not part of him getting his assignments.

21  I'm not part of that department.  I don't know what assignments

22  are assigned to him every morning or what is asked of him.

23  Q.  Okay.  I want to talk to you about a couple more records.

24        Ms. Lombardo, have you ever seen an instance where an

25  employee was paid a half day rate?

LOMBARDO - DIRECT/EDWARDS

1   A.  Yes.

2   Q.  Why is that?

3   A.  It could be depending on the assignment that he was given

4   that day, that employee.

5   Q.  So, there are some assignments that can be paid at a half

6   day rate in your mind?

7   A.  In my mind, I would suppose so, yes, sir.

8   Q.  Okay.  What's the criteria for a half day rate?

9   A.  I'm unaware of what the criteria is.  It's in the system.

10  Q.  Okay.

11  A.  The system calculates it.

12  Q.  You don't know what the criteria is?

13  A.  No.

14  Q.  No idea at all.

15  A.  No.  It's dependent on the assignment he was given.

16  Q.  Okay.  A half day in Waste Pro's world is given when an

17  employee works less than 4.1 hours in a day, isn't it?

18          **MS. TINGLEY:**  Objection.  Leading.

19          **THE COURT:**  Overruled.

20  BY MR. EDWARDS:

21  Q.  You can answer.

22  A.  It depends on if the system calculates it under that.

23  Q.  That wasn't my question.  My question is:  Waste Pro has a

24  policy to pay employees less than their full day rate for hours

25  worked less than 4.1, right?

LOMBARDO - DIRECT/EDWARDS

1   A.   Yes.

2   Q.   Do you know if that policy was ever explained to

3   Mr. Andreu?

4   A.   I'm unaware if it was.

5   Q.   Did you ever explain that policy to Mr. Andreu?

6   A.   Not that I recall.

7   Q.   Is there any policy to pay an employee a half day rate if

8   they clock out before 11:30?

9   A.   No.

10  Q.   Okay.  Did you ever tell Mr. Andreu that?

11  A.   No, I did not.

12  Q.   You never told him that?

13  A.   No, I did not.

14  Q.   Okay.  The Easter pay date that we've been talking a little

15  bit about, did you ever speak to Mr. Andreu about his Easter

16  pay?

17  A.   I do not recall speaking to him about that.

18  Q.   You don't recall?

19  A.   No.

20  Q.   That was a day where he was paid a half rate, wasn't it?

21  A.   Yes.

22  Q.   Is that what Waste Pro would normally do in that situation?

23  Do you know why they did it there?

24  A.   I'm not -- I was not aware of the circumstances that day,

25  and the system calculated it that way.

LOMBARDO - DIRECT/EDWARDS

1  Q.  Okay.

2  A.  So, I'm unable to -- to go any further with that.

3  Q.  Understood.

4       Who -- what's the system?  Can you describe the system

5  to us?

6  A.  Our payroll system is ADP.

7  Q.  Okay.  ADP doesn't do independent actions on their own,

8  though, right?  They're advised, at least in part, by

9  Waste Pro.

10 A.  Yes, but I was not part of that process, when the system

11 was designed for Waste Pro.

12 Q.  Okay.  When an employee works a lot of hours -- and I don't

13 mean more than 40 in a week, more than 80 in a two-week period,

14 I mean a lot, like 150 in a pay cycle -- there's a possibility

15 that their overtime per hour can be below minimum wage, isn't

16 there?

17 A.  Their overtime rate --

18 Q.  Their overtime rate.

19 A.  -- would be -- it depends on the formula and how it works

20 out.

21 Q.  Okay.

22 A.  That's in addition to their day rate.

23 Q.  Okay.  Do you have any feelings about that, about employees

24 being paid less than minimum wage for their overtime hours?

25 A.  I have no personal feelings.

LOMBARDO - DIRECT/EDWARDS

1   Q.  Okay.  I'm gonna show you just a couple more of these.

2          If I was looking at a Waste Pro earnings statement,

3   and I wanted to determine how many dollars per hour of overtime

4   an employee was paid, how would I do that equation?

5   A.  With the equation that I gave you earlier.

6   Q.  I'm just asking about how many dollars per hour.  If I look

7   at this pay statement alone, and I was an employee of

8   Waste Pro, and I came to you, and I said, Ms. Lombardo, thank

9   you for the open-door policy, can you tell me how many dollars

10  per hour of overtime I was paid, how would you do it?

11  A.  I would do the same equation that I described earlier with

12  his pay stub and his time card.  So, I would pull the

13  information and go over it with him or her.

14  Q.  Sure.

15         You could also just take the total overtime paid and

16  divide it by the total amount of over -- hours, right?

17  A.  No, I wouldn't do that, because it's two separate weeks.

18  Q.  Okay.  At least on a single weekly basis, you could do

19  that, though, couldn't you?

20  A.  No, I would still do the calculation properly.

21  Q.  Okay.

22  A.  With the formula that we just went over.

23  Q.  Employees like Mr. Andreu that work 133.63 hours, are they

24  supposed to get paid overtime at less than minimum wage?

25  A.  They're getting the additional money after their day rate.

LOMBARDO - DIRECT/EDWARDS

1   Q.   Okay.  But my question was:  Are they supposed to be paid

2   overtime at less than minimum wage?

3   A.   They're paid overtime, and it's half time of their daily

4   rate.  It's not gonna be half time of their rate from the

5   calculation I gave you.  So, it's not gonna be -- it's not time

6   and a half.

7   Q.   Okay.  Do you know why it's not time and a half?

8   A.   Because it's a day rate.

9   Q.   Okay.

10  A.   So, it's not an hourly rate.  Time and a half is for hourly

11  rates, not for day rates.

12  Q.   Do you know what a "day rate" is?

13  A.   A day rate is for the day worth of work.

14  Q.   A whole day?  Not a job, a whole day?

15  A.   It's for their job for that day.

16  Q.   Is it for a job or is it for a day?

17  A.   It's for the day of their job.

18  Q.   I don't understand what you mean.

19  A.   You go to work for the day.  You're working for us for the

20  day, and you're given a day rate for your job for that day.

21  Q.   So, is the rate, the day rate, is it for 24 hours or is it

22  until the job is completed?

23  A.   It's for your assignments that you were given that day.

24  Q.   So, it's for an assignment.

25  A.   Assignments.

LOMBARDO - DIRECT/EDWARDS

1   Q.  Multiple assignments.

2   A.  It could be multiple assignments.  It could be one route,

3   it could be multiple.

4   Q.  Is there any end to the assignments?  Could Waste Pro

5   assign them seven assignments for 24 hours?

6   A.  We would not have someone work for 24 hours, sir.

7   Q.  Okay.  But, in theory, could you under the pay plan as you

8   understand it?

9   A.  No, sir.  We would not do that, sir.

10  Q.  But can you?

11  A.  No, sir.  And we would not do that.

12  Q.  Okay.

13          **MR. EDWARDS:**  A moment to confer, your Honor?

14          **THE COURT:**  Okay.

15          *(Discussion had off the record between counsel)*

16  BY MR. EDWARDS:

17  Q.  I wanted to clarify one point.

18          Was there anything in Mr. Andreu's file acknowledging

19  his rate of pay or the half day rate policy?

20  A.  I'd have to look through his file again, sir.

21  Q.  Okay.  Do you know when the half day rate policy came

22  about?

23  A.  No, sir.

24  Q.  Okay.

25          **MR. EDWARDS:**  No further questions for the witness,

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

LOMBARDO - CROSS/TINGLEY

1    your Honor.  Thank you.

2            **THE COURT:**  Cross-examination.

3                      **CROSS-EXAMINATION**

4    BY MS. TINGLEY:

5    Q.  Good afternoon, Ms. Lombardo.

6    A.  Good afternoon.

7    Q.  You were asked on direct examination about employees being

8    paid below the minimum wage for overtime.

9    A.  Yes.

10   Q.  Do you believe that drivers, helpers, workers at the

11   transfer station -- do you believe that their hours of

12   overtime, that they're actually paid below the minimum wage?

13   A.  No, I don't believe that they're paid below minimum wage.

14           **THE COURT REPORTER:**  I'm sorry.  You don't believe....

15   A.  They're paid below minimum wage.  I'm sorry.

16   Q.  Let's take this week just for an example.  In June of 2014,

17   so this is at the -- when Mr. Andreu was at $140 his daily

18   rate.  Do you see that?

19   A.  Yes.

20   Q.  Okay.  So, turning to the next page, where you have his

21   hours, on each of those days, Mr. Andreu was paid 140 hours --

22   dollars.

23   A.  Correct.

24   Q.  And then when you look at his overtime hours, is this

25   number just the premium that's added to the daily rate on the

LOMBARDO - CROSS/TINGLEY

1  days he was working more than 40 hours?

2  A.  Correct.

3  Q.  Okay.  So, even if the premium is below minimum wage, his

4  pay for those hours are not below minimum wage, are they?

5  A.  No.  They're above minimum wage.

6  Q.  And even at the $140 an hour, he still gets that every day,

7  when he -- in this pay period, he got it every day, whether it

8  was a regular day or whether it was an overtime day.

9  A.  Correct.  He got his day rate, 140.

10  Q.  And then in addition to that, for the hours each week that

11  were in excess of 40, he got additional money.

12  A.  Correct.

13  Q.  Okay.  As well as his bonuses.

14  A.  Yes.

15  Q.  And is that why you told Mr. Andreu's attorney that you

16  didn't believe that Mr. Andreu was getting below the minimum

17  wage?

18  A.  Correct.

19  Q.  When you are looking at hours for purposes of calculating

20  overtime, does it matter whether the hours are on someone's

21  assigned route or whether the hours are for help pay?

22  A.  No.  I'm just looking at what the employee clocks in and

23  out at.  I'm paying attention to their time card.  I don't know

24  what their route sheets state for what they did that day.

25  Q.  But for purposes of overtime, it doesn't matter.

1   A.   No, ma'am.

2          **MS. TINGLEY:**  I don't have anything further.  Thank

3   you.

4          **THE COURT:**  Redirect?

5          **MR. EDWARDS:**  Yes, your Honor.  One moment.

6                        **REDIRECT EXAMINATION**

7   BY MR. EDWARDS:

8   Q.   Ms. Lombardo, when we see bonus for that additional task

9   work, helper bonus, whatever the term is, are you at all able

10  to determine how many hours that pay covered?

11         **MS. TINGLEY:**  Objection.  Outside the scope.

12         **THE COURT:**  Sustain.

13  BY MR. EDWARDS:

14  Q.   Let me ask you, do you know what the additional bonus pay

15  is given for?

16         **MS. TINGLEY:**  Objection.  Outside the scope.

17         **THE COURT:**  Sustain.

18         **MR. EDWARDS:**  Your Honor, I don't have any further

19  questions for the witness.

20         **THE COURT:**  Thank you, ma'am.  You may step down.

21         **THE WITNESS:**  Thank you, sir.

22         *(Witness excused)*

23         **THE COURT:**  The plaintiff may call its next witness.

24         **MR. EDWARDS:**  Your Honor, the plaintiff calls Russell

25  Mackie.

1        **MS. TINGLEY:**  Your Honor, may we take a convenience

2    break?

3        **THE COURT:**  All right, members of the jury, we're

4    going to take a ten-minute recess.  Remember my admonition not

5    to discuss the case or allow it to be discussed in your

6    presence.  And we'll see you back in the jury room in about ten

7    minutes.

8        **COURTROOM SECURITY OFFICER:**  All rise.

9        *(The jury exited the courtroom)*

10       **THE COURT:**  And tomorrow we're going to start at 9:15.

11       And if there's nothing else to come before the Court,

12   we'll be in recess for ten minutes.

13       **MR. EDWARDS:**  Nothing, your Honor.  Thank you.

14       **MS. TINGLEY:**  Thank you.

15       *(The Judge exited the courtroom)*

16       *(Recess taken at 3:57 p.m. until 4:05 p.m.)*

17       *(The Judge entered the courtroom)*

18       **THE COURT:**  All right.  We're back on the record.

19       Anything to come before the Court before we bring the

20   jury in?

21       **MR. EDWARDS:**  No, your Honor.  If I could just have

22   about 120 more seconds, I'd really appreciate it, so I can get

23   this organized.

24       **THE COURT:**  Okay.

25       Mr. Mackie, do you want to go ahead and take the

MACKIE - DIRECT/EDWARDS

1    stand?

2              **THE WITNESS:**  Yes, sir.

3              *(Pause)*

4              **THE COURT:**  All right.  Let's bring in the jury.

5              **COURTROOM SECURITY OFFICER:**  All rise.

6              *(The jury entered the courtroom)*

7              **THE COURT:**  All right.  We have all the jury back.

8         Did everyone follow my admonition not to discuss the

9    case or allow it to be discussed in your presence?

10        All right.  We can swear in the witness.

11             **THE COURT REPORTER:**  Please raise your right hand.

12             *(RUSSELL MACKIE, PLAINTIFF'S WITNESS, WAS SWORN)*

13             **THE COURT REPORTER:**  Please sit down.

14        Please state your full name for the record, spelling

15   your last name.

16             **THE WITNESS:**  Russell Mackie, M-A-C-K-I-E.

17                    **DIRECT EXAMINATION**

18   BY MR. EDWARDS:

19   Q.  Good afternoon, Mr. Mackie.

20   A.  Good afternoon.

21   Q.  Can you tell us what your job title is at Waste Pro, sir?

22   A.  I'm the regional vice president Waste Pro, Southeast

23   Florida.

24   Q.  Okay.  Do I have it right that you are the youngest

25   regional vice president in company history?

MACKIE - DIRECT/EDWARDS

1   A.  Yes, sir.

2   Q.  You said southeast region of Florida.  Does that have --

3   what does that territory encompass?

4   A.  It's the seven counties that run along the coast of

5   southeast Florida from Indian River County, St. Lucie County,

6   Martin County, Palm Beach, Broward, Dade, and Okeechobee, the

7   only one off the coast.

8   Q.  Okay.  How does Waste Pro divide that territory up?

9   A.  Into hauling divisions or regions within the region.

10  Q.  Okay.  You used the term "division."  How many divisions

11  are there?

12  A.  There are four.

13  Q.  Do you know which divisions Mr. Andreu worked in?

14  A.  He worked at our Pembroke Pines division and our Pompano

15  division.

16  Q.  Are those divisions something that you would oversee?

17  A.  Yes, sir.

18  Q.  Okay.  What kind of operations do you oversee in the south

19  Florida region?

20  A.  We -- we collect solid waste and recycling, as well as

21  construction debris --

22  Q.  Okay.

23  A.  -- from businesses and residential units throughout the

24  regions.  I oversee those operations.

25  Q.  Okay.  Do you oversee all the operations in the south

260

MACKIE - DIRECT/EDWARDS

1   Florida region?

2   A.  All of the operating locations in southeast Florida is what

3   I oversee.

4   Q.  Okay.  Do you report to anybody in your region?

5   A.  No, sir.

6   Q.  Okay.  Are you kind of the top of the pyramid?

7   A.  Within the region, yes.

8   Q.  Okay.  How long have you been in your position?

9   A.  About ten years, 11 years.

10  Q.  So, all of the time that Mr. Andreu was working for

11  Waste Pro, you were in your current role.  Do I have that

12  right?

13  A.  Yes.

14  Q.  What did you do prior to that?

15  A.  I was a division manager.

16  Q.  Okay.  For Waste Pro?

17  A.  Yes, sir.

18  Q.  How long have you been in the waste industry?

19  A.  About 25 years.

20  Q.  Were you ever a driver?

21  A.  I have driven.

22  Q.  Okay.  For Waste Pro?

23  A.  Yes.

24  Q.  Were you ever in the job role of driver, though?  Maybe not

25  driven the vehicles, but were you ever in that role?

MACKIE - DIRECT/EDWARDS

1   A.   Technically, no, not with Waste Pro.

2   Q.   Okay.  With other companies, though?

3   A.   I -- I drove with the company Southeast Reclamation.

4   Q.   Okay.  You were you interviewed by Waste Pro when you were

5   hired?

6   A.   Yes.

7   Q.   Do you know if the interview process when you were hired is

8   the same as it is now?

9        **MS. TINGLEY:**  Object.  Relevance.

10       **THE COURT:**  Sustain.

11  BY MR. EDWARDS:

12  Q.   Do you know if Waste Pro is the same company as when you

13  were hired?

14       **MS. TINGLEY:**  Objection.  Relevance.

15       **THE COURT:**  Overrule.

16  BY MR. EDWARDS:

17  Q.   You can answer.

18  A.   The same company?

19  Q.   Yes, sir, same size, same scope?

20  A.   From when I was hired to right now -- I mean it's a much

21  bigger company now than when I was hired.

22  Q.   You were hired on when it was pretty small, right?

23  A.   I was hired in the first couple of years that the company

24  was created.

25  Q.   Okay.  Have you ever hired or interviewed employees

MACKIE - DIRECT/EDWARDS

1   yourself, sir?

2   A.   Yes, sir.

3   Q.   What kind of employees?

4   A.   All -- all positions within the region.

5   Q.   Okay.  So, we know about drivers and helpers.  Have you

6   interviewed those guys and girls?

7   A.   Yes, sir.

8   Q.   You interview for any other positions?

9   A.   Division managers, operations managers.

10  Q.   As a part of hiring, is there a background check?

11  A.   Yes.

12  Q.   And I'll ask you the same question I asked Ms. Lombardo.

13  Is having a criminal background in your business a deal

14  breaker?

15  A.   No.

16  Q.   Do you require new hires to attain -- or, excuse me --

17  attend any new hire training, anything like that?

18  A.   Yes.

19  Q.   Okay.  When was the last time you attended any of those

20  training sessions?

21  A.   About two months ago.

22  Q.   Okay.  Is it something that you check in on from time to

23  time?

24  A.   Yeah.  Just go and say hi to the new employees that are

25  coming on and introduce myself.

MACKIE - DIRECT/EDWARDS

1    Q.   Okay.  What's discussed at those new hire trainings?

2    A.   You know, I can't give you a detailed list.

3    Q.   Sure.

4    A.   But it's new hire orientation, safety practices, your

5    responsibilities as a driver.

6    Q.   Um-hum.

7    A.   Your clock in and your clock out, your compensation, the

8    bonus structure, you know, requirements of filling out the

9    paperwork, dumping the trucks in the afternoon, the, you know,

10   basic requirements of the position.

11   Q.   Okay.  You mentioned "compensation" and "bonus structure."

12   Do you know if that information was ever included in the new

13   hire training when Mr. Andreu was hired?

14   A.   I can't speak specifically to him.  It was in the new hire

15   training program, you know, for the past seven or eight years,

16   so I can only assume --

17   Q.   How do you know it was in the new hire training program for

18   the last seven, eight years?

19   A.   Uhm, this question came up, and, you know, I checked with

20   some of our personnel.

21   Q.   Okay.  It's because someone told you that?

22   A.   Yes.

23   Q.   Okay.  Another employee of Waste Pro?

24   A.   Yes.

25   Q.   Okay.  So, you don't know that of your own personal

MACKIE - DIRECT/EDWARDS

1    knowledge.  It's because someone told you, right?

2    A.  I -- I have been in the class when compensation has been

3    covered.

4    Q.  Okay.  You've been in classes that Waste Pro taught that

5    compensation has been covered.  When did that happen?

6    A.  I can't give you a specific date on that.

7    Q.  Can you give me a year?

8    A.  Two, three years ago.

9    Q.  Okay.  Do you know if you've been in classes where the

10   compensation or bonus structure was described in, let's say,

11   the end of 2013?

12   A.  I can't be sure on the exact dates.

13   Q.  Okay.  Waste Pro has a lot of policies as well, you just

14   gave us some of those -- safety, fuel card, those things,

15   right?

16   A.  Correct.

17   Q.  You make all the employees sign those policies, don't you?

18   A.  I don't know if we make them sign every single policy.

19   Q.  Okay.  At least the policies that we've seen here -- you've

20   been with us the whole time -- at least the policies we've seen

21   here, they're required to sign, right?

22   A.  The policies that I have seen today in the 1098 and the

23   fuel card policy, I would say yes to.

24   Q.  Okay.  Do you know if there's any other policies that you

25   show them that they're not required to sign?  Can you give me

MACKIE - DIRECT/EDWARDS

1   an example of one of those?

2   A.  I don't know which policies require a signature and which

3   policies do -- you know, don't.

4   Q.  Who would know that in your organization?

5   A.  Uhm, I heard you ask the question to Ms. Lombardo, and she

6   said that everybody's required to sign the policies.  So, I'm

7   assuming HR maintains the files.

8   Q.  Okay.  You don't keep track of that?

9   A.  Me personally?  No.

10  Q.  Do you ever talk to new hires about their jobs, what's

11  gonna be required of them, things of that nature?

12  A.  Yes.

13  Q.  What do you tell them?

14  A.  It depends on the position.

15  Q.  Okay.  How about helper?

16  A.  Tell them it's hard work, and we need you to show up on

17  time, we need you to come to work every day.  It's -- customer

18  service and safety are the two most important things.

19  Q.  Okay.

20  A.  Actually, safety is more important than the customer

21  service.

22  Q.  Sure.

23  A.  But those are two areas that I ask them to focus on.

24          I give them my assurances of the company's financial

25  position and, you know, our commitment to making sure our

MACKIE - DIRECT/EDWARDS

1    employees are happy, they're taken care of.  I give them my

2    commitment to be there if they have any issues.

3    Q.   Okay.

4    A.   Just, you know --

5    Q.   Sure.

6    A.   -- basic information.

7    Q.   Do you know what types of employees are paid under the day

8    rate, daily rate, what we've been discussing in this trial?

9    A.   Laborers and our driver classifications.

10   Q.   Okay.  What kind of driver classifications are there, for

11   our benefit, please?

12   A.   I mean not specific, but there's lines of business,

13   commercial line of business, roll-off line of business,

14   residential line of business.

15   Q.   Okay.  When you're explaining the job responsibilities of

16   these different things that these folks can do, do you ever

17   explain their rate of pay to them?

18   A.   I have.

19   Q.   Okay.  In your experience, have you ever had anyone sign

20   any document that says "I understand this is how I'm being

21   paid"?

22   A.   I've not had anybody sign that.

23   Q.   Okay.  But you have them sign the documents about fuel

24   cards and things like that, right?

25   A.   Uhm, those two particular policies, yes, those require a

MACKIE - DIRECT/EDWARDS

1   signature.

2   Q.  And the reason that those policies are signed is so that

3   none of these drivers or helpers can claim that they didn't

4   know what they were getting into, right?  You can say, Look,

5   you signed this.  You knew -- in case they had to be punished

6   or anything like that, right?

