UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 17-60926-CIV-WPD

```
ROGER ANDREU,                    .
                                 .
              Plaintiff,         . Fort Lauderdale, Florida
                                 . April 18, 2018
              v.                 . 9:21 a.m.
                                 .
WASTE PRO OF FLORIDA, ET AL.,.
                                 .
              Defendants.        .
. . . . . . . . . . . . . . . .
```

- - - - -

Transcript of Trial Proceedings had

before the Honorable William K. Dimitrouleas,

United States District Judge, and a Jury.

- - - - -

VOLUME 3

- - - - -

Proceedings recorded by mechanical stenography, transcript produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

316

**APPEARANCES:**

For the Plaintiff:        Paul D. Edwards, Esq.
                         Marc E. Rosenthal, Esq.
                         Rosenberg, Cummings & Edwards, PLLC
                         801 NE 20th Avenue
                         Fort Lauderdale, Florida  33304

For the Defendant:        Amy S. Tingley, Esq.
                         Joseph S. Hudson, Esq.
                         Stovash, Case & Tingley, P.A.
                         220 North Rosalind Avenue
                         The VUE at Lake Eola
                         Orlando, Florida  32801

Court Reporter:           Francine C. Salopek, RMR, CRR
                         Official Court Reporter
                         United States District Court
                         299 E. Broward Blvd., Room 205F
                         Fort Lauderdale, Florida 33301
                         (954)769-5657/mjsfcs@aol.com

                         -  -  -  -  -

MACKIE - DIRECT/EDWARDS

1          **WEDNESDAY, APRIL 18, 2018, 9:21 A.M.**

2          *(The Judge is presently on the bench)*

3          **THE COURT:**  Terry, do we have all the jurors?

4          **COURTROOM SECURITY OFFICER:**  Yes.

5          **THE COURT:**  All right.  We're back on the record.

6          Counsel are present.

7          Mr. Mackie, if you could resume the stand.

8          Anything to come before the Court before we bring the

9     jury in?

10          **MR. EDWARDS:**  No, your Honor.

11          **MS. TINGLEY:**  No, your Honor.

12          **THE COURT:**  All right.  Let's bring in the jury.

13          **COURTROOM SECURITY OFFICER:**  All rise.

14          *(The jury entered the courtroom)*

15          **THE COURT:**  And we have all the jury back.

16          Did everyone follow my admonition not to discuss the

17     case or allow it to be discussed in your presence?

18          All right.  I think we're ready to continue with the

19     direct examination.

20          Mr. Edwards.

21          **MR. EDWARDS:**  Thank you, your Honor.

22                    **DIRECT EXAMINATION (CONTINUED)**

23     BY MR. EDWARDS:

24     Q.  Good morning again, Mr. Mackie.

25     A.  Good morning.

MACKIE - DIRECT/EDWARDS

1   Q.  To recap a little bit from where we left off yesterday, you

2   and I had discussed your position at Waste Pro as the regional

3   vice president.  Do you recall that testimony?

4   A.  Yes, sir, I do.

5   Q.  As a part of your position, can you ask that policies of

6   Waste Pro, at least in your region, be changed?

7   A.  I can --

8           **MS. TINGLEY:**  Objection.  Objection.  Relevance.

9           **THE COURT:**  Overruled.

10  A.  I could ask a policy be implemented.  As far as a policy

11  that is in place, that's generally driven from the corporate

12  guidelines, and it's sort of my job to make sure that those

13  stay in place.

14  Q.  Okay.  Are those kind of decisions above your position?

15          **MS. TINGLEY:**  Objection.  Relevance.

16          **THE COURT:**  Overruled.

17  A.  I would say -- to change --

18  Q.  Yes, sir.

19  A.  -- a policy?  Yeah, that would be something that would -- I

20  mean there would be some policies -- your know, I would say

21  that policies that are in place, the basic policies we talked

22  about, would be in place from above.

23  Q.  Okay.  Can you give me kind of your best explanation for

24  what Waste Pro of Florida does?

25          **MS. TINGLEY:**  Objection.  Relevance.

MACKIE - DIRECT/EDWARDS

1          **THE COURT:**  Overruled.

2    A.  We are a garbage company.  We collect garbage and

3    recycling.

4    Q.  Okay.  You mentioned yesterday -- we had some discussion

5    about the employees that are paid the so-called day rate.  Do

6    you remember that?

7    A.  Yes.

8    Q.  And I think you said that not all employees are paid at

9    that day rate, right?

10   A.  Not every employee in the region is paid at that day rate.

11   Q.  Okay.  But the helpers and the drivers for the most part

12   are, right?

13   A.  Yes.

14   Q.  Okay.  Do you know what's the proportion of the helpers and

15   drivers that are paid at the day rate compared to other

16   employees that aren't paid at the day rate?

17   A.  I'd be guessing.

18   Q.  Okay.  What's your best guess?

19          **MS. TINGLEY:**  Objection.  Calls for speculation.

20          **THE COURT:**  Sustain.

21          **THE COURT REPORTER:**  Ms. Tingley, microphone.

22   BY MR. EDWARDS:

23   Q.  Do you know how many day rate employees, helpers or

24   drivers, you oversee in your region?

25   A.  I don't know the exact number.

MACKIE - DIRECT/EDWARDS

1  Q.  Okay.  Could you at least agree with me that the helpers

2  and drivers are the majority of the employees that you oversee?

3      **MS. TINGLEY:**  Objection.  Calls for speculation.

4      **THE COURT:**  Overrule.

5  A.  I'd say it's a majority.  I don't know vast majority or

6  slight majority.

7  Q.  Sure.  Okay.  We'll agree on majority.

8      Those helpers and drivers, those are the folks that

9  deliver the service that Waste Pro provides, though, right?

10 A.  Every single employee is part of delivering the service.  I

11 mean the person that answers the phone is servicing the

12 customer just as much as the person picking up.

13 Q.  Sure.

14     But aside from customer service -- and everybody's

15 interested in that, of course -- accounting, executive, those

16 types of things aren't providing the waste delivery and getting

17 the garbage from people's homes, are they?

18     **MS. TINGLEY:**  Objection.  Relevance.

19     **THE COURT:**  Sustain.

20 BY MR. EDWARDS:

21 Q.  Do you remember yesterday we had some discussion about

22 safety bonuses?

23 A.  Yes, I do.

24 Q.  Okay.  And you told us about bonus loss forms.  Do you

25 remember that?

MACKIE - DIRECT/EDWARDS

1    A.  I don't recall bonus -- I know we talked about it, but I

2    don't recall talking about bonus loss forms.

3    Q.  Okay.  Well, let me ask you again then.  Does a bonus loss

4    form have to be submitted if a bonus is taken away from an

5    employee?

6    A.  Yes.

7    Q.  Okay.  And I think you testified yesterday that when you

8    last checked, during this litigation, the file for Mr. Andreu

9    did not have any bonus loss forms in it, did it?

10   A.  I think my testimony was I did not recall if he had any

11   bonus loss forms.

12   Q.  Okay.  Okay.  Did you have an opportunity to check?

13   A.  No, I did not.

14   Q.  Okay.  How hard would it be for you to check that?

15   A.  Not -- not very hard.

16   Q.  Okay.  I think when we were talking about safety bonuses as

17   well, we talked about safety bonuses being lost for reasons

18   other than not attending the mandatory safety meetings.  Do you

19   remember that?

20   A.  Yes.

21   Q.  What other situations can a safety bonus be taken away from

22   an employee in?

23   A.  You know, not taking proper care of the vehicle.  We talked

24   about customer service, you know, egregious customer service

25   complaints.

MACKIE - DIRECT/EDWARDS

1   Q.  Sure.

2   A.  Not doing the basic requirements of their job.

3   Q.  Okay.

4   A.  Filling out the paperwork.

5   Q.  Okay.

6   A.  Things of that nature.

7   Q.  Okay.  I think we would all agree that those are reasons

8   why someone could lose a bonus.  If the employee did any of

9   those things or missed a safety meeting, are they told why the

10  bonus is being taken away from them?

11  A.  Yes.

12  Q.  Is a bonus loss form submitted?

13  A.  Yes.

14  Q.  Okay.  So, if -- using some of your examples, if a person

15  committed an egregious customer service issue, would there be a

16  notation anywhere that says, This is why your bonus was taken

17  from you?

18  A.  Yeah, there's a form, an employee action form or a bonus

19  loss form that has it, and it's discussed with the employee.

20  Q.  Okay.  So, maybe not relative to the safety meetings, but

21  have you had any opportunity to review if Mr. Andreu has any

22  bonus loss forms for any other reason?

23  A.  I -- I do not know that answer.

24  Q.  Okay.  Can you tell me why Mr. Andreu had weekly safety

25  bonuses taken away without bonus loss forms?

MACKIE - DIRECT/EDWARDS

1          **MS. TINGLEY:**  Object to the form.

2          **THE COURT:**  Overrule.

3    A.  I can only assume by Mr. Andreu's testimony yesterday on

4    how he was so cavalier that he very regularly didn't 1098, he

5    very regularly didn't do the post-trip inspection -- which, by

6    the way, as a point of clarification, it is a federally

7    mandated DOT regulation, 396.11, that every single day a driver

8    do a post-trip inspection of their vehicle, write up any

9    deficiencies, whether there's deficiencies or not.

10   Q.  Sure.

11   A.  So, it would be for one of those reasons.

12   Q.  Okay.  I appreciate that additional information.  My

13   question, though, was he ever informed -- is there any reason

14   why his safety bonuses would have been taken away from him

15   without any notation in his file?

16   A.  Not that I'm aware of.

17   Q.  Okay.  I want to show you a couple more of these records,

18   and I'll make the same promise to you that I made to everyone.

19   I won't go through each and every one of these with you.  I'll

20   just start at the beginning.

21          On the first day of the pay periods that have been

22   admitted into evidence in this case, specifically, the pay date

23   of May 30th of 2014, it looks like there's only $50 paid in

24   bonus.  Am I reading that correctly?

25   A.  *(No response)*

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

MACKIE - DIRECT/EDWARDS

1   Q.   Can you see it?

2   A.   Yes.   There's a $50 bonus.

3   Q.   Okay.   Can you tell me, by looking at the time detail card

4   that corresponds with that date, why he wasn't paid a safety

5   bonus?

6   A.   He, ah -- I only see 11 days worked here, not 12.

7   Q.   Okay.

8   A.   If you miss a day of employment, you're not eligible for

9   the bonus that week.

10  Q.   Okay.   Okay.   Well, it says he took a sick day.   Did he

11  lose a safety bonus because he took a sick day?

12  A.   You have to be in attendance every day to --

13  Q.   Okay.   So that's a yes to my question?

14  A.   You have to be in attendance every day to get the bonus.

15  Q.   Okay.   So, he wasn't in attendance, because he was sick,

16  and he lost his weekly safety bonus.

17  A.   He did not earn his bonus, because he was not at work every

18  day for both weeks.

19  Q.   Okay.   Okay.

20        I want to go ahead and show you the next pay period in

21  line.   This is the second in the series of pay records that

22  have been admitted into evidence in this case.   This is for pay

23  date June 13th of 2014.

24        It looks like he was only paid $50 in bonus on that

25  day.   Can we agree to that?

MACKIE - DIRECT/EDWARDS

```
 1   A.  Correct.

 2   Q.  Okay.  And then if we look at the corresponding time detail

 3   sheet for that, it looks like only one safety bonus was paid.

 4   Do you know why only one safety bonus was paid?

 5   A.  I -- I can't say from this information.

 6   Q.  Okay.  Okay.  There's no -- we would agree there's no

 7   notation on there to let him know why it was taken away, right?

 8   A.  I don't see any notation there.

 9   Q.  Okay.  Because if you look with me, too, it looks like he

10   worked 12 days in that pay period, didn't he?

11   A.  Yes.  Or my answer would have been that I thought it was

12   attributed to the days.

13   Q.  Okay.  Okay.  So, we would at least expect there must be

14   some form somewhere that justifies taking away his safety

15   bonus, right?

16   A.  Yes.

17   Q.  Okay.  But we don't have any of those?

18   A.  I don't have that.

19   Q.  Okay.  Okay.

20        All right.  I'm moving right along for you.  I'm gonna

21   show you the pay period of November 14th of 2014.  Can you see

22   that okay?

23   A.  Yes.

24   Q.  Okay.  It looks like there's no bonuses paid and 12 days

25   worked.  Am I reading that correctly?
```

MACKIE - DIRECT/EDWARDS

1  A.  Yes, correct.

2  Q.  Okay.  And if we look at the corresponding time sheet, it

3  says "notes" in a couple positions.  Do you know why that is?

4  A.  No, I'm not familiar with that.

5  Q.  Okay.  So, if those safety bonuses were taken away on the

6  two occasions, we would expect there to be some justification

7  for that, though, right?

8  A.  Yes, I would think there would be.

9  Q.  Okay.  Have you looked into that?

10  A.  No, sir, I have not.

11  Q.  Okay.  I want to show you an example, and for this one, I

12  did pick one of the records.  I'm gonna show you the pay period

13  for April 3rd of 2015.  Can you see that okay?

14  A.  Yes, I can.

15  Q.  Okay.  So, here, it looks like at least more than the

16  hundred dollars of safety bonuses.  Can we agree to that?

17  A.  Yes, it does.

18  Q.  Okay.  I'm gonna show you the corresponding time sheet for

19  that.  Can you tell me which bonuses are for which types of

20  work or safety bonuses by looking at that?

21  A.  The first explanation I had ever heard was Gina's

22  yesterday, so that would be my only basing --

23  Q.  Oh, okay.

24  A.  -- of how -- how it rolls out on this.

25  Q.  Okay.  And what was the explanation as you know it?

MACKIE - DIRECT/EDWARDS

1          **MS. TINGLEY:**  Objection, your Honor.

2          **THE COURT:**  Overruled.

3   A.  That the safety bonuses were on one line and the help

4   bonuses or additional bonuses were on other lines.

5   Q.  Okay.  I think she may have testified that the safety

6   bonuses are paid on Saturday.

7          **MS. TINGLEY:**  Objection, your Honor.

8   A.  I don't recall exactly what her testimony was.

9   Q.  Okay.  Fair enough, fair enough.

10         Look at the date of Saturday, March 21st with me.  Can

11  you see that date?

12  A.  *(No response)*

13  Q.  Can I zoom it in for you?

14  A.  No, I've got it.

15  Q.  Okay.  Do you see it there?

16  A.  Yes.

17  Q.  Can you tell me which of those is a safety bonus, which of

18  those is an additional work bonus?

19  A.  No, sir.

20  Q.  Okay.  Can you tell me which day the $75 was earned on?

21  A.  *(No response)*

22  Q.  Was it the Friday where Mr. Andreu worked 15.37 hours or

23  was it for the Saturday that he worked 13.95?

24  A.  I can't give you that answer.

25  Q.  Okay.  Can you tell me how many hours he worked to earn

MACKIE - DIRECT/EDWARDS

1    that bonus pay?

2    A.  No, sir.

3    Q.  That's because it's not reflected in any of these records,

4    is it?

5    A.  Well, it -- it is reflected.  There's the amount of hours

6    that he worked in the day, so you --

7    Q.  Okay.  We can agree to that, that there's the amount of

8    hours worked in the day, so either the 15.35 *(sic)* or the

9    13.95 -- 37 -- I apologize.  But you can't tell me how much

10   additional time was spent to earn the additional $75, can you?

11   A.  Well, you know, the time of the day is cumulative in

12   nature, and it -- the bonus or the additional pay is part of

13   that cumulative nature of pay.  So, it took him --

14   Q.  Okay.

15   A.  -- however many additional hours.

16   Q.  Okay.  I think yesterday you may have used the term "task"

17   or "route."  I want to use the term you're comfortable with.

18   Which term should we use?

19   A.  "Task."  I mean like I said --

20   Q.  Okay.

21   A.  -- the term they used when I got in the business.

22   Q.  Okay.  Can you tell me how much time was spent on his task

23   for whatever day that was earned on?

24   A.  No, sir, I can't.

25   Q.  Okay.  That's because it's not reflected in that record, is

MACKIE - DIRECT/EDWARDS

1  it?

2  A.  Other than my -- my feeling that the -- the day is

3  encompassing of the task.

4  Q.  The whole day is the task?

5  A.  The day is encompassing of the -- the task.  You know, you

6  come to work, you have a task -- you know, the route, but

7  you're asking me a question where I believe that that bonus is

8  part of the compensation that rolls up for the day.

9  Q.  Okay.  Do you know that that's what it is, or do you guess

10 that that's what it is?  It's your company.

11 A.  We would give -- if there is a bonus on that line that is

12 for help pay, that would be part of additional compensation for

13 that day.

14 Q.  Okay.  I'm gonna show you the last record that I'll have

15 you look at in terms of these safety bonuses.  I'm gonna show

16 you the record for April 17th of 2015.  Can you see that okay?

17 A.  This is making me think I need gasses, but --

18 Q.  My apologies.

19 A.  No, it's okay.  Yes, I can.

20 Q.  Okay.  It looks like $150 in bonus earned there.  Am I

21 reading that right?

22 A.  Yes, sir.

23 Q.  Okay.  Take a look with me at the corresponding time sheet

24 for that.  It looks like two $75 bonuses paid on Sunday.  Do

25 you know why that is?

MACKIE - DIRECT/EDWARDS

1  A.  No, I don't.

2  Q.  Are those weekly safety bonuses?

3  A.  I don't know the answer to that.

4  Q.  Do you pay weekly safety bonuses at $75?

5  A.  No, we do not.

6  Q.  Okay.

7       Okay.  So, could those be extra work bonuses?

8       **MS. TINGLEY:**  Objection.  Calls for speculation.

9       **THE COURT:**  Overruled.

10 A.  Yeah, it could be a combination of a weekly bonus and $25

11 extra for doing something else.  I don't know.  There's not --

12 don't know.

13 Q.  There's nothing in writing on there, right?

14 A.  Well, it -- no, there's not an explanation there.

15 Q.  Okay.  Well, we can at least agree for now that it's above

16 the $50 safety bonus, right?

17 A.  Yes.

18 Q.  Okay.  So, if we look at that, it's earned on Sunday.

19 That's the beginning of the pay period.  You wouldn't give a

20 bonus for something on this pay period that happened in the

21 last pay period, would you?

22 A.  I -- I -- I can't speak to how it makes its way onto

23 this --

24 Q.  Sure, sure.

25 A.  -- this stub.  I really can't.

MACKIE - DIRECT/EDWARDS

1   Q.   So, is it possible that on a day where Mr. Andreu worked

2   8.87, that he also did at least some additional work?

3         **MS. TINGLEY:**  Objection.  Calls for speculation.

4         **THE COURT:**  Overruled.

5   A.   Yes, you could -- you could work eight hours and have done

6   extra work on that day.

7   Q.   So, he could have gotten done earlier and been given one of

8   those assignments that we talked about?

9   A.   Yes.

10  Q.   Okay.  Can you tell me, by looking at this, how much time

11  of that 8.87 hours he spent doing his daily assigned task

12  versus whatever extra work there might have been?

13  A.   You know, I just -- again, the hours are cumulative in

14  nature for the day, but I cannot delineate the breakdown of

15  where he was.

16  Q.   Okay.  That's because it's not there, right?

17  A.   Yes, sir.

18  Q.   Okay.  Wouldn't it be easier for us, as we sit here today

19  trying to figure out what hours he worked, if it was just

20  written down there?

21        **MS. TINGLEY:**  Objection to the form.

22        **THE COURT:**  Sustain.

23  BY MR. EDWARDS:

24  Q.   There's no policy for Waste Pro Florida in documenting

25  those hours, though, is there?  Documenting the additional time

MACKIE - DIRECT/EDWARDS

1  spent after the daily task is completed, after they 1098.

2        **MS. TINGLEY:**  Objection to the form.

3        **THE COURT:**  Overruled.

4  A.  The policy is, you clock in when you get there.  You clock

5  out when you get back to the yard.  If you've done any

6  additional work, it's submitted for extra pay.

7  Q.  Okay.

8  A.  If you don't get that extra pay, you should come to Regina

9  or myself.  And on any occasion that's ever come before me, I

10  have always made sure that the employee has gotten paid.

11  Q.  My question, though, is about the policy.  There is no

12  policy to document that time, is there?

13  A.  Yes, there's a policy.  You clock in when you get to work.

14  You clock out when you get back.  If you do any extra work,

15  your supervisor turns it in for extra pay.

16  Q.  Okay.

17  A.  The extra pay is put into your pay.  If you do not receive

18  it, you come to Regina or myself, and we fix it.

19  Q.  Okay.  I apologize.  And perhaps I'm not being clear.

20        My question is about the policy as it relates to

21  logging the time after a person 1098s.  You don't have a

22  requirement that they log the time maybe that a 1098 call comes

23  in, do you?

24  A.  It -- we -- our job is to pick up the garbage globally.

25  Q.  Sure.

MACKIE - DIRECT/EDWARDS

1  A.  We send our drivers out, they pick up garbage.  So, the

2  policy in nature of taking every single fragment of what an

3  individual may be doing and documenting all of that is

4  encompassed by the day rate, as well as the extra compensation

5  and the premium if they go over.  So, that -- that's a policy.

6  It doesn't need to be a written policy.

7  Q.  Okay.  So, with due respect, Mr. Mackie, I think we

8  understand your position in this case.

9        My question is a lot more narrow than that.  My

10 question is:  Do you have a policy that logs the time after a

11 person 1098s and works an additional task?  Very simple.

12        **MS. TINGLEY:**  Objection.  Asked and answered.

13        **THE COURT:**  Overruled.

14 A.  Again, I'm -- I'd say that's what our policy is.  Your

15 route sheet -- if you're picking up garbage in Hollywood,

16 you're sent to pick up garbage in the City of Hollywood that

17 day, while you start with a route, you're asked to do -- to

18 help on another route.  You're still picking up garbage in

19 Hollywood.  When you come back with your disposal ticket at the

20 end of the day, all of that disposal is dumped in one truck for

21 the City of Hollywood.  So, there's no reason to delineate that

22 some of it was from here, some of it was from a different point

23 of view.

24        If we had sent somebody to an additional city, they

25 would have a separate disposal ticket.  So, that would be on

MACKIE - DIRECT/EDWARDS

1   their route sheet, that they were in different locations for a
2   day.  But that would be on the driver's route sheet.
3   Q.  Okay.  I'm gonna give you a simple question, and I'm gonna
4   ask you to give me a simple answer.  Okay?
5   A.  Okay.
6   Q.  I think it can probably be done in a yes or no.
7        Do you have a policy, written or otherwise, at
8   Waste Pro Florida to document the time of an employee after
9   they 1098?  Yes or no.
10  A.  I think we have an oral policy, yes.
11  Q.  An oral policy.
12  A.  You said written or otherwise.
13  Q.  Okay.  It's written or is it oral?
14  A.  You asked me if it was written or otherwise.  And I say --
15  Q.  Otherwise.
16  A.  -- yes.
17  Q.  Otherwise, okay.
18        How is that oral or otherwise policy transmitted to
19  employees like Mr. Andreu?
20  A.  I'm not sure.
21  Q.  How do we know that Mr. Andreu knew about that, that he
22  knew about a policy?  Because if we look at all of the time
23  records in this case, I'll submit to you, there is no
24  delineation between time spent on a daily task and time spent
25  on bonus work after they 1098.

MACKIE - DIRECT/EDWARDS

1    A.   The bonus work after they've 1098 is turned in by the

2    supervisor for pay.  It comes in on a spreadsheet every single

3    week, and it's put into their pay.

4         If a driver doesn't get it, which does occasionally

5    happen, they ask, Hey, I didn't get the pay, you know, the

6    bonus pay --

7    Q.   Okay.

8    A.   -- and it's fixed.

9         So, I'm saying, our policy is, you come in, you clock

10   in.  You drive, you do your tasks, task or tasks, for that day.

11   You have the compensation for that day.  You clock out.  If you

12   don't receive a portion of your compensation, you should say

13   something.

14   Q.   Okay.  Have you ever communicated that policy, the verbal

15   policy that you described, to any of your employees?

16   A.   Yes.

17   Q.   Okay.  Did you ever communicate it to Mr. Andreu?

18   A.   Yes.  It's a -- the first day of work.  You clock in, you

19   clock out.

20   Q.   Okay.  Just the clock in/clock out or --

21   A.   If there's extra pay, and you're eligible for extra

22   compensation, you're eligible for the premium overtime, the

23   extra compensation will be paid in the form of a bonus.  If you

24   don't get that bonus, come to Regina, come to myself, come to,

25   you know, other HR.  That's a policy.

MACKIE - DIRECT/EDWARDS

1   Q.  Okay.  Do you have any policy at all that would serve to

2   identify additional task time?  Any policy at all?

3   A.  I'm sorry, I don't understand the question.

4   Q.  Do you have any policy at all at Waste Pro that would help

5   us identify the days that Mr. Andreu claims that he did bonus

6   work that he wasn't paid for?  Anything that would help us

7   discern that?

8   A.  I think what would help you discern that is Mr. Andreu

9   never made a complaint to me that he was not paid extra pay for

10  help.  I think -- I mean we talked all the time --

11  Q.  Okay.

12  A.  -- and he never said that, so, I think that that would

13  really help you discern that.

14  Q.  Okay.  So, you don't have a policy for that, do you?

15  A.  I'm saying there is a policy in place.  You clock in.  You

16  clock out.  You get your extra pay for anything extra that

17  you've done.

18  Q.  Okay.

19  A.  If it doesn't show up -- I see that being a policy, sir.

20  It's not a written policy.

21  Q.  Okay.  Okay.  We'll agree that it's not a written policy

22  for now then.

23        We talked yesterday -- I talked with Ms. Lombardo a

24  little bit about it and hadn't had the opportunity to get this

25  area with you.

MACKIE - DIRECT/EDWARDS

1          When an employee is hired by Waste Pro of Florida,

2     there is no employment agreement, is there?

3     A.  You know, we -- or we're talking -- we have offer letters.

4     Q.  Okay.

5     A.  I'm not saying an agreement.  I just want to make sure that

6     there's --

7     Q.  Sure, sure, sure.  We won't parse words on what an

8     agreement is.

9          What's in the offer letter?

10    A.  Your rate of pay, your benefits, other basic general

11    information pertaining -- I mean I can't be exactly sure of all

12    the little things.

13    Q.  Sure.

14    A.  But general basic knowledge of the position.

15    Q.  You don't know what's in the offer letter?  Can't be sure

16    of it?

17    A.  I'm saying there's the basic information -- job title, what

18    you're gonna be responsible for --

19    Q.  Sure.

20    A.  -- rate of pay, benefits.

21    Q.  Okay.

22    A.  I approve the offer letters.  I'm just saying I can't be

23    every single detail *(sic)*.

24    Q.  Sure.  We don't expect you to remember every word of a

25    letter.

MACKIE - DIRECT/EDWARDS

1              When you say "describes the rate of pay," is there

2    anything other than the day rate that they'll be paid at in

3    that offer letter?

4    A.  It's a basic overview of their compensation.

5    Q.  Okay.  My question's simple.  In terms of their

6    compensation that you've described in this offer letter, is

7    there anything in the offer letter other than the day rate that

8    they'll be paid at?

9    A.  Yes, that they're eligible for bonuses and things of that

10   nature.

11   Q.  Okay.  Any breakdown of how their pay is calculated or how

12   their overtime is calculated in the offer letter?

13   A.  No, sir.

14   Q.  Okay.  Do you have Mr. Andreu's offer letter?

15   A.  I don't.

16   Q.  Okay.  Does your company?

17   A.  I would assume we do, yes.

18   Q.  Okay.  So, other than the offer letter, no written

19   agreement, is there?

20   A.  Not to my knowledge.

21   Q.  Okay.  We talked yesterday about when Waste Pro goes into

22   new areas, takes on new assignments, municipalities, things

23   like that.  Do you remember that testimony?

24   A.  Yes, sir.

25   Q.  Okay.  When Waste Pro goes into a new area, whatever it may

MACKIE - DIRECT/EDWARDS

1   be, a new city, do you have a contract?

2   A.  Yes, we do.

3   Q.  Okay.  Does the contract explain how you're going to be

4   paid for servicing that area?

5   A.  Uhm, basic -- basic pricing --

6   Q.  Sure.

7   A.  -- compensation.

8   Q.  Sure.

9       So you can know how you're being paid, right?

10  A.  Yes.

11  Q.  You wouldn't want to go in and start working in a new area

12  and then be surprised, right?

13  A.  Well, it's not all encompassing.  You have an area that has

14  growth.  You may start, it has 30,000 homes.  Three years into

15  it, it has 36,000 homes.  You need to buy three additional

16  trucks.  You didn't know that going in.

17      There's -- there's -- it's not to the -- every single

18  little detail or it be a 9,000-page, you know, document to

19  cover every single page *(sic)*.  It's a basic overview with the

20  basic requirements and the basic compensation that comes to us.

21  Q.  Okay.  You wouldn't start work without that agreement,

22  would you?

23  A.  No.  We would definitely have a signed agreement in place.

24  Q.  Okay.  Why don't you ask -- why don't you do that same

25  thing for your employees?

MACKIE - DIRECT/EDWARDS

1   A.  I -- it's my knowledge that we give an offer letter to our

2   employees.

3   Q.  I want to talk to you about the half day payments.  We

4   talked a little bit about that yesterday.  Do you remember

5   that?

6   A.  Yes, sir.

7   Q.  Okay.  Yesterday you told us that there was no 4.1-hour

8   arrangement at Waste Pro.  Do you remember that?

9   A.  Yes.

10  Q.  In spite of the deposition testimony that we read that said

11  there was.  Do you remember that?

12  A.  Yes, sir, I do.

13  Q.  Okay.  Ms. Lombardo said that there was a 4.1 half day

14  policy.  You heard that, didn't you?

15  A.  In her -- I -- I don't know.  I wasn't maybe paying

16  attention to her testimony at that point.

17  Q.  Okay.  Okay.  Weren't paying attention.

18          If Mr. Andreu was assigned a route, and he finished it

19  in two hours, he would be paid a full day rate, would he not?

20  A.  Please repeat that?

21  Q.  If Mr. Andreu was assigned a route, and he finished that

22  route in two hours, he would be paid his day rate, would he

23  not?

24  A.  We do not have any routes that can be finished in two

25  hours.  I'd say a five- to six-hour minimum that a route could

MACKIE - DIRECT/EDWARDS

1    be finished in.

2    Q.   Okay.   Five- to six-hour minimum.   But we saw records

3    yesterday, when your attorney was examining Mr. Andreu, where

4    he worked less than that.   Some days where he worked 4.02, I

5    think the number was.

6    A.   And the testimony was also that not every day he was on a

7    route.   He might have other job responsibilities or tasks for

8    that day.   Your question was about a route specifically.

9    Q.   Sure.

10   A.   And you said if he finished a route in two hours.   That's

11   impossible.

12   Q.   Well, she showed him records where he worked just at four

13   hours, I believe it was 4.02, and he was paid his day rate.

14   Was that because he was doing a route or a task or what was it?

15   A.   That could have been us accommodating Mr. Andreu.   On many

16   occasions, he needed to leave early to tend to his family.

17   So --

18   Q.   Okay.

19   A.   -- if he needed to leave early and had to come in at four

20   hours, we wouldn't dock him.

21   Q.   Sure.

22   A.   We would say, Hey, he gets the day rate.   He started his

23   route, however far he got.   It's not necessarily that he was on

24   a route that day, either.

25   Q.   When you say "he may have been," are you guessing at that?

MACKIE - DIRECT/EDWARDS

1  A.  I'm saying -- you asked a question about four hours.  I

2  cannot tell you exactly.  I could give you many examples of

3  what would lead to it, but I cannot give you the specific

4  example of what occurred on the day in questions *(sic)*.

5  Q.  Sure.

6       Because you don't know.  You weren't there.  You

7  weren't with him, right?

8  A.  No, sir.

9  Q.  Okay.  If he completed a task that wasn't a route in less

10  than four hours, was he still entitled to his day rate?

11  A.  If it was a task that was not a reasonable -- you know, a

12  quick task, picking up a truck, that may have been a situation

13  for half the daily rate.

14  Q.  Okay.  Who gets to say if it's a reasonable task?

15  A.  That's between the supervisor or op's manager and the

16  individual we're asking to do the job.

17  Q.  And those people are all under you, right?  That's all

18  operations that you oversee.

19  A.  Yes, sir.

20  Q.  Do you ever have -- do you have a training process, for

21  example, that would explain to a supervisor situations where

22  that task is not reasonable?

23  A.  Any employee, driver or helper, if they do not feel what

24  we're asking them to do *(sic)*, can refuse the task.  They can

25  say the compensation is not fair.  They can make a complaint.

MACKIE - DIRECT/EDWARDS

1   They can make a request to speak to me, to speak to Regina,

2   speak to their division manager.  So that's sort of the

3   catchall for that.

4   Q.  Um-hum.

5        Do you ever have concerns that your employees don't

6   speak up?

7   A.  I don't.  I mean I think as Mr. Andreu said to you, I am

8   very approachable.  I give my cell phone number to all the

9   drivers.  It's posted at every location, big numbers on a wall.

10  It says, Hey, call me with any problems.

11       I have an anonymous lockbox next to every clock, time

12  clock, where all you have to do is put your name in, and I have

13  the only key to those.  So, they know that I'm the one that

14  gets those *(sic)* information.  I mean I go to the facilities, I

15  shake hands, I talk to it *(sic)*.  So, I don't have a fear of

16  that, no, I don't.

17  Q.  Okay.  In terms of days where there's a route assigned,

18  right, not a task that may or may not be reasonable, a route,

19  to get their pay for the day, all an employee has to do is

20  finish that route, am I right?

21  A.  As I said before, they don't even have to finish that route

22  to get their pay for the day.

23  Q.  Okay.

24  A.  If somebody had an emergency, their child got sick at

25  school, they had to leave, you know, their mother or father was

MACKIE - DIRECT/EDWARDS

 1   sick, and they had something to do, their -- their son or

 2   daughter was graduating school, and they say, Hey, I'll start

 3   the route, I'll get as far as I can go, but I have to leave at

 4   12 o'clock today.  Okay.  Get in, go, we'll cover it, bring it

 5   in, make sure you clocked in by 12.

 6           So, it's not a requirement that they finish the route

 7   to get their day rate.

 8   Q.  Okay.  What if they clock out before four hours?  Are they

 9   still paid the day rate, if you're giving them one of the

10   accommodations, they have a sick relative, something like that?

11   A.  Yes.

12   Q.  So, the only situation in your mind that an employee

13   wouldn't be paid their full day rate is if you assigned a task

14   that one of your supervisors thought was not reasonable in

15   length to give the day rate.

16   A.  Yes.

17   Q.  Okay.

18   A.  Because that's decided on the front side.

19   Q.  Okay.

20   A.  Not an after-the-fact surprise.

21   Q.  Okay.  Is that communicated to the employees like

22   Mr. Andreu?

23   A.  It should have been communicated at the point.

24   Q.  Yeah.  You can't oversee every phone conversation or every

25   in-person meeting, though, can you?

MACKIE - DIRECT/EDWARDS

1  A.  No, sir, I cannot.

2  Q.  That wouldn't be reasonable for us to expect you to do

3  that.

4  A.  No, it would not, sir.

5  Q.  And there is no policy that requires them to list, Today I

6  sent Mr. Andreu on a very short errand to only pick up a truck,

7  and that's why he's paid a half day rate, is there?

8  A.  There is a payroll spreadsheet that is turned in that has

9  the exceptions, the extra pay, that is submitted to the payroll

10  department.

11  Q.  Okay.  There's a -- there's spreadsheets and exceptions?

12  Do you have those?

13  A.  No, I do not.

14  Q.  Okay.  I want to talk to you about one of the areas we

15  didn't have an opportunity to get to yesterday.  That's the

16  1098 policy.

17        Are you familiar with that policy?

18  A.  Yes.

19  Q.  Okay.

20        **MR. EDWARDS:**  Your Honor, may I approach to grab an

21  exhibit?

22        **THE COURT:**  Okay.

23        **MR. EDWARDS:**  Thank you.

24  BY MR. EDWARDS:

25  Q.  I'm showing you a memo that was entered into evidence in

MACKIE - DIRECT/EDWARDS

1   this case, dated March 26th of 2015 regarding your 1098 policy.

2   Can you take a look at that and let me know when you're done

3   reading?

4        *(Pause)*

5   A.  Yes, I'm ready.

6   Q.  Okay.  Great.

7        Why is it called a 1098?  What does that mean?

8   A.  You know, I don't exactly know what the 1098 -- I don't

9   know if it's a military thing or some code.  But it's something

10  that I've always been familiar with.

11  Q.  Okay.

12  A.  When the route is complete, the job is complete, it's just

13  called "1098."

14  Q.  Okay.  It says for a first offense, there's a written

15  verbal warning.  What's a "written verbal warning"?

16  A.  You know what, I'm not sure.

17  Q.  Might that be just verbal?

18  A.  Yeah.  And it may be the supervisor documents it.

19  Q.  Sure.

20  A.  But it doesn't make it into their file.  Again, that's an

21  assumption.

22  Q.  Sure.  Okay.

23       Be hard for verbal warnings to make it into the file

24  anyway, right?

25  A.  Yes, sir.

MACKIE - DIRECT/EDWARDS

1   Q.  All the way down, the fourth offense, it says

2   "termination."  That's a fireable offense at Waste Pro, not

3   complying with the 1098 policy, isn't it?

4   A.  It could be.

5   Q.  Have you ever fired anybody for not doing it?

6   A.  I couldn't say that with certainty.

7   Q.  Okay.  Do you know if anybody that's within your pyramid

8   has ever been fired for not complying with it?

9   A.  No, I don't.  But --

10  Q.  Okay.

11  A.  -- if a driver was asked to call in when his route was

12  complete and his truck was in the yard, if I was the manager,

13  and I said, Hey, you know you need to call in when your route

14  is complete, and the next day he was in the yard and didn't

15  call in --

16  Q.  Yeah.

17  A.  -- and I wrote him up.  And then the next day, I asked him

18  to --

19  Q.  Same thing?

20  A.  -- same thing, I think I personally would.  That's just a

21  disregard for management requests.

22  Q.  Certainly.  Certainly.

23       Why do you have that policy?

24  A.  The -- really, the genesis of it is more you don't want the

25  driver to leave the area he's servicing in case there are

MACKIE - DIRECT/EDWARDS

1   issues in the area.

2   Q.   Okay.

3   A.   You could have a plumber is fixing Mrs. Jones' house, and

4   he has his plumbing truck parked right in front of the garbage

5   can.   Driver goes down the street, he picks everybody up, but

6   he doesn't see that one can, because it's hidden behind the

7   plumber.

8   Q.   Sure.

9   A.   She immediately calls the office and says, Hey, I came

10  outside, everybody on the street is dumped but me.

11  Q.   What's the deal?

12  A.   What's the deal?   You must have missed me.

13  Q.   Okay.

14  A.   CSRs get that, they get it out to the supervisor.

15  Q.   Okay.

16  A.   Now, it makes sense to grab that while you're still in the

17  area.   If a driver doesn't 1098, now they're back, they're at

18  the dump, you've got to make a special trip back out to that

19  area.   You know, the next day you'll be working in a completely

20  separate area.

21  Q.   Okay.

22  A.   So, there really -- the initial was a service to make

23  sure -- a catchall for service.

24  Q.   Sure.

25  A.   We do have the need, time to time, to help on routes.

MACKIE - DIRECT/EDWARDS

1    Q.   Okay.

2    A.   And I think by Roger's testimony yesterday, you could say

3    no.  And the next guy that called in would -- or guy or girl

4    that called in would be the next person that was asked.

5    Q.   Okay.

6    A.   So, I think also by evidence that we never wrote Roger up

7    for that.

8    Q.   Okay.

9    A.   And he said he very often said no.

10        So, it was obvious that this was not intended to

11   penalize people that needed to leave work or wanted to leave

12   work.  It was to make sure we were providing service.

13   Q.   Okay.  You got a couple things in that response that I want

14   to touch on with you.

15   A.   Okay.

16   Q.   When you mentioned the plumber, I think you said, and

17   couldn't get to the garbage can, are there delays that these

18   drivers can sometimes face that are outside of their control?

19   A.   Yes.

20   Q.   Okay.  They go to pick up a can, and it's blocked in,

21   things like that?

22   A.   Yes.

23   Q.   Okay.  Is that their fault?

24   A.   No.

25   Q.   Okay.  If they have to spend more time to either go back

MACKIE - DIRECT/EDWARDS

1  and get that can themselves after the obstruction is cleared,

2  or go and pick up somebody else's can, that's all still logged

3  into their time for the day, isn't it?

4  A.  In their day rate, correct.

5  Q.  Because they can't go back to the office and clock out

6  until they've 1098ed and asked you if they need to do anything

7  else -- or not you, but their supervisor, right?

8  A.  Yes.  Actually, they can, they should not.

9  Q.  Sure, sure.

10          Sometimes people do it.  We heard Roger say on

11  occasion, he may have done it.

12          You mentioned you never wrote him up for it, right?

13  A.  I didn't say that.  I said I didn't know.

14  Q.  Didn't know if he was ever written up for it.

15  A.  Written up for it.

16  Q.  Did you look into that?

17  A.  No, I did not.

18  Q.  You also said this happens from time to time.  How often is

19  there a need for a driver, who does his 1098 in accordance with

20  your policy, to go and do something extra?

21  A.  To -- to help her out or to go back in the plumber example?

22  Q.  Oh, I won't be as specific as a woman's garbage can blocked

23  by a plumber.

24          How often does a driver who complies with your 1098

25  policy -- how often is he or she told to continue or go back to

MACKIE - DIRECT/EDWARDS

1   work?

2   A.   No, I think there's really good days, and there's days that

3   we face some challenges.   It really varies.   We can have some

4   really good weeks where that percentage is relatively pretty

5   low, and then we can have some weeks where Murphy's Law's

6   working against us --

7   Q.   Yeah.

8   A.   -- and it's pretty regularly.

9   Q.   Yeah.

10          Some neighborhoods are tougher than others, right?

11  A.   Yes.

12  Q.   Some assignments can be tougher than others?

13  A.   They're -- they're -- they're designed to -- we want

14  everybody to be on an even playing field.   The best operation

15  works where all the routes are set equally.   And that's --

16  that's what we strive to design.   That helps the morale, it

17  helps, you know, longevity, it helps limit turnover, when you

18  can set all the routes fair.

19  Q.   Hum-hum.

20  A.   There -- again, you might have -- you know, there's

21  different holidays, you know, in -- that are more -- more

22  neighborhoods produce a lot more garbage after that holiday

23  than others.

24  Q.   Sure.

25  A.   So, in that particular case, there's gonna be a lot more

MACKIE - DIRECT/EDWARDS

1  garbage out --

2  Q.  Yeah.

3  A.  -- on that day in that particular area than others.

4  Q.  Okay.  So, you can expect those, right?  You know that, you

5  know, maybe Memorial Day people have barbecues, there may be

6  some more trash, for example, is that fair?

7  A.  Yes.

8  Q.  Why don't you just assign more drivers?

9  A.  You have -- you have a driver for every route.  You have a

10  truck for -- you know, I'd love to have 30 trucks sitting on

11  the bench ready to go.

12  Q.  Sure.

13  A.  And that's the ebbs and flows of the rate.  There are a lot

14  of guys that finish in that six hours, six-and-a-half hours,

15  and they enjoy that benefit.  And then on -- there's the days

16  where it goes a little bit later, little bit longer, for a

17  variety of reasons.

18  Q.  Okay.  We wouldn't expect that it lasts 14, 15 hours,

19  though, would we?

20  A.  No.

21  Q.  That's not ideal, is it?  Can we agree to that?

22  A.  That is not ideal.

23          And generally, I think to Roger's testimony, that's an

24  individual that's going on and helping.

25  Q.  Okay.  So, we look and we see 14, 15 hours, can we assume

MACKIE - DIRECT/EDWARDS

1   that that's a individual going out and helping?

2           **MS. TINGLEY:**  Objection.  Calls for speculation.

3           **THE COURT:**  Overruled.

4   A.  No.  I said generally.  It could also be a truck was down.

5   He had two hours or three hours' worth of unexpected time.  It

6   could be a big day.  The incinerator in Broward County is doing

7   maintenance on the boiler that cooks the trash --

8   Q.  Okay.

9   A.  -- and the lines get backed up, because then we have one

10  inbound.  The scale's down at the landfill and causes a longer

11  line.

12          So, there can be other circumstances that cause some

13  of those longer days.

14  Q.  Okay.

15  A.  But I'd say generally, those days where the hours are a

16  little bit more are when you're -- finish your task, and you're

17  helping on another.

18  Q.  Okay.  So, it could be either the additional work or maybe

19  the delays that you've just described for us, right?

20  A.  Yes.

21  Q.  Okay.  Anything else?  Any reason why an employee's route

22  could be designed to make them stay out that long?  You guys

23  don't do that, do you?

24  A.  We don't design the routes for them to be out that late.

25  Again --

MACKIE - DIRECT/EDWARDS

1    Q.   Okay.  I'm sorry, I didn't mean to interrupt you.

2    A.   No, I was just gonna say, I mean I did the job.

3    Q.   Okay.

4    A.   I was in that position.

5    Q.   Yeah.

6    A.   I mean I have a sincere, sincere respect for the difficulty

7    of the job.

8    Q.   Okay.

9    A.   And I just take a lot of pride in making it fair for the

10   individuals that work for me.

11   Q.   Okay.  We'll talk about fairness in a minute.

12          You mentioned another comment that I want to touch on

13   with you.  You said "longevity" and "turnover."  Do you have a

14   lot of that?

15   A.   We actually have the lowest turnover rate in our industry.

16   But there is turnover in driving positions.

17   Q.   Yeah.  What's your turnover rate?

18   A.   Well, it's a wonky calculation.  I don't know how we do it,

19   but I believe -- I don't want to say the wrong number.  I see

20   it on the report.

21   Q.   Sure.

22   A.   We publish that report.  And I don't want to give you the

23   wrong number.

24   Q.   Sure, sure, sure.

25          You don't know the number, though?

MACKIE - DIRECT/EDWARDS

1   A.  No, because you can base it on a week, a month, annual.  We

2   measure ourselves against the other companies in a certain

3   ratio.  And, again, it's in my reporting package that comes out

4   every month, and I just -- I go to it and see that we're doing

5   better than all the other haulers.  It's --

6   Q.  Okay.  I want to talk to you about the language that's used

7   in some of these ADP records and the language that we have been

8   using throughout this entire trial.

9        We've talked about the weekly safety bonus at length.

10       The additional work that these guys are asked to do

11  after they call in to 1098, per your policy, why is that called

12  a "bonus"?

13  A.  You know, I -- I can't speak to that specifically, but I

14  probably think it's something -- you know, on our P & L

15  statement, sometimes we have a bucket that's called "portalet

16  trucks."  But just because it's in portalet trucks, it's not

17  really portalet trucks, but that was the only, you know,

18  category the payroll company had, so they put it there.  But I

19  don't know that answer.

20  Q.  Because, strictly speaking, it's not a bonus, is it?  It's

21  not something they're rewarded for, for being around.  They

22  have to do work to get it.

23  A.  It's additional compensation.

24  Q.  Okay.  It's additional compensation for the additional work

25  that they do after their route is complete and they 1098.  Can

MACKIE - DIRECT/EDWARDS

1    we agree to that?

2    A.   In combination with the day rate that they're already

3    given.

4    Q.   Okay.  But this is compensation on top of that, is it not?

5    A.   *(No response)*

6    Q.   And it's compensation that they have to work for.

7    A.   There may be a bonus that is given in that category that is

8    a guy got a complement from Mrs. Jones, Hey, he saw me

9    struggling with my can, he ran up to the driveway and helped me

10   wheel it down.

11   Q.   Okay.  Okay.

12   A.   And we would put a bonus in -- in for that week for going

13   above and beyond.

14   Q.   Okay.

15   A.   So, that -- that would be there.  So, I guess, technically,

16   yes, you're doing something for that.

17   Q.   Come on back with me to what I'm talking about.  I'm

18   talking about the extra work bonuses.

19   A.   Yes.

20   Q.   That bonus is worked for, is it not?

21   A.   Yes.  There's extra work for extra -- additional

22   compensation.

23   Q.   Okay.  Okay.

24        You heard Roger testify that he wasn't paid for some

25   of those 1098s where he says he was promised some extra work

MACKIE - DIRECT/EDWARDS

1    verbally over the phone, and it wasn't given to him.  Did you

2    hear that?

3    A.  I did hear that testimony.

4    Q.  Okay.  I can presume that you disagree with that, is that

5    fair?

6    A.  Yes, I do disagree with that.

7    Q.  Okay.  But you can't tell me it didn't happen, can you?

8    A.  I cannot say that what he is saying is false.

9    Q.  Okay.

10   A.  I say it's highly unlikely that he would not discuss that

11   with anybody.

12   Q.  Sure, sure.

13        Because it seems counterintuitive that a person would

14   be promised money and not bring it up, right?

15   A.  Well, especially when they testified that when they did

16   bring it up, it was fixed, and it was fixed regularly.

17   Q.  Okay.

18   A.  So, you know you have a button that fixes it, and you stop

19   using that button, just doesn't -- especially as much as I know

20   Roger.  I know he's a really smart guy.  He's a hard worker.

21   And he loved his money.  I mean he did.  He -- that's what he

22   wanted to make.  He said, Russ, I lost 22 years in prison, and

23   I -- I need to get ahead.

24   Q.  Yeah.

25   A.  I need to get ahead.  I need to make some money.  And --

MACKIE - DIRECT/EDWARDS

1   Q.  Yeah.

2   A.  -- as much as he liked -- I just do not see any chance of

3   him not bringing that up.

4   Q.  Okay.  Let's not talk about official discipline.  Have you

5   ever heard one of your drivers say that maybe one of their

6   supervisors gave them a worse assignment the next day because

7   they complained?

8          **MS. TINGLEY:**  Objection.  Calls for hearsay.

9          **THE COURT:**  Overruled.

10  A.  I mean, I think you heard Roger say he was our go-to guy.

11  He went and he did a lot of things for us.

12  Q.  Okay.

13  A.  I don't think you penalize your go-to guy.

14  Q.  No.  Hold on.  Come back with me.

15         What I'm asking is, have you ever, in your experience,

16  the ten years that you've been the regional vice president of

17  the southeast region of Waste Pro of Florida --

18  A.  Yeah.

19  Q.  -- have you ever encountered a situation where maybe an

20  employee's supervisor gave him a hard time for filing a

21  complaint or coming to you or anything like that?

22  A.  I have an open-door policy.

23  Q.  Okay.  My question is:  Have you ever, in your experience,

24  had a complaint like that?  That maybe they were afraid to

25  speak up, because they didn't want a bad assignment the next

1   day or what have you.

2   A.  No, I have not had that complaint.

3   Q.  Never, in ten years?

4   A.  I -- again, I think -- my dad was a janitor.  I grew up in

5   a poor family.  I worked on a truck.  And I very much, when I

6   stand in front of these guys, tell them they are the ones --

7   guys and girls, they're the ones that make the world go round.

8   They pick up the -- and I tell my supervisors, You don't treat

9   them right, we're not in business.

10  Q.  Yeah.

11  A.  A lot of people come to me --

12  Q.  They're --

13  A.  -- and if anybody retaliated, they would be terminated.

14  Q.  Sure.  We wouldn't want that.  We wouldn't want that.

15         The drivers and the helpers -- that's what I was

16  asking you about a moment ago -- they're like the lifeblood of

17  your business, because without them, nobody is out driving the

18  trucks and picking up the trash, is that fair?

19  A.  Yes, that is the business we're in.

20  Q.  Okay.  I want to go back and ask you a quick question about

21  some of the delays you mentioned.  Not specific to the lady

22  with the plumber in front of her can.

23         Do you know if Roger was ever explained that those

24  kinds of delays that would be outside of his control -- the

25  lines at the incinerators -- that his day rate was to pay him

MACKIE - DIRECT/EDWARDS

1    for those kind of things?

2    A.  I don't know that.

3    Q.  Okay.  Do you have any policy in place that explains that

4    to them, any written document like the 1098, or the fuel

5    policy, or the clock in/clock out?

6    A.  No, I think it's a -- Hey, you're going out to pick up

7    garbage.  That -- the things that happen during picking up

8    garbage are part of the job in picking up garbage.

9    Q.  Okay.  Did you ever personally ask Roger to do any

10   additional tasks?

11   A.  I'm sure -- I can't say specifically.

12   Q.  Sure.  It's possible?

13   A.  But I'm sure -- yes.

14   Q.  Okay.  Did you ever give him a pay bump to his daily rate

15   because of him coming to you with a complaint, asking to make

16   more money, didn't think like he was --

17   A.  Yeah, Roger thought he was more valuable to us, because he

18   operated a bunch of different pieces of equipment.

19   Q.  Sure.

20   A.  And would do a lot of different things.

21   Q.  Okay.

22   A.  He thought the starting day rate was insufficient, and he

23   really wanted to make more money.

24   Q.  Okay.

25   A.  And --

MACKIE - DIRECT/EDWARDS

1  Q.  If we look, his starting day rate -- we may not have his

2  starting day rate, but at least for the records that are in

3  evidence in this case, his initial day rate's 140 a day, right?

4  A.  Correct.

5  Q.  Do you know if that is his starting day rate or if that's a

6  bump up from what his starting day rate is?

7  A.  I have no idea.

8  Q.  No idea.  Okay.

9       You mentioned that Roger thought that he was more

10  valuable because he operated different kinds of equipment and I

11  think, in your words, did a lot of things for the company.  You

12  would agree that makes him more valuable, doesn't it?  Not all

13  your drivers do that, do they?

14  A.  Not every driver can drive every piece of equipment.

15  Q.  Okay.  He could, though, right?

16  A.  I'm not aware that he drove front-load vehicles, but he did

17  drive multiple pieces of equipment.

18  Q.  Okay.  Okay.

19       I want to talk to you -- only two more time records to

20  show you.  I want to talk to you about a couple of these.  We

21  started to touch on them yesterday, and I want to make sure

22  that everyone's clear.

23       Specifically, the two half date (sic) situations.

24       I'm showing you the record from September 30th of 2016

25  that's been entered into evidence.  This is one of those

MACKIE - DIRECT/EDWARDS

1  occasions he was paid a half day rate, right?

2  A.  Yeah, I don't know the dates offhand, but if these are the

3  ones we've been talking about, I would agree.

4  Q.  Okay.  Well, let me show you.

5       We can agree that that says a half day, doesn't it?

6  It says 5.5?

7  A.  Yes.

8  Q.  Okay.  And if we flip over to the corresponding time

9  record, it shows that he was paid a half day here, doesn't it?

10  3.3.  Can you read that?

11  A.  Yes, I see that.

12  Q.  Okay.  What did he do that day?

13  A.  I think I said yesterday, I don't know for certain --

14  Q.  Okay.

15  A.  -- but I absolutely -- the explanation he gave, I find to

16  be --

17  Q.  You don't buy it.

18  A.  I just find to be absolutely impossible.

19  Q.  Okay.  How do you think it's impossible if you don't know

20  what he did?

21  A.  Because you can only drive a truck so fast on the road, and

22  especially a big truck like that, and 3.3 hours is not enough

23  to even get to the facility, get in the truck, drive, drive

24  past every home on that, and get back without doing anything

25  else.  Let alone, the pretrip, the post-trip, getting fuel, and

MACKIE - DIRECT/EDWARDS

1    going to the dump.

2    Q.  Is that because you designed the routes to be that way,

3    that they can't finish that fast?

4    A.  The routes, on a best-case scenario, everything's going

5    your way, should be a five, six-hour best finish time.

6    Q.  Best case.

7    A.  It just -- you know, that's the way that they're set up.

8    Q.  Okay.

9    A.  You still have to drive by every single home.

10   Q.  Sure.

11   A.  That takes a certain amount of time.  You're not doing

12   45 miles an hour in front of people's houses.

13   Q.  Absolutely.  We wouldn't want that, right?

14   A.  It's ten, 15 miles an hour.

15   Q.  Big truck.

16   A.  It's impossible to drive that far and do it in three hours.

17   Q.  Okay.

18           **THE COURT:**  Mr. Edwards, you can't comment during his

19   testimony.  The court reporter can't take down two people

20   talking at once.

21           **MR. EDWARDS:**  My apologies, your Honor.

22   BY MR. EDWARDS:

23   Q.  The Easter situation, we had some conversation about that.

24   Do you remember that testimony?

25   A.  Yes.

MACKIE - DIRECT/EDWARDS

1   Q.   He was paid a half day rate during that pay period?

2   A.   Yes.

3   Q.   And I think you testified yesterday that you are aware at

4   this point that maybe there was a complaint at the transfer

5   station?

6   A.   Yes.

7   Q.   And he was not supposed to go to the transfer station the

8   day after, right, because the City of Coral Springs told you

9   that they didn't want him there?

10  A.   Correct.

11  Q.   Is that complaint in his file?

12  A.   I don't know the answer to that.

13  Q.   Okay.  Did he get in trouble for that?

14  A.   I don't know what -- if there was any -- his privileges

15  or -- he was removed from the transfer station, so I would say

16  yes.

17  Q.   Okay.  You called him the next day, though, to run a route

18  for you, didn't you?

19  A.   No, I --

20  Q.   Not a route, to do a task we'll call it.

21  A.   Yeah, I -- again, I do not think that that testimony is

22  correct.

23  Q.   Okay.  We'll talk about it.

24        How do you know that he was asked to leave?

25  A.   The city -- we have a call on Monday mornings with the

MACKIE - DIRECT/EDWARDS

1    city.

2    Q.   Um-hum.

3    A.   The city said, Hey, there was an altercation on Saturday.

4    Let's talk about this on Monday morning.   And until further

5    notice, don't have Roger at the transfer station.

6    Q.   They used his name specifically?

7    A.   Yes.

8    Q.   Were you on that phone call?

9    A.   It was -- it was not a phone call.

10   Q.   It was in person?

11   A.   No.   It was a text message that was sent.

12   Q.   Okay.   Did you have anything to do with the call in to him

13   the next day after that to run a task for you?

14   A.   As I said, I do not recall any request.

15   Q.   You don't recall anything, consistent with what Mr. Andreu

16   testified about, about having to run and check on the equipment

17   and go grab some stuff for you?

18   A.   No, I do not recall that.

19   Q.   Okay.   Do you know why your region of Waste Pro of Florida

20   pays their day rate employees like this?

21   A.   I'm not sure I understand that question.

22   Q.   It's your region.   It's a policy that you at least oversee.

23   Do you know why you do it?

24        **MS. TINGLEY:**   Objection.   Relevance.

25        **THE COURT:**   Overrule.

MACKIE - DIRECT/EDWARDS

1  A.  You know, I -- I think our employees, the guys that are

2  on -- guys and girls -- employees that are on that, enjoy the

3  form of compensation.  I think they -- I generally get a lot

4  of, you know -- they genuinely like the form of pay.

5  Q.  Okay.

6  A.  It's always been the way that we've done it.

7  Q.  Okay.  When you say "they genuinely like it," are you

8  guessing at that?

9  A.  No.

10  Q.  Okay.  Wouldn't it be easier to just pay them normally?

11          **MS. TINGLEY:**  Object to the form.

12          **THE COURT:**  Sustain.

13  A.  I say that this is the way we --

14          **MS. TINGLEY:**  Sir --

15          **THE WITNESS:**  Oh, sorry.

16  BY MR. EDWARDS:

17  Q.  Is it a decision that you can control, how they're paid?

18  A.  The way that we're paying them is a good way to pay them.

19  Q.  Okay.  For who?

20  A.  For both.

21  Q.  For both.

22          How is it good for Waste Pro?  Does it save you money?

23  A.  I don't believe it does.

24  Q.  How is it good for the employee?

25  A.  It keeps them in control of their day.

MACKIE - DIRECT/EDWARDS

1   Q.  Okay.  What about the delays we just talked about, where

2   they're not in control of their day, where situations that are

3   outside of their control require them to go back to work and

4   work 16-, 15-, 14-hour days?

5   A.  Do you go to work every day, and it's -- everything goes

6   your way?  It's -- I think that's part of every single job.

7   You have things that are easier some days and harder some days.

8   Our business is no different.  It's a form of compensation, and

9   the employees enjoy that form of compensation.

10  Q.  Okay.

11  A.  I would see no reason to not do it that way.

12  Q.  Okay.  My question, though, is:  How is the employee in

13  control of the length of their day, which we can agree factors

14  into how they're paid in the Waste Pro world, when things like

15  the delays that you described for us are outside of their

16  control?

17  A.  There's a lot of days nothing goes wrong.  A lot of days

18  they're able to finish and go home.  And make more money than

19  they would have made had they came and gone home and what --

20  they were on just a strictly hour basis.

21  Q.  It's not good for them, though, when those delays happen,

22  is it?  That's affects the way that they're paid, it affects

23  the way that their pay is calculated and how their overtime is

24  calculated, does it not?

25        **MS. TINGLEY:**  Object to the form.

MACKIE - DIRECT/EDWARDS

1      **THE COURT:**  Overrule.

2    A.   They get additional compensation for being there.  So, I

3    would -- I would disagree with that.  It is good for them.

4    They make more money.

5    Q.   I'm not talking about the situations where they do extra

6    work and get extra money.  I'm talking about the situations --

7    because hear me on this.  Do we agree that you dispute that the

8    14- and 15-hour days that don't have a bonus next to them, you

9    don't think that Roger was doing extra work those days, do you?

10   A.   I'm sorry, you have to ask that again.

11   Q.   I'll back up.  That was a little bit confusing.

12   A.   Yeah.

13   Q.   The 14- and 15-hour days that we see in those records that

14   don't have a bonus next to them, Roger says he did extra work,

15   and he's owed extra money.  You disagree with that, right?

16   A.   Yes.

17   Q.   Okay.  And you told us just a moment ago that if we look at

18   those time records, and we see 14-, 13-, 15-hour days, that

19   either meant that there was extra work happening or it meant

20   that there was a delay, right?

21   A.   Correct.

22   Q.   Okay.  And those delays are outside of their control and

23   are factored in, in determining how they're paid, is that also

24   correct?

25   A.   The hours that they work are factored in to their

MACKIE - DIRECT/EDWARDS

1    compensation.

2    Q.  Okay.  And the longer hours they work weigh against them in

3    calculating their pay, is that correct?

4    A.  I don't believe that they weigh against them.  It -- it is

5    additional compensation.  The more hours you're at work, the

6    more money ends up in your paycheck.

7    Q.  The more hours you're at work, the more money ends up in

8    your paycheck.  That's your testimony.

9    A.  Yes.

10   Q.  Okay.  Okay.

11        Even if they're not paid bonus time, even if they're

12   just on the clock, and their day runs longer, that doesn't

13   weigh against them.

14   A.  I would say from a standpoint of them not -- if they don't

15   want to be at work and a delay happens, and they're used to

16   getting done in eight hours, and they go to 13 hours --

17   Q.  Um-hum.

18   A.  -- that's -- they're not happy with that --

19   Q.  No.

20   A.  -- and that -- that upsets me.

21   Q.  Um-hum.

22   A.  An employee who's actually doing extra work or being

23   compensated for it --

24   Q.  My question is a lot more simple than that.  It's on the

25   days where we look at those records, and we see that there is a

MACKIE - DIRECT/EDWARDS

```
 1    long day, a 14- or a 15-hour day, those long days that don't

 2    have additional compensation attached to them, that weighs

 3    against them when your payment calculation is done, doesn't it?

 4            MS. TINGLEY:  Object to the form.

 5            THE COURT:  Overruled.

 6    A.  But you're looking at one side of the scale without looking

 7    at the other.  There's all the days that they get done in six

 8    and seven hours where they get maximum benefit --

 9    Q.  Okay.  Now, we're talking.

10            So, we could agree that at least one side of the scale

11    is that the long day is not good, right?

12    A.  Well, in the format that you asked the question is the way

13    that I answered.

14    Q.  Okay.  So, the long days where there's no additional pay

15    attached to the long days, maybe there's a delay, for example,

16    that's not good for them.  And I believe you just testified

17    that the days that are shorter are good for them, right?

18    A.  In a residential operation, and I try to give you this as

19    an example, people have garbage twice a week.  There's a Monday

20    collection and Thursday.

21            Monday, more people put their garbage out, just, you

22    know, after the weekend.  So, there's more participation on a

23    Monday.  Those hours just naturally -- because you have to stop

24    at more homes -- is gonna be more hours on that day.  But on

25    Thursday, where fewer people participate, it's going to be
```

MACKIE - DIRECT/EDWARDS

1   fewer hours on that.

2           So, there's -- there's a -- it's a cumulative nature

3   of it.  You can't look at one without the other.

4   Q.  Okay.  So, my question was about the other side of the

5   scale.  It benefits an employee to work less hours, does it

6   not?

7   A.  It benefits them to work less hours.

8   Q.  Not only do they get the same amount of pay for less time

9   actually out, driving around, picking up garbage, right, but

10  it's also factored into your calculation of how they're paid,

11  is it not?

12  A.  Their hours are factored in to the calculation.

13  Q.  Okay.  There we go.

14          Your attorney mentioned something the other day that I

15  want to touch on with you as well.

16          Did Waste Pro of Florida ever seek advice about their

17  payment policies?

18  A.  I believe we retained a firm to do an audit.

19  Q.  Okay.  What was the name of the firm?

20  A.  I believe -- Ford -- Ford Harrison.

21  Q.  Okay.  Were you involved in that decision?

22  A.  No, I was not.

23  Q.  Do you know when that advice was sought?

24  A.  No, I'm not sure.

25  Q.  Okay.  Did you have anything to do with it?

MACKIE - DIRECT/EDWARDS

1   A.  The selection?

2   Q.  No, I'm sorry, the audit process itself.

3   A.  Not specifically, unless they requested any information

4   from me --

5   Q.  Okay.

6   A.  -- providing information, or our divisions or regions

7   providing information.

8   Q.  Did they ask for any information from you?

9   A.  I don't recall any information from me specifically.

10  Q.  Okay.  Did you get interviewed by them?

11  A.  I -- I don't recall being interviewed by them.

12  Q.  Okay.  Do you know if the audit, as it's been called,

13  factored in the Pembroke Pines division?

14  A.  I do not know.

15  Q.  Okay.  Do you know if it factored in the Pompano division?

16  A.  I do not know.

17  Q.  Okay.  Are -- the divisions that you oversee, do they have

18  their own policies?

19  A.  No.

20  Q.  Okay.  Do the regions of Waste Pro have different policies?

21          **MS. TINGLEY:**  Object to the form.

22          **THE COURT:**  Overruled.

23  A.  What -- what type of policies?

24  Q.  Any policies?  You tell me.

25  A.  I mean I couldn't be certain exactly how other regions run,

MACKIE - DIRECT/EDWARDS

```
 1  because I'm not there.

 2  Q.  Okay.  Sure.  Sure.

 3       Do you know if any employees in your division were

 4  interviewed as a part of that audit?

 5  A.  No, I don't know.

 6  Q.  Okay.  Do you know what kind of advice was sought?

 7       MS. TINGLEY:  Your Honor, objection.  May we approach?

 8       THE COURT:  It seems like it's attorney-client

 9  privilege.  I'll sustain the objection.

10  BY MR. EDWARDS:

11  Q.  Specifically relative to your pay of day rate employees, do

12  you know what advice was sought?

13  A.  I don't know the specific advice.  I believe globally we

14  asked them to look at our payment.

15  Q.  Okay.  Do you know what advice you received specifically

16  relating to the day rate employees of Waste Pro?

17  A.  We received a couple of -- trying to think of the word --

18  recommendations.

19  Q.  Okay.

20  A.  I don't recall exactly what those recommendations were, but

21  we received a couple of recommendations.

22  Q.  Okay.  Okay.

23       Did you provide any information to the law firm that

24  audited your payment practices about the half day policy?

25  A.  I don't know the answer to that.
```

MACKIE - DIRECT/EDWARDS

1  Q.  Okay.  Did you ever seek any advice from the attorney or

2  the firm that was auditing you about the additional

3  compensation after the task is completed, the 1098 money?

4  A.  I don't know the answer to that.

5  Q.  Okay.  Did you ever ask the law firm that conducted the

6  audit about keeping employees on the clock while they were

7  waiting for delays and some of the stuff we described earlier?

8  A.  Again, I don't know the answer to that.

9  Q.  Okay.  Do you know if Mr. Andreu was a part of the audit?

10 A.  No, sir.  I don't know the answer to that.

11 Q.  Do you know if you ever advised the attorney or the law

12 firm that conducted the audit about having no policy that

13 requires a supervisor to report when a bonus is offered?

14      **MS. TINGLEY:**  Object, your Honor.

15      **THE COURT:**  He's already said that he doesn't know

16 anything about what was told to the law firm, so let's move on.

17      **THE WITNESS:**  Oh.

18      **MR. EDWARDS:**  Okay.

19 BY MR. EDWARDS:

20 Q.  Do you know who would know?

21 A.  Whoever commissioned the audit.

22 Q.  Okay.  That wasn't you, though.

23 A.  No, it was not.

24      **MR. EDWARDS:**  One moment to confer, your Honor?

25      **THE COURT:**  Okay.

1          *(Discussion had off the record between counsel)*

2          **MR. EDWARDS:**  Your Honor, I have no further questions

3      for this witness.  Thank you.

4          **THE COURT:**  All right, members of the jury, we're

5      going to take a ten-minute recess.  Remember my admonition not

6      to discuss the case or allow it to be discussed in your

7      presence.  And we'll see you back in the jury room in about ten

8      minutes.

9          **COURTROOM SECURITY OFFICER:**  All rise.

10         *(The jury exited the courtroom)*

11         **THE COURT:**  Are we still on schedule to finish this

12     case tomorrow morning?

13         **MR. EDWARDS:**  We intend to rest, your Honor.

14     Plaintiff intends to rest at the completion of Mr. Mackie's

15     testimony.

16         **MS. TINGLEY:**  Unfortunately, your Honor, when speaking

17     to opposing counsel, he wouldn't let me go beyond the scope of

18     his direct with the witnesses, so we're gonna have duplicative

19     witnesses for the defense.  We're trying to shore that up as

20     quickly as possible.  I think we may be able to get all the

21     evidence today, but I'm not sure that, you know, we'll be able

22     to get to the charge conference and closings and the

23     instructions until tomorrow.

24         **THE COURT:**  Okay.

25         We'll be in recess for ten minutes.

1          **COURTROOM SECURITY OFFICER:**  All rise.

2          *(The Judge exited the courtroom)*

3          *(Recess taken at 10:41 a.m. until 10:57 a.m.)*

4          *(The Judge entered the courtroom)*

5          **THE COURT:**  Please be seated.

6          All right.  We're back on the record.

7          Counsel are present.

8          Anything to come before the Court before we bring the

9   jury in?

10          **MS. TINGLEY:**  No, your Honor.

11          **MR. EDWARDS:**  No, your Honor.

12          **THE COURT:**  All right.  Let's bring in the jury.

13          **COURTROOM SECURITY OFFICER:**  All rise.

14          *(The jury entered the courtroom)*

15          **THE COURT:**  All right.  We have all the jury back.

16          Did everyone follow my admonition not to discuss the

17   case or allow it to be discussed in your presence?

18          All right.  Ms. Tingley, you may inquire.

19          **MS. TINGLEY:**  Thank you, your Honor.

20                        **CROSS-EXAMINATION**

21   BY MS. TINGLEY:

22   Q.  Mr. Mackie, on direct examination, you talked about the

23   different -- just generally talked about when employees clock

24   in and clock out.  For the benefit of the jury, can you please

25   just explain the entire day, including the pretrip, the

MACKIE - CROSS/TINGLEY

1   post-trip, the route, everything that could happen in between

2   the time an employee clocks in, clocks out.

3   A.  An employee would show up, they'd go into the office,

4   they'd swipe their card, they'd be given their paperwork for

5   the day.  If they were driving for that day, they'd go out to

6   their vehicle, do a pretrip inspection, just make sure the

7   tires all had air in it, there was no visible leaks, the lights

8   on the vehicle worked, all the safety items.

9   Q.  Mr. Mackie, is there a particular reason -- say, for

10  example, Mr. Andreu had driven the same truck the day before

11  and had done his post-trip, is it -- would it be appropriate

12  for him to just skip the pretrip, because he knew there was no

13  problems?

14  A.  No.  Absolutely not.  You know, generally, in the

15  afternoon, you do your post-trip inspection.  But if you've

16  just come from the landfill, you can run over nails or

17  something at the landfill.  And when you get back to the shop

18  and measure the air pressure in your tires, it shows that

19  they're full.

20        But by the next morning when you come in, you know,

21  the air is let out of the tire.  So, if you just jump right in

22  the truck and go, you could have one or two flats on the

23  vehicle, which is a tremendous safety concern.  A truck could

24  flip over or a wheel could come flying off.

25        Heat -- when the vehicle is hot, the hydraulic systems

MACKIE - CROSS/TINGLEY

1    are hot, you need to check fluids in the vehicle when they're

2    cool, because there's condensed -- you know, expansion and

3    condension (sic) of fluids.  So, it's vitally important that

4    you check in the morning, not just the afternoon.

5             It's not a correct statement to say if it's fine in

6    the evening, it will be fine in the morning.

7    Q.   In the pretrip inspection, what are your drivers

8    specifically checking?  I mean you talked about air pressure,

9    you talked about liquids.

10   A.   Well, all safety items.  You want to make sure that your

11   lights, your blinkers, the safety lights, the safety cameras

12   that are on the vehicle are working, the fluids in the vehicle.

13   And you're looking for any visible leaks.  You don't want to

14   leak fluids, hydraulic oil on the streets.  As well as the --

15   inside the vehicle, the horn, you know, other -- other things

16   of that nature.

17   Q.   So, is there any form that's filled out by an employee at

18   the time they do this pretrip inspection?

19   A.   Yes.

20   Q.   And what is that?  If you can just describe to the jury.

21   A.   It's just a vehicle inspection report, DVIR, that is done

22   at the pretrip of the vehicle.  Again, with little boxes for

23   all of these different things that I've talked about.

24   Q.   And do you have to fill that form out even if there's no

25   defects?

MACKIE - CROSS/TINGLEY

1    A.  Well, the DVIR form that is required by the government is

2    at the post-trip ex -- you know, the post-inspection phase.

3    But that needs to be filled out after driving the vehicle every

4    single day, day in and day out.

5    Q.  Okay.  Then after the pretrip inspection, what does the

6    driver do next as part of their day?

7    A.  They would get into their vehicle.  They would head to

8    their route.

9    Q.  And what happens next when they're assigned a route on that

10   day?

11   A.  You know, depending on the start time, most cities we're

12   not permitted to be in before seven a.m.  So, sometimes you may

13   arrive at 6:55, you may have to wait, you know, five minutes

14   before you start.  But you go to the beginning point of your

15   route, and you begin to pick up trash.

16   Q.  Do the cities also have limitations on when you can be --

17   the latest time you can be picking up solid waste or trash?

18   A.  Yes.

19   Q.  Okay.  And what is that typically?

20   A.  Six or seven p.m.

21   Q.  Now, in -- after -- what would a driver do next on that

22   route?

23   A.  They -- they would begin to pick up trash until they got to

24   a point where the truck became full.  They would have to go to

25   the dump.

MACKIE - CROSS/TINGLEY

1          If there were any backdoor stops or elderly homes

2    where we have to pull the trash out, they have to, you know,

3    make sure they're paying attention to the route sheet to --

4    Q.   What do you mean by "backdoor stop"?

5    A.   So, people that can't pull their trash to the curb, we

6    offer a service where we'll go to the back door or side door,

7    grab their garbage, and bring it out to the street, dump it,

8    and return their container.  So, those are notated on their

9    route sheet of the special circumstances.

10          If we have a customer that has had multiple complaints

11   in a three- or six-month period, we will have those on the

12   driver's route sheet as spots that they have to verify that

13   there was either the garbage was out or the recycling was out

14   or it was not out.

15          They get to a point where they have to go to the dump.

16   They go, they dump the truck.  They come back.  They continue

17   on route where they left off.

18          If they never become full in -- in the time as they're

19   collecting, they would get to the point where the route is

20   completed.  I mean, obviously, while you're on route, you have

21   to pay -- pay attention to all the safety regulations, the

22   posted speed limits, things of that nature.

23   Q.   And if -- and then what happens next?

24   A.   The driver would then -- after their final stop is

25   complete, they'd be required to 1098 to the supervisor.  The

MACKIE - CROSS/TINGLEY

1    supervisor would make them aware of any -- the situations that

2    we explained earlier, any late set outs, misses, missed street,

3    missed containers that they would need to address before

4    heading to the dump for their final dump of the day.  And then

5    they would head back to the facility.

6    Q.  And what happens next?

7    A.  If it's a -- if it's a natural gas truck, they would fuel

8    at our facility.  If it was a diesel truck, it would need to

9    stop at a fueling station on the way home -- way back to our

10   facility.  So there was a stop in between that.

11   Q.  And is that where the fuel card policy -- when they go to

12   stop and get gas on the way back?

13   A.  Yes.

14   Q.  And where do they get that gas?

15   A.  At a fuel station that's close to the facility.

16   Q.  Those fuel stations, do those only have diesel fuel?

17   A.  No.  They have gasoline and diesel.

18   Q.  And then what happens after they fuel up, the drivers?

19   A.  They proceed back to the facility, and they go through

20   their post-trip inspection.

21   Q.  And this is where the Department of Transportation form

22   comes into play?

23   A.  Yes.

24   Q.  Okay.  And what is the driver required to do under the

25   Department of Transportation regulation?

MACKIE - CROSS/TINGLEY

1   A.  They're required to inspect the vehicle for all the pretrip

2   inspection components that I talked to you -- any visible

3   defects, but there's a considerable focus on the safety items.

4   If the brakes are working, the safety lights, the headlights,

5   basically a full inspection of the vehicle.

6   Q.  And then what happens?  What does the driver do next?

7   A.  The driver would then park the truck in their spot.  They

8   would get all of their belongings out of the truck and they

9   would head to the time clock, clock out, and turn in all the

10  paperwork -- well, they would turn in the paperwork and then

11  clock out.

12  Q.  Okay.  And what paperwork do they turn in before they clock

13  out?

14  A.  They turn in their route sheet.  They turn in the vehicle

15  inspection report, the DVIR, their copy.  It's a two-part form.

16  They'd leave one with the truck and turn one in with their

17  paperwork.

18  Q.  And do they have any receipts or anything from the fueling

19  station, from the landfill?  Do they have any other paperwork?

20  A.  Yeah, absolutely.  They should have a disposal ticket from

21  the landfill, as well as a fuel receipt for getting fuel.  I

22  would think that that is about everything.

23  Q.  And that's when they clock out.

24  A.  Yes.

25  Q.  Now, for purposes of the standard compensation for these

MACKIE - CROSS/TINGLEY

1   drivers, is all of that -- all of those assignments considered

2   part of their route for their daily rate?

3   A.   Yes.

4   Q.   And so, whether it takes the person six hours, ten hours,

5   12 hours, or 20 hours, it's all considered part of that daily

6   rate.

7   A.   Yes.

8   Q.   And on direct examination, when you talked about when hours

9   are being computed, are those hours being calculated solely for

10  the purpose of the overtime premium?

11  A.   Yes.

12  Q.   Okay.  And so, the hours that the drivers, the time they

13  clock in and the time they clock out, it doesn't really matter

14  what they were doing, because it's the same hours being

15  accumulated for purposes of overtime, is that fair?

16  A.   Yes.

17  Q.   Now, we -- on direct examination, you did talk about

18  changes in corporate policies.  Are there policies -- aren't

19  there policies that would be unique to a specific division or

20  unique to a specific region?

21  A.   Well, I mean, we could have different commission structures

22  for sales.  If you have some outside sales -- sales consultants

23  that you would -- that are -- just bring leads to the company,

24  you may have a policy for what you do with those.

25          You could have a situation, uhm, you know, that is

MACKIE - CROSS/TINGLEY

1   specific to a contract, you know, that required something, you

2   know, different.

3   Q.  Okay.  So, by way of example, if Coral Springs says you're

4   not allowed to pick up any solid waste on Saturdays, but the

5   City of Hollywood said you can, you may have, in different

6   divisions, Pembroke Pines and Pompano, under those contracts,

7   different policies for those divisions on when they can run

8   routes on the weekends.  Is that fair?

9   A.  Yeah, that's fair.

10  Q.  Okay.  And so, it may be specific to a certain municipal

11  contract.

12  A.  Yeah.  We -- every contract is written a little bit

13  differently, so the requirements of that could -- could change

14  the requirements division by division.

15  Q.  And in those instances, would it be you or would it be your

16  division managers who would set those policies?

17  A.  Well, not -- it be the division manager that would set the

18  specifics for that.

19  Q.  Okay.  And in speaking about Mr. Andreu's time records on

20  direct examination, we -- you had the opportunity to view some

21  pay stubs.  Do you recall that?

22  A.  Yes.

23  Q.  And I think the first pay stub that you reviewed was the

24  2014, 5-11 to 5-30?  Do you recall that, sir?

25  A.  Yes.

MACKIE - CROSS/TINGLEY

1  Q.  And you were asked about whether you knew what the bonus

2  compensation -- whether -- why there was only one bonus and not

3  two bonuses, were you not?

4  A.  Yes.

5  Q.  And you didn't have any basis to answer that question based

6  on the information you saw.  Correct?

7  A.  Correct.

8  Q.  Okay.  For that same period, you were not shown the time

9  card.  And -- but now, as you see the time card, do you see

10 that it shows that there is one bonus and not two bonuses?

11 A.  Yes.

12 Q.  And on the bottom of the time card, it says the time card

13 was approved by the employee.  Do you see that?

14 A.  Yes.

15 Q.  And who was the employee that approved that time card?

16 A.  Roger Andreu.

17 Q.  Okay.  Do you believe at the time Roger Andreu was in the

18 best position to understand --

19        **MR. EDWARDS:**  Objection.  Speculation.

20        **THE COURT:**  Overruled.

21 BY MS. TINGLEY:

22 Q.  Do you believe at the time that Roger Andreu was in a

23 better position to approve whether he got one or two bonuses

24 than you are today in looking at these records?

25 A.  Yeah.  Absolutely.

MACKIE - CROSS/TINGLEY

1  Q.  You were then shown the pay period of 5-25-14.  Do you

2  recall that?

3  A.  Yes.

4  Q.  And I think that you were asked -- oh, I apologize.  I

5  showed you wrong one, sir.

6        You were next shown the pay period of 10-26-2014 to

7  11-8-2014, and you were asked if you had any information as to

8  why Mr. Andreu, while working six days, did not receive his

9  bonus.  And you were unfamiliar with the reasoning for that?

10  A.  Correct.

11  Q.  Mr. Mackie, I'm now showing you the time card for the same

12  period.  Do you see that?

13  A.  Yes, I do.

14  Q.  And do you see the time card approval by employee on that?

15  At the bottom.

16  A.  Yes, I do.

17  Q.  And who was the employee that signed off on that time card?

18  A.  Roger Andreu.

19  Q.  Would it be fair to say that Roger Andreu was in a better

20  position on November 8th of 2014 to approve the lack of bonuses

21  than you are as you sit here today?

22  A.  Yes.

23  Q.  You were next shown the earning statement from ADP for

24  March 15th, 2015, through March 28th, 2015.  And you were also

25  showed the time detail, and you were asked whether bonuses were

1    earned on Saturday, Sunday, Friday, and the like.  Do you

2    recall that testimony?

3    A.   Yes.

4    Q.   And do you recall that you were not able to determine

5    whether bonuses were paid for work or help or safety or just

6    helping Mrs. Jones, who had a hard time getting her trash

7    container back into her garage?

8    A.   Correct.

9    Q.   Turning now to the time card for the same time period, do

10   you see those bonuses reflected on the time card?

11   A.   Yes, I do.

12   Q.   And do you see that *(sic)* the time card approval by the

13   employee?

14   A.   Yes, I do.

15   Q.   And who was the employee that approved the time card?

16   A.   Roger Andreu.

17   Q.   And is it fair to say that Roger Andreu, when he approved

18   this time card, was in a better position to understand what

19   help pay he had provided for the prior two weeks in 2014 than

20   you are today?

21   A.   Yes.

22   Q.   Mr. Mackie, you were also shown the earning statement from

23   ADP from September 11th of 2016 to September 24th of 2016, and

24   you were asked about this payment of half of the daily rate?

25   A.   Yes.

MACKIE - CROSS/TINGLEY

1   Q.   And then you were shown the time card for the same time

2   period, were you not?

3   A.   Yes, I was.

4   Q.   And you were referred to the 3.33 hours on Wednesday,

5   September 14th?

6   A.   Yes.

7   Q.   Okay.  And you cannot be certain, as you sit here today,

8   what Mr. Andreu's assigned job or task was that day, correct?

9   A.   Correct.

10  Q.   But you can say with a high degree of certainty that

11  it's -- you don't believe that Roger Andreu was running a full

12  route in under three-and-a-half hours.

13  A.   Yes, absolutely.

14  Q.   You were also shown the time card for April 9th, 2017, to

15  April 22nd, 2017?

16  A.   *(No response)*

17  Q.   And then you were showed the 4-16 time entry, the Easter

18  Sunday that we've been speaking of?

19  A.   Yes, ma'am.

20  Q.   And based on your understanding of the events, the

21  incident, altercation occurred on the Saturday?

22  A.   Yes, it did.

23  Q.   And it was not until Sunday that, for whatever reason, it

24  was brought to Waste Pro's attention.

25  A.   Correct.

1  Q.  And that Mr. Andreu could not be at the transfer station

2  until the Monday meeting, that being 4-17.  I mean your Monday

3  meeting with -- or telephone conference with Coral Springs.

4  A.  Yes.  There was an item that was gonna be discussed on that

5  call Monday.

6  Q.  And does Waste Pro always have calls with the City of Coral

7  Springs on Monday to discuss operations issues?

8  A.  Every Monday morning.

9        **MS. TINGLEY:**  Your Honor, may I have a moment?

10       **THE COURT:**  Okay.

11       **MS. TINGLEY:**  Thank you.

12       *(Pause)*

13       **MS. TINGLEY:**  Your Honor, I have no further questions

14  for Mr. Mackie on cross-examination, subject to being recalled

15  in the defense case.

16       **THE COURT:**  Redirect.

17       **MR. EDWARDS:**  No redirect either, your Honor.

18       **THE COURT:**  Thank you, sir.  You may step down.

19       **THE WITNESS:**  Thank you.

20       *(Witness excused)*

21       **THE COURT:**  Anything further from the plaintiff?

22       **MR. EDWARDS:**  No, your Honor.  No further witness.  At

23  this time, the plaintiff rests.

24       **THE COURT:**  All right, members of the jury, let me ask

25  you to go into the jury room for a few minutes, please?

1    **COURTROOM SECURITY OFFICER:**  All rise.

2    *(The jury exited the courtroom)*

3    **THE COURT:**  Does the defendant have a Rule 50 motion?

4    **MS. TINGLEY:**  Yes, your Honor.  May it please the

5    Court.

6    The defendants move for -- under Rule 50(a) for a

7    motion for judgment as a matter of law.

8    In looking at this case in preparing for our Rule 50

9    motion, we ask what's changed since the time of the summary

10   judgment motion?  And the first and probably the most important

11   change is the decision by the United States Supreme Court on

12   April 2nd of 2018.  And that's in the *Encino*

13   *Motorcars, LLC vs. Navarro.*  And I have a copy.

14   **THE COURT:**  Okay.

15   **MS. TINGLEY:**  May I approach?

16   **THE COURT:**  Okay.

17   **MS. TINGLEY:**  In ruling on March 13th of 2018, this

18   Court found that under the FLSA exemptions that they're to be

19   narrowly construed against the employer.  And that decision was

20   consistent with Eleventh Circuit precedent.

21   However, two weeks later, on April 2nd, the Supreme

22   Court ruled on the very issue in the *Encino Motorcars* case

23   before the Court.  The Court was considering whether automobile

24   service advisers are exempt from the FLSA.  The Ninth Circuit

25   had narrowly construed the exemption against the employer.  And

1    the Supreme Court reversed that decision.  In so doing, the

2    Supreme Court rejected the principle -- that principle as a

3    useful guidepost and stated that there is no reason to give

4    FLA *(sic)* exemptions anything other than a fair reading.

5            How does this change in the law impact this case?

6            Here, in referring to the half day rate, there are two

7    instances in three years of six-day workweeks when the

8    plaintiff was paid half of his daily rate.

9            In 2006, the Department of Labor issued an opinion as

10   to the deductions made by an employer for unearned sick time.

11           I have a copy for the Court.  And it's been previously

12   filed.

13           May I approach?

14           **THE COURT:**  Okay.

15           **MR. EDWARDS:**  Is that in evidence?

16           **MS. TINGLEY:**  Yes.

17           The question before the Department of Labor in this

18   opinion was as to deductions made by an employer for unearned

19   sick time.  The Department of Labor stated that if the

20   deductions are made frequently and consistently, the practice

21   would raise questions as to the validity of the plan.

22           Here, a fair reading of this opinion on the

23   exemptions -- as to the exemptions to FLSA, including the day

24   or job rate under 112, would justify finding that 112 is still

25   an acceptable and valid pay plan in this case.  Because the

1    half day rates were not frequent or were not consistent -- and

2    were not consistent, so they would not invalidate Waste Pro's

3    ability to use the 112 daily or job rate.

4           There are many more times, as you've seen from the pay

5    records, where Mr. Andreu worked less than eight hours and was

6    paid his full daily rate.  We've even referenced to when he

7    works 4.02 hours.

8           At the time of summary judgment, one of the Court's

9    findings was that based on the evidence before the Court, that

10   the plaintiff, if he finished his route early, that he would

11   not get his full daily rate.  But the evidence before the Court

12   now is not that evidence.  You have two instances where he did

13   not get his full daily rate in three years of six-hour days.

14          There's also something else that has changed since the

15   time of summary judgment.  And the second aspect is that this

16   unpaid bonuses that the Court said precluded summary judgment.

17          The evidence has revealed before the Court in the past

18   two days that the defendant approved his time records and bonus

19   payments week after week after week.

20          In *Allen vs. Board of Public Education*, the Eleventh

21   Circuit Court of Appeals case -- thank you -- the Eleventh

22   Circuit Court of Appeals instructed that an employer's records

23   must be untrustworthy before the burden shifts to the employer.

24          The plaintiff has not met that burden in this case.

25   In 2009, in the *Debose vs. Broward Health* case, it was a

1    nonjury trial where the Court actually discussed the burden

2    shifting, and the Court informed that the burden shifting

3    doesn't mean that the plaintiff doesn't have a burden.  The

4    plaintiff comes here and must show something to give the Court

5    reason to believe that these records are untrustworthy.

6    Examples in cases are where time is whited out, employees are

7    told you can't clock in until a certain time, auto-deducted

8    lunches.  None of those occur in this case.

9          Instead, in this case, as the Court found in *Debose*,

10   the plaintiffs in that case had not met their primary burden

11   before there was any burden shifting.  And Mr. Andreu has not

12   met his burden, because time and time again, he approved those

13   time records.  He cannot meet his burden of showing that they

14   are untrustworthy.  And if the records are not untrustworthy,

15   then his damages, he can do nothing more than speculate.  And

16   speculative damages would only come into play if the burden has

17   shifted and the defendants can't meet their burden.  And it's

18   the defense's position that he has not met his burden.

19         Going now to the pertinent regulations, under

20   29 C.F.R. 109 *(sic)*, in discussing the regular rate, it clearly

21   states in the last sentence that "the following sections give

22   some examples of the proper method of determining the regular

23   rate of pay in particular instances."

24         The defense has come forward with two possible

25   alternatives for calculating this rate -- and that is

```
 1    29 C.F.R. 778.112 and 29 C.F.R. 778.115 -- either the day or

 2    job rate and employees working at two or more rates.

 3           The Eleventh Circuit Court of Appeals in the Allen

 4    decision actually discussed the nuance between 109 and the

 5    sections beyond it.  In that case, it was about 115.  And with

 6    the bus drivers, they made the argument, Oh, if they're not

 7    doing different jobs, they can't fall within 115.  And the

 8    Eleventh Circuit informed that that is not the case, because

 9    these are mere examples of how to calculate.  And they are not

10    a mandate such that if someone doesn't fall within it, that

11    they have not been paid under the Fair Labor Standards Act.

12           In this case, 112, if read as an example, says:

13           "If the employee's paid a flat sum for a day's

14       work for doing -- or for doing a particular job,

15       without regard to the number of hours worked in the

16       day or at the job, and if he receives no compensation

17       for services -- no other form, the (sic) regular rate

18       is determined by totalling all the sums received at

19       such day rates or job rates in the workweek and

20       dividing by the total number of (sic) hours actually

21       worked.  He is then entitled to extra half time pay

22       at this rate for all hours worked in excess of 40 in

23       the workweek."

24           The Department of Labor has spoke (sic) to this very

25    issue as well.  Granted, it is not a recent opinion.  It's from
```

1   June 22nd, 1967.  However, the Department of Labor was looking
2   at the same exact issue.  And even a different situation.  This
3   was drivers -- bus drivers that were paid ten dollars a day,
4   regardless of the number of hours they worked in a day.  In
5   addition, they were paid two dollars an hour for extra trips.
6           And in the fourth paragraph, the Department of Labor
7   said -- and it was the previous numbered section --
8   Section 778.122 states that:
9           "If an employee is paid a flat sum for a day's
10          work without regard to the number of hours of work,
11          and if he receives no other form of compensation, his
12          regular rate is determined by totalling all the sums
13          received at such day rates in the workweek and
14          dividing by the total hours actually worked.  He's
15          then entitled to extra half time pay at this rate for
16          all hours worked in excess of the applicable maximum
17          workweek."
18          The Department of Labor then goes on to say:
19          "In those workweeks where he makes extra trips at
20          two dollars an hour, the hours worked and the wages
21          received must be added to the total hours worked and
22          the total earnings received.  The total wages at both
23          day rates and hourly rates are added together and
24          divided by the total hours worked to determine the
25          regular rate for the week.  Additional half time must

1    then be paid on the new regular rate."

2        Your Honor, this is consistent with the Eleventh

3    Circuit's decision in *Allen*, that 112 is merely an example of

4    how to calculate the regular rate under certain circumstances.

5    It is not the mandate, such that the plaintiff has argued, that

6    because there were other forms of compensation, that the

7    plaintiff is not entitled to half time on his hourly

8    compensation.

9        And the rationale is the same as it was in *Allen*.

10   Because -- in *Allen,* it was a 115 case, which we'll get to, but

11   because the daily rate encompasses those hours, the employee's

12   already been paid his one-time pay for those hours.  And that's

13   why you only have to give him a half time premium in the event

14   that those hours are over 40.

15       In the *Powell* case, *Powell vs. Carey*

16   *International, Inc.*, in 2007, and in the *Powell* case, here in

17   the Southern District, it was a 112 case, where they were

18   paid -- these were limousine drivers, and they had six

19   different forms of compensation that they were given.  They

20   were given compensation, fuel surcharges, paid percentage, and

21   standby situations, miscellaneous occurrences, and even as

22   directed jobs.  All paid differently, but all based on flat

23   sums.

24       And in that case, there was a finding that nothing in

25   112 precludes a flat sum from having multiple components, as

1    long as the compensation is paid on the per job basis.

2            They even talked about the fuel surcharge, that even

3    that can be something that is not gonna take this out of 112

4    and the as directed jobs.  So, if something is extra work that

5    was added in this case, it did not take the case out of 112.

6            As an alternative to 112, it's the defense position

7    that Mr. Andreu was properly paid under 115.  And 115 is the

8    actual regulation that was reviewed by the Eleventh Circuit in

9    *Allen*.  And those are employees working at two or more rates.

10           And under 115, Mr. Andreu is still only entitled to

11   the half time premium, even though he's working at two or more

12   rates.  And so, in the *Allen* decision, they said they can be

13   doing the same job and getting two rates, because they were

14   getting ten dollars an hour -- or ten dollars a day, and then

15   they were getting the other compensation.

16           And in this situation, it's still just a half day

17   premium, because as the Court said in *Allen*, their first

18   compensation, their first 40 hours has already been

19   compensated, and so that's why they only get the half time

20   premium.

21           Because Mr. Andreu was paid in accordance with the

22   Fair Labor Standards Act and has not put sufficient evidence to

23   show that he was not, defendants would move under Rule 50 for a

24   judgment in their favor.

25           Thank you.

1    **THE COURT:**  All right.  Viewing the evidence in the

2  light most favorable to the plaintiff, I find the plaintiff has

3  set forth a prima facie case.  I deny the Rule 50 motion.

4    Are we ready to proceed with the defense case?

5    **MS. TINGLEY:**  Yes, we are.

6    **THE COURT:**  All right.  Let's bring out the jury.

7    **COURTROOM SECURITY OFFICER:**  All rise.

8    *(The jury entered the courtroom)*

9    **THE COURT:**  All right.  We have all the jury back.

10   Did everyone follow my admonition not to discuss the

11  case or allow it to be discussed in your presence?

12   All right.  Ms. Tingley, you may call your first

13  witness.

14   **MS. TINGLEY:**  Your Honor, I apologize.  May we

15  approach?

16   **THE COURT:**  Okay.

17   It's over this way.

18   *(At the bench out of the hearing of the jury)*

19   **MS. TINGLEY:**  I apologize.  We left a pad of paper for

20  the easel, and it's gone.  It was under the bench.  We brought

21  it with us.

22   **THE COURT:**  I don't know who took it.

23   **MS. TINGLEY:**  I know.  So, I have to get another one.

24   **MR. EDWARDS:**  I'd give you one if I had one.

25   **MS. TINGLEY:**  Yes.  We left it under the bench.

LOMBARDO - DIRECT/TINGLEY

1    Uhm --

2          THE COURT:  You left it under the table over there?

3          MS. TINGLEY:  No.  We left it under the bench when we

4    put our stuff up.  We've been putting everything under the

5    bench, because there's other hearings going on.

6          THE COURT:  I don't know who would have taken it,

7    unless the janitors took it.

8          MS. TINGLEY:  Right.  I just noticed it wasn't there

9    when I went to grab it.

10         THE COURT:  Well, I guess do the best you can.

11         MS. TINGLEY:  Okay.

12         *(The foregoing proceedings were had at sidebar)*

13         MS. TINGLEY:  The defense calls Regina Lombardo.

14         Just found it.  May we get the easel, your Honor?

15         THE COURT:  Okay.

16         And, Ms. Lombardo, you understand you're still under

17   oath?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  You can have a seat.

20         THE WITNESS:  Thank you.

21                       **DIRECT EXAMINATION**

22   BY MS. TINGLEY:

23   Q.  Ms. Lombardo, when you testified yesterday, do you recall

24   rattling off the formula that's used for -- to do the overtime

25   calculations?

LOMBARDO - DIRECT/TINGLEY

1   A.  Yes, ma'am.

2   Q.  Okay.  And for the benefit of the jury --

3       **MS. TINGLEY:**  Your Honor, may she step down?  I was

4   gonna ask her to write down the formula on the board.

5       **THE COURT:**  Okay.

6       **MS. TINGLEY:**  Okay.

7       **THE COURT:**  If she's going to talk, though, she'll

8   need a handheld mic.

9       **MS. TINGLEY:**  Okay.

10      **THE COURT REPORTER:**  You got it, Terry?

11      **THE WITNESS:**  Here?

12      **COURTROOM SECURITY OFFICER:**  Here you go, ma'am.

13      **THE WITNESS:**  Thank you.

14      *(Pause)*

15  BY MS. TINGLEY:

16  Q.  Ms. Lombardo?

17  A.  Yes.

18  Q.  Just speaking to week one for a moment.

19  A.  Okay.  Sorry.

20  Q.  That's okay.

21      When you get your weekly overtime rate, what do you

22  multiply that by, just from your memory?

23  A.  My weekly overtime rate I do by my overtime hours.

24  Q.  Okay.  Because you put -- I think you might have -- sorry.

25  A.  And then I would get my weekly overtime earnings.

LOMBARDO - DIRECT/TINGLEY

1   Q.   Okay.  And then what do you do for week two?

2   A.   For week two, I would repeat this process *(indicating)* and

3   then add them together.

4   Q.   Okay.  So, perhaps you can put just "repeat process and add

5   together," just for -- no, underneath.  Yeah, wherever it goes.

6   A.   Oh, sorry.

7        I would add week one gross, week two gross earnings,

8   and that would give the biweekly gross earnings.

9   Q.   Okay.  And -- you can sit down.  Thank you.

10  A.   Okay.

11  Q.   So, Ms. Lombardo, just to pull a random -- I'm showing you

12  the ADP earnings statement from October 11th of 2015, to

13  October 24th, 2015.

14  A.   Yes.

15  Q.   Okay.  Now, just walking through your formula, what would

16  be the daily rate that you would plug in?

17  A.   The $155.

18  Q.   And what would you multiply that daily rate by?

19  A.   The six days.

20  Q.   For the first week.

21  A.   Correct.

22  Q.   Okay.  And then what would you add in?

23  A.   The hundred dollar bonus for the first week.

24  Q.   And that would give you what?

25  A.   My weekly earnings.

LOMBARDO - DIRECT/TINGLEY

1  Q.  Okay.  And then when you have that weekly earnings, what do

2  you do with that number?

3  A.  My weekly earnings, and then I would divide it by the total

4  number of hours worked.

5  Q.  Okay.  And so, in that -- this first week, what would you

6  divide that by?

7  A.  66.28 hours.

8  Q.  And what would that give you?

9  A.  Wait.  Hold on.  I'm sorry.  I take that back.  59.12

10 hours.

11 Q.  Okay.  And what would that give you?

12 A.  That would give me the hourly rate.

13 Q.  Okay.  And what would you do with that hourly rate then?

14 A.  Then I would do -- the hourly rate, I would divide it by

15 two.

16 Q.  Okay.  And that would give you?

17 A.  The overtime rate.

18 Q.  And then once you have that overtime rate for the first

19 week, what would you multiply that by?

20 A.  The total, uhm, overtime hours.

21 Q.  Okay.  And in that first week, what would have been the

22 total overtime hours?

23 A.  19.12.

24 Q.  And that would give you what?

25 A.  That would give me the overtime weekly earnings.

LOMBARDO - DIRECT/TINGLEY

1   Q.  And then you would do that same formula for the second

2   week?

3   A.  Correct.

4   Q.  Okay.  And for purposes of calculating overtime, just for

5   the benefit of the jury, you don't count the sick day that's on

6   here -- do you count that towards the overtime hours?

7   A.  No, ma'am.

8   Q.  Okay.  And then you would do the same formula and add them

9   together --

10        **MR. EDWARDS:**  Objection.  Leading.

11        **THE COURT:**  Sustain.

12  BY MS. TINGLEY:

13  Q.  After you do the formula for the first week, what do you

14  do?

15  A.  I repeat the process for week two.

16  Q.  And then what do you do?

17  A.  And then I add the two weeks together, week one and week

18  two, and that would give you your gross earnings.

19        **MS. TINGLEY:**  If I could have a moment, your Honor?

20        **THE COURT:**  Okay.

21        *(Discussion had off the record between counsel)*

22        **MS. TINGLEY:**  I don't have any further questions for

23  this witness.

24        **THE COURT:**  Cross-examination?

25        **MR. EDWARDS:**  Yes, your Honor.  One moment.

LOMBARDO - CROSS/EDWARDS

1    *(Discussion had off the record between counsel)*

2                    **CROSS-EXAMINATION**

3    BY MR. EDWARDS:

4    Q.  Good afternoon, Ms. Lombardo.

5    A.  Good afternoon.

6    Q.  Is that the same formula that you recited for me the other

7    day when we were discussing your testimony?

8    A.  Yes, that was yesterday.

9    Q.  Okay.  Is that the same formula that you explain to

10   employees?

11   A.  Yes.

12   Q.  You explained that formula to employees.

13   A.  I will sit down and go over that formula with the

14   employees.

15   Q.  Do you write it out like that?

16   A.  I have a spreadsheet that I fill it all in that's written

17   out like that.

18   Q.  How did you learn how to write that out like that?  That

19   was taught to you by Waste Pro, wasn't it?

20   A.  That was taught to me, yes.

21   Q.  Okay.  That's how Waste Pro calculates.

22   A.  That's how we calculate it, yes.

23   Q.  You know that there are requirements that Waste Pro has to

24   satisfy to be able to calculate overtime at that rate, correct?

25   A.  Yes.

LOMBARDO - CROSS/EDWARDS

1    Q.  Okay.  And you don't know, necessarily, about those, do

2    you?

3    A.  I don't know all the requirements, no.

4    Q.  Okay.  But you know that that's how they do it, right?

5    A.  I know that's how we do it.

6    Q.  And the extent of your involvement with that, as you

7    testified to the other day, is plugging the numbers into a

8    computer system and sending it off, correct?

9    A.  Correct.

10   Q.  Okay.  You don't write that out and hand do all of the time

11   for all of the employees, do you?

12   A.  No, I do not.

13   Q.  Do you know how many employees you calculate the pay for?

14   A.  Over 200.

15   Q.  Okay.  And in all of those instances, you plug numbers into

16   a computer and do that.  You don't make any evaluation as to

17   whether or not the requirements to calculate overtime that way

18   are satisfied, do you?

19   A.  No.  I only process the numbers that are in the system.

20   Q.  Okay.

21   A.  That's what I do.

22   Q.  Okay.  The other day I asked you if additional time on the

23   clock was weighed against an employee.  Do you remember that?

24   A.  Yes.

25        MS. TINGLEY:  Objection.  Outside the scope.

LOMBARDO - CROSS/EDWARDS

1    **THE COURT:** Sustain.

2    BY MR. EDWARDS:

3    Q.  Judging by the assessment there, the formula that you

4    wrote, additional time on the clock, the total hours, is a

5    component of that factor, is it not?

6    A.  Yes.

7    Q.  Okay.  Weekly earnings divided by total weekly hours,

8    right?

9    A.  Correct.

10   Q.  So, the more hours that an employee is on the clock, the

11   larger number is divided into their wages and the less that

12   comes out for their weekly rate, right?

13   A.  I'm sorry?  Can you repeat that?

14   Q.  If the total weekly hours is a bigger number, it means that

15   when it's divided into their weekly earnings, their weekly rate

16   is lower, is it not?

17       **MS. TINGLEY:**  Objection.  Outside the scope.

18       **THE COURT:**  Overrule.

19   A.  Their weekly earnings would be lower or --

20   Q.  Their weekly rate would be lower, because there's more

21   hours being divided into that weekly earnings, is that correct?

22   A.  Correct.

23   Q.  And also, their weekly earnings, if you look at the top

24   component of what you've written out, daily rate plus day's

25   work plus bonus, right?

LOMBARDO - CROSS/EDWARDS

1   A.  Yes.

2   Q.  That equals weekly earnings, right?

3   A.  Correct.

4   Q.  And so, weekly earnings includes bonuses, does it not?

5   A.  It's additional to it, yes.

6   Q.  Okay.  Well, it's a part of it, right?

7   A.  Um-hum.

8   Q.  And if bonuses were withheld, whether they be safety or

9   holiday or any of the other bonuses that we've discussed, then

10  the weekly earnings is lower, is it not?

11  A.  Well, the bonuses earned is additional.

12  Q.  We've already discussed that the bonus is additional.

13  A.  Right.

14  Q.  But what I'm asking is, is if the weekly earnings is a

15  smaller number, because there's less money included in it in

16  the form of bonuses, then the weekly rate ends up being lower,

17  doesn't it?

18  A.  Yes.

19  Q.  And so, after you have your weekly rate, you double it with

20  the other weekly rate, and you divide it by two, that number

21  for overtime is lower as well, is it not?

22  A.  Correct.  That's in addition to their day rate.

23  Q.  Okay.  So, if a person were to miss out on some weekly

24  earnings, and maybe worked some hours that they didn't

25  necessarily have to work, or their clock-out time was later,

LOMBARDO - REDIRECT/TINGLEY

1  that affects their weekly rate, does it not?

2  A.  Their clock-in and -out time, yes.

3  Q.  Okay.

4      **MR. EDWARDS:**  One moment to confer, your Honor?

5      **THE COURT:**  Okay.

6      *(Discussion had off the record between counsel)*

7      **MR. EDWARDS:**  Your Honor, no further questions for

8  Ms. Lombardo.

9      **THE COURT:**  Redirect?

10     **MS. TINGLEY:**  Yes, your Honor.  Thank you.

11                    **REDIRECT EXAMINATION**

12  BY MS. TINGLEY:

13  Q.  You were asked if the total hours -- total weekly hours was

14  increased, wouldn't that bring down that hourly rate for

15  purposes of overtime, were you not?

16  A.  Yes.

17  Q.  And you said that that would reduce that number, right?

18  A.  Yes.

19  Q.  Okay.  But wouldn't -- if the total weekly hours went up,

20  wouldn't that --

21     **MR. EDWARDS:**  Objection.  Leading.

22     **THE COURT:**  It sounds like it's going to be leading.

23     **MS. TINGLEY:**  Okay.

24  BY MS. TINGLEY:

25  Q.  Would -- if the hours increased for the employee, would the

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

LOMBARDO - REDIRECT/TINGLEY

1  hours of overtime also increase?

2  A.  Yes.

3      **MS. TINGLEY:**  Nothing further.

4      **THE COURT:**  Thank you, ma'am.  You may step down.

5      **THE WITNESS:**  Thank you, sir.

6      *(Witness excused)*

7      **THE COURT:**  You may call your next witness.

8      **MS. TINGLEY:**  May I check on our next witness?  It's

9  our -- he was driving in.

10     **THE COURT:**  Okay.

11     *(Pause)*

12     **MR. EDWARDS:**  Your Honor, may we approach briefly?

13     **THE COURT:**  Let's see what's going on.

14     We got the witness.  Let's go and start with the

15  witness.

16     **MR. EDWARDS:**  Your Honor, it pertains to the witness.

17     **THE COURT:**  Okay.  Approach the bench sidebar.

18     *(At the bench out of the hearing of the jury)*

19     **MR. EDWARDS:**  We anticipate the next witness to be

20  called to be Mr. Shane Muñoz.  Mr. Shane Muñoz is the attorney

21  that wrote the audit for Waste Pro in this case.  He was

22  subject to a *Daubert* motion to strike, and Magistrate

23  Judge Snow found that he's not an expert under *Daubert* and is

24  not going to provide an opinion on the ultimate issue.

25     We don't object to him testifying about what he

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

LOMBARDO - REDIRECT/TINGLEY

1  considered and the advice he provided at the time, but we have

2  a grave concern that during the course of that testimony, he

3  may seek to testify to the ultimate issue and validate their

4  payment program.

5       **THE COURT:**  So, if you think a question is

6  objectionable, you object, and I'll rule.

7       **MS. TINGLEY:**  And just for purposes of the record, for

8  this reliance on advice of counsel for our defense, the

9  other -- there's four elements, and one of them is, is the

10  advice reasonable?  So, he does get to discuss what the advice

11  was based on and what was formulated, you know, what he used,

12  because that's one of the elements.

13       **MR. EDWARDS:**  Your Honor, we're afraid he's gonna

14  testify that his view of the case law means that this is

15  correct or incorrect.  And that's inappropriate.

16       **THE COURT:**  So, if you think that's objectionable, you

17  object, and I'll rule on it.

18       **MR. EDWARDS:**  Thank you, your Honor.

19       *(The foregoing proceedings were had at sidebar)*

20       **MS. TINGLEY:**  The defense calls Shane Muñoz.

21       **THE COURT REPORTER:**  Please raise your right hand.

22       *(SHANE MUÑOZ, DEFENDANTS' WITNESS, WAS SWORN)*

23       **THE COURT REPORTER:**  Please sit down.

24       Please get close to the microphone, state your full

25  name for the record, spelling your last name.

411
MUÑOZ - DIRECT/TINGLEY

1          **THE WITNESS:**  Good afternoon, your Honor.  Good to see

2     you again.

3          Ladies and gentlemen of the jury.  My name is Shane

4     Muñoz.  Last name is M-U-N-O-Z.

5                    **DIRECT EXAMINATION**

6     BY MS. TINGLEY:

7     Q.  Good afternoon, sir.

8     A.  Good afternoon.

9     Q.  What is your occupation?

10    A.  I'm an attorney.

11    Q.  And by whom are you employed?

12    A.  Ford Harrison.

13    Q.  And what type of law do you practice?

14    A.  Labor and employment law.

15    Q.  And what does your job typically entail in the labor and

16    employment law area?

17    A.  Well, it varies a lot.  Labor and employment law is a broad

18    area of the law.  I haven't actually done an accounting to make

19    sure, but my guess is I probably spend more than 50 percent of

20    my time advising clients and most of the remainder of my time

21    litigating lawsuits.

22    Q.  Okay.  And what do you mean, for the benefit of the jury,

23    by advising your clients in labor and employment law?

24    A.  Well, again, it can be a wide range of things.  Some days

25    it's a phone call from a client who's got an issue with an

MUÑOZ - DIRECT/TINGLEY

1  employee, and they're trying to figure out what's the right

2  thing to do.  And I'll help them to, first of all, do the thing

3  that's lawful, and, second of all, to do the thing that's best

4  for the business and for the employee.

5       Many times they're wage and hour complaints or wage

6  and hour issues that come up, questions about interpretations

7  of statutes or particular circumstances and how the statutes

8  apply to those circumstances.  Sometimes it's preparing

9  policies or reviewing existing policies for compliance with

10 applicable law.  And, again, just a broad range of things, but

11 those are some of the common things.

12 Q.  Now, have you ever had an opportunity to be hired by

13 Waste Pro?

14 A.  Yes.

15 Q.  Okay.  And how long -- and was it for purposes of this

16 advice and counseling?

17 A.  I believe my first work, and certainly my most substantial

18 work, for Waste Pro was advice and counseling work, yes.

19 Q.  Okay.  And when were you retained to do that?

20 A.  Uhm, I don't know the exact date, but my guess would be

21 that it was early 2013 when I was initially engaged to do that.

22 Q.  And without going into the nature of any of the advice you

23 gave, when you -- what type of audit was this or retention was

24 it?

25 A.  The retention was to conduct a top down end-to-end audit of

413

MUÑOZ - DIRECT/TINGLEY

1  the labor and employment practices for Waste Pro.  So,

2  everything from hiring and firing, to worker's compensation, to

3  immigration, wage and hour.

4  Q.  And speaking specifically to wage and hour, were they

5  seeking advice under the Fair Labor Standards Act?

6  A.  Primarily, because that's the federal statute that covers

7  that area of the law.

8  Q.  And were you involved -- was your firm involved or were you

9  personally involved with this engagement?

10  A.  Both.  The firm was engaged to do the work.  I was the lead

11  attorney on the matter.

12  Q.  And how long did this audit take?

13  A.  *(No response)*

14  Q.  If you recall.

15  A.  I don't recall in terms of months.  But I would guess that

16  we probably spent more than 500 hours on it, and perhaps -- it

17  might have been a thousand hours approximately, I don't really

18  know, spread out over a period of months.

19  Q.  And do you recall how many attorneys had worked on this?

20  A.  I don't know the exact number, but I'm sure it was at least

21  ten.

22  Q.  And what -- in the context of the Fair Labor Standards Act

23  wage and hour aspect of this, did you review the overtime

24  practices of Waste Pro?

25  A.  Absolutely.

MUÑOZ - DIRECT/TINGLEY

1   Q.   Okay.  And what types of things did you look at or did you

2   review in order to give your advice?

3         **MR. EDWARDS:**  Objection.  Calls for hearsay.

4         **THE COURT:**  Overruled.

5   A.   We reviewed a broad range of things.  Uhm, if I recall

6   correctly, at the time, Waste Pro was divided into maybe seven

7   different regions.  We went to at least one location in every

8   region, and in some locations went -- in some regions went to

9   multiple locations so we could actually talk to people in each

10  job position at the company and find out what they were doing.

11  Because that's part of the analysis of determining how somebody

12  should be paid.

13        We reviewed payroll records, we reviewed actual pay

14  practices, we watched the process for people clocking in and

15  clocking out at the end of the day.  We -- we directly

16  interviewed people at all levels in the company, from the very

17  top all the way down to the lowest paid employees.

18  Q.   Okay.  And now speaking specifically to Waste Pro Florida

19  in the southeast region, and -- do you know whether your audit

20  encompassed that region?

21  A.   It did.

22  Q.   And do you know whether or not your law firm or yourself

23  actually visited any of the divisions in that region?

24  A.   I'm not sure how -- I'm not sure of the definition of

25  "division" in Waste Pro.  I've forgotten, because we finished

MUÑOZ - DIRECT/TINGLEY

1  the audit four-and-a-half years ago, I think.  So, I'm not sure

2  how to answer to that particular point.  But I know that we did

3  go to locations in southeast Florida, and we did obtain

4  documents and records from southeast Florida.

5  Q.  And did you interview employees in southeast Florida?

6  A.  I did not personally.  Laura Mall, in our Fort Lauderdale

7  office, would have handled that, because she was in that

8  region.

9      **THE COURT REPORTER:**  I'm sorry.  Laura Mall?

10  A.  Yes.  M-A-L-L.

11  Q.  And did you speak to any supervisors, managers, region

12  managers?

13  A.  I know that our audit materials, the materials that I -- I

14  personally reviewed everything that was done in connection with

15  the audit before we issued our final audit report.  And I know

16  that the materials I reviewed did indicate that the top level

17  people in the southeast region had been interviewed as part of

18  the process.

19  Q.  Okay.  So, just for the benefit of the jury, your law firm

20  is retained, and then you have attorneys that are collecting

21  data?  What -- how did it actually work out?

22  A.  That's correct.  We collected -- well, first of all, I

23  mentioned that there were ten or more attorneys who worked on

24  the audit.  In part that was because, as I mentioned before,

25  labor and employment law is a very broad area of the law.  So,

MUÑOZ - DIRECT/TINGLEY

1    we have attorneys in our firm who specialize in different areas

2    of the law.  So, I brought in the specialists from the various

3    areas.

4           For example, I don't know much about immigration law,

5    so we brought in somebody from our Minneapolis office, who's an

6    expert in immigration law, brought in an expert in drug testing

7    laws.  We had experts in EEO laws and in wage and hour laws.

8           So, we had the substand *(sic)* of expertise.  In terms

9    of gathering the information, it was largely based on region

10   and where an attorney was located, which attorney would go to a

11   site to interview people.  So, again, Ms. Mall, being in

12   southeast Florida, was the one who conducted the on-site

13   interviews there.

14          When we were on site, we would ask for information,

15   for documents, because we didn't want to kind of target what we

16   were going to ask for.  We wanted to get the raw stuff.  We

17   didn't want it filtered.  So, we'd go, and we'd say, We want

18   personnel files for these 15 employees, and we want I9

19   information for these 30, or however many -- actually, we got

20   I9 information for all of the employees.  But the point is that

21   the on-site audits, we were targeting specific information that

22   we had identified but hadn't told Waste Pro we were gonna ask

23   for.

24          But then we also sent out document requests.  So, for

25   example, for things like as handbooks and such, we wrote to

MUÑOZ - DIRECT/TINGLEY

1    them and said, Send us your handbooks.  So, there was a

2    combination of both the on-site document collection and

3    requesting them to provide us with documents by correspondence.

4    Q.  And specific to the overtime and wage and hour aspect of

5    your audit, do you know what type of -- types of information

6    that your law firm collected from Waste Pro?

7    A.  Sure.

8         It was the actual payroll records.  And, again, we

9    went directly to the actual time cards, so we were watching the

10   process of how people clocked in and out and looking at the

11   actual time cards from when people had clocked in and out,

12   making sure that those matched up with the weekly pay records

13   and making sure that the weekly pay records reflected that pay

14   had been properly calculated.

15        And, again, we interviewed people top to bottom in the

16   company to make sure, for example, that people knew that they

17   were required to report all of their hours, that they weren't

18   supposed to work off the clock, to actually talk to people,

19   when did you start, when did you finish.  Look at a time card

20   and see if the time card matched up for that day with what the

21   person said they had actually worked, looked at the written

22   policies.  I've probably forgotten things, but that's what I

23   can remember right now.

24   Q.  I'm showing you -- when you say you looked at the pay

25   records, does this look familiar to you as just representative

MUÑOZ - DIRECT/TINGLEY

1  of a pay stub that you looked at?

2  A.  Many.  I'm sure that I looked at many pay stubs that were

3  similar to this one.

4  Q.  Okay.

5       **MS. TINGLEY:**  Your Honor, might I approach the table?

6       **THE COURT:**  Okay.

7  BY MS. TINGLEY:

8  Q.  And is this representative of a time card you would have

9  reviewed?

10  A.  It -- I have to say honestly, I do a lot of this work, and

11  in the last five years, I've looked at lots of time cards.  I

12  don't remember this particular form, but I know we did look at

13  Waste Pro time cards.

14  Q.  Okay.  Did you become familiar with how Waste Pro Florida,

15  and specifically in the southeast region, was paying its

16  drivers and helpers?

17  A.  Yes.

18  Q.  Okay.  And do you recall whether that was something that

19  you took a look at, was the payment structure?

20  A.  Very definitely, yes.

21  Q.  Okay.  And do you recall how those drivers and helpers were

22  paid?

23  A.  My recollection is that they were paid based on a

24  combination of factors.  One was a day rate.  And then there

25  were at least two or maybe three different safety bonus --

MUÑOZ - DIRECT/TINGLEY

1    bonuses that they could earn that would be added to that.  And

2    then there was also -- I forget exactly what the term was that

3    Waste Pro used to refer to it, but there could be supplemental

4    pay if you did extra work as well.

5    Q.  And what were you specifically retained to do with regard

6    to these day rate employees for the southeast region?

7    A.  With respect to wage and hour?

8    Q.  Yes.

9    A.  To make sure that -- well, to make sure that they -- on the

10   broad range of things you have to do to pay employees

11   correctly, that they were complying with applicable law.  So,

12   everything from making sure that they were properly capturing

13   all of the time and making sure that all the time was

14   compensated, to making sure that people were actually being

15   paid what -- you know, that paychecks matched up with the time

16   cards and all, and to make sure they were calculating pay in

17   the right way.  Because many of them were working overtime,

18   and, of course, you have to calculate overtime the right way.

19   So, we were making sure that they were doing that as well.

20   Q.  And how did you go about determining whether or not

21   Waste Pro was properly calculating overtime and earnings for

22   these helpers and drivers?

23   A.  Well, I -- I've described half of it already.  We gathered

24   the facts to find out exactly what was being done.  And then we

25   compared the facts to the law, to make sure that the law was

MUÑOZ - DIRECT/TINGLEY

1   being applied properly to those facts to make sure that people

2   were being paid the way they should.

3   Q.  And when you say the law, what laws did you --

4   A.  Primarily the Fair Labor Standards Act.  I say primarily

5   because, for example, in Florida, we have a Minimum Wage Act,

6   so things are a little bit different in Florida.  You have to

7   not only make sure that the client, in this case, Waste Pro, is

8   complying with the Fair Labor Standards Act, but also that

9   they're paying at least the minimum wage required in Florida.

10  So, we took all of the applicable laws and applied them to the

11  information we had gathered and made sure that things were

12  being done the way they should.

13  Q.  Okay.  And can you just tell the jury how the Fair Labor

14  Standards Act applies to helpers and drivers?

15          **MR. EDWARDS:**  Objection.  Improper lay opinion.

16          **THE COURT:**  Sustain.

17  BY MS. TINGLEY:

18  Q.  When you said you took a look at the laws as they relate to

19  drivers and helpers, what else did you look at?

20  A.  You mean what laws did I look at?

21  Q.  Yes.

22  A.  Well, I start with the statute.  And particularly

23  29 U.S. Code, Section 207(e).  And maybe I should start more

24  broadly with Section 207, which requires that if an employee --

25          **MR. EDWARDS:**  Objection.  Improper lay opinion.

1        **THE COURT:**  Sustain.

2        Is this a good spot to take a break, Ms. Tingley?

3        **MS. TINGLEY:**  Yes, your Honor.

4        **THE COURT:**  All right, members of the jury, we're

5   going to go ahead and recess for lunch.  Remember my admonition

6   not to discuss the case or allow it to be discussed in your

7   presence.  And I'm gonna ask you to come back at 1:30.

8        So have a nice lunch.  We'll see you back at 1:30.

9        **COURTROOM SECURITY OFFICER:**  All rise.

10       *(The jury exited the courtroom)*

11       **THE COURT:**  And I think Mr. Muñoz can testify as to

12   what advice he gave Waste Pro, and I think he can give his

13   opinion he thought it was reasonable advice, but beyond that, I

14   don't know that I'm gonna allow him to testify as to what his

15   understanding of the law is.

16       Anything further before we recess for lunch?

17       **MS. TINGLEY:**  No, your Honor.

18       **MR. EDWARDS:**  No, your Honor.

19       **THE COURT:**  All right.  We'll see everybody back at

20   1:30, 1:15 on other matters.

21       **COURTROOM SECURITY OFFICER:**  All rise.

22       *(The Judge exited the courtroom)*

23       *(Luncheon recess taken at 12:17 p.m.)*

24                         -  -  -  -  -

25

MUÑOZ - DIRECT/TINGLEY

1          **WEDNESDAY, APRIL 18, 2018, 1:35 P.M.**

2               *(The Judge entered the courtroom)*

3          **THE COURT:**  Please be seated.

4          All right.  We're back on the record.

5          Counsel are present.

6          Anything to come before the Court before we bring the

7     jury in?

8          **MR. EDWARDS:**  No, your Honor.

9          **MS. TINGLEY:**  No, your Honor.

10         **THE COURT:**  All right.  If we have all the jurors,

11    let's bring them in.

12         **COURTROOM SECURITY OFFICER:**  All rise for the jury.

13              *(The jury entered the courtroom)*

14         **THE COURT:**  And we have all the jury back.

15         Did everyone follow my admonition not to discuss the

16    case or allow it to be discussed in your presence?

17         Ms. Tingley, you may continue.

18         **MS. TINGLEY:**  Thank you.

19              **DIRECT EXAMINATION (CONTINUED)**

20    BY MS. TINGLEY:

21    Q.  Sir, I wanted to go back for a moment just to your

22    background.

23         How long have you been a practicing attorney?

24    A.  I began practicing law in 1989.

25    Q.  And since 1989, have you always practiced in the labor and

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

MUÑOZ - DIRECT/TINGLEY

1  employment area?

2  A.  I began practicing labor and employment law in either 1990

3  or '91.

4  Q.  And do you practice exclusively in that area since then?

5  A.  Ninety-nine percent.

6  Q.  You talked about the percentage of your practice that was

7  in litigation and that which was in the more consulting side of

8  it, giving advice to clients.

9       When you're in litigation is that always in the labor

10  and employment arena?

11  A.  Yes.  I -- I had one case that was a discrimination case

12  brought by a student against a school, but other than that, I

13  can't remember a litigation matter I had that wasn't

14  employment.

15  Q.  Okay.  Now, going back to the audit that you did for

16  Waste Pro, without going into actually what the content of the

17  regulations that you relied on were, can you just tell the jury

18  what regulations you relied on?

19  A.  Well, again, I relied on things other than regulations.  I

20  relied on the section of the FLSA that has to do with how to

21  calculate the regular rate.  I relied on Department of Labor

22  regulations, 29 C.F.R. 778.109, 29 C.F.R. 778.112, I believe,

23  and I think 114 and -- again, 29 U.S. Code (sic) 778.114 and I

24  think 115.  I relied on one or more Department of Labor opinion

25  letters.  I relied on a series of Supreme Court cases primarily

424

MUÑOZ - DIRECT/TINGLEY

1  from the 1940s that address how to calculate the regular rate.

2  Q.  When you say "Supreme Court," just for the benefit of the

3  jury, what court?

4  A.  The United States Supreme Court.

5  Q.  Okay.  Thank you.

6  A.  And a decision from I believe 2007 from the Eleventh

7  Circuit Court of Appeals that addresses the regulations that I

8  just named and how to construe those regulations.

9  Q.  Okay.  And anything else that you relied on?

10  A.  In terms of legal or in terms of factual?

11  Q.  We're on legal still.

12  A.  I don't remember specific cases, but I likely would have

13  reviewed cases addressing the various methods of -- the pay

14  methods that would apply to the various categories of employees

15  and how they're paid at Waste Pro.

16       So, for example, with respect to the day rate, I would

17  have done some research to find cases applying the proper

18  method of calculating pay for the day rate.

19  Q.  And those would be cases in addition to the United States

20  Supreme Court cases?

21  A.  I expect I did look at others as well.  I'm not certain.

22  Because, again, typically if we find Supreme Court cases that

23  we think answer a question for us, we don't look much further.

24  In this case, I had Supreme Court cases and the Eleventh

25  Circuit case that I think clearly describe what needs to be

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER

MUÑOZ - DIRECT/TINGLEY

1   done.

2   Q.   And that relates to the legal side.  What did you rely on

3   factually?

4   A.   Uhm, again, the various things that I described that we

5   looked at.  We had a checklist of documents that we asked for,

6   both in writing from the client and when we were doing our

7   on-site visits, that included everything from the actual

8   records -- the actual time cards, to the records created from

9   the time cards of hours worked; the pay policies in place with

10  respect to how to pay the various categories of employees,

11  including the drivers and helpers; the actual time cards and

12  the payroll records that showed what had actually been done;

13  the bonus policy; looked at the pay stubs, or at least some

14  payroll records -- I think they were pay stubs -- to see how

15  bonuses had been added in when calculating the weekly and

16  paycheck pay periods.  We -- I'm sorry -- the weekly and pay

17  period pay.

18        So, basically everything -- everything that we could

19  find that had to do with employee hours and employee pay.

20  Q.   Now, you said earlier that you interviewed employees.  Did

21  you interview drivers and helpers?

22  A.   I did.  I interviewed personally -- I'm sure I met at least

23  20 and probably 30 or more drivers, and I did in-depth

24  interviews at least at each of the locations I went to with two

25  or more.  So that would be, I think, probably somewhere between

MUÑOZ - DIRECT/TINGLEY

1    12 and 20 I did in-depth interviews with.

2    Q.  And as far as for purposes of this audit, did Ford and

3    Harrison interview employees in all the regions?

4    A.  Yes.  We went to every region, and as I said before, in

5    most region -- I don't know if it was most regions -- in some

6    regions, we went to multiple locations.

7    Q.  Now, can you just -- when you said that you spoke to

8    employees, and then in some you did in-depth interviews, can

9    you just describe for the jury what that entailed on both

10   aspects?

11   A.  Well, one of the things was actually one of the more

12   enjoyable aspects of the audit that we did was, because I

13   wanted to meet as many people as I could, I actually went to a

14   picnic.  I think -- I don't know if you still do, but Waste Pro

15   used to do picnics for the drivers I think quarterly.  So, I

16   went to a picnic down in Fort Myers and met all of the drivers

17   I think who were on shift that day, and we had lunch together.

18   So that was more casual.  I wasn't -- probably asked them some

19   questions related to the audit, but it was more just, you know,

20   casual get-together.

21        But in terms of the actual audits -- the actual

22   in-depth interviews, we sat down with people -- I personally

23   sat down with a number of drivers and helpers -- and asked them

24   everything from when do you start work, when do you finish

25   work, what's your day like, how do you keep your time?  And as

MUÑOZ - DIRECT/TINGLEY

1    I said earlier, I actually watched the process at each location
2    I went to of the drivers arriving early in the morning, earlier
3    than I usually get up, and getting their time cards and
4    punching in and going to their trucks and doing the preroute
5    check of their trucks.  And I watched them coming in at the end
6    of the day and bringing their trucks in to have them checked at
7    the line at the end of the day.  And talked to them at the end
8    of the day.  And I talked to them about everything from how
9    they're paid to how they're treated by their supervisors.

10           Spent a lot of time, not particularly pertinent here,
11   but a lot of time talking about safety and the safety meetings
12   that they have and the things that they're taught in those
13   meetings; their actual pay keeping procedures, and what they're
14   actually paid.  Uhm, asked them what they thought about their
15   jobs.  It was surprising to me.  It was an eye-opening thing to
16   find out most of these guys really love their jobs.

17           **MR. EDWARDS:**  Objection.  Hearsay.
18           **THE COURT:**  Sustain.
19   A.  Well, in any case, that's -- that's one of the things that
20   I did.
21   Q.  Now, the in-depth interviews, did you -- did Ford and
22   Harrison -- I know you talked about being at Fort Myers, was --
23   were these interviews of employees done in the southeast
24   region?
25   A.  Yes, they were.  Again, I didn't do them personally.  That

MUÑOZ - DIRECT/TINGLEY

1   would have been Ms. Mall.

2   Q.   Right.  But you reviewed all the work in coming up with

3   your advice in this case.

4   A.   Correct, yes.

5   Q.   Okay.  Now, in addition to interviewing the drivers or the

6   helpers, what other types of employees did you interview as

7   with regard to the drivers and helpers?  Did you interview

8   supervisors, regional vice presidents, any -- specifically in

9   Florida?

10  A.   Yes, we did.  I've forgotten the job title, but if I recall

11  correctly, there was a person who was what one might call a

12  team leader for the drivers.  We interviewed those people.  We

13  interviewed the schedulers for the drivers --

14  Q.   Well, let's start with the team leader.

15        What were you interviewing the team leader of the

16  drivers for?

17  A.   One of the things that we asked anybody above a supervisory

18  level was their understanding of pay practices.  And things

19  like making sure that people record all of their hours worked,

20  making sure that they don't work off the clock.  At that level,

21  I don't think we were asking about how to compensate overtime.

22  I think that was more for the payroll and HR people, rather

23  than for the first-level supervisor.

24        We would ask a series of similar questions of those we

25  had asked of the helpers and drivers about things like when do

MUÑOZ - DIRECT/TINGLEY

1   people start their day, what's the process for checking -- for

2   clocking in at the beginning of the day, et cetera, just to

3   make sure that everybody was telling the same type of story.

4           I've sometimes seen audits where the lawyers focus too

5   much on talking to the supervisors and not enough on the people

6   who are actually doing the work, and sometimes they don't get

7   the true story.  So, we wanted to ask similar questions --

8           **MR. EDWARDS:**  Objection.  Narrative.

9   A.  -- at every level --

10          **THE COURT:**  Next question.

11  BY MS. TINGLEY:

12  Q.  In addition to the team leaders, who else did you

13  interview?

14  A.  We interviewed everybody at every level in the -- well, not

15  every person, but we interviewed people at every level in the

16  organization in each region.  So, you mentioned -- I think you

17  said regional vice president or -- I don't remember the job

18  title, but the top person in each region we interviewed.  We

19  interviewed the people responsible for human resources at each

20  region --

21          **THE COURT REPORTER:**  I'm sorry.  You have to slow

22  down.

23          **THE WITNESS:**  I'm sorry.

24  A.  We interviewed the people responsible for human resources

25  at each region.  We interviewed people --

MUÑOZ - DIRECT/TINGLEY

1   Q.  Okay.  So, let's -- I got another question for you.

2          So, in that specific region, you said there were

3   seven, in that specific region, you would interview the

4   regional -- whoever was doing the HR in that region.

5   A.  Yes.

6   Q.  Okay.  And do you recall whether or not -- and you also

7   interviewed the management above that in each region?

8   A.  Yes.

9   Q.  Okay.  Do you recall whether or not you interviewed Russell

10  Mackie?

11  A.  I believe I did.  I'm not a hundred percent certain, but I

12  believe I did.  I know that he was interviewed.

13  Q.  Okay.  And do you know whether or not you interviewed

14  Regina Lombardo?

15  A.  I don't remember interviewing Ms. Lombardo, but, uhm, that

16  doesn't mean that I didn't.  I interviewed a lot of people,

17  and, again, it was five years ago.

18  Q.  Okay.  Now, when you were conducting these interviews of

19  the regional HR people, what facts were you trying to gain from

20  them?

21  A.  Uhm, well, the HR people probably -- I probably spent as

22  much time with them as with anyone, because --

23  Q.  And this is specific to the Fair Labor Standards Act and

24  overtime.

25  A.  Okay.  So, for Fair Labor Standards Act and overtime, a big

MUÑOZ - DIRECT/TINGLEY

1    focus would have been making sure that they understood, not

2    just for the helpers and drivers but for each category of

3    employees, the proper ways to calculate their pay, and to make

4    sure that they have the proper procedures in place for

5    capturing the data that you need to comply with wage and hour

6    laws, including things like hours worked, you know, were they

7    properly gathering the information through the time card

8    process, were they properly processing it, were they properly

9    maintaining the information.  And then, again, we're checking

10   the records themselves to make sure not only that people know

11   what they should be doing, but that they're actually doing it.

12   Q.  Okay.  So, you conduct the interviews to find out what's

13   being done, and then you compare it to the documents to make

14   sure --

15          **MR. EDWARDS:**  Objection.  Leading.

16   BY MS. TINGLEY:

17   Q.  Okay.  What was --

18   A.  I probably would have said that differently.  I think we

19   were checking the documents to make sure what's being done, and

20   we're talking to the people to find out what they think is

21   being done, because sometimes those two are different.  But,

22   yes, we're looking at both sides.  We were making sure that the

23   knowledge is there, and we're making sure that the records are

24   there.

25   Q.  Now, when you interviewed the various vice presidents in

MUÑOZ - DIRECT/TINGLEY

1    their regions, the -- what information -- what facts were you

2    attempting to -- what facts did you receive from them?

3         **MR. EDWARDS:**  Objection.  Calls for hearsay.

4         **THE COURT:**  I'll allow it for the fact it was said,

5    not the truth of the matter asserted.

6    A.   Uhm, that was a different interview than for the -- than

7    for the, for example, HR folks, who were kind of, you know,

8    there -- no offense to the VPs, but the HR folks, they're kind

9    of on the ground doing things.  So --

10   Q.   Okay.  So, if the interview did not entail anything to do

11   with overtime and wages, then you need not go into it.

12   A.   I would be surprised if it didn't have anything to do with

13   overtime and wages, but as I sit here right now, I'm not

14   remembering what it would have been that related to that, other

15   than certainly making sure that there were communication

16   processes in place.  At that level, I always want to make sure

17   that, first of all, that people have good lines of

18   communications with the HR and payroll folks, but also that

19   they have good lines of communication to higher level

20   executives and to legal.  So, I want to make sure that they're

21   all communicating so that if and when that VP has an issue that

22   needs to be addressed, they have the resources and the networks

23   to make sure that it happens and gets addressed.

24   Q.   Okay.  So, your law firm gathers all these facts.  And what

25   happened next?

MUÑOZ - DIRECT/TINGLEY

1   A.  Well, as I said before, we had a team design partly for the

2   different expertise that the various team members brought to

3   the table, and --

4   Q.  So, specific to the Fair Labor Standards Act, the overtime

5   wages, those issues.

6   A.  Correct.

7          So, we had experts in that area, and took the data

8   that we had gathered, and took our knowledge and expertise of

9   the law, and analyzed the data to identify any areas where

10  perhaps the company wasn't complying fully with what it should

11  be doing under the law.

12  Q.  And how long did that process take, if you know?

13  A.  Specifically for wage and hour?  If -- uhm -- I think it's

14  probably easiest for me to segment it into the process of

15  synthesizing the data to the point where we had a draft and had

16  analyzed and, you know, knew what we thought we would say, but

17  not getting to the final product, probably six to eight weeks.

18  Q.  And what did you do next?

19  A.  *(No response)*

20  Q.  Or what did your firm do next?

21  A.  A draft was prepared that analyzed the data that we had

22  gathered in the context of the applicable law.  And if I recall

23  correctly, it was Ms. Mall who prepared the first draft for the

24  FLSA section, and then, as with every section of the audit,

25  they came to me for my review.  And I -- in some other areas,

MUÑOZ - DIRECT/TINGLEY

1  my review wasn't as quite as deep, because, for example, I'm

2  not an expert on immigration law, but I am an expert -- at

3  least I consider myself one -- in wage and hour law, so I

4  analyzed that section in very close detail, and revised as

5  needed.

6  Q.  After that analysis, what did you do next?

7  A.  We prepared a final audit report and provided it to the

8  client and met with the client to discuss the audit report.

9  Q.  Okay.

10        **MS. TINGLEY:**  Your Honor, may I approach the witness?

11        **THE COURT:**  All right.

12  BY MS. TINGLEY:

13  Q.  Sir, I'm handing you what's been marked for identification

14  as Defense Exhibit Number 3.  Do you recognize this document?

15        *(Defendants' Exhibit 3 marked for identification)*

16  A.  I do, yes.

17  Q.  And what do you recognize it to be?

18  A.  And the reason I hesitated a little is because it's a

19  portion of the audit report that we prepared.

20        And specifically, it's -- it looks like the -- well,

21  the first -- there's a cover page and then a contact

22  information page, and then it looks like a single page from the

23  table of contents, and then maybe it's six or eight pages

24  from -- it's titled "Analysis of Time and Payroll Records."

25  Q.  And if you could just take a look at the pages, just to

MUÑOZ - DIRECT/TINGLEY

1   familiarize yourself for my next question.

2            (Pause)

3   A.  Okay.

4   Q.  You stated earlier that there was a category of employees

5   and drivers and helpers that you referred to as the "day rate

6   employees"?  Do you recall that?

7   A.  Okay.

8   Q.  Yes?

9   A.  That sounds accurate.  I don't remember saying exactly

10  that, but, yes, that sounds accurate.

11  Q.  Okay.  Did you review the pay practices for drivers and

12  helpers at Waste Pro?

13  A.  Yes.

14  Q.  Okay.  And how would you characterize those employees under

15  the review you did?

16  A.  You mean how would I characterize the pay practices for

17  those employees?

18  Q.  Yes.

19  A.  My recollection, and I think what the section of the report

20  that I have indicates, is that they were being paid properly

21  with one minor --

22        **MR. EDWARDS:**  Objection.  Improper lay opinion and

23  ultimate issue.

24        **THE COURT:**  Sustain.

25        **MR. EDWARDS:**  Move to strike.

436

MUÑOZ - DIRECT/TINGLEY

1          **THE COURT:**  Ignore the last answer.

2     BY MS. TINGLEY:

3     Q.  The -- we're speaking to just the category of employee, not

4     whether -- not to any ultimate issue in this case.

5          How were they generically referred to in the report,

6     the audit you did?

7     A.  I think as "drivers and helpers."

8          I see references here to day rate employees.  In the

9     text that I can see here, so far I haven't seen a reference to

10    drivers or helpers.

11    Q.  Okay.  Is it your recollection that the drivers and helpers

12    at Waste Pro were day rate employees?

13         **MR. EDWARDS:**  Objection.  Calls for a legal

14    conclusion.

15         **THE COURT:**  Overruled.

16    A.  It's my understanding they were being paid by the day rate

17    method.

18    Q.  And in this document that I handed you, is this the portion

19    of your audit report that deals with the compensation method

20    for these day rate employees?

21    A.  It does deal with that.

22    Q.  Okay.  And is this a true, accurate, and genuine copy of

23    the portion of your audit report that dealt with compensation

24    for day rate employees?

25    A.  Well, I should note that sections of it have been redacted.

MUÑOZ - DIRECT/TINGLEY

1  But apart from that, it appears to be, yes.

2      **MS. TINGLEY:**  Your Honor, we would offer this into

3  evidence.

4      **MR. EDWARDS:**  Objection.  Hearsay.

5      **THE COURT:**  Can you pass up Defense Exhibit 3 so I can

6  look at it?

7      **MS. TINGLEY:**  Yes.

8      **MR. EDWARDS:**  And objection as to ultimate issue, your

9  Honor.

10     **THE COURT:**  Okay.  Overruled.

11     Three will be received.

12     *(Defendants' Exhibit 3 admitted into evidence)*

13     **MS. TINGLEY:**  Your Honor, may I publish to the jury?

14     **THE COURT:**  Okay.

15     **MS. TINGLEY:**  Thank you.

16  BY MS. TINGLEY:

17  Q.  So, when you first talked about the first page, is this

18  what you were referring to?

19  A.  Yes.

20  Q.  Okay.  And does this set forth the date of this audit?

21  A.  I believe it does, yes.

22  Q.  And so, when you spoke about how long it took to prepare

23  this, that would have been done in the months prior to this

24  advice being given.

25     **MR. EDWARDS:**  Objection.  Leading.

MUÑOZ - DIRECT/TINGLEY

1      **THE COURT:**  Sustain.

2    BY MS. TINGLEY:

3    Q.  When was the actual facts and legal analysis done for

4    purposes of this audit?

5    A.  As I testified earlier, it took a period of months.  I

6    don't think -- and I think I said that I was retained -- we

7    were retained for this sometime in 2013.  I don't think we

8    started in 2012.  I don't remember exactly, but based on how

9    long I think it took, I would either say February -- somewhere

10   February to April time frame we would have started, so six to

11   eight months.

12   Q.  Okay.  And now turning to the next page, the contact

13   information.  And this is you as the audit team leader?

14   A.  That's correct.

15   Q.  And when this was prepared, what -- just for the benefit of

16   the jury, what does that mean the "audit team leader"?

17   A.  It means that I was the leader of the audit team.  I was --

18   of the group of attorneys and some paralegals, as well, who

19   were working on the project, I was the leader of that group.

20   Q.  Okay.  And with regard to any advice that was contained

21   within this, what would have been your role as the audit team

22   leader?

23   A.  As I said earlier, I reviewed every -- every page -- every

24   word of the audit probably several times.  And for most of the

25   audit, I reviewed it to bring my legal expertise to bear,

MUÑOZ - DIRECT/TINGLEY

1   including the wage and hour portion.  There were some portions

2   where I was deferring to my other partners who were more expert

3   in some areas.

4   Q.  Okay.  Turning to the next page, what does this represent?

5   A.  This is the page that I think is a page from the table of

6   contents.

7   Q.  Okay.  And what does it refer to?

8   A.  "Analysis of time and payroll records."

9   Q.  Now, beyond that, it says "summary of findings and

10  recommendations."  What does that mean to you?

11  A.  Well, that would be the section where we summarized the

12  determinations we had made, our findings, with respect to time

13  and payroll records, and our recommendations concerning those

14  records.

15  Q.  And what do you mean by "protocols"?

16  A.  We -- for each section of the audit, we developed a list of

17  protocols in advance of the audit, based partly on our general

18  knowledge and partly based on our knowledge of Waste Pro in

19  particular, of the steps we needed to take to make sure to

20  complete a thorough audit, most of which I've talked about

21  before, gathering documents and information.

22  Q.  And what about "findings"?

23  A.  Well, that would be our -- I have to hesitate for a minute,

24  because without seeing the rest of the table of contents, I'm

25  not quite sure how we divided it up.  But at a minimum, that

MUÑOZ - DIRECT/TINGLEY

1   would be the conclusions that we reached about the facts that

2   we gathered.  I don't remember whether we included our legal

3   findings and -- I see above "summary of findings and

4   recommendations."  And I'm not sure if that Section 3 was

5   limited to our findings, broader description of our findings,

6   or if it may have also included recommendations.  I'm just not

7   sure.

8   Q.  Okay.  And now moving on the next page, is that just a

9   placeholder for --

10  A.  A cover page for a section of the audit.

11  Q.  And this is the section dealing with what?

12  A.  With analysis of time and payroll records.

13  Q.  And now going to page 155 that was referred to in the table

14  of contents, this is the start of the section that you -- that

15  Ford and Harrison and you --

16          **MR. EDWARDS:**  Objection.  Leading.

17          **THE COURT:**  Overruled.

18  BY MS. TINGLEY:

19  Q.  Where you commenced your review of the employment policies

20  and procedures, the analysis of time and payroll records?

21  A.  Yes, it is.

22  Q.  Now, just for the benefit of the jury, when you were

23  talking about gathering all these facts related to day rate

24  employees, is it fair to say that that would be in this

25  section?

MUÑOZ - DIRECT/TINGLEY

1   A.   Yes.

2   Q.   But understanding that you also reviewed pay records for

3   other --

4           **MR. EDWARDS:**   Objection.   Counsel's testifying.

5           **THE COURT:**   I haven't heard the whole question yet.

6   BY MS. TINGLEY:

7   Q.   Were there other types and categories of employees that you

8   also reviewed?

9   A.   Yes.   As I testified earlier, we went top down through the

10  organization, so --

11  Q.   Okay.

12  A.   -- there would have been, for example, an analysis of

13  people who were classified as exempt under the wage and hour

14  statutes, and other categories of hourly employees as well.

15  So, each of the categories of exemptions we would have

16  addressed.

17  Q.   Okay.   Now, turning to the next page -- not very clear --

18  can you take a look at this section?

19  A.   Yes.

20  Q.   Okay.   And what section -- what does this section discuss?

21  A.   This talks about safety bonuses.   And if my recollection's

22  accurate, this was the one area where we found a concern about

23  the wage and hour practices with respect to the day rate

24  employees.

25  Q.   Okay.   Now, can you describe to the jury what was your

MUÑOZ - DIRECT/TINGLEY

1  concern?

2  A.  Yes.  When you -- when you calculate overtime, it has to be

3  based on the regular rate.

4       **MR. EDWARDS:**  Improper lay opinion, your Honor.

5       **THE COURT:**  I'll tell the jury what the law is.  I

6  allow wide latitude.  You may continue.

7  A.  May I continue then?

8       **THE COURT:**  Yes.

9  A.  Okay.  And when calculating the regular rate, you include

10  all of the compensation for a workweek and divide it by the

11  total hours worked during the workweek.

12       I was -- the concern we had was that bonuses, while

13  they were being included in the regular rate calculation, they

14  weren't always being allocated to the right workweek, because

15  the overtime calculation has to be done separately for each

16  workweek.  When a bonus is earned in an individual workweek,

17  it's easy, you allocate the bonus to the workweek when it was

18  earned.  If a bonus is earned over a period of time, you have

19  to properly allocate it to the workweeks during which it was

20  earned.  And if you haven't done that, you haven't properly

21  calculated overtime for the workweek that didn't get the bonus

22  allocated the way it should have been.

23  Q.  Okay.  So, by way of example, in this time card I'm showing

24  you, there is a -- it's a two-week -- two workweek pay period,

25  is it not?

MUÑOZ - DIRECT/TINGLEY

1   A.  Yes, it is.

2   Q.  And when you did your audit, can you describe for the jury

3   where the bonuses were being added in?

4        **MR. EDWARDS:**  Objection.  Improper lay opinion and

5   ultimate issue, your Honor.

6        **THE COURT:**  Overruled.

7   A.  This time card shows that on two successive Saturdays,

8   May 16th and May 23rd, a $50 bonus was included.

9   Q.  And at the time of the audit, what concern did you raise to

10  Waste Pro about these types of bonuses where you have one in

11  each workweek?

12  A.  Well, the concern, again, was making sure that the bonus

13  was allocated to the correct workweek.  And from this time

14  card, I can't tell exactly how that $50 bonus was earned.

15       If the bonus that's -- that shows on May 16th was

16  earned during the week that included May 16th, then that was

17  allocated properly.  But the concern that we had was that there

18  were some records that suggested, if I recall correctly -- and

19  this seems consistent with this card, this time card --

20  Waste Pro was using a two-week pay period.  And I believe we

21  found some pay periods where it appeared from other records

22  that a bonus had been earned in, for example, the second week

23  of the pay period, but had been allocated to the first week, or

24  where a bonus had been earned perhaps over a period of two

25  weeks, but allocated only to one of the workweeks, instead of

MUÑOZ - DIRECT/TINGLEY

1  allocated separately to the two workweeks over which it was

2  earned.  So, it was that type of thing.  It was -- it wasn't

3  that the bonus wasn't being allocated anywhere.  It was that in

4  some cases, other records suggested that -- other records, when

5  looked at together with the time cards, suggested that the

6  bonus had been allocated to the wrong week.

7  Q.  And so, based on that concern, you made a recommendation to

8  Waste Pro, did you not?

9  A.  Yes.

10  Q.  Okay.  And what was that recommendation?

11  A.  Well, the recommendation was consistent with what I just

12  described, that they needed to make sure that bonuses were

13  properly allocated to the workweeks where the bonus was earned.

14  And that's described here on -- did we say page 4 -- page 5, I

15  think?

16  Q.  156?

17  A.  Well, yeah, the page with 156 at the bottom, from -- is it

18  Exhibit 3?

19  Q.  And it wasn't that -- the concern you addressed here was

20  simply to make sure that each workweek's bonuses were captured

21  in those workweeks.

22        **MR. EDWARDS:**  Objection.  Leading.

23  A.  Correct.  Well, in --

24        **THE COURT:**  It's repetitious.  I sustain the

25  objection.

MUÑOZ - DIRECT/TINGLEY

1   BY MS. TINGLEY:

2   Q.  Did you give an alternative recommendation to Waste Pro

3   about the bonuses?

4   A.  Well, in this particular example, uhm -- and, again, we're

5   using an example to illustrate the point -- this example was an

6   employee who earned a $50 bonus in each of two weeks during a

7   pay period.  And what we said is the first recommendation was

8   that that person must have the $50 attributed to each week,

9   because, again, the person earned the $50 in each of the two

10  weeks.  And it had to be allocated separately to those two

11  weeks.

12       And then we explained further that the hundred dollars

13  may not be attributed to either week one or week two, rather it

14  had to be $50 to each of the weeks.  And, yes, we did give an

15  alternative.

16  Q.  Now, in looking at your alternate, you reference daily and

17  weekly bonuses.  Was it your understanding that there were

18  daily and weekly bonuses paid to these folks at Waste Pro?

19  A.  I don't have an independent recollection of that, no.

20  Q.  Okay.  But you referenced daily and weekly bonuses.

21  A.  Yes.

22  Q.  Okay.  Do you think you would have referenced that had you

23  not encountered it?

24       **MR. EDWARDS:**  Objection.  Speculation.

25       **THE COURT:**  Overruled.

MUÑOZ - DIRECT/TINGLEY

1   A.   I don't expect so, but it's possible that we were giving

2   advice beyond the scope of what we had actually found with the

3   expectation that we wanted the -- that we wanted Waste Pro to

4   have a full understanding of how to allocate bonuses.  So, it's

5   possible, but I doubt it.

6   Q.   Did you -- earlier in your testimony, I think that you

7   talked about getting additional compensation for helping

8   people?

9   A.   Yes.  It -- and perhaps that was referred to as a bonus.

10  But my recollection of at least one circumstance in which

11  Waste Pro was paying extra money was if a driver finished their

12  route, and then -- the example I remember is sometimes trucks

13  break down or something else happens, and nine out of ten

14  drivers have finished their routes, but the tenth guy is still

15  out there with a broken down truck, and somebody goes out and

16  finishes his route.  And in that circumstance, I believe they

17  were paying additional pay.  I don't recall whether that was

18  called a bonus, but there was extra pay for that type of

19  circumstance.

20  Q.   Okay.  And do you recall whether that was paid on a daily

21  basis?  If you know.

22  A.   I recall that the amount was based on the fact that on a

23  given day, the driver went out and did this extra work.  And

24  that would be treated just like a bonus.  It would have to be

25  added in to the pay for that week when calculating the regular

MUÑOZ - DIRECT/TINGLEY

1    rate.

2    Q.   Okay.  And so, in this instance, you gave essentially two

3    recommendations to Waste Pro.

4    A.   Well, yes, the one was that absolutely the compensation has

5    to be allocated to the right workweek.  And the other was the

6    suggestion that it -- that it could be combined with the day

7    rates for the individual days, which, of course, because

8    they're part of the week would end up with the pay all being in

9    the right workweek as well.

10   Q.   Turning now to page 158, what were you explaining to

11   Waste Pro on page 158?

12   A.   This is explaining the proper method for calculating

13   overtime pay for a day rate employee.

14   Q.   Okay.  And what did you tell Waste Pro?

15         **MR. EDWARDS:**  Objection.  Best evidence.

16         **THE COURT:**  You can just read that, if you want to.

17   A.   Okay.  This is what we told Waste Pro:

18         "Overtime wages for day rate employees should be

19      calculated by first calculating the regular rate" --

20      and then we have a parenthetical -- "(by taking the

21      gross wages earned in a workweek, including bonuses

22      attributable to the workweek, and dividing that

23      figure by the total hours worked)."  That's the end

24      of the parenthetical.

25         So, that's how you get the regular rate, the total

MUÑOZ - DIRECT/TINGLEY

1   compensation divided by the hours worked.

2          "Then multiplying" -- I'm sorry, to be clear, that was

3   me talking, that wasn't me reading -- so, reading again now:

4          "Then multiplying the regular rate by .5 (for the

5       half time rate), then multiplying that figure by the

6       total time worked over 40 hours in the workweek (for

7       the total overtime owed)."

8          And then we summarized that.

9          "Weekly formula:  Gross wages divided by total

10      hours worked, times .5, times hours worked over 40,

11      equals overtime owed for that workweek."

12  Q.   Okay.  Now, just to give an example to you -- and this is

13  the workweek from October 25th, 2015, to November 7th, 2015.

14  And the first part of your formula is to determine the regular

15  rate.  How would you determine on -- off of this document, the

16  gross wages as referred to?

17          **MR. EDWARDS:**  Objection.  Improper lay opinion and

18  ultimate issue, your Honor.

19          **THE COURT:**  Overruled.

20  A.   I believe --

21  Q.   Do you need to first --

22  A.   Well, I -- I believe you can determine that from the first

23  page by looking at the line that's listed "gross pay," but I

24  was just looking at the other categories to make sure that

25  there isn't something that I'm leaving out of the analysis.

MUÑOZ - DIRECT/TINGLEY

1   But I believe that's -- I believe it's the line that says

2   "gross pay."

3       One of the dilemmas we have with what we're looking at

4   here, though, is this is for two pay periods -- I'm sorry --

5   for two workweeks, and the regular rate calculation and the

6   overtime calculation have to be done on a workweek basis.

7   Q.  Okay.  So, in looking at the first workweek, and you have a

8   day rate employee.

9   A.  I --

10      **MR. EDWARDS:**  Objection.  Counsel's testifying.

11  A.  I don't see a --

12      **THE COURT:**  Overruled.

13  A.  I don't see a separate workweek on here.  I do see days

14  worked in week one and days worked in week two, but I don't see

15  anything that allows me to separate out the pay that's

16  allocated to those two workweeks.

17  Q.  Okay.  When you have a -- for daily rate employees, just if

18  you could tell the jury, what would be the first step that you

19  would do for the first workweek when you have a daily rate

20  employee that's paid a certain amount per day?

21  A.  Well, again, I'd total up the compensation for the

22  workweek, and then I'd start by, uhm, how many days in the day

23  rate.

24  Q.  Okay.  So, how many days --

25  A.  Right.  So --

MUÑOZ - DIRECT/TINGLEY

1  Q.  -- being the six, times the daily rate?

2  A.  Right.

3       So, we can get there, there's $930 in daily rate pay.

4  Q.  Okay.  Now, just we're talking about the first week.  So --

5  and then what do you add in to your six days times the daily

6  rate?

7  A.  Without turning back and forth from page to page, I can't

8  tell which bonus, but I see there are some bonuses here.  I'm

9  just not sure -- well, actually, I guess I can tell by looking

10  in the left column.  So, the workweek -- I'm assuming, and I

11  don't recall, but I see the pay period starts on a Sunday and

12  ends on a Saturday.  So, I'm assuming that the two workweeks

13  are both Sunday through Saturday workweeks.  And I see here

14  that in the first period from Sunday to Saturday, there were

15  two bonuses -- it's a little bit blurry, but I think they're

16  both $50?

17  Q.  Okay.

18  A.  So, it would be a hundred dollars in bonus to be added to

19  the -- I think it was $930 that we had calculated -- that I had

20  calculated for the first week.  So, we're now up to a thousand

21  and 30.

22  Q.  And now for that first workweek, then what do you do with

23  that, based on what you said --

24  A.  First, I want to go back to the second page, if I could,

25  because I wanted to make sure there isn't any other form of

MUÑOZ - DIRECT/TINGLEY

 1   compensation in there.

 2   Q.  Yes, sir.

 3   A.  Okay.  So, we've got -- and, again, it's a little bit hard

 4   for me to read the columns here, but it looks like we've got

 5   columns that are -- hum -- thank you.  That is a little bit

 6   better.

 7   Q.  Does that help?

 8   A.  Yeah.  Oh, okay.  Yes, now I understand.  I was looking at

 9   the columns that say "total amount" and "cumulative total

10   amount," and I didn't realize that was hours.  But it looks

11   like that's the hours, because we see in the first line, for

12   Sunday the 25th, we see an inpunch and an outpunch, and the

13   employee just --

14   Q.  I apologize that I didn't have it zoomed for you.

15   A.  The employee worked just over five-and-three-quarters

16   hours, so that's the 5.77 in the totalled amount.

17         So, the second column from the right is the hours

18   worked on a given day.  The column all the way on the right is

19   the cumulative hours in the pay period.  Uhm, we see the two

20   bonuses.  So, I don't see any other compensation here, other

21   than --

22         **MR. EDWARDS:**  Objection.  Improper lay opinion, your

23   Honor.

24         **THE COURT:**  Let's move on.

25   A.  Back to the first page -- oh, sorry, I guess I need to wait

MUÑOZ - DIRECT/TINGLEY

1  for a question.

2  Q.  So, you've already said that you times the 155 times your

3  six days.

4  A.  Yes.

5  Q.  And then in the first workweek, then you added in the

6  hundred dollars.

7  A.  Correct.

8  Q.  Okay.  And based on your opinion, is that the gross wages

9  that were earned in a workweek?

10  A.  Yes.

11  Q.  And then what do you do next?

12  A.  Then you divide by the hours worked in that workweek.

13  Q.  Okay.  So, now going back to the pay period --

14  A.  And based on my assumption that we have a Sunday through

15  Saturday workweek, uhm -- Sunday, Monday, Tuesday, Wednesday,

16  Thursday, Friday bonus, Saturday bonus, Sunday bonus, Saturday

17  pay -- it's this number right here -- oops, sorry, I came out

18  too low.

19  Q.  Let me see if I can zoom it more for you.  I apologize.

20  A.  And sorry I'm messing up the exhibit.  Thank you.

21       It's the 55.28 hours, the cumulative total through

22  Saturday, October 31st.

23  Q.  Okay.

24  A.  Should have brought my glasses.  I apologize.

25  Q.  So, you divide it by the total hours worked, which is the

MUÑOZ - DIRECT/TINGLEY

1  number you just gave.

2  A.  Correct.

3  Q.  55.28?

4  A.  Yes.

5  Q.  Okay.  And then what would be done?

6  A.  You take that result, the -- I think it was $1,030, divided

7  by 55.28 hours, and multiply that times half to get the half --

8  the half is the overtime premium.

9  Q.  And --

10  A.  I'm sorry.  I left out a step.  Uhm... okay, that's fine.

11  I got it right.  I was -- I was at the next step, where we're

12  gonna multiply times the number of overtime hours.  Multiply

13  times half to get the overtime rate.

14  Q.  Okay.  And what do you mean by the "overtime rate"?

15      **MR. EDWARDS:**  Objection.  Improper lay opinion, your

16  Honor.

17      **THE COURT:**  Overruled.

18  A.  The overtime rate is the rate that the statute and Supreme

19  Court cases and the regulations say has to be paid for hours

20  over 40 in a workweek.

21  Q.  And why is it only .5?

22  A.  Because in the case of a day rate employee, you've already

23  paid --

24      **MR. EDWARDS:**  Objection, your Honor.  Improper lay

25  opinion.

MUÑOZ - DIRECT/TINGLEY

1    **THE COURT:**  Overruled.

2    A.   In the case of day rate employee, you've already paid the

3    straight time pay.  So, when we talk about overtime being

4    one-and-a-half, you've already paid the one by paying the day

5    rate.  So, it's the half time that you have to add.  That's

6    what the regulations and Supreme Court case that I talked about

7    earlier say.

8    Q.   And then what do you do with that -- what you called your

9    overtime rate?

10   A.   Okay.  And that's where I was getting ahead of myself

11   before.  You take -- now that you have your overtime rate,

12   that's an hourly rate, so you have to multiply it times the

13   number of overtime hours.

14   Q.   And in this example, what were the number of overtime

15   hours?

16   A.   That would be the 55.28 minus 40.  So, 15.28.

17   Q.   And then, this -- your opinion was based on a weekly

18   formula.  What would be done then on the second week in this

19   pay period?

20   A.   Well, you'd go through the same analysis, but the numbers

21   would be different, because they're -- if I recall correctly,

22   there was a different amount of bonus, and also there were a

23   different number of hours worked.

24   Q.   And then what do you do after that, once you have the two

25   numbers for each week?

MUÑOZ - DIRECT/TINGLEY

1  A.  Well, when you're issuing the paycheck, you would issue a

2  paycheck that includes the day rate, includes the bonus, and

3  includes the overtime premium.

4  Q.  Okay.  For both workweeks.

5  A.  Correct.

6  Q.  And now turning to page 159, and in the table contents...

7  okay.  What were you communicating to Waste Pro on page 159?

8  A.  The protocols that we've discussed before.  And, again, we

9  thought it like -- I don't know that I said this before -- we

10  thought it important for Waste Pro to know the protocols that

11  we had followed to arrive at our findings and recommendations.

12  So, we were describing here what we had done to get to the

13  point where we could do the kind of analysis that we just went

14  through, including reviewing a sample of payroll and

15  corresponding time records for Waste Pro's employees, to, among

16  other things, ensure that the regular rate was calculated to

17  include all eligible pay.

18        And we also mention here that ineligible pay was --

19  had not been included -- that's another thing we looked at --

20  for purposes of calculating overtime.

21  Q.  Now, when you say that you looked at a sample of employees'

22  payroll and corresponding time records, do you have any

23  recollection how voluminous that sample was?

24  A.  Well, again, I know that we looked at records from every

25  region, and we looked at records for every category of

MUÑOZ - DIRECT/TINGLEY

1   employee.

2         With respect to the drivers and helpers in particular,

3   it -- I would guess that we looked at 200 different individuals

4   probably over the seven regions.  And I -- to be clear and

5   thorough in my answer, we didn't necessarily look at the entire

6   set of payroll records for each of those 200 or so.  For

7   example, as I mentioned before, for some people, we went and

8   actually looked at the process of them punching in at the time

9   clock.  We didn't necessarily match that up in every case with

10  the 200 sets of records we reviewed.  We would have in some

11  cases to make sure that there was a match.

12  Q.  In looking specifically at the drivers and helpers, did

13  you -- was it one of your findings that this -- that these

14  folks worked long hours?

15  A.  Yes.

16  Q.  And how many hours does the day rate encompass?

17        **MR. EDWARDS:**  Objection.  Improper legal opinion.

18        **THE COURT:**  Overruled.

19  A.  The day rate encompasses all of the hours worked in a given

20  day.

21  Q.  So, it could be 24?

22  A.  Theoretically, it could be.  I don't recall any Waste Pro

23  employees working 24-hour days.  They were working extremely

24  hard.

25        And when I say "theoretically," it could -- there is a

MUÑOZ - DIRECT/TINGLEY

1    caveat there.  The day rate has to be enough so that the

2    employee earns at least minimum wage for all the hours.  So,

3    when I say the day rate covers all hours worked, if somebody

4    worked 24 hours, the day rate would have to be minimum wage

5    times 24 or greater.

6    Q.  When you did this audit in 2013, do you recall what the

7    minimum wage was?

8    A.  I believe it was seven-and-a-quarter at the time, federal.

9    The Florida was higher.

10   Q.  Do you recall what Florida was?

11   A.  Not at the time.  It goes up each year.  I don't remember

12   2013 specifically.

13   Q.  Okay.

14   A.  I think it's in the low eight dollars now.  So, it would

15   have been somewhere between -- I think it was in the high

16   sevens, 7.70, something, maybe.

17   Q.  Turning now to page 162, and what does this Section D refer

18   to?  What were you communicating to Waste Pro?

19   A.  Yeah, and this is, again, talking about the regular rate

20   calculation.  And the question being asked here -- the question

21   we're answering here is whether the regular rate calculation

22   was made with all eligible pay included and all ineligible pay

23   excluded for purposes of overtime.

24          And this reflects our conclusion that in at least some

25   cases, the regular weekly safety bonuses have been attributed

MUÑOZ - DIRECT/TINGLEY

1   to a workweek other than the workweek when earned.  And the

2   example we gave is earned in week two of a pay period, but

3   attributed to week one.

4   Q.  And what do you say at the end, sometimes....

5   A.      "Sometimes both weekly bonuses were earned and

6       both were attributed to the first week, with no bonus

7       attributed to the second week."

8   Q.  Okay.  So, your advice was just to make sure that those got

9   split.

10  A.  That's not quite precise.  Our advice was to make sure that

11  they were allocated to the right week.  In some cases, they

12  might both be earned in one week and then should both be

13  attributed to that week.

14  Q.  Okay.  And now turning to page 163, what were you

15  communicating to Waste Pro in Section G?

16  A.  The question we were answering was whether employees who

17  worked over 40 hours in a workweek -- specifically referring to

18  day rate employees -- received half their regular rate for all

19  hours worked over 40 in a workweek.

20      And the comment that we make is that Waste Pro does

21  pay its employees a half time premium, but that there are

22  instances where it appears to have been calculated incorrectly.

23  And we refer back to the section we just discussed concerning

24  misallocation of bonuses.

25  Q.  So, if the safety bonus is -- one is earned each week, they

MUÑOZ - DIRECT/TINGLEY

1   need to be put in that workweek.

2   A.   Correct.

3   Q.   At the time that you rendered this advice to Waste Pro, was

4   your advice reasonable under your understanding of the law?

5   A.   Absolutely.

6         **MR. EDWARDS:**   Objection.   Improper lay opinion.

7         **THE COURT:**   Overrule.

8   A.   Yes.   We were very careful to make sure that we were

9   confident the advice we were giving was good advice, solid

10  advice, and accurate based on the law.

11  Q.   And did you follow up with Waste Pro at any time after to

12  see if they were adhering to your advice?

13  A.   We did not do another audit, but I did follow up to -- and

14  was pleased to learn that they were intending to implement our

15  recommendations.

16        **MR. EDWARDS:**   Objection.   Hearsay.

17        **THE COURT:**   Sustain.

18        **MR. EDWARDS:**   Move to strike.

19        **THE COURT:**   Ignore the last answer.

20  BY MS. TINGLEY:

21  Q.   Did you make any observations that would -- that led you to

22  believe that the advice you gave was being followed?

23        **MR. EDWARDS:**   Objection.   Calls for hearsay.

24        **THE COURT:**   Sustain.

25

MUÑOZ - CROSS/EDWARDS

1   BY MS. TINGLEY:

2   Q.  Besides being told something from Waste Pro, did you

3   observe anything on any subsequent visits that led you to

4   believe your advice was followed?

5   A.  In at least one particular instance.

6   Q.  Okay.  And can you describe that particular instance to the

7   jury?

8   A.  Yes.  We had another matter where we were asked to advise

9   concerning a specific driver and examine records related to

10  that driver, and found that Waste Pro was complying with the

11  recommendations we had made in our audit.

12  Q.  Okay.  And specifically to attributing bonuses to the

13  workweek, your concern?

14  A.  Yes.  And specifically to the southeast region of Florida

15  as well.

16          **MS. TINGLEY:**  Your Honor, may I have a moment?

17          **THE COURT:**  Okay.

18          (*Discussion had off the record between counsel*)

19          **MS. TINGLEY:**  Your Honor, I have no further questions

20  for this witness.

21          **THE COURT:**  Cross-examination.

22                          **CROSS-EXAMINATION**

23  BY MR. EDWARDS:

24  Q.  Good afternoon, Mr. Muñoz.

25  A.  Good afternoon.

MUÑOZ - CROSS/EDWARDS

1  Q.  Was what the scope of your retention for this particular

2  matter that you testified about today?

3  A.  That was it.  I was asked to testify here -- well, I was

4  asked to testify at a deposition.  I think you asked me to do

5  that.  And then to testify here today.

6  Q.  Okay.  Have you spoken to any of the attorneys or any of

7  the parties to this case about your testimony today?

8  A.  Yes.

9  Q.  Okay.  What did you guys talk about?

10  A.  We talked about Exhibit 3.  We talked about the legal basis

11  for the opinions that I had given.  We talked about the

12  opinion -- the specific opinion I had given concerning

13  calculation of the overtime rate for day rate employees.

14  Q.  Let me ask you this.  Did you talk about any of the

15  testimony that's come out in this trial?

16  A.  No.

17  Q.  Okay.  You spoke a little bit about your experience.  I

18  think you indicated about 50 percent of your practice is

19  advising clients, is that fair?

20  A.  Again, I haven't calculated it, but if I was trying to

21  estimate, I'd say it's a little more than 50 percent.

22  Q.  Okay.  When you say "clients," you mean companies,

23  employers, right?

24  A.  In most cases, our clients are employers.  Sometimes

25  they're individuals.

MUÑOZ - CROSS/EDWARDS

1    Q.   Okay.  You advise individual employees about FLSA

2    compliance?

3    A.   No, I don't believe I've advised individual employees about

4    FLSA compliance.

5    Q.   Okay.  So, when it comes to FLSA compliance, wage and hour

6    and the testimony you gave us about the percentage of your

7    practice that's dedicated to that, that's for companies, isn't

8    it?

9    A.   Yes.

10   Q.   Okay.  The audit that you spoke to Ms. Tingley about, that

11   was not for Waste Pro of Florida, was it?

12   A.   It was for, I believe, all of Waste Pro.  I don't remember

13   the corporate title.

14   Q.   We'll just look at the front page.  It says

15   "Waste Pro USA," doesn't it?

16   A.   It does.

17   Q.   Okay.  And so, when you're talking about regions, what are

18   the regions?

19   A.   Uhm, I don't remember the names of the regions.  I know

20   that there was a regional headquarters in Atlanta that I

21   visited.

22   Q.   Okay.

23   A.   There was a regional headquarters somewhere -- it was for a

24   region that was further west.  I think it was Louisiana,

25   Alabama, and maybe part of Georgia.

MUÑOZ - CROSS/EDWARDS

1   Q.   Okay.

2   A.   There was a region that included part of the Carolinas.

3   There was a region that included -- I think there were at least

4   two, maybe three regions in Florida.

5   Q.   Okay.

6   A.   One that was I think southeast, I think one that was

7   southwest, and one that was around the corporate headquarters,

8   which I think is Longwood.

9        That only seems like six.  I -- my -- the number six

10  in my head was seven (sic).  And, again, I don't remember the

11  specific designation or geographical scope of the regions.

12  Q.   Sure, sure.

13       And I think you testified that you evaluated like 200

14  sets of employee records?

15  A.   I think 200 sets of payroll records.

16  Q.   Okay.

17  A.   And that's just an -- it's just an estimate.  I don't

18  really have a number for --

19  Q.   That was over the seven regions across the country?

20  A.   I believe everything was southeast.  But, yes, over the

21  seven regions.  I think that's about right.

22  Q.   Okay.  What do you mean you believe everything was

23  southeast?  I thought you said that you evaluated seven regions

24  with 200 pay records.

25  A.   Yes.  I don't remember -- I'm sorry, I didn't mean to say

MUÑOZ - CROSS/EDWARDS

1   southeast Florida.  You said across the country.

2   Q.  Sure.

3   A.  I meant the southeast U.S.  I don't remember there being

4   anything outside the southeastern U.S.

5   Q.  Okay.  And without referencing any of your opinions for it,

6   the audit included a lot of different things other than just

7   wage and hour, didn't it?

8   A.  Yes.  It was broad side to side, top to bottom.

9   Q.  Okay.  This was the most comprehensive audit that you had

10  ever spearheaded in your career, wasn't it?

11  A.  I think that's correct, yes.

12  Q.  Okay.  How many attorney hours were spent on this?

13  A.  Give me a moment to reverse math in my mind.

14          (Pause)

15  A.  It -- I'm only estimating, but I would -- I'm quite certain

16  it was more than 500, and I think it was probably in the range

17  of a thousand.  But, again, I'm estimating, so....

18  Q.  Okay.  Would that be for the whole audit or would that be

19  for the wage and hour?

20  A.  For the whole audit.

21  Q.  Okay.  Do you know how much money your law firm was paid

22  for that audit?

23  A.  I do.

24  Q.  Okay.  How much?

25          **THE WITNESS:**  Your Honor, is that a question I have to

MUÑOZ - CROSS/EDWARDS

```
1    answer?
2            THE COURT:  Yes.
3    A.  $250,000.
4    Q.  Okay.  $250,000.
5    A.  We lost a lot of money on it, by the way.
6    Q.  Okay.  Okay.
7            Have any of the employees that you've worked with ever
8    paid you $250,000?
9    A.  Paid me personally?
10   Q.  Yes, sir.  For your advice.
11   A.  No.  None of my clients pay me personally.
12   Q.  Okay.  Any of the employees I mean, have any of the
13   employees?  I think you indicated you've given advice to
14   employees before.
15   A.  Yes, but my clients don't pay me personally.  My clients
16   pay my law firm.
17   Q.  Your law firm.  My apologies.
18            Are you being paid for your time to be here today,
19   sir?
20   A.  No, sir.
21   Q.  Okay.  What's your hourly rate?
22   A.  I have different hourly rates depending on the client.
23   They range from -- I always look at the time sheet -- at the
24   rate sheet when somebody asks me this, but from -- our
25   published rates range from around 400 to I think around 670 an
```

MUÑOZ - CROSS/EDWARDS

1   hour, for me.

2   Q.  Okay.  Do you know what your rate per hour was for this?

3   A.  I never calculated it, but it was much lower than that.

4   Q.  Okay.  Okay.

5          Is that because it was paid altogether, and you just

6   ended up doing more work?

7   A.  It's because we quoted a fixed fee for the work, and it

8   took substantially longer than we expected it would.

9   Q.  Okay.  You mentioned that this included the southeast

10  Florida region, correct?

11  A.  Yes, correct.

12  Q.  Can you say for certain if it included the Pembroke Pines

13  division of the southeast Florida region?

14  A.  I cannot say for certain that we visited the Pembroke Pines

15  region, but I'm quite certain that we reviewed records from

16  there.  Again, it would have been Ms. Mall who would have

17  visited.  Unfortunately, she's passed away, so --

18  Q.  Okay.  Our apologies.

19  A.  -- I couldn't check with her to find out specifically where

20  she was.

21  Q.  Can you say for certain if it included the Pompano

22  division?

23  A.  No, I can't say for certain.

24  Q.  Okay.  You've never met Mr. Andreu, have you?

25  A.  Not to my knowledge.

MUÑOZ - CROSS/EDWARDS

1   Q.   And you can't tell us for sure if you have ever reviewed

2   any of Mr. Andreu's time records in coming to any of the

3   opinions that are contained in that report, can you?

4   A.   My recollection is that he didn't start working at

5   Waste Pro until after our audit.

6   Q.   What's your recollection of when he started working at

7   Waste Pro based on?

8   A.   I think I read your complaint in the lawsuit.

9   Q.   Okay.  Were you preparing for this testimony?

10  A.   Preparing for your -- for the deposition you took.

11  Q.   Okay.  Do you have any information about how Mr. Andreu's

12  pay rate was explained to him?

13  A.   No.

14  Q.   Okay.  Do you know if in interviewing any of the folks that

15  you mentioned, did you interview any grapple truck drivers?

16  A.   I don't remember that specific job title.  I know I

17  interviewed a large number of drivers.

18  Q.   How about bulk route drivers?

19  A.   Again, I don't remember that job title.

20  Q.   Okay.  How about lead truck drivers?

21  A.   For all three of those positions, I'm not -- I cannot tell

22  you I didn't interview people in those jobs, but I don't

23  remember those job titles.

24  Q.   Okay.

25  A.   In fact, I looked at every -- the company had a lot of job

MUÑOZ - CROSS/EDWARDS

1   titles when we did our audit.  And in some cases, there were

2   identical or nearly identical positions which at different

3   regions had different job titles.  But I don't recall -- until

4   I think maybe at my deposition, I don't recall hearing any of

5   those three job titles.

6   Q.  Okay.  You interviewed regional vice presidents, though,

7   didn't you?

8   A.  Absolutely.

9   Q.  You interviewed Mr. Mackie?

10  A.  I believe I did interview Mr. Mackie at the Longwood

11  location, yes.

12  Q.  Was it a memorable experience?

13  A.  Not so memorable that I can sit here today and say I'm a

14  hundred percent certain that it occurred, but I believe it did.

15  Q.  Okay.  You believe it did.

16  A.  Yes.  I do recall interviewing several executives at the

17  Longwood office.

18  Q.  Okay.  During your audit, you expressed some concerns about

19  the allocation of the weekly safety bonuses per week rather

20  than together in the two-week period?

21  A.  Correct.

22  Q.  Okay.  So, when you provide a recommendation for them,

23  you're providing a recommendation that they modify one of those

24  policies, are you not?

25  A.  *(No response)*

MUÑOZ - CROSS/EDWARDS

1   Q.  You're making a recommendation that a policy be changed.

2   A.  I'm recommending that a practice be changed.

3   Q.  Practice.  Not a policy, perhaps.

4   A.  And when I say "practice," again, it wasn't a company-wide

5   practice.  We had found examples where the wrong practice had

6   been implemented.

7   Q.  Okay.  Is there anything indicating in your report when it

8   references -- I believe your term is "collapsing the bonuses

9   into the two-week period," is there any recommendation for a

10  particular branch?  How do we know who is being spoken to here?

11  A.  We were speaking company-wide.

12  Q.  Company-wide.

13  A.  Yeah.

14  Q.  For Waste Pro of USA.

15  A.  Correct.  And I don't remember the organizational structure

16  well enough to know how Waste Pro Florida fits into

17  Waste Pro USA.

18  Q.  Waste Pro of USA is who you wrote the report for, right?

19  A.  That's correct.

20  Q.  Okay.  You talked a lot about the information that you were

21  provided in the audit.  Do you know if you were provided all of

22  the information regarding their pay practices?

23  A.  Well, I've already said we reviewed a sampling of payroll

24  records.  So, no, we didn't review every single document

25  relating to pay.

MUÑOZ - CROSS/EDWARDS

1    Q.  Not every single document relating to pay.  That would be

2    unreasonable for us to ask you to do that with this many

3    employees.  But do you know for certain that the policies of

4    Waste Pro were given to you to make your review?

5    A.  I know that we received a large number of policies, and

6    that we did our very best to determine that we had all the

7    policies that were being applied in all -- in any and all of

8    the regions.

9    Q.  Okay.

10   A.  Can I be absolutely certain that we received every one?

11   Not unless I, you know, did a Michael Cohen's office style raid

12   and, you know, went in and --

13   Q.  Very topical.

14   A.  -- pulled open all the file cabinets.

15   Q.  Were you ever told about a half day rate policy?

16   A.  I don't recall knowing about a half day rate policy.

17   Q.  Okay.

18   A.  Again, that was five years ago.

19   Q.  Were you ever told about a policy where day rate employees

20   would be paid less than their full day rate if they worked less

21   than 4.1 hours?

22   A.  And I should be clear.  I assumed your question was talking

23   about during the audit.  I wasn't referring back to the

24   deposition you took.

25   Q.  Certainly.  Yes, during the audit.

MUÑOZ - CROSS/EDWARDS

1   A.  I don't recall that either, no.

2   Q.  Okay.  Did you discuss Waste Pro's 1098 policy?

3   A.  I'm sure we --

4        **MS. TINGLEY:**  Objection, your Honor.  Outside the

5   scope.

6        **THE COURT:**  Sustain.

7   BY MR. EDWARDS:

8   Q.  Is there anything in your report that references that

9   policy?

10       **MS. TINGLEY:**  Objection, your Honor.  Outside the

11  scope.

12       **THE COURT:**  Sustain.

13       **THE COURT REPORTER:**  I didn't get the last word.  You

14  have to be on a microphone.

15       **MS. TINGLEY:**  Oh.

16  BY MR. EDWARDS:

17  Q.  Do you know if they have any policy in place to require a

18  supervisor to report when bonus time is earned?

19       **MS. TINGLEY:**  Objection, your Honor.  Outside the

20  scope.

21       **THE COURT:**  Sustain.

22  BY MR. EDWARDS:

23  Q.  As a component of your review, are you aware if Waste Pro

24  has signed agreements with their employees?

25       **MS. TINGLEY:**  Objection, your Honor.  Outside the

MUÑOZ - CROSS/EDWARDS

1  scope.

2          **THE COURT:**  No, I'll allow that.

3  A.  I know Waste Pro has signed agreements with some of its

4  employees.

5  Q.  Okay.  And pertaining to your evaluation of the wage and

6  hour policies, compliance, and the analysis that you did, is

7  what's contained in the unredacted portions of this -- is that

8  the extent of it?

9  A.  I don't understand your question.

10 Q.  So, if we look at this report, if we want to know if there

11 was anything else you advised specifically relating to their

12 payment of employee wages, is this the extent of it?

13         **MS. TINGLEY:**  Objection, your Honor.  May we approach?

14         **THE COURT:**  Well, who asked for the redactions?

15         **MS. TINGLEY:**  Waste Pro.

16         **THE COURT:**  Overruled.

17 A.  It -- I'm still not sure I understand your question.  I

18 mean, is this --

19 Q.  I'm asking you if you gave them any advice that's contained

20 in any of the blacked-out portion here that's not what's given

21 to us.

22         **MS. TINGLEY:**  Objection to that, on the form.

23         **THE COURT:**  Overruled.

24 A.  We -- yes.  I mean there are many sections here that are

25 blacked out.

MUÑOZ - CROSS/EDWARDS

1   Q.  Do you know why we're only being given the portions dealing

2   with collapsing the weekly safety bonuses and calculation of

3   the regular rate?

4   A.  No, I know --

5        **MS. TINGLEY:**  Objection, your Honor.

6   A.  I know nothing about that.

7        **THE COURT:**  If you want to put in the blacked-out

8   portions, you can put them in, Mr. Edwards.

9        **MR. EDWARDS:**  Your Honor, a moment to confer?

10       *(Discussion had off the record between counsel)*

11  BY MR. EDWARDS:

12  Q.  Do you recall any of the substance of what's contained in

13  your opinions here?

14  A.  You mean in the redacted sections?

15  Q.  Yes, sir.

16  A.  Well, I'd have -- I'd have to give some time to that.  I'm

17  sure I could recall some of it if I thought about it.  Again,

18  the audit was five years ago.  As I mentioned earlier, we did a

19  top down audit, including of all of the payroll practices.  So,

20  I'm certain that one of the things that we addressed was exempt

21  employees and whether they were properly classified exempt,

22  whether they were properly paid as exempt.  I'm quite sure that

23  we had --

24       **MS. TINGLEY:**  Your Honor, I'm gonna tender a new

25  objection.  Can we approach?

MUÑOZ - CROSS/EDWARDS

1          **THE COURT:**  Overruled.

2  A.    I'm quite sure that we spent time looking at whether there

3  were independent contractors, and I believe there were, if I

4  recall correctly, and whether they were being properly

5  classified as independent contractors.  I'm sure we would have

6  looked to make sure that every employee was receiving minimum

7  wage -- at least minimum wage for their hours worked.  I don't

8  think it applied to day rate employees, but I'm sure we would

9  have looked at whether employees who weren't on a day rate and

10  weren't on salary were being paid properly for meal breaks.  We

11  would have looked at -- I'm sure we looked at start and stop

12  times and any procedures regarding rounding of time at start

13  and stop.

14          I know that we looked at the possibility that --

15  because it's always a concern anytime we do an audit of this

16  nature -- the possibility that there might be employees doing

17  things like working at home, doing compensable work, exchanging

18  emails with bosses after hours or with coworkers after hours.

19  Those sorts of things.

20          I know we looked at travel and whether employees were

21  properly being compensated for travel time.  I'm sure we looked

22  at what's called the continuous workday rule, to make sure that

23  that was being complied with, with respect to counting hours of

24  employees.  Uhm, that's what comes to mind now.  I'm sure there

25  were other things as well.  Again, it was --

MUÑOZ - CROSS/EDWARDS

1    Q.  Did you advise Waste Pro to put any of their payment

2    policies in writing for their employees?

3    A.  I -- I don't remember off the top of my head whether

4    Waste Pro had employees who were being paid on a fluctuating

5    workweek basis.  If they did, we would have recommended that

6    those be in writing -- that there be some writing with those

7    employees reflecting the pay plan.

8    Q.  How about employees classified by Waste Pro as day rate

9    employees, did you advise that they should be in writing?

10   A.  Not that I recall.

11   Q.  Okay.

12            MR. EDWARDS:  One moment, your Honor?

13            (Discussion had off the record between counsel)

14   BY MR. EDWARDS:

15   Q.  As a component of your review, did you -- in generating the

16   report that has been put into evidence, were you told that any

17   employees were required to call in and could be requested upon

18   call in to do extra work?

19   A.  I know that's an issue that I've dealt with fairly often.

20   I don't recall whether that was an issue we dealt with --

21   Q.  It wasn't a part of this?

22   A.  I don't recall that being a part of this.  It doesn't mean

23   it wasn't, but not that I recall.

24   Q.  Okay.  It's not in any of the unredacted portions of your

25   report, though, is it?

476

MUÑOZ - REDIRECT/TINGLEY

1  A.  No, but our report, if I recall correctly, was more than

2  200 pages.

3  Q.  Okay.  Do you know why we only get ten of them?

4  A.  Again, I know nothing about what's gone in this litigation

5  and how determinations were made about what was produced or how

6  it was produced.

7          **MR. EDWARDS:**  No further questions for the witness,

8  your Honor.

9          **THE COURT:**  Redirect?

10                    **REDIRECT EXAMINATION**

11  BY MS. TINGLEY:

12  Q.  Sir, you said on cross-examination that if someone worked

13  under the fluctuating workweek, that you would have to put that

14  method in writing?

15  A.  Yes.

16  Q.  Can you just --

17          **MR. EDWARDS:**  Objection.  Outside the scope.

18          **THE COURT:**  No, you asked about that.  He talked about

19  it.

20          Overruled.

21  BY MS. TINGLEY:

22  Q.  Can you just give the jury the benefit of what you mean by

23  the "fluctuating workweek"?

24  A.  Sure.

25          **MR. EDWARDS:**  Objection.  Improper lay opinion.

MUÑOZ - REDIRECT/TINGLEY

1      **THE COURT:**  Overruled.

2    A.  The fluctuating workweek is a -- the regulations we talked

3    about before and case law, the court decisions, set out a

4    number of different ways that overtime can be calculated

5    depending upon the circumstances.  One is the day rate.

6    Another is the fluctuating workweek.  There's a different

7    regulation that applies to that, and it has different

8    requirements.  One of which is that there has to be a clear

9    understanding --

10     **MR. EDWARDS:**  Objection, your Honor.  Improper lay

11   opinion.

12     **THE COURT:**  Overruled.

13   A.  And for that reason -- even though I don't think the

14   regulation expressly requires that it be in writing, I

15   recommend to my clients that they do have an agreement in

16   writing when they use the fluctuating workweek plan.

17     Fluctuating workweek plan, you get a -- you have to

18   guarantee a salary each week, regardless of the number of hours

19   worked.  And, again, unlike the day rate regulation, it

20   specifically says that it has to be a guaranteed salary that

21   doesn't change when the hours change.  And like the day rate,

22   it's also a half time for overtime with a fluctuating workweek

23   plan.  So, you divide the salary by the number of hours, and

24   similar to day rate, if there was a bonus for the week, you'd

25   divide the salary plus the bonus by the number of hours, figure

MUÑOZ - REDIRECT/TINGLEY

1  out the regular rate, pay half time for the overtime hours.

2  Q.  I believe counsel for the plaintiff interrupted while you

3  were in the middle of your statement.  Did you say there has to

4  be a clear understanding?  I had a --

5  A.  Yes.  The regulations require -- the fluctuating workweek

6  regulation requires that there be a clear understanding between

7  employer and employee that the salary is to pay straight time

8  compensation for all hours worked in the week, whether few or

9  many.

10 Q.  Now, you then said with regard to the day rate employees

11 that you would not -- you don't recall making that same

12 recommendation that the method be in writing.  Why is that?

13 A.  There's nothing like that in the regulation or in the

14 Supreme Court decision or the Eleventh Circuit decision.

15 There's no requirement like that.

16 Q.  No requirement like what?

17 A.  For there to be --

18       **MR. EDWARDS:**  Your Honor, outside the scope of cross

19 and improper lay opinion.

20       **THE COURT:**  Overruled.

21 A.  For there to be a -- there is supposed to be an

22 understanding, but it's clear that the understanding can come

23 from how the pay has been done over time, and it's expressed

24 differently in the statute.  So, our legal judgment is that

25 you -- the best practice is to have the writing for the

1   fluctuating workweek, but we don't think that it is required

2   for the day rate.

3         **MS. TINGLEY:**  Thank you.  Nothing further.

4         **THE COURT:**  Thank you, Mr. Muñoz.  You may step down.

5   You're excused.

6         **THE WITNESS:**  Thank you, your Honor.

7         *(Witness excused)*

8         **THE COURT:**  All right, members of the jury, we're

9   going to take a ten-minute recess.  Remember my admonition not

10  to discuss the case or allow it to be discussed in your

11  presence.  And we'll see you back in the jury room in about ten

12  minutes.

13        **COURTROOM SECURITY OFFICER:**  All rise.

14        *(The jury exited the courtroom)*

15        **THE COURT:**  Ms. Tingley, you have some more witnesses?

16        **MS. TINGLEY:**  Yes.

17        **THE COURT:**  Okay.  So, we'll be in recess for about

18  ten minutes.

19        **COURTROOM SECURITY OFFICER:**  All rise.

20        *(The Judge exited the courtroom)*

21        *(Recess taken at 2:57 p.m. until 3:18 p.m.)*

22        *(The Judge exited the courtroom)*

23        **COURTROOM SECURITY OFFICER:**  All rise.

24        *(The Judge entered the courtroom)*

25        **THE COURT:**  Please be seated.

1      *(Pause)*

2      *(Defense counsel entered the courtroom)*

3      **THE COURT:**  All right.  We're back on the record.

4      Counsel are present.

5      Anything to come before the Court before we bring the

6      jury in?

7      **MS. TINGLEY:**  Your Honor, we were gonna just ask about

8      scheduling.  We have -- we're gonna put Mr. Mackie on the stand

9      again.  He'll take, I would think, less than an hour.  I had

10     spoken to plaintiff's counsel about perhaps -- we have, I don't

11     know, maybe six or seven contested jury instructions, but now

12     that the evidence is in, maybe we can sit down and see if we

13     can now reach accord on any of them before we bring them to the

14     Court.

15     **THE COURT:**  Well, we'll see how much time we got.  I

16     mean if we finish this afternoon at 4:30, then we'll do a

17     charge conference at that point.  If you want some time to try

18     to work something out before the charge conference, I could

19     probably give you some time.  It just depends on what time

20     we're going to get done with the testimony.

21     **MS. TINGLEY:**  Okay.  I think in any circumstances,

22     we're asking the Court if we could do closing tomorrow?

23     **THE COURT:**  Yeah, we can do that.

24     **MS. TINGLEY:**  Okay.

25     **MR. ROSENTHAL:**  Your Honor, are motions at the end of

MACKIE - DIRECT/TINGLEY

1   the defendants' case gonna be before the charge conference?

2          **THE COURT:**  Sure.

3          **MR. ROSENTHAL:**  Okay.

4          **THE COURT:**  All right.  Let's bring in the jury.

5          **COURTROOM SECURITY OFFICER:**  All rise.

6          *(The jury entered the courtroom)*

7          **THE COURT:**  And we have all the jury back.

8          Did everyone follow my admonition not to discuss the

9   case or allow it to be discussed in your presence?

10          All right.  Ms. Tingley, you may call your next

11   witness.

12          **MS. TINGLEY:**  The defense calls Russell Mackie.

13          **THE COURT:**  And, Mr. Mackie, you understand you're

14   still under oath?

15          **THE WITNESS:**  Yes, sir, I do.  Thank you.

16          **THE COURT:**  Ms. Tingley, you may proceed.

17          **MS. TINGLEY:**  Thank you, your Honor.

18                         **DIRECT EXAMINATION**

19   BY MS. TINGLEY:

20   Q.  Mr. Mackie, by whom are you employed?

21   A.  Waste Pro of Florida.

22   Q.  And what is Waste Pro Florida's relationship to Waste Pro

23   of USA?

24   A.  It's a subsidiary.

25   Q.  Are all the employees in your region employees of Waste Pro

MACKIE - DIRECT/TINGLEY

1   Florida?

2   A.   Yes, they are.

3   Q.   And you heard the testimony about the audit of Ford and

4   Harrison.   Did your region participate in that audit?

5   A.   Yes.

6   Q.   And did your region receive the opinions and

7   recommendations and legal advice contained within that audit

8   report?

9   A.   Yes, we did.

10  Q.   Now, you heard references to grapple truck drivers and bulk

11  truck drivers throughout Mr. Muñoz's testimony?

12  A.   *(No response)*

13  Q.   Do you recall that?

14  A.   Yes.

15  Q.   Okay.   And are all those drivers residential drivers in

16  your area, in the Pompano division, Pembroke Pines?

17  A.   Yes.   Any driver that drives collecting from residential

18  service units, whether it's a grapple truckdriver or recycling

19  truckdriver, a residential driver, they would -- they all roll

20  up under the residential driver bucket.

21  Q.   Now, you've been here for all of the testimony this week,

22  Mr. Mackie, right?

23  A.   Yes, I have.

24  Q.   Okay.   Are you a defendant in this lawsuit?

25  A.   Yes, I am.

MACKIE - DIRECT/TINGLEY

1  Q.  Okay.  And what -- what do you -- what does that mean to

2  you?

3  A.  It -- it means that I'm here defending myself against a

4  claim.

5  Q.  Okay.  So, you've been sued.

6  A.  Yes.

7  Q.  So, when Mr. Andreu testified that you were just here in

8  some sort of capacity with your relationship to Waste Pro and

9  not as a individual defendant, is that accurate in your mind?

10       **MR. EDWARDS:**  Objection.  Calls for a legal

11  conclusion.

12       **THE COURT:**  Overruled.

13  A.  No, I -- I don't -- you know, just when I was sitting this

14  morning reading through my deposition, it -- right on that

15  deposition, it says, you know, Roger Andreu vs. Waste Pro and

16  Russell Mackie, individually.  And, you know, it just -- I see

17  that involving me.

18  Q.  You were present for Mr. Andreu's testimony yesterday and

19  the day before, were you not?

20  A.  Yes, I was.

21  Q.  Okay.  And when you testified during the plaintiff's case,

22  you were asked about write-ups and performance issues and the

23  like with Mr. Andreu.  Do you recall that testimony?

24  A.  Yes.

25  Q.  Now, at the time, you said you didn't recall whether or not

MACKIE - DIRECT/TINGLEY

```
1   he was ever written up, docked, suspended, terminated for not

2   following policies.

3   A.   That's correct.

4   Q.   You heard Mr. Andreu testify.  And at the time he was your

5   employee, can you just describe what you thought he was doing

6   on the job every day compared to what he said?

7            MR. EDWARDS:  Objection.  Speculation.

8            THE COURT:  Sustain.

9   BY MS. TINGLEY:

10  Q.   Was what Mr. Andreu told the jury this week he was doing

11  when working with Waste Pro -- was that consistent with what

12  you believed from Mr. Andreu at the time of his employment that

13  he was doing for Waste Pro?

14  A.   Well, there's -- there's more to being an excellent

15  employee than just showing up and working very hard.

16            You know, there -- again, there's no dispute that

17  Mr. Andreu was a very hard worker and would do, you know, the

18  job that was asked when encompassing picking up the trash.  But

19  I was actually very surprised to hear, Hey, I wasn't 1098ed, I

20  wasn't pretripping my truck, I wasn't post-tripping my truck.

21  Those are criteria that would make me say that a driver is not

22  the quality of the driver that I would have thought.  And

23  that's not an attack on his hard work ethic.  It's just there's

24  more to work than showing up and getting the stuff up.

25            So, you know, I just learned something new.  I really
```

MACKIE - DIRECT/TINGLEY

1  thought he was doing all those things.

2  Q.  When Mr. Andreu testified, he said that at some point, he

3  became a lead driver.  Can you just describe for the jury what

4  that means at Waste Pro?

5  A.  Well, you know, a lead driver is such an essential

6  position, because you put your new driver or the individual

7  who's in training with that individual to learn all of the

8  company's policies, procedures, which involve from clocking in,

9  all the way out till you get back.  So, that pretrip, that lead

10  driver should say, Hey, this is what we do first thing in the

11  morning, we go, we walk around, we write all these things up,

12  we make sure the truck is in good condition, we go out on to

13  the route, we drive the route.  We, you know, make sure we

14  provide service in an acceptable manner.  We finish the route.

15  We 1098.  We call our supervisor and say, Hey, we're done.  We

16  go to the dump before we go back.

17         You know, leaving trash on the truck is a major safety

18  concern.  People put pool chemicals and things in their trash

19  that they're not supposed to.  They're combustible.  A fire

20  starts in the truck, and now your truck is sitting back at the

21  facility in line with 50 other trucks.  I mean you could --

22         **MR. EDWARDS:**  Objection.  Narrative.

23         **THE COURT:**  Next question.

24  BY MS. TINGLEY:

25  Q.  In Mr. Andreu's testimony, he spoke about how he would not

MACKIE - DIRECT/TINGLEY

1   take his trash to the dump, he would just do it the next day.

2           Did that concern you, that testimony?

3   A.  Yes, it did.

4   Q.  Why did it concern you?

5   A.  The safety risks of having trash on the trucks is a

6   problem.  The only reason you should not go to the dump before

7   coming back to the yard or bring trash on the truck is because

8   the dump is closed when you're coming back to the yard.  The

9   dump closes about five o'clock, and occasionally we do have

10  trucks that would come back.  But if you can make the dump,

11  policy is to bring the truck in empty.

12          Also, if the maintenance department needs to work on

13  the truck, the truck needs to be empty to be able to work on

14  it, make repairs to it, open it to do things.  So, it's very,

15  very important that the truck is empty when it comes back to

16  the yard.

17  Q.  And when you heard Mr. Andreu's testimony about all these

18  requirements of his job that he chose to not do, did that give

19  you any concerns, because of he had held the role of a route

20  supervisor or a lead driver?

21  A.  It did.

22  Q.  Why?

23  A.  Well, you have the teacher teaching the pupil and not

24  teaching them the correct way.

25  Q.  Can you explain to the jury the circumstances of the

MACKIE - DIRECT/TINGLEY

1  conversation you had with Mr. Andreu when you promoted him to

2  that role?

3  A.  You know, I met with Roger on multiple occasions, and I

4  talked to him -- I thought Roger would eventually grow into a

5  supervisor.  I mean he just -- he was a -- he was a mover, he

6  was a shaker, but he was a good talker, and he was a good

7  motivator.

8         But to make that journey to that position, you need to

9  lead by example in all the facets of what an excellent driver

10 should be doing.  And that is what I say to any employee that's

11 trying to go up.  You know, do all the parts to the best of

12 your ability, and you'll get to where you want to be.

13 Q.  So, when you -- do you recall having a conversation with

14 him when you -- when he became a lead driver, when you gave him

15 that promotion, and he went to you and asked for it?

16 A.  Yes, I recall speaking to him and saying, you know, Roger,

17 I need you to help develop the talent at this division.  You

18 need to -- you need to be a teacher here, you need to be a

19 leader here.

20 Q.  And what did he tell you?

21 A.  Absolutely, Russell.  You know, you got me, you got me a

22 hundred percent, I'm there.  Thank you.

23 Q.  And the man that you heard testify this week, is that your

24 understanding about how he was performing his job when he

25 worked for you?

MACKIE - DIRECT/TINGLEY

1   A.   No.   To my surprise, he -- you know, there was a lot of

2   things that were not happening that should have been happening.

3   It was disappointing.

4   Q.   When -- you spoke earlier about Mr. Andreu always wanting

5   to make more money.

6        Now, how often would you talk to him about that?

7   A.   I can't say for certain, but it -- it was a pretty regular

8   topic that, you know, Roger -- again, he said, Hey, man, you

9   know, I lost 22 years of my life, and I want to get ahead.   I

10  need to -- I need to make money.   You know, I want to make some

11  money, I want to try to, you know, do things that I've missed

12  out on.

13       So, it was a regular conversation topic, not an all

14  the time topic.   We talked about a lot of other things.   It

15  wasn't always specific to money.

16  Q.   Now, how often are you at the -- during the tenure of his

17  employment, how often were you at the Pembroke Pines division

18  when he was there, during the time he worked there?

19  A.   Before we opened the Pompano location, you know, Pembroke

20  Pines was the office I reported to, you know, three to four

21  times a week.

22  Q.   And so, when Mr. Andreu said that he maybe saw you every

23  month, every couple months, do you think that was accurate?

24  A.   No.   We saw each other more regularly than every -- every

25  other month or every month.

MACKIE - DIRECT/TINGLEY

1   Q.  And in addition to seeing him, how else would you

2   communicate with him?

3   A.  We would -- we would talk by phone occasionally, but, ah,

4   predominantly text messages, just, you know, back and forth

5   text messages on things.

6   Q.  Now, he said that you guys would text message each other

7   about -- maybe on Sundays about fantasy football.  Any

8   work-related texts that you -- if you can remember?

9   A.  You know, maybe an occasional, Hey, Russ, the truck -- can

10  you get me some help and get somebody to look at the truck?

11  You know, I'm having a little bit of issue with something on

12  the truck.  There'd be a, you know, a maintenance component to

13  a text occasionally.

14        But, really, nothing, you know, other than towards the

15  end of his employment, when I told him that there was potential

16  that I would consider him for a supervisor position, he would

17  text every once in a while, Hey, have you put any thought into

18  that?  Those are the only other work things I can think of.

19  Q.  But, certainly, he had access to you via text message.

20  A.  And telephone.  And if he said, Hey, I really need to see

21  you in person, I'd go -- go see him in person.

22  Q.  You'd make sure that you were there when he was there to

23  meet with him?

24  A.  Yeah, I mean not -- I won't say like I'd drop what I was

25  doing to run over there.  I'd say, Hey, Rog, I'm busy, you

MACKIE - DIRECT/TINGLEY

1  know, give me a week, give me a day, let me make it over there

2  next time and see you.  But very accessible.

3  Q.  Now, you said earlier in the week that you had a very good

4  relationship with Mr. Andreu.  You thought he was a good guy

5  when he worked for you.  Do you recall that testimony?

6  A.  Yes.

7  Q.  And -- now, having heard him testify, has your opinion

8  changed?

9          **MR. EDWARDS:**  Objection.  Relevance.

10          **THE COURT:**  Sustain.

11  BY MS. TINGLEY:

12  Q.  When -- you said that you were aware about what had

13  happened to him and his past before coming to Waste Pro.  Is

14  that the first time that you, in your region or in the

15  divisions in your region, have given someone, you know, a

16  second chance after getting out of jail?

17  A.  No, it's not first time we've given somebody an

18  opportunity.

19  Q.  Okay.  And in dealing with Roger throughout his tenure,

20  what did you believe was the most -- what was communicated to

21  you by him -- what was the most important aspect of his job

22  with Waste Pro?  What was he emphasizing in his mind?

23  A.  You know, Roger wanted to make money.  He needed to make

24  money.  You know, I -- there -- there was definitely a

25  component of fitting in and team work, but Roger wanted to make

MACKIE - CROSS/EDWARDS

1  as much money as he possibly could.  He wanted to know what the

2  things he could do to do that.

3  Q.  And as you sit here today, do you have recollection of a

4  single instance where he said to you, Russell, I'm not getting

5  my bonus pay?

6  A.  I don't have any recollection of him ever saying that he

7  did not get his bonus pay to me.

8      **MS. TINGLEY:**  May I have a moment, your Honor?

9      **THE COURT:**  Okay.

10      *(Discussion had off the record between counsel)*

11  BY MS. TINGLEY:

12  Q.  Had Mr. Andreu said that to you, what would you have done?

13  A.  I would have certainly called the HR, whoever was involved.

14  If he would have said, Hey, this certain supervisor didn't get

15  it, I would have either called that supervisor and said, Why

16  didn't you put in for Roger's bonus, or I would have called the

17  HR department and said, Was it turned in, and I would have paid

18  it.  I would have said, Hey, you know, we gotta get the guy

19  paid, let's pay him.

20      **MS. TINGLEY:**  Thank you.  I have no further questions.

21      **THE COURT:**  Cross-examination.

22      **MR. EDWARDS:**  Yes, your Honor.

23                    **CROSS-EXAMINATION**

24  BY MR. EDWARDS:

25  Q.  Good afternoon, Mr. Mackie.

MACKIE - CROSS/EDWARDS

1   A.  Good afternoon.

2   Q.  You mentioned being named personally as a defendant in this

3   case.  Would it be fair for me to say that you don't understand

4   the legalities behind that?

5   A.  Uhm, I don't -- I don't know.  Consider myself a pretty

6   smart guy, and I'm sitting here in a courtroom, and my name's

7   on a lawsuit.  So --

8   Q.  Sure.  But you don't know why that happened, right?

9   A.  It happened.

10  Q.  For sure.

11       And you heard him testify yesterday that he doesn't

12  want damages from you.  He wants damages from the company for

13  unpaid wages.  He's not holding anything against you.  Nothing

14  personal.  You heard that, didn't you?

15  A.  I probably shouldn't have been on the lawsuit then.

16  Q.  So, you also testified with Ms. Tingley that you were

17  surprised to find out that Roger sometimes hadn't dumped the

18  truck at the end of the day, hadn't attended a safety meeting

19  here or there.  You were surprised by that, weren't you?

20  A.  Yes.

21  Q.  But you have policies in place to find that information

22  out, don't you?

23  A.  I was surprised that Roger was not doing those things.

24  Q.  Yes.  But you have policies in place at Waste Pro under

25  your management that are designed to see when people don't do

MACKIE - CROSS/EDWARDS

1   those things, right?

2   A.  Yes.

3   Q.  You don't think that Roger's the only one that maybe

4   doesn't dump the truck at the end of the day, do you?

5   A.  It depends on the circumstances.  As I said to you before,

6   if you're there after a certain time, and the dump is closed,

7   you would not dump the truck at the end of the day.

8        But when you work 3.3 hours, and you clock out at

9   12 o'clock, and you say, No, that's probably a day I didn't

10  dump the truck, that gives me more context to say, You're

11  blatantly, you know, disregarding a rule.

12  Q.  When he worked for you, you not only gave him promotions

13  and put him in charge of more things, but you often gave him

14  raises, didn't you?

15  A.  Yes.

16  Q.  That's because he's a good employee.

17  A.  I -- I -- my testimony has been, I thought Roger was

18  definitely a good employee.  I thought he was a better -- one

19  of our better employees.

20  Q.  Has that changed, because in this trial, he's told you that

21  he didn't attend safety meetings?

22  A.  Yes.

23  Q.  I think you testified the other day that sometimes it was

24  okay for them to miss safety meetings when you were justifying

25  why the policy didn't catch that.

MACKIE - CROSS/EDWARDS

1    A.   No, I said safety meetings were mandatory.

2    Q.   Okay.

3    A.   I said we had second safety meetings to help catch the

4    early leaving trucks.  I never said I was okay with anybody not

5    attending a safety meeting.

6    Q.   Did you ever ask him to train other drivers?

7    A.   In our conversation of becoming a lead driver and being a

8    leader at the facility, not specific to how he should go about

9    training a lead driver.

10   Q.   I want to ask you a couple more questions.

11        When you would give him these pay raises, you told him

12   that that was so that you could justify those pay raises to

13   corporate, didn't you?

14   A.   You'd have to rephrase that question or --

15   Q.   You gave him pay raises, right?

16   A.   Well, the division gave him pay raises.  I suggested that

17   they --

18   Q.   Sure, sure.

19   A.   -- they put forward his pay, and I would approve it.

20   Q.   Yeah.  And you did that so that it would be justified so

21   that corporate would okay it, right?

22   A.   What would be justified?

23   Q.   The pay raise, so that he could make more money for doing

24   all the work he was doing.

25   A.   He came to me and asked for more money.

MACKIE - CROSS/EDWARDS

1  Q.  Okay.

2  A.  I thought he deserved more money, so I put him in -- well,

3  I asked the division to put him in for a pay raise.

4  Q.  And did you tell him that the change in title was so that

5  you could justify it to corporate?

6  A.  The responsibility in becoming a lead swing driver is, what

7  Roger became, you drive more multiple pieces of equipment, and

8  you become a lead -- you know a lead personnel that trains.

9          By getting into that bucket, that would justify to

10  corporate a change in compensation.  That was not absent of the

11  responsibilities that go along with it.

12  Q.  Sure.

13  A.  So, hey, by Roger, if you can take this position and go

14  into this position, you'll be able to get into that higher

15  bucket.

16  Q.  Did you or did you not tell him that you had to change his

17  position so that you could justify it to corporate?

18  A.  I think I just answered that question.

19  Q.  I don't think you did.

20  A.  I said, Roger, you -- the lead driver position pays more

21  money.  You want to make more money, you go to the lead driver

22  position.

23  Q.  You didn't tell him that you had to change it so that

24  corporate would okay the pay increase?

25  A.  No.

1   Q.  You spoke to Ms. Tingley about some of the pay raises that

2   Roger or -- excuse me -- the bonus -- extra work bonuses

3   Roger's testified about.  Do you remember that testimony?

4   A.  Yes.

5   Q.  And you said that he could have come to you at any time and

6   given you his complaint, and you would have taken care of it.

7   A.  Yes.

8   Q.  While that's appreciated, he shouldn't have to do that,

9   should he?  He shouldn't have to go to his regional vice

10  president to ask that the company's policies on paying him be

11  followed, should he?

12  A.  No, he should not.

13  Q.  Okay.

14          **MR. EDWARDS:**  No further questions, your Honor.

15          **THE COURT:**  Redirect?

16          **MS. TINGLEY:**  Nothing further.  Thank you, your Honor.

17          **THE COURT:**  Thank you, sir.  You may step down.

18          Anything further, Ms. Tingley?

19          **MS. TINGLEY:**  No.  The defense rests.

20          **THE COURT:**  Any rebuttal, Mr. Edwards?

21          **MR. EDWARDS:**  No, your Honor.

22          **THE COURT:**  All right, members of the jury, we're

23  going to go ahead and recess for the evening.  Remember my

24  admonition not to discuss the case or allow it to be discussed

25  in your presence.  I have to go over the jury instructions with

1    the lawyers.  We'll do that this afternoon.

2            I've got a hearing at nine o'clock.  So, I'm gonna ask

3    you to come in at 9:30.  And hopefully at 9:30, we're going to

4    be able to proceed with closing arguments.

5            So have a nice evening.  We'll see you back at 9:30.

6            **COURTROOM SECURITY OFFICER:**  All rise.

7            *(The jury exited the courtroom)*

8            **THE COURT:**  Let me hand out a rough draft of a verdict

9    form and jury instructions so you guys can start looking at it.

10           And do we have any Rule 50 motions?

11           **MR. ROSENTHAL:**  Yes, your Honor.

12           Your Honor, uhm --

13           **THE COURT:**  Hold on, hold on.

14           Okay.

15           **MR. ROSENTHAL:**  Your Honor, plaintiff moves for a

16   judgment as a matter of law under Rule 50(a) on the grounds

17   that there was no proper compliance with the day rate or job

18   rate interpretive bulletin, because there was testimony here

19   today that -- or not -- over the last few days that the

20   defendant, Waste Pro, had a policy.  It wasn't just those two

21   instances.  They had a policy, that if an employee worked less

22   than 4.1 hours, he was not paid the full whatever rate it was.

23   When you have the defendant employer saying that that's their

24   policy, I think that that answers the question on whether they

25   did as the interpretive bulletin requires and paid the amount

1    of money regardless of the amount of hours taken to complete

2    the day or job.

3         Additionally, I think it's undisputed that they paid

4    additional compensation for additional work that was not

5    covered by the daily rate, job rate, task rate, whatever it is

6    that they want to call it.

7         The cases that they relied on, *Powell* and *Defrene* from

8    the Fifth Circuit, the reason that those cases found that what

9    the claimed compensation was, was not actually other forms of

10   compensation is because the interpretive bulletins and the

11   statute excludes that from what needs to be included in the

12   regular rate determination, unlike in our case, the

13   nondiscretionary bonuses which were paid for additional work.

14        So, I don't understand -- sorry -- I -- it's our

15   position that 778.12 does not apply.  And we, again, move for

16   judgment as a matter of law on that basis.

17        Additionally, we move for judgment as a matter of law

18   on the lack of any agreement under 29 C.F.R. 778.318, I believe

19   it is, for no agreement as to productive and nonproductive

20   time, which would enable them to use the all hours worked

21   deviser under 778.115.

22        And those are two grounds for judgment as a matter of

23   law.

24        **THE COURT:**  All right.  I think it's a question of

25   fact for the jury.  I deny the Rule 50 motion.

1          Any other Rule 50 motions?

2          **MS. TINGLEY:**  Yes, your Honor, the defense would renew

3     its motion.

4          **THE COURT:**  All right.  I think it's a question of

5     credibility, and I'll deny the Rule 50 motion.  It's up to the

6     jury to decide this case.

7          You want a few moments to go over the proposed jury

8     instructions, see if you guys agree on anything, and then we'll

9     do the charge conference?

10          **MS. TINGLEY:**  Yes, your Honor.  That would be great.

11          **THE COURT:**  All right.  So why don't we take a

12     15-minute recess.

13          **COURTROOM SECURITY OFFICER:**  All rise.

14          *(The Judge exited the courtroom)*

15          *(Recess taken at 3:50 p.m. until 4:09 p.m.)*

16          **COURTROOM SECURITY OFFICER:**  All rise.  This honorable

17     Court is now back in session.

18          *(The Judge entered the courtroom)*

19          **THE COURT:**  Please be seated.

20          All right.  We're back on the record.

21          Counsel are present.

22          I would propose going through the rough draft of the

23     jury instructions and seeing where we have disagreement.

24          The first page is basic instruction 1.  That looks

25     okay to me.

1          The second page is basic instruction 2.  That looks
2     okay to me.
3          The third one is a basic instruction.  Looks okay to
4     me.
5          The fourth one is credibility.  Looks okay to me.
6          Fifth one's impeachment.  Any problem with that?
7          **MR. EDWARDS:**  No objection from plaintiff.
8          **MS. TINGLEY:**  No objection.
9          **THE COURT:**  The sixth one is the burden of proof.  Any
10    problem with that?
11         **MS. TINGLEY:**  Your Honor, I apologize.  I think I'm
12    off number.  I have the burden of proof --
13         **MR. EDWARDS:**  I think we are too.
14         **THE COURT:**  Well, I'm looking at page number, not the
15    instruction number.
16         **MR. EDWARDS:**  Oh.
17         **MS. TINGLEY:**  Oh.  Sorry.
18         **THE COURT:**  So, I'm looking at page 6 being the burden
19    of proof.
20         **MS. TINGLEY:**  No objection.
21         **MR. ROSENTHAL:**  Your Honor, plaintiff objects to
22    page 6 -- sorry -- not to page 6.  I apologize for that.  No
23    objection to instruction number 5 on page 6.
24         **THE COURT:**  All right.  How about page 7?
25         **MR. ROSENTHAL:**  This is the one plaintiff objects to,

1  good-faith reliance.  I believe the case law says that this is

2  a determination for the Court and not the jury.  So, we object

3  to this being in the jury instructions.

4      **THE COURT:**  Isn't the good faith the one that makes it

5  three years instead of two years?

6      **MR. ROSENTHAL:**  That's willfulness, your Honor.

7      **MR. EDWARDS:**  They're very, very close.  They

8  essentially ask the same question, but one's a Court

9  determination and one's a jury determination.

10      **THE COURT:**  All right.  So, the good faith one is the

11  one where I give liquidated damages?

12      **MR. ROSENTHAL:**  Correct, your Honor.

13      **THE COURT:**  All right.  So, I agree, it's the Court's

14  decision on that, but I give it as an advisory verdict.  So,

15  I'm interested in what the jury has to say.  And then I can go

16  along with it or I don't have to go along with it.

17      If I'm going to have it on the verdict form, then I

18  think I need to put an instruction on it.

19      What's the defendants' position on this?

20      **MS. TINGLEY:**  No objection.

21      **THE COURT:**  All right.  So, I'm gonna leave page 7 in.

22      Page 8 is jury taking notes.  It looks okay to me.

23      Page 9 and 10 is the Fair Labor Standards Act

24  instruction.  What's your positions on those?

25      **MS. TINGLEY:**  No objection.

502

1      **MR. ROSENTHAL:**  Your Honor -- sorry -- plaintiff

2  objects to instruction number 8 on pages 9 and 10.

3      The classification of plaintiff taking the position

4  that it's either an eight-hour day or a day rate, you know, the

5  plaintiff is not contending that he was either an eight-hour

6  per day employee or a day rate employee.  I mean, part of the

7  issue is the regular rate being a question of fact for the jury

8  to determine how many hours the parties intended to pay to

9  compensate.  And that's the question of fact that -- the major

10  one that we believe the jury needs to decide.

11      **THE COURT:**  Okay.  Your objection's overruled.

12      Page 11, any objection to that?

13      **MS. TINGLEY:**  No objection from defense.

14      **MR. ROSENTHAL:**  Your Honor, plaintiff objects to page

15  number 11, the day rate, 778.112, is an interpretive bulletin.

16  It's not the law.  The FLSA and cases interpreting the FLSA say

17  that an understanding is required, absolutely required, under

18  Section 207 of the Fair Labor Standards Act.  I can cite for

19  the Court --

20      **THE COURT:**  Didn't the Fifth Circuit case say that you

21  don't have to have a mutual understanding?

22      **MR. ROSENTHAL:**  That's differing from 2000.  An

23  earlier case that's binding in the Eleventh Circuit from 1962,

24  *Noms Battery (phonetic)*, says that it's an indispensable factor

25  for compliance with 29 U.S.C. 207.

1    **THE COURT:**  The earlier Fifth Circuit opinion that's

2    binding on the Eleventh Circuit, was that on a day rate case?

3    **MR. ROSENTHAL:**  No, your Honor.

4    **THE COURT:**  All right.  I'm going to follow the Fifth

5    Circuit case from 2000.  So, I'll overrule your objection to

6    page 11.

7    How about page 12?

8    **MR. ROSENTHAL:**  Your Honor, with page 11, we also ask

9    for that one that there be a note in here about additional pay

10   for additional work.  Because that's also something that's in

11   778.112.  There can't be any other compensation for additional

12   work, no other forms of compensation for services.  And that's

13   been a major issue --

14   **THE COURT:**  So, what language would you propose adding

15   on page 11?

16   **MR. ROSENTHAL:**  In -- let me see.

17   **MR. EDWARDS:**  "And was paid no additional compensation

18   for services," just exactly as it's worded in the interpretive

19   bulletin, your Honor.

20   **THE COURT:**  Where would I put that?

21   **MR. EDWARDS:**  Directly after the first sentence:

22   Under the law, an employee earns a day rate if he receives a --

23   **THE COURT REPORTER:**  I'm sorry.

24   **MR. EDWARDS:**  I'm sorry.

25   After the first sentence, your Honor.  Regardless of

1  the number of hours he works each day and was paid no

2  additional compensation for services.  It tracks the language

3  nearly precisely.

4          THE COURT:  So, you're suggesting that I add "and was

5  paid no additional compensation for services"?

6          MR. EDWARDS:  Yes, your Honor.

7          THE COURT:  What's the defense position on that?

8          MS. TINGLEY:  Your Honor, the defense's position is

9  the Eleventh Circuit under *Allen* where 109 speaks to the

10  examples that follow thereafter, and they're not mandates.

11  Although the *Allen* decision spoke to 115, it refers to all of

12  the examples that are set forth after 109, which is exactly

13  what 109 says.  And so, we don't believe that they have to

14  receive any other forms of compensation, as shown by the

15  Department of Labor opinion from 1967, where they actually

16  showed how to calculate under a day rate where they got day

17  rate and hourly rate, another form of compensation.

18          We believe 112 is merely an example of how to

19  calculate in a particular circumstance, but that it's not

20  removed from 112 by virtue of there being other forms of

21  compensation.

22          MR. ROSENTHAL:  Your Honor?

23          THE COURT:  All right.  So, the language you're asking

24  to be added would be "and was not paid any additional

25  payments" --

1      **MR. ROSENTHAL:**  "Compensation for additional

2   services."

3      **MS. TINGLEY:**  Your Honor, that's not even from 112.

4      **THE COURT:**  So, what's in 112?

5      **MS. TINGLEY:**  No other form of compensation undefined.

6      **MR. EDWARDS:**  One moment, your Honor.

7      *(Discussion had off the record between counsel)*

8      **MR. EDWARDS:**  Your Honor, I believe it's -- is it not

9   no additional compensation for services, not just no additional

10  compensation?

11     **MS. TINGLEY:**  No.  No other form of compensation.

12     **MR. HUDSON:**  Okay.  No other form of compensation.

13     **MR. ROSENTHAL:**  Your Honor, the -- it technically says

14  "no other form of compensation."  It doesn't say "no other

15  compensation for services."  The case law has interpreted that

16  to mean other forms of compensation for additional services.

17     **THE COURT:**  All right.  So, I'm gonna add at the end

18  of the first sentence "and was paid no other form of

19  compensation."

20     Anything else on page 11?

21     **MS. TINGLEY:**  Your Honor, it would be the defense's

22  position that that's only for day rates and not for job rates.

23     **THE COURT:**  Well, why do we even have job rates in the

24  title on this thing?

25     **MS. TINGLEY:**  Because they're both combined under 112,

506

```
 1   and you did have testimony from the defense, from Mr. Mackie,

 2   that they would get certain tasks or certain jobs.  It wasn't

 3   always gonna be their daily.  And so, that's the defense's

 4   position, that he could be paid a daily rate and a job rate in

 5   the same day and still --

 6         THE COURT:  Well, the first sentence only talks about

 7   day rate.  It doesn't talk about job rates.

 8         MS. TINGLEY:  You hadn't gotten to me yet, your Honor,

 9   sorry.

10         THE COURT:  But I'm saying the first sentence only

11   talks about a day rate.  It doesn't talk about job rates.  And

12   you're saying that the "no other form of compensation" only

13   applies to day rates.  And that's all that it would be added

14   to, the first sentence that has to do with day rate.

15         MS. TINGLEY:  Yes.  And then we would ask for an

16   additional sentence about job rates.

17         THE COURT:  And where did you request that in your

18   jury instructions?

19         MS. TINGLEY:  I believe it was in our Fair Labor

20   Standards Act, and then it made its way into your

21   instruction 8, speaks to both day rate and job rate.

22         It was 18, was it?

23         MR. ROSENTHAL:  You guys filed an amendment, right?

24         MS. TINGLEY:  That's on our proposed -- it was under

25   18, your Honor.
```

1          It said:  "The law allows employers to pay

2      employees on an hourly rate, day rate, job rate, or

3      other basis."

4          **THE COURT:**  So --

5          **MS. TINGLEY:**  And we said -- oh, then we went into our

6      calculation of regular rate.

7          **THE COURT:**  Well, I mean the law does allow employers

8      to pay employees on an hourly basis, a day rate, job rate, or

9      other basis.  I mean that's a correct statement of the law, and

10     I'm just trying to figure out where there was a request for an

11     instruction on job rates, what job rates are.  Just telling the

12     jury there's a creature called "job rates" doesn't mean that

13     job rates had anything to do with this case.  Or a specific

14     instruction about job rates was requested by either side.

15         I mean, 99 percent of what we've been talking about in

16     this case is day rates.  And is job rates an issue in this

17     case?

18         **MS. TINGLEY:**  Your Honor, it's the defense's position

19     that a job rate is.  They're both under 112.  And Mr. Mackie

20     did specifically say that he assigned on tasks or jobs.  And

21     that they wouldn't always get a day -- a job that was for the

22     entire day, that they would have other jobs.

23         **THE COURT:**  I understand.  If someone went to pick up

24     a truck or something like that, they wouldn't get a day rate,

25     they would get a job rate.  So, what would your instruction on

1    job rates say?

2            MS. TINGLEY:  It would be the next -- I think it -- it

3    would be the second paragraph.  And it would be similar to the

4    first paragraph.

5            THE COURT:  The second paragraph of what?

6            MS. TINGLEY:  The second para -- of the same --

7    page 11, instruction 9.  After you finish saying that they

8    were, in fact, paid a day rate, then there would be a second

9    paragraph saying, uhm, almost the same, you know, just conform

10   it to a job rate.  "An employee" -- and this is right out of

11   112 -- "an employee earns a job rate for doing a particular" --

12   it's out of the first sentence of 112.

13           THE COURT:  No, I'm asking, where did you request an

14   instruction on job rate?

15           MS. TINGLEY:  We did not specifically request these

16   words, your Honor.  We believe that based on the evidence from

17   Mr. Mackie, that we are asking for this instruction at this

18   point based on the evidence that's come in at trial.

19           THE COURT:  What's the plaintiff's position on job

20   rates?

21           MR. ROSENTHAL:  Plaintiff objects to job rates.  That

22   goes to the issue of an understanding that we contend that the

23   law requires, and if you say, It was a job rate, just kidding,

24   it was a day rate, that's very inconsistent.

25           And, additionally, to clarify, we pulled up 778.112,

 1  and it does say:  "If the employee is paid a flat sum for a

 2  day's work or for doing a particular job, without regard to the

 3  number of hours worked in the day or at the job, and if he

 4  receives no other form of compensation for services".....  So,

 5  it does say "no other form of compensation for services."

 6       **THE COURT:**  So, now we're going back to the end of the

 7  first sentence, you think there ought to be "for services"

 8  added to that?

 9            **MR. ROSENTHAL:**  Yes, your Honor.

10            **MR. EDWARDS:**  Yes, your Honor.

11       **THE COURT:**  What's your position on that, Ms. Tingley?

12            **MR. ROSENTHAL:**  You want to look at --

13       **MS. TINGLEY:**  No.  We found it at the same time on our

14  phones.

15            **MR. ROSENTHAL:**  Okay.

16       **MS. TINGLEY:**  Your Honor, we can -- that does track

17  112.  We would just ask that then in that first sentence, it

18  track 112:  "If the employee is paid a flat sum for a day's

19  work or for doing a particular job" -- and just put it right in

20  that first sentence.  And that tracks 112, which is day rates

21  and job rates.  The regulation covers both.

22       **THE COURT:**  So, what you're suggesting is, on the

23  second line, after "day's work," I would put in what or job?

24            **MS. TINGLEY:**  I would -- in the first sentence, in the

25  first line, "An employee earns a day" -- and this will be

```
1    similar to what is in the instruction where you did day/job
2    rate -- "an employee earns a day/job rate if he receives a flat
3    sum for a day's work or for doing a particular job, regardless
4    of the number of hours worked in the day or at the job, and no
5    other form of compensation for services."
6            MR. ROSENTHAL:  Received no other, right?
7            THE COURT REPORTER:  I'm sorry?
8            MR. EDWARDS:  Receives.
9            MS. TINGLEY:  I apologize.
10           THE COURT:  So, instead of "and was paid no other form
11   of compensation," you want to change it to what now?
12           MS. TINGLEY:  "And receives no other form of
13   compensation for services."
14           THE COURT:  So, what you're suggesting is the first
15   line should read:  "Under the law, an employee earns a day/job
16   rate if he receives a flat sum for a day's work or for doing a
17   particular job, regardless of the number of hours he works each
18   day, and no other form of compensation for services -- and he
19   receives no other form of compensation for services"?
20           MS. TINGLEY:  After the -- right before the "and
21   receives," under the 112, it says "in the day or at the job,"
22   instead of just each day -- "in the day or at the job."
23           THE COURT:  So, what you're asking is the first
24   sentence to read:  "Under the law, an employee earns a day/job
25   rate if he receives a flat sum for a day's work or for doing a
```

1    particular job, regardless of the number of hours he works in

2    the day or at the job, and no other form of compensation -- and

3    receives no other form of compensation for services."

4            **MR. EDWARDS:**  Yes, your Honor.

5            **THE COURT:**  So that's what you're asking?

6            **MS. TINGLEY:**  Well, yes, but we still maintain our

7    other objection, that no other form of compensation under

8    *Allen*.  We don't want to waive that objection, but --

9            **THE COURT:**  Okay.  So, your objection is noted and

10   overruled.

11           Any other objections to page 11?

12           **MR. ROSENTHAL:**  Your Honor, we object to the inclusion

13   of "job rate," because this is the first time that it's being

14   presented, and we don't believe the evidence supports that.

15           **THE COURT:**  Well, we had the whole testimony about

16   driving up to Coral Springs and taking three hours and whether

17   or not that was a half day's pay or whether it was a job rate,

18   so I'm gonna give it.

19           **MR. ROSENTHAL:**  Okay.

20           **MS. TINGLEY:**  Your Honor, I apologize.  On the second

21   sentence, it would say at the end "the employee is earning a

22   day or job rate."

23           **THE COURT:**  That's the end of the first sentence,

24   isn't it?

25           **MS. TINGLEY:**  Yes, and -- no, "In other words, if the

1  employee's wage is not increased or decreased based on the

2  number of hours he works, the employee is earning a day or job

3  rate."

4         **THE COURT:**  That's the end of the first sentence,

5  isn't it?

6         **MS. TINGLEY:**  I thought the first sentence was

7  "received no other form of compensation" -- oh, and then you're

8  gonna put it there?

9         **THE COURT:**  No, I mean the added verbiage was:  "And

10  receives no other form of compensation for services."  We can

11  put a period there, and then start the next sentence, if, with

12  a capital I, or we could continue with a long run-on sentence.

13         **MS. TINGLEY:**  I think... I don't have a problem as

14  written, as long as the second sentence says "a day or job

15  rate."

16         **THE COURT:**  Well, as written, that would be the end of

17  the first sentence.

18         **MS. TINGLEY:**  Okay.

19         **THE COURT:**  So, the fourth line on page 11 would

20  change "day rate" to "day or job rate," is that what you're

21  suggesting?

22         **MS. TINGLEY:**  Yes, your Honor.

23         **THE COURT:**  How about the next line?  "If the rate

24  changes based on the number of hours worked, it is not a day

25  rate."

1    **MS. TINGLEY:**  A day or a job rate.

2    **THE COURT:**  So, it would be "or job" there also.  So,

3 both the fourth and the fifth line should add "or job" after

4 "day"?

5    **MS. TINGLEY:**  Yes, your Honor.

6    **MR. ROSENTHAL:**  Yes, your Honor.

7    **THE COURT:**  How about the last line of that paragraph,

8 does it just state "day rate" or does it go "day or job rate"?

9    **MS. TINGLEY:**  "Day or job rate."

10    **THE COURT:**  So, the sentence that starts "all that is

11 required" would end with "day or job rate"?

12    **MR. ROSENTHAL:**  Plaintiff objects to that language.

13 That's from *Defrene*, which is talking about a day rate.  And,

14 yeah, that's our objection, based on *Defrene*, which is going to

15 a day rate where whether they were paid regardless of the

16 amount of hours was an undisputed fact, and here it's disputed.

17    **THE COURT:**  If I'm going to be consistent, I'm going

18 to have "day or job" on all those places.  So, we'll put "or

19 job" on the last line of the first paragraph beginning with

20 "all."

21    Any other objections to page 11?

22    **MR. ROSENTHAL:**  Your Honor, the plaintiff requests

23 that there be some instruction that it's clear that it can't be

24 both a day rate and a job rate.  It has to be one or the other.

25    **THE COURT:**  You can argue that to the jury.

1      **MR. ROSENTHAL:**  Okay.

2      **THE COURT:**  All right.  Let's move to page 12.  Any

3   objections to page 12?

4      **MS. TINGLEY:**  No objection from the defense.

5      **MR. EDWARDS:**  Your Honor, the only objection of

6   plaintiff is that it references a specific set number of hours,

7   and the plaintiff has not taken -- although the evidence may

8   show that there's a basis to find an eight-hour workday was

9   worked, the plaintiff has not taken the position that an

10  eight-hour workday is necessarily what was paid, although we do

11  take the position it is a set hour workday.

12      **THE COURT:**  You want to make it eight- to ten-hour

13  workday?

14      **MR. EDWARDS:**  That would be acceptable to plaintiff,

15  your Honor.

16      **THE COURT:**  What do you think about that, Ms. Tingley?

17      **MS. TINGLEY:**  Your Honor, that's inconsistent with the

18  law, because it has to be 40 hours.  They're entitled after

19  40 hours to get overtime.

20      **MR. EDWARDS:**  They are entitled under the law to get

21  40 hours after overtime, your Honor, but one of the inquiries

22  is, what did the parties intend the day to compensate for?  So,

23  it does make explaining damages slightly more difficult.  But

24  there's a basis under the law to calculate damages over 40 and

25  up to the amount of the hours that the parties intended as a

```
 1    straight time calculation, and all hours over that at regular

 2    1.5 overtime.

 3         THE COURT:  I think most people understand

 4    time-and-a-half to be a 40-hour workweek and an eight-hour

 5    workday.  So, I'm going to leave it at eight hours, and you can

 6    argue to the jury, if you want to, that the workday could have

 7    been eight to ten hours or whatever you want to argue.

 8         MR. EDWARDS:  Thank you, your Honor.

 9         THE COURT:  Let's go to page 13.

10         MR. ROSENTHAL:  Your Honor, plaintiff objects to

11    plaintiff -- to page 13.  Uhm, I think it's pretty clear from

12    the evidence that there was no established more than one rate.

13    There may have been established day rates, but no witness was

14    able to tie a bonus to a set amount of hours.  And, therefore,

15    there's not more than one rate.

16         THE COURT:  Page 13 is calculation of overtime pay.

17         MR. ROSENTHAL:  Correct.  I'm talking about the third

18    sentence in the first paragraph.  It talks about established

19    rates.

20         THE COURT:  And what's your position on that,

21    Ms. Tingley?

22         MS. TINGLEY:  Your Honor, we believe that this is the

23    interpretation of 115.  And under *Allen*, the Eleventh Circuit

24    said you didn't have to have different types of work for

25    different overtime and different nonovertime rates of pay.  And
```

1    we believe it's a correct recitation of the law.

2            THE COURT:  All right.  I'm going to leave it in the

3    way it is.

4            Any other objections to page 13?

5            MR. ROSENTHAL:  Your Honor, we would ask that there be

6    an added definition to the regular rate about -- what does it

7    say? -- "The regular rate by its very nature must reflect all

8    payments which the parties have agreed shall be received

9    regularly during the workweek, exclusive of overtime payments,"

10   if it's gonna include the regular rate of pay is the hourly

11   rate actually paid to the employee for the normal nonovertime

12   workweek for which he is employed.  Those two sentences --

13           THE COURT REPORTER:  I'm sorry.  "For the normal"....

14           MR. ROSENTHAL:  Right now, as it reads, it says:

15           "The regular rate of pay is the hourly rate

16       actually paid to the employee for the normal

17       nonovertime workweek for which he is employed."

18           And I -- plaintiff suggested adding the sentence:

19           "The regular rate by its very nature must reflect

20       all payments which the parties have agreed shall be

21       received regularly during the workweek, exclusive of

22       overtime payments."

23           Those two sentences are usually read together, and I'm

24   reading that sentence from binding Eleventh Circuit case

25   *Boyle v. City of Pell City* that came out from the Eleventh

1    Circuit in 2017.

2              **THE COURT:**  Ms. Tingley, what's your position on that?

3              **MS. TINGLEY:**  Your Honor, it would be defense's

4    position under 29 U.S.C. 207, Subsection E, "regular rate" is

5    defined, and it says:  "As used in this section, the regular

6    rate at which an employee is employed shall be deemed to

7    include all remuneration for employment paid to, or on behalf

8    of, the employee, but shall not be deemed to include" -- then

9    it goes through all the, you know, gifts, and sick time, and

10   the like.  And so, it's our position, under the actual statute,

11   that it is just the number -- the amounts paid to.

12             **THE COURT:**  What's your interpretation of the

13   *Boyd (sic)* case?

14             **MR. ROSENTHAL:**  *Boyle*, your Honor.

15             **THE COURT:**  *Boyle* case.

16             **MS. TINGLEY:**  We don't believe that it changed the

17   statute, and we don't believe it either changed

18   29 C.F.R. 778.108, when it says:

19             "Section 7(e) of the Act requires inclusion

20        of *(sic)* the regular rate of," quote, "all

21        remuneration for employment paid to, or on behalf of,

22        the employee, except payment specifically

23        excluded"....

24             We don't believe that the *Boyle* case was about a jury

25   instruction and where the Eleventh Circuit said that that

1   should be given.

2           **THE COURT:**  All right.  Anybody have a copy of the

3   *Boyle* case?

4           **MR. ROSENTHAL:**  Yes, your Honor.

5           **MS. TINGLEY:**  Yes.

6           **MR. ROSENTHAL:**  Your Honor, I may not have a copy.  I

7   can give you the full cite.

8           **MS. TINGLEY:**  I have it, your Honor.

9           **MR. ROSENTHAL:**  Oh, I do have it.

10          **MS. TINGLEY:**  I did draw a line on it.

11          **MR. ROSENTHAL:**  Same case.

12          **THE COURT:**  You can give that one back.

13          *(Pause)*

14          **MS. TINGLEY:**  Your Honor, whenever you're done

15  reading, I just have one more thing to add about *Boyle*.

16          **THE COURT:**  Okay.

17          **MS. TINGLEY:**  Your Honor, *Boyle* was an hourly employee

18  case; it was not day rate or job rate.  And we believe the

19  same --

20          *(Discussion had off the record between counsel)*

21          **MS. TINGLEY:**  This entire -- the same argument goes to

22  the instruction number 12 of bonus payments on 14.

23          **MR. ROSENTHAL:**  Your Honor, *Allen* was not a day rate

24  or job rate case either.

25          Your Honor, I also believe your summary judgment order

1    cited a case with this exact language, except from -- I'm gonna

2    butcher the name -- it starts with a K -- from 2001.

3         **THE COURT:**  It looks to me like *Boyle* cites a United

4    States Supreme Court case, so I'm gonna go ahead and add, after

5    the second sentence on page 13:

6              "The regular rate by its very nature must reflect

7         all payments which the parties have agreed shall be

8         received regularly during the workweek, exclusive of

9         overtime payments."

10         Let me go ahead and give this back to plaintiff's

11   counsel.

12         Any other objections to page 13?

13         **MR. ROSENTHAL:**  No, your Honor.

14         **MS. TINGLEY:**  No, your Honor.

15         **THE COURT:**  How about page 14?

16         **MS. TINGLEY:**  Your Honor, I would refer the Court to

17   our objection.  We had sought to remove "is announced to" or

18   "paid to an employee pursuant to any prior contract."  And we

19   don't believe that the "is announced to or" -- we believe it's

20   supposed to be:  "If a bonus is paid to an employee, it must be

21   included," not that it's announced to.  And we cited to the

22   same 207 -- 29 U.S.C. 207, Subsection E, as well as

23   29 C.F.R. 778.108.

24         **THE COURT:**  So, you're suggesting I take out "is

25   announced to or."

1          **MS. TINGLEY:**  Yes, your Honor.

2          **THE COURT:**  So, it would read:  "If a bonus is paid to

3     an employee pursuant"....

4          What's your position on that, Mr. --

5          **MR. ROSENTHAL:**  Your Honor, 778.211(b) and (c) both

6     say that if -- I'm gonna read you the exact language -- if

7     it's -- I'm not here -- do you have your phone?  Do you have a

8     copy, Amy?

9          **MS. TINGLEY:**  Of what?

10         **MR. ROSENTHAL:**  Of 778.211?

11         Okay.

12         **THE COURT:**  So, if I give the instruction the way

13    you're asking me to do it, then all those bonuses that

14    Mr. Andreu was promised and never got should have been added to

15    his regular rate?

16              *(Discussion had off the record between counsel)*

17         **MR. ROSENTHAL:**  Your Honor, it -- 778.211(c) says:

18    The bonus, to be excluded under Section 7(e)(3)(A) -- referring

19    to 29 U.S.C. 207(e) -- "must not be paid pursuant to any prior

20    contract, agreement, or promise."  Promise bonuses not to be

21    excluded from the regular rate.

22              *(Discussion had off the record between counsel)*

23         MR. ROSENTHAL:  "Bonuses which are announced to

24       employees to induce them to work more steadily or

25       more rapidly or more efficiently or to remain with

521

```
 1        the firm are regarded as part of the regular rate of
 2        pay."
 3             "They must be included in the regular rate," it says
 4     at the bottom.
 5             (Discussion had off the record between counsel)
 6        THE COURT:  So, how's the jury going to figure out how
 7     much in bonuses were promised to him, the work that he never
 8     got, to include it in the regular rate?
 9        MR. ROSENTHAL:  Based on the U.S. Supreme Court
10     Anderson, based on the testimony they have.  If they don't find
11     that there's anything, or, you know, that -- that's where we're
12     prepared to take that.  We just want the jury to be able to
13     decide that issue, you know, based on his testimony, because
14     it's our position that the records were inadequate.  And the
15     case law is pretty clear that he is allowed to testify if the
16     records are inadequate, based on some quotes... pretty much
17     based on approximations and averages and estimations.
18        THE COURT:  Ms. Tingley, I'm inclined to give page 14
19     as it is.  Any other objections?
20        MS. TINGLEY:  Yes, your Honor.  I -- the defense still
21     has a problem with the word "announced."  If it's "promised
22     to," I think that's what he read.  Announced to, that's -- I
23     mean I --
24        THE COURT:  So, you want me to change "announced" to
25     "promised"?
```

1   **MS. TINGLEY:**  Well, we'd like to maintain our

2   objection, but in the event that we're overruled, yes, your

3   Honor.

4   **THE COURT:**  What's your position on changing

5   "announced" to "promised"?

6   **MR. ROSENTHAL:**  The interpretive bulletin says

7   "announced and promised."  So, we would like both, your Honor.

8   **THE COURT:**  So, what you're now saying is that it

9   should read:  "If a bonus is announced to or promised to or

10  paid to an employee" -- is that what plaintiff's asking for?

11  **MR. EDWARDS:**  Yes, your Honor.

12  **MS. TINGLEY:**  I thought you said "announced and

13  promised or paid," based on the bulletin.

14  **MR. ROSENTHAL:**  No, if they're paid, then that's --

15  **MS. TINGLEY:**  Didn't you say "announced and promised"?

16  **MR. ROSENTHAL:**  Announced, promised.  It could say "or

17  paid to."

18  **THE COURT:**  Read again what the verbiage is.

19  "Announced, promised" -- what's the conjunction between it, if

20  any?

21  **MR. ROSENTHAL:**  It says:  "The bonus, to be excluded

22  under Section 7 *(sic)*, must not be paid pursuant to any prior

23  contract, agreement, or promise."

24  **MS. TINGLEY:**  Right.

25  **MR. ROSENTHAL:**  The bonus, to be excluded, must not be

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

```
 1   paid pursuant to any prior contract, agreement, or promise.

 2              THE COURT:  So, where's the word "announced"?

 3              MR. ROSENTHAL:  "Announced" is in Subsection B.  Here,

 4   let me see.

 5              MS. TINGLEY:  And, your Honor, one more --

 6              THE COURT:  Let's do one at a time.

 7              MS. TINGLEY:  Okay.  Thank you.

 8              MR. ROSENTHAL:  It says:

 9              "Thus, if an employer announces" -- this is

10        giving an example -- "to his employees in January

11        that he intends to pay them a bonus in June, he has

12        thereby abandoned his discretion regarding the fact

13        of payment" --

14              THE COURT REPORTER:  I'm sorry.  Start again.

15              MR. ROSENTHAL:  Sorry.

16              "Thus, if an employee (sic) announces to his

17        employees in January that he intends to pay them a

18        bonus in June, he has thereby abandoned his

19        discretion regarding the fact of payment by promising

20        a bonus to his employees.  Such a bonus would not be

21        excluded from the regular rate under

22        Section 7(e)(3)(A)."

23              THE COURT:  All right.  So, I'm gonna change the word

24   "announced" to "promised."

25              MS. TINGLEY:  Your Honor, if I might, just for the
```

```
1    record?
2              THE COURT:  Okay.
3              MS. TINGLEY:  778.211 are discretionary bonuses, and
4    they are excluded from the regular rate.  There has been no
5    testimony that these -- in fact, the plaintiff elicited
6    testimony that these were nondiscretionary bonuses, and those
7    should be included for calculation of the regular rate.  So,
8    they're taking an exemption, where a bonus does not have to be
9    included in the regular rate, and trying to change the jury
10   instruction as to bonuses that were actually included in the
11   regular rate.
12             MR. ROSENTHAL:  Your Honor, that's a complete
13   mischaracterization what we're trying to do.
14             Subsection C says promise bonus is not excluded, not
15   excluded meaning that they're included.  And then it just
16   distinguishes discretionary bonuses, which do not have to be
17   included in the regular rate, from nondiscretionary bonuses,
18   which do.  We've always taken the position that
19   nondiscretionary bonuses are bonuses that are promised in
20   advance, and that they should be included in the regular rate.
21             THE COURT:  All right.  So, on page 14, I'm going to
22   leave it the same way it is, except I'm gonna change the word
23   "announced" to "promised."
24             How about page 15?
25             MR. ROSENTHAL:  No objection from plaintiff.
```

1          **MS. TINGLEY:**  No objection, your Honor, for defense.

2          **THE COURT:**  How about page 16?

3          **MR. ROSENTHAL:**  No objection from plaintiff.

4          **MS. TINGLEY:**  No objection.

5          **THE COURT:**  How about page 17?

6          **MR. ROSENTHAL:**  Amy, quick question.

7          *(Discussion had off the record between counsel)*

8          **MR. ROSENTHAL:**  Your Honor, if I may inquire, is

9   this -- page 17, is this from the pattern instructions or was

10  this one of the parties' proposed?

11         **THE COURT:**  It may be neither.  It may be from the

12  prior Fair Labor Standards Act case instruction that I gave on

13  another case.

14         **MR. ROSENTHAL:**  Plaintiff would just object to the

15  sentence that says:

16         "In common usage, the word 'willful' is

17     considered synonymous with such words as 'voluntary,'

18     'deliberate,' and 'intentional.'"

19         **THE COURT:**  I think that's a correct instruction on

20  the law.

21         Any other objections to page 17?

22         **MR. ROSENTHAL:**  We would ask that "reckless disregard"

23  then have -- be synonymous with "of failure to make adequate

24  inquiry."

25         **MR. EDWARDS:**  Yes, your Honor.  The case law that

1 explains what "reckless disregard" can mean under the law,

2 explains it as a failure to make adequate inquiry into -- I'm

3 gonna get the precise language for you -- "failure to make

4 adequate inquiry into" essentially what is the specific

5 practices.

6       **THE COURT:**  All right.  You can argue that to the

7 jury.  I'm gonna give page 17 the way it is.

8       **MS. TINGLEY:**  Your Honor, I would just ask that

9 "defendants" be plural and not singular, as it is throughout

10 the instructions.

11       **THE COURT:**  Okay.  So, we'll make page 17 the

12 defendant is plural.

13       **MR. EDWARDS:**  I think there's also a small

14 typographical error in the word "definition."

15       **THE COURT:**  I'll put another "i" in definition.

16       How about page 18?

17       **MR. ROSENTHAL:**  Your Honor, this is another objection

18 that the plaintiff has based on the fact that the good faith

19 defense is decided by the Court and not the jury.

20       **THE COURT:**  Right.  And I'm gonna give them that

21 option as an advisory verdict.

22       How about page 19?

23       **MR. ROSENTHAL:**  No objection from plaintiff.

24       **MS. TINGLEY:**  No objection.

25       **THE COURT:**  Page 20 and 21 look like they're standard

1    instructions.

2          Any other additions to the jury instructions?

3          **MS. TINGLEY:**  No, your Honor.

4          **MR. ROSENTHAL:**  No, your Honor.

5          **THE COURT:**  How about the verdict form?

6          **MR. ROSENTHAL:**  No objections from plaintiffs.

7          **MS. TINGLEY:**  Your Honor, on page 2, you have the

8    disclaimer about do not answer a question for May to

9    May 15 *(sic)*, you have it under.  Defense would ask that that

10   just be put above the "in what amount," so they don't do the

11   damage calculation and then see the next instruction.  And that

12   would be similar to how you did it with question 1 and

13   question 2, where they answer the question and then are told if

14   it's yes or no.

15         **THE COURT:**  All right.  So, I'll move the parentheses

16   on top of "in what amount."

17         **MS. TINGLEY:**  Yes, your Honor.

18         And consistent with the others, we would just -- you

19   could -- we would ask you to remove the parentheses so it's

20   similar to how it is on page 1.

21         **THE COURT:**  All right.  I'll move the parentheses on

22   that sentence.

23         Any other objections to the verdict form?

24         *(Discussion had off the record between counsel)*

25         **MS. TINGLEY:**  Your Honor, when you said that you were

528

1  giving the advisories on the verdict form, was that both to

2  administrative interpretation as well as advice of counsel?

3  I'm just looking at question 4.

4      **THE COURT:**  Well, if they -- I mean if you relied on

5  the advice of counsel, and that is a valid administrative

6  interpretation by the Department of Labor, then you wouldn't be

7  responsible for liquidated damages, right?

8      **MS. TINGLEY:**  Correct.  Okay.

9      **THE COURT:**  So, I think the question the way it is, is

10  okay.

11      **MS. TINGLEY:**  Okay.  Thank you.

12      **THE COURT:**  Any other objections to the verdict form?

13      **MR. ROSENTHAL:**  No, your Honor.

14      **THE COURT:**  What if the jury comes back with a

15  question, We want to find one defendant responsible, but the

16  other defendant not responsible?  How do they indicate that on

17  the verdict form?  Or are we agreeing that if one defendant's

18  responsible, they're both responsible?

19      **MS. TINGLEY:**  We stipulated that they were joint

20  employers, that case, and it --

21      **MR. EDWARDS:**  Your Honor, the plaintiff, as the Court

22  heard during his testimony, had indicated not only that he does

23  not want the jury to award damages, we had consulted with

24  opposing counsel and discussed potentially voluntarily

25  dismissing him from the case.  But knowing that that dismissal

1  would have to be approved by the Court, we didn't make that

2  motion during trial.

3        We -- if the Court will accept that, we're open to do

4  it.  We were concerned that there was a stipulation that he was

5  an employer in our joint pretrial stipulation, but we don't

6  intend to request damages against Mr. Mackie from the jury.

7        **THE COURT:**  So, you're moving the Court to voluntarily

8  dismiss Mr. Mackie at this time.

9        **MR. EDWARDS:**  Yes, your Honor.

10        **THE COURT:**  And what's the defense position on that?

11        **MS. TINGLEY:**  The defense's position is that they were

12  both sued, and that they were, uhm, both stipulated to be joint

13  employers.

14        **THE COURT:**  Mr. Mackie should have stuck around.

15        *(Laughter)*

16        **THE COURT:**  So, you're saying that if the jury comes

17  back with a verdict against Mr. Mackie, he's jointly and

18  severally liable with Waste Pro.

19        **MS. TINGLEY:**  Yes.  And it's up to the plaintiff if he

20  wants to collect on that judgment.  Yes.

21        **THE COURT:**  Like I said, Mr. Mackie should have stuck

22  around.

23        **MR. ROSENTHAL:**  Bad advice of counsel.

24        **THE COURT:**  All right.  We'll leave the verdict form

25  the way it is.  And you can argue to the jury that if they come

1  back with a verdict, that you're not gonna ask that Mr. Mackie

2  have to pay any of it.

3  **MS. TINGLEY:**  And, your Honor, to that end, we -- I

4  know the style of the case you have the et al., but we would

5  ask -- because Mr. Andreu did testify he didn't know he sued

6  Mr. Mackie, we would ask that the et al. be removed and his

7  name be put on the style of the case on the verdict form.

8  **MR. EDWARDS:**  I'll only clarify, he didn't know that

9  we didn't -- it wasn't that he didn't know that Mr. Mackie was

10 sued.  He may not have known why, but --

11 **MR. ROSENTHAL:**  Yeah.  Did you know he was sued?

12 **PLAINTIFF ANDREU:**  Yes, I said during the trial it was

13 not directed at him.

14 **THE COURT:**  All right.  So, we'll take out the

15 "et al." on the style of the case and add "and Russell Mackie."

16 Any other objections to the jury instructions or the

17 verdict form?

18 **MS. TINGLEY:**  None other than previously noted by the

19 defense.

20 **MR. ROSENTHAL:**  No, your Honor.

21 Will the instructions be posted on -- well, that

22 doesn't make sense that they would be publicly available.  So,

23 I guess -- sorry, your Honor.

24 **THE COURT:**  The plaintiff has opening and closing

25 argument.  Who's going to do the closing arguments for the

1    plaintiff?

2            MR. EDWARDS:  Paul Edwards, your Honor.

3            THE COURT:  And who's going to do the closing for the

4    defendants?

5            MS. TINGLEY:  I will, your Honor.  Amy Tingley.

6            THE COURT:  And how much time do you need for your

7    closing argument, Ms. Tingley?

8            MS. TINGLEY:  I'd ask for 45 minutes.

9            THE COURT:  I'll give you 30.

10           How do you want to split your 30 minutes, Mr. Edwards?

11           MR. EDWARDS:  Your Honor, 20 and ten, if I could.

12           THE COURT:  And do you want a warning on your first

13   20?

14           MR. EDWARDS:  Yes, your Honor.

15           THE COURT:  How much?

16           MR. EDWARDS:  Three minutes.

17           THE COURT:  A warning on your last ten?

18           MR. EDWARDS:  Three minutes.

19           THE COURT:  A warning on your 30 minutes, Ms. Tingley?

20           MS. TINGLEY:  Yes, your Honor.

21           THE COURT:  How much?

22           MS. TINGLEY:  At five.

23           THE COURT:  All right.  So, we'll start at 9:30.  By

24   about 1:30 or so, if we haven't reached a verdict, I've got to

25   go to Miami for the judge's investiture.  So, at that point, I

1    would probably recess the deliberations and send the jury home

2    till Friday morning.  I could tell them when they come in that

3    we're gonna only be in session till about 1:30, or I could just

4    not mention it at all to them and kind of spring it on them.

5              MS. TINGLEY:  I'd prefer that they know.

6              MR. EDWARDS:  Plaintiff would prefer that they not

7    know.

8              THE COURT:  I don't know how we're going to do the

9    lunch, though.  Yeah, I think what we'll do is, I'll order

10   lunch for them, and they can deliberate through lunch.  And

11   then at 1:30, if they haven't reached a verdict, I'll bring

12   them out and tell them that I'm gonna recess until tomorrow,

13   and they'll come back tomorrow and resume their deliberations.

14             Anything further?

15             MR. EDWARDS:  Nothing from the plaintiff, your Honor.

16             MS. TINGLEY:  No.  We're starting at 9:30 tomorrow?

17             THE COURT:  9:30.

18             MS. TINGLEY:  Okay.  Do you have another matter before

19   that?

20             THE COURT:  Yeah, at nine o'clock, a criminal case.

21             MS. TINGLEY:  Do you mind if we come and mark up the

22   exhibits in each other's -- before we come in the morning, do

23   you mind if we -- can we have the exhibits?  We'll sit at one

24   of the tables.

25             THE COURT:  Yeah, I mean I don't know what time you're

1   going to be able to get in, though.  I don't know what time the

2   courtroom is going to open up.  But if Fran's in here, and the

3   courtroom is open, you're welcome to come in until they start

4   at nine o'clock.

5           **MS. TINGLEY:**  Okay.

6           **THE COURT:**  And I'm gonna want you to have gone over

7   all the exhibits and make sure everything's there that's

8   supposed to be there and nothing's there that's not supposed to

9   be there so we can send the exhibits back to the jury

10  deliberation room when they recess to consider their verdict.

11          Anything else?

12          **MR. ROSENTHAL:**  No, your Honor.

13          **THE COURT:**  All right.  We'll be in recess until 9:30

14  tomorrow on this case.

15          **MS. TINGLEY:**  Thank you.

16          **MR. EDWARDS:**  Thank you, your Honor.

17          **COURTROOM SECURITY OFFICER:**  All rise.

18          *(The Judge exited the courtroom)*

19          *(Proceedings concluded at 5:02 p.m.)*

20                        -  -  -  -  -

21

22

23

24

25

534

```
 1                    INDEX OF WITNESSES

 2      PLAINTIFF'S WITNESS                      PAGE

 3      Russell Mackie
        Direct by Mr. Edwards (Continued)        317
 4      Cross by Ms. Tingley                      376

 5      DEFENDANTS' WITNESS                      PAGE

 6      Regina Lombardo
        Direct by Ms. Tingley                    399
 7      Cross by Mr. Edwards                      404
        Redirect by Ms. Tingley                  408
 8
        Shane Muñoz
 9      Direct by Ms. Tingley                 411, 422
        Cross by Mr. Edwards                     460
10      Redirect by Ms. Tingley                  476

11      Russell Mackie
        Direct by Ms. Tingley                    481
12      Cross by Mr. Edwards                     491

13                     -  -   -   -   -

14                   INDEX OF EXHIBITS

15      DEFENDANTS' EXHIBITS:            MARKED      RECEIVED

16      3                                 434          437

17                     -  -   -   -   -

18

19                 C E R T I F I C A T E

20       I certify that the foregoing is a correct transcript from

21       the record of proceedings in the above-entitled matter.

22

23
          /S/Francine C. Salopek            5-16-18
24      Francine C. Salopek, RMR-CRR      Date
        Official Court Reporter
25
```

**COURTROOM SECURITY OFFICER: [19]** 317/3 317/12 375/8 375/25 376/12 389/25 398/6 400/11 421/8 421/20 422/11 479/12 479/18 479/22 481/4 497/5 499/12 499/15 533/16
**MR. EDWARDS: [102]**
**MR. HUDSON: [1]** 505/11
**MR. ROSENTHAL: [69]**
**MS. TINGLEY: [179]**
**PLAINTIFF ANDREU: [1]** 530/11
**THE COURT REPORTER: [11]** 319/20 400/9 410/20 410/22 415/8 429/20 471/12 503/22 510/6 516/12 523/13
**THE COURT: [275]**
**THE WITNESS: [13]** 366/14 374/16 389/18 399/17 399/19 400/10 400/12 409/4 410/25 429/22 464/24 479/5 481/14

**$**

**$1,030 [1]** 453/6
**$150 [1]** 329/20
**$155 [1]** 401/17
**$25 [1]** 330/10
**$250,000 [3]** 465/3 465/4 465/8
**$50 [11]** 323/23 324/2 324/24 330/16 443/8 443/14 445/6 445/8 445/9 445/14 450/16
**$75 [4]** 327/20 328/10 329/24 330/4
**$930 [2]** 450/3 450/19

**'**

**'91 [1]** 423/3
**'deliberate,' [1]** 525/18
**'intentional.' [1]** 525/18
**'voluntary,' [1]** 525/17
**'willful' [1]** 525/16

**-**

**-out [1]** 408/2

**.**

**.5 [3]** 448/4 448/10 453/21

**/**

**/S/Francine [1]** 534/23

**1**

**1.5 [1]** 515/2
**10 [2]** 501/23 502/2
**10-26-2014 [1]** 386/6
**109 [5]** 393/20 394/4 504/9 504/12 504/13
**1098 [22]** 323/4 332/1 332/22 334/9 334/25 335/1 345/16 346/1 346/7 346/8 346/13 347/3 348/17 350/19 350/24 355/11 355/25 360/4 374/3 380/25 471/2 485/15
**1098ed [2]** 350/6 484/19
**1098s [3]** 332/21 333/11 356/25
**10:41 [1]** 376/3
**10:57 [1]** 376/3
**11 [12]** 324/6 384/24 502/12 502/15 503/6 503/8 503/15 505/20 508/7 511/11 512/19 513/21
**11-8-2014 [1]** 386/7
**112 [22]** 391/24 391/24 392/3 394/12 396/3 396/17 396/25 397/3 397/5 397/6 504/18 504/20 505/3 505/4 505/25 507/19 508/11 508/12 509/17 509/18 509/20 510/21
**114 [1]** 423/23
**115 [9]** 394/5 394/7 396/10 397/7 397/7 397/10 423/24 504/11 515/23
**11th [2]** 387/23 401/12
**12 [7]** 324/6 344/5 426/1 503/7 514/2 514/3 518/22
**12 days [1]** 325/10 325/24
**12 hours [1]** 383/5

**12 o'clock [2]** 344/4 493/9
**12:17 [1]** 421/23
**13 [7]** 368/18 515/9 515/11 515/16 516/4 519/5 519/12
**13 hours [1]** 369/16
**13.95 [2]** 327/23 328/9
**13th [2]** 324/22 390/17
**14 [11]** 352/18 352/25 368/8 368/13 368/18 370/1 386/17 512/22 519/15 521/18 524/21
**14-hour [1]** 367/4
**140 [1]** 361/3
**14th [2]** 325/21 388/5
**15 [5]** 363/14 367/4 416/18 524/24 527/9
**15 hours [2]** 352/18 352/25
**15-hour [4]** 368/8 368/13 368/18 370/1
**15-minute [1]** 499/12
**15.28 [1]** 454/16
**15.35 [1]** 328/8
**15.37 hours [1]** 327/22
**155 [2]** 440/13 452/2
**156 [2]** 444/16 444/17
**158 [2]** 447/10 447/11
**159 [2]** 455/6 455/7
**15th [1]** 386/24
**16 [3]** 367/4 388/17 525/2
**162 [1]** 457/17
**163 [1]** 458/14
**16th [3]** 443/8 443/15 443/16
**17 [6]** 389/2 525/5 525/9 525/21 526/7 526/11
**17-60926-CIV-WPD [1]** 315/4
**17th [1]** 329/16
**18 [7]** 315/7 317/1 422/1 506/22 506/25 526/16 534/23
**19 [1]** 526/22
**19.12 [1]** 402/23
**1940s [1]** 424/1
**1962 [1]** 502/23
**1967 [2]** 395/1 504/15
**1989 [2]** 422/24 422/25
**1990 [1]** 423/2
**1:15 [1]** 421/20
**1:30 [6]** 421/7 421/8 421/20 531/24 532/3 532/11
**1:35 [1]** 422/1

**2**

**20 [5]** 425/23 426/1 526/25 531/11 531/13
**20 hours [1]** 383/5
**200 [7]** 405/14 456/3 456/6 456/10 463/13 463/15 463/24
**200 pages [1]** 476/2
**2000 [2]** 502/22 503/5
**2001 [1]** 519/2
**2006 [1]** 391/9
**2007 [2]** 396/16 424/6
**2009 [1]** 392/25
**2012 [1]** 438/8
**2013 [4]** 412/21 438/7 457/6 457/12
**2014 [8]** 323/23 324/23 325/21 384/24 386/6 386/7 386/20 387/19
**2015 [9]** 326/13 329/16 346/1 386/24 386/24 401/12 401/13 448/13 448/13
**2016 [3]** 361/24 387/23 387/23
**2017 [3]** 388/14 388/15 517/1
**2018 [5]** 315/7 317/1 390/12 390/17 422/1
**205F [1]** 316/10
**207 [8]** 420/23 420/24 502/18 502/25 517/4 519/22 519/22 520/19
**20th [1]** 316/3
**21 [1]** 526/25
**21st [1]** 327/10
**22 years [2]** 357/22 488/9
**220 [1]** 316/6
**22nd [2]** 388/15 395/1
**23rd [1]** 443/8

**24 [2]** 456/21 457/5
**24 hours [1]** 457/4
**24-hour [1]** 456/23
**24th [2]** 387/23 401/13
**25th [2]** 448/13 451/12
**26th [1]** 346/1
**28th [1]** 386/24
**29 C.F.R. 109 [1]** 393/20
**29 C.F.R. 778.108 [2]** 517/18 519/23
**29 C.F.R. 778.109 [1]** 423/22
**29 C.F.R. 778.112 [2]** 394/1 423/22
**29 C.F.R. 778.115 [1]** 394/1
**29 C.F.R. 778.318 [1]** 498/18
**29 U.S. Code [2]** 420/23 423/23
**29 U.S.C. 207 [4]** 502/25 517/4 519/22 520/19
**299 [1]** 316/10
**2:57 [1]** 479/21
**2nd [2]** 390/12 390/21

**3**

**3.3 [1]** 362/10
**3.3 hours [2]** 362/22 493/8
**3.33 hours [1]** 388/4
**30 [8]** 352/10 384/24 416/19 425/23 450/21 531/9 531/10 531/19
**30,000 [1]** 339/14
**30th [2]** 323/23 361/24
**317 [1]** 534/3
**31st [1]** 452/22
**32801 [1]** 316/7
**33301 [1]** 316/10
**33304 [1]** 316/4
**36,000 [1]** 339/15
**37 [1]** 328/9
**376 [1]** 534/4
**396.11 [1]** 323/7
**399 [1]** 534/6
**3:18 [1]** 479/21
**3:50 [1]** 499/15
**3rd [1]** 326/13

**4**

**4-16 [1]** 388/17
**4-17 [1]** 389/2
**4.02 [2]** 341/4 341/13
**4.02 hours [1]** 392/7
**4.1 [1]** 340/13
**4.1 hours [2]** 470/21 497/22
**4.1-hour [1]** 340/7
**40 [8]** 394/22 396/14 397/18 448/10 453/20 454/16 458/19 514/24
**40 hours [5]** 448/6 458/17 514/18 514/19 514/21
**40-hour [1]** 515/4
**400 [1]** 465/25
**404 [1]** 534/7
**408 [1]** 534/7
**411 [1]** 534/9
**422 [1]** 534/9
**434 [1]** 534/16
**437 [1]** 534/16
**45 [1]** 531/8
**45 miles [1]** 363/12
**460 [1]** 534/9
**476 [1]** 534/10
**481 [1]** 534/11
**491 [1]** 534/12
**4:09 [1]** 499/15
**4:30 [1]** 480/16

**5**

**5-11 [1]** 384/24
**5-16-18 [1]** 534/23
**5-25-14 [1]** 386/1
**5-30 [1]** 384/24

**5**

**5.5** [1]  362/6
**5.77** [1]  451/16
**50** [11]  390/3 390/6 390/8 397/23 398/3
485/21 497/10 497/16 498/25 499/1 499/5
**50 percent** [3]  411/19 461/18 461/21
**500** [1]  464/16
**500 hours** [1]  413/16
**55.28** [2]  453/3 454/16
**55.28 hours** [2]  452/21 453/7
**59.12** [1]  402/9
**5:02** [1]  533/19

**6**

**66.28** [1]  402/7
**670** [1]  465/25
**6:55** [1]  379/13

**7**

**7.70** [1]  457/16
**769-5657/mjsfcs** [1]  316/11
**778.108** [2]  517/18 519/23
**778.109** [1]  423/22
**778.112** [5]  394/1 423/22 502/15 503/11
508/25
**778.114** [1]  423/23
**778.115** [2]  394/1 498/21
**778.12** [1]  498/15
**778.122** [1]  395/8
**778.211** [4]  520/5 520/10 520/17 524/3
**778.318** [1]  498/18
**7th** [1]  448/13

**8**

**8.87** [1]  331/2
**8.87 hours** [1]  331/11
**801** [1]  316/3
**8th** [1]  386/20

**9**

**9,000-page** [1]  339/18
**954** [1]  316/11
**99 percent** [1]  507/15
**9:21** [2]  315/7 317/1
**9:30** [7]  497/3 497/3 497/5 531/23 532/16
532/17 533/13
**9th** [1]  388/14

**A**

**a.m** [5]  315/7 317/1 376/3 376/3 379/12
**abandoned** [2]  523/12 523/18
**ability** [2]  392/3 487/12
**above** [9]  318/14 318/22 330/15 356/13
428/17 430/7 440/3 527/10 534/21
**above-entitled** [1]  534/21
**absent** [1]  495/10
**absolutely** [14]  362/15 362/18 363/13
377/14 382/20 385/25 388/13 413/25 447/4
459/5 468/8 470/10 487/21 502/17
**accept** [1]  529/3
**acceptable** [3]  391/25 485/14 514/14
**access** [1]  489/19
**accessible** [1]  490/2
**accommodating** [1]  341/15
**accommodations** [1]  344/10
**accord** [1]  480/13
**accordance** [2]  350/19 397/21
**accounting** [2]  320/15 411/18
**accumulated** [1]  383/15
**accurate** [7]  435/9 435/10 436/22 441/22
459/10 483/9 488/23
**across** [2]  463/19 464/1
**Act** [16]  394/11 397/22 413/5 413/22 420/4
420/5 420/8 420/14 430/23 430/25 433/4
501/23 502/18 506/20 517/19 525/12
**action** [1]  322/18

**add** [14]  401/3 401/4 401/7 401/22 403/8
403/17 450/5 454/5 504/4 505/17 513/3
518/15 519/4 530/15
**added** [15]  395/21 395/23 397/5 419/1
425/15 443/3 446/25 450/18 452/5 504/24
506/13 509/8 512/9 516/6 520/14
**adding** [2]  503/14 516/18
**addition** [6]  395/5 407/22 424/19 428/5
429/12 489/1
**additions** [1]  527/2
**address** [2]  381/3 424/1
**addressed** [5]  432/22 432/23 441/16 444/19
473/20
**addresses** [1]  424/7
**addressing** [1]  424/13
**adequate** [3]  525/23 526/2 526/4
**adhering** [1]  459/12
**administrative** [2]  528/2 528/5
**admitted** [3]  323/22 324/22 437/12
**admonition** [9]  317/16 375/5 376/16 398/10
421/5 422/15 479/9 481/8 496/24
**ADP** [4]  355/7 386/23 387/23 401/12
**advance** [2]  439/17 524/20
**advice** [40]  371/16 371/23 373/6 373/12
373/13 373/15 374/1 410/1 410/8 410/10
410/10 412/16 412/18 412/22 413/5 414/2
421/12 421/13 423/8 428/3 437/24 438/20
446/2 458/8 458/10 459/3 459/4 459/9 459/9
459/10 459/12 459/22 460/4 465/10 465/13
472/19 482/7 528/2 528/5 529/23
**advise** [4]  460/8 462/1 475/1 475/9
**advised** [3]  374/11 462/3 472/11
**advisers** [1]  390/24
**advising** [3]  411/20 411/23 461/19
**advisories** [1]  528/1
**advisory** [2]  501/14 526/21
**affects** [3]  367/22 367/22 408/1
**afraid** [1]  358/24 410/13
**after-the-fact** [1]  344/20
**afternoon** [13]  377/15 378/4 404/4 404/5
411/1 411/7 411/8 460/24 460/25 480/16
491/25 492/1 497/1
**agree** [19]  320/1 320/7 322/7 324/25 325/6
326/16 328/7 330/15 336/21 352/21 356/1
361/12 362/3 362/5 367/13 368/7 370/10
499/8 501/13
**agreement** [12]  337/2 337/5 337/8 338/19
339/21 339/23 477/15 498/18 498/19 520/20
522/23 523/1
**agreements** [2]  471/24 472/3
**ah** [2]  324/6 489/3
**air** [4]  377/7 377/18 377/21 378/8
**al** [4]  315/8 530/4 530/6 530/15
**Alabama** [1]  462/25
**Allen** [13]  392/20 394/3 396/3 396/9 396/10
397/9 397/12 397/17 504/9 504/11 511/8
515/23 518/23
**Allen vs. Board** [1]  392/20
**allocate** [2]  442/17 442/19 446/4
**allocated** [14]  442/14 442/22 443/13 443/17
443/23 443/25 444/1 444/3 444/6 444/13
445/10 447/5 449/16 458/11
**allocation** [1]  448/21
**allow** [14]  317/17 375/6 376/17 398/11
421/6 421/14 422/16 432/4 442/6 472/2
479/10 481/9 496/24 507/7
**allowed** [2]  437/4 521/15
**allows** [2]  449/15 507/1
**almost** [1]  508/9
**alone** [1]  362/25
**altercation** [2]  365/3 388/21
**alternate** [1]  445/16
**alternative** [5]  397/6 445/2 445/15
**alternatives** [1]  393/25
**although** [3]  504/11 514/7 514/10
**altogether** [1]  466/5

**amendment** [1]  506/23
**amount** [17]  328/5 328/7 363/11 371/8
446/22 449/20 451/9 451/10 451/16 454/22
497/25 498/1 513/16 514/25 515/14 527/10
527/16
**amounts** [1]  517/11
**Amy** [4]  316/5 520/8 525/6 531/5
**analysis** [12]  414/11 434/6 434/24 438/3
439/8 440/12 440/20 441/12 448/25 454/20
455/13 472/6
**analyzed** [4]  433/9 433/16 433/21 434/4
**Anderson** [1]  521/10
**ANDREU** [52]
**Andreu vs. Waste Pro** [1]  483/15
**Andreu's** [9]  323/3 338/14 384/19 388/8
467/2 467/11 483/18 485/25 486/17
**announced** [19]  519/17 519/19 519/21
519/25 520/23 521/21 521/22 521/24 522/5
522/7 522/9 522/12 522/15 522/16 522/19
523/2 523/3 523/24 524/23
**announces** [2]  523/9 523/16
**annual** [1]  355/1
**anonymous** [1]  343/11
**answer** [20]  322/23 325/11 327/24 330/3
334/4 355/19 364/12 373/25 374/4 374/8
374/10 385/5 415/2 424/23 436/1 456/5
459/19 465/1 527/8 527/21
**answers** [2]  320/11 497/24
**anticipate** [1]  409/19
**anytime** [1]  474/15
**aol.com** [1]  316/11
**apologies** [4]  329/18 363/21 465/17 466/18
**apologize** [12]  328/9 332/19 386/4 398/14
398/19 451/14 452/19 452/24 500/11 500/22
510/9 511/20
**Appeals** [4]  392/21 392/22 394/3 424/7
**APPEARANCES** [1]  316/1
**applicable** [5]  395/16 412/10 419/11 420/10
433/22
**applied** [4]  420/1 420/10 470/7 474/8
**applies** [3]  420/14 477/7 506/13
**apply** [3]  412/8 424/14 498/15
**applying** [1]  424/17
**appreciate** [1]  323/12
**appreciated** [1]  496/8
**approach** [11]  345/20 373/7 390/15 391/13
398/15 409/12 409/17 418/5 434/10 472/13
473/25
**approachable** [1]  343/8
**approval** [2]  386/14 387/12
**approve** [4]  337/22 385/23 386/20 494/19
**approved** [7]  385/13 385/15 387/15 387/17
392/18 393/12 500/1
**approximately** [1]  413/17
**approximations** [1]  521/17
**April** [10]  315/7 317/1 326/13 329/16 388/14
388/15 390/12 390/21 422/1 438/10
**April 17th** [1]  329/16
**APRIL 18** [1]  422/1
**April 22nd** [1]  388/15
**April 2nd** [2]  390/12 390/21
**April 3rd** [1]  326/13
**April 9th** [1]  388/14
**area** [20]  336/25 338/25 339/4 339/11
339/13 347/25 348/1 348/17 348/19 348/20
352/3 411/16 411/18 413/7 415/25 423/1
423/4 433/7 441/22 482/16
**areas** [7]  338/22 345/14 416/1 416/3 433/9
433/25 439/3
**aren't** [3]  319/16 320/16 383/18
**arena** [1]  423/10
**argue** [5]  513/25 515/6 515/7 526/6 529/25
**argued** [1]  396/5
**argument** [4]  394/6 518/21 530/25 531/7
**arguments** [2]  497/4 530/25
**arrangement** [1]  340/8

**A**

**arrive [2]** 379/13 455/11
**arriving [1]** 427/2
**aspect [4]** 392/15 413/23 417/4 490/21
**aspects [2]** 426/10 426/12
**asserted [1]** 432/5
**assessment [1]** 406/3
**assign [1]** 352/8
**assigned [8]** 331/11 340/18 340/21 343/17 344/13 379/9 388/8 507/20
**assignment [2]** 358/6 358/25
**assignments [4]** 331/8 338/22 351/12 383/1
**assume [3]** 323/3 338/17 352/25
**assumed [1]** 470/22
**assuming [2]** 450/10 450/12
**assumption [2]** 346/21 452/14
**Atlanta [1]** 462/20
**attached [2]** 370/2 370/15
**attack [1]** 484/23
**attempting [1]** 432/2
**attend [1]** 493/21
**attendance [3]** 324/12 324/14 324/15
**attended [1]** 492/18
**attending [2]** 321/18 494/5
**attorney [12]** 341/3 371/14 373/8 374/1 374/11 409/20 411/10 413/11 416/10 416/10 422/23 464/12
**attorney-client [1]** 373/8
**attorneys [6]** 413/19 415/20 415/23 416/1 438/18 461/6
**attributable [1]** 447/22
**attributed [8]** 325/12 445/8 445/13 457/25 458/3 458/6 458/7 458/13
**attributing [1]** 460/12
**audit [65]**
**audited [1]** 373/24
**auditing [1]** 374/2
**audits [3]** 416/21 426/21 429/4
**auto [1]** 393/7
**auto-deducted [1]** 393/7
**automobile [1]** 390/23
**Avenue [2]** 316/3 316/6
**averages [1]** 521/17
**award [1]** 528/23
**aware [6]** 323/16 361/16 364/3 381/1 471/23 490/12

**B**

**backdoor [2]** 380/1 380/4
**background [1]** 422/22
**barbecues [1]** 352/5
**base [1]** 355/1
**basic [14]** 318/21 322/2 337/10 337/14 337/17 338/4 339/5 339/5 339/19 339/20 339/20 499/24 500/1 500/3
**basis [13]** 367/20 385/5 397/1 446/21 449/6 461/10 475/5 498/16 507/3 507/8 507/9 514/8 514/24
**Battery [1]** 502/24
**bear [1]** 438/25
**becoming [2]** 494/7 495/6
**began [2]** 422/24 423/2
**begin [2]** 379/15 379/23
**beginning [5]** 323/20 330/19 379/14 429/2 513/19
**behind [2]** 348/6 492/4
**believe [57]**
**believed [1]** 484/12
**belongings [1]** 382/8
**bench [9]** 317/2 352/11 398/18 398/20 398/25 399/3 399/5 409/17 409/18
**benefit [11]** 352/15 370/8 376/24 400/2 403/5 411/22 415/19 424/2 438/15 440/22 476/22
**benefits [4]** 337/10 337/20 371/5 371/7
**Besides [1]** 460/2

**best-case [1]** 363/4
**beyond [6]** 356/13 375/17 394/5 421/13 439/9 446/2
**bigger [1]** 406/14
**binding [3]** 502/23 503/2 516/24
**biweekly [1]** 401/8
**blacked [3]** 472/20 472/25 473/7
**blacked-out [2]** 472/20 473/7
**blatantly [1]** 493/11
**blinkers [1]** 378/11
**blocked [2]** 349/20 350/22
**blurry [1]** 450/15
**Blvd [1]** 316/10
**board [2]** 392/20 400/4
**boiler [1]** 353/7
**bonus [110]**
**bonuses [71]**
**bosses [1]** 474/18
**bottom [6]** 385/12 386/15 417/15 444/17 464/8 521/4
**boxes [1]** 378/22
**Boyd [1]** 517/13
**Boyle [8]** 516/25 517/14 517/15 517/24 518/3 518/15 518/17 519/3
**Boyle v. City [1]** 516/25
**brakes [1]** 382/4
**branch [1]** 469/10
**break [2]** 421/2 446/13
**breakdown [2]** 331/14 338/11
**breaks [1]** 474/10
**broad [6]** 411/17 412/10 414/5 415/25 419/10 464/8
**broader [1]** 440/5
**broadly [1]** 420/24
**broken [1]** 446/15
**Broward [3]** 316/10 353/6 392/25
**bucket [4]** 355/15 482/20 495/9 495/15
**bulk [2]** 467/18 482/10
**bulletin [6]** 497/18 497/25 502/15 503/19 522/6 522/13
**bulletins [1]** 498/10
**bump [2]** 360/14 361/6
**bunch [1]** 360/18
**burden [15]** 392/23 392/24 393/1 393/2 393/3 393/10 393/11 393/12 393/13 393/16 393/17 393/18 500/9 500/12 500/18
**bus [2]** 394/6 395/3
**business [6]** 328/21 359/9 359/17 359/19 367/8 412/4
**busy [1]** 489/25
**butcher [1]** 519/2
**button [1]** 357/18 357/19
**buy [2]** 339/15 362/17

**C**

**C.F.R. [8]** 393/20 394/1 394/1 423/22 423/22 498/18 517/18 519/23
**cabinets [1]** 470/14
**calculate [14]** 394/9 396/4 404/22 404/24 405/13 405/17 419/18 423/21 424/1 431/3 442/2 504/16 504/19 514/24
**calculated [15]** 338/11 338/12 367/23 367/24 383/9 417/14 442/21 447/19 450/19 450/20 455/16 458/22 461/20 466/3 477/4
**calculates [1]** 404/21
**calculating [12]** 369/3 393/25 403/4 419/16 419/21 424/18 425/15 442/9 446/25 447/12 447/19 455/20
**calculation [17]** 354/18 370/3 371/10 371/12 442/13 442/15 449/5 449/6 457/20 457/21 461/13 473/2 507/6 515/1 515/16 524/7 527/11
**calculations [1]** 399/25
**call [21]** 332/22 343/10 347/11 347/13 347/15 355/11 364/20 364/25 365/8 365/9 365/12 389/5 398/12 409/7 411/25 428/11

**475/17 475/18 481/10 485/15 498/6
**called [17]** 319/5 346/7 346/13 349/3 349/4 355/11 355/15 364/17 372/12 409/20 446/18 454/8 474/22 491/13 491/15 491/16 507/12
**calls [16]** 319/19 320/3 330/8 331/3 348/9 353/2 358/8 389/6 399/13 410/20 414/3 432/3 436/13 459/23 481/12 483/10
**cameras [1]** 378/11
**capacity [1]** 483/8
**capital [1]** 512/12
**captured [1]** 444/20
**capturing [2]** 419/12 431/5
**card [27]** 324/3 377/4 381/11 385/9 385/9 385/12 385/12 385/15 386/11 386/14 386/17 387/9 387/10 387/12 387/15 387/18 388/1 388/14 417/19 417/20 418/8 431/7 442/23 443/7 443/14 443/19 443/19
**cards [10]** 417/9 417/11 418/11 418/13 419/16 425/8 425/9 425/11 427/3 444/5
**career [1]** 464/10
**careful [1]** 459/8
**Carey [1]** 396/15
**Carolinas [1]** 463/2
**casual [1]** 426/18 426/20
**catch [2]** 493/25 494/3
**catchall [2]** 343/3 348/23
**categories [6]** 424/14 425/10 441/7 441/14 441/15 448/24
**category [6]** 355/18 356/7 431/2 435/4 436/3 455/25
**cause [1]** 353/12
**causes [1]** 353/10
**cavalier [1]** 323/4
**caveat [1]** 457/1
**cell [1]** 343/8
**certainty [2]** 347/6 388/10
**certify [1]** 534/20
**cetera [1]** 429/2
**challenges [1]** 351/3
**chance [2]** 358/2 490/16
**characterize [2]** 435/14 435/16
**charge [6]** 375/22 480/17 480/18 481/1 493/13 499/9
**check [8]** 321/12 321/14 365/16 378/1 378/4 409/8 427/5 466/19
**checked [2]** 321/8 427/6
**checking [4]** 378/8 429/1 431/9 431/19
**checklist [1]** 425/5
**chemicals [1]** 485/18
**child [1]** 343/24
**chose [1]** 486/18
**Circuit [21]** 390/20 390/24 392/21 392/22 394/3 394/8 397/8 424/7 424/25 478/14 498/8 502/20 502/23 503/1 503/2 503/5 504/9 515/23 516/24 517/1 517/25
**Circuit's [1]** 396/3
**circumstance [4]** 440/10 446/16 446/19 504/19
**circumstances [9]** 353/12 380/9 396/4 412/7 412/8 477/5 480/21 486/25 493/5
**cite [2]** 502/18 518/7
**cited [2]** 519/1 519/21
**cites [1]** 519/3
**cities [2]** 379/11 379/16
**city [12]** 333/16 333/21 333/24 339/1 364/8 364/25 365/1 365/3 384/5 389/6 516/25 516/25
**CIV [1]** 315/4
**claim [1]** 483/4
**claimed [1]** 498/9
**claims [1]** 336/5
**clarification [1]** 323/6
**clarify [2]** 508/25 530/8
**classification [1]** 502/3
**classified [4]** 441/13 473/21 474/5 475/8
**clear [13]** 332/19 361/22 441/17 448/2 456/4

**C**

**clear...** [8] 470/22 477/8 478/4 478/6 478/22 513/23 515/11 521/15
**cleared** [1] 350/1
**client** [7] 373/8 411/25 420/7 425/6 434/8 434/8 465/22
**clients** [10] 411/20 411/23 423/8 461/19 461/22 461/24 465/11 465/15 465/15 477/15
**clock** [39] 332/4 332/4 332/13 332/14 335/9 335/11 335/18 335/19 335/20 335/20 336/16 336/16 343/11 343/12 344/8 350/5 360/5 360/5 369/12 374/6 376/23 376/24 382/9 382/9 382/11 382/12 382/23 383/13 383/13 393/7 405/23 406/4 406/10 407/25 408/2 417/18 428/20 456/9 493/8
**clock-in** [1] 408/2
**clock-out** [1] 407/25
**clocked** [3] 344/5 417/10 417/11
**clocking** [4] 414/14 414/15 429/2 485/8
**clocks** [2] 377/2 377/2
**close** [4] 381/15 410/24 434/4 501/7
**closed** [2] 486/8 493/6
**closes** [1] 486/9
**closing** [6] 480/22 497/4 530/24 530/25 531/3 531/7
**closings** [1] 375/22
**code** [3] 346/9 420/23 423/23
**Cohen's** [1] 470/11
**collapsing** [2] 469/8 473/2
**collect** [2] 319/2 529/20
**collected** [2] 415/22 417/6
**collecting** [3] 380/19 415/20 482/17
**collection** [2] 370/20 417/2
**column** [3] 450/10 451/17 451/18
**columns** [3] 451/4 451/5 451/9
**combination** [4] 330/10 356/2 417/2 418/24
**combined** [2] 447/6 505/25
**combustible** [1] 485/19
**comfortable** [1] 328/17
**commenced** [1] 440/19
**comment** [3] 354/12 363/18 458/20
**commission** [1] 383/21
**commissioned** [1] 374/21
**committed** [1] 322/15
**common** [2] 412/11 525/16
**communicate** [2] 335/17 489/2
**communicated** [4] 335/14 344/21 344/23 490/20
**communicating** [4] 432/21 455/7 457/18 458/15
**communication** [2] 432/15 432/19
**communications** [1] 432/18
**companies** [3] 355/2 461/22 462/7
**company** [15] 319/2 329/10 338/16 355/18 361/11 383/23 414/10 414/16 417/16 433/10 467/25 469/4 469/11 469/12 492/12
**company's** [2] 485/8 496/10
**company-wide** [3] 469/4 469/11 469/12
**compare** [1] 431/13
**compared** [3] 319/15 419/25 484/6
**compensable** [1] 474/17
**compensate** [3] 428/21 502/9 514/22
**compensated** [4] 369/23 397/19 419/14 474/21
**compensation** [82]
**complained** [1] 358/7
**complaint** [10] 336/9 342/25 358/21 358/24 359/2 360/15 364/4 364/11 467/8 496/6
**complaints** [3] 321/25 380/10 412/5
**complement** [1] 356/8
**complete** [9] 346/12 346/12 347/12 347/14 355/25 380/25 439/20 498/1 524/12
**completed** [4] 332/1 342/9 374/3 380/20
**completion** [1] 375/14
**compliance** [7] 412/9 462/2 462/4 462/5 472/6 497/17 502/25

**complied** [1] 474/23
**complies** [1] 350/24
**comply** [1] 431/5
**complying** [6] 347/3 347/8 419/11 420/8 433/10 460/10
**component** [6] 406/5 406/24 471/23 475/15 489/12 490/25
**components** [2] 382/2 396/25
**comprehensive** [1] 464/9
**computed** [1] 383/9
**computer** [3] 315/25 405/8 405/16
**concern** [15] 377/23 410/2 441/22 442/1 442/12 443/9 443/12 443/17 444/7 444/19 460/13 474/15 485/18 486/2 486/4
**concerned** [1] 442/12
**concerning** [4] 439/13 458/23 460/9 461/12
**concerns** [3] 343/5 468/18 486/19
**concluded** [1] 533/19
**conclusion** [3] 436/14 457/24 483/11
**conclusions** [1] 440/1
**condensed** [1] 378/2
**condension** [1] 378/3
**condition** [1] 485/12
**conduct** [2] 412/25 431/12
**conducted** [3] 374/5 374/12 416/12
**conducting** [1] 430/18
**confer** [3] 387/23 404/3 473/9
**conference** [6] 375/22 389/3 480/17 480/18 481/1 499/9
**confident** [1] 459/9
**conform** [1] 508/9
**confusing** [1] 368/11
**conjunction** [1] 522/19
**connection** [1] 415/14
**considerable** [1] 382/3
**consistent** [10] 365/15 390/20 392/1 392/2 396/2 443/19 444/11 484/11 513/17 527/18
**consistently** [1] 391/20
**construe** [1] 424/8
**construed** [2] 390/19 390/25
**consultants** [1] 383/22
**consulted** [1] 528/23
**consulting** [1] 423/7
**contact** [2] 434/21 438/12
**contained** [6] 438/20 467/3 472/7 472/19 473/12 482/7
**container** [2] 380/8 387/7
**containers** [1] 381/3
**contend** [1] 508/22
**contending** [1] 502/5
**content** [1] 423/16
**contents** [5] 434/23 439/6 439/24 440/14 455/6
**contested** [1] 480/11
**context** [1] 413/22 433/22 493/10
**CONTINUED** [3] 317/22 422/19 534/3
**continuous** [1] 474/22
**contract** [9] 339/1 339/3 384/1 384/11 384/12 519/18 520/20 522/23 523/1
**contractors** [2] 474/3 474/5
**contracts** [1] 417/3
**control** [9] 349/18 359/24 366/17 366/25 367/2 367/3 367/13 367/16 368/22
**conversation** [6] 344/24 363/23 487/1 487/13 488/13 494/7
**cooks** [1] 353/7
**cool** [1] 378/2
**copy** [7] 382/15 390/13 391/11 436/22 518/2 518/6 520/8
**Coral** [5] 364/8 384/3 389/3 389/6 511/16
**corporate** [10] 318/11 383/18 462/13 463/7 494/13 494/21 495/5 495/10 495/17 495/24
**correspondence** [1] 417/3
**corresponding** [7] 325/2 326/2 326/18 329/23 362/8 455/15 455/22
**corresponds** [1] 324/4

**counsel** [30] 317/6 375/1 375/17 376/7 403/21 404/1 408/6 410/8 422/5 460/18 473/10 475/13 478/2 480/2 480/4 480/10 491/10 499/21 505/7 518/20 519/11 520/16 520/22 521/5 525/7 527/24 528/2 528/5 528/24 529/23
**Counsel's** [2] 441/4 449/10
**counseling** [2] 412/16 412/18
**count** [2] 403/5 403/6
**counterintuitive** [1] 357/13
**country** [2] 463/19 464/1
**County** [1] 353/6
**court** [57]
**Court's** [2] 392/8 501/13
**courtroom** [24] 317/14 375/10 376/2 376/4 376/14 390/2 398/8 421/10 421/22 422/2 422/13 479/14 479/20 479/22 479/24 480/2 481/6 492/6 497/7 499/14 499/18 533/2 533/3 533/18
**cover** [4] 339/19 344/4 434/21 440/10
**covered** [1] 498/5
**covers** [3] 413/6 457/3 509/21
**coworkers** [1] 474/18
**created** [1] 425/8
**creature** [1] 507/12
**credibility** [2] 499/5 500/5
**criminal** [1] 532/20
**criteria** [1] 484/21
**cross** [14] 376/20 389/14 403/24 404/2 460/21 460/22 476/12 478/18 491/21 491/23 534/4 534/7 534/9 534/12
**cross-examination** [9] 376/20 389/14 403/24 404/2 460/21 460/22 476/12 491/21 491/23
**CRR** [2] 316/8 534/24
**CSRs** [1] 348/14
**Cummings** [1] 316/3
**cumulative** [7] 328/11 328/13 331/13 371/2 451/9 451/19 452/21
**curb** [1] 380/5
**customer** [6] 320/12 320/14 321/24 321/24 322/15 380/10

**D**

**dad** [1] 359/4
**daily** [29] 331/11 332/1 334/24 342/13 360/14 383/2 383/5 387/24 391/8 392/3 392/6 392/11 392/13 396/11 401/16 401/18 406/24 445/16 445/18 445/20 446/20 449/17 449/19 450/1 450/3 450/5 498/5 506/3 506/4
**damage** [1] 527/11
**damages** [10] 393/15 393/16 492/12 492/12 501/11 514/23 514/24 528/7 528/23 529/6
**data** [6] 415/21 431/5 433/7 433/9 433/15 433/21
**date** [9] 323/22 324/4 324/23 327/10 327/11 361/23 412/20 437/20 534/24
**dated** [1] 346/1
**dates** [1] 362/2
**Daubert** [2] 409/22 409/23
**daughter** [1] 344/2
**day's** [10] 394/13 395/9 406/24 509/2 509/18 509/23 510/3 510/16 510/25 511/17
**day/job** [4] 510/1 510/2 510/15 510/24
**dealt** [3] 436/23 475/19 475/20
**Debose** [2] 392/25 393/9
**Debose vs** [1] 392/25
**decide** [3] 499/6 502/10 521/13
**decided** [2] 344/18 526/19
**decision** [13] 366/17 371/21 390/11 390/19 391/1 394/4 396/3 397/12 424/6 478/14 478/14 501/14 504/11
**decisions** [2] 318/14 477/3
**decreased** [1] 512/1
**dedicated** [1] 462/7
**deducted** [1] 393/7

**D**

**deductions [3]** 391/10 391/18 391/20
**deemed [2]** 517/6 517/8
**deep [1]** 434/1
**defects [2]** 378/25 382/3
**defendant [11]** 316/5 390/3 392/18 482/24 483/9 492/2 497/20 497/23 526/12 528/15 528/16
**defendant's [1]** 528/17
**defendants [6]** 315/9 390/6 393/17 397/23 526/9 531/4
**defendants' [7]** 410/22 434/15 437/12 481/1 501/19 534/5 534/15
**defending [1]** 483/3
**defense [24]** 375/19 389/15 393/24 397/6 398/4 399/13 410/8 410/20 434/14 437/5 480/2 481/12 496/19 499/2 502/13 504/7 506/1 514/4 521/20 525/1 526/19 527/9 529/10 530/19
**defense's [7]** 393/18 504/8 505/21 506/3 507/18 517/3 529/11
**deferring [1]** 439/2
**deficiencies [2]** 323/9 323/9
**defined [1]** 517/5
**definition [4]** 414/24 516/6 526/14 526/15
**Defrene [3]** 498/7 513/13 513/14
**degree [1]** 388/10
**delay [3]** 368/20 369/15 370/15
**delays [9]** 349/17 353/19 359/21 359/24 367/1 367/15 367/21 368/22 374/7
**deliberate [1]** 532/10
**deliberation [1]** 533/10
**deliberations [2]** 532/1 532/13
**delineate [2]** 331/14 333/21
**delineation [1]** 334/24
**deliver [1]** 320/9
**delivery [1]** 320/16
**deny [3]** 398/3 498/25 499/5
**department [16]** 345/10 381/21 381/25 391/9 391/17 391/19 394/24 395/1 395/6 395/18 423/21 423/24 486/12 491/17 504/15 528/6
**depending [3]** 379/11 465/22 477/5
**depends [2]** 480/19 493/5
**deposition [7]** 340/10 461/4 467/10 468/4 470/24 483/14 483/15
**depth [5]** 425/23 426/1 426/8 426/22 427/21
**describe [8]** 378/20 424/25 426/9 441/25 443/2 460/6 484/5 485/3
**described [9]** 335/15 338/6 353/19 367/15 374/7 419/23 425/4 444/12 444/14
**describes [1]** 338/1
**describing [1]** 455/12
**description [1]** 440/5
**deserved [1]** 495/2
**design [3]** 351/16 353/24 433/1
**designation [1]** 463/11
**designed [4]** 351/13 353/22 363/2 492/25
**detail [6]** 324/3 325/2 337/23 339/18 386/25 434/4
**determination [4]** 498/12 501/2 501/9 501/9
**determinations [2]** 439/12 476/5
**determine [7]** 387/4 395/24 448/14 448/15 448/22 470/6 502/8
**determined [2]** 394/18 395/12
**determining [4]** 368/23 393/22 414/11 419/20
**develop [1]** 487/17
**developed [1]** 439/16
**deviser [1]** 498/21
**diesel [3]** 381/8 381/16 381/17
**difficult [1]** 514/23
**difficulty [1]** 354/6
**dilemmas [1]** 449/3
**Dimitrouleas [1]** 315/14
**direct [15]** 317/19 317/22 375/18 376/22

383/8 383/17 384/20 399/21 411/5 422/19 481/18 534/3 534/6 534/9 534/11
**directed [2]** 396/22 397/4 530/13
**directly [3]** 414/15 417/9 503/21
**disagree [6]** 357/4 357/6 368/3 368/15
**disagreement [1]** 499/23
**disappointing [1]** 488/3
**discern [3]** 336/7 336/8 336/13
**discipline [1]** 358/4
**disclaimer [1]** 527/8
**discretion [2]** 523/12 523/19
**discretionary [2]** 524/3 524/16
**discrimination [1]** 423/11
**discuss [15]** 317/16 357/10 375/6 376/16 389/7 398/10 410/10 421/6 422/15 434/8 441/20 471/2 479/10 481/8 496/24
**discussed [19]** 317/17 318/2 322/19 375/6 376/17 389/4 393/1 394/4 398/11 407/9 407/12 421/6 422/16 455/8 458/23 479/10 481/9 496/24 528/24
**discussing [2]** 393/20 404/7
**discussion [17]** 319/4 320/21 375/1 403/21 404/1 408/6 460/18 473/10 475/13 491/10 505/7 518/20 520/16 520/22 521/5 527/5 527/24
**dismiss [1]** 529/8
**dismissal [1]** 528/25
**dismissing [1]** 528/25
**disposal [4]** 333/19 333/20 333/25 382/20
**dispute [2]** 368/7 484/16
**disputed [1]** 513/16
**disregard [3]** 347/21 525/22 526/1
**disregarding [1]** 493/11
**distinguishes [1]** 524/16
**DISTRICT [5]** 315/1 315/2 315/15 316/9 396/17
**divide [9]** 402/3 402/6 402/14 407/20 442/10 452/12 452/25 477/23 477/25
**divided [10]** 395/24 406/7 406/11 406/15 406/21 414/6 439/25 448/1 448/9 453/6
**dividing [3]** 394/20 395/14 447/22
**division [18]** 315/3 343/2 372/13 372/15 373/3 383/19 384/14 384/14 384/16 384/17 414/25 466/13 466/22 482/16 487/17 488/17 494/16 495/3
**divisions [6]** 372/6 372/17 384/6 384/7 414/23 490/15
**dock [1]** 341/20
**docked [1]** 484/1
**document [11]** 332/12 334/8 339/18 360/4 416/24 417/2 434/14 436/18 448/15 469/24 470/1
**documenting [3]** 331/24 331/25 333/3
**documents [8]** 346/18 415/4 416/15 417/3 425/5 431/13 431/19 439/21
**dollar [1]** 401/23
**dollars [10]** 326/16 395/3 395/5 395/20 397/14 397/14 445/12 450/18 452/6 457/14
**door [3]** 358/22 380/6 380/6
**DOT [1]** 323/7
**double [1]** 407/19
**doubt [1]** 446/5
**draft [5]** 433/15 433/21 433/23 497/8 499/22
**draw [1]** 518/10
**drive [10]** 335/10 361/14 361/17 362/21 362/23 362/23 363/9 363/16 485/13 495/7
**driven [2]** 318/11 377/10
**driver [38]** 323/7 335/4 342/23 347/11 347/25 348/5 348/17 350/19 350/24 352/9 361/14 379/6 379/21 380/24 381/24 382/6 382/7 446/11 446/23 460/9 460/10 482/17 482/19 482/20 484/21 484/22 485/3 485/5 485/6 485/10 486/20 487/9 487/14 494/7 494/9 495/6 495/20 495/21
**driver's [2]** 334/2 380/12
**drivers [56]**

**drives [1]** 482/17
**driveway [1]** 356/9
**driving [7]** 354/16 359/17 371/9 377/5 379/3 409/9 511/16
**drop [1]** 489/24
**drove [1]** 361/16
**drug [1]** 416/6
**dump [18]** 348/18 363/1 379/25 380/7 380/15 380/16 381/4 381/4 485/16 486/1 486/6 486/8 486/9 486/10 493/4 493/6 493/7 493/10
**dumped [3]** 333/20 348/10 492/17
**duplicative [1]** 375/18
**DVIR [3]** 378/21 379/1 382/15

**E**

**early [6]** 341/16 341/19 392/10 412/21 427/2 494/4
**earn [4]** 324/17 327/25 328/10 419/1
**earned [26]** 327/20 328/23 329/20 330/18 387/1 407/11 442/16 442/18 442/18 442/20 443/14 443/16 443/22 443/24 444/2 444/13 445/6 445/9 447/21 452/9 458/1 458/2 458/5 458/12 458/25 471/18
**earning [4]** 386/23 387/22 511/21 512/2
**earnings [21]** 395/22 400/25 401/7 401/8 401/12 401/25 402/1 402/3 402/25 403/18 406/7 406/15 406/19 406/21 406/23 407/2 407/4 407/10 407/14 407/24 419/21
**earns [7]** 457/2 503/22 508/11 509/25 510/2 510/15 510/24
**easel [2]** 398/20 399/14
**easier [3]** 331/18 366/10 367/7
**easiest [1]** 433/14
**Easter [2]** 363/23 388/17
**easy [1]** 442/17
**ebbs [1]** 352/13
**Education [1]** 392/20
**Edwards [13]** 316/2 316/3 317/20 363/18 471/16 473/8 496/20 531/2 531/10 534/3 534/7 534/9 534/12
**EEO [1]** 416/7
**efficiently [1]** 520/25
**egregious [2]** 321/24 322/15
**eight [15]** 331/5 369/16 392/5 433/17 434/23 438/11 457/14 502/4 502/5 514/8 514/10 514/12 515/4 515/5 515/7
**eight-hour [5]** 502/4 502/5 514/8 514/10 515/4
**elderly [1]** 380/1
**elements [2]** 410/9 410/12
**Eleventh [17]** 390/20 392/20 392/21 394/3 394/8 396/2 397/8 424/6 424/24 478/14 502/23 503/2 504/9 515/23 516/24 516/25 517/25
**elicited [1]** 524/5
**eligible [6]** 324/8 335/21 335/22 338/9 455/17 457/22
**else's [1]** 350/2
**emails [1]** 474/18
**emergency [1]** 343/24
**emphasizing [1]** 490/22
**employed [5]** 411/11 481/20 516/12 516/17 517/6
**employee [80]**
**employee's [5]** 353/21 358/20 394/13 396/11 512/1
**employees [94]**
**employees' [1]** 455/21
**employer [9]** 390/19 390/25 391/10 391/18 392/23 478/7 497/23 523/9 529/5
**employer's [1]** 392/22
**employers [6]** 461/23 461/24 507/1 507/7 528/20 529/13
**employment [18]** 324/8 337/2 411/14 411/16 411/17 411/23 413/1 415/25 423/1

**E**

**employment...** **[9]** 423/2 423/10 423/14 440/19 484/12 488/17 489/15 517/7 517/21
**empty** **[3]** 486/11 486/13 486/15
**enable** **[1]** 498/20
**Encino** **[2]** 390/12 390/22
**encompass** **[1]** 456/16
**encompassed** **[2]** 333/4 414/20
**encompasses** **[2]** 396/11 456/19
**encompassing** **[4]** 329/3 329/5 339/13 484/18
**encountered** **[2]** 358/19 445/23
**end-to-end** **[1]** 412/25
**engaged** **[2]** 412/21 413/10
**engagement** **[1]** 413/9
**enjoy** **[3]** 352/15 366/2 367/9
**enjoyable** **[1]** 426/12
**ensure** **[1]** 455/16
**entail** **[2]** 411/15 432/10
**entailed** **[1]** 426/9
**entitled** **[8]** 342/10 394/21 395/15 396/7 397/10 514/18 514/20 534/21
**entry** **[1]** 388/17
**Eola** **[1]** 316/7
**equally** **[1]** 351/15
**equals** **[2]** 407/2 448/11
**equipment** **[6]** 360/18 361/10 361/14 361/17 365/16 495/7
**errand** **[1]** 345/6
**error** **[1]** 526/14
**especially** **[3]** 357/15 357/19 362/22
**Esq** **[4]** 316/2 316/2 316/5 316/5
**essential** **[1]** 485/5
**essentially** **[3]** 447/2 501/8 526/4
**established** **[3]** 515/12 515/13 515/18
**estimate** **[2]** 461/21 463/17
**estimating** **[2]** 464/15 464/17
**estimations** **[1]** 521/17
**et** **[5]** 315/8 429/2 530/4 530/6 530/15
**et al** **[3]** 530/4 530/6 530/15
**et cetera** **[1]** 429/2
**ethic** **[1]** 484/23
**evaluated** **[2]** 463/13 463/23
**evaluation** **[2]** 405/16 472/5
**evening** **[3]** 378/6 496/23 497/5
**event** **[2]** 396/13 522/2
**events** **[1]** 388/20
**everybody** **[6]** 348/5 348/10 351/14 421/19 429/3 429/14
**everybody's** **[1]** 320/14
**everyone** **[6]** 317/16 323/18 376/16 398/10 422/15 481/8
**everyone's** **[1]** 361/22
**everything's** **[2]** 363/4 533/7
**evidence** **[24]** 323/22 324/22 345/25 349/6 361/3 361/25 375/21 391/15 392/9 392/11 392/12 392/17 397/22 398/1 437/3 437/12 447/15 475/16 480/12 508/16 508/18 511/14 514/7 515/12
**ex** **[1]** 379/2
**examination** **[21]** 317/19 317/22 376/20 376/22 383/8 383/17 384/20 389/14 399/21 403/24 404/2 408/11 411/5 422/19 460/21 460/22 476/10 476/12 481/18 491/21 491/23
**examine** **[1]** 460/9
**examining** **[1]** 341/3
**examples** **[8]** 322/14 342/2 393/6 393/22 394/9 469/5 504/10 504/12
**excellent** **[2]** 484/14 487/9
**exceptions** **[2]** 345/9 345/11
**excess** **[2]** 394/22 395/16
**exchanging** **[1]** 474/17
**excluded** **[10]** 457/23 517/23 520/18 520/21 522/21 522/25 523/21 524/4 524/14 524/15
**excludes** **[1]** 498/11
**exclusive** **[1]** 516/9 516/21 519/8

**exclusively** **[1]** 423/4
**excuse** **[1]** 496/2
**excused** **[4]** 389/20 409/6 479/5 479/7
**executive** **[1]** 320/15
**executives** **[2]** 432/20 468/16
**exempt** **[5]** 390/24 441/13 473/20 473/21 473/22
**exemption** **[2]** 390/25 524/8
**exemptions** **[5]** 390/18 391/4 391/23 391/23 441/15
**exhibit** **[5]** 345/21 434/14 434/15 437/5 437/12 444/18 452/20 461/10
**Exhibit 3** **[3]** 437/5 444/18 461/10
**exhibits** **[6]** 532/22 532/23 533/7 533/9 534/14 534/15
**existing** **[1]** 412/9
**exited** **[11]** 375/10 376/2 390/2 421/10 421/22 479/14 479/20 479/22 497/7 499/14 533/18
**expansion** **[1]** 378/2
**expect** **[8]** 325/13 326/6 337/24 345/2 352/4 352/18 424/21 446/1
**expectation** **[1]** 446/3
**expected** **[1]** 466/8
**experience** **[4]** 358/15 358/23 461/17 468/12
**expert** **[6]** 402/23 416/6 416/6 434/2 434/2 439/2
**expertise** **[4]** 416/8 433/2 433/8 438/25
**experts** **[2]** 416/7 433/7
**explain** **[5]** 339/3 342/21 376/25 404/9 486/25
**explained** **[5]** 359/23 381/2 404/12 445/12 467/12
**explaining** **[3]** 447/10 447/12 514/23
**explains** **[3]** 360/3 526/1 526/2
**explanation** **[5]** 318/23 326/21 326/25 330/14 362/15
**expressed** **[2]** 468/18 478/23
**expressly** **[1]** 477/14
**extent** **[3]** 405/6 472/8 472/12
**extra** **[40]** 330/7 330/11 331/6 331/12 332/6 332/8 332/14 332/15 332/17 333/4 335/21 335/25 335/23 336/9 336/16 336/16 345/9 350/20 356/18 356/21 356/21 356/25 368/5 368/6 368/9 368/14 368/15 368/19 369/22 394/21 395/5 395/15 395/19 397/4 419/4 446/11 446/18 446/23 475/18 496/2
**extremely** **[1]** 456/23
**eye** **[1]** 427/15
**eye-opening** **[1]** 427/15

**F**

**face** **[2]** 349/18 351/3
**facets** **[1]** 487/9
**facie** **[1]** 398/3
**facilities** **[1]** 343/14
**facility** **[8]** 362/23 381/5 381/8 381/10 381/15 381/19 485/21 494/8
**fact** **[13]** 344/20 432/4 446/22 467/25 498/25 502/7 502/9 508/8 513/16 523/12 523/19 524/5 526/18
**factor** **[2]** 406/5 502/24
**factored** **[6]** 368/23 368/25 371/10 371/12 372/13 372/15
**factors** **[2]** 367/13 418/24
**facts** **[10]** 419/24 419/25 420/1 430/19 432/1 432/2 432/24 438/3 440/1 440/23
**factual** **[1]** 424/10
**factually** **[1]** 425/3
**failure** **[3]** 525/23 526/2 526/3
**fairness** **[1]** 354/11
**faith** **[4]** 501/1 501/4 501/10 526/18
**fall** **[2]** 394/7 394/10
**false** **[1]** 357/8
**familiarize** **[1]** 435/1

**family** **[2]** 341/16 359/5
**fantasy** **[1]** 489/7
**fast** **[2]** 362/21 363/3
**father** **[1]** 343/25
**fault** **[1]** 349/23
**favor** **[1]** 397/24
**favorable** **[1]** 398/2
**fear** **[1]** 343/15
**February** **[2]** 438/9 438/10
**federal** **[2]** 413/6 457/8
**federally** **[1]** 323/6
**fee** **[1]** 466/7
**fewer** **[2]** 370/25 371/1
**field** **[1]** 351/14
**fifth** **[6]** 498/8 500/6 502/20 503/1 503/4 513/3
**figure** **[7]** 331/19 412/1 447/23 448/5 477/25 507/10 521/6
**file** **[6]** 321/8 323/15 346/20 346/23 364/11 470/14
**filed** **[2]** 391/12 506/23
**files** **[1]** 416/18
**filing** **[1]** 358/20
**fill** **[2]** 378/24 404/16
**filled** **[2]** 378/17 379/3
**Filling** **[1]** 322/4
**filtered** **[1]** 416/17
**final** **[5]** 380/24 381/4 415/15 433/17 434/7
**findings** **[10]** 392/9 439/9 439/12 439/22 440/3 440/3 440/5 440/5 455/11 456/13
**fine** **[3]** 378/5 378/6 453/10
**finish** **[14]** 343/20 343/21 344/6 352/14 353/16 363/3 363/5 367/18 375/11 417/19 426/24 480/16 485/14 508/7
**finished** **[9]** 340/18 340/21 340/24 341/1 341/10 392/10 414/25 446/11 446/23
**finishes** **[1]** 446/16
**fire** **[1]** 485/19
**fireable** **[1]** 347/2
**fired** **[2]** 347/5 347/8
**firing** **[1]** 413/2
**firm** **[19]** 371/18 371/19 373/23 374/2 374/5 374/12 374/16 413/8 413/10 414/22 415/19 416/1 417/6 432/24 433/20 464/21 465/16 465/17 521/1
**first-level** **[1]** 428/23
**fits** **[1]** 469/16
**fitting** **[1]** 490/25
**five o'clock** **[1]** 486/9
**five-and-three-quarters** **[1]** 451/15
**fix** **[1]** 332/18
**fixed** **[4]** 335/8 357/16 357/16 466/7
**fixes** **[1]** 357/18
**fixing** **[1]** 348/3
**FLA** **[1]** 391/4
**flat** **[9]** 394/13 395/9 396/22 396/25 509/1 509/18 510/2 510/16 510/25
**flats** **[1]** 377/22
**flip** **[2]** 362/8 377/24
**FLORIDA** **[34]** 315/2 315/6 315/8 316/4 316/7 316/10 318/24 331/24 334/8 337/1 358/17 365/19 371/16 414/18 415/3 415/4 415/5 416/12 418/14 420/5 420/6 420/9 428/9 457/9 457/10 460/14 462/11 463/4 464/1 466/10 466/13 469/16 481/21 482/1
**Florida's** **[1]** 481/22
**flows** **[1]** 352/13
**FLSA** **[10]** 390/18 390/24 391/23 423/20 433/24 462/1 462/4 462/5 502/16 502/16
**fluctuating** **[10]** 475/4 476/13 476/23 477/2 477/6 477/16 477/17 477/22 478/5 479/1
**fluids** **[4]** 378/1 378/3 378/12 378/14
**flying** **[1]** 377/24
**focus** **[3]** 382/3 429/4 431/1
**folks** **[7]** 320/8 432/7 432/8 432/18 445/18 456/14 467/14

**F**

**football [1]** 489/7
**Ford [7]** 371/20 371/20 411/12 426/2 427/21 440/15 482/3
**foregoing [3]** 399/12 410/19 534/20
**forget [1]** 419/2
**forgotten [3]** 414/25 417/22 428/10
**form [58]**
**format [1]** 370/12
**forms [13]** 320/24 321/2 321/9 321/11 322/22 322/25 396/6 396/19 498/9 503/12 504/14 504/20 505/16
**formula [14]** 399/24 400/4 401/15 403/1 403/8 403/13 404/6 404/9 404/12 404/13 406/3 448/9 448/14 454/18
**formulated [1]** 410/11
**FORT [7]** 315/3 315/6 316/4 316/10 415/6 426/16 427/22
**Fort Lauderdale [1]** 415/6
**Fort Myers [2]** 426/16 427/22
**four-and-a-half [1]** 415/1
**fourth [5]** 347/1 395/6 500/5 512/19 513/3
**fragment [1]** 333/2
**frame [1]** 438/10
**Fran's [1]** 533/2
**Francine [3]** 316/8 534/23 534/24
**frequent [1]** 392/1
**frequently [1]** 391/20
**Friday [4]** 327/22 387/1 452/16 532/2
**front [7]** 344/18 348/4 359/6 359/22 361/16 363/12 462/14
**front-load [1]** 361/16
**fuel [12]** 360/4 362/25 381/7 381/11 381/15 381/16 381/16 381/18 382/21 382/21 396/20 397/2
**fueling [2]** 381/9 382/18

**G**

**gain [1]** 430/19
**garage [1]** 387/7
**garbage [21]** 319/2 319/2 320/17 332/24 333/1 333/15 333/16 333/18 348/4 349/17 350/22 351/22 352/1 360/7 360/8 360/8 370/19 370/21 371/9 380/7 380/13
**gas [3]** 381/7 381/12 381/14
**gasoline [1]** 381/17
**gasses [1]** 329/17
**gathered [5]** 419/23 420/11 433/8 433/22 440/2
**gathering [4]** 416/9 431/7 439/21 440/23
**gathers [1]** 432/24
**general [3]** 337/10 337/14 439/17
**generating [1]** 475/15
**generically [1]** 436/5
**genesis [1]** 347/24
**gentlemen [1]** 411/3
**genuine [1]** 436/22
**genuinely [2]** 366/4 366/7
**geographical [1]** 463/11
**Georgia [1]** 462/25
**get-together [1]** 426/20
**gets [4]** 341/22 342/14 343/14 432/23
**gifts [1]** 517/9
**Gina's [1]** 326/21
**girl [1]** 349/3
**girls [2]** 359/7 366/2
**gives [1]** 493/10
**glasses [1]** 452/24
**globally [2]** 332/24 373/13
**go-to [2]** 358/10 358/13
**gonna [43]** 325/20 326/12 326/18 329/14 329/15 334/3 334/3 337/18 351/25 354/2 370/24 375/18 389/4 397/3 400/4 410/13 416/22 421/7 421/14 432/12 473/24 480/7 480/8 481/1 497/2 501/21 505/17 506/3 511/18 512/8 516/10 519/1 519/4 520/6

**good-faith [1]** 501/1
**gotta [1]** 491/18
**gotten [3]** 331/7 332/10 506/8
**government [1]** 379/1
**grab [5]** 345/20 348/16 365/17 380/7 399/9
**graduating [1]** 344/2
**Granted [1]** 394/25
**grapple [3]** 467/15 482/10 482/18
**grave [1]** 410/2
**great [2]** 346/6 499/10
**greater [1]** 457/5
**grew [1]** 359/4
**gross [10]** 401/7 401/7 401/8 403/18 447/21 448/9 448/16 448/23 449/2 452/8
**ground [1]** 432/9
**grounds [2]** 497/16 498/22
**group [2]** 438/18 438/19
**grow [1]** 487/4
**growth [1]** 339/14
**guarantee [1]** 477/18
**guaranteed [1]** 477/20
**guidelines [1]** 318/12
**guidepost [1]** 391/3

**H**

**half [41]** 340/3 340/13 342/13 345/7 352/14 361/23 362/1 362/5 362/9 364/1 373/24 387/24 388/12 391/6 391/8 392/1 394/21 395/15 395/25 396/7 396/13 397/11 397/16 397/19 415/1 419/23 448/5 453/7 453/7 453/8 453/13 454/4 454/5 458/18 458/21 470/15 470/16 477/22 478/1 511/17 515/4
**hand [3]** 405/10 410/21 497/8
**handbooks [2]** 416/25 417/1
**handed [1]** 436/18
**handheld [1]** 400/8
**handing [1]** 434/13
**handled [1]** 415/7
**hands [1]** 343/15
**happy [1]** 369/18
**harder [1]** 367/7
**Harrison [6]** 371/20 411/12 426/3 427/22 440/15 482/4
**haulers [1]** 355/5
**He'll [1]** 480/9
**head [5]** 379/7 381/5 382/9 463/10 475/3
**heading [1]** 381/4
**headlights [1]** 382/4
**headquarters [3]** 462/20 462/23 463/7
**Health [1]** 392/25
**hear [4]** 357/2 357/3 368/7 484/19
**heard [16]** 326/21 340/14 350/10 356/24 358/5 358/10 441/5 482/3 482/10 484/4 486/17 487/23 490/7 492/11 492/14 528/22
**hearing [4]** 398/18 409/18 468/4 497/2
**hearings [1]** 399/5
**hearsay [7]** 358/8 414/3 427/17 432/3 437/4 459/16 459/23
**Heat [1]** 377/25
**help [17]** 327/3 329/12 333/18 336/4 336/6 336/8 336/10 336/13 348/25 350/22 387/5 387/19 412/2 451/7 487/17 489/10 494/3
**helped [1]** 383/4
**helper [1]** 342/23
**helpers [25]** 319/11 319/14 319/23 320/1 320/8 359/15 418/16 418/21 419/22 420/14 420/19 425/11 425/21 426/23 428/6 428/7 428/25 431/2 435/5 435/12 436/7 436/10 436/11 456/2 456/12
**helping [5]** 352/24 353/1 353/17 387/6 446/7
**helps [3]** 351/16 351/17 351/17
**hesitate [1]** 439/23
**hesitated [1]** 434/18

**hey [20]** 335/5 341/22 343/10 344/2 347/13 348/9 356/8 360/6 365/3 484/19 485/10 485/15 488/8 489/9 489/17 489/20 489/25 491/14 491/18 495/13
**hidden [1]** 348/6
**high [2]** 388/10 457/15
**higher [3]** 432/19 457/9 495/14
**highly [1]** 357/10
**hired [2]** 337/1 412/12
**hiring [1]** 413/2
**hold [4]** 358/14 402/9 497/13 497/13
**holding [1]** 492/13
**holiday [2]** 351/22 407/9
**holidays [1]** 351/21
**Hollywood [5]** 333/15 333/16 333/19 333/21 384/5
**home [7]** 362/24 363/9 367/18 367/19 381/9 474/17 532/1
**homes [5]** 320/17 339/14 339/15 370/24 380/1
**honestly [1]** 418/10
**Honor [166]**
**honorable [2]** 315/14 499/16
**hopefully [1]** 497/3
**horn [1]** 378/15
**hot [2]** 377/25 378/1
**hour [46]**
**hourly [16]** 395/23 396/7 402/12 402/13 402/14 408/14 441/14 454/12 465/21 465/22 504/17 507/2 507/8 516/10 516/15 518/17
**hours [154]**
**hours' [1]** 353/5
**house [1]** 348/3
**houses [1]** 363/12
**how's [1]** 521/6
**HR [10]** 335/25 428/22 430/4 430/19 430/21 432/7 432/8 432/18 491/13 491/17
**Hudson [1]** 316/5
**hum [8]** 343/4 351/19 351/19 365/2 369/17 369/21 407/7 451/5
**Hum-hum [1]** 351/19
**human [2]** 429/19 429/24
**hundred [8]** 326/16 401/23 430/11 445/12 450/18 452/6 468/14 487/22
**hydraulic [2]** 377/25 378/14

**I**

**I'd [17]** 319/17 320/5 333/14 340/25 352/10 353/15 398/24 449/21 449/22 461/21 473/16 473/16 489/21 489/24 489/25 531/8 532/5
**I'll [23]** 323/18 323/19 329/14 334/23 344/2 344/3 368/11 373/9 410/6 410/17 412/2 432/4 442/5 472/2 499/5 503/5 526/15 527/15 527/21 530/8 531/9 532/9 532/11
**I'm [141]**
**I've [16]** 327/14 346/10 378/23 414/25 417/22 418/11 419/23 428/10 429/4 439/20 462/3 469/23 475/19 488/11 497/2 531/24
**I9 [2]** 416/18 416/20
**idea [2]** 361/7 361/8
**ideal [2]** 352/21 352/22
**identical [2]** 468/2 468/2
**identification [2]** 434/13 434/15
**identified [1]** 416/22
**identify [3]** 336/2 336/5 433/9
**Ignore [2]** 436/1 459/19
**illustrate [1]** 445/5
**immediately [1]** 348/9
**immigration [4]** 413/3 416/4 416/6 434/2
**impact [1]** 391/5
**impeachment [1]** 500/6
**implement [1]** 459/14
**implemented [2]** 318/10 469/6
**impossible [4]** 341/11 362/18 362/19 363/16
**improper [14]** 420/15 420/25 435/22 442/4

**I**

**improper... [10]** 443/4 448/17 451/22 453/15
453/24 456/17 459/6 476/25 477/10 478/19
**in-depth [5]** 425/23 426/1 426/8 426/22
427/21
**in-person [1]** 344/25
**in/clock [2]** 335/20 360/5
**inadequate [2]** 521/14 521/16
**inappropriate [1]** 410/15
**inbound [1]** 353/10
**Inc [1]** 396/16
**incident [1]** 388/21
**incinerator [1]** 353/6
**incinerators [1]** 359/25
**inclined [1]** 521/18
**include [6]** 442/9 455/17 516/10 517/7 517/8
521/8
**included [24]** 407/15 425/7 440/2 440/6
442/13 443/8 443/16 455/19 457/22 463/2
463/3 464/6 466/9 466/12 466/21 498/11
519/21 521/3 524/7 524/9 524/10 524/15
524/17 524/20
**includes [4]** 407/4 455/2 455/2 455/3
**including [8]** 376/25 391/23 425/11 431/6
439/1 447/21 455/14 473/19
**inclusion [2]** 511/12 517/19
**inconsistent [2]** 508/24 514/17
**incorrect [1]** 410/15
**incorrectly [1]** 458/22
**increase [2]** 409/1 495/24
**increased [3]** 408/14 408/25 512/1
**independent [3]** 445/19 474/3 474/5
**INDEX [2]** 534/1 534/14
**indicate [2]** 415/16 528/16
**indicated [3]** 461/18 465/13 528/22
**indicates [1]** 435/20
**indicating [2]** 401/2 469/7
**indispensable [1]** 502/24
**individual [11]** 333/3 342/16 352/24 353/1
442/16 447/7 462/1 462/3 483/9 485/6 485/7
**individually [1]** 483/16
**individuals [3]** 354/10 456/3 461/25
**induce [1]** 520/24
**industry [1]** 354/15
**ineligible [2]** 455/18 457/22
**information [30]** 323/12 325/5 337/11
337/17 343/14 372/3 372/6 372/7 372/8
372/9 373/23 385/6 386/7 416/9 416/14
416/19 416/20 416/21 417/5 420/11 431/7
431/9 432/1 434/22 438/13 439/21 467/11
469/20 469/22 492/21
**informed [3]** 323/13 393/2 394/8
**initial [2]** 348/22 361/3
**initially [1]** 412/21
**inpunch [1]** 451/12
**inquire [2]** 376/18 525/8
**inquiries [1]** 514/21
**inquiry [3]** 525/24 526/2 526/4
**inspect [1]** 382/1
**inspection [13]** 323/5 323/8 377/6 377/15
378/7 378/18 378/21 379/2 379/5 381/20
382/2 382/5 382/15
**instance [4]** 447/2 460/5 460/6 491/4
**instances [7]** 384/15 391/7 392/12 393/23
405/15 458/22 497/21
**instead [5]** 393/9 443/25 501/5 510/10
510/22
**instructed [1]** 392/22
**instruction [24]** 499/24 500/1 500/3 500/15
500/23 501/18 501/24 502/2 506/21 507/11
507/14 507/25 508/7 508/14 508/17 510/1
513/23 517/25 518/22 520/12 524/10 525/12
525/19 527/11
**instruction 1 [1]** 499/24
**instruction 2 [1]** 500/1
**instruction 8 [1]** 506/21

**instruction 9 [1]** 508/7
**instructions [14]** 375/23 480/11 496/25
497/9 499/8 499/23 501/3 506/18 525/9
526/10 527/1 527/2 530/16 530/21
**insufficient [1]** 360/22
**intend [3]** 375/13 514/22 529/6
**intended [3]** 349/10 502/8 514/25
**intending [1]** 459/14
**intends [3]** 375/14 523/11 523/17
**interested [2]** 320/15 501/15
**International, [1]** 396/16
**International, Inc [1]** 396/16
**interpretation [4]** 515/23 517/12 528/2
528/6
**interpretations [1]** 412/6
**interpreting [1]** 502/16
**interpretive [6]** 497/18 497/25 498/10
502/15 503/18 522/6
**interrupt [1]** 354/1
**interrupted [1]** 478/2
**interview [13]** 415/5 416/11 425/21 426/3
428/6 428/7 429/13 430/3 432/6 432/10
467/15 467/22 468/10
**interviewed [25]** 372/10 372/11 373/4
414/16 415/17 417/15 425/20 425/22 428/12
428/13 429/14 429/15 429/18 429/19 429/24
429/25 430/7 430/9 430/12 430/13 430/16
431/25 467/17 468/6 468/9
**interviewing [5]** 428/5 428/15 430/15
467/14 468/16
**interviews [9]** 416/13 425/24 426/1 426/8
426/22 427/21 427/23 430/18 431/12
**invalidate [1]** 392/2
**investiture [1]** 531/25
**involvement [1]** 406/6
**issue [22]** 322/15 390/22 394/25 395/2
409/24 410/3 411/25 432/21 435/23 436/4
437/8 443/5 448/18 455/1 475/19 475/20
489/11 502/7 503/13 507/16 508/22 521/13
**issued [2]** 391/9 415/15
**issues [5]** 348/1 389/7 412/6 433/5 483/22
**issuing [1]** 455/1
**item [1]** 389/4
**items [3]** 377/8 378/10 382/3

**J**

**jail [1]** 490/16
**janitor [1]** 359/4
**janitors [1]** 399/7
**January [2]** 523/10 523/17
**job [96]**
**jobs [9]** 394/7 396/22 397/4 427/15 427/16
467/22 506/2 507/20 507/22
**joint [3]** 528/19 529/5 529/12
**jointly [1]** 529/17
**Jones [2]** 356/8 387/6
**Jones' [1]** 348/3
**Joseph [1]** 316/5
**journey [1]** 487/8
**Judge [13]** 315/15 317/2 376/2 376/4 409/23
421/22 422/2 479/20 479/22 479/24 499/14
499/18 533/18
**Judge Snow [1]** 409/23
**judge's [1]** 531/25
**Judging [1]** 406/3
**judgment [13]** 390/7 390/10 392/8 392/15
392/16 397/24 478/24 497/16 498/16 498/17
498/22 518/25 529/20
**jump [1]** 377/21
**June [4]** 324/23 395/1 523/11 523/18
**June 13th [1]** 324/23
**June 22nd [1]** 395/1
**jurors [2]** 317/3 422/10
**jury [91]**
**justification [1]** 326/6
**justified [2]** 494/20 494/22

**justifies [1]** 325/14
**justify [5]** 391/24 494/12 495/5 495/9 495/17
**justifying [1]** 493/24

**K**

**keep [1]** 426/25
**keeping [2]** 374/6 427/13
**keeps [1]** 366/25
**key [1]** 343/13
**kidding [1]** 508/23
**kinds [2]** 359/24 361/10
**knowing [2]** 470/16 528/25
**knowledge [8]** 337/14 338/20 340/1 431/23
433/8 439/18 439/18 466/25

**L**

**labor [34]** 391/9 391/17 391/19 394/11
394/24 395/1 395/6 395/18 397/22 411/14
411/15 411/17 411/23 413/1 413/5 413/22
415/25 420/4 420/8 420/13 422/25 423/2
423/9 423/21 423/24 430/23 430/25 433/4
501/23 502/18 504/15 506/19 525/12 528/6
**lack [2]** 386/20 498/18
**Ladies [1]** 411/3
**lady [1]** 359/21
**Lake [1]** 316/7
**landfill [5]** 353/10 377/16 377/17 382/19
382/21
**language [9]** 355/6 355/7 503/14 504/2
504/23 513/12 519/1 520/6 526/3
**large [2]** 467/17 470/5
**largely [1]** 416/9
**larger [1]** 406/11
**lasts [1]** 352/18
**late [2]** 353/24 381/2
**latest [1]** 379/17
**latitude [1]** 442/6
**LAUDERDALE [5]** 315/3 315/6 316/4 316/10
415/6
**Laughter [1]** 529/15
**Laura [2]** 415/6 415/9
**law [65]**
**Law's [1]** 351/5
**lawful [1]** 412/3
**laws [8]** 416/7 416/7 416/7 420/3 420/10
420/18 420/20 431/6
**lawsuit [4]** 467/8 482/24 492/7 492/15
**lawsuits [1]** 411/21
**lawyers [2]** 429/21 498/25
**lay [13]** 420/15 420/25 435/22 442/4 443/4
448/17 451/22 453/15 453/24 459/6 476/25
477/10 478/19
**lead [16]** 342/3 413/10 467/20 485/3 485/5
485/9 486/20 487/9 487/14 494/7 494/9
495/6 495/8 495/8 495/20 495/21
**leader [10]** 428/12 428/14 428/15 438/13
438/16 438/17 438/19 438/22 487/19 494/8
**leaders [1]** 429/12
**leading [7]** 403/10 408/21 408/22 431/15
437/25 440/16 444/22
**leads [1]** 383/23
**leak [1]** 378/14
**leaks [2]** 377/7 378/13
**learn [3]** 404/18 459/14 485/7
**learned [1]** 486/25
**leave [14]** 341/16 341/19 343/25 344/3
347/25 341/11 349/11 364/24 382/16 501/21
515/5 516/2 524/22 529/24
**leaving [3]** 448/25 485/17 494/4
**led [2]** 459/21 460/3
**legal [13]** 424/10 424/11 425/2 432/20
436/13 438/3 438/25 440/2 456/17 461/10
478/24 482/7 483/10
**legalities [1]** 492/4
**length [3]** 344/15 355/9 367/13
**letter [10]** 337/9 337/15 337/25 338/3 338/6

**L**

**letter... [5]** 338/7 338/12 338/14 338/18 340/1
**letters [3]** 337/3 337/22 423/25
**levels [1]** 414/16
**liable [1]** 529/18
**life [1]** 488/9
**lifeblood [1]** 359/16
**light [1]** 398/2
**lights [4]** 377/7 378/11 378/11 382/4
**liked [1]** 358/2
**limit [1]** 351/17
**limitations [1]** 379/16
**limited [1]** 440/5
**limits [1]** 380/22
**limousine [1]** 396/18
**lines [5]** 327/4 353/9 359/25 432/17 432/19
**liquidated [2]** 501/11 528/7
**liquids [1]** 378/9
**list [2]** 345/5 439/16
**litigating [1]** 411/21
**litigation [5]** 321/8 423/7 423/9 423/13 476/4
**LLC [1]** 390/13
**load [1]** 361/16
**location [5]** 343/9 414/7 427/1 468/11 488/19
**locations [6]** 334/1 414/8 414/9 415/3 425/24 426/6
**lockbox [1]** 343/11
**log [1]** 332/22
**logged [1]** 350/2
**logging [1]** 332/21
**logs [1]** 333/10
**Lombardo [12]** 336/23 340/13 399/13 399/16 399/23 400/16 401/11 404/4 408/8 430/14 430/15 534/6
**longevity [2]** 351/17 354/13
**Longwood [3]** 463/8 468/10 468/17
**lose [2]** 322/8 324/11
**loss [9]** 320/24 321/2 321/3 321/9 321/11 322/12 322/19 322/22 322/25
**lost [5]** 321/17 324/16 357/22 465/5 488/9
**Louisiana [1]** 462/24
**love [2]** 352/10 427/16
**loved [1]** 357/21
**lower [7]** 406/16 406/19 406/20 407/10 407/16 407/21 466/3
**lowest [2]** 354/15 414/17
**lunch [7]** 421/5 421/8 421/16 426/17 532/9 532/10 532/10
**Luncheon [1]** 421/23
**lunches [1]** 393/8

**M**

**M-A-L-L [1]** 415/10
**M-U-N-O-Z [1]** 411/4
**Mackie [32]** 317/7 317/24 333/7 376/22 377/9 386/11 387/22 389/14 430/10 468/9 468/10 480/8 481/12 481/13 481/20 482/22 483/16 491/25 506/1 507/19 508/17 529/6 529/8 529/14 529/17 529/21 530/1 530/6 530/9 530/15 534/3 534/11
**Mackie's [1]** 375/14
**Magistrate [1]** 409/22
**maintain [2]** 511/6 522/1
**maintaining [1]** 431/9
**maintenance [1]** 353/7 486/12 489/12
**major [3]** 485/17 502/9 503/13
**majority [5]** 320/2 320/5 320/5 320/6 320/7
**Mall [6]** 415/6 415/9 416/11 428/1 433/23 466/16
**man [2]** 487/23 488/8
**management [1]** 347/21 430/7 492/25
**manager [4]** 342/15 343/2 347/12 384/17
**managers [3]** 384/16 415/11 415/12

**mandate [2]** 394/10 396/5
**mandated [1]** 323/7
**mandates [1]** 504/10
**mandatory [2]** 321/18 494/1
**manner [1]** 485/14
**Marc [1]** 316/2
**March [5]** 327/10 346/1 386/24 386/24 390/17
**March 13th [1]** 390/17
**March 15th [1]** 386/24
**March 21st [1]** 327/10
**March 26th [1]** 346/1
**March 28th [1]** 386/24
**mark [1]** 532/21
**marked [3]** 434/13 434/15 534/15
**match [2]** 456/9 456/11
**matched [3]** 417/12 417/20 419/15
**materials [3]** 415/13 415/13 415/16
**math [1]** 464/13
**matter [13]** 383/13 390/7 413/11 423/13 432/5 460/8 461/2 497/16 498/16 498/17 498/22 532/18 534/21
**matters [1]** 421/20
**maximum [2]** 370/8 395/16
**May 15 [1]** 527/9
**May 16th [3]** 443/8 443/15 443/16
**May 23rd [1]** 443/8
**May 30th [1]** 323/23
**meal [1]** 474/10
**mean [53]**
**meaning [1]** 524/15
**means [5]** 406/14 410/14 438/17 483/3 485/4
**meant [3]** 368/19 368/19 464/3
**measure [2]** 355/2 377/18
**mechanical [1]** 315/24
**meet [4]** 393/13 393/17 426/13 489/23
**meeting [6]** 322/9 344/25 389/2 389/3 492/18 494/5
**meetings [8]** 321/18 322/20 427/11 427/13 493/21 493/24 494/1 494/3
**members [6]** 375/4 389/24 421/4 433/2 479/8 496/22
**memo [1]** 345/25
**memorable [2]** 468/12 468/13
**Memorial [1]** 352/5
**memory [1]** 400/22
**mere [1]** 394/9
**merely [2]** 396/3 504/18
**message [3]** 365/11 489/6 489/19
**messages [2]** 489/4 489/5
**messing [1]** 452/20
**method [7]** 393/22 424/18 436/17 436/19 447/12 476/14 478/12
**methods [2]** 424/13 424/14
**Miami [1]** 531/25
**mic [1]** 400/8
**Michael [1]** 470/11
**microphone [2]** 319/21 410/24 471/14
**middle [1]** 478/3
**miles [2]** 363/12 363/14
**military [1]** 346/9
**minimum [10]** 340/25 341/2 420/5 420/9 439/25 457/2 457/4 457/7 474/6 474/7
**Minneapolis [1]** 416/5
**minor [1]** 435/21
**minus [1]** 454/16
**minute [5]** 354/11 375/5 439/23 479/9 499/12
**minutes [11]** 375/8 375/25 379/13 389/25 479/12 479/18 531/8 531/10 531/16 531/18 531/19
**misallocation [1]** 458/24
**miscellaneous [1]** 396/21
**mischaracterization [1]** 524/13
**miss [3]** 324/8 407/23 493/24

**missed [5]** 322/9 348/12 381/2 381/3 488/11
**misses [1]** 381/2
**mjsfcs [1]** 316/11
**modify [1]** 468/23
**moment [15]** 359/16 368/17 374/24 389/9 400/18 403/19 403/25 408/4 422/21 460/16 464/13 473/9 475/12 491/8 505/6
**moments [1]** 499/7
**Monday [1]** 364/25 365/4 370/19 370/21 370/23 389/2 389/2 389/5 389/7 389/8 452/15
**money [30]** 357/14 357/21 357/25 360/16 360/23 366/22 367/18 368/4 368/6 368/15 369/6 369/7 374/3 407/15 446/11 464/21 465/5 488/5 488/10 488/11 488/15 490/23 490/24 491/1 494/23 494/25 495/2 495/21 495/21 498/1
**month [6]** 355/1 355/4 380/11 488/23 488/25 488/25
**months [6]** 413/15 413/18 437/23 438/5 438/11 488/23
**morale [1]** 351/16
**morning [13]** 317/24 317/25 365/4 375/12 377/20 378/4 378/6 389/8 427/2 483/14 485/11 532/2 532/22
**mornings [1]** 364/25
**mother [1]** 343/25
**motion [10]** 390/3 390/7 390/9 390/10 398/3 409/22 498/25 499/3 499/5 529/2
**motions [3]** 480/25 497/10 499/1
**motivator [1]** 487/7
**Motorcars [1]** 390/22
**Motorcars, [1]** 390/13
**Motorcars, LLC vs. Navarro [1]** 390/13
**move [11]** 374/16 390/6 397/23 435/25 451/24 459/18 498/15 498/17 514/2 527/15 527/21
**mover [1]** 487/5
**moves [1]** 497/15
**moving [3]** 325/20 440/8 529/7
**MR [6]** 471/16 520/4 534/3 534/7 534/9 534/12
**Mr. [89]**
**Mr. Andreu [42]** 321/8 322/21 322/24 327/22 331/1 334/19 334/21 335/17 336/5 336/8 340/18 340/21 341/3 341/15 343/7 344/22 345/6 365/15 374/9 377/10 386/8 389/1 392/5 393/11 397/7 397/10 397/21 466/24 483/7 483/23 484/4 484/10 484/12 484/17 485/2 487/1 488/4 488/22 490/4 491/12 520/14 530/5
**Mr. Andreu's [9]** 323/3 338/14 384/19 388/8 467/2 467/11 483/18 485/25 486/17
**Mr. Edwards [5]** 317/20 363/18 473/8 496/20 531/10
**Mr. Mackie [26]** 317/7 317/24 333/7 376/22 377/9 386/11 387/22 389/14 468/9 468/10 480/8 481/13 481/20 482/22 491/25 506/1 507/19 508/17 529/6 529/8 529/14 529/17 529/21 530/1 530/6 530/9
**Mr. Mackie's [1]** 375/14
**Mr. Muñoz [3]** 421/11 460/24 479/4
**Mr. Muñoz's [1]** 482/11
**Mr. Shane [2]** 409/20 409/20
**Mrs. [3]** 348/3 356/8 387/6
**Mrs. Jones [2]** 356/8 387/6
**Mrs. Jones' [1]** 348/3
**MS [7]** 437/16 534/4 534/6 534/7 534/9 534/10 534/11
**Ms. [32]** 319/21 336/23 340/13 376/18 398/12 399/16 399/23 400/16 401/11 404/4 408/8 416/11 421/2 422/17 428/1 430/15 433/23 462/10 466/16 479/10 481/16 492/16 496/1 496/18 509/11 514/16 515/21 517/2 521/18 531/7 531/19
**Ms. Lombardo [9]** 336/23 340/13 399/16

**M**

**Ms. Lombardo... [6]** 399/23 400/16 401/11 404/4 408/8 430/15
**Ms. Mall [4]** 416/11 428/1 433/23 466/16
**Ms. Tingley [19]** 319/21 376/18 398/12 421/2 422/17 462/10 479/15 481/10 481/16 492/16 496/1 496/18 509/11 514/16 515/21 517/2 521/18 531/7 531/19
**multiple [7]** 361/17 380/10 396/25 414/9 426/6 487/3 495/7
**multiply [7]** 400/22 401/18 402/19 453/7 453/12 453/12 454/12
**multiplying [3]** 448/2 448/4 448/5
**municipal [1]** 384/10
**municipalities [1]** 338/22
**Murphy's [1]** 351/5
**mutual [1]** 502/21
**Muñoz [9]** 409/20 409/20 410/20 410/22 411/4 421/11 460/24 479/4 534/8
**Muñoz's [1]** 482/11
**Myers [2]** 426/16 427/22

**N**

**nails [1]** 377/16
**name [9]** 343/12 365/6 371/19 410/25 410/25 411/3 411/4 519/2 530/7
**name's [1]** 492/6
**named [2]** 424/8 492/2
**names [1]** 462/19
**Narrative [2]** 429/8 485/22
**narrow [1]** 333/9
**narrowly [2]** 390/19 390/25
**natural [1]** 381/7
**nature [14]** 322/6 328/12 328/13 331/14 333/2 338/10 371/2 378/16 380/22 412/22 474/16 516/7 516/19 519/6
**Navarro [1]** 390/13
**NE [1]** 316/3
**nearly [2]** 468/2 504/3
**neighborhoods [2]** 351/10 351/22
**neither [1]** 525/11
**networks [1]** 432/22
**nice [2]** 421/8 497/5
**nine [5]** 423/5 446/13 497/2 532/20 533/4
**nine o'clock [3]** 497/2 532/20 533/4
**Ninety [1]** 423/5
**Ninety-nine [1]** 423/5
**Ninth [1]** 390/24
**nobody [1]** 359/17
**Noms [1]** 502/24
**nondiscretionary [4]** 498/13 524/6 524/17 524/19
**None [3]** 393/8 465/11 530/18
**nonjury [1]** 393/1
**nonovertime [1]** 515/25 516/11 516/17
**nonproductive [1]** 498/19
**normal [3]** 516/11 516/13 516/16
**normally [1]** 366/10
**North [1]** 316/6
**notated [1]** 380/8
**notation [4]** 322/16 323/15 525/7 325/8
**note [2]** 436/25 503/9
**noted [2]** 511/9 530/18
**notes [2]** 326/3 501/22
**nothing's [1]** 533/8
**notice [1]** 365/5
**noticed [1]** 399/8
**November [3]** 325/21 386/20 448/13
**November 14th [1]** 325/21
**November 7th [1]** 448/13
**November 8th [1]** 386/20
**nuance [1]** 394/4
**number [50]**
**number 11 [1]** 502/15
**number 12 [1]** 518/22
**Number 3 [1]** 434/14

**number 5 [1]** 500/23
**number 8 [1]** 502/2
**numbered [1]** 395/7
**numbers [6]** 343/9 405/7 405/15 405/19 454/20 454/25

**O**

**o'clock [6]** 344/4 486/9 493/9 497/2 532/20 533/4
**oath [2]** 399/17 481/14
**object [12]** 323/1 366/11 367/25 370/4 372/21 374/14 409/25 410/6 410/17 501/2 511/12 525/14
**objection [91]**
**objection's [1]** 502/11
**objectionable [2]** 410/6 410/16
**objections [11]** 511/11 513/21 514/3 516/4 519/12 521/19 525/21 527/6 527/23 528/12 530/16
**objects [7]** 500/21 500/25 502/2 502/14 508/21 513/12 515/10
**observations [1]** 459/21
**observe [1]** 460/3
**obstruction [1]** 350/1
**obtain [1]** 415/3
**obvious [1]** 349/10
**occasion [2]** 332/9 350/11
**occasional [1]** 489/9
**occasions [4]** 326/6 341/16 362/1 487/3
**occupation [1]** 411/9
**occurrences [1]** 396/21
**October [4]** 401/12 401/13 448/13 452/22
**October 11th [1]** 401/12
**October 24th [1]** 401/13
**October 25th [1]** 448/13
**October 31st [1]** 452/22
**offense [4]** 346/14 347/1 347/2 432/8
**offer [13]** 337/3 337/9 337/15 337/22 338/3 338/6 338/7 338/12 338/14 338/18 340/1 380/6 437/2
**offhand [1]** 362/2
**office [8]** 348/9 350/5 377/3 415/7 416/5 468/17 470/11 488/20
**official [3]** 316/9 358/4 534/24
**oh [15]** 326/23 350/22 366/15 374/17 386/4 394/6 401/6 451/8 451/25 471/15 500/16 500/17 507/5 512/7 518/9
**oil [1]** 378/14
**on-site [2]** 411/6 416/21 417/2 425/7
**one's [3]** 500/6 501/8 501/9
**one-and-a-half [1]** 454/4
**one-time [1]** 396/12
**oops [1]** 452/17
**op's [1]** 342/15
**open [6]** 358/22 470/14 486/14 529/3 533/2 533/3
**open-door [1]** 358/22
**opening [2]** 427/15 530/24
**operated [2]** 360/18 361/10
**operation [2]** 351/14 370/18
**operations [2]** 342/18 389/7
**opinion [28]** 391/9 391/18 391/22 394/25 409/24 420/15 420/25 421/13 423/24 435/22 442/4 443/4 448/17 451/22 452/8 453/15 453/25 454/17 456/17 459/6 461/12 461/12 476/25 477/11 478/19 490/7 503/1 504/15
**opinions [5]** 461/11 464/5 467/3 473/13 482/6
**opportunity [7]** 321/12 322/21 336/24 345/15 384/20 412/12 490/18
**opposing [2]** 375/17 528/24
**option [1]** 526/21
**oral [4]** 334/10 334/11 334/13 334/18
**order [3]** 414/2 518/25 532/9
**organization [2]** 429/16 441/10
**organizational [1]** 469/15

**Orlando [1]** 316/7
**other's [1]** 532/22
**ought [1]** 509/7
**outpunch [1]** 451/12
**outs [1]** 381/2
**overrule [7]** 320/4 323/2 365/25 368/1 406/18 459/7 503/5
**overruled [35]** 318/9 318/16 319/1 327/2 330/9 331/4 332/3 333/13 353/3 358/9 370/5 372/22 385/20 414/4 436/15 437/10 440/17 443/6 445/25 448/19 449/12 453/17 454/1 456/18 472/16 472/23 474/1 476/20 477/1 477/12 478/20 483/12 502/11 511/10 522/2
**oversee [6]** 319/24 320/2 342/18 344/24 365/22 372/17
**overtime [66]**
**overview [2]** 338/4 339/19
**owed [3]** 368/15 448/7 448/11

**P**

**P.A [1]** 316/6
**p.m [8]** 379/20 421/23 422/1 479/21 479/21 499/15 499/15 533/19
**package [1]** 355/3
**pad [1]** 398/19
**page [77]**
**page 1 [1]** 527/20
**page 11 [9]** 502/12 503/6 503/8 503/15 505/20 508/7 511/11 512/19 513/21
**page 12 [2]** 514/2 514/3
**page 13 [5]** 515/9 515/11 516/4 519/5 519/12
**page 14 [3]** 519/15 521/18 524/21
**page 155 [1]** 440/13
**page 158 [2]** 447/10 447/11
**page 159 [2]** 455/6 455/7
**page 162 [1]** 457/17
**page 163 [1]** 458/14
**page 17 [4]** 525/9 525/21 526/7 526/11
**page 2 [1]** 527/7
**page 4 [1]** 444/14
**page 5 [1]** 444/14
**page 6 [4]** 500/18 500/22 500/22 500/23
**page 7 [2]** 500/24 501/21
**page 8 [1]** 501/22
**Page 9 [1]** 501/23
**pages [4]** 433/23 434/25 476/2 502/2
**pages 9 [1]** 502/2
**paper [1]** 398/19
**paperwork [7]** 322/4 377/4 382/10 382/10 382/12 382/17 382/19
**para [1]** 508/6
**paragraph [8]** 395/6 508/3 508/4 508/5 508/9 513/7 513/19 515/18
**paralegals [1]** 438/18
**parentheses [3]** 527/15 527/19 527/21
**parenthetical [2]** 447/20 447/24
**park [1]** 382/7
**parked [1]** 348/4
**parse [1]** 337/7
**part [26]** 318/5 319/11 320/10 328/12 329/8 329/12 360/8 367/6 373/4 374/9 379/6 382/15 383/2 383/5 407/6 414/11 415/17 415/24 447/8 448/14 462/25 463/2 475/21 475/22 502/6 521/1
**participate [2]** 370/25 482/4
**participation [1]** 370/22
**parties [7]** 461/7 502/8 514/22 514/25 516/8 516/20 519/7
**parties' [1]** 525/10
**partly [3]** 433/1 439/17 439/18
**partners [1]** 439/2
**parts [1]** 487/11
**pass [1]** 437/5
**passed [1]** 466/17
**pattern [1]** 525/9

**P**

**Paul [2]** 316/2 531/2
**Pause [8]** 346/4 389/12 400/14 409/11 435/2 464/14 480/1 518/13
**pay [150]**
**paycheck [5]** 369/6 369/8 425/16 455/1 455/2
**paychecks [1]** 419/15
**payment [12]** 370/3 371/17 373/14 373/24 387/24 410/4 418/19 472/12 475/1 517/22 523/13 523/19
**payments [10]** 340/3 392/19 504/25 516/8 516/9 516/20 516/22 518/22 519/7 519/9
**payroll [20]** 345/8 345/9 355/18 414/13 417/8 425/12 425/14 428/22 432/18 434/24 439/8 439/13 440/12 440/20 455/14 455/22 456/6 463/15 469/23 473/19
**Pell [1]** 516/25
**Pembroke [7]** 372/13 384/6 466/12 466/14 482/16 488/17 488/19
**penalize [2]** 349/11 358/13
**people [46]**
**people's [2]** 320/17 363/12
**percent [8]** 411/19 423/5 430/11 461/18 461/21 468/14 487/22 507/15
**percentage [4]** 351/4 396/20 423/6 462/6
**performance [1]** 483/22
**performing [1]** 487/24
**perhaps [8]** 332/19 401/4 413/16 433/10 443/24 446/9 469/3 480/10
**period [33]** 324/20 325/10 325/21 326/12 330/19 330/20 330/21 364/1 380/11 385/8 386/1 386/6 386/12 387/9 388/2 413/18 425/17 438/5 442/18 442/24 443/20 443/23 443/24 445/7 450/11 450/14 451/19 452/13 454/19 458/2 468/20 469/9 512/11
**periods [4]** 323/21 425/16 443/21 449/4
**permitted [1]** 379/12
**person [19]** 320/11 320/12 322/14 332/21 333/11 344/25 349/4 357/13 365/10 383/4 407/23 417/21 428/11 429/15 429/18 445/8 445/9 489/21 489/21
**personal [1]** 492/14
**personally [12]** 347/20 360/9 413/9 415/6 415/14 425/22 426/22 427/25 465/9 465/11 465/15 492/2
**personnel [2]** 416/18 495/8
**pertaining [2]** 337/11 472/16
**pertains [1]** 409/16
**pertinent [2]** 393/19 427/10
**phase [1]** 379/2
**phone [9]** 320/11 343/8 344/24 357/1 365/8 365/9 411/25 489/3 520/7
**phones [1]** 509/14
**phonetic [1]** 502/24
**pick [13]** 326/12 332/24 333/1 333/16 345/6 349/20 350/2 359/8 360/6 379/15 379/23 384/4 507/23
**picking [10]** 320/12 333/15 333/18 342/12 359/18 360/7 360/8 371/9 379/17 484/18
**picks [1]** 348/5
**picnic [2]** 426/14 426/16
**picnics [1]** 426/15
**piece [1]** 361/14
**pieces [3]** 360/18 361/17 495/7
**Pines [7]** 372/13 384/6 466/12 466/14 482/16 488/17 488/20
**place [13]** 318/11 318/13 318/21 318/22 336/15 339/23 360/3 425/9 431/4 432/16 471/17 492/21 492/24
**placeholder [1]** 440/9
**plaintiff [45]**
**plaintiff's [6]** 480/10 483/21 508/19 519/10 522/10 534/2
**plaintiffs [2]** 393/10 527/6
**plan [6]** 391/21 391/25 475/7 477/16 477/17

477/23
**play [2]** 381/22 393/16
**playing [1]** 351/14
**PLLC [1]** 316/3
**plug [2]** 401/16 405/15
**plugging [1]** 405/7
**plumber [6]** 348/3 348/7 349/16 350/21 350/23 359/22
**plumbing [1]** 348/4
**plural [2]** 526/9 526/12
**plus [3]** 406/24 406/25 477/25
**point [18]** 323/6 333/22 340/16 344/23 364/4 379/14 379/24 380/15 380/19 415/2 416/20 433/15 445/5 455/13 480/17 485/2 518/18 531/25
**policies [30]** 318/5 318/20 318/21 318/21 371/17 372/18 372/20 372/23 372/24 383/18 383/18 383/19 384/7 384/16 412/9 412/9 417/22 425/9 440/19 468/24 470/3 470/5 470/7 472/6 475/2 484/2 485/8 492/21 492/24 496/10
**policy [63]**
**Pompano [5]** 372/15 384/6 466/21 482/16 488/19
**pool [1]** 485/18
**poor [1]** 359/5
**portalet [3]** 355/15 355/16 355/17
**portion [6]** 335/12 434/19 436/18 436/23 439/1 472/20
**portions [5]** 439/1 472/7 473/1 473/8 475/24
**position [43]** 318/2 318/5 318/14 333/8 337/14 354/4 385/18 385/23 386/20 387/18 393/18 397/6 414/10 485/6 487/8 489/16 495/13 495/14 495/17 495/20 495/22 498/15 501/19 502/3 504/7 504/8 505/22 506/4 507/18 508/19 509/11 514/9 514/11 515/20 517/2 517/4 517/10 520/4 521/14 522/4 524/18 529/10 529/11
**positions [6]** 326/3 354/16 467/21 468/2 501/24
**possibility [2]** 474/14 474/16
**post [10]** 323/5 323/8 362/25 377/1 377/11 377/15 379/2 379/2 381/20 484/20
**post-inspection [1]** 379/2
**post-trip [8]** 323/5 323/8 362/25 377/1 377/11 377/15 379/2 381/20
**post-tripping [1]** 484/20
**posted [3]** 343/9 380/22 530/21
**potential [1]** 489/15
**potentially [1]** 528/24
**Powell [4]** 396/15 396/15 396/16 498/7
**Powell vs. Carey [1]** 396/15
**practice [12]** 391/20 411/13 423/4 423/6 461/18 462/7 469/2 469/3 469/4 469/5 469/5 478/25
**practiced [1]** 422/25
**practices [11]** 373/24 413/1 413/24 414/14 428/18 435/11 435/16 441/23 469/22 473/19 526/5
**practicing [3]** 422/23 422/24 423/2
**precedent [1]** 390/20
**precise [2]** 458/10 526/3
**precisely [1]** 504/3
**precluded [1]** 392/16
**precludes [1]** 396/25
**predominantly [1]** 489/4
**prefer [2]** 532/5 532/6
**premium [10]** 333/5 335/22 383/10 396/13 397/11 397/17 397/20 453/8 455/3 458/21
**prepare [1]** 437/22
**prepared [6]** 433/21 433/23 434/7 434/19 438/15 521/12
**preparing [4]** 390/8 412/8 467/9 467/10
**preroute [1]** 427/4
**presence [9]** 317/17 375/7 376/17 398/11 421/7 422/16 479/11 481/9 496/25

**present [6]** 317/6 376/7 422/5 480/4 483/18 499/21
**presented [1]** 511/14
**presently [1]** 317/2
**president [4]** 318/3 358/16 429/17 496/10
**presidents [3]** 428/8 431/25 468/6
**pressure [2]** 377/18 378/8
**presume [1]** 357/4
**pretrial [1]** 529/5
**pretrip [10]** 362/25 376/25 377/6 377/12 378/7 378/18 378/22 379/5 382/1 485/9
**pretripping [1]** 484/20
**pricing [1]** 339/5
**pride [1]** 354/9
**prima [1]** 398/3
**prima facie [1]** 398/3
**primarily [4]** 413/6 420/4 420/4 423/25
**primary [1]** 393/10
**principle [2]** 391/2 391/2
**prison [1]** 357/22
**privilege [1]** 373/9
**privileges [1]** 364/14
**PRO [97]**
**Pro's [4]** 388/24 392/2 455/15 471/2
**problem [6]** 486/6 500/6 500/10 512/13 521/21
**problems [2]** 343/10 377/13
**procedures [5]** 427/13 431/4 440/20 474/12 485/8
**proceed [4]** 381/19 398/4 481/16 497/4
**proceedings [6]** 315/13 315/24 399/12 410/19 533/19 534/21
**process [5]** 342/20 372/2 401/2 401/4 403/15 405/19 414/14 415/18 417/10 427/1 429/1 431/8 433/12 433/14 456/8
**processes [1]** 432/16
**processing [1]** 431/8
**produce [1]** 351/22
**produced [3]** 315/25 476/5 476/6
**product [1]** 433/17
**productive [1]** 498/19
**program [1]** 410/4
**project [1]** 438/19
**promise [6]** 323/18 520/20 520/20 522/23 523/1 524/14
**promised [16]** 356/25 357/14 520/14 521/7 521/21 521/25 522/5 522/7 522/9 522/13 522/15 522/16 522/19 523/24 524/19 524/23
**promising [1]** 523/19
**promoted [1]** 487/1
**promotion [1]** 487/15
**promotions [1]** 493/12
**proof [3]** 500/9 500/12 500/19
**proper [7]** 321/23 393/22 424/17 431/3 431/4 447/12 497/17
**properly [18]** 397/7 417/14 419/12 419/21 420/1 431/7 431/8 431/8 435/20 442/19 442/20 443/17 444/13 473/21 473/22 474/4 474/10 474/21
**proportion [1]** 319/14
**propose [2]** 499/22 503/14
**proposed [3]** 499/7 506/24 525/10
**protocols [4]** 439/15 439/17 455/8 455/10
**provide [5]** 373/23 409/24 417/3 468/22 485/14
**provided [5]** 387/19 410/1 434/7 469/21 469/21
**provides [1]** 320/9
**providing [5]** 320/16 349/12 372/6 372/7 468/23
**Public [1]** 392/20
**publicly [1]** 530/22
**publish [2]** 354/22 437/13
**published [1]** 465/25
**pull [3]** 380/2 380/5 401/11
**pulled [2]** 470/14 508/25

**P**

**punching [2]** 427/4 456/8
**pupil [1]** 486/23
**purposes [10]** 382/25 383/15 403/4 408/15
410/7 412/15 426/2 438/4 455/20 457/23
**pursuant [5]** 519/18 520/3 520/19 522/22
523/1
**pyramid [1]** 347/7

**Q**

**quality [1]** 484/22
**quarter [1]** 457/8
**quarterly [1]** 426/15
**quarters [1]** 451/15
**question [51]**
**question 1 [1]** 527/12
**question 2 [1]** 527/13
**question 4 [1]** 528/3
**question's [1]** 338/5
**questions [15]** 342/4 375/2 389/13 391/21
403/22 408/7 412/6 426/19 428/24 429/7
460/19 476/7 491/20 494/10 496/14
**quick [3]** 342/12 359/20 525/6
**quickly [1]** 375/20
**quote [1]** 517/20
**quoted [1]** 466/7
**quotes [1]** 521/16

**R**

**raid [1]** 470/11
**raise [5]** 391/21 410/21 443/9 494/23 495/3
**raises [6]** 493/14 494/11 494/12 494/15
494/16 496/1
**ran [1]** 356/9
**random [1]** 401/11
**range [7]** 411/24 412/10 414/5 419/10
464/16 465/23 465/25
**rapidly [1]** 520/25
**rate [246]**
**rate's [1]** 361/3
**rates [35]** 392/1 394/2 394/19 394/19 395/13
395/23 395/23 397/9 397/12 397/13 447/7
465/22 465/25 505/22 505/22 505/23 506/7
506/11 506/13 506/16 507/11 507/11 507/12
507/13 507/14 507/16 508/1 508/20
508/21 509/20 509/21 515/13 515/19 515/25
**ratio [1]** 355/3
**rationale [1]** 396/9
**rattling [1]** 399/24
**raw [1]** 416/16
**reach [1]** 480/13
**reached [3]** 440/1 531/24 532/11
**read [14]** 340/10 362/10 394/12 447/16
451/4 467/8 510/15 510/24 516/23 520/2
520/6 521/22 522/9 522/18
**reading [11]** 323/24 325/25 329/21 346/3
391/4 391/22 448/3 448/3 483/14 516/24
518/15
**reads [1]** 516/14
**ready [4]** 317/18 346/5 352/11 398/4
**realize [1]** 451/10
**reasoning [1]** 386/9
**reasons [4]** 321/17 322/7 323/11 352/17
**rebuttal [1]** 496/20
**recall [57]**
**recalled [1]** 389/14
**recap [1]** 318/1
**receipt [1]** 382/21
**receipts [1]** 382/18
**receive [6]** 332/17 335/12 386/8 432/2 482/6
504/14
**received [17]** 373/15 373/17 373/21 394/18
395/13 395/21 395/22 437/11 458/18 470/5
470/10 510/6 512/7 516/8 516/21 519/8
534/15
**receives [13]** 394/16 395/11 503/22 509/4

510/2 510/8 510/12 510/16 510/19 510/21
510/25 511/3 512/10
**receiving [1]** 474/6
**recent [1]** 394/25
**recess [16]** 375/5 375/25 376/3 421/5
421/16 421/23 479/9 479/17 479/21 496/23
499/12 499/15 532/1 532/12 533/10 533/13
**recitation [1]** 516/1
**recited [1]** 404/6
**reckless [2]** 525/22 526/1
**recognize [2]** 434/14 434/17
**recollection [10]** 418/23 435/19 436/11
445/19 446/10 455/23 467/4 467/6 491/3
491/6
**recollection's [1]** 441/21
**recommend [1]** 477/15
**recommendation [10]** 444/7 444/10 444/11
445/2 445/7 468/22 468/23 469/1 469/9
478/12
**recommendations [12]** 373/18 373/20
373/21 439/10 439/13 440/4 440/6 447/3
455/11 459/15 460/11 482/7
**recommended [1]** 475/5
**recommending [1]** 469/2
**record [30]** 317/5 328/25 329/14 329/16
361/24 362/9 375/1 376/6 403/21 404/1
408/6 410/7 410/25 422/4 428/19 460/18
473/10 475/13 480/3 491/10 499/20 505/7
518/20 520/16 520/22 521/5 524/1 525/7
527/24 534/21
**recorded [1]** 315/24
**records [59]**
**recycling [3]** 319/3 380/13 482/18
**redacted [2]** 436/25 473/14
**redactions [1]** 472/14
**redirect [9]** 389/16 389/17 408/9 408/11
476/9 476/10 496/15 534/7 534/10
**reduce [1]** 408/17
**refer [6]** 419/3 439/7 457/17 458/23 519/16
**reference [2]** 436/9 445/16
**referenced [3]** 392/6 445/20 445/22
**references [5]** 436/8 469/8 471/8 482/10
514/6
**referencing [1]** 464/5
**referred [6]** 388/4 435/5 436/5 440/13 446/9
448/16
**referring [5]** 391/6 437/18 458/17 470/23
520/18
**refers [1]** 504/11
**reflect [3]** 516/7 516/19 519/6
**reflected [5]** 328/3 328/5 328/25 387/10
417/13
**reflecting [1]** 475/7
**reflects [1]** 457/24
**refuse [1]** 342/24
**Regina [7]** 332/8 332/18 335/24 343/1
399/13 430/14 534/6
**region [41]** 318/6 319/10 319/24 358/17
365/19 365/22 383/20 414/8 414/19 414/20
414/23 415/8 415/11 415/17 416/9 418/15
419/6 426/4 426/5 427/24 429/16 429/18
429/20 429/25 430/2 430/3 430/4 430/7
455/25 460/14 462/24 463/2 463/3 466/10
466/13 466/15 481/25 482/4 482/6 490/14
490/15
**regional [10]** 318/2 358/16 428/8 429/17
430/4 430/19 462/20 462/23 468/6 496/9
**regions [20]** 372/6 372/20 372/25 414/7
414/8 426/3 426/5 426/6 452/1 456/4 462/17
462/18 462/19 463/4 463/11 463/19 463/21
463/23 468/3 470/8
**regular [52]**
**regularly [8]** 323/4 323/5 351/8 357/16
488/24 516/9 516/21 519/8
**regulation [9]** 323/7 381/25 397/8 477/7
477/14 477/19 478/6 478/13 509/21

**regulations [12]** 380/21 393/19 423/17
423/18 423/19 423/22 424/7 424/8 453/19
454/6 477/2 478/5
**rejected [1]** 391/2
**relationship [3]** 481/22 483/8 490/4
**relative [3]** 322/20 344/10 373/11
**relatively [1]** 351/4
**Relevance [6]** 318/8 318/15 318/25 320/18
365/24 490/9
**reliance [2]** 410/8 501/1
**relied [10]** 423/17 423/18 423/19 423/20
423/21 423/24 423/25 424/9 498/7 528/4
**rely [1]** 425/2
**remain [1]** 520/25
**remainder [1]** 411/20
**remember [38]** 319/6 320/21 320/25 321/19
337/24 338/23 340/4 340/8 340/11 363/24
375/5 405/23 417/23 418/12 421/5 423/13
424/12 429/17 430/15 435/9 438/8 440/2
446/12 457/11 462/12 462/19 463/10 463/25
464/3 467/16 467/19 467/23 469/15 475/3
479/9 489/8 496/3 496/23
**remembering [1]** 432/14
**remove [2]** 519/17 527/19
**removed [3]** 364/15 504/20 530/6
**remuneration [2]** 517/7 517/21
**rendered [1]** 459/3
**renew [1]** 499/2
**repairs [1]** 486/14
**repetitious [1]** 444/24
**rephrase [1]** 494/14
**report [24]** 354/20 354/22 374/13 378/21
382/15 415/15 417/17 434/7 434/8 434/19
435/19 436/5 436/19 436/23 467/3 469/7
469/18 471/8 471/18 472/10 475/16 475/25
476/1 482/8
**reporter [4]** 316/8 316/9 363/19 534/24
**reporting [1]** 355/3
**represent [1]** 439/4
**representative [2]** 417/25 418/8
**request [7]** 343/1 365/14 506/17 507/10
508/13 508/15 529/6
**requested [3]** 372/3 475/17 507/14
**requesting [1]** 417/3
**requests [3]** 347/21 416/24 513/22
**required [12]** 379/1 380/25 381/24 382/1
384/1 417/17 420/9 475/17 479/1 502/17
502/17 513/11
**requirement [4]** 332/22 344/6 478/15
478/16
**requirements [9]** 322/2 339/20 384/13
384/14 404/23 405/3 405/17 477/8 486/18
**research [1]** 424/17
**residential [5]** 370/18 482/15 482/17 482/19
482/20
**resources [3]** 429/19 429/24 432/22
**response [10]** 323/25 327/12 327/21 349/13
356/5 388/16 413/13 433/19 468/25 482/12
**responsibilities [2]** 341/7 495/11
**responsibility [1]** 495/6
**rest [3]** 375/13 375/14 439/24
**rests [2]** 389/23 496/19
**result [1]** 453/6
**resume [2]** 317/7 532/13
**retained [6]** 371/18 412/19 415/20 419/5
438/6 438/7
**retaliated [1]** 359/13
**retention [3]** 412/23 412/25 461/1
**return [1]** 380/8
**revealed [1]** 392/17
**reverse [1]** 464/13
**reversed [1]** 391/1
**review [12]** 322/21 413/23 414/2 433/25
434/1 435/11 435/15 440/19 469/24 470/4
471/23 475/15
**reviewed [18]** 384/23 397/8 414/5 414/13

**R**

**reviewed... [14]**  414/13 415/14 415/16 418/9
424/13 428/2 438/23 438/25 441/2 441/8
456/10 466/15 467/1 469/23
**reviewing [2]**  412/9 455/14
**revised [1]**  434/4
**rewarded [1]**  355/21
**rise [17]**  317/13 375/9 376/1 376/13 390/1
398/7 421/9 421/21 422/12 479/13 479/19
479/23 481/5 497/6 499/13 499/16 533/17
**risks [1]**  486/5
**RMR [2]**  316/8 534/24
**RMR-CRR [1]**  534/24
**road [1]**  362/21
**Rog [1]**  489/25
**ROGER [36]**  315/5 349/6 350/10 356/24
357/20 358/10 359/23 360/9 360/17 361/9
365/5 368/9 368/14 385/16 385/17 385/22
386/18 386/19 387/16 387/17 388/11 483/15
487/3 487/4 487/16 488/8 490/19 490/23
490/25 492/17 492/23 493/17 495/7 495/13
495/20 496/2
**Roger's [5]**  349/2 352/23 491/16 493/3
496/3
**role [3]**  438/21 486/19 487/2
**roll [1]**  482/19
**rolls [2]**  326/24 329/8
**room [5]**  316/10 375/7 389/25 479/11
533/10
**Rosalind [1]**  316/6
**Rosenberg [1]**  316/3
**Rosenthal [1]**  316/2
**rough [2]**  497/8 499/22
**round [1]**  359/7
**rounding [1]**  474/12
**route [54]**
**routes [9]**  340/24 348/25 351/15 351/18
353/24 363/2 363/4 384/8 446/14
**rule [14]**  390/3 390/6 390/8 397/23 398/3
410/6 410/17 474/22 493/11 497/10 497/16
498/25 499/1 499/5
**Rule 50 [10]**  390/3 390/6 390/8 397/23
398/3 497/10 497/16 498/25 499/1 499/5
**ruled [1]**  390/22
**ruling [1]**  390/17
**run-on [1]**  512/12
**runs [1]**  369/12
**Russ [2]**  357/22 489/9
**Russell [8]**  430/9 481/12 483/16 487/21
491/4 530/15 534/3 534/11

**S**

**safety [52]**
**salary [6]**  474/10 477/18 477/20 477/23
477/25 478/7
**sales [3]**  383/22 383/22 383/22
**Salopek [3]**  316/8 534/23 534/24
**sample [3]**  455/14 455/21 455/23
**sampling [1]**  469/23
**sat [2]**  426/22 426/23
**satisfied [1]**  405/18
**satisfy [1]**  404/24
**Saturday [13]**  327/6 327/10 327/23 365/3
387/1 388/21 450/12 450/13 450/14 452/15
452/16 452/16 452/22
**Saturdays [2]**  384/4 443/7
**save [1]**  366/22
**saw [5]**  341/2 356/8 385/6 488/22 488/24
**scale [3]**  370/6 370/10 371/5
**scale's [1]**  353/10
**scenario [1]**  363/4
**schedule [1]**  375/11
**schedulers [1]**  428/13
**scheduling [1]**  480/8
**school [3]**  343/25 344/2 423/12
**scope [12]**  375/17 405/25 406/17 446/2

461/1 463/11 471/5 471/11 471/20 472/1
476/17 478/18
**seat [1]**  399/19
**second [20]**  324/21 392/15 403/1 412/3
443/22 450/24 451/17 454/18 458/7 490/16
494/3 500/1 508/3 508/5 508/6 508/8 509/23
511/20 512/14 519/5
**section [28]**  395/7 395/8 420/23 420/24
423/20 433/24 433/24 434/4 435/19 439/11
439/16 440/4 440/10 440/11 440/14 440/25
441/18 441/20 441/20 457/17 458/15 458/23
502/18 517/5 517/19 520/18 522/22 523/22
**Section 207 [3]**  420/23 420/24 502/18
**Section 3 [1]**  440/4
**Section 7 [4]**  517/19 520/18 522/22 523/22
**Section 778.122 [1]**  395/8
**Section D [1]**  457/17
**Section G [1]**  458/15
**sections [5]**  393/21 394/5 436/25 472/24
473/14
**seek [3]**  371/16 374/1 410/3
**seeking [1]**  413/5
**segment [1]**  433/14
**selection [1]**  372/1
**send [4]**  333/1 417/1 532/1 533/9
**sending [1]**  405/8
**sense [2]**  348/16 530/22
**sentence [29]**  393/21 503/21 503/25 505/18
506/6 506/10 506/14 506/16 508/12 509/7
509/17 509/20 509/24 510/24 511/21 511/23
512/4 512/6 512/11 512/12 512/14 512/17
513/10 515/18 516/18 516/24 519/5 525/15
527/22
**sentences [2]**  516/12 516/23
**September [4]**  361/24 387/23 387/23 388/5
**September 11th [1]**  387/23
**September 14th [1]**  388/5
**September 24th [1]**  387/23
**September 30th [1]**  361/24
**series [3]**  324/21 423/25 428/24
**serve [1]**  336/1
**service [13]**  320/9 320/10 320/14 321/24
321/24 322/15 348/22 348/23 349/12 380/6
390/24 482/18 485/14
**services [18]**  394/17 503/12 503/18 504/2
504/5 505/2 505/9 505/15 505/16 509/4
509/5 509/7 510/5 510/13 510/18 510/19
511/3 512/10
**servicing [1]**  320/11 339/4 347/25
**session [2]**  499/17 532/3
**seven [12]**  370/8 379/12 379/20 414/6 430/3
456/4 457/8 463/10 463/19 463/21 463/23
480/11
**seven a.m [1]**  379/12
**seven-and-a-quarter [1]**  457/8
**sevens [1]**  457/16
**shake [1]**  343/15
**shaker [1]**  487/6
**shall [5]**  516/8 516/20 517/6 517/8 519/7
**Shane [6]**  409/20 409/20 410/20 410/22
411/3 534/8
**she'll [1]**  400/7
**sheet [13]**  325/3 326/2 326/18 329/23
333/15 334/1 334/2 380/3 380/9 380/12
382/14 465/23 465/24
**shift [1]**  426/17
**shifted [1]**  393/17
**shifting [3]**  393/2 393/2 393/11
**shifts [1]**  392/23
**shop [1]**  377/17
**shore [1]**  375/19
**short [1]**  345/6
**shorter [1]**  370/17
**shown [8]**  385/8 386/1 386/6 386/23 387/22
388/1 388/14 504/14
**sic [23]**  328/8 337/23 339/19 342/4 342/24

343/14 343/15 361/23 378/3 387/12 391/4
393/20 394/17 394/20 394/24 416/8 423/23
463/10 517/13 517/20 522/22 523/16 527/9
**sick [10]**  324/10 324/11 324/15 343/24
344/1 344/10 391/10 391/19 403/5 517/9
**side [10]**  344/18 370/6 370/10 371/4 380/6
423/7 425/2 464/8 464/8 507/14
**sidebar [3]**  399/12 409/17 410/19
**sides [1]**  431/22
**signed [4]**  339/23 386/17 471/24 472/3
**simple [5]**  333/11 334/3 334/4 338/5 369/24
**sincere [2]**  354/6 354/6
**single [14]**  320/10 323/7 333/2 335/2 337/23
339/17 339/19 363/9 367/6 379/4 434/22
469/24 470/1 491/4
**singular [1]**  526/9
**site [6]**  416/11 416/12 416/14 416/21 417/2
425/7
**situation [7]**  342/12 344/12 358/19 363/23
383/25 395/2 397/16
**situations [8]**  321/21 342/21 361/23 367/2
368/5 368/6 381/1 396/21
**six-and-a-half [1]**  352/14
**six-day [1]**  391/7
**six-hour [4]**  340/25 341/2 363/5 392/13
**six-month [1]**  380/11
**sixth [1]**  500/9
**skip [1]**  377/12
**slight [1]**  320/6
**slightly [1]**  514/23
**slow [1]**  429/21
**small [1]**  526/13
**smaller [1]**  407/15
**smart [2]**  357/20 492/6
**Snow [1]**  409/23
**so-called [1]**  319/5
**solely [1]**  383/9
**solid [3]**  379/17 384/4 459/9
**sometime [1]**  438/7
**son [1]**  344/1
**sorts [1]**  474/19
**sought [4]**  371/23 373/6 373/12 519/17
**sounds [2]**  420/22 435/9 435/10
**southeast [18]**  358/17 414/19 415/3 415/4
415/5 415/17 416/12 418/15 419/6 427/23
460/14 463/6 463/20 463/23 464/1 464/3
466/9 466/13
**southeastern [1]**  464/4
**SOUTHERN [2]**  315/2 396/17
**southwest [1]**  463/7
**spearheaded [1]**  464/10
**special [2]**  348/18 380/9
**specialists [1]**  416/2
**specialize [1]**  416/1
**specific [24]**  342/3 350/22 359/21 373/13
383/19 383/20 384/1 384/10 416/21 417/4
424/12 430/2 430/3 430/23 433/4 460/9
461/12 463/11 467/16 488/15 494/8 507/13
514/6 526/4
**specifics [1]**  384/18
**speculate [1]**  393/15
**speculation [8]**  319/19 320/3 330/8 331/3
353/2 385/19 445/24 484/7
**speculative [1]**  393/16
**speed [1]**  380/22
**spelling [1]**  410/25
**spend [2]**  349/25 411/19
**spent [11]**  328/10 328/22 331/11 332/1
334/24 334/24 413/16 427/10 430/21 464/12
474/2
**spite [1]**  340/10
**split [2]**  458/9 531/10
**spoke [9]**  394/24 426/7 437/22 461/17
462/10 485/25 488/4 496/1 504/11
**spoken [2]**  461/6 469/10 480/10
**spot [2]**  382/7 421/2

**S**

**spots [1]** 380/12
**spread [1]** 413/18
**spreadsheet [3]** 335/2 345/8 404/16
**spreadsheets [1]** 345/11
**spring [1]** 532/4
**Springs [5]** 364/8 384/3 389/3 389/7 511/16
**stand [3]** 317/7 359/6 480/8
**standard [2]** 382/25 526/25
**Standards [14]** 394/11 397/22 413/5 413/22
420/4 420/8 420/14 430/23 430/25 433/4
501/23 502/18 506/20 525/12
**standby [1]** 396/21
**standpoint [1]** 369/14
**starting [6]** 360/22 361/1 361/2 361/5 361/6
532/16
**starts [4]** 450/11 485/20 513/10 519/2
**state [2]** 410/24 513/8
**stated [3]** 391/3 391/19 435/4
**statement [7]** 355/15 378/5 386/23 387/22
401/12 478/3 507/9
**states [9]** 315/1 315/15 316/9 390/11 393/21
395/8 424/4 424/19 519/4
**station [8]** 364/5 364/7 364/15 365/5 381/9
381/15 382/19 389/1
**stations [1]** 381/16
**statute [7]** 413/6 420/22 453/18 478/24
498/11 517/10 517/17
**statutes [3]** 412/7 412/7 441/14
**stay [2]** 318/13 353/22
**steadily [1]** 520/24
**stenography [1]** 315/24
**step [8]** 389/18 400/3 409/4 449/18 453/10
453/11 479/4 496/17
**steps [1]** 439/19
**stipulated [2]** 528/19 529/12
**stipulation [2]** 529/4 529/5
**stop [9]** 357/18 370/23 380/4 380/24 381/9
381/10 381/12 474/11 474/13
**stops [1]** 380/1
**story [2]** 429/3 429/7
**Stovash [1]** 316/6
**straight [3]** 454/3 478/7 515/1
**street [4]** 348/5 348/10 380/7 381/2
**streets [1]** 378/14
**strictly [2]** 355/20 367/20
**strive [1]** 351/16
**structure [2]** 418/19 469/15
**structures [1]** 383/21
**struggling [1]** 356/9
**stub [3]** 330/25 384/23 418/1
**stubs [4]** 384/21 418/2 425/13 425/14
**stuck [2]** 529/14 529/21
**student [1]** 423/12
**stuff [5]** 365/17 374/7 399/4 416/16 484/24
**style [4]** 470/11 530/4 530/7 530/15
**subject [2]** 389/14 409/22
**submit [1]** 334/23
**submitted [4]** 321/4 322/12 332/6 345/9
**Subsection [4]** 517/4 519/22 523/3 524/14
**Subsection B [1]** 523/3
**Subsection C [1]** 524/14
**Subsection E [2]** 517/4 519/22
**subsequent [1]** 460/3
**subsidiary [1]** 481/24
**substance [1]** 473/12
**substand [1]** 416/8
**substantial [1]** 412/17
**substantially [1]** 466/8
**successive [1]** 443/7
**sued [5]** 483/5 529/12 530/5 530/10 530/11
**sufficient [1]** 397/22
**suggested [5]** 443/18 444/4 444/5 494/16
516/18
**suggesting [5]** 504/4 509/22 510/14 512/21
519/24

**suggestion [1]** 447/6
**sum [8]** 394/13 395/9 396/25 509/1 509/18
510/3 510/16 510/25
**summarized [2]** 439/11 448/8
**summary [7]** 390/9 392/8 392/15 392/16
439/9 440/3 518/25
**sums [3]** 394/18 395/12 396/23
**Sunday [12]** 329/24 330/18 387/1 388/18
388/23 450/11 450/13 450/14 451/12 452/14
452/15 452/16
**Sundays [1]** 489/7
**supervisor [19]** 332/15 335/2 342/15 342/21
346/18 348/14 350/7 358/20 374/13 380/25
381/1 428/23 471/18 485/15 486/20 487/5
487/16 491/14 491/15
**supervisors [7]** 344/14 358/6 359/8 415/11
427/9 428/8 429/5
**supervisory [1]** 428/17
**supplemental [1]** 419/3
**supports [1]** 511/14
**Supreme [15]** 390/11 390/21 391/1 391/2
423/25 424/2 424/4 424/20 424/22 424/24
453/18 454/6 487/14 519/4 521/9
**surcharge [1]** 397/2
**surcharges [1]** 396/20
**surprise [2]** 344/20 488/1
**surprised [5]** 339/12 432/12 484/19 492/17
492/19 492/23
**surprising [1]** 427/15
**suspended [1]** 484/1
**sustain [20]** 319/20 320/19 331/22 366/12
373/9 403/11 406/1 420/16 421/1 427/18
435/24 438/1 444/24 459/17 459/24 471/6
471/12 471/21 484/8 490/10
**swing [1]** 495/6
**swipe [1]** 377/4
**SWORN [1]** 410/22
**synonymous [2]** 525/17 525/23
**synthesizing [1]** 433/15
**system [2]** 405/8 405/19
**systems [1]** 377/25

**T**

**table [8]** 399/2 418/5 433/3 434/23 439/5
439/24 440/13 455/6
**tables [1]** 532/24
**take [25]** 329/23 346/2 354/9 363/19 375/5
397/3 397/5 402/9 413/12 421/2 433/12
434/25 439/19 441/18 453/6 454/17 479/9
480/9 486/1 495/13 499/11 514/11 519/24
521/12 530/14
**taken [18]** 321/4 321/21 322/10 322/16
322/25 323/14 325/7 326/5 376/3 399/6
421/23 479/21 496/6 498/1 499/15 514/7
514/9 524/18
**takes [3]** 338/22 363/11 383/4
**talent [1]** 487/17
**talk [21]** 340/3 343/15 345/14 354/11 355/6
358/4 361/19 361/20 364/23 365/4 383/17
400/7 414/9 417/18 454/3 461/9 461/14
488/6 489/3 506/7 506/11
**talked [36]** 318/21 321/1 321/17 321/23
331/8 336/10 336/23 336/23 338/21 340/4
355/9 367/1 376/22 376/23 378/8 378/9
378/23 382/2 383/8 397/2 423/6 427/7 427/8
427/22 437/17 439/20 446/7 454/6 461/10
461/10 461/11 469/20 476/18 477/2 487/4
488/14
**talker [1]** 487/6
**talking [22]** 321/2 321/16 337/3 356/17
356/18 362/3 363/20 368/5 368/6 370/9
427/11 429/5 431/20 440/23 448/3 450/4
457/19 462/17 470/22 507/15 513/13 515/17
**talks [4]** 441/21 506/6 506/11 515/18
**target [1]** 416/15
**targeting [1]** 416/21

**task [28]** 328/16 328/19 328/22 329/3 329/4
329/5 329/6 331/11 332/1 333/11 334/24
335/10 336/2 341/14 342/9 342/11 342/12
342/14 342/22 342/24 343/18 344/13 353/16
364/20 365/13 374/3 388/8 498/5
**tasks [6]** 335/10 335/10 341/7 360/10 506/2
507/20
**taught [3]** 404/19 404/20 427/12
**teacher [2]** 486/23 487/18
**teaching [2]** 486/23 486/24
**team [11]** 428/12 428/14 428/15 429/12
433/1 433/2 438/13 438/16 438/17 438/21
490/25
**technically [2]** 356/15 505/13
**telephone [2]** 389/3 489/20
**tell [30]** 322/24 324/3 326/19 327/17 327/20
327/25 328/9 328/22 331/10 342/2 357/7
359/6 359/8 372/24 420/13 423/17 442/5
443/14 447/14 449/18 450/8 450/9 467/1
467/21 487/20 495/4 495/16 495/23 532/2
532/12
**telling [2]** 429/3 507/11
**ten-hour [1]** 514/12
**ten-minute [2]** 375/5 479/9
**tend [1]** 341/16
**tender [1]** 473/24
**tenth [1]** 446/14
**tenure [2]** 488/16 490/19
**term [8]** 328/16 328/17 328/18 328/21 419/2
469/8
**terminated [1]** 359/13 484/1
**termination [1]** 347/2
**terms [8]** 329/15 338/5 343/17 413/15 416/8
424/10 424/10 426/21
**Terry [2]** 317/3 400/10
**testified [18]** 321/7 327/5 357/15 364/3
365/16 370/16 399/23 405/7 438/5 441/9
461/2 463/13 483/7 483/21 485/2 492/16
493/23 496/3
**testify [14]** 356/24 410/3 410/14 421/11
421/14 461/3 461/4 461/5 484/4 487/23
490/7 492/11 521/15 530/5
**testifying [3]** 409/25 441/4 449/10
**testimony [44]** 318/3 321/10 323/3 327/8
338/23 340/10 340/16 341/6 349/2 352/23
357/3 363/19 363/24 364/21 369/8 375/15
387/2 404/7 410/2 446/6 461/7 461/15 462/6
467/9 480/20 482/3 482/11 482/21 483/18
483/23 485/25 486/2 486/17 490/5 493/17
496/3 497/18 506/1 511/15 521/10 521/13
524/5 524/6 528/22
**testing [1]** 416/6
**text [8]** 365/11 436/9 489/4 489/5 489/6
489/13 489/17 489/19
**texts [1]** 489/8
**thank [35]** 317/21 345/23 375/3 376/19
389/11 389/18 389/19 392/21 397/25 399/20
400/13 401/9 408/10 409/4 409/5 410/18
422/18 424/5 437/15 451/5 452/20 479/3
479/4 479/6 481/15 481/17 487/22 491/20
496/16 496/17 515/8 523/7 528/11 533/15
533/16
**theoretically [2]** 456/22 456/25
**There'd [1]** 489/12
**thereafter [1]** 504/10
**thereby [2]** 523/12 523/18
**they'd [6]** 377/3 377/4 377/4 377/5 380/25
382/16
**think [125]**
**thorough [2]** 439/20 456/5
**thought [23]** 325/11 344/14 360/17 360/22
361/9 421/13 427/14 433/16 455/9 455/10
463/23 473/17 484/5 484/22 485/1 487/4
489/17 490/4 493/17 493/18 495/2 512/6
522/12
**thousand [3]** 413/17 450/20 464/17

**T**

three-and-a-half [1] 388/12
Thursday [3] 370/20 370/25 452/16
Thus [2] 523/9 523/16
ticket [3] 333/19 333/25 382/20
tie [1] 515/14
till [3] 485/9 532/2 532/3
time [177]
time-and-a-half [1] 515/4
times [16] 392/4 412/5 438/24 448/10
  448/10 450/1 450/5 452/2 452/2 453/7
  453/12 453/13 454/12 457/5 474/12 488/21
Tingley [29] 316/5 316/6 319/21 376/18
  398/12 421/2 422/17 437/16 462/10 479/15
  481/10 481/16 492/16 496/1 496/18 509/11
  514/16 515/21 517/2 521/18 531/5 531/7
  531/19 534/4 534/6 534/7 534/9 534/10
  534/11
tire [1] 377/21
tires [2] 377/7 377/18
title [8] 337/17 428/10 429/18 462/13 467/16
  467/19 495/4 505/24
titled [1] 434/24
titles [4] 467/23 468/1 468/3 468/5
top [12] 356/4 406/23 412/25 414/17 415/16
  417/15 429/18 441/9 464/8 473/19 475/3
  527/16
topic [3] 488/8 488/13 488/14
topical [1] 470/13
total [26] 394/20 395/14 395/21 395/22
  395/22 395/24 402/3 402/20 402/22 406/4
  406/7 406/14 408/13 408/13 408/19 442/11
  447/23 447/25 448/6 448/7 448/9 449/21
  451/9 451/9 452/21 452/25
totalled [1] 451/16
totalling [2] 394/18 395/12
touch [4] 349/14 354/12 361/21 371/15
tougher [2] 351/10 351/12
towards [2] 403/6 489/14
track [2] 509/16 509/18
tracks [2] 504/2 509/20
train [1] 494/6
training [3] 342/20 485/7 494/9
trains [1] 495/8
transcript [3] 315/13 315/24 534/20
transfer [5] 364/4 364/7 364/15 365/5 389/1
transmitted [1] 334/18
Transportation [2] 381/21 381/25
trash [15] 352/6 353/7 359/18 379/15
  379/17 379/23 380/2 380/5 387/6 484/18
  485/17 485/18 486/1 486/5 486/7
travel [2] 474/20 474/21
treat [1] 359/8
treated [2] 427/9 446/24
tremendous [1] 377/23
trial [8] 315/13 355/8 393/1 461/15 493/20
  508/18 529/2 530/12
trip [9] 323/5 323/8 348/18 362/25 377/1
  377/11 377/15 379/2 381/20
tripping [1] 484/20
trips [2] 395/5 395/19
trouble [1] 364/13
truck [46]
truckdriver [2] 482/18 482/19
trucks [14] 339/16 352/10 355/16 355/16
  355/17 359/18 427/4 427/5 427/6 446/12
  485/21 486/5 486/10 494/4
true [2] 429/7 436/22
truth [1] 432/5
Tuesday [1] 452/15
turning [9] 387/9 438/12 439/4 441/17
  447/10 450/7 455/6 457/17 458/14
turnover [5] 351/17 354/13 354/15 354/16
  354/17
twice [1] 370/19
two-part [1] 382/15

two-week [4] 442/24 443/20 468/20 469/9
typically [3] 379/19 411/15 424/22
typographical [1] 526/14

**U**

U.S [2] 464/3 464/4
U.S. [3] 420/23 423/23 521/9
U.S. Supreme [1] 521/9
U.S.C. [4] 502/25 517/4 519/22 520/19
uhm [24] 339/5 383/25 399/1 402/20 412/20
  414/5 425/4 427/14 430/15 430/21 432/6
  433/13 445/4 449/22 451/19 452/15 453/10
  462/19 474/24 492/5 497/12 508/9 515/11
  529/12
ultimate [7] 409/24 410/3 435/23 436/4
  437/8 443/5 448/18
Um [5] 343/4 365/2 369/17 369/21 407/7
Um-hum [5] 343/4 365/2 369/17 369/21
  407/7
undefined [1] 505/5
underneath [1] 401/5
understand [14] 333/8 336/3 365/21 385/18
  387/18 399/16 451/8 472/9 472/17 481/13
  492/3 498/14 507/23 515/3
understanding [17] 388/20 421/15 428/18
  436/16 441/2 445/17 446/4 459/4 477/9
  478/4 478/6 478/22 478/22 487/24 502/17
  502/21 508/22
understood [1] 431/1
undisputed [2] 498/3 513/16
unearned [2] 391/10 391/18
unexpected [1] 353/5
unfamiliar [1] 386/9
Unfortunately [2] 375/16 466/17
unique [2] 383/19 383/20
UNITED [7] 315/1 315/15 316/9 390/11
  424/4 424/19 519/3
units [1] 482/18
unless [3] 372/3 399/7 470/11
unlike [2] 477/19 498/12
unlikely [1] 357/10
unpaid [2] 392/16 492/13
unreasonable [1] 470/2
unredacted [2] 472/7 475/24
untrustworthy [4] 392/23 393/5 393/14
  393/14
ups [1] 483/22
upsets [1] 369/20
us [22] 320/24 331/18 336/5 336/6 339/20
  340/7 341/15 345/2 351/6 353/19 358/11
  360/17 367/15 368/17 398/21 417/1 417/3
  424/23 462/6 467/1 470/2 472/21
USA [5] 462/15 469/14 469/17 469/18
  481/23
usage [1] 525/16
useful [1] 391/3

**V**

v. [1] 516/25
valid [2] 391/25 528/5
validate [1] 410/3
validity [1] 391/21
valuable [3] 360/17 361/10 361/12
varies [2] 351/3 411/17
variety [1] 352/17
vast [1] 320/5
vehicle [17] 321/23 323/8 377/6 377/8
  377/23 377/25 378/1 378/12 378/12 378/15
  378/21 378/22 379/3 379/7 382/1 382/5
  382/14
vehicles [1] 361/16
verbal [5] 335/14 346/15 346/15 346/17
  346/23
verbally [1] 357/1
verbiage [2] 512/9 522/18
verdict [17] 497/8 501/14 501/17 526/21

527/5 527/23 528/1 528/12 528/17 529/17
  529/24 530/1 530/7 530/17 531/24 532/11
  533/10
verify [1] 380/12
versus [1] 331/12
via [1] 489/19
vice [7] 318/3 358/16 428/8 429/17 431/25
  468/6 496/9
view [3] 333/23 384/20 410/14
Viewing [1] 398/1
virtue [1] 504/20
visible [3] 377/7 378/13 382/2
visited [4] 414/23 462/21 466/14 466/17
visits [2] 425/7 460/3
vitally [1] 378/3
VOLUME [1] 315/17
voluminous [1] 455/23
voluntarily [2] 528/24 529/7
VP [1] 432/21
VPs [1] 432/8
vs. [4] 390/13 392/20 396/15 483/15
VUE [1] 316/7

**W**

wage [26] 412/5 412/5 413/3 413/4 413/23
  416/7 417/4 419/7 420/5 420/9 431/5 433/13
  434/3 439/1 441/13 441/23 457/2 457/4
  457/7 462/5 464/7 464/19 472/5 474/7 474/7
  512/1
wages [13] 395/20 395/22 406/11 432/11
  432/13 433/5 447/18 447/21 448/9 448/16
  452/8 472/12 492/13
wait [3] 379/13 402/9 451/25
waiting [1] 374/7
waive [1] 511/8
walk [1] 485/11
walking [1] 401/15
wall [1] 343/9
warning [5] 346/15 346/15 531/12 531/17
  531/19
warnings [1] 346/23
waste [104]
Waste Pro [93]
Waste Pro USA [2] 462/15 469/17
Waste Pro's [4] 388/24 392/2 455/15 471/2
watched [3] 414/14 427/1 427/5
watching [1] 417/9
we'd [3] 416/17 416/17 522/1
WEDNESDAY [4] 317/1 388/4 422/1 452/15
week [61]
weekend [1] 370/22
weekends [1] 384/8
weekly [47]
weeks [12] 324/18 351/4 351/5 387/19
  390/21 403/17 433/17 443/25 445/6 445/10
  445/11 445/14
weigh [3] 369/2 369/4 369/13
weighed [1] 405/23
weighs [1] 370/2
welcome [1] 533/3
west [1] 462/24
wheel [2] 356/10 377/24
whenever [1] 518/14
where's [1] 523/2
wherever [1] 401/5
whited [1] 393/6
who's [6] 369/22 411/25 416/5 485/7 530/25
  531/3
wide [5] 411/24 442/6 469/4 469/11 469/12
willfulness [1] 501/6
William [1] 315/14
withheld [1] 407/8
witness [257] 375/3 389/20 389/22 398/13
  403/23 409/6 409/7 409/8 409/14 409/15
  409/16 409/19 410/22 434/10 460/20 476/7
  479/7 481/11 515/13 534/2 534/5



**W**

**witnesses [4]** 375/18 375/19 479/15 534/1
**woman's [1]** 350/22
**wonky [1]** 354/18
**word [10]** 337/24 373/17 438/24 471/13
521/21 523/2 523/23 524/22 525/16 526/14
**worded [1]** 503/18
**words [5]** 337/7 361/11 508/16 511/25
525/17
**work [93]**
**work-related [1]** 489/8
**workday [7]** 474/22 514/8 514/10 514/11
514/13 515/5 515/6
**worked [69]**
**worker [2]** 357/20 484/17
**worker's [1]** 413/2
**working [18]** 339/11 348/19 351/6 378/12
382/4 386/8 394/2 397/9 397/11 419/17
438/19 456/23 456/23 467/4 467/6 474/17
484/11 484/15
**works [7]** 333/11 351/15 392/7 504/1 510/17
511/1 512/2
**workweek [55]**
**workweek's [1]** 444/20
**workweeks [12]** 391/7 395/19 442/19
443/25 444/1 444/13 444/21 449/5 449/16
450/12 450/13 455/4
**world [2]** 359/7 367/14
**worse [1]** 358/6
**worth [1]** 353/5
**WPD [1]** 315/4
**write [7]** 323/8 400/4 404/15 404/18 405/10
483/22 485/11
**write-ups [1]** 483/22
**writing [11]** 330/13 425/6 475/2 475/6 475/6
475/9 476/14 477/14 477/16 478/12 478/25
**written [21]** 331/20 333/6 334/7 334/12
334/13 334/14 336/20 336/21 338/18 346/14
346/15 350/14 350/15 360/4 384/12 404/16
406/24 417/21 484/1 512/14 512/16
**wrong [6]** 354/19 354/23 367/17 386/5
444/6 469/5
**wrote [7]** 347/17 349/6 350/12 406/4 409/21
416/25 469/18

**Y**

**yard [6]** 332/5 347/12 347/14 486/7 486/8
486/16
**you'd [4]** 454/20 477/24 489/22 494/14

**Z**

**zoom [2]** 327/13 452/19
**zoomed [1]** 451/14