7   A.  I wouldn't characterize it like that, but I mean, you know,

8   I guess an acknowledgment is a good thing.

9   Q.  Sure, sure.  Because then there's no ambiguity, right, if

10  they've signed and acknowledged it?

11  A.  They may still have a disagreement.

12  Q.  Okay.  But if they had a disagreement, you could at least,

13  in that instance, show that they signed it, and it was

14  explained to them, right?

15  A.  Yeah, sort of it like when you show them that they approved

16  their time record and accepted that everything was there and on

17  it, and it was good.

18  Q.  Sure, sure.  We'll talk about time records in a minute.

19         But in all of those acknowledgments, Waste Pro doesn't

20  do that for the day rate.  Is there any reason why that doesn't

21  happen?

22  A.  No reason that I know of.

23  Q.  Okay.  It's not because maybe we don't want to write it

24  down, is it?

25  A.  No.

MACKIE - DIRECT/EDWARDS

1  Q.  You have to be verbal, sorry.

2  A.  Yeah.

3  Q.  The new hire orientations, do you know how often the rate

4  of pay is discussed at those meetings?

5  A.  I would assume every new hire class.

6  Q.  Okay.  But you don't know for sure?

7  A.  I don't sit in every class.

8  Q.  You sat through some, though, haven't you?  We just talked

9  about that a moment ago?

10  A.  Yes.

11  Q.  How about safety meetings, is rate of pay ever discussed at

12  safety meetings?

13  A.  I know in the past it has been discussed.

14  Q.  Okay.

15  A.  But that's not generally a topic of discussion at safety

16  meetings.

17  Q.  Okay.  You've actually never been present at a safety

18  meeting where it's been discussed, have you?

19  A.  Not at a safety meeting, where the compensation was

20  explained.

21  Q.  Okay.  But you go to several safety meetings, don't you?

22  A.  Not as many as I used to, but I do attend the safety

23  meetings.

24  Q.  But in the ones that you've been to, maybe not as many as

25  you used to go to, it's not discussed at those meetings, is it?

MACKIE - DIRECT/EDWARDS

1   A.   No.

2   Q.   Okay.  That would be kind of weird to discuss rates of pay

3   at a daily safety meeting, wouldn't it?

4   A.   I wouldn't say it's weird.  We pick topics of -- that need

5   to be discussed.  We call it a safety meeting, but it's really

6   a collaborative or combined operational meeting that also

7   encompasses a major focus on safety.  So, if there was a

8   questioning, and we needed to cover something that had to do

9   with compensation, we would allot some time during that safety

10  meeting for that.

11  Q.   Okay.  You actually knew Mr. Andreu personally while he was

12  working at Waste Pro, didn't you?

13  A.   Yes.

14  Q.   And would you agree with me that he was a hard worker?

15  A.   Yes.

16  Q.   Would you agree with me he's a likable guy?

17  A.   Yes.

18  Q.   You never had a problem with him, did you?

19  A.   No.

20  Q.   Okay.  You never wrote him up?

21  A.   No, sir.

22  Q.   In some instances, he would actually come to you with some

23  of the complaints that he has voiced today from the witness

24  stand, wouldn't he?

25  A.   He never came to me about not receiving help pay or

MACKIE - DIRECT/EDWARDS

1  additional bonus pay.  He did question the structure or the

2  methodology of the overtime calculation.

3  Q.  Okay.  Would you explain it to him?

4  A.  I did explain it to him.

5  Q.  He actually came to you about that often, didn't he,

6  multiple occasions?

7  A.  Yes.

8  Q.  How would you explain it to him?

9  A.  That it was an approved calculation, you know, payroll

10 calculation, that took the, you know, same total hours -- total

11 days worked times the number of days divided by the total hours

12 to get the straight time, and, you know, so on and so forth

13 through that equation.

14 Q.  Okay.

15 A.  I don't think he would like the answer, but I explained to

16 him, Hey, that is the methodology in which it is -- it's

17 derived.

18 Q.  Okay.  Do you know if that was explained to him, that

19 methodology and the math equation that you've just recited for

20 us -- do you know if that was explained to him when he was

21 hired?

22 A.  Again, I only make an assumption that it was.

23 Q.  Okay.  Did you ever speak to anybody that hired him, ask if

24 they brought that up?

25 A.  Uhm, uhm, Mike Allen that was in our safety department, as

MACKIE - DIRECT/EDWARDS

1   well as some HR function, told me that he had addressed that

2   with him directly and explained it to him.

3   Q.  Okay.

4          **THE COURT REPORTER:**  I'm sorry, the name?

5          **THE WITNESS:**  Mike Allen.

6   BY MR. EDWARDS:

7   Q.  Mike Allen didn't hire him, though, did he?  Carlos hired

8   him, right?

9   A.  I don't know who hired.

10  Q.  Okay.  So, you didn't speak to at least the person he says

11  that hired him, right?

12  A.  Today was the first time that I had heard that Carlos --

13  Q.  Okay.  Is Carlos still with the company?

14  A.  No, he's not.

15  Q.  Okay.  Do you know why?

16  A.  No, I do not.

17  Q.  I want to talk to you about the weekly safety bonuses.

18         First of all, they were given out weekly, right?

19  A.  The weekly safety bonus?

20  Q.  Yes, sir.

21  A.  They were -- they were earned weekly.  So, if you earned

22  it, you got it.  They weren't just given out.

23  Q.  Okay.  How do you earn it?

24  A.  You've got to be safe.  There's a variety of things.  You

25  need to dump the truck.  You need to do your pretrip, your

MACKIE - DIRECT/EDWARDS

1   post-trip.  You need to make sure that you don't have any

2   egregious, you know, customer errors or complaints.

3   Q.  Sure.

4          So, customer complaints could get the safety bonus

5   taken away?

6   A.  Egregious ones.

7   Q.  Okay.

8   A.  You get a lot of complaints that -- again, there's no way

9   to verify it, so it wouldn't be fair to dock --

10  Q.  Sure.

11  A.  -- an employee on something that wasn't verifiable.

12  Q.  Do you occasionally get complaints from residents -- we

13  talked a little bit about the Coral Springs transfer center --

14  do you get complaints like that occasionally?

15  A.  Oh, absolutely.

16  Q.  Okay.  Is that kind of an occupational deal for you guys,

17  something we have to deal with that runs with the territory?

18  A.  You know, we put a lot of focus on our service.  It's just

19  the nature of -- we touch so many customers with an essential

20  service every single day, that there's -- there's a lot of

21  ability for there to be certain complaints.

22  Q.  Okay.

23  A.  Uhm, not getting there at the right time, you know.

24  Q.  Sure.

25  A.  Toppling a garbage can over, leaving it in the middle of

MACKIE - DIRECT/EDWARDS

1   somebody's driveway, and not closing the lids.  There's many

2   things that could upset a customer.

3   Q.  You get more complaints in certain neighborhoods?

4   A.  Uhm, you know, every area has -- has its pluses and

5   minuses.

6   Q.  Sure.

7        Some areas generate more garbage than others, for

8   example, even though they're equal size, right?

9   A.  Correct.

10  Q.  Okay.  The weekly safety bonus is also directly tied to

11  attendance at those weekly safety meetings, isn't it?

12  A.  Uhm, I -- I was asked that question before, and I believe

13  that I answered that I -- it wasn't, and I subsequently found

14  out that it was required or it was tied to it.

15  Q.  You answered that it was.

16  A.  Yeah.

17  Q.  So, it is tied to the weekly safety meetings, right?

18  A.  It -- one or the other ways, but I believe it -- yeah.

19  Q.  Okay.  Well, do you know, as you sit today as the witness

20  stand, if it's tied to the weekly safety meetings?

21  A.  No.  No, I don't.  But I know that what I answered, I felt

22  like I got that wrong, and it was the other way around.

23  Q.  Okay.  Were you confused?

24  A.  I wouldn't say that I was confused.  I thought that the

25  safety -- I sit here today thinking the attendance at the

274

MACKIE - DIRECT/EDWARDS

1   safety meeting is a requirement for getting it.

2   Q.  Okay.  Is the attendance at a safety meeting mandatory?

3   A.  Yes.

4   Q.  Okay.  And an employee can lose that bonus if they don't

5   go, right?

6   A.  I believe so.

7   Q.  Because their supervisor is charged with submitting a bonus

8   loss form, isn't that true?

9   A.  With the safety meeting, there's a sign-in sheet that I

10  believe is what drives the bonus loss form.  I'm not -- not

11  necessarily sure it's the specific supervisor for that

12  employee.

13  Q.  Okay.  But regardless, if they don't go, there's a bonus

14  loss form, regardless of how it's reported, right?

15  A.  I believe so.

16  Q.  Okay.  And when you reviewed Mr. Andreu's file, there was

17  no bonus loss form submitted, was there?

18  A.  I heard that today, but I -- I don't believe there were

19  any.

20  Q.  Okay.  Well, when you checked it last, there wasn't, was

21  there?

22  A.  I really can't be certain about that.  I --

23  Q.  Okay.  You heard Mr. Andreu tell you today that sometimes

24  he didn't go to those mandatory safety meetings, right?

25  A.  I heard his testimony.

MACKIE - DIRECT/EDWARDS

1    Q.   Okay.  Well, you heard him say that he didn't go to

2    meetings, right?

3    A.   I heard him say that sometimes he was on a commercial

4    route, and the commercial trucks would start at two o'clock in

5    the morning.  Knowing that we have staggered start times, we

6    would have multiple safety meetings to accommodate that.  We

7    would have a commercial meeting for the guys who started

8    earlier.  We would have the residential meeting, which was for

9    more of the cluster, that started at six a.m.

10   Q.   Okay.  Again, though, no bonus loss forms in his file,

11   right?

12   A.   Again, I can't be a hundred percent sure about that.

13   Q.   Okay.  If there was no bonus loss form in his file, and he

14   told you directly today he didn't go to the meeting, would that

15   mean that a supervisor dropped the ball?

16   A.   I -- I'd be making an assumption.  It could be the

17   supervisor said, Hey, you've been working really hard, I'm

18   gonna let you get a pass on this and not hit with you a bonus

19   loss form.  I know that there is a degree of, Hey, you've been

20   busting your butt, I don't want to penalize you.

21   Q.   Yeah, that's kind of how the industry is, isn't it?

22   A.   I'm not gonna say the industry.  I think that's human

23   nature.

24   Q.   Okay.  Sometimes guys are working together, and maybe we

25   let one slide?

MACKIE - DIRECT/EDWARDS

1   A.   You know, you asked me a question that I made an assumption

2   on.

3   Q.   Sure, sure.

4        Would you ever question a supervisor who didn't report

5   an employee under his supervision for missing a mandatory

6   meeting?

7   A.   You know, in my position, I think that that is something

8   that I need to be.  You know, those are rules -- rules about

9   safety or customer service are very serious.  And I would

10  have -- I would have to have a serious problem with a

11  supervisor that was not enforcing an employee to be present at

12  safety meetings.

13  Q.   Right.  Because that would not be enforcing a company

14  policy, right?

15  A.   It would be -- repeat that again?

16  Q.   Allowing a supervisor who's charged with reporting the

17  absence of an employee at a mandatory meeting would be you not

18  requiring that that policy be enforced, wouldn't it?

19  A.   If the supervisor took it upon himself to not allow the

20  employee to be there when he was given a directive to have the

21  employee there, yes.

22  Q.   Do you know how often that happens?

23  A.   No, I do not.

24  Q.   Okay.  Are there any other policies that are lax like that?

25  A.   Well, I didn't say that -- that it was laxed *(sic)*.

MACKIE - DIRECT/EDWARDS

1   Q.  Sure, sure.  Well, maybe we won't agree on terms.

2          Are there any other policies that you could do a

3   better job at making sure are enforced?

4   A.  Any policies that I could do --

5   Q.  Yes, sir.

6   A.  -- making sure that --

7   Q.  Yes, sir.

8   A.  I mean nothing that comes to mind.

9   Q.  Okay.  Just the safety mandatory meeting policy?

10  A.  Well, that was in the context that you gave it, that it was

11  occurring, and a supervisor needed to be -- you know, was being

12  laxed on it.  So....

13  Q.  Okay.  You know that happens, though, right?

14  A.  I wouldn't say that that does happen.

15  Q.  You don't think it happens?

16  A.  No, I said that there was a possibility that maybe that was

17  an instant *(sic)* -- or an explanation for why somebody might

18  not be at a meeting.

19  Q.  Let me ask you this.  The weekly safety bonus can also be

20  withheld as a form of punishment, can it?

21  A.  As a form of punishment, I -- I think that that's -- if

22  there's certain things that you don't do, you don't earn it.

23  It's a bonus.  It's not an entitlement.  It's a -- it's if you

24  do the X, Y, and Z, you get this.

25  Q.  Hum-hum.

MACKIE - DIRECT/EDWARDS

1    A.   And if you don't do X, Y, or Z, you're disqualified from

2    earning it for the week.

3    Q.   Okay.   So, it's your testimony that it's never withheld

4    from employees for not doing anything in particular?   What

5    exactly is the weekly safety bonus tied to, is my question?

6    A.   It's tied to all of the things that we've said.

7    Q.   Okay.

8    A.   There's safety, there's a service component.   It's the

9    basic job responsibilities that you have during the week.

10   Q.   Okay.   Uhm --

11        **MR. EDWARDS:**   Your Honor, may I approach?

12        **THE COURT:**   Okay.

13   BY MR. EDWARDS:

14   Q.   I'm showing you the "pride in your daily job" Waste Pro

15   memorandum.   And here it says that "we are forced to deduct

16   bonus accordingly."   Do you know what that's referring to?

17   A.   *(No response)*

18   Q.   Is that the safety bonus?

19        *(Pause)*

20   A.   I can't be sure that that's safety bonus.

21   Q.   Okay.   What other bonus could it be?

22   A.   We have a year-end bonus.

23   Q.   So, if a person didn't clock in, they might not receive a

24   year-end bonus?

25   A.   Year-end bonus, which is $250 a year -- it's cumulative --

MACKIE - DIRECT/EDWARDS

1   500 the second year, 750 the third year, is tied to certain

2   criteria.

3   Q.  Like punching the clock in?

4   A.  Well, it's a requirement of your job.

5   Q.  Okay.  What other criteria is it tied to?

6   A.  Safety, service, property damage.

7   Q.  Are we talking about the safety bonus or the year-end

8   bonus?

9   A.  We're talking about our bonuses.

10  Q.  All bonuses.

11  A.  Yes, bonuses are tied to performance.

12  Q.  Okay.  All bonuses are tied to all of the things that you

13  just mentioned?

14  A.  Yes.

15  Q.  Okay.  Do you know how time is logged in by your employees?

16  A.  I'm sorry, I didn't hear the question.  I apologize.

17  Q.  Excuse me.  The microphone is a little far away.

18          Do you understand -- are you familiar with how time is

19  logged in by your employees?

20  A.  Yes.  I believe they use the time clock.

21  Q.  Okay.  Do you have to clock your time?

22  A.  No, I don't.

23  Q.  Who has to clock their time?  What kind of employees?

24  A.  Well, I believe all --

25  Q.  Is it drivers and helpers?

MACKIE - DIRECT/EDWARDS

1  A.  I believe all employees need to -- all hourly and day rate

2  employees need to clock their time.

3  Q.  Okay.  That's to make sure that the employees are

4  accountable, right?

5  A.  That's to make sure that we know exactly how much time

6  they're at work so we can compensate them correctly.

7  Q.  Okay.  We'll come to compensating them correctly in just a

8  moment.

9       A driver can actually be disciplined for

10  miscalculating their time or misreporting their time, can't

11  they?

12  A.  You need to clock in when you get to work, and you need to

13  clock out.  There's -- there's a lot of reasons for it.

14  Q.  Okay.

15  A.  Most recently, you know, there's a safety aspect to it.  We

16  need to know who's on the property, you know, when they're on

17  the property.  They could be out, you know, behind a truck

18  or --

19  Q.  Sure.

20  A.  -- with a truck.  So, you know, there's a serious

21  requirement for wanting to have when somebody clocks in and

22  when they clock out.

23  Q.  Do their time records tell you when they're on the

24  property?  They just tell you when they sign in and sign out,

25  right?

MACKIE - DIRECT/EDWARDS

1   A.  It's a requirement when you come on the property, you need

2   to clock in.

3   Q.  Sure, sure.

4       But then after that, they're almost certainly leaving

5   the property to go do their job, right?

6   A.  It depends what position they're in.

7   Q.  Okay.  What policy is there that requires supervisors to

8   report when they give a bonus?  Is there a policy for that?

9   A.  A policy for when supervisors give a bonus?

10   Q.  Yes, sir.  I'll submit to you, we've heard some testimony

11   in this case that sometimes a supervisor can contact a driver

12   or a helper and offer them extra money to do an errand, pick up

13   a truck, things of that nature.  You've heard that with us,

14   haven't you?

15   A.  Yes.

16   Q.  Is there any policy that Waste Pro has that requires a

17   supervisor, if they enter into one of those arrangements, to

18   report it immediately?

19   A.  I don't know of any policy we have other than a spreadsheet

20   needs to be turned in with all of the bonuses that are due.

21   Q.  Wouldn't a policy that requires the supervisors to report

22   when they promise to pay extra money to these drivers foster

23   the same kind of accountability that a clock-in and clock-out

24   policy requires?

25   A.  You know, clock in and clock out is sort of a -- you start

MACKIE - DIRECT/EDWARDS

1  at a time, you end at a time.  I think the bonus is, you know,

2  when -- when those arrangements are made, it could happen

3  throughout the day, so I'm not sure that there would be, you

4  know, a policy, or that you could structure other than to say,

5  Hey, turn it in, and what's due -- what's due is due, it will

6  be reviewed and entered.

7  Q.  Okay.  Can you withhold a bonus from a supervisor for

8  failing to report extra money that he promised to a driver?

9  A.  Yes.  If it -- if a supervisor -- you know, if I had

10  multiple employees coming to me and saying a supervisor was not

11  doing his job, which that would be a requirement of his job,

12  and the research proved out that he was not putting, you know,

13  bonuses in that were due, his year-end bonus could be and would

14  be adjusted.

15  Q.  Sure.

16       Have you ever had an employee come to you and tell you

17  that, My supervisor promised me some additional money after my

18  shift and didn't give it to me?

19  A.  Yes.

20  Q.  Okay.  Does that happen often?

21  A.  Not -- not really often, no.

22  Q.  Did you discipline the supervisor when it happened?

23  A.  No.  When I asked the supervisor about it, he said, I

24  honestly forgot to put it in, and we put it in, and we paid the

25  person.

MACKIE - DIRECT/EDWARDS

1  Q.  So, mistakes can happen, right?

2  A.  Yes.

3  Q.  A lot of times, these deals are arranged on the phone, or

4  Mr. Andreu indicated, you know, in an alley.  It's an informal

5  process to say the least.  Can we agree to that?

6  A.  It is.  But I also believe that Mr. Andreu would have and

7  should have contacted me.  We had that kind of relationship.

8  And he never did.

9  Q.  Okay.  He came to you with requests about the explanation

10  of the day rate, though, right?

11  A.  Yes.

12  Q.  Let me ask you this.  When we say "day rate," what is a day

13  rate in your business supposed to compensate an employee for?

14  A.  It's their daily task of what they come to work to do.

15  Q.  Okay.

16  A.  And --

17  Q.  What is their daily task for a driver, for example?

18  A.  It depends on what line of business that driver -- it could

19  be a number of different things.

20  Q.  Is it usually a route?

21  A.  It could be a number of different things.

22  Q.  Okay.  Can it be in some cases a route?

23  A.  Yes.

24  Q.  How is a route assigned?  Do you give them a route sheet?

25  A.  Uhm, the drivers are given a route sheet in the morning.

284

MACKIE - DIRECT/EDWARDS

1   Q.  Okay.

2   A.  But not -- again, I -- I shouldn't -- I don't know if every

3   single driver is given a route sheet, depending on the task.

4   Q.  Sure, sure.

5        We don't need every single driver.

6   A.  Okay.

7   Q.  The day rate, it's not designed to compensate 24 hours in a

8   day, though, is it?

9   A.  As Regina said, and I would agree, we would never ask

10  somebody to work 24 hours in a day.

11  Q.  Sure.

12       But I mean, in theory.  Is it supposed to be, I'm

13  gonna give you -- we saw Mr. Andreu's records, $207.79 I think

14  was his highest day rate -- I'm gonna give you that, and I own

15  you for the rest of the day?  That's not what it is, is it?

16  A.  No.  It's for a reasonable day.

17  Q.  Okay.  What's a reasonable day?

18  A.  Well, there's the ups and downs of the days.  But it's --

19  as Roger said, we look at a -- you know, we try to make the

20  days a fair task.

21  Q.  Okay.

22  A.  You know, again, I'm not gonna ask anybody to do something

23  that I'm not willing to do.

24  Q.  Sure.

25  A.  We don't want to make things unfair.  We don't want people

MACKIE - DIRECT/EDWARDS

1   working, you know, more hours than others.  There are things

2   that occur --

3   Q.  Sure.

4   A.  -- you know, and he alluded to breakdowns and traffic and

5   things at the dump that -- that occur that may lengthen and

6   then there's things that may shorten.

7   Q.  Okay.

8   A.  In the case of the things that lengthen the day, that's why

9   we have the premium on top of the day rate.  Or additional

10  compensation for things that are over and above the task that

11  they start the day.

12  Q.  Okay.  So, I'm a little bit confused, because we've been

13  using the term "day rate," and you're telling me it's a task.

14  Is it a day or a task?

15  A.  You know, I think they're all sort of synonymous --

16  Q.  Okay.

17  A.  -- in a way.  I just have always used --

18  Q.  Sure.

19  A.  -- the terminology "task pay."  That's -- when I was

20  brought up into the industry --

21  Q.  Okay.

22  A.  -- you know, that's what they called it.

23  Q.  Okay.

24  A.  But, yeah, the task is your daily responsibility.

25  Q.  Okay.  And at least in some instances, that daily

MACKIE - DIRECT/EDWARDS

1   responsibility would be reflected on a route sheet.  Can we

2   agree to that?

3   A.   Yes.

4   Q.   Okay.  And those route sheets are designed by supervisors

5   as well.  Can we agree to that?

6   A.   You know, I don't want to be nitpicky, but I don't know if

7   they design the actual route sheet.  But in terms of the job

8   makeup that's requested on the route sheet?

9   Q.   Yes.

10  A.   Is that what you're --

11  Q.   Yes.

12  A.   Yes.  Supervisors and the operations staff would create the

13  routes.

14  Q.   Okay.  So, somebody has to tell them where to go to pick

15  the stuff up, is that fair?

16  A.   Correct.

17  Q.   And there are targets for that, aren't there?

18  A.   *(No response)*

19  Q.   Targets for how long a route should last?

20  A.   Yes.

21  Q.   Okay.  And that target is eight to ten hours, isn't it?

22  A.   I go with ten hours.

23  Q.   Okay.  It could be eight to ten, though, couldn't it?

24  A.   It could be six to 12, but ten hours is -- I mean it could

25  be, you know, a wide range, but we stay with the ten hour a day

MACKIE - DIRECT/EDWARDS

1  number, because ten hours a day is -- keeps the employee at

2  60 hours in six days.

3  Q.  Okay.  Sixty hours in six days.

4       Did you look at any of Mr. Andreu's time records

5  before you came in here today?

6  A.  I've seen some.

7  Q.  Okay.  Do you know how often he worked only 60 hours in six

8  days?

9  A.  I do not know.

10 Q.  Okay.  So, the day rate too, at least in theory, right, is

11 designed to have these guys do it as fast as they can within

12 safety boundaries, right?

13 A.  It's -- I wouldn't say, you know, as fast, because

14 sometimes the fastest amount of service doesn't -- it doesn't,

15 you know, yield the best service.

16 Q.  Sure.

17 A.  So, there's a customer service component.  There's a safety

18 component.

19 Q.  Sure.

20 A.  But it is -- it is to put the employee in control of

21 efficiency.

22 Q.  Okay.  So, maybe "efficiency" is a better word than "fast,"

23 is that fair?

24 A.  I would use that.  I think that's a fair characterization.

25 Q.  Okay.  Because we don't want speed.  We don't want people

288

MACKIE - DIRECT/EDWARDS

1    leaving cans on the ground or anything like that, right?

2    A.   Yes, sir.

3    Q.   But, in theory at least, an employee does better when the

4    day is shorter, is that fair?

5    A.   Does better by what measurement?

6    Q.   They work less.

7    A.   So, they do better for themselves?

8    Q.   Yes, sir.

9    A.   When they work --

10   Q.   Less hours.

11   A.   Yes.

12   Q.   Yeah, because they get the same amount of pay whether it's

13   done in six hours or whether it's done in ten hours, right?

14   A.   Correct.

15   Q.   So, at least in your mind, that's to incentivize employees,

16   isn't it?

17   A.   I think that, you know, there's a degree of incentivization

18   there to --

19   Q.   Okay.  Waste Pro modifies those routes, though, those daily

20   tasks, don't they?

21   A.   We adjust routes.

22   Q.   How often?  As needed?

23   A.   Yeah, as needed.  You may have a community that is --

24   that's growing, that is adding homes.  You know, Pembroke

25   Pines, for example, has some areas where they're adding homes

MACKIE - DIRECT/EDWARDS

1  on.  So, if those homes are all coming on to one, you know, the

2  route in which that encompasses, that wouldn't be fair.  You

3  know, a route could go from a thousand homes to 1500 homes.

4  So, you need to make adjustments, add trucks.

5        There also -- in the economy, there can be homes that

6  are empty for a long time, and those homes start to fill up.

7  Q.  Sure.

8  A.  More garbage is more set out.  More set out requires, you

9  know, more trips to the dump.  More trips to the dump requires

10  more time.

11  Q.  Okay.

12  A.  So, there are adjustments that are made.

13  Q.  So, it's not a perfect science, is it?

14  A.  No.

15  Q.  And maybe if Waste Pro starts doing business in a new area,

16  a new municipality, anything like that, the supervisor might

17  not know the area, is that fair?

18  A.  Well, I would say that when we go into a new area, we try

19  to hire people that have knowledge of the area to create the

20  routes and that have -- most times when we take over a

21  community, we wind up hiring the supervisor that was in place

22  for the previous company.

23  Q.  Okay.

24  A.  Just because they have so much knowledge of the area.

25  Q.  Sometimes there's still mistakes, though.  Sometimes routes

290

MACKIE - DIRECT/EDWARDS

1  take too long and people need help with their routes, right?

2  A.  Yes.  Sometimes there are routes that need to be adjusted.

3  Q.  Sometimes routes are too short too, aren't they?

4  A.  Uhm, yeah, there's definitely routes on both sides.

5  Q.  Okay.  Have you ever adjusted a route up because it was

6  being finished too short?

7  A.  In the early stages of after a startup, yes.

8       But because I drove on a truck, and I know what it's

9  like to do that, all of my supervisors know I have a standing

10  policy that if -- if somebody is finishing their route early,

11  because they've become really efficient and good at doing it,

12  we don't add things to that person's route.

13  Q.  Okay.  Are employees punished for too much efficiency?

14  A.  I -- I -- I don't believe so, because I think, you know,

15  most of our efficient people, throughout the region, they like

16  to take advantage of going out and doing extra work.  It's

17  extra compensation in the same amount of hours they were gonna,

18  you know, be there anyway.

19  Q.  Well, they're there longer if they're doing more work,

20  aren't they?

21  A.  Yes.  I mean, but they're -- by choice.  I mean it's not a

22  forced situation.

23  Q.  Sure, sure.

24       At least Roger, though, wasn't sure what he was

25  getting into, at least that's what he told us here at trial,

MACKIE - DIRECT/EDWARDS

1  right?

2  A.  Yeah.  That's -- that's what he told us.  And I just -- you

3  know, by the numbers of what I deal with, I just don't get

4  complaints on that from our employee base.  I don't.

5  Q.  Okay.  Anybody ever tell you, other than Roger, that they

6  don't understand it?

7  A.  Yes.

8  Q.  Okay.  Uhm, I want to talk to you about efficiency again.

9           Waste Pro has a policy of not paying a full day rate

10  if a rate -- if a route or a task is finished in less than four

11  hours and one minute, don't they?

12  A.  I -- I -- I don't know that to be a policy that we have.

13  Q.  You don't know that.

14  A.  No.

15  Q.  You don't know that Waste Pro has a policy of giving a

16  driver a half day rate if they finish their route in less than

17  four hours and one minute.

18  A.  No.

19  Q.  Okay.  Have you ever given a statement that's different

20  than that under oath?

21  A.  I'm not sure.

22  Q.  Okay.  Do you recall giving a deposition in this case,

23  Mr. Mackie?

24  A.  Yes.

25  Q.  Okay.  It was December 1st of last year, wasn't it?

292

MACKIE - DIRECT/EDWARDS

```
 1           MR. EDWARDS:  I got it.

 2    BY MR. EDWARDS:

 3    Q.  You were there?

 4    A.  Yes.

 5    Q.  I was there, correct?

 6    A.  Yes.

 7    Q.  Your attorney was there?

 8    A.  Yes.

 9    Q.  We were at their office, actually, weren't we?

10    A.  Well, we were at two different offices.

11    Q.  Very true.  The December 1st deposition, we were at their

12    office, right?

13    A.  I -- we were at two different, so I just don't know the

14    dates.

15    Q.  One was in Orlando, right?

16    A.  Yes.

17    Q.  One was here.

18    A.  Yes, sir.

19    Q.  Okay.  And at that deposition, you were asked the following

20    questions, and you gave the following answers.

21           "Is there a minimum amount of hours he was

22       required to work to receive his day rate?

23           "Answer:  Four hours and minute -- four hours and

24       one minute."

25           That's your testimony, isn't it?
```

MACKIE - DIRECT/EDWARDS

1    A.   Yes.  I mean if you're --

2    Q.   So, I'll ask you again.  Does Waste Pro have a policy to

3    pay a half day rate for days less than four hours and one

4    minute?

5    A.   I don't believe we have a policy to pay half a day rate.

6    Q.   Okay.  Do you have any policy at all to pay a half day

7    rate?

8    A.   No.  I believe that the -- the day rate is -- we are to pay

9    the day rate on the days that they work.

10   Q.   Okay.

11   A.   If there could be special circumstances or something that

12   comes up where it would be something less than the day rate --

13   Q.   Okay.

14   A.   -- based on the task that's asked for them -- because it's

15   a task driven -- so, if we ask the driver to go pick up a

16   truck, Hey, we don't need you tomorrow, because we don't have a

17   truck for you, but there's a truck at the shop --

18   Q.   Yeah.

19   A.   -- that needs to just be picked up, probably take you two

20   hours, we'll give you half your day rate to go do that task.

21   Q.   Okay.  So, you tell them that you're gonna give them a half

22   day rate before you do it.

23   A.   Yes, I believe so.

24   Q.   Okay.  Have you ever done that?

25   A.   Have I ever?

MACKIE - DIRECT/EDWARDS

1  Q.  Called up an employee and told them, I only have a small

2  job for you, I'm only gonna give you a half day rate?

3  A.  No.

4  Q.  Okay.  How do you know it happens then?

5  A.  Because I know the two times that we have talked about in

6  this case, that that's where the half rate came from.

7  Q.  Okay.  So, is that a policy for Waste Pro's drivers and

8  helpers, or is it a policy for Roger Andreu?

9  A.  No.  I believe we've paid half the daily rate in other

10  situations.

11  Q.  Okay.  Like what?

12  A.  Tasks that were just a few hours' worth of work.

13  Q.  Okay.  Like less than four hours maybe?

14  A.  Uhm, I don't know -- I don't remember saying four hours as

15  a threshold, so I'm sorry.

16  Q.  Okay.

17  A.  But is generally not a route or reasonable day's worth of,

18  you know, responsibility worth of work.

19  Q.  Okay.  Who says what's a reasonable day's worth of work?

20  A.  Again, as we told you, we try to set the work to that, you

21  know, eight- to ten-hour day.

22  Q.  Yeah.

23  A.  But -- you know, that ten-hour, 60 hours, six-day workweek.

24  Q.  Sixty hours, six-day workweek.

25        The occasions that Roger was paid a half day rate,

MACKIE - DIRECT/EDWARDS

1    we've talked about those at length in this trial, the

2    September 30th date and the date that was right around Easter,

3    do you have any knowledge of those?  Were you involved in

4    those?

5    A.  Uhm, the Easter Sunday, we received a complaint from the

6    City of Coral Springs.

7    Q.  Um-hum.

8    A.  On the day before Easter, Roger had an altercation at the

9    transfer station.

10   Q.  Sure.

11   A.  The city sent word that they did not want Roger at the

12   transfer station on Easter -- the following day.

13   Q.  The City of Coral Springs told you, Don't put him there on

14   Easter?

15   A.  Yes, that they did not want him there the day after that

16   altercation.

17   Q.  Okay.  Just for the day?

18   A.  No.  Indefinitely.

19   Q.  Indefinitely.

20          Did he ever go back?

21   A.  I don't have the answer to that.

22   Q.  Okay.  Did you receive that complaint?

23   A.  The -- yes.  The operation -- I was on a text message that

24   came through to the supervisor, Bill Riccio *(phonetic)*, asking

25   that we not have Roger at the transfer station because of an

MACKIE - DIRECT/EDWARDS

1  altercation that occurred.

2  Q.  Did he get written up for that?

3  A.  I believe there was an incident report on it.

4  Q.  Okay.  Is that in his employee file?

5  A.  I don't know the answer to that.

6  Q.  You didn't write him up, though, did you?

7  A.  No, sir.

8  Q.  Because you've never written him up, right?

9  A.  No, sir, I have not.

10 Q.  Okay.  I want to talk to you -- we'll get back to the

11 Easter date.  I want to talk to you about the September 14th

12 date in 2016, 3.3 hours, and on his earnings statement, 5.5

13 days.  Why was he paid a half day rate on that day?

14 A.  I'm assuming that this is the second --

15 Q.  I think first chronologically, but... do you know what

16 that's for?  Why that happened?

17 A.  No, I don't.  But I -- I really don't believe it was to run

18 the bulk route, as Roger has stated.

19 Q.  Okay.  You don't believe it, but you can't show us that it

20 wasn't, can you?

21 A.  I believe with a very high degree of certainty that it

22 would be impossible to work 3.3 hours and to clock in, make it

23 to West Coral Springs, run a entire route, which would

24 encompass a thousand homes -- and just to drive by a thousand

25 homes in a garbage truck, it would take close to two-and-a-half

MACKIE - DIRECT/EDWARDS

1   hours -- and get all the way to the dump and back to the

2   facility in 3.3 hours.  I just --

3   Q.  Other than --

4   A.  -- impossible.

5   Q.  Other than defending the company, do you have any personal

6   experience running that route in that city?

7   A.  *(No response)*

8   Q.  You don't, because you don't drive, right?

9   A.  I have -- I'm born and raised in Broward County.  I've been

10  here my whole life.

11  Q.  Sure.

12  A.  I've driven just about every single route that we have.  I

13  know the wait times at the dump.  I know the wait times at the

14  fuel stations.  I know the traffic patterns, the difficulties

15  in that area.  And I can say with a very high degree of

16  certainty that it would just be impossible to go and run a

17  route, as he said, to collect bulk in that area in three hours.

18  Q.  So, if it wasn't for running a route, what was it for?

19  A.  He may have gone to pick up a truck.

20  Q.  Okay.

21  A.  That's -- that's -- if I were making an assumption, I think

22  that is what he was asked to do that day.

23  Q.  That's an assumption, though, right?  You don't know.

24  A.  I do not know for sure what he was asked to do that day.

25  Q.  It's your company that paid the half day rate, and you

MACKIE - DIRECT/EDWARDS

1    don't know what it was for.

2    A.   That would be something that would be discussed between the

3    supervisor and Mr. Andreu and agreed to beforehand, because it

4    was the policy that if it was something that took less than our

5    standard day's worth of work, you know, assumptions --

6    Q.   Okay.

7    A.   -- that they would agree that there would be a half of the

8    day rate paid.

9    Q.   Less than our standard day of work.  Is it less than eight

10   hours they get a half day rate?

11   A.   It's -- we pay a day rate every single day that you're at

12   work.  No matter what.  Unless there is a small insignificant,

13   you know, type thing that would take just a few hours.  And

14   that task would be something that would be between the

15   supervisor, and it would be compensated at half of the daily

16   rate.

17   Q.   Sure.

18        And if you wanted to find out what that job was, could

19   you do it?

20   A.   I'm sorry?

21   Q.   If you wanted to find out what job Roger Andreu did on

22   September 14th of 2016 for 3.3 hours to earn a half day rate,

23   could you do it?

24   A.   We tried.  I mean I -- I asked.

25   Q.   Sure.

MACKIE - DIRECT/EDWARDS

1   A.  He didn't have a -- he didn't have a route sheet that day.

2   He didn't have a dump ticket that day.  He didn't have a fuel

3   card receipt that day.

4   Q.  Okay.  Does he have them for all the other days?

5   A.  Routes generally have the route sheets that have that

6   information on them.

7   Q.  Generally.

8   A.  No.  When you run a route, they will have that information.

9   You will go out and have that information on it.

10  Q.  Do you have route sheets for every route he ran?

11  A.  I -- I don't -- I would make an assumption that, yes, we

12  would, but I don't have that information.

13  Q.  Did you look into it?

14  A.  No.

15  Q.  Okay.  Why not?

16  A.  *(No response)*

17  Q.  Wouldn't that be helpful to us if we were trying to figure

18  out why it was that he was paid a half day rate, from what it

19  sounds like from you, in violation of the policy?

20  A.  It would be helpful if there was a route sheet, and we

21  would have produced that if we had the route sheet.  There is

22  no route sheet for that day.

23  Q.  Sure, sure.

24          Did his supervisor mess up?

25  A.  I don't believe so.  You know, I'm just going by what Roger

```
 1    testified to, and he seemed pretty sure that he was on bulk
 2    route that day.  And I can --
 3    Q.  Okay.  Do you know what route it was for?
 4    A.  I don't believe it was for a route.
 5    Q.  Okay.  But I thought you told us that you didn't think he
 6    could do the route that fast, because you knew the
 7    neighborhood.
 8    A.  That's why I'm saying, I don't believe that he was on a
 9    route that day.
10    Q.  Okay.  Okay.
11            THE COURT:  Mr. Edwards, is this a good spot to break?
12            MR. EDWARDS:  Yes, your Honor, it be a great spot.
13            THE COURT:  All right, members of the jury, we're
14    going to go ahead and recess for the evening.  Remember my
15    admonition not to discuss the case or allow it to be discussed
16    in your presence.  And I'm going to ask you to come back at
17    9:15.
18            So have a nice evening.  We'll see you back at 9:15.
19            COURTROOM SECURITY OFFICER:  All rise.
20            (The jury exited the courtroom)
21            THE COURT:  And if there's nothing else to come before
22    the Court, we'll be in recess until 9:15 on this case,
23    nine o'clock on other matters.
24            MR. EDWARDS:  Thank you, your Honor.
25            MS. TINGLEY:  Thank you, your Honor.
```

```
 1          (The Judge exited the courtroom)

 2          (Proceedings concluded at 5:06 p.m.)

 3                    -  -  -  -  -

 4

 5

 6               INDEX OF WITNESSES

 7   PLAINTIFF'S WITNESS                    PAGE

 8   Roger Andreu
     Cross by Ms. Tingley                 91, 191
 9   Redirect by Mr. Edwards             220

10   Regina Lombardo
     Direct by Mr. Edwards               230
11   Cross by Ms. Tingley                254
     Redirect by Mr. Edwards             256
12
     Russell Mackie
13   Direct by Mr. Edwards               258

14                    -  -  -  -  -

15               INDEX OF EXHIBITS

16   DEFENDANTS' EXHIBITS:         MARKED       RECEIVED

17   16                            204          204

18                    -  -  -  -  -

19              C E R T I F I C A T E

20    I certify that the foregoing is a correct transcript from

21    the record of proceedings in the above-entitled matter.

22

23

       /S/Francine C. Salopek              5-15-18
24   Francine C. Salopek, RMR-CRR      Date
     Official Court Reporter
25
```

**COURTROOM SECURITY OFFICER: [8]**
90/15 144/17 145/11 189/15 190/12 257/7 258/4 300/18
**MR. EDWARDS: [32]** 95/6 122/7 122/19 131/19 144/21 145/6 160/6 161/14 161/24 189/20 198/15 198/18 198/20 204/3 218/23 219/3 220/2 220/5 229/5 229/21 230/2 253/12 253/24 256/4 256/17 256/23 257/12 257/20 278/10 291/25 300/11 300/23
**MS. TINGLEY: [41]** 90/4 90/7 90/13 90/23 94/2 115/21 144/11 145/5 145/10 149/13 170/5 173/11 189/6 189/21 190/2 190/4 190/10 190/22 195/1 195/3 198/12 198/19 198/22 203/8 204/1 204/5 204/7 204/11 217/10 219/25 222/17 224/5 248/17 256/1 256/10 256/15 256/25 257/13 261/8 261/13 300/24
**THE COURT REPORTER: [15]** 94/1 94/3 125/15 133/16 133/20 143/17 195/2 196/7 214/18 230/4 230/6 254/13 258/10 258/12 271/3
**THE COURT: [70]**
**THE WITNESS: [12]** 90/10 125/16 133/22 190/7 196/9 214/19 229/24 230/9 256/20 258/15 258/15 271/4

**$**
**$10,000 [1]** 197/4
**$11,000 [1]** 186/23
**$140 [2]** 254/17 255/6
**$150 [2]** 118/19 195/13
**$155 [1]** 196/21
**$2 [1]** 187/11
**$2 million [1]** 187/11
**$207.79 [2]** 187/21 284/13
**$250 [2]** 246/11 278/25
**$300 [1]** 209/15
**$35 [1]** 120/1
**$5,000 [1]** 197/6
**$50 [1]** 209/14
**$67,000 [1]** 196/19
**$74,000 [2]** 186/5 186/21
**$75 [1]** 209/14
**$8,000 [1]** 187/3

**'**
**'13 [1]** 151/9
**'14 [2]** 106/5 106/6
**'15 [2]** 106/18 124/18
**'16 [5]** 124/18 129/2 215/25 222/17 223/5

**/**
**/S/Francine [1]** 301/23

**1**
**100 [1]** 149/11
**100 percent [3]** 114/25 131/8 194/10
**100-yard [1]** 102/25
**1098 [4]** 109/6 124/14 234/18 264/22
**1098s [1]** 142/13
**10:11 [1]** 134/23
**10:11 a.m [2]** 134/14 134/21
**10:58 [1]** 144/24
**11 [4]** 110/15 171/10 180/7 260/9
**11 o'clock [1]** 102/23
**11:11 [1]** 144/24
**11:13 [2]** 132/17 133/4
**11:19 [1]** 136/5
**11:19 a.m [1]** 136/2
**11:30 [31]** 128/18 128/23 128/24 129/19 129/21 130/3 130/13 130/17 130/25 131/8 131/11 132/25 133/11 133/24 133/25 134/3 134/4 134/23 135/5 135/12 135/17 136/8 195/24 196/5 196/13 222/14 222/16 222/25 223/1 223/6 249/8

**2**
**2.28 [2]** 167/16 170/10
**2.28 hours [1]** 170/3
**20 [1]** 193/19
**20 bucks [1]** 238/22
**20 minutes [2]** 179/25 181/2
**20 percent [1]** 193/15
**20-hour [1]** 188/2
**200 bucks [3]** 215/12 217/7 217/7
**2000 [3]** 101/4 124/18 129/1
**2006 [1]** 108/1
**2013 [6]** 91/12 222/3 232/24 233/1 234/18 264/11
**2014 [2]** 151/22 254/16

**11th [1]** 160/5
**12 [3]** 98/23 207/6 286/24
**12 hours [1]** 213/21
**12.67 hours [1]** 243/3
**120 [2]** 186/13 257/22
**120 hours [1]** 192/6
**12:18 [1]** 189/24
**12th [2]** 158/8 243/11
**13 [1]** 213/24
**13 hours [2]** 128/11 213/21
**13-hour [1]** 154/23
**13.88 [3]** 244/8 244/9 244/11
**133.63 hours [1]** 251/23
**13s [1]** 150/9
**14 [3]** 149/25 174/20 217/13
**14 hours [5]** 213/25 216/21 216/24 227/20 227/25
**14-and-a-half [1]** 150/24
**14-hour [1]** 154/23
**14.7 [1]** 194/2
**140 [2]** 186/13 255/9
**140 hours [1]** 254/21
**14s [1]** 150/10
**14th [2]** 296/11 298/22
**15 [17]** 128/7 128/11 139/19 149/3 149/22 149/25 150/23 151/3 151/5 151/11 152/7 154/22 154/22 178/15 181/1 194/3 194/7
**15 hours [3]** 157/2 226/1 226/5
**15-hour [3]** 127/18 154/14 194/2
**15-minute [1]** 141/21
**150 [1]** 250/14
**150 bucks [2]** 118/6 221/1
**150-hour [1]** 154/25
**1500 [1]** 289/3
**156 weeks [1]** 193/11
**157.79 [1]** 200/10
**15s [1]** 150/12
**15th [1]** 134/12
**16 [9]** 150/9 150/12 167/14 204/6 204/7 204/9 204/10 204/11 301/17
**16 hours [1]** 128/11
**160 [2]** 156/11 156/21
**160 hours [1]** 156/17
**168 [2]** 155/6 155/6
**168 hours [4]** 156/4 156/11 186/13 187/14
**16th [4]** 161/13 170/5 170/8 170/9
**17 [4]** 88/7 90/1 151/11 190/1
**17 hours [1]** 128/7
**17-60926-CIV-WPD [1]** 88/4
**17.45 [1]** 223/22
**17.45 hours [1]** 223/13
**17.5 [1]** 223/22
**17th [4]** 153/4 169/24 170/1 170/1
**18 [1]** 301/23
**180 hours [1]** 155/5
**186 hours [1]** 155/2
**18th [2]** 129/6 132/16
**191 [1]** 301/8
**19th [3]** 132/14 135/14 195/7
**1:15 [2]** 189/20 190/19
**1st [5]** 135/14 195/7 205/12 291/25 292/11

**2015 [16]** 106/12 135/14 135/14 136/1 150/4 150/9 158/7 158/8 195/7 196/17 197/12 213/16 234/19 242/7 243/11 243/11
**2016 [16]** 102/20 108/1 129/4 129/6 132/13 132/14 150/9 186/5 187/21 187/25 200/2 200/4 223/6 223/12 296/12 298/22
**2017 [6]** 91/12 134/10 135/1 161/6 161/8 161/13
**2018 [3]** 88/7 90/1 190/1
**204 [2]** 301/17 301/17
**205F [1]** 89/10
**207 [5]** 200/8 215/17 216/4 216/10 217/8
**207.79 [2]** 170/15 200/13
**20th [3]** 89/3 151/22 195/8
**220 [2]** 89/6 301/9
**22nd [2]** 135/25 223/12
**230 [1]** 171/10
**24 [1]** 171/10
**24 hours [5]** 252/21 253/5 253/6 284/7 284/10
**25 [1]** 260/19
**254 [1]** 301/11
**256 [1]** 301/11
**258 [1]** 301/13
**26th [1]** 135/1
**27 [1]** 118/22
**28 [1]** 167/5
**28th [2]** 134/12 234/17
**29 [1]** 242/7
**299 [1]** 89/10
**2:18 [1]** 190/1
**2nd [2]** 151/22 152/2

**3**
**3.3 hours [7]** 173/7 173/8 181/18 296/12 296/22 297/2 298/22
**30 [4]** 139/7 139/17 178/11 178/12
**30 minutes [1]** 180/3
**30-hour [1]** 155/1
**30th [4]** 153/4 153/5 158/7 295/2
**32801 [1]** 89/7
**33301 [1]** 89/10
**33304 [1]** 89/4
**35 bucks [3]** 119/25 121/25 212/21
**3:24 [1]** 205/14
**3:57 [1]** 257/16
**3rd [3]** 203/18 203/20 213/15

**4**
**4-16 [1]** 167/14
**4-24-2016 [1]** 150/9
**4-26-15 [1]** 149/25
**4-27-14 [1]** 149/25
**4-28 [1]** 167/5
**4.0 hours [1]** 130/2
**4.01 [1]** 195/24
**4.02 [2]** 195/22 195/25
**4.1 [7]** 130/3 130/6 130/8 131/9 133/15 216/1 248/25
**4.1 hours [7]** 129/18 130/20 131/6 134/2 134/5 154/6 248/17
**40 [4]** 188/7 197/23 250/13 255/11
**40 hours [2]** 156/20 255/1
**45 minutes [2]** 182/14 205/19
**451.85 [1]** 197/18
**48 [1]** 196/23
**48,780 [1]** 196/24
**4:05 [1]** 257/16
**4s [1]** 233/9
**4th [2]** 118/14 159/4

**5**
**5-1 [1]** 205/5
**5-10-2015 [1]** 150/9
**5-15-18 [1]** 301/23
**5-2 [1]** 203/2 204/25

## 5

**5-3 [2]** 202/23 204/17
**5.5 [1]** 296/12
**50 [9]** 118/4 118/4 120/4 152/14 152/14 152/22 152/22 212/22 213/3
**50 bucks [7]** 110/17 119/6 120/2 121/25 212/20 218/18 222/12
**500 [1]** 279/1
**52 weeks [1]** 193/11
**54 hours [1]** 197/17
**5:06 [1]** 301/2
**5:25 [1]** 204/21
**5:45 [1]** 205/14
**5th [2]** 129/4 136/1

## 6

**6-2 [2]** 244/2 244/4
**6-27 [1]** 118/22
**6-3 [1]** 244/2
**6.1 [1]** 133/8
**6.1 hours [1]** 132/21
**6.57 [2]** 152/4 153/1
**60 hours [3]** 287/2 287/7 294/23
**66 hours [1]** 197/19
**6:11 [7]** 173/19 173/22 173/23 174/5 178/1 178/4 178/5
**6:11 a.m [2]** 173/16 177/25
**6:15 [1]** 131/16
**6:30 [1]** 143/23
**6:30 a.m [1]** 143/2
**6th [1]** 129/8

## 7

**7.1 hours [1]** 134/25
**7.48 [1]** 153/7
**70 hours [1]** 155/13
**74 grand [1]** 186/18
**75 bucks [2]** 118/6 119/6
**750 [1]** 279/1
**769-5657/mjsfcs [1]** 89/11
**7:30 a.m [1]** 132/6

## 8

**8.05 [1]** 188/1
**80 [2]** 156/21 250/13
**80 hours [1]** 155/13
**801 [1]** 89/3
**8th [1]** 135/1

## 9

**9-11 [1]** 171/10
**9-24 [1]** 171/10
**90 [1]** 211/5
**90 percent [2]** 142/1 213/25
**91 [1]** 301/8
**954 [1]** 89/11
**99 percent [1]** 219/22
**9:15 [4]** 257/10 300/17 300/18 300/22
**9:22 [1]** 135/23
**9:22 a.m [1]** 135/15
**9:31 a.m [1]** 173/18
**9:41 [2]** 88/7 90/1
**9:52 [1]** 129/9
**9:56 a.m [2]** 135/3 135/5

## A

**a.m [25]** 88/7 90/1 110/25 111/2 129/9 132/5 132/6 132/8 132/10 134/14 134/21 135/3 135/5 135/15 136/2 143/2 143/4 144/24 144/24 173/16 173/18 173/24 177/25 178/1 275/9
**ability [1]** 272/21
**above [4]** 154/22 255/5 285/10 301/21
**above-entitled [1]** 301/21
**absence [1]** 276/17
**absolutely [86]**

**absurd [1]** 186/17
**acceptable [1]** 184/10
**accepted [8]** 119/17 202/17 202/22 202/24 203/20 204/19 204/21 267/16
**accommodate [5]** 200/17 200/24 208/10 208/15 275/6
**accommodated [3]** 194/24 200/1 207/20
**accommodations [2]** 207/23 208/2
**accordingly [1]** 278/16
**accountability [2]** 240/21 281/23
**accountable [3]** 210/14 241/2 280/4
**accounts [2]** 98/20 231/16
**accurate [5]** 129/15 149/6 200/18 203/23 211/21
**accused [1]** 226/13
**acknowledged [1]** 267/10
**acknowledging [2]** 235/7 253/18
**acknowledgment [2]** 234/4 267/8
**acknowledgments [1]** 267/19
**act [1]** 141/15
**actions [2]** 125/7
**add [6]** 109/15 111/8 157/19 238/4 289/4 290/12
**added [7]** 108/22 109/10 109/25 110/18 112/19 206/13 254/25
**adding [2]** 288/24 288/25
**addition [9]** 95/23 96/10 96/16 96/22 152/11 188/16 239/10 250/22 255/10
**address [2]** 105/20 108/17
**addressed [1]** 271/1
**addresses [1]** 99/2
**adhere [1]** 137/18
**adjust [1]** 288/21
**adjusted [3]** 282/14 290/2 290/5
**adjustments [2]** 289/4 289/12
**admitted [1]** 204/11
**admonition [8]** 90/20 144/14 145/17 189/10 190/16 257/4 258/8 300/15
**ADP [7]** 91/20 91/23 117/3 118/1 168/22 250/6 250/7
**advantage [1]** 290/16
**advised [3]** 222/3 222/5 250/8
**affected [1]** 205/25
**afforded [1]** 105/24
**afraid [2]** 101/23 193/14
**afternoon [12]** 118/7 145/9 189/12 220/11 220/12 230/13 230/14 254/5 254/6 258/19 258/20 263/9
**afternoons [1]** 180/24
**afterwards [2]** 93/2 168/20
**agree [13]** 156/14 170/1 247/15 247/15 247/18 269/14 269/16 277/1 283/5 284/9 286/2 286/5 298/7
**agreements [1]** 235/20
**AL [1]** 88/8
**Allen [3]** 270/25 271/5 271/7
**alleviate [1]** 206/2
**alley [2]** 210/13 283/4
**alleys [1]** 119/24
**allot [1]** 269/9
**allow [11]** 90/21 144/15 145/18 163/7 189/11 190/17 222/21 257/5 258/9 276/19 300/15
**allowed [6]** 123/10 163/13 163/16 163/25 205/21 216/19
**Allowing [1]** 276/16
**allows [1]** 123/3
**alluded [1]** 285/4
**almost [9]** 102/23 119/21 143/21 185/9 186/23 187/3 195/10 199/21 281/4
**alone [1]** 251/7
**altercation [10]** 161/12 161/21 163/6 163/11 164/23 169/12 216/18 295/8 295/16 296/1
**altercations [1]** 161/17
**alternative [1]** 237/11
**amazing [1]** 218/9

**ambiguity [1]** 267/9
**amount [13]** 96/19 182/20 185/8 192/15 208/12 222/9 238/15 246/19 251/16 287/14 288/12 290/17 292/21
**amounts [2]** 121/20 224/20
**Amy [1]** 89/5
**ANDREU [47]**
**Andreu vs. Waste [1]** 90/4
**Andreu's [8]** 233/12 236/4 243/10 253/18 255/15 274/16 284/13 287/4
**answer [13]** 97/20 131/11 133/22 151/12 201/8 216/16 235/19 248/21 261/17 270/15 292/23 295/21 296/5
**answers [2]** 162/2 292/20
**anticipate [1]** 132/20
**anticipated [1]** 184/3
**Anytime [1]** 215/18
**aol.com [1]** 89/11
**apartment [9]** 108/13 109/4 160/24 161/4 165/23 169/20 212/24 217/5 227/14
**apologize [3]** 96/3 190/18 279/16
**APPEARANCES [1]** 89/1
**appointment [1]** 208/9
**appreciate [3]** 215/14 221/12 257/22
**approach [7]** 115/22 149/14 173/12 198/24 203/9 220/7 278/11
**approval [1]** 116/20
**approvals [1]** 116/12
**approve [6]** 116/23 117/20 117/25 118/22 118/24 120/25
**approved [21]** 117/6 117/18 118/2 118/7 118/16 118/18 119/3 119/4 119/5 119/16 120/4 121/9 149/12 149/18 151/19 151/20 167/17 198/8 198/8 267/15 270/9
**approximate [1]** 191/4
**approximately [2]** 106/4 106/19
**April [10]** 88/7 90/1 135/1 161/13 169/24 170/1 170/1 170/5 170/8 190/1
**April 16th [3]** 161/13 170/5 170/8
**APRIL 17 [1]** 190/1
**April 17th [3]** 169/24 170/1 170/1
**April 8th [1]** 135/1
**area [16]** 102/22 102/23 126/16 174/16 179/5 213/24 221/22 239/5 273/4 289/15 289/17 289/18 289/19 289/24 297/15 297/17
**areas [8]** 108/13 124/22 130/5 172/7 180/5 265/23 273/7 288/25
**aren't [9]** 140/16 141/7 141/13 143/23 162/18 197/22 286/17 290/3 290/20
**argument [2]** 197/15 215/17
**arise [1]** 162/12
**arm [1]** 206/25
**arose [1]** 114/21
**arranged [1]** 283/3
**arrangements [2]** 281/17 282/2
**arrive [1]** 224/19
**Art [2]** 176/19 212/20
**aspect [2]** 232/22 280/15
**ass [1]** 218/19
**asserted [1]** 222/22
**assign [1]** 253/5
**assigned [15]** 95/6 95/13 97/11 97/24 101/1 111/5 184/2 225/10 225/12 225/14 244/18 246/2 247/22 255/21 283/24
**assignment [11]** 95/22 95/24 96/14 97/13 100/4 100/8 100/11 246/23 248/3 248/15 252/24
**assignments [17]** 95/18 96/10 100/7 113/2 244/14 245/24 246/5 247/14 247/20 247/21 248/5 252/23 252/25 253/1 253/2 253/4 253/5
**assist [2]** 102/13 123/1
**assistance [1]** 221/18
**assisting [1]** 103/18
**assists [1]** 126/5
**assume [11]** 144/9 152/22 157/23 192/2

**A**

**assume... [7]** 192/12 199/16 243/23 245/4
245/17 263/16 268/5
**assumed [1]** 199/17
**assuming [6]** 131/12 159/2 181/4 224/1
265/7 296/14
**assumption [7]** 182/20 270/22 275/16 276/1
297/21 297/23 299/11
**assumptions [1]** 298/5
**assurances [1]** 265/24
**assured [1]** 200/1
**attain [1]** 262/16
**attend [2]** 262/17 268/22
**attendance [5]** 144/7 233/23 273/11 273/25
274/2
**attended [1]** 262/19
**attorney [4]** 116/5 221/16 255/15 292/7
**attorneys [5]** 94/11 130/15 201/3 221/18
221/19
**August [16]** 94/6 129/21 130/17 135/14
151/22 152/2 153/4 153/4 153/5 158/7
159/24 160/5 171/21 172/2 182/16 195/7
**August 11th [1]** 160/5
**August 17th [1]** 153/4
**August 1st [2]** 135/14 195/7
**August 2nd [2]** 151/22 152/2
**August 30th [3]** 153/4 153/5 158/7
**automatically [2]** 152/21 239/23
**Avenue [2]** 89/3 89/6
**average [1]** 109/20 156/20
**aware [2]** 240/14 249/24

**B**

**background [6]** 232/7 232/10 232/11 232/13
262/10 262/13
**ball [1]** 275/15
**bank [1]** 207/9
**base [2]** 101/18 291/4
**basic [3]** 263/10 266/6 278/9
**basis [8]** 92/1 92/1 103/16 104/6 105/15
155/14 233/25 251/18
**battling [1]** 208/4
**Bay [2]** 174/17 178/18
**Beach [3]** 183/25 231/8 259/6
**becomes [1]** 179/1
**beef [1]** 219/13
**beforehand [1]** 298/3
**beg [1]** 219/13
**beginning [5]** 97/3 155/9 185/15 186/1
228/19
**begins [1]** 245/6
**behind [6]** 91/24 139/5 139/14 172/25
185/22 280/17
**belief [4]** 172/14 177/7 182/20 182/21
**believe [88]**
**believes [1]** 245/13
**below [8]** 250/15 254/8 254/12 254/13
254/15 255/3 255/4 255/16
**bench [2]** 90/2 190/2
**benefit [5]** 147/9 147/10 192/17 192/19
266/11
**benefits [1]** 154/2
**betting [1]** 101/13
**beyond [1]** 180/7
**bigger [2]** 238/14 261/21
**Bill [3]** 174/12 205/17 295/24
**biweekly [3]** 92/1 155/1 155/11
**black [1]** 214/2
**Blvd [1]** 89/10
**boarding [7]** 230/20 230/23 230/24 230/24
231/2 231/3 231/25
**bonus [105]**
**bonuses [38]** 116/17 117/5 117/6 117/15
117/19 117/21 117/23 118/1 118/3 118/22
118/25 119/11 119/22 119/22 122/2 122/14
152/15 152/19 169/3 187/6 197/6 209/5

210/8 213/4 224/12 229/14 242/20 245/14
247/9 247/17 255/13 271/17 279/9 279/10
279/11 279/12 281/20 282/13
**born [1]** 297/9
**boss [1]** 277/3
**boss/employee [1]** 220/21
**bother [1]** 166/14
**bottom [6]** 102/9 116/12 116/20 117/12
159/9 246/7
**boundaries [2]** 126/4 287/12
**Bowls [1]** 221/7
**box [1]** 90/6
**brain [1]** 208/4
**break [5]** 127/22 137/14 144/11 257/2
300/11
**breakdown [1]** 223/23
**breakdowns [2]** 223/15 285/4
**breaker [2]** 232/13 262/14
**breaking [1]** 125/25
**breaks [1]** 126/22
**brief [1]** 220/3
**broke [7]** 98/9 126/7 126/12 126/15 126/16
126/18 128/1
**broken [2]** 99/12 127/14
**Broward [5]** 89/10 100/20 100/23 259/6
297/9
**brunch [6]** 160/23 164/20 165/2 165/22
217/4 227/11
**bucks [25]** 110/17 118/6 118/6 119/6 119/6
119/25 120/2 121/25 121/25 166/10 185/10
185/11 188/9 197/19 212/20 212/21 215/12
216/4 216/11 217/7 217/7 218/18 221/1
222/12 238/22
**building [1]** 174/15
**bulk [17]** 100/23 106/8 106/13 106/15
106/15 106/21 107/16 107/19 107/21 175/16
178/24 178/25 179/14 181/6 296/18 297/17
300/1
**bumped [1]** 221/5
**bunch [5]** 112/2 112/8 150/9 212/24 223/25
**buried [1]** 208/5
**business [12]** 108/5 112/20 179/4 211/9
262/13 266/12 266/13 266/13 266/14 283/13
283/18 289/15
**businesses [3]** 108/22 109/10 259/23
**busted [1]** 218/18
**busting [1]** 275/20
**butt [1]** 275/20

**C**

**calculate [5]** 197/15 198/2 199/14 218/11
239/21
**calculated [4]** 199/16 228/22 235/12 249/25
**calculates [2]** 248/11 248/22
**calculating [1]** 255/19
**calculation [7]** 237/17 239/17 251/20 252/5
270/2 270/9 270/10
**call [32]** 104/5 104/7 109/1 109/2 109/11
109/14 110/6 110/16 110/23 111/7 126/18
136/13 136/16 137/11 138/1 142/12 142/15
162/13 165/4 165/9 165/9 165/19 165/22
184/8 208/8 217/4 227/7 230/2 230/3 237/12
256/23 269/5
**called [16]** 93/2 108/23 111/13 141/2 160/22
160/23 165/19 168/14 225/18 227/5 227/9
227/12 229/10 236/13 285/22 294/1
**calling [2]** 109/8 137/19
**calls [4]** 109/6 122/8 219/4 256/24
**camera [1]** 179/10
**cameras [1]** 179/10
**cancer [1]** 208/5
**car [3]** 103/8 123/10 123/14
**card [32]** 116/20 116/24 117/1 117/5 117/20
118/3 118/8 118/16 119/16 120/25 121/9
122/24 123/2 123/3 123/3 123/5 123/11
123/16 124/11 167/9 167/10 167/17 173/12

173/23 234/11 242/15 243/23 251/12 255/23
264/14 264/23 299/3
**cards [10]** 91/24 91/25 116/4 123/19 123/19
149/12 149/17 149/18 198/7 266/24
**Carlos [12]** 92/5 92/6 92/6 92/22 92/23 93/2
93/14 193/2 222/6 271/7 271/12 271/13
**Carrier [1]** 141/15
**cause [1]** 183/22
**caused [1]** 163/6
**ceased [1]** 106/3
**center [1]** 272/13
**certainty [3]** 131/9 296/21 297/16
**certify [1]** 301/20
**chance [1]** 91/17
**chaotic [2]** 151/10 201/23
**characterization [1]** 287/24
**characterize [2]** 101/7 267/7
**charged [2]** 274/7 276/16
**check [12]** 114/8 128/7 129/12 141/19
152/19 166/13 168/20 216/19 232/7 232/10
262/10 262/22
**checked [4]** 148/4 148/16 263/19 274/20
**checking [4]** 161/21 163/8 164/15 164/17
**choice [1]** 290/21
**choices [1]** 182/6
**choose [5]** 176/8 182/4 182/7 182/8 184/7
**choosing [1]** 226/13
**chose [5]** 177/6 181/5 182/11 202/9 215/25
**chosen [2]** 181/20 181/22 181/23 181/24
181/25 182/10
**Christmas [6]** 157/18 158/1 158/16 158/17
158/23 158/24
**chronologically [1]** 296/15
**circumstances [4]** 201/12 232/21 249/24
293/11
**cite [1]** 147/14
**cited [1]** 141/16
**city [18]** 103/4 103/13 108/14 161/19 161/19
161/20 163/7 163/12 163/15 164/11 164/12
164/14 164/18 183/12 295/6 295/11 295/13
297/6
**CIV [1]** 88/4
**claim [4]** 122/6 219/2 235/3 267/3
**clarify [2]** 220/13 253/17
**clarity [1]** 189/2
**class [3]** 264/2 268/5 268/7
**classes [2]** 264/4 264/9
**classifications [2]** 266/9 266/10
**clean [1]** 96/20
**cleaning [1]** 98/7
**cleanup [1]** 99/12
**clear [1]** 102/22
**clock [61]**
**clock-in [2]** 131/5 281/23
**clock-out [2]** 130/25 281/23
**clocked [33]** 118/7 128/18 128/24 129/18
130/5 130/6 131/5 132/12 132/16 132/25
133/4 133/11 134/14 134/21 135/3 135/12
135/15 136/1 143/2 143/9 159/20 159/21
160/15 160/15 161/4 169/18 169/18 173/10
176/14 177/14 178/4 196/13 204/21
**clocking [5]** 92/1 92/2 131/12 136/5 144/4
**clocks [4]** 132/2 240/1 255/22 280/21
**close [3]** 102/25 230/8 296/25
**closer [1]** 131/8
**closing [1]** 273/1
**cluster [1]** 275/9
**coast [2]** 259/4 259/7
**code [1]** 123/9
**collaborative [1]** 269/6
**collect [2]** 259/20 297/17
**combined [1]** 269/6
**comments [1]** 146/2
**commercial [16]** 98/20 107/24 108/4 108/10
108/12 109/21 124/19 141/8 147/7 164/3
172/18 172/20 266/13 275/3 275/4 275/7

**C**

**commission** [1]  103/9
**commitment** [2]  265/25 266/2
**common** [1]  193/6
**communicate** [3]  101/23 104/2 104/23
**communicated** [1]  105/2
**communicating** [2]  104/19 105/3
**community** [4]  99/11 99/12 288/23 289/21
**compactor** [4]  160/25 161/1 164/20 227/14
**compactors** [2]  98/15 108/14
**companies** [1]  261/2
**company** [22]  117/2 155/9 199/12 213/7 218/4 218/5 218/13 219/12 219/15 219/16 219/17 258/25 261/3 261/12 261/18 261/21 261/23 271/13 276/13 289/22 297/5 297/25
**company's** [1]  265/24
**compensate** [3]  280/6 283/13 284/7
**compensated** [4]  218/14 225/17 241/10 298/15
**compensating** [1]  280/7
**compensation** [18]  185/13 263/7 263/11 264/2 264/5 264/10 268/19 269/9 285/10 290/17
**complain** [3]  113/25 114/8 168/24
**complained** [1]  208/20
**complaining** [1]  103/13
**complaint** [3]  211/20 295/5 295/22
**complaints** [10]  103/12 269/23 272/2 272/4 272/8 272/12 272/14 272/21 273/3 291/4
**complete** [12]  95/21 98/25 99/3 103/11 127/5 127/12 127/12 137/15 141/16 153/18 171/17 174/9
**completed** [2]  136/19 252/22
**completing** [2]  136/14 175/5
**completion** [1]  136/11
**complex** [9]  109/5 160/25 161/4 165/23 169/20 177/10 212/24 217/6 227/14
**complexes** [1]  108/14
**component** [3]  278/8 287/17 287/18
**comprehension** [1]  102/11
**computer** [4]  88/25 98/19 230/25 231/4
**concerns** [2]  105/17 105/20
**concerted** [1]  219/21
**concluded** [1]  301/2
**conclusion** [2]  122/9 219/5
**condition** [3]  139/23 140/3 205/20
**conditions** [1]  143/25
**conduct** [1]  162/21
**confer** [2]  229/6 253/13
**confirm** [1]  119/11
**confused** [3]  273/23 273/24 285/12
**confusing** [1]  175/3
**confusion** [1]  188/10
**consistent** [1]  229/13
**constant** [2]  180/10 194/20
**construction** [2]  108/11 259/21
**contact** [2]  104/12 281/11
**contacted** [1]  283/7
**contacts** [1]  233/9
**contained** [5]  145/24 233/21 234/20 234/22 235/6
**container** [8]  98/21 98/22 98/22 102/25 108/18 108/20 108/24 109/2
**containers** [6]  95/25 98/14 110/14 110/14 110/16 183/5
**contention** [2]  187/16 187/17
**context** [1]  277/10
**CONTINUED** [1]  191/1
**contracts** [1]  235/20
**contrary** [1]  164/12
**control** [3]  132/2 224/3 287/20
**convenience** [1]  257/1
**conversation** [3]  222/13 223/3 223/4
**conversations** [1]  184/6
**copy** [2]  147/13 203/23
**Coral** [17]  97/12 124/22 139/12 161/3

161/13 161/19 163/7 163/12 163/15 171/16 172/13 179/5 216/18 272/13 295/6 295/13 296/23
**corners** [1]  211/6
**corporate** [2]  200/21 221/2
**corrected** [9]  114/16 166/3 168/4 168/6 168/19 169/1 209/22 209/25 212/11
**corrections** [1]  219/21
**cortisone** [1]  206/1
**counsel** [5]  90/3 145/3 203/8 229/8 253/15
**count** [4]  149/7 149/25 150/22 178/18
**counties** [1]  259/4
**County** [6]  100/20 100/23 259/5 259/5 259/6 297/9
**court** [16]  88/1 89/8 89/9 89/9 94/13 94/15 112/1 112/7 122/3 144/21 145/4 189/19 257/11 257/19 300/22 301/24
**courtroom** [14]  90/17 144/19 144/23 144/25 145/13 189/17 189/23 190/14 257/9 257/15 257/17 258/6 300/20 301/1
**cover** [2]  229/11 269/8
**covered** [4]  212/22 256/10 264/3 264/5
**crazy** [1]  110/15
**create** [2]  286/12 289/19
**created** [1]  261/24
**credit** [2]  123/3 123/19
**criminal** [4]  232/10 232/13 232/17 262/13
**criteria** [5]  248/8 248/9 248/12 279/2 279/5
**cross** [9]  90/22 91/1 189/6 191/1 220/14 254/2 254/3 301/8 301/11
**cross-examination** [6]  90/22 91/1 191/1 220/14 254/2 254/3
**CRR** [2]  89/8 301/24
**crumple** [1]  148/8
**crux** [1]  215/17
**cuff** [1]  172/4
**Cummings** [1]  89/3
**cumulative** [1]  278/25
**customer** [8]  231/16 265/17 265/20 272/2 272/4 273/2 276/9 287/17
**customers** [1]  272/19
**cut** [1]  211/6
**cycle** [2]  224/12 250/14
**cycles** [1]  224/15

**D**

**Dade** [1]  259/6
**daily** [63]
**damage** [1]  279/6
**darn** [1]  201/24
**date** [15]  106/5 148/23 196/19 202/22 202/25 203/6 203/17 204/17 249/14 264/6 295/2 295/2 296/11 296/12 301/24
**dated** [1]  243/11
**dates** [4]  106/14 172/7 264/12 292/14
**day's** [5]  95/13 168/2 294/17 294/19 298/5
**debris** [1]  259/21
**December** [4]  136/1 151/8 291/25 292/11
**December 1st** [2]  291/25 292/11
**December 5th** [1]  136/1
**decent** [2]  101/10 221/7
**decide** [1]  148/19
**decided** [1]  180/11
**decision** [1]  201/24
**decreases** [1]  229/4
**deduct** [1]  278/15
**defect** [8]  146/18 146/19 147/13 147/15 147/16 147/22 147/24 148/6
**defects** [4]  146/18 148/11 148/13 148/25
**defend** [1]  210/22
**Defendant** [1]  89/5
**Defendants** [1]  88/9
**Defendants'** [3]  204/9 204/11 301/16
**defending** [1]  297/5
**Defense** [2]  204/10 217/13
**Defense 14** [1]  217/13

**definite** [1]  183/13
**definitive** [1]  199/15
**degree** [5]  232/1 275/19 288/17 296/21 297/15
**delay** [1]  224/2
**delays** [1]  224/3
**deliberation** [1]  144/16
**deliver** [1]  183/5
**demand** [1]  162/17
**demands** [1]  112/2
**deny** [2]  130/18 211/6
**department** [10]  141/5 141/10 141/14 141/18 146/25 147/9 147/18 244/23 247/21 270/25
**dependent** [1]  248/15
**depending** [8]  118/6 126/16 179/22 180/2 180/8 237/7 248/3 284/3
**depends** [7]  127/2 132/1 248/22 250/19 265/14 281/6 283/18
**depo** [1]  166/6
**deposit** [1]  233/10
**deposition** [22]  94/6 94/24 95/10 101/9 129/21 130/17 130/19 159/24 160/5 166/1 167/23 168/7 171/18 171/21 171/23 172/6 172/10 211/24 214/10 291/22 292/11 292/19
**derived** [1]  270/17
**describe** [6]  102/3 126/14 199/9 235/10 235/12 250/4
**described** [3]  239/1 251/11 264/10
**describes** [2]  235/11 235/14
**describing** [1]  234/18
**description** [1]  176/5
**deserve** [1]  200/22
**design** [1]  286/7
**designed** [4]  250/11 284/7 286/4 287/11
**detail** [4]  151/21 171/13 213/19 242/20
**detailed** [1]  263/2
**details** [3]  171/19 171/22 242/16
**determination** [2]  225/1 225/2
**determinations** [1]  240/4
**determine** [2]  251/3 256/10
**diesel** [4]  123/4 123/13 123/15 123/16
**difference** [1]  156/15
**differentiate** [1]  223/24
**differentiation** [2]  245/9 245/11
**difficulties** [1]  297/14
**difficulty** [1]  197/20
**dime** [2]  201/10 219/11
**Dimitrouleas** [1]  88/14
**direct** [9]  91/6 136/10 222/24 230/11 233/10 254/7 258/17 301/10 301/13
**directing** [3]  135/25 151/21 195/6
**directive** [1]  276/20
**directly** [5]  140/23 199/12 271/2 273/10 275/14
**disagreement** [2]  267/11 267/12
**disciplinary** [3]  233/6 233/11 233/14
**discipline** [1]  282/22
**disciplined** [1]  280/9
**discuss** [10]  90/20 144/15 145/17 189/11 190/16 227/3 257/5 258/8 269/2 300/15
**discussed** [21]  90/21 101/11 144/15 145/18 189/11 190/17 192/11 221/23 223/10 236/4 257/5 258/9 263/1 268/4 268/11 268/13 268/18 268/25 269/5 269/2 300/15
**discusses** [1]  236/4
**discussing** [2]  221/24 266/8
**discussion** [5]  203/8 229/8 241/4 253/15 268/15
**dishonest** [1]  133/14
**disputing** [3]  156/2 214/9 245/17
**disqualified** [1]  278/1
**disregard** [1]  140/8
**disregarding** [1]  208/12
**disrespect** [1]  112/6
**disrespectful** [1]  112/6

**D**

**distinguishes [1]** 123/9
**DISTRICT [4]** 88/1 88/2 88/15 89/9
**divide [5]** 237/23 237/25 238/14 251/16 259/8
**divided [3]** 197/17 238/8 270/11
**division [19]** 88/3 101/2 102/4 102/25 103/25 107/23 109/19 110/21 124/16 124/17 124/20 161/2 185/8 231/7 259/10 259/14 259/15 260/15 262/9
**divisions [5]** 231/9 259/9 259/10 259/13 259/16
**dock [1]** 272/9
**document [6]** 148/14 198/15 199/4 203/12 203/22 266/20
**documents [3]** 93/17 93/21 266/23
**dollar [1]** 246/19
**dollars [21]** 96/19 170/18 171/1 187/6 188/11 188/16 192/16 215/16 238/21 238/21 238/24 239/2 243/15 243/21 243/22 244/7 244/9 251/3 251/6 251/9 254/22
**door [4]** 105/25 115/1 241/25 251/9
**DOT [2]** 141/2 141/4
**downstairs [1]** 105/10
**draw [1]** 153/19
**drive [15]** 97/6 103/15 106/18 139/9 175/21 178/13 178/19 179/6 179/8 180/23 182/13 205/21 236/24 296/24 297/8
**driven [4]** 260/21 260/25 293/15 297/12
**driver [43]**
**driver's [1]** 147/8
**drivers [11]** 103/7 131/18 236/19 240/21 254/10 262/5 267/3 279/25 281/22 283/25 294/7
**drives [1]** 274/10
**driveway [1]** 273/1
**driving [6]** 97/4 102/21 124/21 141/17 206/8 236/20
**dropped [1]** 275/15
**drove [2]** 261/3 290/8
**dump [27]** 97/7 97/7 102/24 108/19 108/19 140/12 140/13 140/13 140/16 140/18 140/23 163/25 179/13 179/23 180/18 182/7 184/7 184/9 184/11 185/1 271/25 285/5 289/9 289/9 297/1 297/13 299/2
**dumped [2]** 181/4 181/6
**dumping [5]** 180/9 180/9 184/19 184/23 263/9
**duty [1]** 97/12
**DVIR [5]** 145/22 147/2 147/8 147/17 181/23
**DVIRs [2]** 175/4 176/4
**DVR [1]** 138/21

**E**

**earliest [1]** 223/1
**early [13]** 106/5 110/25 132/7 143/20 153/17 163/9 163/11 178/23 179/24 199/12 208/7 290/7 290/10
**earn [5]** 107/1 187/12 271/23 277/22 298/22
**earned [12]** 156/9 185/9 186/11 186/15 186/25 187/3 187/5 187/5 197/2 209/11 271/21 271/21
**earning [5]** 129/15 155/24 156/10 156/12 278/2
**earnings [10]** 129/14 187/10 237/22 237/23 238/3 238/3 238/4 238/5 251/2 296/12
**easiest [3]** 173/1 178/19 179/6
**Easter [51]**
**easy [4]** 162/19 174/13 176/18 245/19
**economy [1]** 289/5
**Edwards [9]** 89/2 89/3 271/6 292/2 300/11 301/9 301/10 301/11 301/13
**efficiency [4]** 287/21 287/22 290/13 291/8
**efficient [2]** 290/11 290/15
**effort [1]** 219/21
**efforts [1]** 125/13

**egregious [2]** 272/2 272/6
**eight [37]** 111/17 152/3 153/5 153/12 154/5 154/11 154/16 154/18 154/21 157/20 159/10 183/22 191/8 191/25 192/15 192/16 192/18 192/19 192/22 192/24 192/24 192/25 193/3 193/7 193/8 193/12 195/10 222/6 222/8 224/16 229/20 263/15 263/18 286/21 286/23 294/21 298/9
**element [1]** 231/23
**Elliot [1]** 199/13
**emails [2]** 163/16 163/19
**emergency [1]** 233/9
**emperor [1]** 104/5
**employed [4]** 91/11 102/1 222/2 230/15
**employee [43]**
**Employee A [1]** 241/12
**employee's [1]** 233/22
**employees [38]** 230/21 232/8 233/2 234/23 236/12 236/18 236/22 236/23 237/9 237/13 237/14 237/16 239/15 239/18 239/22 240/8 240/15 240/17 248/24 250/23 251/23 254/7 261/25 262/3 262/24 264/17 266/1 266/7 278/4 279/15 279/19 279/23 280/1 280/2 280/3 282/10 288/15 290/13
**employment [3]** 95/17 134/6 191/22
**emptied [1]** 108/24
**empty [3]** 90/6 183/12 289/6
**encompass [5]** 95/12 97/4 99/19 259/3 296/24
**encompassed [1]** 94/25
**encompasses [5]** 102/12 192/20 199/8 269/7 289/2
**enforced [2]** 276/18 277/3
**enforcing [2]** 276/11 276/13
**ensure [1]** 124/10
**enter [2]** 204/2 281/17
**entitled [8]** 131/9 162/17 162/17 164/6 164/6 186/15 210/4 301/21
**entitlement [1]** 277/23
**Eola [1]** 89/7
**equal [1]** 273/8
**equation [5]** 251/4 251/5 251/11 270/13 270/19
**equipment [1]** 166/24
**errand [1]** 281/12
**errors [1]** 272/2
**especially [4]** 155/9 168/13 175/15 177/1
**Esq [4]** 89/2 89/2 89/5 89/5
**essential [2]** 272/19
**established [2]** 134/2 146/19
**ET [1]** 88/8
**evening [4]** 300/14 300/18
**event [5]** 97/18 98/7 99/8 99/11 99/24
**events [2]** 98/3 100/14
**everybody [3]** 154/24 172/25 186/2
**everybody's [1]** 265/6
**everyday [3]** 167/2 241/18 241/20
**everyone [4]** 90/20 145/17 190/16 258/8
**everything's [1]** 137/15
**evidence [13]** 151/13 155/17 156/6 162/2 162/2 175/23 194/13 198/18 198/19 198/20 204/3 204/11 226/15
**evident [3]** 168/19 215/20 221/16
**examination [12]** 90/22 91/1 136/10 191/1 220/9 220/14 230/11 254/2 254/3 254/7 256/6 258/17
**examples [1]** 208/1
**exception [1]** 116/11
**excess [6]** 154/21 156/15 156/16 156/20 186/5 255/11
**excuse [6]** 196/8 214/19 262/16 279/17
**excused [2]** 230/1 256/22
**excuses [1]** 212/24
**executive [1]** 237/3
**exhibit [6]** 174/20 204/5 204/9 204/11 204/15 220/15

**Exhibit 14 [1]** 174/20
**exhibits [5]** 115/25 151/13 220/4 301/15 301/16
**exists [1]** 212/11
**exited [8]** 144/19 144/23 189/17 189/23 257/9 257/15 300/20 301/1
**expanse [1]** 119/20
**expect [3]** 133/3 226/5 229/10
**expectation [1]** 109/25
**expected [7]** 112/22 133/4 134/18 135/9 135/20 136/5 191/9
**experience [2]** 266/19 297/6
**expertise [1]** 239/6
**explain [19]** 108/3 108/7 179/2 186/3 199/16 212/14 230/19 230/23 237/8 237/12 237/15 237/18 237/19 239/17 249/5 266/17 270/3 270/4 270/8
**explained [13]** 93/24 166/22 192/13 201/18 235/25 236/1 249/2 267/14 268/20 270/15 270/18 270/20 271/2
**explaining [2]** 214/24 266/15
**explains [1]** 232/19
**explanation [3]** 238/7 277/17 283/9
**Expressway [4]** 139/12 139/13 173/1 181/14
**extensive [1]** 208/5
**extent [1]** 222/19
**extra [20]** 108/22 201/19 206/21 206/22 223/19 224/17 242/12 243/1 243/4 243/5 243/7 244/2 244/13 244/22 246/24 281/12 281/22 282/8 290/16 290/17

**F**

**facilities [2]** 140/16 180/10
**facility [9]** 100/2 127/10 127/14 127/23 128/5 138/13 139/15 181/4 297/2
**fact [5]** 103/20 200/2 217/17 217/24 222/21
**factored [1]** 225/1
**facts [1]** 221/21
**failed [1]** 138/25
**failing [1]** 282/8
**fairness [1]** 110/4
**falling [1]** 206/25
**falls [2]** 144/3 159/18
**family [5]** 160/23 165/22 217/4 227/6 227/11
**fantasy [4]** 101/12 104/22 105/1 221/6
**fast [7]** 153/23 171/17 215/20 287/11 287/13 287/22 300/6
**faster [2]** 193/4 193/4
**fastest [1]** 287/14
**father [1]** 208/5
**federal [2]** 141/15 158/1
**feelings [3]** 187/18 250/23 250/25
**females [1]** 236/24
**Fifteen [5]** 139/16 150/24 178/11 178/12 178/16
**fighter [1]** 186/16
**fighting [1]** 212/5
**figure [5]** 229/5 238/11 238/25 239/4 299/17
**file [11]** 231/3 233/12 233/16 233/22 236/4 253/18 253/20 274/16 275/10 275/13 296/4
**filed [1]** 122/3
**files [3]** 234/20 234/23 265/7
**fill [11]** 146/10 146/13 148/14 148/22 174/8 174/22 175/1 175/13 177/6 211/4 289/6
**filled [4]** 97/6 164/2 177/7 211/1
**filling [2]** 124/24 263/8
**film [1]** 179/10
**final [1]** 150/19
**financial [1]** 265/24
**fine [7]** 107/4 137/13 137/14 146/16 146/17 189/3 242/19
**finish [7]** 109/1 154/13 177/4 179/12 184/13 184/15 291/6
**finished [4]** 112/22 206/7 290/6 291/10
**finishing [2]** 184/19 290/10
**fit [1]** 109/13

## F

**five a.m** [1] 173/24
**fix** [10] 115/18 120/7 164/20 168/12 208/19 208/19 209/2 215/10 215/12 215/13
**fixed** [18] 160/11 167/23 168/7 168/9 168/16 169/8 208/24 209/1 209/3 211/24 214/6 214/8 214/13 215/1 215/6 219/18 228/8 228/12
**flaw** [1] 210/12
**flip** [1] 149/17
**floor** [2] 92/18 92/24
**FLORIDA** [13] 88/2 88/6 88/8 89/4 89/7 89/10 201/6 258/23 259/2 259/5 259/19 260/1 260/2
**focus** [3] 265/23 269/7 272/18
**folks** [5] 124/11 142/6 232/16 237/3 266/16
**football** [6] 101/12 101/12 104/18 104/21 105/1 221/6
**force** [1] 114/13
**forced** [2] 278/15 290/22
**foregoing** [1] 301/20
**forgot** [2] 136/23 282/24
**form** [28] 92/2 116/8 145/22 146/10 146/13 146/20 146/22 146/23 147/2 147/8 147/11 147/12 147/15 147/17 147/21 147/24 148/2 148/22 181/23 224/7 274/8 274/10 274/14 274/17 275/13 275/19 277/20 277/21
**forms** [2] 233/16 275/10
**formula** [11] 188/20 198/9 198/10 199/5 199/7 199/9 238/11 239/19 239/21 250/19 251/22
**formulas** [1] 185/25
**FORT** [7] 88/3 88/6 89/4 89/10 169/19 217/6 227/14
**Fort Lauderdale** [3] 169/19 217/6 227/14
**foster** [1] 281/22
**frame** [2] 172/18 213/24
**Francine** [3] 89/8 301/23 301/24
**frequent** [1] 156/22
**frequently** [3] 138/8 155/7 155/8
**Friday** [2] 118/7 132/16
**front** [7] 102/5 129/12 131/2 143/10 172/4 178/25 236/10
**front-end** [2] 102/5 143/10
**fuel** [16] 122/24 123/1 123/3 123/3 123/14 123/16 123/18 138/25 139/1 139/2 234/11 264/14 264/23 266/23 297/14 299/2
**fueled** [2] 139/25 140/3
**fueling** [1] 138/24
**function** [1] 271/1
**furthest** [1] 139/19

## G

**game** [2] 215/25 216/5
**games** [2] 101/12 101/13
**garbage** [8] 103/21 185/17 185/20 185/21 272/25 273/7 289/8 296/25
**gas** [8] 123/4 123/5 123/5 123/7 123/7 123/16 123/19 124/11
**gate** [1] 97/8
**generalist** [3] 230/18 231/12 232/25
**generate** [1] 273/7
**generates** [1] 239/25
**gentlemen** [1] 219/10
**genuine** [1] 203/23
**George** [1] 222/17
**gets** [4] 169/1 208/24 247/9 255/6
**girls** [1] 262/6
**gist** [1] 97/19
**gives** [3] 237/22 238/1 238/2
**Glenn** [4] 165/23 166/9 227/9 227/12
**go-to** [2] 172/22 183/14
**God** [1] 188/12
**gonna** [55]
**gotta** [7] 111/22 140/16 168/22 206/15 208/9 208/9 217/21

**gotten** [5] 102/15 103/8 133/4 136/6 169/12
**grab** [1] 174/15
**grand** [1] 186/18
**grapple** [11] 97/5 106/13 106/15 106/18 107/19 107/21 172/20 172/21 176/21 183/11 206/8
**gratuitous** [1] 158/19
**great** [5] 101/15 213/17 243/9 246/6 300/12
**greater** [2] 101/22 186/16
**greatest** [1] 210/11
**grievances** [1] 218/8
**gross** [1] 238/5
**ground** [1] 288/1
**group** [1] 221/18
**growing** [1] 288/24
**guesstimate** [1] 193/14

## H

**half** [54]
**hall** [1] 183/12
**hand** [3] 187/2 230/5 258/11
**handed** [8] 95/25 99/13 109/19 148/2 177/14 177/16 177/18 203/22
**handful** [1] 198/5
**handing** [2] 149/12 203/12
**handle** [2] 230/21 232/1
**hands** [1] 101/16
**hands-on** [1] 101/16
**happy** [1] 266/1
**harder** [1] 193/4
**hate** [2] 218/6 221/14
**hauling** [1] 259/9
**he'll** [4] 127/4 153/21 172/23 200/22
**headed** [1] 136/19
**hear** [3] 101/24 140/15 279/16
**heard** [14] 199/14 199/15 242/1 245/15 245/16 265/5 271/12 274/18 274/23 274/25 275/1 275/3 281/10 281/13
**hearings** [2] 189/12 190/19
**hearsay** [2] 161/25 222/19
**Hello** [1] 104/4
**help** [48]
**helped** [2] 103/20 219/23
**helper** [14] 96/24 102/9 106/3 106/3 106/8 107/12 107/13 119/25 120/1 120/3 166/9 256/9 265/15 281/12
**helpers** [8] 131/18 236/19 236/24 254/10 262/5 267/3 279/25 294/8
**helpful** [2] 299/17 299/20
**helping** [12] 102/1 103/18 103/20 127/19 128/3 128/4 128/8 128/12 137/20 138/4 154/20 213/25
**here's** [2] 117/12 167/10
**Heron** [2] 174/17 178/18
**Hey** [13] 110/6 114/15 114/23 217/5 217/21 220/25 221/12 221/13 270/16 275/17 275/19 282/5 293/16
**hi** [1] 262/24
**high** [3] 178/21 296/21 297/15
**high-priced** [1] 178/21
**highest** [1] 284/14
**Hill** [2] 179/16 180/4
**hire** [11] 222/6 262/17 263/1 263/4 263/13 263/14 263/17 268/3 268/5 271/7 289/19
**hired** [24] 92/25 93/1 93/3 96/23 101/4 211/19 230/25 232/19 232/21 232/23 261/5 261/7 261/13 261/20 261/21 261/22 261/25 261/25 263/13 270/21 270/23 271/7 271/9 271/11
**hires** [2] 262/16 265/10
**hiring** [5] 94/1 231/25 232/4 262/10 289/21
**history** [1] 258/25
**hit** [2] 103/8 275/18
**hold** [4] 190/20 210/14 218/8 241/2
**holding** [1] 140/16
**holiday** [17] 157/14 157/17 158/2 158/8

**158/11 158/15 158/23 158/25 159/5 159/6 159/10 159/12 159/15 159/16 159/18 187/8 197/9
**holidays** [7] 157/13 157/21 157/23 157/25 158/1 158/14 158/22
**Hollywood** [6] 106/9 119/24 151/10 202/6 205/21 206/5
**home** [8] 110/4 111/15 111/18 153/16 169/11 185/17 185/19 216/19
**homes** [10] 178/21 288/24 288/25 289/1 289/3 289/3 289/5 289/6 296/24 296/25
**honest** [1] 182/20
**honestly** [2] 111/13 282/24
**Honor** [45]
**Honorable** [1] 88/14
**hope** [3] 154/23 218/16 229/4
**hopefully** [1] 169/1
**hour** [29] 127/18 152/25 154/14 154/23 154/23 154/25 155/1 180/8 182/12 185/10 185/11 188/2 188/9 188/11 188/16 194/2 195/11 218/18 238/21 238/22 239/2 250/15 251/3 251/6 251/10 255/6 286/25 294/21 294/23
**hourly** [6] 200/20 229/3 237/6 252/10 252/10 280/1
**hours** [215]
**hours'** [2] 171/1 294/12
**house** [2] 178/18 178/25
**houses** [2] 95/25 178/17
**HR** [2] 265/7 271/1
**Hudson** [1] 89/5
**hum** [39] 95/11 96/11 97/10 97/23 109/9 111/3 112/18 113/1 113/16 114/18 115/11 116/13 116/22 118/12 119/10 120/8 120/11 121/1 122/17 126/24 127/20 129/5 131/1 132/24 134/13 139/4 139/18 142/17 147/1 148/18 162/6 169/23 184/14 188/15 191/24 263/6 277/25 277/25 295/7
**Hum-hum** [1] 277/25
**human** [13] 101/10 101/14 220/20 221/7 230/4 230/18 231/12 231/17 231/18 231/20 231/23 232/25 275/22
**hundred** [23] 150/6 151/6 156/1 156/2 156/13 156/16 157/1 166/10 170/18 170/25 194/6 215/16 216/4 216/11 238/20 238/21 238/24 243/15 243/21 243/22 244/6 244/9 275/12
**hundreds** [8] 128/10 128/10 149/3 149/4 149/9 149/11 151/6 154/14
**hurry** [2] 140/14 181/1
**hustle** [1] 110/4
**hustler** [1] 103/14
**Hypothetically** [1] 238/20

## I

**I'd** [15] 114/22 114/22 126/18 129/12 142/1 149/20 151/7 168/21 185/7 199/22 203/12 215/14 253/20 257/22 275/16
**I'll** [27] 93/19 110/17 127/4 158/12 162/25 168/24 176/23 184/9 187/18 201/9 201/10 203/4 206/11 206/21 206/25 216/7 216/15 217/6 221/3 222/21 226/13 234/9 241/8 242/3 262/12 281/10 293/2
**I'm** [168]
**I've** [34] 103/2 105/2 110/25 111/17 114/14 131/24 131/25 145/9 147/5 147/5 149/10 161/17 162/11 163/23 188/23 189/12 197/25 198/6 198/8 198/8 199/10 199/11 199/13 199/13 199/14 199/15 203/22 220/19 233/13 237/14 266/22 287/6 297/9 297/12
**ID's** [1] 164/18
**idea** [1] 248/14
**identification** [1] 204/9
**identify** [1] 203/13
**IDs** [4] 161/21 163/8 164/15 216/19
**imagination** [1] 112/8

**I**

**immediately [1]** 281/18
**impeachment [2]** 95/7 160/7
**imported [1]** 230/25
**impossible [3]** 296/22 297/4 297/16
**Improper [2]** 95/7 160/7
**improperly [1]** 124/12
**incentive [3]** 153/19 158/20 193/4
**incentive-based [1]** 158/20
**incentivization [1]** 288/17
**incentivize [1]** 288/15
**incident [5]** 162/20 162/22 164/10 204/23 296/3
**incinerator [3]** 179/15 180/2 180/2
**include [1]** 138/24
**included [2]** 117/21 263/12
**increase [1]** 167/4
**increases [1]** 157/7
**incredible [1]** 185/16
**Indefinitely [2]** 295/18 295/19
**Independence [1]** 159/4
**independent [1]** 250/7
**INDEX [2]** 301/6 301/15
**Indian [1]** 259/5
**indicate [1]** 205/7
**indicated [3]** 241/12 245/19 283/4
**indicates [1]** 244/21
**indicating [1]** 242/7
**individually [2]** 201/1 201/7
**industry [9]** 99/7 107/24 111/24 112/2 232/14 260/18 275/21 275/22 285/20
**inform [1]** 93/3
**informal [1]** 283/4
**information [25]** 92/13 116/14 117/1 117/1 117/13 117/15 125/6 125/8 125/12 125/14 125/22 145/24 146/1 146/7 146/9 172/4 176/12 239/20 251/13 263/12 266/6 299/6 299/8 299/9 299/12
**input [3]** 146/1 240/3 240/19
**insignificant [1]** 298/12
**insinuates [1]** 110/5
**inspect [1]** 138/22
**inspection [24]** 125/20 126/11 127/25 138/22 140/25 141/3 141/4 141/13 141/17 141/21 145/23 145/25 146/4 146/11 146/14 148/20 178/7 178/9 181/21 182/5 211/11 211/17 225/12 225/14
**inspections [3]** 141/5 145/22 146/8
**instance [10]** 98/6 111/1 118/10 130/24 143/10 191/15 197/17 227/8 247/24 267/13
**instances [6]** 226/1 226/8 234/17 241/11 269/22 285/25
**instant [1]** 277/17
**instead [2]** 121/9 211/14
**instructions [1]** 137/7
**intended [1]** 95/12
**interacted [1]** 221/11
**interaction [2]** 163/13 210/11
**interactions [1]** 101/19
**interjecting [1]** 102/6
**internal [1]** 164/11
**interview [8]** 92/15 92/19 92/20 93/5 93/12 236/2 261/7 262/8
**interviewed [9]** 92/4 92/9 92/21 92/23 93/1 93/15 261/4 261/25 262/6
**introduce [1]** 262/25
**invasive [1]** 205/19
**investigate [1]** 241/8
**island [1]** 123/13
**issue [14]** 102/4 103/3 103/10 160/24 165/17 165/23 169/19 193/10 221/10 221/25 223/7 227/4 227/13 234/5
**issued [2]** 168/13 168/22
**issues [9]** 101/24 125/23 125/25 142/4 146/1 162/12 163/23 228/5 266/2
**It'll [1]** 193/3

**item [2]** 178/20 179/7
**items [1]** 100/23

**J**

**January [3]** 134/12 134/12 223/12
**January 15th [1]** 134/12
**January 22nd [1]** 223/12
**January 28th [1]** 134/12
**job [47]**
**jobs [4]** 95/18 184/2 231/19 265/10
**joining [1]** 231/20
**Jones [1]** 137/3
**Joseph [1]** 89/5
**Judge [9]** 88/15 90/2 144/23 144/25 189/23 190/2 257/15 257/17 301/1
**July [6]** 118/14 135/14 151/22 159/4 195/7 213/15
**July 19th [2]** 135/14 195/7
**July 20th [1]** 151/22
**July 3rd [1]** 213/15
**July 4th [1]** 159/4
**jump [2]** 139/23 175/11
**June [6]** 129/4 129/6 129/8 151/22 243/11 254/16
**June 12th [1]** 243/11
**June 18th [1]** 129/6
**June 5th [1]** 129/4
**June 6th [1]** 129/8
**jury [76]**
**justify [4]** 167/4 207/4 211/8 216/7

**K**

**keep [13]** 96/21 114/12 120/5 122/1 147/11 147/12 147/17 158/2 194/4 233/2 233/5 233/5 265/8
**keeping [1]** 158/3
**keeps [2]** 244/25 287/1
**keys [3]** 174/15 175/10 177/21
**knock [2]** 112/2 175/11
**knock-around [1]** 112/2
**Knowing [1]** 275/5
**knowledge [9]** 103/17 117/2 131/23 131/24 213/12 264/1 289/19 289/24 295/3
**knows [1]** 172/25

**L**

**L-O-M-B-A-R-D-O [1]** 230/10
**Labor [1]** 158/8
**laborer [1]** 210/13
**laborers [2]** 101/21 266/9
**lack [4]** 125/12 185/13 198/16 225/1
**Ladies [1]** 219/10
**lady [2]** 218/9 219/18
**Lake [1]** 89/7
**landfill [2]** 184/21 211/14
**landscaper [1]** 178/21
**landscapers [2]** 178/23 182/1
**large [3]** 108/14 121/20 126/4
**latter [2]** 222/17 223/5
**LAUDERDALE [8]** 88/3 88/6 89/4 89/10 98/7 169/19 217/6 227/14
**lawsuit [8]** 120/20 122/3 151/15 201/3 201/4 201/6 218/22 221/17
**lawyer [1]** 175/25
**lawyers [2]** 162/1 190/21
**lax [1]** 276/24
**laxed [2]** 276/25 277/12
**lead [4]** 125/13 166/18 166/20 167/3
**Leading [1]** 248/18
**learn [2]** 166/24 166/25
**learned [1]** 129/1
**leave [6]** 157/9 163/9 163/10 208/7 227/16 227/18
**leaving [1]** 154/18 272/25 281/4 288/1
**legal [3]** 122/8 219/4 221/20
**length [2]** 191/4 295/1

**lengthen [2]** 285/5 285/8
**lengthy [1]** 93/4
**letter [10]** 202/10 235/9 235/10 235/24 236/1 236/3 236/6 236/7 236/9 236/10
**level 1 [1]** 141/5
**license [2]** 141/8 147/8
**lids [1]** 273/1
**life [2]** 213/18 297/10
**likable [1]** 269/16
**lines [1]** 266/12
**list [3]** 98/20 228/2 263/2
**Listen [1]** 206/10
**literally [16]** 111/22 163/17 175/7 175/10 176/16 177/10 178/19 178/19 179/6 181/7 181/12 186/14 202/5 210/7 210/12 229/3
**loader [1]** 172/17
**loads [1]** 164/2
**local [1]** 123/4
**location [1]** 112/19
**locations [2]** 99/2 260/2
**logged [2]** 279/15 279/19
**Lombardo [46]**
**Lombardo's [2]** 119/17 128/22
**longest [1]** 180/3
**lose [2]** 124/11 274/4
**loss [8]** 233/16 274/8 274/10 274/14 274/17 275/10 275/13 275/19
**lost [3]** 123/19 123/21 123/22
**love [2]** 187/18 193/13
**lower [1]** 239/6
**Lucie [1]** 259/5
**lucky [1]** 110/2
**lunch [4]** 145/10 189/10 189/14 209/10
**Luncheon [1]** 189/24

**M**

**M-A-C-K-I-E [1]** 258/16
**Mackie [32]** 101/3 101/8 101/25 102/7 102/13 103/17 103/24 104/3 104/15 104/17 153/21 199/20 199/21 200/16 201/7 201/7 203/15 203/19 203/24 218/8 219/9 219/11 220/18 220/24 221/15 256/25 257/25 258/12 258/16 258/19 291/23 301/12
**mad [1]** 218/15
**magic [3]** 185/16 185/22 185/22
**magical [1]** 185/24
**main [3]** 109/16 126/20 126/20
**maintains [1]** 265/7
**major [1]** 269/7
**makeup [1]** 286/8
**Males [1]** 236/24
**man [3]** 218/6 220/25 221/12
**managed [1]** 185/23
**management [4]** 102/11 125/14 126/5 231/22
**manager [5]** 92/23 93/19 101/16 161/20 260/15
**managers [2]** 262/9 262/9
**mandated [2]** 141/23 141/24
**mandatory [6]** 225/8 274/2 274/24 276/5 276/17 277/9
**manner [1]** 109/12
**map [4]** 174/15 174/16 175/19 177/2
**Marc [1]** 89/2
**March [1]** 135/1
**March 26th [1]** 135/1
**marked [2]** 249/4 301/16
**Martin [1]** 259/6
**match [1]** 114/12
**math [4]** 185/7 188/21 229/3 270/19
**mathematical [1]** 238/13
**matter [12]** 153/18 165/8 165/20 165/24 165/25 168/13 222/22 227/13 255/20 255/25 298/12 301/21
**matters [4]** 106/1 166/25 189/20 300/23
**May 1st [1]** 205/12

**M**

**May 29 [1]** 242/7
**May 3rd [2]** 203/18 203/20
**McDonald's [1]** 187/14
**mean [39]** 116/23 132/11 142/24 144/3 153/24 154/25 157/16 158/3 160/14 171/4 176/16 179/2 186/16 188/23 193/25 199/23 210/16 213/15 228/23 228/24 231/1 233/8 238/10 238/13 242/8 250/13 250/14 252/18 261/20 266/12 267/7 275/15 277/8 284/12 286/24 290/21 290/21 293/1 298/24
**means [2]** 230/19 230/23
**measurement [1]** 288/5
**mechanic [2]** 126/19 126/19
**mechanical [1]** 88/24
**mechanics [1]** 147/22
**meet [1]** 101/3
**meeting [21]** 143/1 143/12 143/21 143/22 225/10 268/18 268/19 269/3 269/5 269/6 269/10 274/1 274/2 274/9 275/7 275/8 275/14 276/6 276/17 277/9 277/18
**meetings [23]** 142/20 142/21 143/4 143/7 144/1 144/5 144/8 225/4 225/7 268/4 268/11 268/12 268/16 268/21 268/23 268/25 273/11 273/17 273/20 274/24 275/2 275/6 276/12
**members [4]** 144/13 189/9 257/3 300/13
**memo [6]** 136/11 136/13 137/6 137/11 137/24 138/1
**memorandum [1]** 278/15
**Memorial [1]** 158/11
**memory [1]** 171/25
**mess [1]** 299/24
**message [6]** 203/15 203/19 203/24 220/15 220/17 295/23
**messed [1]** 187/19
**method [3]** 237/11 237/14 239/1
**methodology [3]** 270/2 270/16 270/19
**microphone [2]** 230/8 279/17
**Mid [1]** 233/1
**Mid-November [1]** 233/1
**middle [2]** 216/5 272/25
**Mike [3]** 270/25 271/5 271/7
**million [1]** 187/11
**mine [1]** 213/14
**minimum [24]** 141/20 170/21 170/22 170/22 185/2 185/5 187/23 188/4 197/13 197/14 197/16 250/15 250/24 251/24 252/2 254/8 254/12 254/13 254/15 255/3 255/4 255/5 255/16 292/21
**minuses [1]** 273/5
**minute [9]** 141/21 144/14 257/4 267/18 291/11 291/17 292/23 292/24 293/4
**minutes [23]** 139/7 139/16 139/17 139/19 144/17 144/21 178/11 178/12 178/15 178/16 179/19 179/25 180/3 181/2 181/7 181/9 181/10 181/12 181/13 182/14 205/19 257/7 257/12
**miscalculating [1]** 280/10
**misconception [1]** 125/13
**misplaced [2]** 123/20 124/1
**misreporting [1]** 280/10
**miss [5]** 142/11 142/23 142/24 143/1 144/4
**missed [3]** 109/2 136/22 142/13
**missing [2]** 176/20 276/5
**mistakes [2]** 283/1 289/25
**misunderstanding [1]** 235/17
**mjsfcs [1]** 89/11
**modifies [1]** 288/19
**moment [10]** 90/5 202/14 213/17 217/11 220/4 229/6 253/13 256/5 268/9 280/8
**Monarch [1]** 180/4
**Monday [6]** 129/8 185/1 195/7 205/5 206/3 206/5
**money [47]**
**month [1]** 104/9
**months [4]** 103/10 106/20 208/6 262/21

**morning [40]** 91/3 91/4 96/1 96/2 97/21 98/18 108/23 111/7 111/16 125/9 132/1 134/24 135/11 135/20 135/23 138/12 143/11 143/21 143/23 148/1 148/16 149/2 157/18 172/23 178/3 180/6 180/12 180/24 181/14 184/11 185/15 194/17 195/23 202/18 204/20 205/17 245/24 247/22 275/5 283/25
**mostly [1]** 228/19
**mother [3]** 208/3 208/8 208/9
**Motor [1]** 141/15
**move [4]** 94/2 94/3 124/17 217/10
**moved [3]** 96/24 105/10 167/3
**MR [7]** 214/21 271/6 292/2 301/9 301/10 301/11 301/13
**Mr. [67]**
**Mr. Andreu [41]** 90/9 91/3 109/23 112/9 112/11 115/25 122/23 145/21 159/23 164/13 179/12 190/6 191/3 194/6 199/2 201/4 213/6 214/10 231/9 235/7 242/6 243/2 244/6 244/22 245/13 249/3 249/5 249/10 249/15 251/23 254/17 254/21 255/16 259/13 260/10 263/13 269/11 274/23 283/4 283/6 298/3
**Mr. Andreu's [8]** 233/12 236/4 243/10 253/18 255/15 274/16 284/13 287/4
**Mr. Edwards [1]** 300/11
**Mr. Mackie [17]** 101/25 102/7 102/13 103/24 104/3 104/15 104/17 104/23 190/9 199/21 200/16 203/24 220/18 220/24 257/25 258/19 291/23
**Mrs. [1]** 137/3
**Mrs. Jones [1]** 137/3
**MS [8]** 122/12 133/19 145/20 170/7 198/14 199/1 301/8 301/11
**Ms. [54]**
**Ms. Lombardo [39]** 93/8 105/7 114/14 114/19 114/22 115/6 115/17 118/1 119/6 120/7 120/13 121/3 121/19 121/21 131/11 134/4 152/18 160/11 166/11 167/19 168/25 169/6 211/21 212/6 214/4 214/13 215/1 217/20 219/17 219/20 228/5 230/13 234/22 247/24 251/8 254/5 256/8 262/12 265/5
**Ms. Lombardo's [2]** 119/17 128/22
**Ms. Regina [1]** 223/1
**Ms. Tingley [12]** 90/23 94/2 144/10 145/19 189/5 190/22 220/14 221/23 222/14 223/10 223/14 225/24
**multiple [12]** 93/11 99/13 126/22 156/12 168/3 179/7 253/1 253/2 253/3 270/6 275/6 282/10
**municipality [1]** 289/16
**mute [1]** 209/25

**N**

**name [18]** 92/6 92/7 93/15 93/18 93/20 148/15 148/23 175/4 175/8 175/14 176/13 177/8 177/11 230/9 230/9 258/14 258/15 271/4
**names [1]** 199/15
**nature [7]** 98/15 146/3 210/17 265/11 272/19 275/23 281/13
**NE [1]** 89/3
**necessary [1]** 207/15
**neck [4]** 202/2 202/4 205/24 205/25
**negotiate [1]** 113/3
**negotiated [1]** 247/14
**negotiation [2]** 113/5 210/12
**neighborhood [3]** 98/8 98/9 300/7
**neighborhoods [1]** 273/3
**nice [2]** 189/14 300/18
**nine [7]** 111/7 111/14 111/16 111/17 120/1 195/11 300/23
**nine o'clock [1]** 300/23
**nine-hour [1]** 195/11
**nitpicky [1]** 286/6
**nobody [5]** 127/11 142/5 156/2 199/15 210/14

**none [2]** 150/21 267/3
**nonresidents [1]** 161/18
**normal [2]** 245/5 246/2
**normally [1]** 249/22
**North [2]** 89/6 98/7
**notation [1]** 244/17
**note [2]** 125/23 126/7
**notice [2]** 168/23 207/14
**noticed [1]** 223/8
**November [6]** 132/13 132/14 135/25 151/8 233/1 234/17
**November 19th [1]** 132/14
**November 22nd [1]** 135/25
**November 28th [1]** 234/17
**November 6 [1]** 132/13
**nowhere [1]** 141/16
**number [13]** 149/8 149/11 157/11 187/13 193/14 204/5 235/15 238/14 254/25 270/11 283/19 283/21 287/1
**numbers [5]** 224/19 238/18 239/24 240/3 291/3
**numerous [6]** 142/22 163/18 164/9 209/23 209/23 209/24

**O**

**o'clock [12]** 102/20 102/23 131/15 131/16 131/19 131/25 145/10 189/13 189/15 189/19 275/4 300/23
**oath [12]** 94/15 94/17 94/21 132/23 133/9 135/19 151/4 160/1 160/3 173/25 215/4 291/20
**object [4]** 222/18 224/6 224/6 261/9
**objection [16]** 95/7 122/8 122/20 131/20 160/7 161/15 161/25 198/16 204/4 206/20 218/24 219/4 248/18 256/11 256/16 261/14
**observe [1]** 101/25
**occasion [7]** 101/25 105/14 128/8 143/17 155/2 211/6 214/8
**occasions [30]** 101/11 113/19 114/14 114/21 121/14 121/20 126/12 127/9 127/16 140/22 142/15 142/23 149/3 149/4 150/22 151/17 154/21 163/18 164/9 168/3 193/8 209/23 209/24 209/24 212/10 216/9 216/9 216/13 270/6 294/25
**occupational [1]** 272/16
**occurrence [4]** 156/22 193/6 241/18 241/20
**October [4]** 91/12 151/8 222/3 232/24
**offended [1]** 206/14
**offer [12]** 191/13 235/9 235/10 235/14 235/24 236/1 236/3 236/6 236/7 236/9 236/10 281/12
**office [11]** 92/18 93/11 100/25 105/8 114/22 118/5 126/21 175/10 237/1 292/9 292/12
**offices [2]** 105/10 292/10
**official [3]** 89/9 164/18 301/24
**offs [2]** 110/8 111/4
**Oh [23]** 96/14 111/8 125/4 125/17 137/2 137/21 138/18 139/21 147/4 148/10 153/24 157/3 167/14 170/6 172/23 184/18 186/14 186/17 188/12 195/23 210/16 214/20 272/15
**Okeechobee [1]** 259/6
**one a.m [2]** 110/25 111/2
**ongoing [2]** 103/10 142/4
**online [1]** 168/22
**open [9]** 105/25 108/15 115/1 164/24 191/17 198/1 235/17 241/25 251/9
**open-door [4]** 105/25 115/1 241/25 251/9
**operate [1]** 165/16
**operated [2]** 214/2 214/2
**operates [1]** 179/4
**operating [3]** 96/20 126/17 260/2
**operation [1]** 295/23
**operational [1]** 269/6
**operations [7]** 92/23 93/19 259/18 259/24 259/25 262/9 286/12
**opinion [1]** 102/6

**O**

**opportunities [2]** 101/10 119/13
**opportunity [7]** 118/21 118/24 119/8 121/4
198/6 224/11 233/12
**option [1]** 191/11
**order [2]** 146/10 226/14
**organization [1]** 265/4
**organize [1]** 220/4
**organized [1]** 257/23
**orientation [1]** 263/4
**orientations [1]** 268/3
**originally [1]** 222/2
**originates [1]** 185/12
**Orlando [2]** 89/7 292/15
**outstanding [1]** 101/14
**Overrule [1]** 261/15
**Overruled [9]** 50/12 122/11 131/21 160/8
161/16 162/3 222/20 224/8 248/19
**oversee [5]** 259/16 259/18 259/24 259/25
260/3
**overtime [47]**
**owe [3]** 153/25 201/10 216/10
**owed [5]** 186/12 189/2 189/3 189/4 240/18
**owes [1]** 215/11
**owned [1]** 123/15

**P**

**P.A [1]** 89/6
**p.m [5]** 189/24 190/1 257/16 257/16 301/2
**page [4]** 242/16 246/7 254/20 301/7
**pain [2]** 206/2 207/4
**Palm [2]** 183/25 259/6
**paper [2]** 92/2 116/7
**papers [3]** 92/12 92/17 92/25
**paperwork [2]** 231/3 263/9
**part [38]** 91/12 92/15 97/2 106/6 106/11
107/24 108/1 109/10 109/16 109/25 110/11
111/12 119/23 136/21 139/24 141/14 147/17
159/2 159/9 174/24 176/4 176/10 184/21
197/20 222/17 223/5 229/4 238/11 239/1
239/3 244/14 244/23 246/18 247/20 247/21
250/8 250/10 262/10
**pass [1]** 275/18
**passed [1]** 157/23
**patterns [1]** 297/14
**Paul [1]** 89/2
**Pause [9]** 90/12 125/19 149/24 150/8 150/20
167/11 190/9 258/3 278/19
**pay [118]**
**paycheck [11]** 113/20 115/7 117/8 117/9
118/9 119/9 121/10 121/11 129/24 131/3
168/22
**paychecks [1]** 119/17
**payment [4]** 236/5 236/5 237/9 237/11
**payroll [9]** 91/6 91/13 117/2 230/20 233/7
246/4 246/25 250/6 270/9
**Pembroke [14]** 101/2 102/19 103/4 103/11
103/25 105/8 106/2 124/16 124/21 138/13
199/25 231/8 259/14 288/24
**penalize [1]** 275/20
**penalized [1]** 239/11
**people [19]** 101/19 102/10 112/3 115/2
131/24 131/25 137/21 162/14 162/15 162/16
185/15 186/14 211/8 221/11 284/25 287/25
289/19 290/1 290/15
**percent [10]** 114/25 131/8 142/1 193/15
193/19 194/10 211/5 213/25 219/22 275/12
**perfect [4]** 121/7 210/18 210/19 289/13
**performance [1]** 279/11
**Perhaps [1]** 151/12 151/12
**period [21]** 91/14 91/16 117/9 117/21
118/11 120/1 129/24 149/13 155/5 155/11
156/3 156/4 156/13 171/10 192/7 195/6
196/16 207/8 227/3 250/13 255/7
**Periodically [1]** 104/1
**periods [1]** 155/24

**permit [1]** 131/6
**person [6]** 93/24 102/8 238/20 271/10
278/23 282/25
**person's [1]** 290/12
**personal [5]** 123/8 233/8 250/25 263/25
297/5
**personally [5]** 102/17 218/12 221/9 265/9
269/11
**personnel [4]** 233/5 233/9 234/20 263/20
**phone [2]** 227/7 283/3
**phonetic [1]** 295/24
**physically [1]** 103/21
**pick [12]** 100/8 111/23 126/21 161/2 182/2
183/23 228/20 269/4 281/12 286/14 293/15
297/19
**picked [3]** 98/11 111/4 293/19
**picking [9]** 99/20 100/1 100/2 100/19 100/22
103/18 103/21 110/8 226/13
**Pines [16]** 101/2 102/19 102/25 103/4 103/5
103/11 103/25 105/8 106/2 124/16 124/21
138/13 199/25 231/8 259/14 288/25
**pissed [1]** 103/4
**place [4]** 139/19 182/14 185/14 240/10
240/15 289/21
**plaintiff [6]** 88/6 89/2 230/2 230/3 256/23
256/24
**PLAINTIFF'S [1]** 230/6 258/12 301/7
**plan [1]** 253/7
**play [1]** 99/10
**plenty [2]** 155/25 163/20
**PLLC [1]** 89/3
**plug [1]** 239/24
**plus [2]** 217/6 237/21
**pluses [1]** 273/4
**point [6]** 94/4 166/16 167/19 213/1 222/10
253/17
**points [1]** 220/13
**police [1]** 162/13
**policies [31]** 218/5 219/12 233/6 233/20
233/21 233/23 233/24 233/24 234/1 234/2
234/3 234/8 234/19 234/23 234/25 240/6
240/7 264/13 264/17 264/19 264/20 264/22
264/24 265/2 265/3 265/6 266/25 267/2
276/24 277/2 277/4
**policy [55]**
**polite [2]** 105/25 112/4
**Pompano [10]** 102/4 103/5 103/15 124/17
124/20 138/13 161/2 205/21 231/8 259/14
**posed [1]** 131/10
**position [16]** 106/7 107/22 112/14 112/23
112/24 165/4 166/21 177/5 183/13 183/14
260/8 263/10 265/14 265/25 276/7 281/6
**positions [4]** 102/11 237/7 262/4 262/8
**positive [1]** 179/11
**possibility [2]** 250/14 277/16
**post [19]** 140/2 140/10 140/24 141/13
141/16 142/1 142/9 145/21 146/8 146/11
146/16 180/20 180/21 180/25 181/1 182/4
211/16 225/14 272/1
**post-trip [19]** 140/2 140/10 140/24 141/13
141/16 142/1 142/9 145/21 146/8 146/11
146/16 180/20 180/21 180/25 181/1 182/4
211/16 225/14 272/1
**Powerline [1]** 181/8
**practices [1]** 263/4
**praising [1]** 163/17
**precheck [1]** 138/16
**predicate [1]** 198/17
**premise [1]** 133/15
**premium [4]** 197/22 254/25 255/3 285/9
**prepare [1]** 201/3
**prerequisite [1]** 144/8
**presence [8]** 90/21 144/16 145/18 189/12
190/17 257/6 258/9 300/16
**present [3]** 145/3 268/17 276/11
**presented [1]** 221/17

**presently [2]** 90/2 190/2
**president [3]** 101/21 258/22 258/25
**pretrip [21]** 138/22 139/17 139/20 140/1
140/6 141/19 141/21 141/25 142/10 142/18
145/21 146/8 146/11 146/14 148/20 178/6
178/9 181/21 211/10 225/12 271/25
**priced [1]** 178/21
**pride [1]** 278/14
**primary [1]** 104/2
**privilege [1]** 105/24
**PRO [105]**
**Pro's [5]** 108/4 124/10 230/4 248/16 294/7
**problem [7]** 115/6 155/15 170/25 211/21
216/16 269/18 276/10
**procedure [5]** 202/5 205/3 205/19 205/22
206/6
**proceedings [4]** 88/13 88/24 301/2 301/21
**process [12]** 92/15 92/19 92/20 93/5 93/12
127/15 230/20 231/4 232/4 250/10 261/7
283/5
**processing [2]** 117/2 246/4
**produced [2]** 88/25 299/21
**productive [1]** 125/13
**proficient [1]** 192/17
**program [2]** 263/15 263/17
**projects [1]** 109/22
**promise [3]** 234/10 242/4 281/22
**promised [22]** 114/16 115/12 117/5 119/23
121/5 159/22 160/20 160/21 166/9 168/1
209/5 210/15 212/8 212/20 212/20 213/4
215/8 215/13 216/4 241/13 282/8 282/17
**promotions [1]** 215/21
**properly [1]** 96/20 187/17 251/20
**property [6]** 279/6 280/16 280/17 280/24
281/1 281/5
**proved [1]** 282/12
**provided [1]** 236/1
**publish [1]** 204/12
**Publix [6]** 108/13 108/23 109/2 109/4
139/14 173/1
**pull [3]** 173/11 181/1 251/12
**pulled [3]** 146/24 147/5 147/14 147/18
**punch [4]** 245/23 245/23 246/1 246/1
**punching [1]** 279/3
**punish [2]** 186/12 186/18
**punished [3]** 240/25 267/5 290/13
**punishment [2]** 277/20 277/21
**purchase [1]** 123/10
**purposes [3]** 99/16 255/19 255/25
**puts [1]** 118/1
**pyramid [1]** 260/6

**Q**

**quarter [1]** 157/11
**question [29]** 93/22 95/1 97/19 105/23
110/5 131/11 156/3 158/22 162/1 169/21
199/11 221/22 223/7 224/7 234/24 239/13
239/14 248/23 248/23 252/1 262/12 263/19
265/5 270/1 273/12 276/1 276/4 278/5
279/16
**questioning [1]** 269/8
**questions [13]** 105/17 112/12 172/3 201/8
216/15 223/14 223/15 228/15 229/22 242/2
253/25 256/19 292/20
**quick [2]** 180/7 214/14
**quickly [2]** 153/20 172/17
**quote [1]** 110/19
**quote/unquote [1]** 110/19

**R**

**raise [5]** 168/13 200/2 200/5 230/5 258/11
**raised [1]** 297/9
**raises [2]** 200/1 215/20
**ran [2]** 172/21 299/10
**random [1]** 104/1
**range [1]** 286/25

**R**

**Rarely [1]** 241/18
**rate [154]**
**rates [7]** 197/2 200/4 219/3 236/25 252/11
252/11 269/2
**rationalize [1]** 216/7
**reading [2]** 125/17 243/16
**ready [5]** 90/13 90/22 140/4 190/10 190/21
**reality [1]** 211/9
**rear [1]** 172/17
**reasons [2]** 136/21 280/13
**recall [54]**
**recalled [1]** 171/13
**receipt [1]** 299/3
**receivable [1]** 231/16
**receive [9]** 198/1 215/8 241/8 244/6 244/9
244/10 278/23 292/22 295/22
**received [9]** 167/25 204/10 242/13 243/19
244/2 244/11 244/12 295/5 301/16
**receiving [2]** 180/5 269/25
**recent [2]** 215/1 215/9
**recently [1]** 280/15
**receptive [2]** 106/1 220/23
**recess [11]** 144/14 144/21 144/24 189/10
189/19 189/24 257/4 257/12 257/16 300/14
300/22
**recited [1]** 270/19
**Reclamation [1]** 261/3
**recognize [1]** 199/5
**recollection [3]** 95/5 162/5 213/20
**recollections [1]** 213/12
**record [21]** 128/6 129/3 145/2 190/15 203/8
223/11 226/14 229/8 230/9 240/22 242/6
242/7 243/10 244/15 244/21 244/25 253/15
257/18 258/14 267/16 301/21
**recorded [3]** 88/24 223/19 223/21
**records [59]**
**recruit [1]** 230/20
**recycling [1]** 259/20
**Redirect [6]** 220/2 220/9 256/4 256/6 301/9
301/11
**reducing [1]** 238/15
**refer [1]** 125/8
**reference [1]** 217/17
**referencing [8]** 92/12 126/2 155/11 161/11
163/4 195/25 195/25 196/12
**referred [1]** 92/24
**referring [1]** 278/16
**refers [1]** 146/4
**reflect [1]** 227/22
**reflected [1]** 286/1
**refusing [1]** 137/22
**Regina [22]** 92/13 92/14 92/24 166/2 168/7
199/12 208/19 208/19 208/23 209/1 209/2
209/7 209/22 212/19 215/10 218/8 223/1
230/4 230/6 230/10 284/9 301/10
**region [8]** 259/2 259/9 259/19 260/1 260/4
260/7 262/4 290/15
**regional [2]** 258/22 258/25
**regions [2]** 259/9 259/24
**regular [15]** 96/23 123/14 130/4 131/5
155/13 167/2 196/23 196/24 220/21 238/25
239/7 239/8 239/8 246/8 255/8
**relations [1]** 230/21
**relationship [5]** 101/7 191/22 191/22 220/20
283/7
**Relevance [4]** 131/20 161/15 261/9 261/14
**remains [1]** 206/3
**remember [16]** 101/6 128/16 144/14 171/22
189/10 213/18 215/7 215/9 221/24 223/15
225/5 226/2 227/11 257/4 294/14 300/14
**remembered [1]** 215/7
**remove [1]** 162/14
**removed [2]** 98/22 208/4
**renege [1]** 215/19
**repair [1]** 98/14

**repaired [1]** 100/1
**repairing [1]** 169/19
**replaced [2]** 98/21 98/21
**reply [1]** 221/1
**report [21]** 126/11 127/25 145/23 145/25
146/5 149/1 162/20 162/23 164/10 240/8
240/16 240/23 241/1 241/5 260/4 276/4
281/8 281/18 281/21 282/8 296/3
**reporter [5]** 89/8 89/9 94/13 94/15 301/24
**reporting [1]** 276/16
**reports [1]** 125/20
**represent [1]** 203/23
**representative [1]** 230/4
**request [8]** 103/22 109/14 125/22 137/5
194/24 207/20 217/5 233/6
**requested [4]** 103/14 207/16 221/18 286/8
**requests [2]** 208/16 283/9
**required [17]** 96/17 140/13 141/13 143/7
143/8 143/10 147/17 163/12 192/10 234/12
234/15 264/21 264/25 265/6 265/11 273/14
292/22
**requirement [5]** 274/1 279/4 280/21 281/1
282/11
**requirements [2]** 263/8 263/10
**research [1]** 282/12
**residences [1]** 175/20
**resident [5]** 161/12 162/10 163/6 163/11
164/6
**resident's [1]** 99/20
**residential [5]** 108/25 175/16 259/23 266/14
275/8
**residents [11]** 100/20 103/12 161/18 163/14
163/18 163/23 163/24 164/2 181/9 181/11
272/12
**resign [3]** 202/7 202/8 202/9
**resignation [7]** 201/13 202/10 202/16
202/21 202/23 202/25 203/3 203/20 204/19
204/21 204/23 204/25
**resigned [5]** 201/25 203/5 207/14 217/15
221/9
**resigning [1]** 221/8
**resolve [2]** 121/21 165/20
**resolved [1]** 165/24
**resource [1]** 230/18
**resources [7]** 230/4 231/12 231/17 231/18
231/20 231/23 232/25
**response [9]** 95/3 120/18 124/4 186/7
188/18 278/17 286/18 297/7 299/16
**responsibilities [4]** 166/23 263/5 266/15
278/9
**responsibility [4]** 99/2 285/24 286/1 294/18
**rest [1]** 284/15
**resume [3]** 90/10 145/10 190/6
**retain [1]** 108/18
**return [1]** 108/19
**review [5]** 93/19 125/24 149/7 172/5 242/15
**reviewed [4]** 91/13 91/15 274/16 282/6
**Riccio [1]** 295/24
**ride [2]** 127/9 127/22
**ridiculous [1]** 182/15
**ripped [1]** 154/7
**rise [8]** 90/16 144/18 145/12 189/16 190/13
257/8 258/5 300/19
**River [1]** 259/5
**RMR [2]** 89/3 301/24
**RMR-CRR [1]** 301/24
**road [2]** 140/4 181/7
**ROGER [23]** 88/5 116/21 118/5 165/4
220/11 221/22 224/10 232/19 232/22 234/12
234/15 284/19 290/24 291/5 294/8 294/25
295/8 295/11 295/25 296/18 298/21 299/25
301/8
**Roger's [1]** 232/21
**role [4]** 108/16 260/11 260/24 260/25
**roll [26]** 97/5 107/23 107/25 108/4 108/7
108/10 108/15 108/21 109/7 109/19 109/21

110/8 110/21 111/4 112/15 112/19 124/19
143/20 143/22 143/23 172/19 172/20 175/18
183/8 183/8 266/13
**roll-off [24]** 97/5 107/23 107/25 108/4 108/7
108/10 108/15 108/21 109/7 109/19 109/21
110/21 112/15 112/19 124/19 143/20 143/22
143/23 172/19 172/20 175/18 183/8 183/8
266/13
**roll-offs [2]** 110/8 111/4
**room [3]** 89/10 144/16 257/6
**Rosalind [1]** 89/6
**Rosenberg [1]** 89/3
**Rosenthal [1]** 89/2
**route [191]**
**routes [29]** 95/23 96/10 102/1 102/13 103/2
103/11 108/25 109/21 126/6 136/11 137/7
167/1 175/15 176/17 179/3 192/14 213/20
213/23 222/7 286/13 288/19 288/21 289/20
289/25 290/1 290/2 290/3 290/4 299/5
**routine [2]** 104/6 104/7 105/14
**routinely [1]** 104/19
**rule [1]** 140/8
**rules [17]** 141/11 141/14 171/5 208/13
208/17 210/21 210/24 210/25 211/1 211/3
211/10 211/13 211/16 211/18 216/5 276/8
276/8
**runs [1]** 272/17
**Russ [1]** 220/25
**Russell [21]** 101/3 101/7 103/17 160/22
201/1 201/7 203/15 203/19 217/20 217/24
218/8 219/9 219/10 219/13 220/19 221/15
227/13 256/24 258/12 258/16 301/12

**S**

**safe [1]** 271/24
**safety [72]**
**salary [2]** 237/6 238/4
**Salopek [3]** 89/8 301/23 301/24
**sat [1]** 268/8
**Saturday [17]** 97/17 118/13 134/14 152/2
153/5 162/7 164/22 164/23 165/18 216/21
216/25 227/17 227/21 227/22 242/22 242/24
243/2
**Saturdays [2]** 96/7 97/1
**saw [6]** 104/12 116/11 158/4 199/21 199/22
284/13
**Sawgrass [5]** 139/12 139/13 173/1 181/13
181/14
**scenarios [1]** 179/21
**scheme [3]** 237/9 237/10 237/11
**science [2]** 176/16 289/13
**scope [1]** 256/11 256/16 261/19
**screw [2]** 221/13 222/11
**screwed [2]** 209/19 213/1
**scrolling [1]** 167/20
**second [9]** 92/18 92/24 93/9 226/19 234/19
242/6 243/10 279/1 296/14
**seconds [1]** 257/22
**section [5]** 98/10 98/11 99/14 172/25 178/20
**sections [4]** 98/10 98/12 99/13 179/7
**send [2]** 98/8 99/13
**sending [1]** 203/19
**sense [3]** 199/19 218/12 229/15
**sentencings [1]** 145/9
**September [4]** 158/8 295/2 296/11 298/22
**September 12th [1]** 158/8
**September 14th [2]** 296/11 298/22
**September 30th [1]** 295/2
**serious [4]** 103/3 276/9 276/10 280/20
**service [18]** 96/1 97/6 98/23 108/10 109/4
109/21 183/11 231/16 265/18 265/21 272/18
272/20 276/9 278/8 279/6 287/14 287/15
287/17
**serviced [1]** 108/18
**sessions [1]** 262/20
**seven [21]** 96/17 106/20 107/2 107/3 109/20

**S**

**seven... [16]** 110/14 131/12 131/19 131/25 132/5 132/8 132/10 132/12 152/25 153/25 154/1 228/18 253/5 259/4 263/15 263/18
**seven a.m [2]** 132/5 132/8
**seven o'clock [2]** 131/19 131/25
**seven-hour [1]** 152/25
**seventh [4]** 191/12 191/15 194/21 228/20
**shake [1]** 218/7
**Shawn [14]** 160/23 160/23 165/22 166/9 168/14 168/14 168/25 174/12 176/20 212/20 215/10 215/13 227/9 227/12
**she'd [1]** 114/24
**she'll [1]** 119/7
**sheet [55]**
**sheets [17]** 128/10 176/4 242/3 255/24 286/4 299/5 299/10
**shift [6]** 125/10 131/8 131/14 132/5 132/7 282/18
**shifts [1]** 191/4
**shirt [1]** 111/25
**shoot [1]** 181/12
**shop [2]** 179/19 293/17
**short [5]** 110/6 176/19 182/19 290/3 290/6
**shorten [1]** 285/6
**shorter [2]** 183/19 288/4
**shots [1]** 206/1
**shown [1]** 198/21
**sic [10]** 100/20 112/1 138/21 213/16 228/3 233/8 239/2 241/2 276/25 277/17
**sick [9]** 157/9 157/9 157/10 187/8 197/9 206/17 206/23 206/24 206/25
**side [2]** 108/4 171/8
**sides [1]** 290/4
**sign [19]** 92/25 233/6 234/1 234/2 234/3 234/12 234/15 240/24 264/17 264/18 264/21 264/25 265/6 266/19 266/22 266/23 274/9 280/24 280/24
**sign-in [1]** 274/9
**signature [3]** 125/2 265/2 267/1
**signed [7]** 92/12 235/9 236/6 267/2 267/5 267/10 267/13
**simple [1]** 174/17
**single [18]** 91/22 178/20 179/2 179/7 180/9 209/8 212/16 212/19 213/19 214/2 226/5 251/18 264/18 272/20 284/3 284/5 297/12 298/11
**site [1]** 108/17
**sites [2]** 108/11 108/12
**situation [2]** 249/22 290/22
**situations [1]** 294/10
**six a.m [2]** 143/4 275/9
**six o'clock [2]** 131/15 131/16
**six-day [4]** 97/2 120/9 294/23 294/24
**Sixteen [2]** 150/13 204/8
**Sixty [2]** 287/3 294/24
**size [2]** 261/19 273/8
**slide [1]** 275/25
**small [5]** 126/4 185/23 261/22 294/1 298/12
**so-called [2]** 225/18 236/13
**sole [1]** 97/13
**solid [3]** 179/13 179/14 259/20
**somebody's [1]** 273/1
**someone's [1]** 255/20
**soon [1]** 145/14
**sooner [1]** 193/5
**sore [1]** 207/1
**soreness [1]** 206/10
**sorts [1]** 92/25
**sounds [1]** 299/19
**south [2]** 259/18 259/25
**southeast [5]** 258/22 259/2 259/5 260/2 261/3
**SOUTHERN [1]** 88/2
**special [8]** 97/18 98/2 98/7 99/8 99/11 99/24 100/13 293/11

**specific [11]** 99/12 152/13 156/10 162/24 175/18 177/18 177/19 213/24 264/6 266/12 274/11
**speed [1]** 287/25
**spelling [2]** 230/9 258/14
**spend [1]** 234/10
**spending [1]** 244/22
**spent [11]** 127/17 139/17 223/17 223/18 224/3 225/18 244/17 244/18 244/25 245/20 246/2
**spoke [5]** 102/24 116/4 134/3 156/23 225/5
**sports [2]** 104/5 104/22
**spot [3]** 144/10 300/11 300/12
**spreadsheet [2]** 240/9 281/19
**Springs [17]** 97/12 124/22 139/12 161/3 161/13 161/19 163/7 163/12 163/15 171/16 172/13 179/5 216/18 272/13 295/6 295/13 296/23
**St. [1]** 259/5
**St. Lucie [1]** 259/5
**staff [2]** 237/1 286/12
**stages [1]** 290/7
**staggered [1]** 275/5
**stand [7]** 90/10 91/19 190/7 216/3 258/1 269/24 273/20
**standard [2]** 298/5 298/9
**standing [2]** 180/22 290/9
**starting [2]** 191/21 226/14
**starts [2]** 143/24 289/15
**startup [1]** 290/7
**state [41]** 221/21 230/8 255/24 258/14
**stated [10]** 95/20 131/7 160/22 165/23 182/18 201/16 209/4 220/24 227/13 296/18
**statement [8]** 128/7 129/14 129/16 156/10 251/2 251/7 291/19 296/12
**statements [5]** 91/23 155/24 156/12 185/10 187/12
**states [4]** 88/1 88/15 89/9 241/7
**station [41]** 96/4 96/7 96/12 96/15 96/19 97/3 97/12 99/22 100/17 123/4 123/5 123/7 126/17 161/3 161/9 161/10 161/13 161/21 162/8 162/14 162/16 162/24 163/8 163/10 163/17 163/20 164/24 165/3 165/6 165/13 165/17 166/19 172/21 191/16 216/17 216/22 227/16 254/11 295/9 295/12 295/25
**stations [2]** 199/25 297/14
**stay [7]** 148/11 154/13 166/13 173/4 216/17 230/8 286/25
**staying [1]** 239/8
**steal [1]** 216/2
**stenography [1]** 88/24
**step [2]** 229/24 256/20
**stiffing [1]** 217/22
**stolen [2]** 123/19 123/24
**stops [8]** 102/5 109/20 109/24 109/25 110/3 110/4 136/22 175/18
**stores [1]** 108/12
**Stovash [1]** 89/6
**straight [2]** 181/12 270/12
**street [2]** 136/23 179/15
**streets [1]** 102/21
**strictly [2]** 246/21 247/5
**structure [5]** 263/8 263/11 264/10 270/1 282/4
**stub [4]** 117/12 167/7 205/6 251/12
**stuck [1]** 127/11
**stuff [17]** 92/18 101/13 103/4 164/3 184/25 199/24 201/20 206/2 206/13 206/15 206/21 206/22 206/24 214/1 216/2 221/20 286/15
**submit [3]** 240/9 240/18 281/10
**submitted [1]** 274/17
**submitting [1]** 274/7
**substantial [2]** 156/14 200/2
**sudden [2]** 195/23 216/2
**sue [2]** 120/16 120/23
**sued [5]** 120/21 122/13 201/1 208/11 219/9

**suing [1]** 218/1
**summary [1]** 132/13
**Sunday [57]**
**Sundays [4]** 96/7 97/9 97/16 191/17
**Super [1]** 221/7
**supervise [3]** 96/15 97/3 166/19
**supervising [3]** 165/4 165/5 165/12
**supervision [1]** 276/5
**supervisor [40]** 109/1 114/1 114/8 118/4 119/5 121/3 121/5 121/18 121/22 126/18 166/17 207/20 210/6 210/13 212/9 241/9 241/12 274/7 274/11 275/15 275/17 276/4 276/11 276/16 276/19 277/11 281/11 281/17 282/7 282/9 282/10 282/17 282/22 282/23 289/16 289/21 295/24 298/3 298/15 299/24
**supervisors [18]** 115/4 127/3 131/18 175/6 184/6 201/17 230/22 240/7 240/18 240/20 240/24 241/2 281/7 281/9 281/21 286/4 286/12 290/9
**supervisory [1]** 166/20
**support [1]** 218/3
**surgery [11]** 201/17 202/2 202/4 205/1 205/10 205/16 206/4 206/7 207/19 207/20 208/5
**suspended [1]** 137/19
**Sustain [6]** 122/21 198/22 218/25 256/12 256/17 261/10
**swear [1]** 258/10
**swipe [1]** 173/23
**swore [4]** 94/17 94/20 94/20 160/3
**sworn [5]** 160/10 166/1 185/4 230/6 258/12
**SWS [1]** 180/5
**synonymous [1]** 285/15
**system [16]** 210/12 210/18 210/20 231/6 239/23 239/24 240/2 240/5 248/9 248/11 248/22 249/25 250/4 250/4 250/6 250/10

**T**

**table [1]** 209/16
**take [68]**
**taken [9]** 94/7 144/24 172/16 182/22 183/1 189/24 257/16 266/1 272/5
**takes [2]** 153/19 185/14
**talk [36]** 101/20 101/23 104/5 105/18 109/7 110/20 112/3 114/2 114/4 115/5 121/17 121/19 137/17 142/6 142/6 143/13 143/15 144/5 158/22 167/19 167/22 168/25 188/20 196/8 198/7 218/6 220/22 225/4 233/20 247/23 265/10 267/18 271/17 291/8 296/10 296/11
**talked [20]** 120/6 122/23 122/23 124/14 136/10 138/11 139/11 154/13 170/21 171/6 184/12 185/2 191/16 196/1 198/9 200/19 268/8 272/13 294/5 295/1
**talking [18]** 120/12 130/8 130/24 133/17 143/18 158/24 159/23 163/22 172/6 187/9 198/10 199/7 202/5 210/9 214/4 249/14 279/7 279/9
**talks [2]** 176/2 176/12
**tank [1]** 123/8
**tardy [1]** 190/18
**target [3]** 111/8 111/11 286/21
**targets [3]** 108/13 286/17 286/19
**task [23]** 97/11 97/21 97/22 244/18 245/1 245/14 245/20 246/2 256/8 283/14 283/17 284/3 284/20 285/10 285/13 285/14 285/19 285/24 291/10 293/14 293/15 293/20 298/14
**tasks [6]** 95/18 184/2 223/19 225/19 288/20 294/12
**taught [1]** 264/4
**technical [1]** 230/24
**Technically [1]** 261/1
**tell [43]**
**telling [13]** 115/9 128/21 133/16 133/20 156/15 156/16 163/4 179/4 196/14 219/14 239/12 246/19 285/13

**T**

**ten o'clock [1]** 102/20
**ten-hour [2]** 294/21 294/23
**ten-minute [2]** 144/14 257/4
**tenure [5]** 155/9 166/16 184/3 199/12
  217/18
**term [6]** 242/8 247/1 247/16 256/9 259/10
  285/13
**terminated [1]** 137/19
**terminology [1]** 285/19
**terms [3]** 242/3 277/1 286/7
**territory [3]** 259/3 259/8 272/17
**testified [8]** 168/3 168/16 173/25 211/23
  228/4 228/8 245/13 300/1
**testify [4]** 92/14 153/21 177/12 215/22
**testimony [54]**
**text [13]** 104/15 104/20 104/24 105/3 203/14
  203/15 203/17 203/19 203/23 204/17 220/15
  220/17 295/23
**texting [3]** 104/13 104/15 104/17
**thank [29]** 90/11 90/24 144/22 145/11
  189/21 189/22 190/5 190/8 190/11 190/23
  195/4 217/25 219/25 220/6 221/10 229/24
  229/25 231/5 238/7 242/19 251/8 254/1
  256/2 256/20 256/21 257/13 257/14 300/24
  300/25
**thanked [4]** 163/18 163/19 217/24 218/1
**Thanks [1]** 90/8
**Thanksgiving [2]** 158/1 158/14
**Thanksgiving's [1]** 158/15
**theme [1]** 194/20
**theoretically [1]** 181/20
**theory [4]** 253/7 284/12 287/10 288/3
**There'd [1]** 181/16
**thereof [1]** 225/1
**they'd [1]** 238/22
**think [49]**
**thinking [4]** 175/4 191/23 193/22 273/25
**thought [8]** 96/3 172/18 173/25 190/19
  192/21 228/21 273/24 300/5
**thousand [4]** 187/6 289/3 296/24 296/24
**three-and-a-half [1]** 171/14
**three-year [1]** 91/14 91/16 149/13
**threshold [1]** 294/15
**throw [3]** 147/25 148/8 148/13
**ticket [1]** 299/2
**tie [1]** 111/25
**tied [10]** 273/10 273/14 273/17 273/20 278/5
  278/6 279/1 279/5 279/11 279/12
**till [1]** 189/19
**time [177]**
**times [87]**
**Tingley [23]** 89/5 89/6 90/23 94/2 122/12
  133/19 144/10 145/9 145/20 170/7 189/5
  190/22 198/14 199/1 214/21 220/14 221/23
  222/14 223/10 223/14 225/24 301/8 301/11
**title [5]** 99/10 167/3 200/21 230/17 258/21
**titled [1]** 166/18
**tons [1]** 183/15
**top [10]** 108/15 133/17 143/19 157/20
  196/23 196/23 197/22 247/10 260/6 285/9
**topic [2]** 268/15
**topics [1]** 269/4
**Toppling [1]** 272/25
**total [9]** 150/17 222/9 238/8 238/15 251/15
  251/16 270/10 270/10 270/11
**totally [1]** 184/24
**touch [2]** 114/22 272/19
**tow [10]** 126/21 126/23 126/25 127/4 127/6
  127/8 127/13 127/22 128/5 128/9
**towards [2]** 94/4 180/7
**track [3]** 158/2 158/3 265/8
**traffic [4]** 181/15 181/16 285/4 297/14
**training [8]** 231/18 231/19 237/15 262/17
  262/20 263/13 263/15 263/17
**trainings [1]** 263/1

**transcript [3]** 88/13 88/24 301/20
**transfer [41]** 96/4 96/7 96/12 96/15 96/19
  97/3 97/12 99/22 100/17 126/17 161/3 161/9
  161/10 161/13 161/21 162/7 162/14 162/16
  162/23 163/8 163/10 163/17 163/20 164/24
  165/3 165/6 165/12 165/17 166/19 172/21
  180/5 191/16 199/25 216/17 216/22 227/16
  254/11 272/13 295/9 295/12 295/25
**transitioned [3]** 106/8 106/13 107/23
**Transportation [7]** 141/6 141/10 141/14
  141/19 146/25 147/17 147/19
**trash [4]** 99/20 100/19 103/19 211/13
**treated [2]** 101/9 220/19
**tremendously [1]** 218/7
**trial [6]** 88/13 229/11 245/13 266/8 290/25
  295/1
**trick [1]** 185/16
**tricks [1]** 178/22
**trip [19]** 140/2 140/10 140/24 141/13 141/16
  142/1 142/9 145/21 146/8 146/11 146/16
  180/20 180/21 180/25 181/1 182/4 211/16
  225/14 272/1
**trips [2]** 289/9 289/9
**truck [82]**
**truck's [1]** 137/14
**trucks [17]** 98/8 98/11 99/13 102/15 123/4
  138/23 142/1 164/2 179/9 179/25 184/25
  214/1 236/20 236/20 263/9 275/4 289/4
**true [11]** 110/12 160/6 160/10 160/18 169/13
  169/16 185/13 185/18 203/23 274/8 292/11
**truth [6]** 94/17 94/20 94/21 128/21 160/3
  222/21
**truthful [1]** 213/8
**TUESDAY [4]** 90/1 190/1 195/19 203/2
**tumor [1]** 208/4
**turning [2]** 175/17 254/20
**two o'clock [5]** 145/10 189/13 189/15
  189/19 275/4
**two-and-a-half [1]** 296/25
**two-week [5]** 120/1 155/24 207/14 224/12
  250/13
**typically [1]** 110/23

**U**

**Uh [1]** 244/8
**uhm [23]** 151/25 159/10 180/2 220/20
  220/21 223/17 225/7 232/4 240/6 263/19
  265/5 266/25 270/25 270/25 272/23 273/4
  273/12 278/10 283/25 290/4 291/8 294/14
  295/5
**um [37]** 95/11 96/11 97/10 97/23 109/9
  111/3 112/18 113/1 113/6 114/18 115/11
  116/13 116/22 118/12 119/10 120/8 120/11
  121/1 122/17 126/24 127/20 129/5 131/1
  132/24 134/13 139/4 139/18 142/17 147/1
  148/18 162/6 169/23 184/14 188/15 191/24
  263/6 295/7
**um-hum [37]** 95/11 96/11 97/10 97/23 109/9
  111/3 112/18 113/1 113/6 114/18 115/11
  116/13 116/22 118/12 119/10 120/8 120/11
  121/1 122/17 126/24 127/20 129/5 131/1
  132/24 134/13 139/4 139/18 142/17 147/1
  148/18 162/6 169/23 184/14 188/15 191/24
  263/6 295/7
**unable [1]** 250/2
**unaware [2]** 248/9 249/4
**understand [30]** 91/5 110/21 130/8 134/1
  134/16 152/13 154/8 157/17 174/10 179/3
  186/4 188/22 188/24 197/3 197/21 197/23
  197/24 201/8 216/6 216/7 224/2 225/17
  225/20 229/5 239/13 252/18 253/8 266/20
  279/18 291/6
**understanding [11]** 106/23 123/1 124/5
  124/6 128/17 185/13 188/10 192/14 197/1
  229/13 236/5
**understands [2]** 102/10 235/24

**understood [4]** 112/11 225/21 239/20 250/3
**unfair [1]** 284/25
**unfamiliar [1]** 99/17
**unfortunately [2]** 130/3 166/7
**UNITED [3]** 88/1 88/15 89/9
**units [1]** 259/23
**universe [1]** 104/5
**unlike [2]** 102/10 182/16
**unpaid [3]** 207/9 219/2 245/14
**unquote [1]** 110/19
**unsure [1]** 193/24
**unzoom [1]** 116/3
**upfront [1]** 201/9
**ups [1]** 284/18
**upset [3]** 161/17 163/24 273/2
**upstairs [1]** 105/9
**us [25]** 109/13 123/3 125/7 152/18 220/17
  224/20 224/24 230/17 230/19 238/1 239/12
  244/15 245/15 250/5 252/19 258/21 264/14
  264/20 270/20 281/13 290/25 291/2 296/19
  299/17 300/5
**utilize [1]** 239/21
**utmost [1]** 219/23

**V**

**vacation [5]** 157/4 187/8 197/9 207/8 207/10
**varies [2]** 177/22 180/9
**variety [1]** 271/24
**vegetation [4]** 179/18 179/22 181/6 182/1
**vehicle [16]** 125/20 126/11 127/14 127/24
  138/16 138/24 138/25 139/1 145/23 145/25
  146/2 146/3 147/16 223/15 223/23 224/1
**vehicles [1]** 260/25
**venue [1]** 112/1
**verbal [2]** 114/11 268/1
**verbally [1]** 162/15
**verbiage [2]** 99/11 247/4
**verifiable [1]** 272/11
**verified [1]** 121/22
**verify [1]** 272/9
**versus [2]** 244/18 246/3
**vice [3]** 101/21 258/22 258/25
**viewed [1]** 91/19 92/1
**violate [1]** 235/2
**violated [1]** 188/25
**violating [2]** 208/16 208/21
**violation [1]** 299/19
**voiced [1]** 269/23
**VOLUME [1]** 88/17
**volunteer [1]** 126/5
**volunteering [1]** 214/22
**vs. [1]** 90/4
**VUE [1]** 89/7

**W**

**W-4s [1]** 233/9
**wage [23]** 170/21 170/22 170/22 185/2
  185/5 185/23 187/23 188/4 197/13 197/14
  197/16 250/15 250/24 251/24 252/2 254/8
  254/12 254/13 254/15 254/15 255/3 255/4 255/5
  255/17
**wages [1]** 196/19
**wait [7]** 126/25 127/4 127/6 127/22 180/22
  297/13 297/13
**waiting [2]** 128/5 128/9
**wake [1]** 185/15
**walk [2]** 187/18 216/7
**walked [1]** 205/22
**Walmart [1]** 109/4
**Walmarts [1]** 108/13
**warning [2]** 137/17 137/18
**warrant [1]** 221/13
**waste [120]**
**Waste Pro [103]**
**Waste Pro's [5]** 108/4 124/10 230/4 248/16

**W**

**Waste Pro's... [1]** 294/7
**watch [2]** 96/19 142/4
**watched [1]** 97/7
**watching [1]** 180/22
**Wednesday [11]** 171/16 172/8 172/13
172/16 173/15 177/1 182/19 182/21 202/23
203/18 204/17
**Wednesdays [1]** 172/25
**week [35]** 93/2 97/2 104/8 105/5 106/23
107/2 107/4 120/1 120/9 120/10 152/22
152/22 155/24 156/19 156/19 156/21 157/6
168/10 191/23 192/5 193/20 207/14 210/8
212/19 224/12 228/18 228/19 228/20 238/5
250/13 250/13 254/16 255/10 278/2 278/9
**weekend [1]** 184/25
**weekends [2]** 96/4 166/19
**weekly [18]** 92/1 237/22 237/23 238/4 238/4
240/9 247/9 251/18 271/17 271/18 271/19
271/21 273/10 273/11 273/17 273/20 277/19
278/5
**weeks [16]** 107/3 155/1 155/1 155/10
155/12 155/12 156/20 157/7 166/14 193/11
193/11 207/13 207/15 207/16 207/18 251/17
**weighed [1]** 224/4
**weird [2]** 269/2 269/4
**West [1]** 296/23
**whatever's [1]** 98/24
**wheel [1]** 139/5
**wheels [1]** 98/21
**who's [5]** 103/13 180/8 180/9 276/16 280/16
**Whoa [1]** 136/23
**wide [1]** 286/25
**willfully [2]** 208/11 208/21
**William [1]** 88/14
**willing [5]** 115/1 190/21 207/17 220/22
284/23
**wind [1]** 289/21
**wish [1]** 179/2
**withheld [2]** 277/20 278/3
**withhold [1]** 282/7
**witness [15]** 198/24 203/9 229/22 230/1
230/2 230/6 253/25 256/19 256/22 256/23
258/10 258/12 269/23 273/19 301/7
**WITNESSES [1]** 301/6
**woman [1]** 219/24
**women [2]** 185/20 236/21
**word [4]** 115/17 146/4 287/22 295/11
**words [1]** 220/18
**work [115]**
**worked [70]**
**worker [3]** 103/14 186/13 269/14
**workers [2]** 240/21 254/10
**working [30]** 99/22 100/16 106/21 106/23
119/24 149/21 153/25 154/1 154/25 156/4
156/9 159/14 159/19 182/19 185/23 191/5
191/23 192/6 195/1 195/15 213/21 213/24
246/2 252/19 255/1 260/10 269/12 275/17
275/24 285/1
**works [6]** 216/1 239/6 239/11 248/17 250/12
250/19
**workweek [2]** 294/23 294/24
**world [1]** 248/16
**worry [1]** 176/23
**worth [7]** 121/25 252/13 294/12 294/17
294/18 294/19 298/5
**WPD [1]** 88/4
**write [8]** 161/24 162/20 162/22 164/10
202/10 221/16 267/23 296/6
**written [5]** 137/18 137/21 138/3 296/2 296/8
**wrong [8]** 154/1 186/16 186/20 186/20
187/11 218/12 218/13 273/22
**wronged [1]** 221/20
**wrote [6]** 202/13 202/14 203/1 203/2 204/23
269/20

**X**

**X amount [2]** 96/19 192/15

**Y**

**yard [2]** 102/25 136/20
**year-end [6]** 197/10 278/22 278/24 278/25
279/7 282/13
**year-to-date [1]** 196/19
**yellow [1]** 147/12
**Yep [3]** 137/9 150/16 205/13
**yield [1]** 287/15
**you'd [6]** 154/13 174/14 181/16 191/4 192/2
237/11
**youngest [1]** 258/24